**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| ELMER CAMPBELL, *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION NO. C-1-01-527 |
| | ) | |
| v. | ) | JUDGE: BECKWITH |
| | ) | MAGISTRATE JUDGE: HOGAN |
| INTERNATIONAL PAPER, | ) | |
| SUN CAPITAL PARTNERS, INC., | ) | |
| SMART PAPERS, | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |

**<u>DEFENDANT SMART PAPERS' MEMORANDUM OF LAW</u>**
**<u>IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

Stanley F. Lechner
Margery Sinder Friedman
Laine S. Posel
Of Counsel
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC  20004
Telephone:  202.739.3000
Facsimile:  202.739.3001

Date:  September 30, 2003

Robert J. Hollingsworth (0024559)
CORS & BASSETT, LLC
537 East Pete Rose Way
Suite 400
Cincinnati, Ohio 45202
Telephone: 513.852.8200
Facsimile:  513.852.8222

Counsel For Defendant
Smart Papers LLC

**CONTENTS / SUMMARY**
**(Per Local Rule 7.2(a)(3))**
<u>**Main Sections Of The Memorandum**</u>

**STATEMENT OF UNDISPUTED FACTS**

<u>Page</u>

**Changes Affecting the Paper Industry And The Hamilton B Street Mill** ............   3

In this section, we summarize the relevant history of the Hamilton Mill, its unprofitability, and its ongoing struggle for survival under three different owners in the past three years – Champion International, International Papers ("IP"), and now Smart Papers.

**Creation of Smart Papers and Attempts To Save The Business** ...........................   4

Smart Papers is a newly created company owned by private investors who are attempting to turn around an underperforming business to enable it to become an economically viable stand-alone entity.  To save the business and preserve jobs for nearly 600 employees, Smart Papers established new terms and conditions of employment and is operating the Mill with about 200 fewer employees than had worked for IP.

**The Weissman Group And The Hiring Process** ......................................................   6

The Weissman Group is a professional human resources consulting firm that was hired by Smart Papers to hire Smart Papers' initial workforce at the Hamilton Mill in February 2001.  Each former IP employee who wanted a job with Smart Papers was required to fill out a job application, participate in a one-on-one interview with the Weissman Group, participate in mandatory drug testing, and authorize his managers and supervisors from IP to discuss with the Weissman Group the applicant's job performance and suitability for employment with Smart Papers. Based on this process, and especially the evaluations and comments and recommendations from the IP supervisors and managers, the Weissman Group made hiring recommendations to Smart Papers, and these recommendations were followed by Smart Papers without exception.

**Nondiscriminatory Hiring Decisions** ........................................................... 11

The Weissman Group and Smart Papers made its hiring decisions relying heavily on the recommendations from the IP supervisors and managers at the Mill, and relying on the supervisors' evaluation of the applicant's work record, safety awareness, customer orientation, problem solving ability, dependability, flexibility, etc. Neither age nor an applicant's alleged disability status was taken into consideration. The results of this hiring process reveal no adverse impact based on age. In fact, the oldest job applicants had the highest job offer rate of any age group. As shown below, 72.6% of applicants age 40 and over received job offers, compared to 67.3% of applicants under age 40. Moreover, applicants ages 60-65 and 55-59 had the highest selection rates of any age group:

| Age Range | Number of Applicants | Number Selected | Selection Rate By Age Group |
|---|---|---|---|
| 60-65 | 34 | 27 | 79.4% |
| 55-59 | 86 | 68 | 79.0% |
| 50-54 | 164 | 117 | 71.3% |
| 45-49 | 166 | 120 | 72.3% |
| Total 40 and over | 522 | 379 | 72.6% |
| 39 and under | 46 | 31 | 67.3% |
| Total | 568 | 410 | 72.2% |

**Placement Of New Hires Into Positions** .................................................... 12

Once hiring decision were made on job applicants, Smart Papers placed them into positions. Generally, new hires were placed into the jobs they had previously performed at IP. If no such positions were available, Smart Papers would place them into a position for which they had been trained or for which they were considered to be qualified.

**NLRB Discrimination Charge And Dismissal Thereof** ......................................... 13

Shortly after the hiring decisions were made, 20 members and officials of PACE Local Union 5-1967 who did not receive offers – including 7 Plaintiffs in this case – filed charges against Smart Papers with the NLRB, alleging unlawful discrimination on the basis of union affiliation. After an investigation, the NLRB dismissed all of the charges, concluding that Smart Papers used legitimate nondiscriminatory hiring criteria in making its employment decisions.

**The Angel Litigation For Severance Pay** ................................................................. **14**

> In July 2001, 115 hourly employees who formerly worked for IP at the Hamilton Mill sued the PACE Union, IP, and Smart Papers, seeking severance pay.  In contrast to the 72 Plaintiffs in this case who are claiming age discrimination by being denied job offers by Smart Papers, these 115 Plaintiffs are claiming age discrimination by Smart Papers because they were offered jobs by Smart Papers and thus denied severance.  In other words, former hourly employees at the Mill have asserted totally inconsistent allegations against Smart Papers.

**The Extensive Discovery Process In This Case** ....................................................... **15**

> Plaintiffs were provided considerable time by the Court to conduct discovery, over a period of 18 months.  Plaintiffs served interrogatories and document requests and conducted 48 depositions.  Defendants served interrogatories and document requests and deposed 66 of the Plaintiffs.

## ARGUMENT

**I.    The Claims Of 6 Plaintiffs Should Be Dismissed Under Rule 37 For Failure To Prosecute** ......................................................................................... **18**

> Six Plaintiffs failed to respond to interrogatories and document requests and failed to attend their noticed depositions.  Their claims should be dismissed under Fed. R. Civ. P. 37(d).

**II.   The Age Discrimination Claims By 64 Plaintiffs Who Were Not Hired Cannot Survive Summary Judgment** ............................................................. **19**

A.    The 18 Plaintiffs who failed their drug test cannot establish a *prima facie* case of discrimination under <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973) .................................................... **22**

B.    The remaining 46 Plaintiffs who were not hired were denied employment for legitimate nondiscriminatory reasons – primarily because their former IP supervisors and mangers at the Mill did not recommend them for employment with Smart Papers.  <u>See, e.g.</u>, <u>Hill v. Metropolitan Gov't of Nashville</u>, 2002 WL 31863829 (6th Cir. Dec. 17, 2002) ...................................................................... **28**

> C.    Smart Papers was entitled to rely on the references provided by the IP supervisors and managers, and there is no evidence that Smart Papers' reasons for its hiring decisions are a pretext for intentional age discrimination.  To the contrary, it is well-established that Plaintiffs may not establish pretext by second-guessing the wisdom or soundness of Smart Papers' personnel

decisions.  See, e.g., McDonald v. Union Camp Corp., 898 F.2d
1155, 1160 (6th Cir. 1990) ..................................................................  33

III.  **The Age Discrimination Claims of 6 Plaintiffs Who Were Offered
Employment By Smart Papers Are Insufficient To Withstand Summary
Judgment** .........................................................................................  38

The claims of these 6 Plaintiffs, who were offered employment with
Smart Papers, are inconsistent with the claims of the 64 Plaintiffs who
were not offered employment.  In addition, the claims of these Plaintiffs
are meritless because 2 of them were offered higher-paying jobs than the
jobs they wanted, 3 did not want to receive a job offer from Smart Papers
because they wanted severance pay, and 1 was promoted to a higher-
level job within weeks of her hire.

IV.  **The Claims Of Disability Discrimination By 13 Of The Plaintiffs Fail
As A Matter of Law** .......................................................................  41

The disability claim of these 13 Plaintiffs fail because they either cannot
establish a necessary element of their *prima facie* case, or they cannot
rebut the nondiscriminatory reasons articulated by Smart Papers for its
actions.  Among other things, 3 of the Plaintiffs admitted they were not
disabled, 3 failed the drug test, 2 received job offers, and 5 received
negative references from IP managers and supervisors.  In addition,
several of these Plaintiffs cannot establish they are "disabled" under
applicable law, or that Smart Papers' knew or should have known of
their alleged disability.  See, e.g., Monette v. EDS Corp., 90 F.3d 1173
(6th Cir. 1996).

V.  **Plaintiffs' Defamation Claims Against Smart Papers, Which Appear To
Be Filed On Behalf Of All 72 Plaintiffs, Cannot Be Sustained As They
Are Wholly Without Proof** ..............................................................  57

Plaintiffs' defamation claims are directed against defendant IP, which
provided negative references for most of the Plaintiffs, and do not appear
to be directed at Smart Papers, which merely was the recipient of the
references.  To the extent these claims are directed against Smart Papers,
however, they fail for numerous reasons:  Plaintiffs signed an
Authorization/Release expressly authorizing Smart Papers to receive the
references; Plaintiffs have not identified any specific false and
defamatory statements of fact made and published by Smart Papers
against them; and Plaintiffs have offered no proof that Smart Papers
acted with fault or that they were injured by any defamatory statements
made by Smart Papers.  See, e.g., Celebreeze v. Dayton Newspapers,
Inc., 41 Ohio App. 3d 343 (Chuyahoga 1988).

## INDIVIDUAL PLAINTIFFS' APPENDIX ("SP APPENDIX")

After our legal discussion, Smart Papers submits an Individual Plaintiffs' Appendix that briefly discusses in a few pages particularized facts and legal argument on each of the 72 Plaintiffs individually.  This appendix, which is labeled "SP Appendix," has Tabs 1-72, which correspond to each of the 72 Plaintiffs, in alphabetical order.  The electronic version of the SP Appendix is in narrative form and has been sent to the Court and the parties electronically.  The "hard copy" of the SP Appendix, which is also being sent to the Court and the parties, includes both the narratives and several pages of exhibits pertaining to each Plaintiff.  In general, the SP Appendix for each Plaintiff contains the relevant nondiscriminatory factors that were relied upon by Smart Papers in making its employment decisions for each Plaintiffs.

For example, the SP Appendix for a "typical Plaintiff" notes whether the IP supervisor or manager recommended the Plaintiff for employment with Smart Papers.  If the IP reference did not recommend the Plaintiff, which is typically the case, the SP Appendix will summarize some of the negative comments from the reference that were recorded by the Weissman Group for each such Plaintiff, such as:

- "below average" in willingness and ability to learn
- "doesn't stay on his job"
- "has had some quality issues"
- "interferes with [his co-workers] by going over and talking"
- is an "instigator," "stirs things up," and "is argumentative"
- has "no ability to communicate"

In addition, if the individual Plaintiff was not recommended by a IP supervisor and claims that the recommendation was because of age discrimination, we set forth in a chart the ages of some of the other applicants that the supervisor did recommend, including applicants about the same age or older than the Plaintiff.  This demonstrates that the IP supervisors did not discriminate on the basis of age in making their hiring recommendations to Smart Papers.

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| ELMER CAMPBELL, *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION NO. C-1-01-527 |
| | ) | |
| v. | ) | JUDGE: BECKWITH |
| | ) | MAGISTRATE JUDGE:  HOGAN |
| INTERNATIONAL PAPER, | ) | |
| SUN CAPITAL PARTNERS, INC., | ) | |
| SMART PAPERS, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**DEFENDANT SMART PAPERS' MEMORANDUM OF LAW IN SUPPORT OF ITS**
**MOTION FOR SUMMARY JUDGMENT**

Defendant Smart Papers, LLC ("Smart Papers"), pursuant to Rule 56 of the Federal Rules of Civil Procedure, and Local Rule 7.2, submits this Memorandum of Law in support of its Motion for Summary Judgment as to all of Plaintiffs' claims.

**PRIOR DECISION**

This case arises out of the sale of the Hamilton B Street Paper Mill in Hamilton, Ohio from International Paper ("IP") to Smart Papers in February 2001.  It involves 72 former hourly employees of IP at the Hamilton Mill who are asserting various employment-related claims against IP, Sun Capital Partners, Inc., and Smart Papers.  In a decision dated March 25, 2003, this Court granted in part Defendants' motions to dismiss, and dismissed with prejudice Plaintiffs' claims under ERISA (Count V) and their alleged violations of Ohio public policy (Court X).  By this Motion, Smart Papers is moving for Summary Judgment on the remaining claims against it, namely Counts I, II, III, and IV (alleged age discrimination under federal and state law), Counts VII and VIII (alleged disability discrimination under federal and state law), and Count IX (alleged defamation).

## STATEMENT OF UNDISPUTED FACTS

1.       Plaintiffs' Complaint arises out of the sale of the Hamilton B Street Paper Mill ("the Mill") in Hamilton, Ohio from International Paper Company ("IP") to Smart Papers, LLC ("Smart Papers") on February 9, 2001.  (Fifth Amended Complaint ("Complaint") ¶ 7).  In January 2001, IP informed its employees that it would be selling substantially all of the assets of the Mill to Smart Papers, and that IP would be terminating all of its employees immediately prior to the sale.  (Complaint ¶¶ 7, 84-85, and 87).  In order to be considered for employment at the Mill with Smart Papers, former IP employees were required to apply for employment with Smart Papers.  (Complaint ¶ 84).

## Overview Of Plaintiffs' Claims

2.       On or about February 10 and 11, 2001, Smart Papers extended offers of employment for 410 hourly positions, which constituted approximately 72% of the hourly job applicants.  (SP Exh. 1 (Maheu Declaration) ¶ 11.)[1/]  158 applicants for hourly jobs did not receive offers of employment from Smart Papers.  (Id.)  Of those 158 who did not receive job offers, 64 filed this lawsuit against International Paper, Sun Capital Partners, and Smart Papers alleging, among other things, defamation and age discrimination.  In addition, 2 plaintiffs who actually received job offers have sued, erroneously alleging that they did not receive job offers; and 6 other plaintiffs who received job offers have sued, alleging that they were discriminated against on the basis of age and disability because they were not offered the exact positions that they desired.  A total of 13 Plaintiffs are alleging disability discrimination, and all 72 are alleging defamation.

---

[1/]       "SP Exh. 1" refers to the Exhibit Book Submitted by Defendant Smart Papers In Support of Its Motion for Summary Judgment.

## Changes Affecting The Paper Industry And The Hamilton B Street Mill

3.      The Hamilton B Street Paper Mill was opened on April 15, 1894 in Hamilton, Ohio and was owned and operated by Champion International Corporation for 106 years – from 1894 to 2000. The Hamilton Mill under Champion International engaged in the manufacture of certain premium cast-coated and uncoated papers. Over the past ten years, however, both the paper industry in general and the Hamilton Mill in specific have experienced substantial changes. (SP Exh. 1 ¶¶ 4, 5.)

4.      The paper industry has experienced in recent years a number of mergers, consolidations, plant closures and layoffs. The industry currently is experiencing, for the third consecutive year, overcapacity, weak demand, falling prices, and a weak economy. Competition is intense from both domestic and foreign sources. Thousands of employees in the paper industry have been laid off in the last few years. In addition, a number of paper mills in the Midwest have closed or substantially cut back production including Crystal Tissue, Middletown Paper Board, Sorg Paper, Menasha, MeadWestvaco Corporation, Potlatch Corporation, and International Paper. (SP Exh. 1 ¶ 4.)

5.      The Hamilton B Street Mill has not been immune from this industry-wide upheaval. The Hamilton Mill has experienced substantial changes in the past ten years, including restructurings, downsizings, an acquisition by International Paper in June 2000, and a sale to Smart Papers in February 2001. Currently, Smart Papers is operating the mill and struggling to survive as a stand-alone company competing with industrial giants. (SP Exh. 1 ¶¶ 5, 7.)

6.      Daniel Maheu currently is the Chief Operating Officer for Smart Papers. A graduate of Cornell University, Mr. Maheu has worked in the paper industry for over 25 years.

When he first came to the Hamilton Mill as Mill Manager in 1992, his principal assignment with Champion was to turn the Mill into a profitable operation. Over the next several years, the Mill was restructured, discontinued unprofitable products, ceased doing business with certain customers and accounts, and downsized the workforce. These efforts, however, were only moderately successful. The Hamilton Mill under Champion International continued to perform below expectations throughout the decade of the 1990s. (SP Exh. 1 ¶¶ 1, 3, 6.)

7.      By the late 1990s, Champion International was attempting to sell the Hamilton Mill, but no acceptable buyer was found at the time. Eventually, in June of 2000, all of Champion International (including but not limited to the Hamilton Mill) was acquired by International Paper Company, the largest paper company in the United States with annual sales exceeding $25 billion. The Hamilton Mill, however, was not profitable for International Paper either, and in 2001 was losing over $1 million per month. International Paper expressed a desire to sell the Hamilton Mill shortly after its acquisition. International Paper operated the Hamilton Mill for only about seven months, selling it to a newly formed company, Smart Papers, LLC in February 2001. (SP Exh. 1 ¶ 7.)

### Creation of Smart Papers and Attempts to Save the Business

8.      Smart Papers LLC is a limited liability company that was incorporated on December 12, 2000 for the purpose of acquiring, owning, and operating the Hamilton Mill. Smart Papers is a stand-alone company that is wholly owned by Sun Premium Paper Partners, L.P., based in Boca Raton, Florida. Sun Premium Paper Partners is a passive investment partnership. It consists of over 30 partners (individuals and entities) who own 100 percent of Sun Premium Paperl Partners, which in turn owns 100 percent of Smart Papers. (SP Exh. 3 (Couch Decl.) ¶¶ 6, 8); (SP Exh. 7 (Couch Dep.) at 7-8.)

4

9.    Smart Papers was interested in purchasing the Hamilton Mill because it was an underperforming part of a larger corporation (International Paper) that wanted to divest itself of the Mill.  (SP Exh. 7 at 60).  Smart Papers realized that the Mill was losing a substantial sum of money each year but believed that it could turn the Mill around to become an economically viable stand-alone entity.  (Id. at 61-62.)  Among other things, Smart Papers believed that the cost structure of the Hamilton Mill exceeded what was required in the particular local market in Hamilton, Ohio; that pulp prices were at historical highs and likely to go down; and that certain cost allocations from Champion International exceeded what those costs could have been if the services were provided at the Hamilton Mill level or by third parties.  (Id. at 63.)

10.    On December 29, 2000, Smart Papers entered into an Asset Purchase Agreement to purchase substantially all of the assets of the Hamilton Mill from Champion International, which was a wholly owned subsidiary of International Paper at the time.  (SP Exh. 8 (Asset Purchase Agreement) Section 12.15.)  On January 22, 2001, Smart Papers hired Mill Manager Daniel Maheu as a full-time paid consultant to assist Smart Papers in completing the transaction to purchase the Hamilton Mill.  (SP Exh. 3 ¶ 14.)

11.    Based on his 25 years of experience in the paper industry and his knowledge of the Hamilton Mill, Maheu believed that in order for the Hamilton Mill to survive as a profitable stand-alone entity, Smart Papers had to operate the Mill more efficiently and flexibly and with a more competitive cost structure.  He believed the Mill could operate with fewer than 600 employees (both hourly and salaried), as compared to about 800 who had worked for International Paper.  For the salaried workforce, he believed Smart Papers could operate effectively with at least 20 percent fewer salaried positions than had existed under International Paper.  Based on market conditions for hourly employees, he believed Smart Papers would have

to establish initial terms and conditions of employment that were more competitive than had existed under International Paper.  (SP Exh. 1 ¶ 9.)  In the words of Mr. Maheu:

> Although this resulted in many applicants for employment with Smart Papers receiving job offers at wages that were more than 20 percent lower than had existed under International Paper, this was done for one overriding reason – survival.  In other words, unless Smart Papers operated the Hamilton Mill more efficiently and with a more competitive cost structure, it could not continue to operate with the staggering economic losses the Mill was experiencing and it would join the ranks of other paper mills that were being shutdown at the time.  Although some cynically view Smart Papers' actions as cutting jobs and wages, Smart Papers has enabled the Hamilton Mill to survive and has preserved about 600 paper mill jobs (more than 400 hourly) with hourly pay rates ranging from $12.00 to $21.00 per hour.  (Id.)

### The Weissman Group Retained To Hire Smart Papers' Initial Workforce

12.     On January 11, 2001, Smart Papers entered into an Employment Agreement with Mary Rita Weissman to serve as Smart Papers' Acting Director of Human Resources.  (SP Exh. 3 ¶ 13.)  At the time Ms. Weissman was hired, Smart Papers had no employees.  (SP Exh. 5 (Weissman Dep.) at 18.)  Ms. Weissman was hired to develop and implement plans for interviewing, evaluating, and hiring the initial workforce for Smart Papers at the Hamilton Mill. (SP Exh. 3 ¶ 13.)

13.     Ms. Weissman is a professional human resources consultant for the Weissman Group, based in Dayton, Ohio.  The Weissman Group is a human resources consulting firm with local and national clients.  (SP Exh. 5 at 89-92) (citing clients in Canada, Illinois, New Jersey, Arizona, Mississippi, and Ohio.)  It has particular expertise in candidate assessment and hiring processes and has advised numerous paper industry clients.  (Id. at 91.)  Weissman herself has more than 25 years' experience in this field.  (Id. at 11, 88-89.)

14.     After consulting with Maheu on what factors he considered important for efficiently operating the business, Weissman developed interview questions and reference

checking forms that sought information from the applicant and his IP supervisors and managers on the following criteria:  work record, safety awareness, customer orientation, analytical/problem solving ability, dependability, excellence orientation, team player, integrity, and flexibility.  (SP Exh. 9 (Applicant Profile).)  Each former IP employee who wanted a job with Smart Papers was required to (1) fill out an application for employment with Smart Papers, (2) participate in an individual one-on-one interview with the Weissman Group, (3) participate in mandatory pre-employment drug testing, and (4) authorize the Weissman Group to interview the applicant's supervisors and managers at IP to discuss the applicant's job performance and suitability for employment with Smart Papers.  (See, e.g. SP Exh. 10 (Paxton Dep.) at 39-40, 42.)

### Applicant Interviews

15.    568 former IP hourly employees applied for positions at Smart Papers.  (SP Exh. 1 ¶¶ 10, 11.).  Each applicant was required to go to the Hamiltonian Hotel where the Weissman Group conducted one-on-one interviews.  (See, e.g., SP Exh. 11 (Ketcham Dep.) at 27-28.)  The interviewers had a standard set of questions to ask all applicants, (see, SP Exh. 12 (Interview Guide)), and each applicant was asked questions regarding their work record, safety awareness, customer orientation, analytical/problem solving ability, dependability/attendance, excellence orientation, team player, integrity, and flexibility.  (SP Exh. 9.)  Weissman consultants took notes on a Documentation/Scoresheet form (see e.g., SP Exh. 13 (Sample Documentation/Scoresheet form)) and then rated each applicant 1 to 5 in each particular category, with 1 being the lowest and 5 being the highest.  (SP Exh. 14 (Scoring Production/Maintenance Positions).)  After each individual interview, the applicants received an overall interview rating of "green" (favorable), "yellow" (maybe) or "red" (not favorable).  See, e.g., SP Exh. 5 at 133, 210.)

16.    Most of the Plaintiffs in this case received "green" or "yellow" ratings from their individual interviews, and thus "passed" this portion of the application process.  Only 11 of the 72 Plaintiffs in this case faired poorly in the interviews and received "red" interview ratings.  Some of these Plaintiffs received poor interview evaluations because of the following factors noted on their interview evaluation form:

- poor workplace relationships (Bullio);
- bad arguments with co-workers (Brewer);
- hard to stay awake on the job because it "doesn't interest me" (Broughton);
- cannot handle shift work and "doesn't want a job with Smart Papers" (Brandenburg);
- does not want to be told that he has to do something (Isreal);
- would not answer questions during the interview and breaks safety rules  (Heinrich).

Each of the Plaintiffs, and the reasons they were not recommended for hire by Smart Papers, are discussed separately (in alphabetical order) in the attached Individual Plaintiffs' Appendix.

### Drug Testing

17.    After their individual interviews, all applicants were required to take a mandatory pre-employment drug test.  (SP Exh. 5 at 133.)  As part of the application packet, applicants were required to sign a Smart Papers Consent to Drug Test form, which stated: "a positive drug screen will be grounds for my immediate rejection for employment by Smart Papers, LLC."  (SP Exh. 15 (Sample Consent to Drug Test).)  All applicants were required to pass this test in order to be considered for employment with Smart Papers.  There were no exceptions.  Failing a drug test constituted immediate disqualification from the application process—regardless of an applicant's age.  (SP Exh. 5 at 133-134) ("Q: Was it a disqualifier if you failed your drug test?  A: Absolutely.")   In fact, 56 applicants, ranging in ages from 36 to 58 years old, failed their drug test and were not offered employment with Smart Papers, including 18 of the plaintiffs in this case.  (SP Exh. 1 ¶ 12.)

## Reference Checks:  Interviews with IP Managers and Supervisors

18.     As part of the application process, each former IP employee who wanted a job with Smart Papers signed an Authorization/Release form in which the applicant expressly authorized IP managers and supervisors (i.e., the "references") to meet with the Weissman Group to discuss their job performance at the Hamilton Mill.  (See, e.g., SP Exh. 16 (Sample Authorization/Release).)  In addition, in the Authorization/Release, each applicant agreed not to bring any legal action against IP or Smart Papers relating to the managers and supervisors' disclosure of work performance information.  The Authorization/Release states as follows:

> I, [insert name], hereby authorize representatives of International Paper Company (the "Company") to make available any information contained in my personnel files to Smart Papers L.L.C. (the "Buyer") or to any representative of the Buyer.  I further hereby authorize Company managers/supervisors to meet with the Buyer and/or representatives of the Buyer to discuss my job performance and the information contained in my personnel files.  I authorize representatives of the Company to provide the above-referenced information to the Buyer, or to any representative of the Buyer, prior and subsequent to the completion of the sale of the Mill's assets.

> In addition, I hereby release the Company and the Buyer and their subsidiaries, affiliates, officers, directors, managers, supervisors, agents, representatives and employees from any claims arising under federal, state or local law relating to the disclosure of the above-referenced information to the Buyer or its representatives.  I further hereby agree not to bring any action or proceeding against the Company, the Buyer or its representatives relating to the Company's disclosure of the above-referenced information.  (Id.)

19.     The Weissman Group then conducted one-on-one interviews with various IP supervisors and managers who were working at the Mill.[2/]  (SP Exh. 5 at 114.)  The managers and/or supervisors were asked questions to elicit information about the applicants in the

---

2/     21 different IP supervisors and managers were interviewed by the Weissman Group regarding the 72 plaintiffs in this case.  Of these 21 IP supervisors and managers, 15 (over 70%) were age 40 or older.  (See SP Exh. 4 ¶ 6.)

following categories: willingness and ability to learn, excellence orientation, productivity, dependability, team player, and safety awareness. (See, e.g., SP Exh. 17 (Sample Applicant Reference Check).) Additionally, the Weissman Group asked each IP manager and/or supervisor whether or not they would recommend the applicant for hire. (See, e.g., SP Exh. 17.) At the conclusion of the reference interviews, the Weissman Group rated applicants "green" (yes), "yellow" (maybe), or "red" (no), based upon information provided about the applicant by the IP supervisors and managers. (See, e.g., SP Exh. 5 at 163.)

20.    In making final recommendations to Maheu as to which job applicants should receive offers and which should not, Weissman relied most heavily on the comments, judgments, and recommendations of the IP managers and supervisors who were working in the Hamilton Mill with the Plaintiffs.[3/] (SP Exh. 5 at 144-145.) According to Weissman, the "reference was given greater weight than the interview." (Id. at 166.) Weissman considered the references critical because the IP supervisors and managers were in the best position to evaluate not only the applicants' past performance at the Mill, but other less tangible factors such as attitude, willingness to learn, excellence orientation, and whether they were team players. In the words of Weissman:

> The most accurate, powerful and predictive information, and information and data about the likelihood of success of an employee, comes from the reference check. (Id. at 144-45.)

21.    In addition, Weissman obtained information from IP's Human Resources department regarding each applicant's attendance record, and certain applicants' disciplinary

---

[3/]    According to the deposition testimony, the 21 managers and supervisors who gave references about the Plaintiffs in this case were familiar with the Plaintiffs and their job performance and/or met prior to the reference interview with other supervisors and managers who were familiar with their job performance. (See, e.g., Weiser Dep. at 37); (McCoy Dep. at 30.)

record.  (Id. at 101-104) (attendance records); (Id. at 120) (disciplinary records.)  At the end of

this process, and after reviewing all of the relevant job-related information, Weissman made a

final recommendation to Maheu as to which applicants should be hired.  Each applicant received

a final recommendation from Weissman of either Green, Yellow, or Red.  (Id. at 52-53.)

**Maheu Accepts All Weissman Recommendations**

22.    Maheu accepted, without exception, all of Weissman's recommendations

regarding the hourly applicant pool. (SP Exh. 6 (Maheu Dep.) at 40) ("I hired everybody that

was presented in the pool of those qualified for hiring); (Id. at 86) ("I took the recommendations

of The Weissman Group"); (Id. at 188) (Maheu did not disagree with any of the

recommendations of The Weissman Group).  In fact, Maheu hired all "greens" and all "yellows"

from the hourly applicant pool. (Id. at 53, 55). ("All the yellows and all the greens.  I said, we

don't have to sort this out, they're all going to get employment.")[4/]

**Nondiscriminatory Hiring Decisions**

23.    When Weissman made her hiring recommendations to Maheu, the

recommendations were based on the results of each applicants' drug test, individual interview

and the recommendation of the IP managers and supervisors.  Weissman did not take into

account or consider the applicant's age or any alleged disability.  As stated in her deposition:

Q.    Did you ever request age data?

A.    Absolutely not.

Q.    Okay.

---

[4/]    At the time the recommendations were made, Weissman was 52 years old.  (SP Exh. 5 at 13), and
Maheu was 45 years old.  (SP Exh. 6 at 7.)

A.    Didn't want it.  It was irrelevant.  The decisions were made on the information provided by the candidate and the candidate's supervisors against objective criterion.  So age, race, sex, national origin were immaterial to the decisions that were made.

(SP Exh. 5 at 51.); (Id. at 102) ("I had no information about disability.")

24.    Significantly, the results of Weissman's recommendations (i.e., the actual hiring decisions made regarding the 568 hourly job applicants) demonstrate that the hiring decisions did not have an adverse impact based on age.  To the contrary, 72.6 percent of applicants age 40 or over received job offers, compared to 67.3 percent of applicants under age 40.  In addition, as shown in the chart below, the highest job offer rate for any age group (79.4%) was for the oldest applicants in age group 60-65; and the second highest job offer rate (79.0%) was for the second oldest age group, 55-59:

| Age Range | Number of Applicants | Number Selected | Selection Rate By Age Group |
|---|---|---|---|
| 60-65 | 34 | 27 | 79.4% |
| 55-59 | 86 | 68 | 79.0% |
| 50-54 | 164 | 117 | 71.3% |
| 45-49 | 166 | 120 | 72.3% |
| Total 40 and over | 522 | 379 | 72.6% |
| 39 and under | 46 | 31 | 67.3% |
| Total | 568 | 410 | 72.2% |

(SP Exh. 1 ¶ 11.)

**Placement of New Hires Into Positions**

25.    Once the hiring decisions on job applicants were made, Maheu gave the list of successful candidates to his four deputies to place eligible applicants into Smart Papers' jobs. (SP Exh. 6 at 155.)  Hourly applicants with "green" ratings generally were placed first. (Bergeron Dep. at 21.)  Those with "yellow" ratings were placed after the greens.  (Id.) Generally, new hires were placed into jobs that they had previously performed at IP.  (Id. at 58.) If it was uncertain what job an applicant had performed or what jobs he or she was qualified for,

Bergeron would review prior training records to determine for what jobs the applicant was trained. (Id. at 27, 56 and 58-59)  An applicant would not be placed in any job for which he or she had not been trained and was not qualified.  (Id. at 59).  Applicants rated "red" (no) were not offered positions based on the recommendations of the Weissman Group.  (SP Exh. 6 at 121) (people not given offers were not cleared as being in the hiring pool); (Id. at 174) ("the reds were the reds").

## NLRB Discrimination Charge And Dismissal Thereof

26.    On March 19, 2001, one month after the sale of the Mill, PACE Union Local 5-1967 Union, on behalf of  20 of its members, filed a charge with the National Labor Relations Board ("NLRB") against Smart Papers alleging that they were "discriminated against . . . [by] refusing to hire them because of their union offices and union activities."  (See SP Exh. 4 (Posel Decl.) ¶ 4 and SP Exh. 19 (NLRB Charge).)  The 20 individuals alleging discrimination before the NLRB included 7 of the Plaintiffs in this case – Blevins, Broughton, Fowler, Italiano, Ketcham, McCreary, and Sandlin.  (SP Exh. 4 ¶ 8.)

27.    After an investigation by NLRB Region 9 in Cincinnati, the charges of discrimination were found to be without merit and were dismissed.  (SP Exh. 20 (NLRB written decision dated May 31, 2001 and July 26, 2001).)  In reaching his conclusion, NLRB Regional Director Richard Ahearn stated in relevant part:

- in the hiring process, the Employer [Smart Papers] "used a consulting firm, the Weissman Group, to conduct the initial interviews.  The consulting firm interviewed the applicants and contacted references, including prior supervisors with the predecessor employer."

*    *    *    *

- the Employer used legitimate nondiscriminatory criteria in selecting employees for its workforce.  "For example, the Employer sought employees who were cross-trained in multiple skills, who were flexible in regard to work assignments, who had demonstrated

integrity, who were team oriented, who had safety awareness, and who were dependable with good attendance."

(SP Exh. 20 at 2.)

28.    The Union appealed the Regional Director's dismissal of its charges and its

appeal was considered by the NLRB's Office of the General Counsel in Washington, D.C.  In a

written decision dated August 31, 2001, the NLRB denied the appeal and stated in relevant part:

> Hiring of the initial employee complement was based on the recommendations of the Employer's consulting firm, which conducted interviews, drug testing, and reference checks.  At the conclusion of the process the percentage of applicant Union officials hired by the Employer for its reduced employee complement approximated the percentage of former International Paper bargaining-unit employees hired. . . . Regarding the Employer's decisions not to hire [certain individuals], the investigation disclosed that the consulting firm recommended, based upon legitimate, non-discriminatory criteria, that the two applicants not be hired.  Moreover, the firm had no actual knowledge of their Union activities. . . .

> *    *    *    *

> Although information about applicants was supplied to the consulting firm by former International Paper supervisors as part of the overall applicant evaluation process, those supervisors were not employees of the Employer at the time they supplied information to the consulting firm.  In the circumstances of this matter, the former supervisors' knowledge of the Union activities of the applicants could not be imputed to the Employer, which followed the consultant's hiring recommendations.  See, *Guarantee Savings and Loan*, 274 NLRB 676 (1985).

(See SP Exh. 20.)

## The Angel Litigation For Severance Pay

29.    On or about July 18, 2001 115 individually named plaintiffs, most of whom are

former hourly employees of IP at the Hamilton Mill who were offered employment by Smart

Papers, filed a lawsuit in this Court against PACE Local and International Union, International

Paper, and Smart Papers, alleging that they are owed severance pay from IP under various

theories.  (See Angel et al. v. International Paper et al., Case No. C-1-01-467.)  Plaintiffs state in

their Second Amended Complaint, dated January 9, 2002, that "those employees who received

an offer of employment from Smart Papers would not be entitled to severance pay."  (Complaint

¶ 51.)  Plaintiffs further allege in their Complaint that "Plaintiffs, if given the choice, would have

preferred to reject employment with Smart and receive [severance] benefits to which they were

entitled."  (Id.)

      30.     In other words, Plaintiffs in the Angel case include former IP hourly employees

who received job offers from Smart Papers, yet have made representations to the Court that they

would have preferred not receiving offers so that they could receive severance pay from IP.  In

contrast, the Plaintiffs in the Campbell case are former IP hourly employees who are alleging

that Smart Papers and IP discriminated against them by not offering them jobs.[5/]

### The Extensive Discovery Process

      31.     Plaintiffs were provided considerable time by the Court to conduct discovery.  By

Calendar Order dated March 7, 2002, Magistrate Judge Hogan gave the parties until June 30,

2003 to conduct discovery, and subsequently extended the discovery period until August 29,

2003.  During the 18-month discovery period, each party served interrogatories and document

requests, and took numerous depositions.

      32.     Smart Papers answered interrogatories and produced almost 13,000 pages of

documents to the Plaintiffs.  Among other things, Smart Papers produced the complete job

_____

[5/]    In an Amended Order filed on March 27, 2003, this Court dismissed certain counts of Plaintiffs'
Second Amended Complaint in the Angel case and refused to dismiss others.  In refusing to
dismiss Plaintiffs' claim that older job applicants disproportionately were denied severance
because they were offered jobs by Smart Papers, the Court stated that it "would assume that the
bulk of Plaintiffs' case would be devoted to an analysis tending to show that younger, non-
protected employees were recipients of severance pay under the EBP at a statistically significant
higher incidence than other employees."  (See Amended Order at 34-35.)

application file for each of the 568 formerly hourly employees at IP who applied for employment

with Smart Papers. This included 410 applicants who were offered hourly positions with Smart

Papers and 158 who were not, including complete application files for each of the 72 Plaintiffs in

this case.

33.    In addition, Plaintiffs took the depositions of 42 former IP supervisors and/or

current Smart Papers' employees of Smart Papers, and 5 employees of the Weissman Group as

well as the 30(b)(6) depositions of Sun Capital Partners and Smart Papers. Moreover, IP and

Smart Papers took the depositions of 66 of the 72 Plaintiffs in this case. Two of the Plaintiffs

were not deposed because they expressed a willingness to voluntarily dismiss their Complaint,

and 4 were not deposed because they could not be located and otherwise refused to participate in

the discovery process.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is an effective tool used "to secure the just, speedy and inexpensive

determination of [an] action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed.

R. Civ. P. 1). It is not "a disfavored procedural shortcut[.]" Id. "Rule 56(c) mandates the entry

of summary judgment . . . against a party who fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and one on which that party will bear the

burden of proof at trial." Id. at 322. In ruling on a motion for summary judgment, the court must

construe the evidence in the light most favorable to the nonmoving party. Creech v. Ohio

Casualty Ins. Corp., 944 F. Supp. 1347, 1352 (S.D. Ohio 1996). But, "[t]here is no issue for trial

unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for

that party." Id.

16

Summary judgment should be granted "where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 570 (6th Cir. 2003) (citing Fed. R. Civ. P. 56(c)). A fact is considered material if, when applied to the substantive law, it affects the outcome of the litigation. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party." Black v. Columbus Pub. Schools, 124 F. Supp.2d 550, 561 (S.D. Ohio 2000).

## ARGUMENT

Smart Papers respectfully submits that Plaintiffs' claims cannot withstand summary judgment for several reasons: (1) the claims of 6 of the Plaintiffs should be dismissed for failure to prosecute, (2) the 18 Plaintiffs who failed their drug test cannot establish a *prima facie* case of discrimination under the well-established McDonnell Douglas analysis, (3) the 64 Plaintiffs who were not hired by Smart Papers were denied employment for legitimate nondiscriminatory reasons – primarily because IP supervisors and managers at the Mill did not recommend them for employment – and Plaintiffs cannot establish that this was a pretext for intentional discrimination under controlling caselaw, (4) the 6 Plaintiffs who were offered employment by Smart Papers did not receive any "materially adverse" employment action from Smart Papers, (5) the 13 Plaintiffs who are alleging disability discrimination cannot establish several necessary elements of a *prima facie* case and cannot rebut the nondiscriminatory reasons articulated by Smart Papers for its actions, and (6) Plaintiffs' defamation claim cannot be sustained against Smart Papers, which merely received employment references from IP, and there is no evidence that Smart

Papers published to third parties false and defamatory factual statements about any of the

individual Plaintiffs.  Each of these points are discussed in greater detail below.

I.    **THE CLAIMS OF PLAINTIFFS FISHER, GUMM, JACKSON, PARSLEY, RATLIFF AND WHITAKER SHOULD BE DISMISSED UNDER FEDERAL RULE 37 FOR FAILURE TO PROSECUTE.**

Plaintiffs Fisher, Gumm, Jackson, Parsley, Ratliff and Whitaker failed to participate in

the discovery process, and therefore should be dismissed for failing to prosecute their case.

Specifically, these Plaintiffs failed to respond to Defendant Smart Papers' (and Defendant

International Paper's) Interrogatories and Document Requests propounded on them on May 16,

2003—three and a half months before the close of discovery.  These six Plaintiffs additionally

failed to attend their noticed depositions.  In fact, all of these Plaintiffs received multiple Notices

of Deposition: Fisher was noticed three times; Gumm was noticed four times; Jackson was

noticed three times; Parsley was noticed four times; Ratliff was noticed two times; and Whitaker

was noticed four times.  (SP Exh. 21 (Notices of Deposition).)

Moreover, Plaintiffs' counsel stated on the record that these 6 Plaintiffs did not intend to

appear for their depositions. (SP Exh. 22 (Fisher Dep.) at 4) ("we haven't been able to reach Mr.

Fisher so we don't know why he's not responded to the deposition notices.  Certainly, the

defense have the right to seek dismissal . . ."); (SP Exh. 23 (Gumm Dep.) at 4) ("We have no

reason to think that Mr. Gumm will appear tomorrow for deposition"); (SP Exh. 24 (Jackson

Dep.) at 4) ("We have no reason to think that Mr. Jackson will appear for his deposition"); (SP

Exh. 25 (Parsley Dep.) at 4) ("We have no reason to believe that Mr. Parsley will appear for his

deposition tomorrow"); (SP Exh. 26 (Ratliff Dep.) at 4) (Q: "What's Mr. Ratliff's position in the

litigation?" A: "As far as I know, that's it."); (SP Exh. 27 (Whitaker Dep.) at 4) ("We have no

reason to believe that Mr. Whitaker will appear for his deposition tomorrow").  On August 15,

2003, counsel for Plaintiffs sent Defendants' counsel a letter stating "please be aware that we have been unable to contact the following plaintiffs via written correspondence or voice messages regarding their depositions: Kenneth Fisher, John Parsley, John Gumm, and George Jackson.  In addition, Plaintiffs James Whitaker and David Ratliff have indicated that they would like to drop out of the lawsuit.  Therefore, we believe that these Plaintiffs will be unavailable for their noticed deposition dates."  (SP Exh. 28 (Letter from Plaintiffs' Counsel).)

Accordingly, the claims of Plaintiffs Fisher, Gumm, Jackson, Parsley, Ratliff and Whitaker should be dismissed under Federal Rule of Civil Procedure 37(d) (Failure of Party to Attend Own Deposition or Serve Answers to Interrogatories or Respond to Request for Inspection).  See, e.g., Bell & Beckwith v. USA, IRS, 766 F.2d 910, 912 (6th Cir. 1985) (district court did not abuse discretion in dismissing case under Federal Rule 37 based on plaintiff's "repeated, unexplained failures to appear for depositions.").

## II.    THE AGE DISCRIMINATION CLAIMS BY THE 64 PLAINTIFFS WHO WERE NOT HIRED BY SMART PAPERS CANNOT SURVIVE SUMMARY JUDGMENT.

Plaintiffs' age discrimination claims, brought under the ADEA and Ohio law, are meritless and insufficient to withstand summary judgment.  The 64 Plaintiffs who were not hired by Smart Papers (hereinafter referred to as "the 64 Plaintiffs") have not alleged in their Complaint, or provided in discovery, any direct evidence of intentional age discrimination.[6]

---

6/    The 64 Plaintiffs who were not hired are: Abner, Adams, Baylor, Thomas Bennett, Wayne Bennett, Blevins, Brandenburg, Brewer, Brooks, Broughton, Bullio, Charles Campbell, Chasteen, Clear, Joshua Combs, Jerry Combs, Cress, Duncan, Durbin, Eaton, Fisher, Fowler, Freeman, Gardner, Gentry, Gill, Gregory, Gumm, Heinrich, Hensley, Horn, Huntington, Hyden, Israel, Italiano, Jackson, Johnson, Ketcham, Knodel, Lakes, Mann, Marsee, McCreary, McKay, Miller, Ogg, Parsley, Paxton, Pennington, Ratliff, Robertson, Rodgers, Sandlin, Spada, Taulbee, Thomas, Tolbert, Turley, Turner, Volz, Whitaker, Wilkins, Willis and York.  (See Complaint ¶ 92.)

(footnote continued next page)

Therefore, their case must be analyzed using the <u>McDonnell Douglas</u> burden-shifting model of proof.  <u>See</u> <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973); <u>Mitchell v. Toledo Hosp.</u>, 964 F.2d 577, 582 (6th Cir. 1992).

Under this model, the 64 Plaintiffs have the initial burden of "establishing a *prima facie* case by proving, by a preponderance of the evidence, facts which, if not explained, give rise to an inference of unlawful activity on the part of [Smart Papers]."  <u>Creech</u>, 944 F. Supp. at 1354.  If the 64 Plaintiffs meet their burden to establish a *prima facie* case of age discrimination, the burden of production shifts to Smart Papers to articulate a legitimate, non-discriminatory reason for not hiring the 64 Plaintiffs.  <u>Id.</u> (citing cases).  "The burden of persuasion, however, remains at all times upon the [64 Plaintiffs]" to prove intentional age discrimination.  <u>Id.</u>  Once Smart Papers articulates non-discriminatory reasons for not hiring the 64 Plaintiffs, the burden shifts back to the Plaintiffs to establish, by a preponderance of the evidence, that Smart Papers' articulated reasons are a pretext for age discrimination.  <u>Id.</u>; <u>see also</u> <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 146-47 (2000) ("the ultimate question is whether the employer intentionally discriminated").

The 64 Plaintiffs fail to meet their evidentiary burdens under the <u>McDonnell Douglas</u> analysis.  As discussed in detail below, many of the 64 Plaintiffs are unable to establish a *prima facie* case of age discrimination because they cannot show that they possess the minimum objective qualifications for employment with Smart Papers.  But even assuming, *arguendo*, that

---

Plaintiff Hess is listed in paragraphs 92 and 106 of the Complaint as not having been hired, despite the fact he was offered a position with Smart Papers and continues to work there today. (SP Appendix Tab 36 (Hess Dep. at 47, 76).)  In fact, Plaintiff Hess acknowledges in the Complaint that he was hired by Smart Papers.  (<u>See</u> Complaint ¶ 44.)  Plaintiff Geeding is also listed in paragraphs 92 and 106 as not having been hired, despite the fact that he was offered a position with Smart Papers.  (SP Appendix Tab 28 (Geeding Dep. at 54, 86).)

each of the 64 Plaintiffs could establish a *prima facie* case, Smart Papers has articulated

legitimate non-discriminatory reasons for not hiring each and every one of them, and Plaintiffs

are unable to demonstrate that Smart Papers' reasons are a pretext for intentional age

discrimination.  Accordingly, the age discrimination claims of the 64 Plaintiffs who were not

hired by Smart Papers are without merit and should be dismissed as a matter of law.

### A.    Many Of The 64 Plaintiffs Cannot Establish A *Prima Facie* Case Of Age Discrimination Under The ADEA And/Or Ohio Law.

The 64 Plaintiffs who were not hired by Smart Papers bear the burden of proof in

establishing a *prima facie* case of age discrimination with respect to Smart Papers' decision not

to hire them for employment at the Hamilton B Street mill.  See Grant v. Harcourt Brace & Co.,

12 F. Supp.2d 748, 752-53 (S.D. Ohio 1998).  To establish a *prima facie* case of age

discrimination in a failure to hire case, the Plaintiffs must establish the following elements: (1)

they are members of the protected class (i.e., age 40 or older); (2) they applied and were

qualified for employment with Smart Papers; (3) they were not hired; and (4) other persons who

were substantially younger than the 64 Plaintiffs were given the positions.  See Grant, 12 F.

Supp.2d at 753; Creech, 944 F. Supp. at 1355; Pucci v. BASF Corp., Case No. 01-3766, 2002

WL 31890921 (6th Cir. Dec. 23, 2002) (unpublished opinion attached hereto as SP Exh. 29).

"These requirements apply equally to one who brings claims under the ADEA and the Ohio state

anti-discrimination law."  Grant, 12 F. Supp.2d at 753.

Many of the 64 Plaintiffs cannot establish a *prima facie* case of age discrimination.  As

shown below, although all of the 64 Plaintiffs are over age 40 and all applied for and were

denied employment with Smart Papers, at least 18 of the Plaintiffs cannot demonstrate that they were objectively qualified for employment.[7]

       **1.**      **The 18 Plaintiffs who failed their drug tests cannot establish a *prima facie* case.**

The 18 Plaintiffs in this lawsuit who failed their mandatory pre-employment drug tests nevertheless claim that Smart Papers discriminated against them on the basis of their age by not hiring them.  Their allegations are frivolous and should be dismissed as a matter of law.  As explained above, all Smart Papers' applicants were advised that they would be required to pass a drug test to be eligible for employment.  (Statement of Facts ("SOF") ¶ 17.)  All applicants, including the 18 plaintiffs, signed a "Consent to Drug Screening," which expressly stated: "I acknowledge that a positive drug test will be grounds for my immediate rejection for employment by Smart Papers LLC."  (SOF ¶ 17.)

Despite the fact that they were given ample warning that they would have to take and pass a drug test to be considered for employment at Smart Papers, 18 of the Plaintiffs could not satisfy this legitimate and nondiscriminatory screening criteria.  In fact, as described in the

---

[7]    A recent decision in this Circuit has held that "[a]t the *prima facie* stage, a court should focus on a plaintiff's *objective* qualifications to determine whether he or she is qualified for the relevant job."  Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 575 (6th Cir. 2003) (emphasis in original).  The court further stated: "The *prima facie* burden of showing that a plaintiff is qualified can therefore be met by presenting credible evidence that his or her qualifications are at least equivalent to the minimum objective criteria required for employment in the relevant field.  Although the specific qualifications will vary depending on the job in question, the inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills."  Id. at 575-576.  In this case, all of the Plaintiffs had worked at the Hamilton B Street mill and had at least minimal experience in the paper industry.  Based on the Wexler decision, Smart Papers does not concede, but will not argue on summary judgment, that the Plaintiffs who passed their drug tests did not have minimal objective qualifications.  However, as shown when discussing the individual Plaintiffs, virtually each Plaintiff hired by Smart Papers was not recommended by managers at the Hamilton B Street Mill based on legitimate non-discriminatory employment-related reasons that were relied upon by Smart Papers in its employment decisions.  Thus, Smart Papers had legitimate nondiscriminatory reasons for not hiring the Plaintiffs, even if they can establish a *prima facie* case.

Individual Plaintiff' Appendix when discussing each individual Plaintiff, all 15 Plaintiffs who were deposed admitted in their depositions to having used drugs.[8/]  (See SP Appendix):  (Tab 8, Blevins Dep. at 54); (Tab 17, Clear Dep. at 58); (Tab 29, Gentry Dep. at 46-47); (Tab 30, Gill Dep. at 45-46); (Tab 32, Gregory Dep. at 55); (Tab 44, Johnson Dep. at 17, 38); (Tab 47, Lakes Dep. at 61); (Tab 49, Marsee Dep. at 33); (Tab 52, Miller Dep. at 14-15); (Tab 56, Pennington Dep. at 22-23): (Tab 59, Rodgers Dep. at 95); (Tab 62, Spada Dep. at 38); (Tab 65, Tolbert Dep. at 97); (Tab 66, Turley Dep. at 25, 48); and (Tab 70, Wilkins Dep. at 116).   The 18 Plaintiffs and the drugs for which they tested positive were:

| | |
|---|---|
| Earl Blevins | cocaine |
| James Clear, Jr. | marijuana |
| David Gentry | marijuana |
| Everett Gill | marijuana |
| John Gregory | marijuana |
| George Jackson | marijuana |
| Chester Johnson | marijuana |
| James Lakes | marijuana |
| Linda Marsee | marijuana |
| David Miller | cocaine |
| Ronald Pennington | marijuana |
| David Ratliff | marijuana |
| James Rodgers | cocaine |
| Peter Spada | marijuana |
| Theresa Tolbert | cocaine |
| Jerry Turley | marijuana |
| James Whitaker | marijuana |
| Robert Wilkins | marijuana |

(See SP Appendix):  Tabs 8, 17, 29, 30, 32, 55, 44, 47, 49, 52, 56, 59, 62, 65, 66, and 70.)

---

8/     As detailed in Section I of this brief, Plaintiffs Jackson, Ratliff and Whitaker did not respond to Defendant's discovery and did not attend their noticed depositions.  In addition to not being able to establish a *prima facie* case of discrimination, Jackson, Ratliff and Whitaker should be dismissed from this lawsuit under Federal Rule of Civil Procedure 37.

Based on their positive drug test results, the 18 Plaintiffs were not qualified for employment with Smart Papers and cannot establish the second element of their *prima facie* case.  See, e.g. Young v. Chicago Transit Auth., 189 F. Supp.2d 780, 789 (N. D. Ill. 2002) (finding that employee could not establish a *prima facie* case of race discrimination based on his termination because he could not show that he was meeting the employer's legitimate performance expectations where he tested positive for cocaine); see also Redding v. Chicago Transit Auth., No. 99 C 1082, 2000 WL 1468322, at * 4 (N.D. Ill. Sept. 29, 2000) (unpublished opinion attached hereto as SP Exh. 29) (recognizing that an employee who tested positive for cocaine was not qualified and therefore could not establish a *prima facie* case of disability discrimination).  Accordingly, summary judgment should be granted to Smart Papers on the claims of Plaintiffs Blevins, Clear, Gentry, Gill, Gregory, Jackson, Johnson, Lakes, Miller, Marsee, Pennington, Ratliff, Spada, Rodgers, Tolbert, Turley, Whitaker and Wilkins for their failure to establish a *prima facie* case.[9]

### 2.    Other elements of a *prima facie* case.

The fourth prong of a *prima facie* case requires Plaintiffs to demonstrate that Smart Papers hired substantially younger individuals to fill the positions that they sought.  Pucci, 2002 WL 31890921 at *2 (unpublished opinion attached hereto as SP Exh. 29); Grant, 12 F. Supp.2d at 753.  In their EEOC charges, each of the Plaintiffs submitted a sworn statement indicating, "In January, 2001, I applied for the position with Smart Papers that I had been performing for International Paper, and formerly Champion International."  (SP Exh. 30 (Sample EEOC

---

[9]    In total, 56 applicants for employment with Smart Papers (both hourly and salaried) failed their drug test, and none was offered employment by Smart Papers.  These individuals ranged in age from 36 to 58 years old.  38 of these persons did not initiate legal action against Smart Papers, but 18 sued claiming "age discrimination."  (SP Exh. 1 ¶ 12.)

Charge).)[10/]  These individuals also submitted an Affidavit to the EEOC, stating under oath in relevant part that "The Company failed to hire me into the position that I had performed for many years . . ."  (SP Exh. 31 (Sample EEOC Affidavit).)  Moreover, in their Complaint filed in this Court, each of the Plaintiffs alleged that "Defendants failed to hire [plaintiff] back as a [specific position, i.e., backtender, sheeter operator, pulper furnisher, drum operator, embosser operator, rewinder operator etc.].  (See Complaint ¶¶ 10-81)

During discovery in this case, Plaintiffs generally were not able to identify substantially younger individuals who were hired by Smart Papers to fill their former position with IP.  In the few instances where a Plaintiff was able to identify a younger individual allegedly hired into his former position at IP, those younger individuals were at most a few years younger than the Plaintiff and typically were also over 40 years old.  This Court has found that an age difference of as much as seven years did not meet the "substantially younger" standard.  See Black, 124 F. Supp.2d at 575; see also Bush v. Dictaphone Corp., 161 F.3d 363, 368 (6th Cir. 1998) (finding that a five-year age difference was insufficient to establish the "substantially younger" requirement); Myers v. Ball Metal Beverage Container Corp., No. 3:01-CV-7214, 2002 WL 2003135, at *1-2 (N.D. Ohio Aug. 30, 2002) (finding that an eight-year age difference was insufficient to establish the "substantially younger" requirement); Woodsmall v. Eclipse Mfg. Co., 249 F. Supp.2d 918, 924 (E.D. Tenn. 2002) (finding that a six-year age difference was insufficient to establish the "substantially younger" requirement).

---

10/     All Plaintiffs, except for Horn, Rodgers, Lakes, Gumm, and Whitaker filed an EEOC Charge.  It is undisputed that these charges were drafted by Plaintiffs' counsel and are nearly verbatim. (Bullio Dep. at 60) (Plaintiffs' counsel stating, "we prepared the charge.").

Based on the foregoing, these Plaintiffs cannot establish a *prima facie* case against Smart Papers because they cannot prove that substantially younger persons were hired into their former positions at IP.  After Plaintiffs realized that they could not establish a *prima facie* case if they continued to adhere to their prior sworn testimony about seeking their former positions with IP, many Plaintiffs in their depositions (assisted by counsel) began stating for the first time that they sought "any position" with Smart Papers, including the lowest paid "department relief" positions, and that younger persons subsequently were hired to fill those entry-level positions.[11]/

It is the position of Smart Papers that Plaintiffs cannot establish a *prima facie* case by contradicting prior sworn testimony.  See Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984) (finding "[a] genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.") However, for purposes of this motion for summary judgment, Smart Papers will assume for the sake of argument that these Plaintiffs can satisfy the low threshold for a *prima facie* case.  As shown below, however, there is overwhelming evidence that Smart Papers did not hire these Plaintiffs for legitimate non-discriminatory reasons (including the fact that they were not recommended for employment by their former IP managers at the Hamilton Mill), and Plaintiffs cannot establish that these non-discriminary business reasons are a pretext for intentional age discrimination.

---

[11]/ The assertions that they were seeking "any position" are not only contrary to their prior sworn testimony and their Complaint, but contradicted by several Plaintiffs who were offered positions with Smart Papers that are different from their former IP positions, and now are suing Smart Papers stating that they unlawfully were "demoted" from their former positions with IP.  (See the Plaintiffs discussed in Individual Plaintiffs' Appendix.)

**B.**  **Assuming, Arguendo, That The 64 Plaintiffs Can Establish A *Prima Facie* Case, There Is Overwhelming Evidence That Smart Papers Did Not Hire Them For Legitimate Nondiscriminatory Reasons.**

Even assuming, *arguendo*, that each of the 64 Plaintiffs could establish a *prima facie* case, there is overwhelming and clearly documented evidence showing that Smart Papers had legitimate non-discriminatory reasons for not hiring each of the them.

**1.**  **Smart Papers did not hire 18 of the Plaintiffs because they failed their pre-employment drug tests.**

Numerous courts have found that an employer's reliance on a failed drug test is a legitimate non-discriminatory reason for taking an adverse employment action. See generally Saridakis v. United Airlines, No. 00-16141, 2001 WL 1646875, at * 1 (9th Cir. Dec. 20, 2001) (unpublished opinion attached hereto as SP Exh. 29) (finding that the employer "easily" established a legitimate non-discriminatory reason for terminating the plaintiff where he tested positive for drugs); Knighton v. City of Syracuse Fire Dep't, 145 F. Supp.2d 217, 224 (N.D.N.Y. 2001) (holding that "Defendants correctly assert that the two positive drug tests provided a legitimate non-discriminatory reason for terminating [p]laintiff."); Anton v. Palumbo Bros., Inc., No. 96 C 1108, 1997 WL 337226, at *6 (N.D. Ill. June 16, 1997) (unpublished opinion attached hereto as SP Exh. 29) (ruling that the plaintiff could not "show that defendants improperly discriminated against him . . . when defendants legitimately, nondiscriminatorily terminated plaintiff for testing positive for marijuana during a random drug test"); Kulinski v. Runyon, No. Civ. A. N-93-2959, 1995 WL 795726, at *4 (D. Md. Feb. 8, 1995) (unpublished opinion attached hereto as SP Exh. 29) (finding that the employer who terminated the plaintiff for testing positive for morphine "clearly rebutted the inference of age discrimination by articulating a legitimate reason for [the plaintiff's] discharge"); Bellinger v. Weight Watchers Gourmet Food Co., 756

N.E.2d 1251, 1255 (Ohio Ct. App. 2001) (finding that defendant had a legitimate

nondiscriminatory reason for terminating the plaintiff where he tested positive for marijuana).

Thus, even assuming that the 18 Plaintiffs somehow can establish a *prima facie* case of

discrimination despite having failed their pre-employment drug tests, Smart Papers has

successfully rebutted their *prima facie* case. The burden, therefore, returns to the 18 Plaintiffs to

show that Smart Papers' articulated reason for not hiring them—their having failed the pre-

employment drug tests—is a pretext for intentional age discrimination, which Plaintiffs cannot

show.

> **2.    Smart Papers did not hire the remaining 46 Plaintiffs for legitimate
> nondiscriminatory reasons – primarily because their former
> supervisors or managers at the Hamilton Mill did not recommend
> them for employment.**

Each former IP employee who wanted a job with Smart Papers, regardless of the

applicant's age or number of years they had worked at the Mill, was required to be interviewed

by the Weissman Group, to pass a drug test, and have their supervisors and managers questioned

about their job performance and suitability for employment with Smart Papers. (SOF ¶ 14.)

Using hiring criteria developed by professional human resources consultants at the Weissman

Group, which stressed legitimate employment-related factors, Smart Papers' application of this

criteria resulted in job offers to over 72% of the applicants over age 40. (SOF ¶¶ 2, 14, 15.)

Plainly, given these results, the Smart Papers hiring process was not "a veiled effort at screening

out older applicants." Browning v. Rohm & Haas Co., No. 95-6186, 1999 WL 1000884, at *4-5

(6th Cir. Oct. 29, 1999) (unpublished opinion attached hereto as SP Exh. 29).

As described in detail in the Statement of Facts, all 568 applicants for employment with

Smart Papers were evaluated using the same hiring criteria. Each applicant was asked the same

basic interview questions concerning factors such as work record, safety awareness, customer

orientation, analytical/problem solving, excellence oriented, team player, integrity and flexibility. (SOF ¶ 15.)  In addition, Smart Papers conducted a reference check for each applicant by interviewing IP supervisors and managers who were also working at the Hamilton Mill at the time.  (SOF ¶¶ 18-19.)  The supervisors and managers were asked questions regarding each Plaintiffs' willingness and ability to learn, excellence orientation, productivity, dependability, team player, and safety awareness, and were asked whether they would recommend each Plaintiff for employment with Smart Papers.  (SOF ¶ 19.)  Significantly, for all but one of the 44 Plaintiffs listed below, the IP supervisors and managers did not recommend these Plaintiffs for employment.[12]

| NAME | Interview | Reference from former IP supervisor/ manager | Final Recommendation | Other/Additional Reasons |
|------|-----------|-----------|-----------|-----------|
| ABNER, THOMAS K | GREEN | RED | RED | Attendance |
| ADAMS, DONNIE C | GREEN | GREEN | RED | Attendance |
| BAYLOR, CHARLES T. | YELLOW/ GREEN | RED | RED | |
| BENNETT, THOMAS D. | YELLOW | RED | RED | |
| BENNETT, WAYNE M. | RED | RED | RED | |
| BRANDENBURG, LARRY A. | RED | RED | RED | Attendance |
| BREWER, CARL | RED | RED | RED | |
| BROOKS, JAMES S. | RED | RED | RED | |
| BROUGHTON, LARRY | RED | RED | RED | |
| BULLIO, PHILIP M. | RED | RED | RED | Falsification of application |
| CAMPBELL, CHARLES B. | YELLOW | RED | RED | |
| CHASTEEN, ROBERT D. | GREEN | RED | RED | |
| COMBS, JERRY L. | GREEN | RED | RED | |
| COMBS, JOSHUA E. | GREEN | RED | RED | |
| CRESS, JOHN M. | YELLOW | RED | RED | |
| DUNCAN, TERRY W. | YELLOW | RED | RED | |
| DURBIN, PATRICK STEPHEN | YELLOW | RED | RED | |
| EATON, MENDOL CLEVE | YELLOW | RED | RED | |

---

[12]    The chart contains only 44 Plaintiffs because Plaintiffs Geeding and Hess—contrary to the allegations in the Complaint—actually received offers of employment from Smart Papers.  (See discussion of individual Plaintiffs Gedding (Tab 28) and Hess (Tab 36) in the Individual Plaintiffs' Appendix.)

| NAME | Interview | Reference from former IP supervisor/ manager | Final Recommendation | Other/Additional Reasons |
|------|-----------|------|------|------|
| FISHER, KENNETH C. | GREEN | RED | RED | |
| FOWLER, TERRELL K. | RED | RED | RED | |
| FREEMAN, CHARLES W. | GREEN | RED | RED | |
| GARDNER, HENRY D. | RED | RED | RED | |
| GUMM, JOHN | YELLOW | RED | RED | |
| HEINRICH, DENNIS A. | RED | RED | RED | |
| HENSLEY, EDWARD R. | YELLOW | RED | RED | Attendance |
| HORN, ROGER D. | YELLOW | RED | RED | |
| HUNTINGTON, RICK L. | YELLOW | RED | RED | |
| HYDEN JR., EMANUEL | GREEN | RED | RED | |
| ISREAL, JEROME | RED | RED | RED | |
| ITALIANO, PAUL P. | *** | RED | RED | |
| KETCHAM, JAMES L. | GREEN | RED | RED | |
| KNODEL, STANLEY C. | GREEN | RED | RED | Attendance |
| MANN, STEVEN J | YELLOW | RED | RED | |
| MCCREARY, LARRY WAYNE | GREEN | RED | RED | |
| MCKAY, ROSS | RED | RED | RED | |
| OGG, FREDERICK S | GREEN | RED | RED | |
| PARSLEY, JOHN R | YELLOW | RED | RED | |
| PAXTON, DOUGLAS G | YELLOW | RED | RED | |
| ROBERTSON, DAVID E | GREEN | RED | RED | |
| SANDLIN, BARNEY | GREEN | RED | RED | Falsification of application |
| TAULBEE, EVERETT D. | *** | RED | RED | |
| THOMAS, ROBERT W. | YELLOW | RED | RED | |
| TURNER, RONALD E. | GREEN | RED | RED | |
| VOLZ, FRANCIS A. (Pete) | GREEN | RED | RED | |
| WILLIS, JAMES M. | GREEN | RED | RED | |
| YORK, JOHN | YELLOW | RED | RED | Attendance |

*** Color not indicated on Applicant Tracking Sheet.

(SP Exh. 4 ¶¶ 2-5.)

The IP supervisors and managers articulated to Smart Papers legitimate non-discriminatory employment-related reasons for not recommending the Plaintiffs. For example, it was noted that some Plaintiffs were "below average" in their ability to learn, were "instigators," had "no ability to communicate," showed "no initiative," had "conflicts with others," were "inflexible," had a "belligerent attitude," were the "worst operator," would "sabotage" his machine, "does not

accept responsibility," and had other negative employment attributes.  (See Individual Plaintiffs'
Appendix.)

Smart Papers legitimately relied on these negative references from IP supervisors and
managers who worked at the Hamilton Mill in making its decision not to hire each of these
Plaintiffs.  See Hill v. Metropolitan Gov't of Nashville, No. 02-5305, 2002 WL 31863829, at *2
(6th Cir. Dec. 17, 2002) (unpublished opinion attached hereto as SP Exh. 29) (finding that the
employer's stated reliance on the plaintiff's poor employment references was a legitimate
nondiscriminatory reason for not hiring the plaintiff); Safford v. St. Tammany Parish Fire
Protection District 1, No. Civ. A 02-0055, 2002 WL 1379133, at *8 (E.D. La. June 24, 2002)
(unpublished opinion attached hereto as SP Exh. 29) (defendants rebutted presumption of
discrimination with evidence that applicant received negative reference); Kehrer v. City of
Springfield, 104 F. Supp.2d 1001, 1008 (C.D. Ill. 2000) (fact that employee received unfavorable
reference was legitimate, non-discriminatory reason); Lewis-Calhoun v. City of Jackson, 977 F.
Supp. 1148, 1152 (S.D. Ala. 1997) (relying on negative references constituted legitimate, non-
discriminatory reason for failure to hire); Gray v. Brown, No. C.-93-2732 MHP, 1994 WL
621977, at *5 (N.D. Cal. 1994) (unpublished opinion attached hereto as SP Exh. 29) (plaintiff
"offered no evidence to overcome the proffered legitimate nondiscriminatory reasons for not
hiring her—her poor performance at the interview and the former employer's negative
reference.")

In addition to not being recommended by their IP supervisors and managers, 11 of the
Plaintiffs fared poorly in their interviews with the Weissman Group and received "Red"
interview ratings.  For example, some of these Plaintiffs received poor interview evaluations
because it was noted by the interviewer that:  he had poor workplace relationships (Bullio); had

bad arguments with co-workers (Brewer); had a hard time staying on the job because "it doesn't interest me" (Broughton); could not handle shift work and "doesn't want a job with Smart Papers"(Brandenburg); does not want to be told that he had to do something (Isreal); or was belligerent, would not answer any of the questions in the interview and breaks safety rules (Heinrich).  (See Individual Plaintiffs' Appendix.)

Smart Papers legitimately relied on these negative interviews, along with negative references, in making its decision not to hire these 11 Plaintiffs.  Mustafa v. State of Nebraska Dep't of Correctional Serv., 196 F. Supp.2d 945, 952 (D. Neb. 2002) (holding that employer established a legitimate nondiscriminatory reason for not recommending applicant for promotion based on his poor interview);  Kelley v. Goodyear Tire & Rubber Co., 45 F. Supp.2d 888, 891 (D. Kan. 1999) (finding employer legitimately rejected plaintiff's job application based, in part, on his poor interview); Safford, 2002 WL 1379133, at *8 (unpublished opinion attached hereto as SP Exh. 29) (finding reliance on a negative interview constituted a legitimate nondiscriminatory reason for failure to hire); Gray, 1994 WL 621977, at *5 (same) (unpublished opinion attached hereto as SP Exh. 29).

Overall, the results of the interviews and references from the IP supervisors and managers who worked at the Hamilton Mill establish legitimate non-discriminatory reasons for Smart Papers failing to hire each of these 46 Plaintiffs.  Smart Papers legitimately relied on these employment-related factors in refusing to hire the Plaintiffs, regardless of their age.  See Millbrook v. IBP, Inc., 280 F.3d 1169, 1176 (7th Cir. 2002) (finding that the employer legitimately refused to hire candidates who "were lacking traits needed for the job."); Luse v. Henderson, 68 F. Supp.2d 1217, 1224 (D. Kan. 1999) (finding that although plaintiff was minimally qualified, employer's perception of plaintiff's qualifications based on interview,

attendance, work habits and safety record is what was relevant); Ullmann v. Ohio Bureau of Jobs and Family Serv., 782 N.E.2d 185, 189 (Ohio Ct. of Claims 2002) (holding that employer's lack of confidence in plaintiff, coupled with fact that person who replaced her had other qualities of value to employer besides experience were legitimate nondiscriminatory reason). Smart Papers has met its burden of articulating a legitimate nondiscriminatory reasons for not hiring these 46 Plaintiffs. The burden thus returns to Plaintiffs to demonstrate pretext—which they are unable to do.

### C. The 64 Plaintiffs Cannot Show That Smart Papers' Legitimate Employment-Related Reasons For Not Hiring Them Are Pretext For Age Discrimination.

The 64 Plaintiffs cannot meet their burden because they cannot show that Smart Papers' "proffered reason[s are] unworthy of credence" or that "discriminatory reasons 'more likely' motivated [Smart Papers'] decision." Browning v. Rohm & Haas Co., 1999 WL 1000884 at *3 (unpublished opinion attached hereto as SP Exh. 29).

### 1. The 18 Plaintiffs Who Tested Positive For Drugs Cannot Establish Pretext.

Smart Papers did not hire 18 of the Plaintiffs based on the undisputed fact that they failed their drug tests. Smart Papers rejected each and every one of the 56 applicants who failed their respective drug tests, regardless of their age.

During their depositions, a few of the 18 Plaintiffs asserted that they had not taken drugs "recently," see, e.g., (SP Appendix): (Tab 65, Tolbert Dep. at 66); (Tab 59, Rodgers Dep. at 75) or that other former IP employees with "worse drug habits" were offered jobs. See, e.g., (SP Appendix): (Tab 49, Marsee Dep. at 70); (Tab 66, Turley Dep. at 30). Neither of these arguments has merit or establishes pretext. It does not matter whether an applicant used illegal drugs 3 days or 3 months prior to the drug test, or whether someone else who allegedly also used illegal drugs was somehow able to pass the drug screen. Anyone who tested positive for illegal

drugs was rejected for Smart Papers' employment, regardless of their age.  Even if the drug test

were later proven to be inaccurate — which the Plaintiffs cannot show — Smart Papers' reliance

on the drug test is a legitimate non-discriminatory reason for not hiring them and has nothing to

do with Plaintiffs' age.  See Redding, 2000 WL 1468322, at * 6 (unpublished opinion attached

hereto as SP Exh. 29) ("The fact that the employer . . . misunderstands the reasons for or

circumstances of a positive drug test does not render suspect its reliance on the employee's

failure as a reason for refusing to hire her.")[13]

### 2.    The remaining 46 Plaintiffs cannot demonstrate pretext.

In making its hiring decisions in this case, it is undisputed that Smart Papers relied on the

recommendations, experience, and judgment of the Weissman Group, the professional human

resources consulting firm with which Smart Papers had contracted for the specific purpose of

hiring the initial workforce at the Hamilton Mill.  (SOF at ¶¶ 12-14, 22.)  The Weissman Group

interviewed each applicant and relied heavily on the evaluations and judgments about each

applicant that were provided by the IP supervisors and managers who were working at the Mill at

the time.  (SOF at ¶ 20.)

Regardless of whether the Weissman Group and Smart Papers made unwise or unsound

hiring recommendations and decisions, Plaintiffs cannot establish pretext by second-guessing the

wisdom or soundness of those personnel decisions.  "[T]he aim is not to . . . question the

soundness of an employer's judgment."  McDonald v. Union Camp Corp., 898 F.2d 1155, 1160

(6th Cir. 1990).  See also Chappell, 803 F.2d at 266 ("The factfinder may not . . . focus on the

---

[13]    Significantly, none of the 18 Plaintiffs who failed their drug test requested a new test or used the
procedures that were available to them (such as requesting a test of the split sample) if they truly
believed that the test produced an erroneous result.

soundness of an employer's business judgment."); <u>Godfredson v. Hess & Clark, Inc.</u>, 173 F.3d

365, 372 (6th Cir. 1999) ("The role of the court is not to review the employer's business

decisions . . . ."); <u>Ullman v. Ohio Bureau of Jobs and Family Serv.</u>, 782 N.E.2d 185, 190 (Ohio

Ct. of Claims 2002) ("The general rule is that this court will not substitute its judgment for that

of the employer and may not second-guess the business judgments of the employers regarding

personnel decisions).

 Regardless of what Plaintiffs' assert about the Smart Papers' hiring process, it did not

adversely impact applicants age 40 or over.  The ages and selection rates of the applicants are as

follows:

| Age Range | Number of Applicants | Number Selected | Selection Rate |
|---|---|---|---|
| 60-65 | 34 | 27 | 79.4% |
| 55-59 | 86 | 68 | 79.0% |
| 50-54 | 164 | 117 | 71.3% |
| 45-49 | 166 | 120 | 72.3% |
| 40-44 | 72 | 47 | 65.3% |
| Total 40 and over | 522 | 379 | 72.6% |
| 39 and under | 46 | 31 | 67.3% |
| Total | 568 | 410 | 72.2% |

 The data shows that 72.2% of all hourly applicants from the IP workforce were offered

jobs.  For applicants in the protected group of age 40 and over, the selection rate was 72.6%,

which is higher than the selection rate (67.3%) for the younger group of under 40.  Significantly,

the oldest group of applicants, ranging in age from 60-65, had the highest selection rate (79.4%),

and the second oldest group of applicants, ranging in age from 55-59, had the second highest

selection rate (79.0%).  (SOF at ¶ 24.)

 As aptly stated by the Sixth Circuit in a prior case alleging age discrimination, "The

picture painted by the facts in this case is not one of a company discriminating on the basis of

age; it is a picture, rather, of a company retrenching in a way that required a number of

employees to compete for a smaller number of positions available in the [Smart Papers mill]." Dabrowski v. Warner-Lambert Co., 815 F.2d 1076, 1079 (6th Cir. 1987).

The mere fact that Smart Papers hired some employees who were younger than the Plaintiffs is not evidence of age discrimination. As the Sixth Circuit has stated in a restructuring context that involved the elimination of numerous employees from the defendant's workforce, "an unsuccessful older employee who brings suit for age discrimination must show more than a mere age difference between himself and those employees who better weather the storm." Dabrowski, 815 F.2d 1076, at 1080. "[T]he mere fact that a younger employee or applicant receives better treatment that an older one is insufficient to carry the burden of proof in a case under the federal [ADEA]." Id. at 1078; see, also Chappell v. GTE Products Corp., 803 F.2d 261, 267 (6th Cir. 1986) ("The isolated fact that a younger person eventually replaces an older employee is not enough to permit a rebuttal inference that the replacement was motivated by age discrimination."); Brown v. EG & G Mound Applied Tech., Inc., 117 F. Supp.2d 671, 677-78 (S.D. Ohio 2000) ("[t]he fact that a younger . . . employee was retained while Plaintiff was terminated, taken alone, is simply insufficient to establish discriminatory motives"); Wilson v. Precision Environmental Co., No. 81932, 2003 WL 21291062, at *6 (Ohio App. 8 Dist. June 5, 2003) (unpublished opinion attached hereto as SP Exh. 29) ("The mere fact that some of the retained employees were younger than [the plaintiff] does not establish pretext.").

Moreover, Plaintiffs' self-serving and unsubstantiated assertions in their depositions that they were "more qualified" than other applicants hired or that age "must have played some role," are insufficient to show pretext. See, e.g., Chappell, 803 F.2d at 266 ("Mere personal beliefs, conjecture and speculation are insufficient to support an inference of age discrimination."); Ackerman v. Diamond Shamrock Corp., 670 F.2d 66, 70 (6th Cir. 1982) (rejecting plaintiff's age

discrimination claim where "[n]othing in the record, other than personal conclusions by [the plaintiff], suggests that [the plaintiff's] age in any way was a factor in the decision."); Hein v. All American Plywood Co., 232 F.3d 482, 490 (6th Cir. 2000) ("[S]ubjective interpretations are insufficient as a matter of law to establish a discrimination claim.").

Most of the Plaintiffs who passed the drug test were rejected by Smart Papers based on unfavorable references provided by IP supervisors and managers who worked at the Hamilton Mill.  (See Chart pp. 29-30, supra.)  During their depositions, many of the Plaintiffs expressed disagreement with these references and claimed that the negative comments made about them by IP to Smart Papers were untrue.  The Plaintiffs' self-serving, subjective, and favorable views about themselves—in contrast to the negative views of their IP supervisors and managers — are not relevant to Smart Papers' hiring decisions and do not demonstrate that Smart Papers discriminated against them in any manner.  See, e.g., McDonald, 898 F.2d at 1160 (finding that the plaintiff did "not raise a material issue of fact on the decision of the quality of his work merely by challenging the judgment of his supervisors") (citation omitted).

Moreover, in addition to not being able to second-guess the judgments and evaluations of their former supervisors and managers, Plaintiffs cannot establish that Smart Papers did not rely on the negative references provided by the IP supervisors and managers, or that relying on those references somehow was a pretext for age discrimination.  In sum, the Plaintiffs are unable to demonstrate pretext, which is fatal to their age discrimination claims.  See, e.g., Irwin v. Marquette Medical Sys., Inc., 107 F. Supp.2d 974, 988-89 (S.D. Ohio 2000); Brown, 117 F. Supp.2d at 681.

### III. THE AGE DISCRIMINATION CLAIMS OF THE SIX PLAINTIFFS WHO WERE OFFERED EMPLOYMENT WITH SMART PAPERS ARE INSUFFICIENT TO WITHSTAND SUMMARY JUDGMENT.

As discussed above, 64 Plaintiffs claim that Smart Papers discriminated against them based on their age by not offering them jobs at the Mill. In contrast, 6 Plaintiffs (Arthur, Begley, E. Campbell, Greene, Holland and Rumpler) claim that Smart Papers discriminated against them based on their age by offering them jobs at the Mill. Plaintiffs cannot have it both ways.

After extensive discovery, these six Plaintiffs have no evidence that Smart Papers discriminated against them because of their age by offering them employment. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 146-47 (2000) ("the ultimate question is whether the employer intentionally discriminated"). To the contrary, Plaintiffs' own deposition testimony sheds light on the absurdness of this claim. In their depositions, Plaintiffs Arthur and Holland admitted that they received higher paying jobs than the jobs that they formerly held at the Mill when they worked for IP, and Plaintiff Holland testified that he did not want a job with Smart Papers. Offering someone a higher level position than they formerly held with a separate employer obviously is not grounds for age discrimination:

- Plaintiff Arthur (age 62 in February 2001) admitted that he was offered a "higher level position" than the job he wanted. (SP Appendix) (Tab 3, Arthur Dep. at 30) ("Q: In fact, the [position offered] was a higher level position than the [position desired], is that right? A: "Yes.")[14]

- Plaintiff Holland (age 62 in February 2001) alleged in his deposition that Smart Papers discriminated against him by hiring him because he wanted to receive severance from his former employer –IP. (SP Appendix) (Tab 37, Holland Dep. at 29). Moreover, Holland admitted that he was offered a higher level position by Smart Papers than the one he wanted, (Id. at 43-44) ("Q: So you actually wanted a lower level position than what you were offered at Smart Papers? A: Yes.") and he further

---

[14]/    Each Plaintiff is discussed in greater depth in Individual Plaintiffs' Appendix.

admitted that the position he was offered paid a higher wage than the one he wanted. (Id.)

Plaintiff E. Campbell was offered the exact same job as the one he held at IP in February 2001 at the time the Mill was sold and also testified that he did not want to work for Smart Papers:

- Plaintiff E. Campbell (age 60 in February 2001) admitted in his deposition that Smart Papers offered him the same position that he held with IP at the time the mill was sold. (SP Appendix) (Tab 15, E. Campbell Dep. at 91) ("Q: So Smart Papers was offering you the position that you held with International Paper at the time the mill was sold, correct? A: I would say so.") Additionally, Plaintiff E. Campbell testified that he did not want an offer of employment from Smart Papers. (Id. at 109-110) ("Q: It was a well-known fact that you were interested in severance and did not wish to be hired back by Smart Papers, is that correct? A: I would say so, yes.")

Plaintiffs Begley and Rumpler also stated in their depositions that they did not want offers from Smart Papers (and wanted severance from IP) and incredibly are claiming age discrimination by being offered jobs at Smart Papers. Their claims of age discrimination are meritless, and inconsistent with the claims of the other Plaintiffs who did not receive job offers.

- Plaintiff Begley (age 59 in February 2001) alleged in his deposition that Smart Papers discriminated against him by hiring him. (SP Appendix) (Tab 5, Begley Dep. at 82) ("Q: so the fact that Smart Papers offered you employment you believe was discriminatory? A: Yes."); see, also, (Id. at 30) ("I didn't want a job with Smart Papers. I wanted my severance package.")

- Plaintiff Rumpler (age 50 in February 2001) similarly testified in his deposition that Smart Papers allegedly discriminated against him by hiring him. (SP Appendix) (Tab 60, Rumpler Dep. at 57) ("Q: So what you're really claiming is that it was discrimination to hire you because you didn't want to be hired, you wanted your severance? A: Yeah, I wanted my severance. I wanted out of there.")

Finally, Plaintiff Greene was offered a position with Smart Papers, but is claiming age discrimination even though the person who received the position she wanted was substantially the same age. In addition, within weeks of her hire, Greene was promoted to a higher-paying position:

39

- Plaintiff Greene stated in her deposition that the position she wanted was filled by a person [Nancy Etter] "approximately ten years younger than me." (SP Appendix) (Tab 31, Greene Dep. at 51). In reality, Ms. Etter was 46 years old in February 2001—only three years younger than Greene, who was 49. (SP Exh. 4 at ¶ 7.) Green cannot establish that Ms. Etter was substantially younger than her pursuant to well-established caselaw. See, e.g., Black, 124 F. Supp. 2d at 575 (age difference of as much as seven years did not meet the substantially younger standard).

- Additionally, in March 2001, only weeks after being offered a position with Smart Papers, Greene was promoted to the position of Logistics Clerk. (SP Appendix) (Tab 31, Green Dep. at 54-55). This position was a non-exempt hourly position outside of the bargaining unit with higher pay than her initial job with Smart Papers. (Id.) Promoting an employee to a higher paying job is not an adverse employment action and is further evidence that Smart Papers did not—and does not—discriminate on the basis of age.

In sum, these six Plaintiffs have no evidence that Smart Papers discriminated against them on the basis of age by offering them jobs. Plaintiffs who were offered jobs by Smart Papers suffered no adverse employment action by Smart Papers. See, e.g., Policastro v. Northwest Airline, Inc., 297 F.3d 535 (6th Cir. 2002) (denying plaintiff's claim of discrimination because she did not demonstrate that she suffered an adverse employment action). They have no grounds to claim "demotion" because they never were employed by Smart Papers, and thus could not have been "reduced" in pay or stature from one position to another. See, e.g., Hooks v. Diamond Crystal Specialty Foods, 997 F.2d 793, 799 (10th Cir. 1993) (defining a demotion as "a reduction to a lower rank or grade"); Peterson v. Buckeye Steel Casings, 133 Ohio Ct. App. 715, 727 (1999) (demotion may be evidenced by a decrease in wage or salary). Moreover, two of the Plaintiffs admitted that they were offered higher-level positions than their former jobs at IP, four testified that they did not want any job whatsoever, one was offered the same position that he formerly held at IP, and one was promoted to a higher paying job only weeks after being hired by Smart Papers. In light of the above, and additional reasons cited in the Individual Plaintiffs'

Appendix, the claims of these six Plaintiffs cannot survive, and summary judgment should be granted to Smart Papers as a matter of law.

## IV.   THE DISABILITY CLAIMS ASSERTED BY 13 PLAINTIFFS AGAINST SMART PAPERS FAIL AS A MATTER OF LAW.

In addition to the other claims asserted in this litigation, several Plaintiffs have alleged that they are disabled within the meaning of the Americans with Disability Act ("ADA"), 42 U.S.C. §§ 12101 et seq., and the corresponding Ohio anti-discrimination statute, O.R.C. § 4112.02.  These Plaintiffs (the "Disability Plaintiffs") contend that, based on their alleged disabled status they were treated "differently" than non-disabled employees by Smart Papers during the Smart Papers' hiring process.  (Complaint, ¶¶ 125, 128.)  The Disability Plaintiffs, however, who number 13 or 14 individuals,[15/] are unable for several reasons to establish a *prima facie* case of disability discrimination under either the ADA or Ohio law.  Further, even if any of the Disability Plaintiffs could establish a *prima facie* case, none of them can establish that the reasons for Smart Papers' employment decision are a pretext for discrimination.  Accordingly, the Disability Plaintiffs cannot survive summary judgment.

### A.   The Disability Plaintiffs Cannot Establish Any Viable Claim of Discrimination Against Smart Papers.

As with Plaintiffs' age discrimination claims, the Disability Plaintiffs – regardless whether or not they were hired by Smart Papers – have not alleged in their Complaint nor

---

[15/]   The Fifth Amended Complaint asserts claims of disability on behalf of a Plaintiff identified only as "Campbell."  (See Complaint, ¶¶ 124, 128.)  Two Plaintiffs in this matter, however, share this last name, and Plaintiffs' counsel has never identified which Campbell – Elmer or Charles – has asserted a claim for disability in this case.  This confusion is immaterial, however, because as explained more fully below, both Elmer and Charles denied in their depositions that they even have a disability or a claim for disability.  Despite these denials, however, Plaintiffs' counsel has never withdrawn these claims.  Smart Papers thus will address the potential claims of both Elmer and Charles, but count them as one person, "Campbell," for purposes of tallying the number of Disability Plaintiffs in this action.

provided in discovery any direct evidence of intentional disability discrimination by Smart

Papers during the hiring process at the Mill.  As such, their claims must be reviewed under the

McDonnell Douglas burden-shifting model of proof.  See Monette v. EDS Corp., 90 F.3d 1173,

1178-86 (6th Cir. 1996).[16/]  Under this standard, a plaintiff must first establish a *prima facie* case

of disability discrimination by showing that:

- he or she is disabled;

- he or she is otherwise qualified for the position, with or without reasonable
  accommodation;

- he or she suffered an adverse employment decision;

- the employer knew or had reason to know of the plaintiff's disability; and

- the position remained open while the employer sought other applicants or the disabled
  person was replaced.

Monette, 90 F.3d at 1186.  If a plaintiff is successful in establishing these five elements, then the

burden of production shifts to the employer to offer a legitimate explanation for its action.  Id.

Once the employer successfully does this  – which Smart Papers does here – the plaintiff then

must introduce evidence showing that the employer's proffered explanation is unworthy of belief

or a pretext for disability discrimination.  Id.  At all times the ultimate burden of persuasion rests

squarely on the Plaintiffs.  Id. at 1186-87.

In this case, the Disability Plaintiffs fail to establish even a rudimentary *prima facie* case

of discrimination, or rebut the legitimate, non-discriminatory reasons for the employment actions

---

16/    Because Ohio's disability anti-discrimination law was modeled on the ADA, claims brought
under either the ADA or the Ohio statute follow the same analysis, and courts may rely on cases
interpreting the ADA when deciding claims under the Ohio law.  See Martin v. Barnesville
Exempted Village School Bd. of Educ., 209 F.3d 931 (6th Cir. 2000); Little Forest Med. Ctr. v.
Ohio Civ. Rights Comm'n 575 N.E.2d 1164, 1167 (Ohio 1991); Pflanz v. City of Cincinnati, 778
N.E.2d 1073 (Ohio Ct. App. 2002).

that Smart Papers took with respect to each such Plaintiff.  Smart Papers does not concede that

the Disability Plaintiffs can establish any of the required elements of a cognizable claim for

disability discrimination under either the ADA or Ohio law.  For purposes of this motion,

however, and for the convenience of the Court, the following table summarizes the many

deficiencies in each of Plaintiff's disability claims.  A checkmark (✔) denotes that the Plaintiff is

unable to satisfy a necessary element of a viable disability claim.  The numbers 1, 2, 3, 4, 5, and

6 refer to the specific elements of a disability claim which the Plaintiffs cannot satisfy, namely:

"1" failure to allege disability in an EEOC charge; "2" not disabled under applicable law; "3" not

otherwise qualified for the position; "4" has not suffered an adverse employment decision; "5"

failed to produce any evidence Smart Papers knew, or should have known, about the alleged

'disability;' and "6" cannot rebut the legitimate, non-discriminatory reason for Smart Paper's

employment action.  The Comments refer to other problems with the Disability Plaintiffs'

claims.

| PLAINTIFF | 1 | 2 | 3 | 4 | 5 | 6 | COMMENTS |
|---|---|---|---|---|---|---|---|

**A. *Plaintiffs alleging disability discrimination, yet who have admitted that they are not disabled:***

| PLAINTIFF | 1 | 2 | 3 | 4 | 5 | 6 | COMMENTS |
|---|---|---|---|---|---|---|---|
| 1. Campbell | ✓ | ✓ | | | ✓ | ✓ | Admits No Claim or disability |
| 2. Holland | ✓ | ✓ | | | ✓ | ✓ | Admits No Claim or disability |
| 3. Rumpler | ✓ | ✓ | | | ✓ | ✓ | Admits No Claim or disability |

**B. *Plaintiffs alleging disability discrimination who failed drug test:***

| PLAINTIFF | 1 | 2 | 3 | 4 | 5 | 6 | COMMENTS |
|---|---|---|---|---|---|---|---|
| 4. Gregory | ✓ | | ✓ | | ✓ | ✓ | Failed Drug Test |
| 5. Miller | ✓ | | ✓ | | ✓ | ✓ | Failed Drug Test |
| 6. Rodgers | ✓ | ✓ | ✓ | | ✓ | ✓ | Failed Drug Test |

**C. *Plaintiffs alleging disability discrimination who were hired by Smart Papers:***

| PLAINTIFF | 1 | 2 | 3 | 4 | 5 | 6 | COMMENTS |
|---|---|---|---|---|---|---|---|
| 7. Begley | ✓ | ✓ | | ✓ | | ✓ | Received Job |
| 8. Greene | ✓ | ✓ | | ✓ | ✓ | ✓ | Received Job |

**D. *Plaintiffs alleging disability discrimination not offered employment by Smart Papers:***

| PLAINTIFF | 1 | 2 | 3 | 4 | 5 | 6 | COMMENTS |
|---|---|---|---|---|---|---|---|
| 9. Brandenburg | - | ✓ | | | ✓ | ✓ | Negative Reference |
| 10. Brewer | ✓ | ✓ | | | ✓ | ✓ | Negative Reference |
| 11. Horn | ✓ | | ✓ | | | ✓ | Negative Reference |
| 12. Isreal | ✓ | ✓ | | | ✓ | ✓ | Negative Reference |
| 13. McKay | ✓ | ✓ | | | ✓ | ✓ | Negative Reference |

As discussed below, the individual Disability Plaintiffs fail to establish these specific elements of their claim. Further, even if they could, these Plaintiffs cannot rebut Smart Papers'

44

legitimate, non-discriminatory reasons for the employment actions it took regarding these

Plaintiffs.

### B.     Four of the Disability Plaintiffs, Despite the Allegations in their Complaint, Admit That They Are Not Disabled.

Of the 13 Disability Plaintiffs in this case, 4 of them – Plaintiffs Green, Holland, Rumpler

and the "Campbells" – have admitted in their respective depositions that they are not disabled or

otherwise asserting claims for disability discrimination in this lawsuit:

- Plaintiff Holland testified that he had no claim against either Smart Papers or International Paper for alleged disability discrimination.  (SP Appendix) (Tab 37, Holland Dep. at pp. 31, 48).

- Plaintiff Rumpler testified that he did not suffer from *any* physical ailments until he hurt his back approximately a year <u>after</u> Smart Papers purchased the Mill.  (SP Appendix) (Tab 60, Rumpler Dep. at pp. 22, 78).

- Plaintiff Greene testified under oath that the only claims she has against Smart Papers are her age discrimination claim and a potential defamation claim.  (SP Appendix) (Tab 31, Greene Dep. at 140-41) ("Q.   Other than your age discrimination claim and possibly the defamation claim, do you have any other claims against Smart Papers in this litigation, Campbell?  A.   Not at this time.").

- The two "Campbells," Elmer and Charles, both admitted that they either are not disabled or not asserting a claim for disability discrimination in this suit.  <u>See</u> (SP Appendix) (Tab 14, Elmer Campbell Dep. at 66) ("Q.  You are not claiming that you were discriminated against on the basis of any disability?  A.  No."); SP Appendix Tab 15:  Charles Campbell Dep. at 54 (acknowledging no claims in this lawsuit except alleged age discrimination, defamation, and WARN Act violation.).

Based on the above admissions, the disability claims of these Plaintiffs cannot survive

summary judgment.

### C.     Three of the Disability Plaintiffs Who Failed Their Drug Tests Cannot Establish a *Prima Facie* Case.

In addition to the frivolous claims of disability discrimination brought by the Plaintiffs

who admit they are not disabled, three additional Plaintiffs – Gregory, Miller, and Rodgers –

failed their mandatory pre-employment drug tests with Smart Papers.  As discussed previously,

these Plaintiffs cannot satisfy one of Smart Paper's legitimate and non-discriminatory requirements for a position with Smart Papers. No dispute exists that these Plaintiffs failed their drug test. (See discussion of Individual Plaintiffs' Appendix.) Moreover, each admitted in their depositions to have used illegal drugs in the past. See (SP Appendix) (Tab 32, Gregory Dep. at 93) (acknowledging smoking pot in the month prior to taking the test);[17] (SP Appendix) (Tab 52, Miller Dep. at 14-15) (acknowledging using cocaine in the past) (SP Appendix Tab 59); (Rodgers Dep. at 75) (same). As such, based on their drug test results, these three Disability Plaintiffs do not meet a threshold qualification for employment with Smart Papers and thus cannot establish an essential element of their *prima facie*. See, e.g., Swanson v. Univ. of Cincinnati, 268 F.3d 307, 324 (6th Cir. 2001) (holding that plaintiff, in order to assert a cognizable claim for disability discrimination, among other things must show that he or she is otherwise qualified for the position with or without a reasonable accommodation); Monette v. EDS Corp., 90 F.3d 1173, 1188 (6th Cir. 1996) (same); Redding v. Chicago Transit Auth., No. 99 C 1082, 2000 WL 1468322, at * 4 (N.D. Ill. Sept. 29, 2000) (unpublished opinion attached hereto as SP Exh. 29) (concluding that employee who tested positive for cocaine was not qualified and therefore could not establish a *prima facie* case of disability discrimination). Accordingly, the disability claims asserted by Plaintiffs Gregory, Miller, and Rodgers should be rejected for failure to establish a *prima facie* case.

---

[17] Plaintiff Gregory in fact admitted that he as so concerned about failing his drug test that he purchased special shampoo that purportedly would mask his previous drug consumption. (See SP Appendix) (Tab 32, Gregory Dep. at 94). Apparently the shampoo did not work as advertised.

**D.    Two of the Disability Plaintiffs Fail to State a Claim Because They Did Not Suffer an Adverse Job Action.**

As discussed previously, six of the Plaintiffs in this lawsuit allege that they suffered employment discrimination at the hands of Smart Papers even though Smart Papers offered them employment.  Two of these six Plaintiffs – Begley and Greene –further claim that their job offers also amount to disability discrimination because they allegedly were treated "differently" in the hiring process than non-disabled employees.  (See Complaint ¶¶ 125, 129.)  Despite extensive discovery in this case, Plaintiffs Begley and Greene have offered no evidence or support for this allegation, nor in any way explained how this "different" treatment constitutes an "adverse employment action" for purposes of their *prima facie* case.

As this Circuit has held, in order to establish an "adverse employment action" for purposes of stating a *prima facie* case, a plaintiff must show that the employment action was "materially adverse," i.e., that it "involved a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation."  Kocsis v. Multi-Care Mgt., Inc., 97 F.3d 876, (6th Cir. 1996) (citations omitted).

In this case, Plaintiffs Begley and Greene did not suffer such an action, for they were not previously employed by Smart Papers and thus Smart Papers did not "demote" them or "decrease" their pay, benefits, or status.  Smart Papers, a new employer, simply hired them as new employees as part of Smart Papers' initial workforce.  They were offered positions for which Smart Papers believed they were qualified based on its business judgment.  (See SP Exh. 18, Bergeron Dep. at 59).  Even in a situation (not present here) where an existing employer reassigns an employee in a workforce reduction, companies enjoy "considerable discretion" in making reassignment decisions that follow in the wake of job eliminations.  See Vannoy v.

47

OCSEA Local 11, 36 F. Supp. 2d 1018, 1024 (S.D. Ohio 1999).  As such, "as long as the employer's employment decisions regarding an employee are not based on impermissible considerations, the employer is entitled to considerable discretion in making business decision, such as reassignment."  Id. at 1023-24.

The same logic applies here, because Smart Papers placed employees into jobs in which it believed the employees were qualified based on their prior employment at the Mill.  (SP Exh. 18, Bergeron at 59.)  Because Plaintiffs Begley and Greene point to no evidence that Smart Papers took their disability into account when making these decisions, they cannot as a matter of law establish that they suffered an adverse employment action.

Finally, the testimony of these Plaintiffs in their depositions is illuminating and sheds light on the lack of merit in their disability claim.  First, Plaintiff Begley testified that he specifically told Smart Papers about his alleged disability so that Smart Papers would take his health condition into account when reviewing his application and reject him from employment with the Company:

> Q.     And you wrote, "open heart surgery" [on your employment application]?
>
> A.     That's when I explained [to the interviewer] I didn't want a job with Smart Paper.  I wanted my severance package; I would exit the mill because of health reasons.  And I said if I got my severance package, I would be home free.

(See SP Appendix) (Tab 5, Begley Dep. at 30).  As this testimony reveals, Plaintiff Begley in fact desired that Smart Papers do what the law forbids – take his alleged disability into account when reviewing his application and reject him for employment.  Plaintiff Begley cannot now reasonably claim that Smart Papers, by offering him a job despite his alleged disability, somehow unlawfully discriminated against him.

Plaintiff Greene's disability claim is equally dubious.  As discussed above, Smart Papers, after initially hiring her into a position for which it believed she was qualified, almost immediately thereafter promoted her to a new position that had enhanced responsibilities and a higher salary despite her alleged "disability."  (See SP Appendix Tab 31.)  Plaintiff Greene cannot now contend that these two actions, her initial hiring by Smart Papers her subsequent promotion to a new, higher paying position a few weeks later, constitute an "adverse employment decision" for purposes of establishing a *prima facie* case.

**E.    11 of The 13 Disability Plaintiffs Fail to State a Claim Under the ADA.**

In their respective EEOC Charges field before the commencement of this action, all but three of the Disability Plaintiffs failed to check the box on the charge of discrimination form alleging disability discrimination, and none of these Plaintiffs except McKay and Miller mentioned disability discrimination in the narrative describing their charge.[18/]  It is undisputed that each of the Plaintiffs' charges that were filed with the EEOC were prepared by Plaintiffs' counsel in this case.  (See supra note 11.)  It is also undisputed that each and every one of these charges essentially followed the same boilerplate script, alleging that the individual charging party was discriminated in some fashion on the basis of age.[19/]

---

[18/]    Plaintiff Rodgers and Horn did not even file a Charge of Discrimination with the EEOC before commencing this action.  (See SP Exh. 33 (Deposition Excerpts) Rodgers Dep. at 66; Horn Dep. at 19, 83.)  In addition, Plaintiff Brandenburg has not alleged discrimination under the ADA.

[19/]    Each of the Plaintiffs' charges in this lawsuit, regardless of the specific circumstances surrounding the Plaintiffs' former employment with IP, state that the charging party "applied for the position" that the employee formerly had performed for IP, and that IP and Smart Papers "hired younger people into the open positions, thereby eliminating many older workers who had the most seniority, experience, and qualifications."  Each also alleged that they "believed" a "younger person was hired into the position" in which the charging party had applied."  In other words, the narratives allege only age discrimination, except for McKay and Miller, which do mention disability, albeit briefly.  (SP Exh. 32.)

As this Circuit has held, it is axiomatic that federal courts lack subject matter jurisdiction to hear claims of discrimination under the ADA unless the plaintiff either first files a charge of discrimination with either the EEOC or corresponding state agency, or the court determines that the claim brought in litigation could have been expected to grow out of the initial EEOC charge. See Jones v. Sumser Retirement Village, 209 F.3d 851, 853-54 (6th Cir. 2000); Abeita v. TransAmerica Mailings, Inc., 159 F.3d 246, 254 (6th Cir. 1998). Because a disability claim cannot plausibly be expected to grow out of a charge of age discrimination, the ADA claims in this lawsuit filed on behalf of Plaintiffs Begley, Brewer, the two "Campbells," Greene, Gregory, Holland, Horn, and Rumpler cannot withstand summary judgment.

Finally, the EEOC charge filed by Disability Plaintiff Isreal does not confer subject matter jurisdiction on this Court over his ADA claim. In Plaintiff Isreal's charge, he merely checked the box for "Disability," but his narrative is confined to the allegation of age discrimination. (SP Exh. 33.)

The mere fact that a plaintiff has checked the box for "disability" on a charge filed with the EEOC does not mean that the plaintiff can assert a claim for discrimination where the charge does not otherwise allege any facts related to the purported discrimination. See, e.g., Allen v. St. Cabrini Nursing Home, Inc., 2001 WL 286788, at *4 (S.D.N.Y. Mar. 9, 2001) (unpublished opinion attached hereto as SP Exh. 29) (dismissing race discrimination claims even though "race" had been checked on EEOC charge because narrative did not raise any allegations of race discrimination); Mohan v. American Telephone & Telegraph Co., 1999 WL 495113, at *10 (N.D. Ill. June 30, 1999) (unpublished opinion attached hereto as SP Exh. 29) ("[M]erely checking a box – without more – does not fulfill the administrative purposes that a charge with the EEOC is designed to serve, and does not provide a basis for a later federal court

discrimination complaint."). As one court has noted, "[w]ere it otherwise, plaintiffs could circumvent the 'reasonably related' rule altogether by simply checking every box on their EEOC form, even if they alleged no facts to support their claims." McKinney v. Eastman Kodak Co., 975 F. Supp. 462, 466 (W.D.N.Y. 1997).

> F.    The "Disability" Plaintiffs are Not "Disabled" Within the Meaning of State or Federal Law.

Even if the Court were to consider any of the Disability Plaintiffs' ADA claims, the majority of these Plaintiffs cannot make out a *prima facie* case for discrimination under either federal or state law because they are not disabled within the meaning of the ADA or Ohio law. In their Fifth Amended Complaint, the Disability Plaintiffs (with the exception of Plaintiff Brandenburg, who was not mentioned in ¶ 82 of the Fifth Amended Complaint, the sole paragraph that addresses alleged disability discrimination) simply assert in conclusionary terms that they "are disabled and are qualified individuals with disabilities as defined under state and federal law." (Complaint ¶ 82. )

The ADA defines a disability as a "physical or mental impairment that substantially limits one or more major life activities of such individuals; a record of such impairment; or being regarded as having such an impairment." See 42 U.S.C. § 12102(2). After extensive discovery, the Disability Plaintiffs have produced no evidence that they meet this definition.

To be "substantially limited" in a major life activity, an individual must be "[u]nable to perform a major life activity that the average person in the general population can perform" or be "significantly restricted as to the condition, manner or duration under which [that] individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1) (2000). As this Court has stated, "[t]o be a disability under the ADA,

51

an impairment must 'limit an individual, not in a trivial or even moderate manner, but in major

way.'"  White v. Honda of America Mfg., 241 F. Supp. 2d 852, 856 (S.D. Ohio 2002) (citations

omitted).  As such, a distinction must be drawn between those impairments that merely affect

major life activities from those that substantially limit those activities.  Id.  (citations omitted).

This assessment must be done on a "case-by-case basis."  Albertson's, Inc v. Kirkingburg, 527

U.S. 555, 565-67 (1999) (whether an individual has a disability under the ADA is an

individualized issue); see also Sutton v. United Air Lines, Inc., 527 U.S. 471, 482 (1999) (same),

and the ADA requires plaintiffs to prove a disability by offering evidence that their alleged

limitation is substantial "in terms of their own experience . . . ."  U, 527 U.S. at 565.

    Under these standards, the Disability Plaintiffs are unable to satisfy their burden of proof.

As the following chart reveals, six of the Disability Plaintiffs testified in their depositions that,

despite the alleged impairments, they still were able to do their job (and then some) at the time

Smart Papers purchased the Mill:

| Disability Plaintiff | Alleged Disability and Purported Substantial Limitations (or Lack Thereof) |
|---|---|
| 1. Begley | Testified that, despite heart condition, he was not only able to do his job, but that, while working for Smart Papers after he was hired, he also performed the job of another employee because, as Begley put it, she was "female" and could not do the job herself. (SP Exh. 34 (Deposition Excerpts),Begley Dep. at 94-96.) |
| 2. Brandenburg | Testified that, despite problems associated with his hip, back, and depression related to the stress of both conditions, was able to work "to the best of my ability" at his job.  (SP Exh. 34, Brandenburg Dep. at 112, 128.) |
| 3. Brewer | Testified that he suffered a back injury in 1999 that placed him on a eight-hour work restriction, but that nonetheless he was physically and mentally able to perform the essential functions of any job Smart Papers may have offered him. (SP Exh. 34, Brewer Dep. at 50, 97.) |
| 4. Isreal | Testified had back injury dating back to 1994-1995. However, last saw a doctor in approximately 1996. Condition did not affect his ability to do job, he never |

| Disability Plaintiff | Alleged Disability and Purported Substantial Limitations (or Lack Thereof) |
|---|---|
| | complained about it, never heard any negative comments directed towards him, and did not tell Smart Papers about his alleged condition. Also testified that he felt qualified to do his job, and believed he was physically able to perform it. (SP Exh. 34, Isreal Dep. at 82-83, 85-88, 135.) |
| 5.  McKay | Testified had arm injury dating back to 1975 that did not affect his ability to perform his job between 1998 and 2001, the date of his last surgery.  In addition, had valve replacement in 1998, which rectified any problem he had with his heart.  Also testified that, at all times, he could perform his job, and did not ask for a reasonable accommodation because of his alleged disability.  (SP Exh. 34, McKay Dep. at 71-74.) |
| 6.  Rodgers | Testified that he had two screws inserted in his leg during the 1980's that at times causes his arthritis to flair up.  Despite his condition, testified he was physically able to and actually could do his job without any restrictions.  (SP Exh. 34, Rodgers Dep. at 66-67, 70, 131-132.) |

The remaining Plaintiffs fare no better.  As discussed above, Plaintiffs Elmer and Charles Campbell, along with Greene, Holland, and Rumpler, have admitted that they do not have a disability or a claim for disability discrimination.  As such, they too cannot establish a *prima facie* case.  In addition, Plaintiffs Horn, Miller, and Rodgers cannot establish that they were otherwise qualified for a position with Smart Papers.

First, Plaintiff Horn cannot establish that he meets an essential function of a job with Smart Papers because he admitted in his deposition that he was medically unable to report to work with Smart Papers. (See SP Exh. 34:  Horn Dep. at 93).  See Gantt v. Wilson Sporting Goods Co., 143 F.3d 1042, 1047 (6th Cir. 1998) (finding that, "because [plaintiff] was not released by her doctor to return to work, she has not met the second requirement [of her *prima facie* case] that he is qualified to perform the essential functions of the job"); Tyndall v. Nat'l Educ. Ctrs. Inc., 31 F.3d 209, 213 (4th Cir. 1994) ("[a]n employee who cannot meet the attendance records of the job at issue cannot be considered a 'qualified' individual protected by

the ADA . . . an employee must be willing an able to demonstrate . . . skills [necessary to do job] by coming to work on a regular basis"); <u>Shirey v. Pepperidge Farm Inc.</u>, 2002 WL 31233243, at *4 (N.D. Ohio 2002) ) ("[b]ecause plaintiff was not released by his doctor to return to work, he did not meet the second requirement that he be qualified to perform the essential function of the job.")

In addition, Plaintiffs Gregory, Miller, and Rodgers, given their positive drug test results, were unable to show that they met a basic hiring criteria of employment with Smart Papers.  <u>See Redding</u>, 2000 WL 1468322, at *4 (unpublished opinion attached hereto as SP Exh. 29) (individual not qualified for purposes of ADA where he failed drug test).

### G.     The Disability Plaintiffs Also Fail to Establish That They Told Smart Papers They Were Disabled During the Hiring Process.

The fourth element of the Disability Plaintiffs' *prima facie* case requires them to demonstrate that Smart Papers knew or had reason to know of their alleged disabilities.  <u>See Monette</u>, 90 F.3d at 1185.  An employer is not required to speculate as to the extent of an employee's alleged disability or an employee's need or desire for an accommodation.  <u>Hammon v. DHL Airways, Inc.</u>, 165 F.3d 441, 449-50 (6th Cir. 1999); <u>Gantt v. Wilson Sporting Goods Co.</u>, 143 F.3d 1042, 1046-47 (6th Cir. 1998); <u>Powell v. Morris</u>, 37 F. Supp. 2d 1011, 1015 (S.D. Ohio 1999).  Rather, an employer has notice of an employee's alleged disability when the employee tells the employer that she is disabled.  <u>See Powell</u>, 37 F. Supp. 2d at 1015-16 (citations omitted).

In this case, 11 of the 13 Disability Plaintiffs did not tell Smart Papers or its representatives during the interview process about any alleged disability or a need for reasonable accommodation:

| Disability Plaintiff | Smart Papers' Lack of Knowledge |
|---|---|
| 1. Brandenburg | Testified he did not tell anyone at Smart Papers about his disability. (See SP Exh. 37 (Deposition Excerpts): 16.) |
| 2. Brewer | Testified that he did not recall telling anyone from Smart Papers about his alleged disability. (SP Exh. 37, Dep. at 97-98.) |
| 3(a). Campbell, Charles | Testified he did not have claim for disability and thus could not have told Smart Papers anything about an alleged disability. |
| 3(b). Campbell, Elmer | Testified he did not have a claim for disability and thus would not have told Smart Papers anything about an alleged disability. |
| 4. Greene | Testified she did not have claim for disability and thus could not have told Smart Papers anything about an alleged disability. |
| 5. Gregory | Testified that he did not tell Smart Papers that he needed any accommodation to do his job. (SP Exh. 37, Dep. at 121). |
| 6. Holland | Testified had no claim for discrimination on the basis of disability (SP Exh. 37: Dep. at 31, 38), and thus could not have told Smart Papers anything about an alleged disability. (SP Appendix, Tab 31.) |
| 7. Isreal | Did not tell Smart Papers about alleged disability, knew of no negative comments about his alleged disability when he worked at IP, and had no evidence Smart Papers took it into account during process (SP Exh. 37, Dep. at 88, 134). |
| 8. McKay | Testified did not tell Smart Papers about his disability. (SP Exh. 37, Dep. at 75). |
| 9. Miller | Testified that, unless someone knew him, person could not tell he was disabled, and that he did not tell anyone from Smart Papers about his alleged condition. (SP Exh. 37, Dep. at 66, 110.) |
| 10. Rodgers | Testified he did not recall telling anyone from Smart Papers about his disability (SP Exh. 37, Dep. at 132). |
| 11. Rumpler | Testified not disabled (SP Exh. 37, Dep. at 22, 28), and thus could not have told Smart Papers anything an alleged disability. |

In addition to not telling Smart Papers that they were disabled, Smart Papers did not

otherwise know of any alleged disabilities. As Disability Plaintiff Gregory acknowledged, IP

kept employee medical files separate from employee personnel files, retaining the former in the

IP Medical Department and the latter in the IP Personnel Department.  (SP Exh. 37, Gregory

Dep. at 121-22.)  Further, Mary Rita Weissman, when making hiring recommendations, did not

request, receive, or review any medical files of the applicants and had no knowledge of any of

the applicant's alleged disabilities.  (See SP Exh. 5 at 101-02; SP Exh. 2 at ¶ 8.)

> **H.    The Disability Plaintiffs Cannot Challenge the Legitimate, Non-Discriminatory Reasons Behind Smart Paper's Employment Actions.**

Even if any of the Disability Plaintiffs could establish the basic elements of a *prima facie*

case of disability discrimination (which for a variety of reasons they cannot), none can rebut the

legitimate, non-discriminatory reasons behind the employment action Smart Papers took with

respect to each of them.  Smart Papers legitimately relied on several factors – including the

Plaintiffs' drug test results and the references that these Plaintiffs received from their former IP

managers or supervisors – when Smart Papers made its initial hiring decisions.  These reasons

which are set forth below, and are more fully explained in the Individual Plaintiffs' Appendix,

conclusively demonstrate that Smart Papers did not rely on impermissible factors in deciding

whether to hire the individual Plaintiffs:

| Disability Plaintiff | Legitimate, Non-Discriminatory Reason Behind Employment Action |
|---|---|
| 1. Begley | Offered position in former department at IP, acknowledged that Smart Papers reduced the number of employees performing his former IP job from four to three, and that the three employees Smart Papers retained in the position were qualified operators.  (SP Appendix Tab 5.) |
| 2. Brandenburg | Not recommended where reference indicated among other things: difficulty staying focussed; viewed the Company as the enemy and managers as worthless; undependable; and refused to use his skills. (SP Appendix Tab 9.) |
| 3. Brewer | Not recommended where reference indicated among other things: troublemaker; uncooperative; wanted the opposite of what his supervisors and managers wanted; took no pride in his work; and bickered with fellow operators. (SP Appendix Tab 10.) |

| Disability Plaintiff | Legitimate, Non-Discriminatory Reason Behind Employment Action |
|---|---|
| 4(a).  Campbell, Charles | Not applicable because not claiming he is disabled. (SP Appendix Tab 14.) |
| 4(b).  Campbell, Elmer | Not applicable because not claiming he is disabled. (SP Appendix 15.) |
| 5.  Green | Not applicable because not claiming she is disabled. (SP Appendix Tab 31.) |
| 6.  Gregory | Failed drug test. (SP Appendix Tab 32.) |
| 7.  Holland | Not applicable because claiming not disabled. (SP Appendix Tab 37.) |
| 8.  Horn | Not recommended where admitted he was not able to report to work. (SP Appendix Tab 38.) |
| 9.  Isreal | Not recommended where reference indicated among other things: conflicts with others; and tardy more often than normal.  (SP Appendix Tab 41.) |
| 10.  McKay | Not recommended where reference indicated among other things: disciplined for safety violations; supervisor questioned whether he preformed his quality checks and his overall honesty; agitator; troublemaker; and no communication with his supervisors or managers. (SP Appendix Tab 51.) |
| 11.  Miller | Failed drug test. (SP Appendix 52.) |
| 12.  Rodgers | Failed drug test. (SP Appendix 59.) |
| 13.  Rumpler | Not applicable because admits not disabled. (SP Appendix Tab 60.) |

Smart Papers legitimately relied on these references or drug test results when making its hiring decisions, and thus meets its burden of articulating a legitimate non-discriminatory reason for its employment decisions regarding the Disability Plaintiffs.  Moreover, the Disability Plaintiffs have not and cannot demonstrate that these reasons are a pretext for disability discrimination.

## V.    PLAINTIFFS' DEFAMATION CLAIM AGAINST SMART PAPERS CANNOT BE SUSTAINED

Plaintiffs allege in their Complaint that Defendant IP offered Smart Papers several reasons for not offering jobs to Plaintiffs and that Defendants "publicly and privately referred to some or all of the Plaintiffs as 'excess baggage' and made other disparaging comments."

(Complaint ¶¶ 132-133.)  Plaintiffs cannot establish any element of their *prima facie* case of defamation against Smart Papers and therefore summary judgment should be granted as a matter of law.

### A.    Plaintiffs' Claim of Defamation is Not Directed Towards Smart Papers

Smart Papers maintains that Plaintiffs' claim of defamation is directed at Defendant International Paper and not Defendant Smart Papers.  Specifically, the Complaint alleges that "Defendant IP offered Defendants Sun Capital and Smart several reasons upon which to base not offering jobs to Plaintiffs."  (See Complaint ¶ 132) (emphasis added).  Based on these alleged "negative references," it is alleged that "Defendant IP's actions were willful, wanton, and in complete reckless disregard to the rights of Plaintiffs…."  (See Complaint ¶ 136) (emphasis added).  From the outset therefore, Plaintiffs' defamation claim was not directed towards Smart Papers.  This is not surprising because Smart Papers was a new company with no prior knowledge of the Plaintiffs.  It did not give job references for the Plaintiffs, it received such references from IP.

### B.    Plaintiffs Have Released Smart Papers From Any Claim of Defamation

Smart Papers is not aware of any authority holding that the <u>receiving party</u> of a job reference can be found liable for defamation, especially where the receiving party did not publish the reference to third parties.  Moreover, in this case, the Plaintiffs explicitly authorized Smart Papers (the "Buyer" of the Mill) to receive the job reference information, and released Smart Papers from any liability associated therewith.  The release states:

> I, [applicant's name], hereby authorize representatives of International Paper Company (the "Company') to make available any information contained in my personnel files to Smart Papers L.L.C (the "Buyer") or to any representative of the Buyer.  I further hereby authorize Company managers/supervisors to meet with the Buyer and/or representatives of the Buyer to discuss my job performance and the information contained in my personnel files.  I authorize representatives of the Company <u>to</u>

> provide the above-referenced information to the Buyer, or to any representative of the Buyer, prior and subsequent to the completion of the sale of the Mill's assets.
>
> In addition, I hereby release the Company and the Buyer and their subsidiaries, affiliates, officers, directors, managers, supervisors, agents, representatives and employees from any claims arising under federal, state or local law relating to the disclosure of the above-referenced information to the Buyer or its representatives.  I further hereby agree not to bring any action or proceeding against the Company, the Buyer or its representatives relating to the Company's disclosure of the above-referenced information. (SP Exh. 16.) (emphasis added)

Ohio courts routinely recognize the validity of such releases to bar future tort liability, such as defamation, so long as the intent of the parties is stated in clear and unambiguous terms. See Denlinger v. City of Columbus, Case No. 00AP-315, 2000 WL 1803923 (Ohio Ct. App. Dec. 7, 2000) (unpublished opinion attached hereto as SP Exh. 29) (finding release where employee waived all claims "arising from or in connection with his employment and resignation" clearly and unambiguously includes plaintiffs' defamation claim).  The release signed by each of the Plaintiffs in this case clearly states what kind of liability is contemplated (liability arising out of the disclosure of personnel files or information pertaining to applicant's job performance) and clearly states who is being released from such liability ("I further hereby agree not to bring any action or proceeding against the Company (IP), the Buyer (Smart Papers) or its representatives.") (SP Exh. 16.)

This release is sufficiently specific and clear and bars Plaintiffs' claim of defamation arising out of any information disclosed to Smart Papers by IP.  See also, Schuman v. Lake Hosp. System, Case No. 96-L-035, 1997 WL 124225 (Ohio Ct. App. Feb. 28, 1997) (unpublished opinion attached hereto as SP Exh. 29) (barring plaintiff's defamation claim predicated upon alleged false statements concerning her work ethic because she signed unambiguous release releasing appellant from "any and all liability"); Wall v. Ohio Permanente

Medical Group, 695 N.E.2d 1233, 1244 (Ohio Ct. App. 1997) (plaintiff's claim of defamation and tortious interference barred by broad release) (citing Pinger v. Behavioral Science Center, Inc., 556 N.E.2d 209 (Ohio Ct. App. 1988) (same)); Ostasz v. Medical College of Ohio, 691 N.E.2d 371 (Ohio Ct. Cls. 1997) (barring plaintiff's defamation claims where he signed a waiver and release specifically identifying the party he was releasing).

### C.    Plaintiffs Cannot Establish Any Elements of Their *Prima Facie* Case

Assuming, arguendo, that the Court considers a defamation claim against Smart Papers notwithstanding the release, Plaintiffs still cannot satisfy the elements of a *prima facie* case. Under Ohio law, the essential elements of a defamation action are: (1) a statement published by the defendant; (2) the statement is materially false; (3) the statement is one of fact, not opinion; (4) the statement has a defamatory meaning toward the plaintiff; (5) the defendant published the false statement with the requisite degree of fault; and (6) the publication of the statement is the proximate cause of the injury to the plaintiff.  See Celebreeze v. Dayton Newspapers, Inc., 41 Ohio App. 3d 343, 346 (Cuyahoga 1988).  To survive a motion for summary judgment in a defamation action, the plaintiff must make a sufficient showing of the existence of every element essential to his or her case.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

### 1.    Plaintiffs Have Produced No Evidence of Any Statements for Which Smart Papers is Responsible.

Assuming, arguendo, that the employment references provided by IP supervisors and managers to the Weissman Group were defamatory, they were not made by Smart Papers.  Smart Papers did not provide any references regarding Plaintiffs, but rather received references in the

course of the hiring process.[20/]  Under Ohio law, a defamation claim requires proof that the defendant made the alleged statements: "In an action for defamation, the plaintiff's *prima facie* case is made out when he has established a publication to a third person for which the defendant is responsible . . . ."  See <u>Hahn v. Kotten</u>, 43 Ohio St. 2d 237, 243 (1975) (emphasis added).  Because Smart Papers did not make any statements with regard to the references provided by IP managers and/or supervisors, but rather received such statements, Plaintiffs can not establish an essential element of their claim.

To the extent that Plaintiffs somehow attempt to base their defamation claim against Smart Papers on the references provided by IP managers and/or supervisors, they cannot establish that the references were published by Smart Papers to any third party.   See <u>Bram v. M. Weingold & Co.</u>, 2000 Ohio App. LEXIS 1375 (March 20, 2000) (unpublished opinion attached hereto as SP Exh. 29) ("publication is an essential element of a cause of action for slander.")  To the contrary, Smart Papers used the references solely for the purpose of making employment decisions regarding the applicants and did not disclose the contents of the references to any third party.

To the extent Plaintiffs attempt to rely on an alleged statement of "excess baggage," or "other disparaging comments," Plaintiffs cannot sustain a claim against Smart Papers.  Specifically, in their depositions, Plaintiffs were unable to identify any specific statements made by any person from Smart Papers, when such alleged defamatory statements were made, where they were made, to whom they were made, or in what context they were made.  (<u>See</u> Individual

---

20/    Assuming that the statements made by IP managers and/or supervisors are defamatory, which they are not, a qualified privilege would apply to such statements.  <u>See</u> <u>Rainey v. Shaffer</u>, 456 N.E. 2d 1328, 1332 (Ohio Ct. App. 1983).

Plaintiffs' Appendix.)  Failure to identify who made the allegedly defamatory statements or what the unidentified person stated is fatal to Plaintiffs' claim of defamation.  See, e.g., Howell v. Stark County Cmty. Action Agency, 63 F. Supp.2d 843 (N.D. Ohio 1999) (failure to specifically identify who made the defamatory statements and when they were allegedly made results in the failure to establish a *prima facie* case of defamation); Wall v. Ohio Permanente Medical Group, Inc., 695 N.E. 2d 1233, 1244 (Ohio Ct. App. 1997) (plaintiff failed to support defamation claim without identifying who made the allegedly defamatory statement or what was said).  In fact, Plaintiffs' deposition testimony contradicts one another as to whether such statements were made, who made such statements, and when they were made.  (Compare (SP Appendix Tab 31, Greene Dep. at 88-89) (testifying she saw an "article in the mill" using term excess baggage while working at IP sometime between 1993 and 1997) and (SP Appendix Tab 18, Jerry Combs Dep. at 70-76) (saw a company document while he worked at IP that referred to older people as excess baggage) with (SP Appendix Tab 45, Ketcham Dep. at 59) (heard comments regarding excess baggage by members of a private club he frequents) and (SP Appendix Tab 66, Turley Dep. at 35-36) (saw term excess baggage on front page of newspaper in later part of 2000 before talks of selling the mill.)

Additionally, numerous Plaintiffs admitted in their depositions that their defamation claim was based on hearsay and rumor.  (See, e.g., SP Appendix Tab 45, Ketcham Dep. at 59) (heard comments regarding excess baggage by members of a private club he frequents); (SP Appendix Tab 27, Gardner Dep. at 78-79) (defamation claim based, in part, on hearsay); (SP Appendix Tab 51, McKay Dep. at 62-63) (same); (SP Appendix Tab 70, Wilkins Dep. at 88) (may have heard the term excess baggage when it "spread through the mill like wildfire.")  This lack of evidence is fatal to their claims.  See Ashcroft v. Mount Sinai Medical Center, 588  N.E.

2d 280, 284 (Ohio Ct. App. 1990) (defamation allegation based on speculation and "rumors by way of the grapevine" is fatal to claim); see also Lathwell v. Lorain County Jobs For Ohio's Graduates, 2000 WL 563331 (Ohio Ct. App. May 10, 2000) (unpublished opinion attached hereto as SP Exh. 29) (plaintiff's evidence of defamation was based on hearsay and was thus inadmissible evidence to support defamation claim).  As a result, Plaintiffs cannot establish that a statement was made for which Smart Papers was responsible and summary judgment should be granted as a matter of law.

In their depositions and their boilerplate Responses to International Paper's Interrogatories, Plaintiffs uniformly state that "defamatory statements were also published about Plaintiffs in the Journal-News newspaper of Bulter County, Ohio and possibly other newspapers."  However, Plaintiffs could not identify any defamatory statements by Smart Papers that were in fact published in any newspaper.  (See Individual Plaintiffs' Appendix.)  Plaintiffs, and their counsel, had ample opportunities to bolster their defamation claim and provide evidence of even one defamatory statement against Smart Papers, but they failed to do so.

With only a few weeks left in discovery and after numerous depositions had been conducted, Plaintiffs' counsel produced approximately 67 pages of various newspaper articles relating to the sale of the Hamilton Mill.  None of these articles, however, contain allegedly defamatory statements made by Smart Papers.  In fact, Plaintiffs' counsel stated on the record that he had not seen and did not have a copy of any newspaper article that used the term "excess baggage."  (SP Exh. 35) (Mr. Reul (counsel for Plaintiffs) "Have I seen [the article referring to "excess baggage"] personally? No."  Ms. Goodboe (counsel for IP): "And you've never had a copy of it in your possession, the attorneys have never had a copy of it?"; "Mr. Reul:  No, no.  I mean we'd certainly produce it to you if we had it.")

To the extent that Plaintiffs' defamation claim is based upon one newspaper article where Smart Papers' Chief Operating Officer, Dan Maheu, is quoted as saying "smart people tend to do that!," their claim fails as a matter of law.  (SP Exh. 36.)  The statement was made in reference to the new workforce and its ability to help Smart Papers succeed.  It is a compliment to the existing workforce, using "smart" as a double entendre, and it clearly is an opinion.  Although some of the Plaintiffs claim that this statement implied that they were stupid, Ohio does not recognize defamation through implied statements.  See Krems v. University Hosp. of Cleveland, 726 N.E.2d 1016, 1021 (Ohio Ct. App. 1999).

### 2.    Plaintiffs Have Produced No Evidence of a Materially False Statement

Plaintiffs additionally have the burden of proof under Ohio law to prove that the allegedly defamatory statements are materially false.  National Medic Serv. Corp. v. E.W. Scripps Co., 61 Ohio App. 3d 752, 755 (1989).  Because Plaintiffs have not identified any specific statements made about them by Smart Papers, they cannot meet their burden to show that such statements are false.

To the contrary, as detailed in Individual Plaintiffs' Appendix, certain Plaintiffs allege that their defamation claim is based, in part, on such things as the fact that they were not hired (SP Appendix Tab 1 (Abner Dep. at 69)) and the fact that applicant's had to take a drug test.  (SP Appendix Tab 37 (Holland Dep. at 48).)  These allegations, which are (1) not statements, and (2) not made by any Smart Papers' employee, are true.  To the extent that Plaintiffs are alleging that such realities constitute defamation, they cannot establish that they are false.  See, Ohio Rev. Code Ann. § 2739.02 (truth is a complete defense in a defamation action).

### 3.    Plaintiffs Have Produced No Evidence of a Statement of Fact

Under Ohio law, for a statement to be defamatory it must be a statement of fact and not of opinion.  Vail v. The Plain Dealer Publishing Co., 72 Ohio St. 3d 279, 281 (1996).  As

discussed above, Plaintiffs fail to identify any false statements made by Smart Papers and

therefore cannot establish this prong of their *prima facie* case. To the extent that Plaintiffs allege

that someone from Smart Papers used the term "excess baggage"—which they have presented no

evidence to support—they cannot prove that this was a factual statement and not one of opinion.

The statement "excess baggage," when applied to persons in an employment context, suggests

that the persons were not needed. In hiring the initial workforce at the Hamilton Mill, it was the

opinion and judgment of Smart Papers that the Plaintiffs were not needed.

### 4. Plaintiffs Have Produced No Evidence That Any Statements Made By Smart Papers Were Defamatory Towards Plaintiffs.

Although it is generally "for the court to decide as a matter of law whether certain

statements alleged to be defamatory are actionable or not," Plaintiffs have not presented any

evidence of a statement made by Smart Papers for the Court to make such a determination.

Yeager v. Local Union 20, 6 Ohio St. 3d 369, 372 (1983).

To the extent that Plaintiffs rely on statements such as "excess baggage" or "smart people

tend to do that" for their defamation claim, their reliance is misplaced as these terms do not have

an explicit defamatory meaning. See, e.g., Krems v. University Hosp. of Cleveland, 133 Ohio

App. 3d at 12 (rejecting plaintiff's argument that the defendants committed libel by "implying"

that plaintiffs sought to "sucker" the public into contributing to a health care fund for their sick

son). Plaintiffs cannot imply a meaning to a general statement in order to establish their

defamation claim.[21]

---

[21] Additionally, Plaintiff Eaton stated that his defamation claim is based, in part, on the fact that he did not get a job because that implied that he was not "good enough to do the job." (SP Appendix 23, Eaton Dep. at 95-96) This allegation is meritless as no statement was made to form the basis of his defamation claim and defamation cannot succeed by way of implication. See Lawson v. AK Steel Corp., 121 Ohio App. 3d 251 (1997) (rejecting plaintiff's defamation claim on the basis that his demotion left an impression of wrongdoing).

Additionally, Plaintiffs in their depositions did not identify any specific statements made by Smart Papers that were defamatory towards a particular Plaintiff. This lack of evidence is fatal to their claim. See, e.g., Schuman v. Lake Hosp. System, Case No. 96-L-035, 1997 WL 124225 (Ohio Ct. App. Feb. 28, 1997) (unpublished opinion attached hereto as SP Exh. 29) (granting summary judgment on defamation claim where plaintiff lacked evidence as to any specific statement made in regard to him).

> **5.      Plaintiffs Produced No Evidence To Prove That Smart Papers Was Negligent.**

Plaintiffs have the further burden of proving that Smart Papers acted with the requisite degree of fault in publishing allegedly defamatory statements. Lansdowne v. Beacon Journal Publishing Co., 32 Ohio St. 3d 176, 178 (1987). To the extent that Plaintiffs can establish the other elements of their *prima facie* case of defamation, they must prove by clear and convincing evidence that the Smart Papers failed to act reasonably in attempting to discover the truth or falsity of the defamatory character of the publication. Id. Because Plaintiffs have not identified any defamatory statements attributable to Smart Papers, they cannot establish that Smart Papers somehow was negligent in making certain statements.

> **6.      Plaintiffs Have No Evidence To Show That They Were Injured By Any Statements Made By A Smart Papers' Employee.**

Plaintiffs have the additional burden of proving that they were damaged by Smart Papers' alleged defamatory statements. Bram, 2000 Ohio App. LEXIS 1375. Because Plaintiffs have not identified any defamatory statements made about them by any persons at Smart Papers, when they were made, to whom they were made, or in what context they were made, they cannot show that they suffered injury as a result of such statements. Id. at *10 ("appellant simply could not identify one instance in which someone knew of the alleged defamatory statements and thought less of him as a result").

Accordingly, for all the foregoing reasons, Plaintiffs' allegations of defamation against Smart Papers are meritless, and summary judgment should be granted to Smart Papers as a matter of law.

## <u>CONCLUSION</u>

For all of the reasons set out above, Smart Papers respectfully asks the Court to grant its Motion for Summary Judgment in its entirety.

Respectfully Submitted,

<u>/s Robert J. Hollingsworth / by Stanley F. Lechner<br>per telephone permission</u><br>
Robert J. Hollingsworth (0024559)<br>
Trial Attorney<br>
CORS & BASSETT, LLC<br>
537 East Pete Rose Way<br>
Suite 400<br>
Cincinnati, Ohio 45202<br>
Telephone: 513.852.8200<br>
Facsimile:  513.852.8222

Stanley F. Lechner<br>
Margery Sinder Friedman<br>
Laine S. Posel<br>
Of Counsel<br>
MORGAN, LEWIS & BOCKIUS, LLP<br>
1111 Pennsylvania Avenue, N.W.<br>
Washington, DC  20004<br>
Telephone:  202.739.3000<br>
Facsimile:   202.739.3001

Counsel for Defendant Smart Papers, LLC

Dated: September 30, 2003

67

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing Defendant Smart Papers' Motion for Summary Judgment and Memorandum of Law in Support with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Randolph H. Freking, Esq.
George M. Reul, Jr., Esq.
Freking & Betz
215 East 9th Street, 5th Floor
Cincinnati, OH 45202

and I hereby certify that I have sent this document by First Class Mail, postage prepaid, on this 30th day of September, 2003, to the following non CM/ECF participants:

Counsel for Defendant International Paper Company:

W. Carter Younger, Esq.
Vincent Miraglia, Esq.
McGuire Woods LLP
1050 Connecticut Avenue, N.W.
Suite 1200
Washington, DC 20036

Michael A. Roberts, Esq.
Graydon Head & Ritchey LLP
1900 53rd Center
511 Walnut Street
Cincinnati, OH 45202

s/ Laine S. Posel
Laine S. Posel