FILED
KENNETH J. MURPHY
CLERK

'03 SEP 30 PM 4: 27

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST DIV CINCINNATI

## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

|  |  |  |
|---|---|---|
| ELMER CAMPBELL, ET AL., | : | |
|  | : | |
| **Plaintiffs,** | : | |
|  | : | |
| **v.** | : | **CASE NO. C-1-01-527** |
|  | : | |
| INTERNATIONAL PAPER, | : | |
| SUN CAPITAL PARTNERS, INC. | : | |
| SMART PAPERS, | : | |
|  | : | |
| **Defendants.** | : | |

---

### INTERNATIONAL PAPER COMPANY'S
### MOTION FOR SUMMARY JUDGMENT

International Paper Company ("International Paper"), by counsel and pursuant to Rule 56 of the Federal Rules of Civil Procedure moves for summary judgment on Plaintiffs' Fifth Amended Complaint. Plaintiffs allege violations of the Age Discrimination In Employment Act, 29 U.S.C. § 621 et seq.; Ohio Discrimination Act, O.R.C. §4112; Worker Adjustment and Retraining Notification Act, 29 U.S.C. §2102(a); Americans with Disabilities Act, 42 U.S.C. §12101, et seq. and defamation.   As the attached Memorandum of Law and Appendix confirms, International Paper is entitled to summary judgment on Plaintiffs' Fifth Amended Complaint because, under the undisputed evidence:

1. Plaintiffs' claims of age and disability discrimination against International Paper should be denied because the undisputed facts demonstrate that:

   • International Paper did not make the hiring decisions complained of by Plaintiffs;

1

- International Paper was not an agent of SMART in the hiring process and, even if it was, it could not be liable for the acts of its principal;

- Plaintiffs cannot establish a prima facie case of age or disability discrimination against either Defendant;

- Plaintiffs cannot establish that the reasons proffered by SMART for not hiring them were a pretext for age or disability discrimination.

2. Plaintiffs' claims of defamation should be denied because the undisputed facts demonstrate that:

- Each Plaintiff consented in writing to the disclosure of information about his employment in interviews with managers and supervisors and in his records, and released International Paper from all liability for such disclosure;

- Any comments made by Plaintiffs' supervisors were made in the course of SMART's interview and hiring process, and were protected by a qualified privilege under applicable law;

- Plaintiffs cannot establish that any alleged defamatory comments made by Plaintiffs' supervisors were made with actual malice, and thus cannot overcome the supervisors' qualified privilege under applicable law;

- International Paper is statutorily immune under Ohio law from liability for the disclosures to SMART's interviewers pertaining to the Plaintiffs' job performance; and

- To the extent Plaintiffs base their defamation claims, SMART's applicant reference check forms reflect interpretations and characterizations by SMART's representatives, not the verbatim comments of International Paper's supervisors.

- The comments or characterizations complained of by Plaintiffs as defamatory are true, do not constitute defamation under Ohio law, and/or are opinions that cannot provide the basis for a defamation claim.

- Plaintiffs have no evidence to support their claim that they were referred to by International Paper as "excess baggage" in

2

connection with the sale of the Mill and their failure to be hired by SMART, or that they were defamed by International Paper in local newspapers.

3. Plaintiffs' WARN Act claim must be dismissed because the undisputed facts demonstrate that:

- There was no "plant closure" or "mass layoff" as these terms are defined under WARN; and

- The sale of the Mill is covered by the sales exemption under WARN, and the fact that Plaintiffs did not continue employment at the Mill does not result in WARN liability.

For the above reasons, as more fully stated in the attached Memorandum and Appendices, International Paper respectfully submits that the Court should grant this Motion for Summary Judgment; dismiss the Complaint in its entirety, with prejudice; and award attorney fees and costs to International Paper..

Respectfully submitted,

INTERNATIONAL PAPER COMPANY

By_____
                              Counsel

| | |
|---|---|
| Michael Roberts, Esq. | W. Carter Younger, Esq. |
| Graydon Head & Ritchey, LLP | Vincent J. Miraglia, Esq. |
| 1900 5th 3rd Center | McGuireWoods LLP |
| 511 Walnut Street | 1050 Connecticut Avenue |
| Cincinnati, Ohio 45202 | Washington, DC 20036 |
| (513) 629-2799 | (202) 857-1704 |

## MEMORANDUM IN SUPPORT

## SUMMARY OF ARGUMENT

Plaintiffs are 72 individuals who formerly worked for International Paper as hourly, union employees in the Hamilton "B" Street Mill in Hamilton, Ohio. International Paper sold the Mill to SMART Papers on February 9, 2001. Plaintiffs either were not hired by SMART or were given jobs by SMART with which they were not satisfied. Plaintiffs have sued both International Paper and SMART, alleging age discrimination, disability discrimination and defamation arising out of the hiring process. Plaintiffs also claim a WARN violation because International Paper did not give them 60 days advance notice of the sale.

Under the Asset Purchase Agreement for the Mill, SMART agreed that it would employ a substantial number of the employees at the Mill to continue the Mill's operation, but reserved the right to determine which and how many employees it would hire. International Paper's involvement in SMART's hiring process was limited to the distribution and collection of applications, releasing employees for interviews and drug screens by SMART and, in accordance with advance written authorizations and releases from its employees, by making its supervisors and managers available for reference checks and by allowing SMART to have access to employee files and attendance records.

Before the sale, SMART Papers retained Mary Rita Weissman of the Weissman Group as its Director of Human Resources. Weissman, and employees of the Weissman Group, developed SMART's qualification standards, application process, application forms, interview questions, evaluation documents, and drug screening procedure based

i

on a hair sample, with no involvement of International Paper. Each of the 72 Plaintiffs completed SMART's application forms and authorization and release documents.

SMART's interviewers interviewed each of the Plaintiffs, held reference check interviews with their supervisors, and evaluated Plaintiffs' application forms, records and drug screen results. Weissman determined from the results of SMART's entire process which of the applicants she would recommend for employment, and made her recommendations to Daniel Maheu, SMART's Mill Manager. Maheu made the final decision as to which applicants would be offered employment by SMART before the date of the sale. International Paper made no decisions as to whom SMART would hire.

On Friday, February 9, 2001, the sale was completed and the Mill was transferred to SMART. All Mill personnel were terminated as International Paper employees. On Saturday and Sunday, February 10 and 11, SMART held meetings with the Mill employees who had applied for employment, and informed them whether or not they would be hired. SMART inventoried the Mill and received acceptances of its offers between February 10 and 12. On Tuesday, February 13, the hourly employees who accepted continued employment at the Mill were at their work stations.

International Paper moves for summary judgment against Plaintiffs on all of their claims, for the following reasons:

1.      Under the undisputed facts, International Paper was not a decision maker as to SMART's hiring process, SMART's qualifications, or which applicants would receive employment offers from SMART. International Paper was not a "joint employer" with SMART, there was no agency relationship between SMART and International Paper, and International Paper is not liable for SMART's hiring decisions.

2.      Plaintiffs offer no direct evidence of age or disability discrimination. Similarly, Plaintiffs cannot meet the burden of showing discriminatory motive through the indirect, burden shifting approach discussed by the Sixth Circuit in <u>Burzynski v. Cohen</u>, 264 F.3d 611, 622 (6th Cir. 2001). Plaintiffs' qualifications under SMART's hiring criteria are matters for SMART to address. In a number of cases, Plaintiffs cannot show that a substantially younger person was hired instead of Plaintiffs. Plaintiffs have offered no evidence of pretext for age or disability discrimination, other than their own opinions and conclusory allegations, which are not competent.

3.      Plaintiffs Brewer, Campbell, Gregory, Holland, Israel, Rogers and Rumpler have not filed disability charges against International Paper, and, therefore, cannot pursue Americans with Disabilities Act claims against International Paper.

4.      Plaintiffs' claims for defamation against International Paper are barred because each Plaintiff executed a written consent to reference checks with International Paper's supervisors and managers and the disclosure of their personnel records. Plaintiffs also released International Paper from liability, and covenanted not to sue International Paper.

In negotiations with Plaintiffs' union, PACE Local 1967, International Paper agreed to pay severance to all employees who cooperated fully in SMART's hiring process, including executing all necessary forms, if those employees did not receive offers by SMART. International Paper paid severance pay to all Plaintiffs who qualified under their Agreement with the union.

5.      Plaintiffs have produced no facts to support the allegations in their Complaint that any Plaintiff was referred to as "excess baggage" in relation to the sale of

the Mill or Plaintiffs' loss of employment. Moreover, terms used to refer to a group or class of persons, and not a specific individual, are insufficient to support an action for defamation. Additionally, Plaintiffs have not pointed to any newspaper article that contains comments by any International Paper employee that are defamatory.

6.    Statements by supervisors and managers during the reference check process are not defamatory, because they are true, as supported by other documentation or Plaintiffs' own admission, or are opinions.

7.    Communications by supervisors and managers to SMART's interviewers were protected by a qualified privilege under Ohio common law.

8.    To the extent Plaintiffs' defamation claims are based on notes or evaluations of SMART's interviewers on interview sheets, their claims are based on inadmissible to prove what was said by International Paper's supervisors and managers. Such notes only reflect the opinions, impressions, and interpretations of SMART's interviewers, not necessarily the actual statements of International Paper supervisors.

9.    Plaintiffs cannot establish that the communications made to SMART's interviewers were made with actual malice. The majority of Plaintiffs admitted that statements made on the interview sheets were either reflected in their personnel files or, if made by their supervisor or manager, were true and/or reflected opinion from observation of the employee's performance for some period of time. With few exceptions, Plaintiffs testified that there was no ill will or malice between them and their supervisors or managers.

10.    Pursuant to Ohio Code Section 4113.71, International Paper is immune from liability for defamation when its supervisors and managers communicate

information about an employee's job performance to a prospective employer. The exceptions to the statute are not applicable, because there is no showing that the statements were made "with the knowledge that it was false, with the deliberate intent to mislead the prospective employer or another person, in bad faith or with malicious purpose," and there is no evidence to support a finding the disclosure constituted an unlawful, discriminatory practice under Ohio law.

11.    Plaintiffs' WARN Act claim fails because the sale of this plant did not constitute a mass layoff or a plant closure. The plant continued as a going concern producing the same products with the same processes, and with over 70% of the same personnel, following a four-day administrative hiatus in production after the February 9 sale. SMART's use of February 10, 11 and 12, to hold meetings, make offers and receive acceptances, take inventory and spend the time on administrative matters, does not constitute a "mass layoff" or "plant closing" under WARN.

Moreover, the four-day hiatus in production at the Mill did not "result in" the employment losses alleged by Plaintiffs. There is no causal relationship between the weekend hiatus in production by SMART, and the fact that the Plaintiffs were not hired by SMART.

Under WARN's sales exclusion, 29 U.S.C. § 2101(b), termination of employees by the seller in the sale of a going concern is not a WARN event. Accordingly, International Paper has no liability to Plaintiffs under WARN.

# TABLE OF CONTENTS AND PRIMARY AUTHORITIES[1]

I.    INTRODUCTION .................................................................................1

Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq.

II.   STATEMENT OF UNDISPUTED FACTS ...........................................5

    A.    Background ...........................................................................6

    B.    SMART'S Hiring Process .......................................................7

        1.    Application.................................................................8

        2.    Applicant Interviews.................................................8

        3.    Reference Checks.......................................................9

        4.    Drug Screening ........................................................11

        5.    SMART's Hiring Decision .......................................11

    C.    SMART Offers Employment to 574 of International Paper's 800 Former Employees.........................................................................12

    D.    International Paper Bargained with the Union Over the Effects of the Sale .........13

    E.    Plaintiffs File EEOC Charges and Sue SMART and International Paper .............14

        Federal Rule of Civil Procedure 56

III.  GENERAL ARGUMENTS...................................................................15

    A.    The Standard For Summary Judgment Is Met .......................................15

        Celotex Corporation v. Catrett, 477 U.S. 317 (1986)
        Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)
        Hartsel v. Keys, 87 F.3d 795 (6th Cir. 1996)
        Gregg v. Allen-Bradley Company, 801 F.2d 859 (6th Cir. 1986)
        First National Bank of Arizona v. Cities Service Company, 391 U.S. 253 (1968)
        Schultz v. Newsweek, Inc., 668 F.2d 911 (6th Cir. 1982)
        Federal Rule of Civil Procedure 56(e)

---

[1]    Because the Memorandum exceeds twenty pages, attached is a Table of Contents and Primary Authorities.

**B.**    International Paper is Entitled to Summary Judgment on Plaintiffs'
Claims of Age and Disability Discrimination ........................................................16

1.    International Paper was not a Decisionmaker ............................................16

29 U.S.C. § 630(b)(1)
42 U.S.C. §12111(8)
Ohio Revised Code § 4112.01(A)(2)
Walters v. Metropolitan Education
    Enterprises, Inc., 519 U.S. 202
    (1997)
Williams v. Ford Motor Company, 187 F.3d
    533 (6th Cir. 1999)
Swallows v. Barnes & Noble Book Stores,
    Inc., 128 F.3d 990 (6th Cir. 1997)
Rhyce v. Martin, et al., 173 F. Supp. 2d 521
    (E.D.La. 2001)
In Re Enron, 2001 U.S. Dist. LEXIS 1668
    (S.D. Tex. Jan. 28, 2003)

2.    Plaintiffs' Age Discrimination Claims Fail as a Matter of
Law ............................................................................................................23

Reeves v. Sanderson Plumbing Products,
    Inc., 530 U.S. 133 (2000)
O'Connor v. Consolidated Coin Caterers
    Corporation, 517 U.S. 308 (1996)
Merkel v. Scovill, Inc., 787 F.2d 174 (6th
    Cir.), cert. denied, 479 U.S. 990
    (1986)
McDonnell-Douglas Corporation v. Green,
    411 U.S. 792 (1973)
Bush v. Dictaphone Corporation, 161 F.3d
    363 (6th Cir. 1998)
Ohio Revised Code §4112
Byrnes v. LCI Communications Holdings
    Company, 77 Ohio St. 3d 125, 672
    N.E.2d 145 (Ohio 1996)
Weller v. Titanium Metals Corporation, 98
    Ohio St. 3d 1535, 876 N.E.2d 899
    (2003)
Burzynski v. Cohen, 264 F.3d 611 (6th
    Cir. 2001)
Scott v. Parkview Memorial Hospital, 175
    F.3d 523 (7th Cir. 1999)

Swiggum v. Ameritech Corporation, 1999
Ohio App. LEXIS 4634 (Sept. 30,
1999)

Coryell v. Bank One Trust Co., 2002 Ohio
4443 (Aug. 29, 2002)

Lilley v. BTM Corporation, 958 F.2d 746
(6th Cir. 1992)

Reeher v. Baker Material Handling
Corporation, 1993 U.S. App. LEXIS
16142 (6th Cir. 1993)

Brown v. EG&G Mound Applied
Technology, Inc., 117 F.Supp.2d 671
(S.D.Ohio 2000)

Williams v. Ford Motor Company, 187 F.3d
533 (6th Cir. 1999)

Cooley v. Carmike Cinemas, Inc., 25 F.3d
1325 (6th Cir. 1994)

Moon v. Compass Group USA Inc., 1999
Ohio App. LEXIS 3951 (Aug. 27,
1999)

Weigel v. Baptist Hosp. of East Tennessee,
302 F.3d 367 (6th Cir. 2002)

Dabrowski v. Warner-Lambert Company,
815 F.2d 1076 (6th Cir. 1987)

Chappell v. GTE Products Corporation, 803
F.2d 261 (6th Cir. 1986)

3.    Plaintiffs' Disability Discrimination Claims Fail as a
Matter of Law ..............................................................................................28

Monette v. Electronic Data System
Corporation, 90 F.3d 1173 (6th Cir.
1996)

Columbus Civil Service Committee v.
McGlone, 82 Ohio St. 3d 569, 697
N.E.2d 204 (Ohio 1998)

42 U.S.C. § 12131

Bragdon v. Abbott, 524 U.S. 624 (1998)

Cotter v. Ajilon Services, Inc., 287 F.3d 593
(6th Cir. 2002)

Penny v. United Parcel Service, 128 F.3d
408 (6th Cir. 1997)

Cain v. Airbourne Express, 1999 U.S. App.
LEXIS 22437 (6th Cir. 1999)

42 U.S.C. § 2000e-5(e)

Howlett v. Holiday Inns, Inc., 49 F.3d 189
(6th Cir. 1995)

Abeita v. TransAmerica Mailings, Inc., 159
    F.3d 246 (6th Cir. 1998)

**C.**    Plaintiffs' Defamation Claims Fail As a Matter of Law........................................31

Parry v. Mohawk Motors of Michigan, Inc., 236 F.3d 299 (6th Cir.
2000)

    **1.**    Plaintiffs' Claims that They Were Referred to as "Excess
    Baggage" Fails As a Matter of Law ..........................................................32

        Rinehart v. Maiorano, 76 Ohio App. 3d 413,
           602 N.E.2d 340 (1991)
        F&J Enterprises, Inc. v. Columbia
           Broadcasting System Inc., 373
           F.Supp. 292 (N.D.Ohio 1974)
        Schuman v. Lake Hospital System, Inc.,
           1997 Ohio App. LEXIS 727 (Feb.
           27, 1997)
        Restatement Torts (Second) § 564A,
           Comment a
        Brunsman v. Western Hills Country Club,
           151 Ohio App. 3d 718, 785 N.E.2d
           794 (2003)
        Vail v. The Plain Dealer Publishing
           Company, 72 Ohio St. 3d 279, 649
           N.E.2d 182, cert. denied, 516 U.S.
           1043 (1995)
        Wampler v. Higgins, 93 Ohio St. 3d 111,
           752 N.E.2d 962 (2001)
        Arsham-Brenner v. Grande Point Health
           Care Community, 2000 Ohio App.
           LEXIS 3164 (July 13, 2000)
        Zappola v. Hennig, 20 F.Supp.2d 1150
           (N.D.Ohio 1998)
        Sweitzer v. Outlet Communications, Inc.,
           133 Ohio App. 3d 102, 726 N.E.2d
           1084 (1999)

    **2.**    Plaintiffs' Assertion That Newspaper Articles Constituted
    Defamation by International Paper Fails under the Facts
    and the Law................................................................................................35

    **3.**    Plaintiffs Cannot Establish that References Allegedly
    Provided to SMART by International Paper Supervisors
    Are Defamatory ..........................................................................................36

Restatement of the Law (Second) Torts §
 583

Denlinger v. City of Columbus, 2000 Ohio
 App. LEXIS 5679 (Dec. 7, 2000)

Sanfillipo v. Rarden, 24 Ohio App. 3d 164,
 493 N.E.2d 991 (Ohio App. 1985)

Wall v. Ohio Permanente Medical Group,
 Inc., 119 Ohio App. 3d 654, 695
 N.E.2d 1233 (1997)

Ostasz v. Medical College of Ohio, 88 Ohio
 Misc. 2d 6, 691 N.E.2d 371 (Ohio
 Ct. Cl. 1997)

Schuman v. Lake Hospital System, Inc.,
 1997 Ohio App. LEXIS 727 (Feb.
 27, 1997)

Pinger v. Behavioral Science Center, Inc.,
 52 Ohio App. 3d 17, 556 N.E.2d 209
 (1988)

Ohio Revised Code § 2739.02

Kemper v. American Broadcasting
 Companies, Inc., 365 F. Supp. 1275
 (S.D.Ohio 1973)

Sweitzer v. Outlet Communications, Inc.,
 133 Ohio App. 3d 102, 726 N.E.2d
 1084 (1999)

Scott v. News-Herald, 25 Ohio St. 3d 243,
 496 N.E.2d 699 (1986)

Vail v. The Plain Dealer Publishing
 Company, 72 Ohio St. 3d 279, 649
 N.E.2d 182, cert. denied, 516 U.S.
 1043 (1995)

Wampler v. Higgins, 93 Ohio St. 3d 111,
 752 N.E.2d 962 (2001)

Arsham-Brenner v. Grande Point Health
 Care Community, 2000 Ohio App.
 LEXIS 3164 (July 13, 2000)

Parano v. O'Connor, 433 Pa. Super. 570,
 641 A.2d 607 (1994)

Doherty v. Kahn, 289 Ill. App. 3d 544, 682
 N.E.2d 163 (1997)

Greer v. Columbus Monthly Publishing
 Corporation, 4 Ohio App. 3d 235,
 448 N.E.2d 157 (1982)

Brunsman v. Western Hills Country Club,
 151 Ohio App. 3d 718, 785 N.E.2d
 794 (2003)

Restatement of the Law (Second) Torts §
    593

Hahn v. Kotten, 43 Ohio St. 2d 237, 331
    N.E.2d 713 (1975)

West v. Peoples Banking & Trust Company,
    14 Ohio App. 2d 69, 236 N.E.2d 679
    (1967)

McCartney v. Oblates of St. Francis de
    Sales, 80 Ohio App. 3d 345, 609
    N.E.2d 216 (1992)

Nichols v. Ryder Truck Rental, Inc., 1994
    Ohio App. LEXIS 2697 (June 23,
    1994)

Rinehart v. Maiorano, 76 Ohio App. 3d 413,
    602 N.E.2d 340 (1991)

Rainey v. Shaffer, 8 Ohio App. 3d 262, 456
    N.E.2d 1328 (1983)

Restatement of the Law (Second) Torts §
    595 and Comment i

A&B-Abell Elevator Company
    v.Columbus/Central Ohio Building
    & Construction Trades Council, 73
    Ohio St. 3d 1, 651 N.E.2d 1283
    (1995)

Smith v. Ameriflora 1992, Inc., 96 Ohio
    App. 3d 179, 644 N.E.2d 1038
    (1994)

Wolf v. First Natational Bank of Toledo, 20
    Ohio App. 3d 262 (1980)

Evely v. Carlon Company, Division of
    Indian Head, Inc., 4 Ohio St. 3d 163,
    447 N.E.2d 1290 (1983)

12 Oh. Jur. 3d, Business Relationships §§
    544, 545

Moham v. Steego Corp., 3 F.3d 873 (5th
    Cir. 1993)

Austin v. Mabey, 184 F.Supp.2d 534
    (M.D.La. 2001)

Curry v. Nestle USA, Inc., 2000 U.S. App.
    LEXIS 18743 (6th Cir. July 27, 2000)

Mosley v. Evans, 90 Ohio App. 3d 633, 630
    N.E.2d 75 (1993)

Dodson v. Wright State University, 91 Ohio
    Misc. 2d 57, 697 N.E.2d 287 (1997)

Rinehart v. Maiorano, 76 Ohio App. 3d 413,
    602 N.E.2d 340 (1991)

Tohline v. Central Trust Co., 48 Ohio App.
        3d 280, 549 N.E.2d 1223 (1988)
Ohio Revised Code § 4113.71(B)
Randleman v. Dick Masheter Ford, Inc.,
        1991 Ohio App. LEXIS 4032
        (August 22, 1991)

**D.**    Plaintiffs Fail to Establish A Violation of the WARN Act.....................................54

**1.**    The Mill was sold as a going concern.......................................................................54

**2.**    There was no "mass layoff" because the Mill employees
        hired by SMART did not suffer an "employment loss." ..........................56

                29 U.S.C. § 2101(a)(3)(b)
                Wiltz v. M/G Transport Services, Inc., 128
                        F.3d 957 (6th Cir. 1997).
                29 U.S.C. § 2101(a)(6)
                Gonzalez v. AMR Services Corporation, 68
                        F.3d 1529 (2d Cir. 1995)
                International Oil, Chemical, and Atomic
                        Workers v. Uno-Ven Company, 170
                        F.3d 779 (7th Cir. 1999)

**3.**    There was no "plant closing" because there either was no
        "permanent or temporary shutdown" of the Mill and
        Plaintiffs' employment losses did not result from any "plant
        closing." employment losses.......................................................................58

                29 U.S.C. § 2101(a)(2)
                Alter v. SCM Office Supplies, Inc., 906
                        F.Supp.2d  1243 (S.D.Ind. 1995)
                29 U.S.C. § 2107
                Washington v. Aircap Indus. Corp., 831
                        F.Supp. 1292 (D.S.C. 1993)
                20 C.F.R. § 639.3(b)

                29 U.S.C. § 2101(a)(6)
                Rifkin v. McDonnell Douglas Corp., 78 F.3d
                        1277 (8th Cir. 1996)
                Burnsides v. MJ Optical, Inc., 128 F.3d 700
                        (8th Cir. 1997)
                Comments to Final WARN Regulations, 20
                        C.F.R. 649, 54 Fed. Reg. 16042, §§
                        639.3(c), (j) (April 20, 1989)
                20 C.F.R. § 639.2
                20 C.F.R. § 639.4(c)(1)

4.    The conclusion that the termination of Plaintiffs'
      employment was not a WARN event is compelled by
      WARN's sales exemption, 29 U.S.C. § 2101(b). ........................................65

      29 U.S.C. § 2101(b)(1)
      20 C.F.R. § 639.6 (1996)
      International Alliance of Theatrical & Stage
              Employees v. Compact Video
              Services, Inc., 50 F.3d 1464 (9th Cir.
              1995)
      Burnsides v. MJ Optical, Inc., 128 F.3d 700
              (8th Cir. 1997)

IV.   CONCLUSION .............................................................................................67

## MEMORANDUM IN SUPPORT OF
## DEFENDANT INTERNATIONAL PAPER'S
## MOTION FOR SUMMARY JUDGMENT

Defendant, International Paper, by counsel, submits this Memorandum in Support of its Motion for Summary Judgment. International Paper submits that under the undisputed facts, it is entitled to summary judgment on Plaintiffs' Fifth Amended Complaint ("Complaint").

I.    INTRODUCTION

In June 2000, International Paper merged with Champion International ("Champion"), thereby acquiring Champion's "B" Street Mill in Hamilton County, Ohio. Later that year, International Paper found a buyer, Smart Papers, LLC ("SMART"), that would continue to operate the Mill as a going concern. The sale was finalized on February 9, 2001 and preserved jobs for the majority of employees at the Mill. SMART offered employment to 574 of the Mill's 800 employees. This lawsuit is brought by 72 former Mill employees who were either not hired by SMART or who were not offered the jobs they wanted.

International Paper was not involved in SMART's hiring decisions at the Mill. The Asset Purchase Agreement between SMART and International Paper provided that SMART would set its own selection criteria, establish its own application and hiring process, and make its own hiring decisions. International Paper agreed to facilitate SMART's process by making Mill employees available for interviews with SMART, allowing SMART to meet with International Paper supervisors and managers to discuss applicant job performance, and by providing SMART access to employee records and files. International Paper allowed the reference checks and access to records only with the written authorization of the Mill employees. All 72 Plaintiffs specifically agreed to

1

release International Paper and SMART from any liability associated with the reference checks and SMART's access to International Paper's employee records and files.

International Paper also negotiated an Effects Bargaining Agreement with PACE Local Union 5-1967 ("PACE"), which represented the hourly employees at the Mill (including Plaintiffs). The Effects Bargaining Agreement provided severance pay for hourly employees who completed SMART's application process but were not hired by SMART. Pursuant to the Effects Bargaining Agreement, International Paper paid severance to 66 of the 72 Plaintiffs.[2] This included 18 Plaintiffs who were disqualified from employment with SMART because they failed SMART'S mandatory drug screen.

Despite International Paper's efforts to sell the Mill as a going concern in Hamilton, and its payment of severance to former employees who were not offered continued employment at the Mill, Plaintiffs now contend that International Paper discriminated against them on the basis of their age and/or disability. The undisputed evidence, however, is that SMART established its own selection criteria; created its own hiring process; used its own employees or consultants to conduct its interviews and reference checks; and made its own hiring decisions. International Paper's role – pursuant to the authorization and release agreements signed by Plaintiffs – consisted solely of making its supervisors and records available for SMART's reference check process. Thus, even if Plaintiffs had a plausible claim of age or disability discrimination – and they do not – there is no basis on which International Paper can be liable for SMART's employment decisions.

---

[2] The remaining six Plaintiffs initially accepted positions and were hired by SMART. However, they later decided they were dissatisfied with their positions and now contend that SMART's job offer was discriminatory. Under the terms of the Effects Bargaining Agreement, these individuals were not eligible for severance pay.

Furthermore, the record is utterly devoid of any evidence that Plaintiffs were discriminated against in SMART's hiring process. Plaintiffs cannot establish a *prima facie* case of discrimination, or produce any evidence demonstrating that SMART's legitimate non-discriminatory reasons for its employment decisions were pretextual.

Plaintiffs assert claims of defamation against International Paper based on alleged comments in newspapers and an allegation that they were referred to as "excess baggage." However, Plaintiffs have not identified a single newspaper article containing any defamatory remarks made by International Paper, nor have Plaintiffs identified any International Paper employee who referred to Plaintiffs as "excess baggage" at any time during the sale or hiring process. In short, there is absolutely no basis for this claim.

Plaintiffs also attempt to assert a claim of defamation based on comments allegedly made by International Paper supervisors and managers to SMART's interviewers during the reference check process. As set forth above, any comments that were made by supervisors and managers were covered by the authorization and release agreements signed by Plaintiffs as part of SMART's application process. The alleged comments were also within the scope of both common law and statutory qualified privilege for employment references under Ohio law. Moreover, the referenced statements upon which Plaintiffs' claims are apparently based do not meet the legal standards for defamation.

Plaintiffs also allege that International Paper owes them additional pay, over and above their severance pay, under the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. ("WARN"). Plaintiffs' WARN claim fails, however,

3

because the Mill continued as a going concern and there was no "plant closure" or "mass layoff" under the Act.

In summary:

1.     Plaintiffs' claims of age and disability discrimination against International Paper should be denied because the undisputed facts demonstrate that:

- International Paper did not make the hiring decisions complained of by Plaintiffs;

- International Paper was not an agent of SMART in the hiring process and, even if it were, it would not be liable for the acts of its principal;

- Plaintiffs cannot establish a *prima facie* case of age or disability discrimination against either Defendant; and

- Plaintiffs cannot establish that the reasons proffered by SMART for not hiring them were a pretext for age or disability discrimination.

2.     Plaintiffs' claims of defamation should be denied because the undisputed facts demonstrate that:

- Plaintiffs have no evidence to support their claim that they were referred to by International Paper as "excess baggage" in connection with the sale of the Mill and their failure to be hired by SMART, or that they were defamed by International Paper in local newspapers.

- Each Plaintiff consented in writing to the disclosure of information about his job performance and released International Paper from all liability for such disclosure;

- The comments or characterizations complained of by Plaintiffs as defamatory are true, do not constitute defamation under Ohio law, and/or are opinions that cannot provide the basis for a defamation claim;

- Any comments made by Plaintiffs' supervisors were made in the course of SMART's interview and hiring process, and were

4

protected by a qualified privilege under Ohio common and statutory law; and

- Plaintiffs cannot establish that any alleged defamatory comments made by Plaintiffs' supervisors were made with actual malice, and thus cannot overcome the supervisors' qualified privilege under applicable law.

3.    Plaintiffs' WARN Act claim must be dismissed because the undisputed facts demonstrate that:

- There was no "plant closure" or "mass layoff" as these terms are defined under WARN; and

- The sale of the Mill is covered by the sales exemption under WARN, and the fact that Plaintiffs did not continue employment at the Mill does not result in WARN liability.

For these reasons, as more fully set forth below and in the attached Appendix, International Paper is entitled to summary judgment and all of Plaintiffs' claims should be dismissed with prejudice. [3]

## II.    STATEMENT OF UNDISPUTED FACTS

The undisputed facts regarding Plaintiffs' claims in general and the legal arguments applicable to all or a majority of Plaintiffs will be set forth in the following sections of this Memorandum. The specific undisputed facts and arguments with respect to each Plaintiff individually are contained in the attached Appendix. The Appendix

---

[3] Federal Rule of Civil Procedure Rule 37(b)(2)(C), provides that "if a party or an officer, director, or managing agent of a party . . . fails to obey an order to provide or permit discovery, . . .the court in which the action is pending may make . . . (C) [a]n order . . . dismissing the action or proceeding." In addition, pursuant to Rule 37(d), the Court may dismiss a party's action for failing to appear at a scheduled deposition or for failing to serve a written response to a properly served request for inspection or production. Fed. R. Civ. P. 37(d)(1) & (3) & 37(b)(2)(C). In this case, Plaintiffs Fisher, Gumm, Jackson, Parsley, Ratliff, and Whitaker failed to appear for their properly scheduled deposition at the time noticed and Plaintiffs' counsel advised Defendant International Paper that these Plaintiffs would not appear. Furthermore, Plaintiffs Fisher, Gumm, Jackson, Parsley, and Whitaker also failed to serve written answers to Defendant's properly served Request for Production of Documents. (Fisher Tr. 4, Ex. 1; Gumm Tr. 4, Ex. 1; Jackson Tr. 4, Ex. 1; Whitaker Tr. 4, Ex. 1; Parsley Tr. 4, Ex. 1; Ratliff Tr. 4, Ex. 1). Accordingly, International Paper moves the Court to dismiss the claims of Plaintiffs Fisher, Gumm, Jackson, Parsley, Ratliff, and Whitaker.

contains a tab for each Plaintiff behind which is a discussion of the undisputed facts

related to that Plaintiff, the transcript excerpts for that Plaintiff's cited testimony, and

exhibits related to that Plaintiff.  The facts and arguments are submitted in this way for

the convenience of the Court and are incorporated into this Memorandum as if set forth in

this same document.

**A.    Background.**

> International Paper Enters Into An Asset Purchase Agreement with
> Smart Papers, LLC on December 29, 2000

On or about December 29, 2000, International Paper entered into an Asset

Purchase Agreement with SMART in which International Paper agreed to sell the

Hamilton "B" Street Mill to SMART. (Amended Complaint ¶¶7, 77).  The Mill was sold

as a "going concern." (Asset Purchase Agreement p.1).  During negotiations with

SMART, International Paper's initial position was that SMART would hire all employees

of the Mill. (Couch Tr. 78-79). [4]  While SMART indicated an intention to hire a

substantial number of the employees that were working for International Paper at the time

of the Agreement, SMART was determined to apply its own qualification criteria and

make its own selection decisions. (Couch Tr. 79).  Accordingly, SMART obligated itself

"to hire only those employees that in the opinion of Smart Papers were qualified and

were necessary for the operation of the mill." (Couch Tr. 79).  The parties further agreed

that if SMART did not hire at least two-hundred and nineteen former International Paper

employees, SMART was required to pay a portion of their severance.  (Asset Purchase

Agreement, §4.1(f), p.18).  The Asset Purchase Agreement expressly provided that

---

[4] Depositions are identified by the name of the deponent and the transcript page reference.  Exhibits to
depositions are identified by the name of the deponent and the exhibit number.  Transcript pages and
Exhibits from Plaintiffs' depositions are located in the appendices.  Transcript pages and Exhibits from
other depositions are attached to this memorandum.

SMART retained discretion and control over the application and hiring process and decisions:

> ### Article 4.1(a) – Employees
>
> Seller recognizes that Buyer intends to make offers of employment to a substantial number of employees of the Business, at terms and conditions of employment different from that provided by Seller, and that it is uncertain how many employees of the Seller will accept employment with Buyer. **The number of offers of employment made by Buyer, and the terms and conditions of such offers, shall be determined by Buyer in its sole discretion** and in accordance with applicable law…

(Asset Purchase Agreement, §4.1, p.16) (emphasis added).[5]

## B.    SMART's Hiring Process.

In January 2001, International Paper advised its employees that the Mill was being sold to SMART, and that SMART intended to continue its operation. (Lewis Tr. 44; Bray Tr. 15). At that same time, several weeks before the sale, SMART began its hiring process. (Weissman Tr. 25). SMART contracted with the Weissman Group, an employment relations consulting company, to assist it in hiring a workforce. (Weissman Tr. 12). Additionally, SMART hired the Vice President of the Weissman Group, Mary Rita Weissman, as its Director of Human Resources. (Weissman Tr. 12-13).

Weissman was tasked with hiring SMART's workforce at the Mill. (Weissman Tr. 12, 83). At the outset of that process, she met with SMART's management team to determine their hiring requirements. (Weissman Tr. 12, 32-34). Weissman testified as follows regarding the criteria she considered most important in recommending a workforce to SMART:

---

[5] The Asset Purchase Agreement further stated that "[SMART] shall be responsible for complying with all applicable laws in the interviewing and hiring process, and any liability incurred in the interviewing and hiring process based on conduct of [SMART] shall be the responsibility of [SMART]." (Asset Purchase Agreement, §4.1, p.16).

> [M]y advice to SMART, as their HR Director and an experienced HR
> person, was hire for behavior and values, train for skills. So don't get
> yourself all excited if you don't have enough people with X skills. Train
> those people. Because you can train people for skills, you can't train them
> for values and appropriate work behavior.

(Weissman Tr. 78). Based on these criteria, SMART began the process of hiring the

Mill's workforce. This process generally consisted of (1) receiving applications from

prospective employees; (2) interviewing all applicants; (3) conducting reference checks

of all applicants with International Paper's supervisors; (4) screening all applicants for

the use of controlled substances; (5) Weissman making a recommendation to SMART's

decisionmakers regarding which applicants to offer employment; and (6) SMART's Mill

manager, Daniel Maheu, making a final decision with respect to each applicant.

(Weissman Tr. 32-33).

### 1.    Application

International Paper employees filled out their applications for employment with

SMART over a one-week period beginning January 10, 2001. (Weissman Tr. 43). The

applications were drafted and reviewed by SMART. Other than the ministerial acts of

distribution and collection, which, in accordance with the Asset Purchase Agreement,

International Paper did in an effort to assist its employees in securing employment with

SMART, International Paper had no involvement in SMART's application process.

(Weissman Tr. 12-13; Johnson Tr. 28-29).

### 2.    Applicant Interviews

Weissman and the representatives of the Weissman Group interviewed each of the

interested candidates at the Hamiltonian Hotel during the week of January 21, 2001.

During the interview, Weissman and her colleagues asked questions concerning their

work history, skills and experiences, previous employment, and attitude toward their

jobs. (Weissman Tr. 80). The responses to these inquiries were recorded by representatives from the Weissman Group and were considered in determining which employees would be recommended for hire by SMART. (Weissman Tr. 32; Moore Tr. 68-69).

### 3.   Reference Checks

Additionally, SMART spoke with International Paper's supervisors in order to obtain reference information about each of the applicants. (Weissman Tr. 113-114). Weissman and other interviewers from the Weissman Group met with the supervisors in person. (Weissman Tr. 114). The questions asked in the interviews, and the interpretation and application of the information against SMART's qualification standards, was determined by the Weissman Group and SMART. (Moore Tr. 24-25). According to Weissman,

> [o]ur process solicits specific data and information and . . . asks for examples. And we, because we do a lot of this, have a fairly good ability to distinguish if a supervisor has a particular problem with a particular person unrelated to that person's performance and measurement against the standards set for hiring.

(Weissman Tr. 125-126).

The reference check interviewers used an "Applicant Reference Check" form for each applicant. On the form, the interviewer rated the applicant's performance on six performance factors: "Willingness and Ability to Learn," "Excellence Oriented," "Productivity," "Dependability," "Team Player," and "Safety Awareness." Under each factor, the Weissman Group interviewer rated the applicant's performance on a scale of 1-5, with 1 ("significantly below requirements") as the lowest and 5 ("significantly exceeds requirements") as the highest.

In addition, the Applicant Reference Check form listed a series of questions requesting examples of performance. The Weissman Group interviewers were expected to note examples and comments on the form along with the interviewer's conclusions and impressions of the applicant. The Applicant Reference Check forms for each Plaintiff is included in the Appendix.

The information recorded on the Applicant Reference Check forms are the impressions, conclusions and interpretations of the Weissman interviewers – not the verbatim statements of the International Paper supervisors. (Weissman Tr. 113; Moore Tr. 24-25).

Additionally, in accordance with the authorization and releases signed by each of the applicants, International Paper provided Weissman access to each of the Plaintiffs' personnel files and attendance records so that she could confirm statements made during both the interviews and reference checks. (Weissman Tr. 170). International Paper provided Weissman with all of the information that she requested. (Weissman Tr. 105). During her deposition, Weissman explained how she used the information she gathered:

> What we do is we take the information the supervisor gives us, we categorize that information in the way the supervisor rated them, and in the end take all of the data together to decide whether the candidate is recommended or not recommended based upon our expertise, our understanding of the data, and the information the supervisor gives and what the supervisor answers. This data is then used to measure whether the recommendation of the supervisor is consistent with what we would recommend. Ultimately, it is our decision, not the supervisor's, based on the data given and how it compares to the standards set.

(Weissman Tr. 181).[6]

---

[6] The reference check sheets defined each rating for each factor. For example, a "1" on the "Willingness and Ability to Learn" performance factor is defined as "Not only lacks knowledge, but detracts from the

### 4.   Drug Screening

SMART required each applicant to undergo a drug screening as part of the application process. (Weissman Tr. 32). Any applicant who failed his or her drug test was automatically disqualified from employment with SMART. (Weissman Tr. 133-134). Eighteen Plaintiffs were disqualified from consideration for employment with SMART on this basis. (Blevins Tr. 59; Clear Tr. 58; Gentry Tr. 44; Gill Tr. 47-48; Gregory Tr. 55, 65-66; Johnson Tr. 16-18; Lakes Tr. 36; Marsee Tr. 35; Mill Tr. 10; Pennington Tr. 25; Rodgers Tr. 74-75; Spada Tr. 37; Tolbert Tr. 64; Turley Tr. 24-25; Williams 60-62; Weissman Tr. 202-211, 219). International Paper had no involvement in the drug screening, SMART's standards for the drug screen or its actions on the results of the screens.

### 5.   SMART's Hiring Decision

As director of Human Resources for SMART, Weissman reviewed the applications, notes from the applicant interviews, notes taken by the Weissman Group during the reference checks, employee records, and the results of the drug screen. (Weissman Tr. 62). Weissman determined which employees to recommend for hire by SMART. (Weissman Tr. 52). It is undisputed that Weisman – not International Paper or its supervisors – decided which employees would be recommended for employment with SMART. (Weisman Tr. 52) ("The final recommendations were determined by one person, that person was me").

---

pool of knowledge, causes more problems than makes contributions." A "5" under the same factor is defined as "Is recognized as an expert by peers and supervisors, is technical leader, creates learning opportunities for self and others." The interviewer circled the performance level he or she identified for each factor. (Weissman Tr. 181).

Weisman's recommendations were given to Daniel Maheu, SMART's Mill Manager. (Weissman Tr. 38; Maheu Tr. 40, 87). Maheu considered these recommendations and decided which International Paper employees would receive offers of employment from SMART. (Maheu Tr. 87, 125-126). Maheu was responsible for making all hiring decisions related to SMART's offers of employment. (Maheu Tr. 86; Weissman Tr. 76).

### C.    SMART Offers Employment to 574 of International Paper's 800 Former Employees

International Paper continued operating the Mill until Friday, February 9, 2001 – the day on which International Paper and SMART finalized the sale. (Bray Tr. 27). Prior to February 9, 2001, employees of SMART and the Weissman Group put together a letter to applicants advising them to report at a specified time to the Hamiltonian Hotel on either Saturday or Sunday, February 10-11, at which time they would be told whether they were being offered a job by SMART. (Maheu Tr. 173-174). Those being offered a job were directed to certain designated meetings and those not being offered a job were directed to attend different meetings. (Maheu Tr. 174; Adams Tr. 14; Forsythe Tr. 19).

The Mill became the property of SMART on February 9, 2001. Shortly before the sale was finalized, Maheu hired four core managers to assist in placement of applicants. (Maheu Tr. 151). SMART chose to not operate the Mill's production equipment during this period. Instead, meetings were held at the Hamiltonian Hotel to advise Mill employees whether they were being offered employment with SMART. (Maheu Aff. ¶13; Johnson Tr. 80; Begley Tr. 37, 38; E. Campbell Tr. 63). Other SMART personnel were responsible for taking an inventory of the Mill's equipment and supplies. (Maheu Aff. ¶14).

12

The Mill power plant continued in operation. (Simpson Tr. 6). There is no evidence that production equipment was removed or prepared for removal. Of the 800 employees that worked at the Mill at the time of the sale, SMART offered employment to 574.[7] Employees and their supervisors held meetings at the Mill on February 13 and normal production resumed on February 14. SMART continued to operate all operating units with at least 50 or more employees that International Paper had operated, using the same equipment and processes. (Maheu Aff. ¶14). Hamilton Mill employees who sought a position with SMART but were not offered a job were eligible for the severance pay negotiated by their union. (Bray Tr. 17-18).

### D.    International Paper Bargained with the Union Over the Effects of the Sale

Plaintiffs were each represented by PACE Local 1967 during their employment with International Paper. In approximately the first week in January 2001, shortly after the completion of the Asset Purchase Agreement, International Paper notified Union President Tim Bray about the pending sale. (Bray Tr. 14-15). On or about January 22, 2001, International Paper Labor Relations Manager, Tom Stewart, and Hamilton Mill human resources representatives, Annetta Johnson and Milton Lewis, met with Bray, PACE Vice President Irving Sandlin and PACE International Representative Ken Stanifer to bargain over the effects of the sale of the Mill to SMART. (Bray Tr. 16).

International Paper and the Union agreed that employees who cooperated in SMART's application process, but were not offered employment by SMART, would be eligible for severance pay of 60 hours pay from International Paper for every year of

---

[7] Of those 800, only 768 completed SMART's application process and were considered for employment by SMART. Four of the 800 were temporary co-op students who worked in the Mill for less than six months. (Wilson Aff. ¶2).

service at the Hamilton "B" Street Mill. (Bray Tr. 17-18, 25; Bray Tr. Ex. 3 – Effects Bargaining Agreement).[8]  As part of the process, all applicants were required to sign an "Authorization/Release" authorizing International Paper and its supervisors to provide information about them to SMART.  (Bray Tr. 21).  Bray testified that he had already signed the authorization forms and gone through SMART's application process by the date of the effects bargaining meeting (January 22) and that the Union had raised no objections to the process.  (Bray Tr. 23).  Additionally, no grievances were filed by anyone with regard to SMART's application and hiring process.  (Bray Tr. 23).

It is undisputed that of the 72 Plaintiffs in this case, 66 received severance pay from International Paper.  It is also undisputed that the remaining six were offered employment with SMART.

**E.    Plaintiffs File EEOC Charges and Sue SMART and International Paper**

Following the sale of the Mill, PACE Local President Timothy Bray sent a letter to all former International Paper employees asking them to attend a meeting to discuss potential age discrimination claims with lawyers.  (Bray Tr. 7-8).  Subsequently, Plaintiffs filed virtually identical EEOC charges against SMART and International Paper. Plaintiffs alleged that, beginning on February 10, 2001, they were discriminated against by SMART and International Paper on the basis of their age and, in some cases, disability.  (See Appendix for each Plaintiff's EEOC charge).  At Plaintiffs' requests, the EEOC issued administrative notices of right to sue without conducting any investigation,

---

[8] Cooperation was defined in the Effects Bargaining Agreement as "submitting an employment application, signing and returning the requested form, including one requiring a substance abuse screen and participating in employment interview process."  (Bray Tr. 18; Bray Tr. Ex. 3 – Effects Bargaining Agreement).

and Plaintiffs' First Complaint was filed on August 3, 2001. Plaintiffs have since

amended this Complaint four times. The most recent, the Fifth Amended Complaint, was

filed on September 5, 2003.[9]

      After extensive discovery in this matter, there are no material disputes of fact for

trial. Summary judgment should be granted in favor of International Paper pursuant to

Rule 56 of the Federal Rules of Civil Procedure, for the reasons set forth below and in the

Appendix.

## III.   GENERAL ARGUMENTS

### A.   The Standard for Summary Judgment is Met

      The United States Supreme Court has held that the "[s]ummary judgment

procedure is properly regarded not as a disfavored procedural shortcut, but rather as an

integral part of the Federal Rules as a whole, which are designed to secure the just,

speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477

U.S. 317, 328 (1986). Parties who bear the burden of proof on a crucial issue at trial

cannot survive summary judgment without sufficient evidence to sustain their burden of

proof on that point. See id. They must provide "significant probative evidence tending

to support the complaint" or provide "specific facts showing that there is a genuine issue

for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). "Accordingly,

hearsay evidence may not be considered on a motion for summary judgment." Hartsel v.

Keys, 87 F.3d 795, 799 (6th Cir. 1996) (citation omitted).

---

[9] International Paper filed a Motion to Dismiss Plaintiffs' Third Amended Complaint. On March 25, 2003, the Court granted International Paper's Motion to Dismiss in part, dismissing Plaintiffs' public policy claim under Count 10. The Court denied the remainder of International Paper's Motion, finding that the Complaint raised sufficient issues on its face, and giving Plaintiffs an opportunity to identify evidence supporting their claims.

Moreover, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." <u>Anderson</u>, 477 U.S. at 252. A "nonmoving party is not entitled to a trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." <u>Gregg v. Allen-Bradley Co.</u>, 801 F.2d 859, 861 (6th Cir. 1986) (<u>citing</u> <u>First Nat'l Bank of Ariz. v. Cities Serv. Co.</u>, 391 U.S. 253, 289-90 (1968) and <u>Schultz v. Newsweek, Inc.</u>, 668 F.2d 911, 918-19 (6th Cir. 1982)). The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The undisputed material facts demonstrate that International Paper is entitled to summary judgment on all of Plaintiffs' claims.

**B.     International Paper is Entitled to Summary Judgment on Plaintiffs' Claims of Age and Disability Discrimination**

Plaintiffs have brought age and disability claims against SMART and International Paper, alleging that SMART's hiring decisions regarding their applications for employment were based on their age and/or disability. Plaintiffs assert liability under the ADEA, the ADA, and Ohio state law. However, there is no basis on which International Paper can be liable for SMART's employment decisions. International Paper is therefore entitled to summary judgment on all Plaintiffs' claims of age and disability discrimination.

Moreover, Plaintiffs' evidence fails to establish a *prima facie* case of age or disability discrimination or that SMART's legitimate, non-discriminatory reasons for not hiring Plaintiffs were pretextual. Thus, even if there were a basis for Plaintiffs to pursue their claims against International Paper, summary judgment would still be appropriate.

### 1.    International Paper was not a Decisionmaker

Plaintiffs allege that they were not offered positions with SMART on February 10, 2001 (or that they were offered lesser positions than they were qualified to perform) as a result of their age and/or disability.  With respect to their claims of age discrimination, 66 Plaintiffs allege that Defendants "hired younger people into open positions, and did not hire many older workers . . . "  (Fifth Amended Complaint, ¶¶92, 106).  The six remaining Plaintiffs contend that, although they were offered positions by SMART, Defendants nonetheless "engaged in a discriminatory hiring practice in violation of the ADEA . . . [by offering them] lower-level, lower-pay positions than their former jobs at the Mill" and offering "better, more desirable jobs to younger employees."[10] (Id. at ¶¶99, 100, 112, 113).  Twelve Plaintiffs further allege that Defendants treated them differently than non-disabled employees on account of their disabilities. (Id. at ¶¶125, 129).

In support of these claims, some Plaintiffs testified that younger or non-disabled individuals were hired on February 10, 2001 into positions they were more qualified to perform, while other Plaintiffs allege that these individuals were hired several weeks after International Paper's sale of the Mill to SMART.  None of the Plaintiffs allege that they were discriminated against during their employment with International Paper, which ended on February 9, 2001.  Moreover, Plaintiffs were not applying for employment with International Paper.   Accordingly, it is undisputed that International Paper was not Plaintiffs' "employer" on the date of the alleged discrimination.  See 29 U.S.C. §

---

[10] As an illustration of the inconsistencies among Plaintiffs' claims, those Plaintiffs that received a job offer from SMART allege that those offers were "demeaning" and "insulting." (Fifth Amended Compl. ¶100). On the other hand, several Plaintiffs that did not receive an offer allege that they would have accepted any position with SMART.  Plaintiff Ray Arthur actually admits that he was offered a higher level position than the one he applied for, yet, remarkably, still contends that he was discriminated against on the basis of age. (Arthur Tr. 30).

630(b)(1); 42 U.S.C. §12111(8); O.R.C. 4112.01(A)(2) (all defining an "employee" as "an individual employed by any employer"); see also Walters v. Metro. Educ. Enters. Inc., 519 U.S. 202 (1997) (holding that the term "employees" in 42 U.S.C. § 2000e(b) refers to those persons with whom an employer has an existing employment relationship).

It is further undisputed under the evidence that International Paper did not have any hiring authority for the Mill on or after February 9, 2001. To the contrary, SMART was the sole decisionmaker in determining its selection criteria, application and evaluation process, and in making selection decisions on applications for employment at the Mill. (Weissman Tr. 181). There is no factual basis for a claim that anyone at International Paper had any authority to make these decisions.

Rather, Plaintiffs' age discrimination claim against International Paper rests exclusively on their conclusory allegation that International Paper and SMART jointly decided whom to hire to work for SMART at the Mill. Plaintiffs have not identified any evidence in support of this claim. To the contrary, Plaintiffs acknowledged that it is simply their personal opinion or feeling that International Paper and SMART acted together or were actually "one and the same." See e.g., T. Bennett Tr. 36, 55; J. Brooks Tr. 36; Bullio Tr. 35-40; C. Campbell Tr. 45, 57-58; Cress Tr. 53; Duncan Tr. 79; Fowler Tr. 66-67; A. Holland Tr. 40; C. Johnson Tr. 18-20; Ketcham Tr. 113-14; Lakes Tr. 49; McCreary Tr. 90; Ogg Tr. 94; Paxton Tr. 42-43; Pennington Tr. 33-34, 38; Taulbee Tr. 74; Volz Tr. 15-16, 43; Wilkins Tr. 72. It is axiomatic, however, that mere speculation is insufficient to withstand summary judgment. See Williams v. Ford Motor Co., 187 F.3d 533, 544 (6th Cir. 1999). Accordingly, International Paper should be granted summary judgment on Plaintiffs' claims of age and disability discrimination.

18

In replying to International Paper's Rule 12 Motion to Dismiss, Plaintiffs argued that International Paper could be liable for SMART's hiring decisions because it was SMART's "agent." Relying on <u>Swallows v. Barnes & Noble Book Stores, Inc.</u>, 128 F.3d 990 (6th Cir. 1997), this Court denied International Paper's motion and granted Plaintiffs the opportunity to produce competent evidence supporting such a claim. Despite months of discovery and over one hundred-twenty depositions, Plaintiffs have been unable to produce any such evidence. On the contrary, the totality of all competent evidence confirms that International Paper was not SMART's agent during SMART's hiring process at the Mill. The <u>Swallows</u> rationale simply does not apply to the facts in this case.

In <u>Swallows,</u> the plaintiffs were employed by Tennessee Technological University ("TTU") in its bookstore until June 15, 1994. At that time, TTU entered into a contract with Barnes & Noble in which Barnes & Nobles assumed responsibility for the operation and management of the University's bookstore for a period of three years. <u>Id.</u> at 990. Pursuant to the agreement, plaintiffs became employees of Barnes & Noble. <u>Id.</u> Barnes & Noble further agreed to employ the former TTU employees for six months, after which time it was entitled to terminate their employment. <u>Id.</u>

Plaintiffs were subsequently discharged, and sued both Barnes & Noble and the State of Tennessee contending that their termination violated the ADEA and the ADA. <u>Id.</u> at 992. The State of Tennessee filed a motion to dismiss, arguing that it could not be liable because TTU was not the plaintiffs' employer at the time of termination. <u>Id.</u> The plaintiffs claimed that TTU and Barnes & Noble were an "integrated employer" for purposes of the ADEA and ADA, and, in the alternative, that TTU and Barnes & Noble

19

had a principal-agent relationship. Id. Specifically, the plaintiffs contended that, even though TTU was not Plaintiffs' direct employer at the time of their termination, it could be held liable because Barnes & Noble was TTU's agent for purposes of making employment decisions at the University bookstore. Id. The district court rejected both arguments and dismissed the claims against the State of Tennessee. Id. at 990.

In affirming this decision, the Sixth Circuit recognized that there are certain situations in which an entity can be liable for an employment decision it did not make.[11] Swallows, 128 F.3d at 991-93. One such basis is when one entity has authorized another entity to act as its agent. Id. at 993. Under certain circumstances, the agent's acts may bind the principal and render the principal liable. Id.

The Court in Swallows found that, as a matter of law, TTU could not be liable for Barnes & Noble's decision to terminate the plaintiffs' employment. With respect to the plaintiffs' agency argument, the Court held that:

> There is no evidence supporting plaintiffs' theory that Barnes & Noble acted as TTU's agent. TTU did not delegate to Barnes & Noble the authority to make employment decisions on its behalf, nor did it exercise the requisite control over Barnes & Noble's employment decisions. Therefore, the district court properly concluded that TTU cannot be considered plaintiffs' "employer" under the ADEA and/or the ADA on the basis that Barnes & Nobles was acting as its agent.

Id. at 996 (citation omitted). In other words, Barnes & Noble acted on its own in deciding to terminate the plaintiffs' employment, not pursuant to a delegation of authority

---

[11] For example, if it can be shown that two entities are so interrelated as to constitute a "single employer" or that they are acting as a plaintiff's "joint employer," it is possible for an entity to be liable for discrimination against an individual not in its direct employ. Id. Neither doctrine is even arguably applicable here.

from TTU. Id. Thus, because Barnes & Noble was not acting as TTU's agent, TTU

could not be liable for any liability flowing from the plaintiffs' termination. Id.

Plaintiffs' agency argument here is even weaker than the one the Sixth Circuit

rejected in Swallows. SMART did not operate the Mill for International Paper, while

Barnes & Noble operated TTU's bookstore. International Paper did not authorize

SMART to make hiring decisions on International Paper's behalf regarding SMART's

workforce at SMART's Mill. In fact, Plaintiffs do not even contend that International

Paper was SMART's principal. Instead, Plaintiffs here apparently argue the opposite –

that International Paper was SMART's agent, and that the agent is liable for the

employment decisions of the principal, SMART. Any such argument must be rejected on

the law and on the undisputed facts.

First, even if there were evidence that International Paper was SMART's agent,

this would merely mean that SMART could be found liable for actions taken by

International Paper in its capacity as SMART's agent. It would not provide a legal basis

on which International Paper, as an agent, could be liable for employment decisions made

by the principal, SMART. Any holding to that effect would turn agency law on its head.

See, e.g., Rhyce v. Martin, et al., 173 F. Supp. 2d 521, 537 (E.D.La. 2001) (holding that,

while in certain cases an employer may be liable for the acts of its employees or agents,

the opposite is not true) (citing *Black's Law Dictionary*); In Re Enron, Civil Action No.

H-01-3624, 2001 U.S. Dist. LEXIS 1668 (S.D.Tx. Jan. 28, 2003) (unpublished opinion

attached) (stating that the "reverse is not true; there is no rule of law that a nonculpable

employee or agent can be held personally liable for the acts of its

master/employer/principal or for the acts of other employees").

21

Second, the extensive record in this case is utterly devoid of <u>any</u> evidence demonstrating that SMART delegated to International Paper the authority to make employment decisions on its behalf, or that International Paper exercised or could have exercised the requisite amount of control over such decisions. To the contrary, SMART expressly retained and exercised all hiring authority on its own behalf. That is expressly stated in the Asset Purchase Agreement and confirmed by all witnesses. (<u>Asset Purchase Agreement</u>, §4.1, p.16). International Paper's only involvement in SMART's hiring process was to distribute application forms and make available records and employees for reference checks by SMART's employees. (Weissman Tr. 52, 181).

If permitting supervisors to give references or make employment related documents available, with the express written authorization of the applicants for employment, is sufficient to establish an agency relationship and make the prior employer liable for the hiring decisions of the prospective employer, employers will no longer give or get employment references. This is contrary to the public policy explained in the Ohio Code and the Ohio court decisions upholding the common law of qualified privilege for employment references, as set forth in Section III, C, 2, b of this memorandum.

Plaintiffs have had ample opportunity to put substance to their conclusory allegations of International Paper's participation in SMART's hiring decisions and have been unable to identify <u>any</u> evidence supporting their allegations  The evidence is all to the contrary.  These are precisely the sort of conclusory allegations that are insufficient to survive summary judgment.  <u>See</u> <u>Williams v. Ford Motor Co.</u>, 187 F.3d 533, 544 (6th

Cir. 1999) (holding that plaintiffs cannot challenge a summary judgment motion by relying on allegations contained in their Complaint or on conclusory allegations).

### 2. Plaintiffs' Age Discrimination Claims Fail as a Matter of Law

Even assuming *arguendo* that there were some basis to find International Paper liable for SMART's hiring decisions, Plaintiffs' evidence still fails to establish a *prima facie* case of age discrimination under the ADEA or Ohio law, or to prove that the stated non-discriminatory reasons for SMART's hiring decisions are pretextual.

### a. *No* Prima Facie *Case of Age Discrimination*

To establish a claim under the ADEA, a plaintiff must show that his age "actually played a role in [the employer's decision-making] process and had a determinative influence on the outcome." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141 (2000) (citation omitted). See also O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 311 (1996) (holding that the plaintiff must show that "he has lost out *because of his age*" in the adverse employment decision) (emphasis in the original); Merkel v. Scovill, Inc., 787 F.2d 174, 179 (6th Cir.), *cert. denied*, 479 U.S. 990 (1986) (holding that the plaintiff "must prove that age was a determining factor in the adverse action"). Such a claim may be proven through direct evidence of the employer's discriminatory motive, or through the indirect, burden-shifting approach articulated by the Supreme Court in McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). See Bush v. Dictaphone Corp., 161 F.3d 363, 368 (6th Cir. 1998). A similar analysis is employed for age discrimination claims under Ohio Revised Code §4112. See Byrnes v. LCI Communications Holdings Co., 77 Ohio St. 3d 125, 672 N.E.2d 145 (Ohio 1996) (citing Barker v. Scovill, 6 Ohio St. 3d 146, 451 N.E. 2d 807 (1983)).

23

Plaintiffs have no direct evidence that they were treated differently because of age, or of any age-related remarks associated with SMART's hiring process. Thus, Plaintiffs must rely on indirect evidence and try to prove their age discrimination claims under McDonnell-Douglas' burden-shifting analysis. See O'Connor, 517 U.S. at 311; Byrnes, 77 Ohio St. 3d at 128. Under that approach, a plaintiff must first establish a *prima facie* case of discrimination. In a failure to hire case, this requires proof that: (1) plaintiff was a member of a protected class; (2) plaintiff was adversely affected with respect to a position for which the employer was seeking applicants; (3) plaintiff was qualified for the position; and (4) a substantially younger person was hired instead of plaintiff.[12] See Burzynski v. Cohen, 264 F.3d 611, 622 (6th Cir. 2001). Plaintiffs' evidence fails to meet this standard.

First, as set forth above, Plaintiffs cannot demonstrate that International Paper took any adverse action against them with respect to their failure to secure a satisfactory position with SMART.

Second, many Plaintiffs failed to identify any "substantially younger" individuals that were allegedly selected over them because of their age. Indeed, several Plaintiffs identified "younger" individuals that were approximately the same age or older than Plaintiffs. See Arthur Tr. 38 (62-year-old employee identified "younger" employees in their fifties); J. Brooks Tr. 29-30 (54-year-old employees identified employees 51 and 43 years old); Gentry Tr. 56-57 (identified older employee); Isreal Tr. 74 (identified

---

[12] The Supreme Court of Ohio has not yet decided whether plaintiffs alleging age discrimination under Ohio law must demonstrate that they were treated less favorably than a person outside the protected class or than a "substantially younger" individual. That question was recently certified to the Ohio Supreme Court by the United States District Court for the Southern District of Ohio, Eastern Division and remains pending. See Weller v. Titanium Metals Corp., 98 Ohio St.3d 1535, 876 N.E.2d 899 (2003). However, as forth herein, Plaintiffs' claims here fail under either standard.

employee four years <u>older</u>); Pennington Tr. 38-41; Paxton Tr. 68-69 (identified two

employees less than six months younger than him). This is not sufficient to demonstrate

a *prima facie* case of age discrimination. <u>See</u> <u>Bush v. Dictaphone Corp.</u>, 161 F.3d 363,

368 (6th Cir. 1998) (holding that five years is not "substantially younger"). <u>See</u> <u>also</u>

<u>Scott v. Parkview Mem'l Hosp.</u>, 175 F.3d 523, 525 (7th Cir. 1999) (defining

"substantially younger" as "ten years or more"); <u>Swiggum v. Ameritech Corp.</u>, 1999

Ohio App. LEXIS 4634, at 9 (Ohio Ct. App. Sept. 30, 1999) (holding that less than ten

years difference in age is not sufficient disparity to establish a *prima facie* case)

(attached); <u>Coryell v. Bank One Trust Co.</u>, 2002 Ohio 4443 (Ohio Ct. App. Aug. 29,

2002) (same) (attached). [13]

      Other Plaintiffs simply failed to identify anyone who was allegedly offered the

position Plaintiff applied for because of their age. <u>See</u> Chasteen Tr. 120; Clear Tr. 67;

Joshua Combs Tr. 70-74; Hyden Tr. 61-62; Freeman Tr. 114 (". . . I was just assuming

they were hiring younger people or [that they] would"). These claims also fail as a

matter of law. <u>See</u> <u>Lilley v. BTM Corp.</u>, 958 F.2d 746, 752 (6th Cir. 1992) (affirming a

J.N.O.V. on the ground that plaintiff did not show that he was replaced by younger

workers); <u>Reeher v. Baker Material Handling Corp.</u>, 1993 U.S. App. LEXIS 16142, *11

(6th Cir. June 23, 1993) ("Conclusory statements that younger employees were hired to

replaced [plaintiffs] are not sufficient to identify genuine issues of material fact

precluding summary judgment") (attached); <u>Brown v. EG&G Mound Applied Tech.,</u>

<u>Inc.</u>, 117 F.Supp.2d 671, 677-78 (S.D.Ohio 2000) (finding that mere assertions that

---

[13] The dates of birth for Plaintiffs and their coworkers are listed in the attached "Hourly Employee Roster," which was produced in Response to Plaintiffs Request for Production No. 1.

plaintiff's replacement was younger and had less experience was insufficient to survive summary judgment) (attached).

Third, Plaintiffs must demonstrate that they were "qualified" under SMART's hiring criteria. Plaintiffs' evidence regarding their qualifications consists solely of their opinion that they were more qualified than an employee with less service at the Mill. See, e.g., T. Bennett Tr. 37 (sole basis for saying he was more qualified is that he had worked at the Mill for a longer period of time); Ogg Tr. 85-87 (same). This argument utterly ignores the fact that SMART set its own hiring criteria for applicants. (Weissman Tr. 37). International Paper did not make the hiring decisions, but SMART's uncontradicted testimony is that many Plaintiffs failed to satisfy SMART's criteria. (Maheu Tr. 118; Weissman Tr. 181). Plaintiffs' conclusory allegations to the contrary are not sufficient to overcome this evidence. See Williams v. Ford Motor Co., 187 F.3d 533 at 544.

### b.    *No Evidence of Pretext*

Furthermore, Plaintiffs' age discrimination claims also fail because they have failed to produce sufficient evidence demonstrating that SMART's legitimate, non-discriminatory reasons for not hiring Plaintiffs are pretextual.

Once a plaintiff establishes a *prima facie* case of age discrimination, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its decision. If the employer asserts a legitimate, non-discriminatory explanation, the burden shifts to the plaintiff to show that the proffered reason is merely a pretext for age discrimination. See Cooley v. Carmike Cinemas, Inc., 25 F.3d 1325, 1329 (6th Cir.1994); Byrnes, 77 Ohio St. 3d at 128. In making a determination whether an inference of age discrimination is warranted, the Court must focus on "whether the [age-

26

related] comments were made by a decisionmaker or by an agent within the scope of his employment; whether they were related to the decision-making process; whether they were more than merely vague, ambiguous, or isolated remarks; and whether they were proximate in time to the act of [discrimination]." Cooley, 25 F.3d at 1330 (6th Cir. 1994). See also Moon v. Compass Group USA Inc., 1999 Ohio App. LEXIS 3951 (Aug. 27, 1999) (holding that isolated and ambiguous comments are too abstract to support a finding of discrimination).

Plaintiffs have presented no evidence here that SMART's asserted non-discriminatory reasons for its decisions (i.e., failure to meet its hiring criteria) is a pretext to cover age discrimination.[14] In fact, they cannot identify a single piece of evidence suggesting that any of the decisionmakers harbored any bias against older employees, or that age was considered in any way in SMART's employment decisions. Indeed, many Plaintiffs admitted that their claim of age discrimination was based solely on their own personal opinion or speculation. (See, e.g., Abner Tr. 51; Baylor Tr. 39, 45-46; Begley Tr. 52; W. Bennett Tr. 52; Brandenburg Tr. 90; Jerry Combs Tr. 62; Joshua Combs Tr. 70-73; Duncan Tr. 66-67; Durbin Tr. 86-87; Fowler Tr. 66-67; Gardner Tr. 89-90; Hensley Tr. 82; Ketcham Tr. 113-14; Lakes Tr. 49; Mann Tr. 66; McCreary Tr. 90;

---

[14] In some instances, it is incredible that Plaintiffs believe, even in their own minds, that they were qualified under SMART's criteria. For example, 18 Plaintiffs failed a drug test that SMART made a mandatory qualification for employment for all applicants. See Blevins Tr. 59; Clear Tr. 58; Gentry Tr. 44; Gill Tr. 47-48; Gregory Tr. 55, 65-66; Johnson Tr. 16-18; Lakes Tr. 36; Marsee Tr. 35; Mill Tr. 10; Pennington Tr. 25; Rodgers Tr. 74-75; Spada Tr. 37; Tolbert Tr. 64; Turley Tr. 24-25; Williams 60-62; Weissman Tr. 202-211, 219. Other Plaintiffs made statements on their application or in their interview which virtually disqualifies them as candidates for job offers from SMART. See, e.g., Brandenburg Tr. 80-81 (said during interview he did not want a job with SMART); Sandlin Tr. 55 (on application, wrote "I don't need a boss. I know just as much as my supervisors do"). Others admitted that they did not even want a job with SMART and did everything they could not to get a job offer. See, e.g., Begley Tr. 25; Gardner Tr. 98.

McKay Tr. 50-51; Miller Tr. 86; Ogg Tr. 95-96; Turner Tr. 55, 63).  As Plaintiff Paxton

succinctly testified, "they're younger than me, that's all I know."  (Paxton Tr. 73, 100).[15]

Plaintiffs are simply dissatisfied with SMART's employment decisions at the Mill

and therefore summarily allege that they were discriminated against on the basis of age.

However, their evidence is not sufficient to state a plausible claim of age discrimination.

See Weigel v. Baptist Hosp. of East Tenn., 302 F.3d 367, 379 (6th Cir. 2002) (affirming

summary judgment because plaintiff's claim that a younger individual was hired was not

sufficient to overcome the defendant's legitimate non-discriminatory reason); Dabrowski

v. Warner-Lambert Co., 815 F.2d 1076, 1078 (6th Cir. 1987) (stating that "the mere fact

that a younger employee or applicant receives better treatment than an older one is

insufficient" to prove discrimination under the ADEA"); Chappell v. GTE Prods. Corp.,

803 F.2d 261, 268 (6th Cir. 1986) (holding that "[m]ere personal beliefs, conjecture and

speculation are insufficient to support an inference of age discrimination").

### 3.    Plaintiffs' Disability Discrimination Claims Fail as a Matter of Law

Even assuming *arguendo* that International Paper could be held liable for

SMART's hiring decisions at the Mill, summary judgment on Plaintiffs' disability claims

is nonetheless appropriate.  Plaintiff must establish that (1) he is a member of a protected

class (disabled in fact or regarded as disabled), (2) that he is otherwise qualified to

perform the job requirements with or without reasonable accommodation, and (3) that he

---

[15] Many Plaintiffs further admitted that they were never once treated any differently because of their age during their entire employment with International Paper.  See, e.g., Adams Tr. 33; Baylor Tr. 45-46;  T. Bennett Tr. 46-47; Bullio Tr. 35-36, 59-61; C. Campbell Tr. 49; Clear Tr. 66; Cress Tr. 52-55; Gentry Tr. 54; Hess Tr. 41; Italiano Tr. 18-19; Paxton Tr. 74-75; Pennington Tr. 12-13, 42; Spada Tr. 42-43; Taulbee Tr. 24, 27-28; Tolbert Tr. 71.Thus, even if International Paper made the hiring decisions at issue in this litigation – and it did not – Plaintiffs could still not demonstrate that the non-discriminatory reasons for those decisions were pretextual.

was discharged "solely by reason of his handicap." See Monette v. Elec. Data Sys. Corp., 90 F.3d 1173, 1178 (6th Cir. 1996); Columbus Civ. Serv. Comm. v. McGlone, 82 Ohio St.3d 569, 571, 697 N.E.2d 204 (Ohio 1998).

First, as set forth above, the hiring decisions in this litigation were not made by International Paper. Thus, as a matter of law, Plaintiffs cannot demonstrate that International Paper subjected them to an adverse employment action.

Second, many Plaintiffs failed even to demonstate that they were qualified individuals with a disability under the ADA. The ADA defines a "qualifed individual with a disability" as "an individual with a disability who with or without reasonable accommodation, can perform the essential functions of the job." 42 U.S.C. § 12131. To have a "disability," a plaintiff must show that the alleged physical impairment substantially limits one or more of his major life activities. Bragdon v. Abbott, 524 U.S. 624, 631 (1998); Columbus Civ. Serv. Comm. v. McGlone, 82 Ohio St.3d 569, 571, 697 N.E.2d 204 (Ohio 1998). Several Plaintiffs here concede that their alleged disability did not interfere with a major life activity or the performance of his job at International Paper.[16] These Plaintiffs do not qualify as disabled under the ADA or Ohio law. Their claims should be dismissed for this additional reason. See Cotter v. Ajilon Servs., Inc., 287 F.3d 593, 599 (6th Cir. 2002) (affirming summary judgment because plaintiff did not establish that he was limited in a major life activity); Penny v. United Parcel Serv., 128 F.3d 408, 415 (6th Cir. 1997) (Penny not limited in a major life activity); Cain v.

---

[16] See, e.g., Brandenburg Tr. 117-18 (testified that his alleged disability did not interfere with job); Brewer Tr. 52-53 (other than the fact that he was limited to eight hour shifts for a period of time in early 2001, he conceded that his alleged disability did not affect his ability to do his job); Isreal Tr. 83-86 (admitted that he had not seen a doctor for his alleged disability since 1996 and that it did not interfere with his job during the last three years of employment); McKay Tr. 72-73 (admitted that alleged disability did not interfere with his job).

Airbourne Express, 1999 U.S. App. LEXIS 22437, at *7-8 (6th Cir. September 10, 1999) (holding that Cain was not disabled because he stated in his deposition that he was able to perform his job without a problem and he passed all physicals required of his employer) (attached).

Third, the record is devoid of any evidence demonstrating that Plaintiffs' alleged disabilities were taken into account when SMART made its hiring decisions. Indeed, Plaintiffs' own testimony establishes that there is no such evidence. See, e.g., Brandenburg Tr. 114-15 (admitted that he had no evidence that disability was a factor other than his personal belief); Brewer Tr. 52-53 (admitted that he had no evidence to support his disability claim). For this additional reason, summary judgment is appropriate on all of Plaintiffs' claims of disability discrimination. See Cotter v. Ajilon Services, Inc., 287 F.3d 593, 599 (6th Cir. 2002) ("single conclusory statement about an alleged substantial limitation is not enough to avoid summary judgment sought by the employer").

Fourth, three Plaintiffs expressly admitted that – contrary to the allegations in the Complaint – they were not alleging discrimination on the basis of disability under federal or state law. (See, e.g., E. Campbell Tr. 66; Holland Tr. 31; Rumpler Tr. 22).

Fifth, Plaintiffs Brewer, Campbell, Gregory, Holland, Rogers and Rumpler each claim disability discrimination under the ADA, but they each admit that they failed to file a charge of disability discrimination with the EEOC. (See Brewer Tr. 65; E. Campbell Tr. 57, 66; Gregory Tr. 73; Holland Tr. 31, 38; Rogers Tr. 66; Rumpler Tr. 78). Thus, these Plaintiffs' claims of disability discrimination under the ADA must be dismissed for

30

this reason as well. 42 U.S.C. § 2000e-5(e)[17] (ADA plaintiff must timely file an EEOC

charge prior to filing a lawsuit); Abeita v. TransAmerica Mailings, Inc., 159 F.3d 246,

254 (6th Cir. 1998) (failure to file EEOC charge forever bars a party from bringing his or

her claims under the ADA).

Sixth, even if Plaintiffs could demonstrate a *prima facie* case of discrimination,

for the reasons set forth in the age discrimination section, Plaintiffs cannot demonstrate

the SMART's non-discriminatory reasons for its hiring decisions are a pretext for

discrimination.

For all of these reasons, summary judgment should be granted to International

Paper on Plaintiffs' claims of disability discrimination under the ADA and Ohio law.

### C.    Plaintiffs' Defamation Claims Fail As a Matter of Law

Plaintiffs contend that International Paper made defamatory statements about

some or all of them during the sale of the Mill to SMART.[18]

Specifically, Plaintiffs allege that International Paper defamed in three ways: (1)

by referring to employees as "excess baggage," (2) by making disparaging comments

about Plaintiffs in newspaper articles concerning the Mill, and (3) by providing

---

[17] In a state with a deferral agency, such as Ohio, a plaintiff must file his or her EEOC charge of
discrimination within 300 days of the alleged discriminatory event. See Howlett v. Holiday Inns, Inc., 49
F.3d 189, 197 (6th Cir. 1995).

[18] Of the 72 Plaintiffs in this action, the following thirteen (13) Plaintiffs testified in their deposition that
they had no claim against IP for defamation or were aware of no defamatory statements made by IP
supervisors or managers:  Adams, Arthur, Begley, Blevins, Gentry, Greene, Holland, Johnson, Lakes,
Miller, Spada, Turley, and Wilkins.  Six (6) plaintiffs, four of whom are included in the preceding group,
testified that their only allegation of defamation was based upon a comment in a newspaper, and was not
based upon anything contained in the reference sheet:  Begley, Gentry, Greene, McKay, Miller, and
Sandlin.  The following six (6) Plaintiffs refused to appear for deposition, and thus have presented no facts
in support of their claims:  Fisher, Gumm, Jackson, Parsley, Ratliff, Whitaker.  A majority of the remainder
of the 51 plaintiffs agreed that many of the comments contained in the reference sheet were true, were
substantially true, and/or were the understandable and good faith opinion of their supervisor(s).

employment references to SMART with which Plaintiffs do not agree. Each of these allegations fails as a matter of law.[19]

### 1.  Plaintiffs' Claims that They Were Referred to as "Excess Baggage" Fails As a Matter of Law

Plaintiffs allege generally in the Complaint that an "unidentified agent" of Defendant(s) referred to "some or all Plaintiffs as excess baggage." Plaintiffs further allege in the Complaint that this statement was made publicly and referred to some of the former employees of International Paper who were not offered employment with SMART. Statements made by unknown persons are not actionable. Rinehart v. Maiorano, 76 Ohio App. 3d 413, 421, 602 N.E.2d 340, 346 (1991). In addition, statements regarding unidentified persons, a large group of class of persons, or persons other than the individual plaintiff are generally not actionable. See F&J Enters., Inc. v. Columbia Broad. Sys. Inc., 373 F. Supp. 292 (N.D.Ohio 1974) (reference to "class" of products insufficient to support action for defamation of product within class that was not named); Schuman v. Lake Hosp. Sys., Inc., 1997 Ohio App. LEXIS 727 (Ohio Ct. App. Feb. 27, 1997) (evidence that manager stated plaintiff and several other individuals had been discharged because they were troublemakers insufficient to state claim of

---

[19] If International Paper supervisors were acting as SMART's agents in SMART's hiring process, as Plaintiffs' allege, Plaintiffs' defamation claims against International Paper fail as a matter of law because there was no publication to a third party, an essential element of their claims. Parry v. Mohawk Motors of Mich., Inc., 236 F.3d 299, 312 (6th Cir. 2000). As the Court previously noted in its Order granting in part and denying in part International Paper's motion to dismiss the Complaint, if International Paper managers and supervisors were acting as agents of SMART, their communications were protected by the intracorporate communications privilege, were not published to a "third party," and thus cannot and do not constitute defamation. See March 25, 2003 Beckwith Order on Defendant's Motion to Dismiss, page 11, fn. 2. Plaintiffs cannot have it both ways – arguing that International Paper was SMART's agent in the hiring process for purposes of their age and disability claims, and not SMART's agent for purposes of their defamation claims. Publishing to a third party is an essential element of Plaintiffs' defamation claim. Parry, 236 F.3d at 312. If the Court finds as a matter of law that International Paper supervisors were acting as agents of SMART in the hiring process, then Plaintiffs' defamation claims fail as a matter of law for lack of publication.

defamation because there was no evidence as to any specific statement made in regard to plaintiff) (attached); Restatement Torts (Second) § 564A, Comment a ("As a general rule no action lies for the publication of defamatory words concerning a large group or class of persons . . . The words are not reasonably understood to have any personal application to any individual unless there are circumstances that give them such an application.")

In Plaintiffs' depositions, only a handful of individuals identified an "excess baggage" comment as having been made. (See, e.g., Begley Tr. 72-73; Gentry Tr. 51, 73, 75, Greene Tr. 88, McKay Tr. 66-67, Miller Tr. 71). Begley, for example, alleges the comment was made by Dan Maheu, but that Maheu was employed by SMART at that time, not by International Paper. (Begley Tr. 72-73). Gentry similarly acknowledged that the comment, if made, was made by a representative of SMART, and that he is not asserting a defamation claim against International Paper. (Gentry Tr. 51, 73, 75). Greene testified that she only heard the term "excess baggage" somewhere between 1993 and 1997, which predicated International Paper's ownership of the Mill. (Greene Tr. 88-89). McKay testified he had heard the term "excess baggage," does not know any details about it, and admits he never saw the document containing the comment. (McKay Tr. 66-68). Miller testified he also believed Maheu made the comment in the newspaper, but doesn't remember where he heard that. (Miller Tr. 71-72). Neither Miller nor any of the Plaintiffs have produced such a newspaper article in response to International Paper's requests for production of documents. This allegation cannot withstand summary judgment.

Furthermore, this statement, like many of the alleged statements in the references, is not "defamatory" as a matter of law. A defamatory statement is the unprivileged

publication of *false* and *defamatory* matter that tends to reflect injuriously on a person's reputation or exposes a person to "public hatred, contempt, ridicule, shame or disgrace, or affecting a person adversely in his or her trade, business or profession." Brunsman v. W. Hills Country Club, 151 Ohio App. 3d 718, 726-27, 785 N.E.2d 794, 800 (2003) (citing A&B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council, 73 Ohio St. 3d 1, 7, 651 N.E.2d 1283 (1995)). This statement simply cannot be construed to come within this definition.

First, if the "excess baggage" statement was made, it cannot be proven as true or false because it was clearly stated only as the opinion of the speaker, which is not verifiable and not actionable as a matter of law. See Vail v. The Plain Dealer Publ'g Co., 72 Ohio St. 3d 279, 281, 649 N.E.2d 182, 185, cert. denied, 516 U.S. 1043 (1996); Wampler v. Higgins, 93 Ohio St. 3d 111, 124, 752 N.E.2d 962, 975 (2001) (recognizing distinction between actionable factual statements and nonactionable opinions pursuant to Ohio constitutional freedoms of the press and speech). See also Arsham-Brenner v. Grande Point Health Care Community, 2000 Ohio App. LEXIS 3164 *25-27, (July 13, 2000) (manager's assertion that plaintiff was "not worth the salary" she was being paid and that she was "nothing but trouble" were subjective and unverifiable and thus nonactionable statements of opinion) (attached); Zappola v. Hennig, 20 F.Supp.2d 1150, 1154 (N.D.Ohio 1998) (councilman's comment to newspaper that "I think we should have fired him" and that he wasn't afraid of a possible lawsuit, referring to police officer who resigned in face of improprieties, were nonactionable statements of opinion).

In addition, the innocent construction rule adopted by Ohio courts provides that "if an utterance is reasonably susceptible to both a defamatory and an innocent meaning,

34

as a matter of law, the innocent meaning is to be adopted." Sweitzer v. Outlet

Communications, Inc., 133 Ohio App.3d 102, 112, 726 N.E.2d 1084, 1091 (1999).  Even

if a comment that employees not offered employment with SMART were "excess

baggage," were shown to have been made, it could be construed to mean simply that

some number of employees were not needed, because SMART did not require their

services for the efficient operation of the Mill.  The Plaintiffs' opinion that it is an insult

toward them, or toward all employees not retained, is a subjective interpretation.  Under

Ohio law, their claim may and should be rejected in favor of the innocent construction.

The alleged "excess baggage" comment fails to state a claim for defamation as a matter

of law.

> ### 2.    Plaintiffs' Assertion That Newspaper Articles Constituted Defamation by International Paper Fails under the Facts and the Law

Plaintiffs have alleged generally that, following the sale of the Mill, derogatory

comments were published in Hamilton newspaper articles about former International

Paper employees who did not receive job offers from SMART.  Plaintiffs have been

unable to produce evidence of any such article containing comments by International

Paper.[20]   The only articles produced by Plaintiffs included a comment by a Union

representative, comments by SMART representatives, or comments by former Mill

employees.  None of these comments are defamatory.  None of the articles identified by

Plaintiffs in discovery contain any statements made by or attributed to International

Paper.  Plaintiffs' defamation claim against International Paper premised upon

unsubstantiated allegations of newspaper articles therefore fails as a matter of law.

---

[20] For example, Barney Sandlin alleged that his defamation claim was premised upon a comment in a newspaper article, but he doesn't have the article and doesn't remember what it said.  (Sandlin Tr. 86).  Such vague allegations clearly cannot support a claim of defamation, nor can IP respond to them.

3.    **Plaintiffs Cannot Establish that References Allegedly Provided to SMART by International Paper Supervisors Are Defamatory**

    a.    *Plaintiffs' Defamation Claims Regarding Reference Checks Are Barred Because They Consented in Writing to the Disclosure of Supervisory Comments During the Reference Check and Released International Paper from Liability*

Although Plaintiffs now claim that International Paper is liable to them for comments made by its supervisors during reference check interviews with SMART, it is undisputed that – in two separate documents – Plaintiffs authorized International Paper to provide job-related information to SMART and expressly released International Paper from any liability associated with such disclosure. First, each Plaintiff this action signed a "Certification and Authorization" in SMART's employment application which stated in pertinent part, that:

> I authorize any reference, school, employer, or other person to disclose to Smart Papers LLC, upon request, any employment-related information they may have about me and I release them from all liability for disclosing such information to Smart Papers LLC.

Second, Plaintiffs signed an "Authorization / Release" Form which stated:

> I [Plaintiff's name], hereby authorize representatives of International Paper Company (the "Company") to make available any information contained in my personnel files to Smart Papers LLC (the "Buyer") or to any representative of the Buyer. **I further hereby authorize Company managers / supervisors to meet with the Buyer and/or representatives of the Buyer to discuss my job performance and the information contained in my personnel files.** I authorize representatives of the Company to provide the above-referenced information to the Buyer, or to any representatives of the Buyer, prior and subsequent to the completion of the sale of the Mill's assets.
>
> In addition, **I hereby release the Company** and the Buyer and their subsidiaries, affiliates, officers, directors, managers, supervisors, agents, representatives and employees **from any claims arising under federal, state or local law relating to the disclosure of the above-referenced**

**information to the Buyer or its representatives. I further hereby agree not to bring any action or proceeding against the Company, the Buyer or its representative relating to the Company's disclosure** of the above-referenced information.

(See Authorization/Release in Appendix for each Plaintiff) (emphasis added). Plaintiffs cannot escape the clear and unambiguous language of their own agreements. Thus, to the extent Plaintiffs' claims are based upon communications allegedly made during the reference check interviews, those claims are specifically barred by their consent to these communications. See Restatement of the Law (Second) Torts § 583 (the consent of another to the publication of defamatory matter concerning him is a complete defense to his action for defamation).

A release is an enforceable contract, and as such, is ordinarily an absolute bar to a later action on any claim encompassed within the release. See Denlinger v. City of Columbus, 2000 Ohio App. LEXIS 5679 *15-16 (Dec. 7, 2000) (citing Haller v. Borror Corp., 50 Ohio St. 3d 10, 13, 552 N.E.2d 207 (1990)) (attached). Ohio courts uphold a release of future liability where the alleged misconduct is premised upon negligence. Sanfillipo v. Rarden, 24 Ohio App. 3d 164, 493 N.E.2d 991, 996 (Ohio App. 1985). A party may not, however, avoid future liability on the basis of a release when liability is premised upon intentional, reckless, willful or wanton misconduct. See Denlinger, 2000 Ohio App. LEXIS 5779 *17 (Dec. 7, 2000). As stated more fully below, Plaintiffs expressly authorized and released International Paper to provide information about their job performance and employment. There is no evidence that International Paper supervisors intentionally, recklessly, or willfully provided defamatory information regarding any Plaintiff.

Releases of liability are routinely enforced under these circumstances where the intent of the parties is stated in clear and unambiguous terms. Denlinger, 2000 Ohio App. LEXIS 5679 at *17 and cases cited therein. Wall v. Ohio Permanente Medical Group, Inc., 119 Ohio App.3d 654, 671-672, 695 N.E.2d 1233 (1997) (release of all claims against persons providing references concerning qualifications for medical staff appointment barred subsequent suit for allegedly defamatory reference); Ostasz v. Med. College of Ohio, 88 Ohio Misc. 2d 6, 691 N.E.2d 371 (Ohio Ct. Cl. 1997) (plaintiff's application containing waiver and release for information from the Medical College of Ohio (MCO) barred subsequent suit against MCO for defamatory information provided by the college's director in response to request for information); Schuman v. Lake Hosp. Sys., Inc., 1997 Ohio App. LEXIS 727, at *14 (Ohio Ct. App. Feb. 27, 1997) (plaintiff's claim that employer defamed her by making false statements about her general work quality to prospective employers barred by plaintiff's execution of unambiguous release of "any and all liability" in supplying the requested information) (attached); Pinger v. Behavioral Science Ctr., Inc., 52 Ohio App. 3d 17, 18, 556 N.E.2d 209, 211 (1988) (authorization to release psychological test results to employer and release of liability for same barred subsequent action for defamation based on information communicated in report that resulted in termination from employment).

In Wall v. Ohio Permanente Medical Group, Inc., 119 Ohio App.3d 654, 695 N.E.2d 1223 (1997), for example, the plaintiff doctor sued his former employer medical group for defamation. While applying for a position with a prospective employer hospital, the plaintiff executed a release of liability discharging all persons from claims associated with providing information about the plaintiff's competency, ethics, character,

mental or emotional stability or other qualifications for medical staff appointment. Id. at 671. The plaintiff alleged that the defendant improperly provided information to the prospective employer attributing to him surgical complications when responding to a request for an employment reference. The court rejected the plaintiff's claim that the release did not bar his defamation claim. Id. at 671-72. Although the court affirmed summary judgment for the defendant employer on other grounds, the court unequivocally stated that even if the plaintiff had produced sufficient evidence to support his defamation claim, the claim would be barred by the release. Id. at 671.

Similarly, in Pinger, the plaintiff was hired by Toledo Edison as an engineer in its nuclear power station. 56 N.E. 2d at 210. Toledo Edison required Plaintiff to undergo psychological testing. Id. In conjunction with this testing, Plaintiff signed a release authorizing the testing center to provide the results of the psychological test to Toledo Edison and releasing the testing center from all liability associated with administering the tests, evaluating the data and reporting the results of the tests. Id. at 211. The testing center reported that the plaintiff possessed an extreme propensity for alcoholism to Toledo Edison. Id. Based on this report, Toledo Edison terminated the plaintiff from his employment. Id. at 210. The plaintiff sued the testing center for defamation. The plaintiff claimed the results of the psychological testing were untrue, stating he had never had an alcohol problem and that he believed the test's prediction of his propensity was flawed. Id. The Court granted the defendant's motion for summary judgment, holding that the plaintiff's claims were barred by the release.

Plaintiffs' execution of the authorizations and releases similarly bars the instant action relating to the subject matter contained therein: the disclosure of any allegedly

defamatory personnel documents or references by International Paper's managers or supervisors in response to SMART's requests for information regarding the Plaintiffs' job performance and employment with International Paper. Plaintiffs understood and agreed by executing these authorizations that their supervisors and managers could and would provide opinions and information about the Plaintiffs' work performance, and that SMART would take these opinions and information into consideration in making employment decisions. (See, e.g., Abner Tr. 45-46; Arthur Tr. 14; Bennett Tr. 17; Bray Tr. 21; Huntington Tr. 47-48). Plaintiffs should be held to the terms of the authorization and release, and barred from pursuing claims against International Paper for any disclosures made pursuant to this agreement.[21]

> ### b. *The Allegedly Defamatory Reference Statements Were True or Were the Opinions of International Paper Supervisors*

Even if Plaintiffs had not authorized International Paper supervisors to give references regarding job performance, their allegations still fail as a matter of law because the statements made were either true or were the nonactionable opinions.

The truth of the matter charged as defamatory is a complete defense. Ohio Rev. Code Ann. § 2739.02; Kemper v. Am. Broad. Cos., Inc., 365 F. Supp. 1275 (S.D.Ohio 1973). See also, Sweitzer v. Outlet Communications, Inc., 133 Ohio App. 3d 102, 110, 726 N.E.2d 1084, 1090 (1999) (holding "a defamation action may be completely defended by showing that the gist, or imputation, of the statement is substantially true").

---

[21] The public policy reasons for enforcing these unambiguous authorizations and releases are apparent. If authorization and releases are ineffective to bar costly litigation, employers will not be willing to provide potentially negative assessments of an employee's job performance for fear of being sued, and references would be unavailable. Moreover, employers would be reluctant to provide even positive references, for fear that workers who received neutral or no references would claim that this was, by comparison, negative. References serve a clear public interest in facilitating the hiring of qualified and suitable employees and protecting the interests of the public, coworkers, and employers.

Each of the managers and supervisors provided good faith assessments of the employees they supervised.[22] Some Plaintiffs conclusorily assert that every negative comment reflected in the reference check forms were "lies," but when questioned about individual comments, most admitted that many of the comments were based on facts, discipline for attendance or performance problems, personality conflicts with co-workers. Most admitted that, at least in the eyes of the supervisor or manager, they had the characteristics described. (See Appendix for discussions of each Plaintiff). Such assessments are not actionable as defamation.

For example, Plaintiff McCreary claims that the comment on his reference sheet that he was caught cheating on his time sheet is a lie; however, Plaintiff admits that he was disciplined for adding extra hours to his time sheet and had to pay back the time. (McCreary Tr. 49-51, 108-109). Plaintiff McKay initially claimed during his deposition that he disagreed with every single comment on the reference sheet. (McKay Tr. 45-46). McKay later admitted, however, that, as indicated on the reference sheet, he had indeed been disciplined for failing to wear his safety glasses. (McKay Tr. 37-38, 46). He also agreed with the comment that he had been absent and tardy in the past, but he qualified this by stating that he was absent and tardy only "accordingly to their standards." (McKay Tr. 46). Plaintiff McKay admits that he was disciplined on numerous occasions for various reasons, as was described on the reference sheet. (McKay Tr. 32-38).

Plaintiff Huntington disagreed with a statement allegedly made by his supervisors during

---

[22] Most Plaintiffs rely upon notations recorded in SMART's applicant reference check forms as the basis for their defamation claim against International Paper. These reference sheets and the notations on them, however, were completed by SMART, not by International Paper. International Paper supervisors responded to questions posed to them by SMART representatives, and these SMART representatives evaluated and made selective notes from these interviews based on the factors and categories in SMART's Reference Sheets, using their own discretion, interpretation, and recollection. (Moore Tr. 24; Weissman Tr. 113). The categories the interviewers circled on the form and the notes they made are the interviewers' impressions and not necessarily those of International Paper supervisors.

the reference checks that he was argumentative; however, he testified "I ain't argumentative. To him maybe… I am not an argumentative person so that's why." He also admitted, however, that his supervisor might think he was the argumentative type and that they frequently "butted heads together," over the way things should be run and done. (Huntington Tr. 68-72). Additional examples of similar admissions are found throughout the attached Appendix.

Furthermore, many other of the alleged defamatory statements consist of the supervisor's personal opinion of their employee's work performance. For example, several Plaintiffs base their defamation claims on comments that they did not seem to get along well with their co-workers, that they were not hard workers, or that they did not follow directions well. It is axiomatic that one cannot be held liable for defamation in Ohio for giving their opinion – especially when specifically authorized to do so. See Scott v. News-Herald, 25 Ohio St. 3d 243, 496 N.E.2d 699 (1986) (holding that opinions are entitled to absolute privilege); Vail v. The Plain Dealer Publ'g Co., 72 Ohio St. 3d 279, 281, 649 N.E.2d 182, 185, cert. denied, 516 U.S. 1043 (1995). The "opinion privilege" is not limited to freedom of the press, but also applies to protect the freedom of speech by "every citizen," including non-media defendants. Wampler v. Higgins, 93 Ohio St. 3d 111, 124, 752 N.E.2d 962, 975 (2001).

The determination of whether a statement comes within the "opinion privilege" is a question of law to be decided by the court. Wampler, 93 Ohio St. 3d at 127, 752 N.E.2d at 977. "When determining whether speech is protected opinion a court must consider the totality of the circumstances. Specifically, a court should consider:  the specific language at issue, whether the statement is verifiable, the general context of the

statement, and the broader context in which the statement appeared." Vail, 72 Ohio St. 3d at 283. The "opinion privilege" applies in the employment context. See, e.g., Arsham-Brenner v. Grande Point Health Care Community, 2000 Ohio App. LEXIS 3164, at *25-27 (Ohio Ct. App. July 13, 2000) (manager's assertion that plaintiff was "not worth the salary" she was being paid and that she was "nothing but trouble" were subjective and unverifiable and thus nonactionable statements of opinion) (attached); Parano v. O'Connor, 433 Pa. Super. 570, 575, 641 A.2d 607, 609 (Pa. Super. 1994) (finding incapable of being defamatory comments that appellant was adversarial, less than helpful and uncooperative because subjective opinions); Doherty v. Kahn, 289 Ill.App.3d 544, 556-557, 682 N.E.2d 163, 170 (1997) (statement that plaintiff was "incompetent," "lazy," and "dishonest," were expressions of nonactionable opinion).

Plaintiffs' defamation claims essentially are claims that their supervisors and managers offered negative opinions of their job performance. However, the mere fact that opinions are negative or critical, or that the person being reviewed does not agree with the opinion, does not make the statement actionable. See Greer v. Columbus Monthly Publ'g Corp., 4 Ohio App. 3d 235, 237-38, 448 N.E.2d 157, 160-61 (1982) ("Criticism, by its nature, is controversial," but criticism that reflects opinion of the reviewer is protected by freedom of speech, and disagreement with the opinion does not make it actionable). Many of the Plaintiffs admitted that they believed the comments reflected in the reference sheets to be the opinions of their supervisors with which they disagreed. Disagreement does not make the opinion actionable. Id. 2d at 160-61. Plaintiffs' allegations of defamation premised upon supervisors' or managers' subjective opinions of the Plaintiffs' character and work performance thus fail as a matter of law.

**c.**    ***Plaintiffs' Defamation Claims Fail As a Matter of***
***Law Because the Supervisors' Communications***
***Were Protected By a Qualified Privilege***

Even if some statements made by Plaintiffs' supervisors are determined to be

false and defamatory, Plaintiffs' claims still fail as a matter of law because the alleged

statements are covered by a qualified privilege.  As set forth above, a defamatory

statement is the *unprivileged* publication of false and defamatory matter about an

individual.  Brunsman, 151 Ohio App. 3d at 726-27, 785 N.E.2d at 800.  An individual

who publishes allegedly defamatory matter concerning another is not liable for the

publication, however, if that matter is published upon an occasion that makes it

conditionally privileged and the privilege is not abused.  Restatement of the Law

(Second) Torts § 593; Hahn v. Kotten, 43 Ohio St. 2d 237, 331 N.E.2d 713 (1975).

The Ohio Supreme Court held in Hahn v. Kotten that "[a] communication made in

good faith on any subject matter in which the person communicating has an interest, or in

reference to which he has a duty, is privileged if made to a person having a corresponding

interest or duty, even though it contains matter which, without this privilege, would be

actionable, and although the duty is not a legal one, but only a moral or social duty of

imperfect obligation." 43 Ohio St. 2d at 245-46, 331 N.E.2d 713.  "The privilege arises

from the necessity of full and unrestricted communication concerning a matter in which

the parties have an interest or duty, and is not restricted within any narrow limits." West

v. Peoples Banking & Trust Co., 14 Ohio App. 2d 69, 72, 236 N.E.2d 679, 681 (1967)

(adopted by Hahn, 43 Ohio St. 2d at 245-46, 331 N.E.2d at 719-20).

The elements of this qualified privilege "are fully satisfied by showing that the

relationship of the parties to the communication 'is such as to afford reasonable ground

for supposing an innocent motive for giving information and to deprive the act of an

44

appearance of officious intermeddling in the affairs of others.'" McCartney v. Oblates of St. Francis de Sales, 80 Ohio App. 3d 345, 356, 609 N.E.2d 216, 224 (1992) (quoting Hahn, 43 Ohio St. at 246, 331 N.E.2d at 720). The Court in Hahn held that this privilege is intended to cover statements made by an employer about a former employee.[23] Hahn, 43 Ohio St. at 245-46, 331 N.E.2d at 719-20.

Where the circumstances of the occasion for the alleged defamatory communications are not in dispute, as here, the determination of whether the occasion is privileged is a question of law for the court. See A&B-Abell Elevator Co. v. Columbus/Central Ohio Bldg. & Constr. Trades Council, 73 Ohio St. 3d 1, 651 N.E.2d 1283 (1995).

The allegedly defamatory communications at issue in this case were protected by the qualified privilege. International Paper and SMART had an ongoing business relationship during the sale of the Mill. International Paper and SMART shared a common interest in the fluid transition of the operation of the Mill to SMART and in facilitating the hiring process to minimize any disruption in employment and production at the Mill. International Paper and its supervisors and managers provided information to

---

[23] Other courts have similarly recognized that this qualified privilege applies to defamatory statements made in employment and business contexts. See, e.g., Brunsman v. Western Hills Country Club, 151 Ohio App. 3d 718, 727, 785 N.E.2d 794, 801 (2003) ("When alleged defamatory statements have occurred in a business context, by someone whose job gives that person a legitimate interest in the matter, they are subject to a qualified privilege when the circumstances are reasonably believed by the defendant to exist"); Nichols v. Ryder Truck Rental, Inc., 1994 Ohio App. LEXIS 2697, at *13 (Ohio Ct. App. June 23, 1994) ("A qualified privilege attaches to statements made within the scope of employment") (citing Hahn); Rinehart v. Maiorano, 76 Ohio App. 3d 413, 421, 602 N.E.2d 340, 346 (1991) ("an employer may relay facts, opinions, or suspicions about a former employee to that employee's prospective employer and be within the qualified privilege") (citing Rainey v. Shaffer, 8 Ohio App. 3d 262, 263-64, 456 N.E.2d 1328, 1330-32 (1983)). See also, Restatement of the Law (Second) Torts § 595 and Comment i ("Under many circumstances, a former employer of a servant is conditionally privileged to make a defamatory communication about the character or conduct of the servant to a present or prospective employer . . . Information regarding the honesty and efficiency of an employee's work comes within the conditional privilege.").

SMART at its specific request, in response to specific questions, regarding matters that directly affected SMART's business interests, and with the consent of affected employees. (Weissman Tr. 181).

"[I]t is generally held that if a defendant publishes defamatory words to an interested party *at that party's request or solicitation*, there is such a relationship between the parties to justify the communication." Smith v. Ameriflora 1992, Inc., 96 Ohio App. 3d 179, 644 N.E.2d 1038 (1994) (emphasis in original) (citing Hahn). See also Restatement of the Law (Second)Torts § 595 ("In determining whether a publication is conditionally privileged, it is an important factor that the publication is made in response to a request rather than volunteered by the publisher or there is a relationship between the parties."). The Weissman Group and SMART posed specific questions from SMART's Applicant Reference Check forms designed to solicit data and information related to their hiring and performance standards. International Paper had a duty and obligation to respond to these requests fully and forthrightly, and did so in good faith.

> [W]hen a former employer is asked by a prospective employer to provide information about a former employee, '[a] duty is thereby cast upon the former master to state fully and honestly all that he knows either for or against the servant; any communication made in the performance of this duty is clearly privileged for the sake of the common convenience of society, even though it should turn out that the former master was mistaken in some of his statements.

Wolf v. First Nat'l Bank of Toledo, 20 Ohio Op. 3d 262 (1980) (quoting McKenna v. Mansfield Leland Hotel Co., 55 Ohio App. 163, 167, 9 N.E.2d 166 (1936)).

Here, of course, the communications were not merely at the request of SMART, the prospective employer. They were made with the express prior written consent of Plaintiffs, the prospective employees. The comments made by International Paper's

supervisors in response to SMART's questions come squarely within the qualified privilege recognized by <u>Hahn</u> and applied in subsequent cases.  See <u>Evely v. Carlon Co. Div. of Indian Head, Inc.</u>, 4 Ohio St. 3d 163, 165, 447 N.E.2d 1290, 1292 (1983) (statements made concerning activities of plaintiff arising out of employment status with the company, not as an individual separate and apart from his employment, afforded qualified privilege concerning business interest between the parties); <u>Rinehart v. Maiorano</u>, 76 Ohio App. 3d 413, 421, 602 N.E.2d 340, 346 (1991) (statements about the reasons for Rinehart's discharge "fall well within the boundaries of a qualified privilege, for they concern activities of Rinehart arising out of his employment status with Reuben").[24]

In <u>Rinehart v. Maiorano</u>, for example, Plaintiff Rinehart sought to bring an action against his former employer, the Reuben Company for, among other things, advising a prospective employer of the reasons for Plaintiff's discharge, including that Plaintiff had harassed female employees, lacked a willingness to work with subordinates, intimidated fellow employees and outside contractors, and lacked leadership.  <u>Id.</u> at 342, 345-46.[25]

---

[24] International Paper should not be held liable for statements by supervisors or managers made during these reference interviews also because any benefit advanced only SMART's interests, not International Paper's.  An employer is bound by the acts of its agents only when they are acting within the scope of their authority.  <u>See</u> 12 Oh. Jur. 3d, <u>Business Relationships</u> § 544, 545.  A selling company cannot be liable for discriminatory acts by its supervisory employees while in the employ of the selling company, but acting for the benefit of the purchasing company.  <u>Moham v. Steego Corp.</u>, 3 F.3d 873 (5th Cir. 1993); <u>Austin v. Mabey</u>, 184 F.Supp.2d 534(M.D. La. 2001).  Although International Paper had a common interest with SMART in the sale of the Mill to SMART, and made its supervisors available for interviews, the decision about which former International Paper employees to hire was entirely within the discretion and control of SMART.  Moreover, negative employment references were of no benefit to International Paper because, under the Effects Bargaining Agreement, any hourly employee not hired by SMART was entitled to receive severance pay from International Paper in making any allegedly defamatory comments.  Under these circumstances, the supervisors were not acting as agents of International Paper, but as agents of and for the benefit of SMART.  International Paper therefore cannot be held vicariously liable for any allegedly tortious conduct that occurred during this process.  In addition, as SMART's agents, supervisors' comments to SMART's interviewers would not constitute publication.

[25] The plaintiff in <u>Rinehart</u> consulted an attorney regarding his claims against the Reuben Company, but the attorney failed to timely file a lawsuit.  Rinehart subsequently filed this action against his attorney for

47

The court held that the alleged defamatory statements were clearly made within the scope of employment and were therefore protected by a qualified privilege because "all such alleged statements concerned the activities of Rinehart arising out of his employment status with Reuben," and "an employer may relay facts, opinions or suspicions about a former employee to that employee's prospective employer and be within the qualified privilege." Id. at 346 (citing Rainey v. Shaffer, 8 Ohio App. 3d 262, 263-64, 456 N.E.2d 1328, 1330-32 (1983)).

Just as in Rinehart, any "facts, opinions, or suspicions" provided by International Paper supervisors and managers to SMART were limited to the scope of Plaintiffs' employment, and clearly come within the qualified privilege. In addition, the International Paper supervisors' comments and opinions regarding employees were made only to SMART hiring representatives in the scope of the authorized reference checks. They did not disseminate information beyond those with a legitimate need to know, and thus did not exceed the scope of the qualified privilege. Control over questions asked in the interviews, the information documented in the reference forms, and the interpretation and application of the information against SMART's qualification standards, remained the province of the Weissman Group and SMART. (Weissman Tr. 181).

The circumstances and substance of the allegedly defamatory references at issue in this case undeniably bring the communications within a conditional or qualified privilege. The burden of proof accordingly shifts to Plaintiffs to establish that International Paper abused this privilege. See Brunsman v. W. Hills Country Club, 151

---

malpractice. The court held that Rinehart could not have an actionable claim for malpractice unless the underlying claim for defamation was actionable, therefore it analyzed the defamation claim in this context. Id. at 344-45.

Ohio App. 3d 718, 727, 785 N.E.2d 794, 801 (2003); Rinehart, 602 N.E.2d at 346.  Their

failure to do so is fatal to their claims.

> **d.      *Plaintiffs' Defamation Claims Fail Because They
> Cannot Establish the Communications Were Made
> with Actual Malice***

To defeat International Paper's qualified privilege, it is incumbent upon Plaintiffs

to prove that the published statements were untrue and made with actual malice.

Brunsman v. Western Hills Country Club, 151 Ohio App. 3d 718, 727, 785 N.E.2d 794,

801 (2003).  "Proof of actual malice requires clear and convincing evidence that the

defendant, acting out of spite or ill will, made the statements either with knowledge that

they were false or with reckless disregard for their truth."  Id. (citing Jacobs v. Frank, 60

Ohio St. 3d 111, 573 N.E.2d 609 (1991)).  "[M]ere inaccuracies in statements and alleged

improper motivations by speakers are insufficient to show actual malice.  Rather, the

party seeking relief must present evidence that defendants knew the statements were

false, entertained serious doubts about whether they were false, or disregarded a high

probability that they were false."  Wall v. Ohio Permanente Medical Group, 119 Ohio

App. 3d 654, 666, 695 N.E.2d 1233, 1241 (1997).  See also Curry v. Nestle USA, Inc.,

2000 U.S. App. LEXIS 18743, at *20 (Ohio Ct. App. July 27, 2000) (to establish

"reckless disregard," a plaintiff must present sufficient evidence to permit a finding that

the defendant had serious doubts as to the truth of his publication) (attached); Mosley v.

Evans, 90 Ohio App. 3d 633, 630 N.E.2d 75, 78 (1993) (finding no actual malice where

conclusions based on defendants observations and conversations with others).  Plaintiffs

cannot meet the requisite standard of proof to overcome the qualified privilege.

In Mosley, for example, Deacons of a church sent a letter to their pastor and then

to the church congregation opining that it was necessary for the pastor to resign to protect

49

the health and vitality of the church because the pastor's health and physical condition prohibited him from effectively performing his pastoral responsibilities. The pastor brought suit against the Deacons for the publication of the letter, and asserted that the Deacons' failure to contact his doctors or consult the church records prior to drafting and distributing the letter amounted to reckless disregard as to the truth or falsity of the statements contained therein. The court disagreed and affirmed the trial court's dismissal of the action. The court held that numerous sources of information were available to the Deacons, and that they were not required to consult these specific sources to establish the truth of their statements. Id. The Deacons reached their conclusions through conversations with members of the congregation, their own observations, and discussions during official meetings regarding the deteriorating financial condition and membership of the church. The court therefore found that the Deacons had "a factual foundation for their opinion concerning the effect of Mosley's health on his performance as pastor and did not act in reckless disregard as to the truth or falsity of their statements in the letter." (630 N.E. 2d at 78).

Similarly, in the instant case, supervisors and managers had a factual basis for their opinions concerning each of the Plaintiffs. They relied upon their own observations of the Plaintiffs' performance, discussions with current and former supervisors, and their knowledge acquired from experience and interaction with these individuals. The statements provided "must be viewed on the *subjective* belief of the author." McCartney v. Oblates of St. Francis de Sales, 80 Ohio App. 3d 345, 609 N.E.2d 216 (1992) (*citing* Jacobs, 573 N.E.2d at 119).

50

Generally, Plaintiffs admitted they had good relationships with their supervisors, that they understood that the supervisors' comments were simply their own opinions of Plaintiffs' work performance, and/or that they had no reason to believe their supervisors would provide false information about them knowing the information was false or with reckless disregard for the truth.[26] Their failure to present evidence of actual malice defeats their claims as a matter of law. See Dodson v. Wright State Univ., 91 Ohio Misc. 2d 57, 697 N.E.2d 287 (1997) (communications regarding reason for removal as department chair were qualifiedly privileged and plaintiff's failure to prove actual malice by a preponderance of the evidence warranted judgment for defendant); Rinehart v. Maiorano, 76 Ohio App. 3d 413,422, 602 N.E.2d 340, 346-47 (1991) ("bold allegations" without more are insufficient to establish actual malice and overcome qualified privilege between former employer and prospective employer regarding disclosure of reason for plaintiff's discharge); Tohline v. Central Trust Co. N.A., 48 Ohio App. 3d 280, 284, 549 N.E.2d 1223, 1228 (1988) (allegation that managers "misapprehended the facts" insufficient to establish actual malice and therefore qualified privilege applied to protect allegedly false statements).

---

[26] Although some Plaintiffs made conclusory statements that the Applicant Reference Check forms completed by SMART's interviewers contained "lies" about them, when questioned about individual items, many admitted the factual basis underlying the supervisor's opinion. For example, Plaintiff Abner complained that the reference sheet noted he had absenteeism issues, but admitted he had been disciplined for excessive absenteeism. (Abner Tr. 55-56.) Plaintiff Baylor alleged that comments that he was "angry, hostile, [and has a] chip on [his] shoulder" was defamatory, but admitted that "[t]here was a period of time that I was going through a divorce and I basically carried a chip on my shoulder," and "I was short-tempered at times." (Baylor Tr. 22-23, 87). Plaintiff Brandenburg disagreed with the comment on his reference sheet that he had poor quality of work, but admitted he had been disciplined for poor paper quality. (Brandenburg Tr. 55-56). Plaintiff Huntington disagreed with the comment that he was argumentative, but conceded that he and his supervisor "butted heads together" and the supervisor might consider this argumentative. (Huntington Tr. 70). As noted more fully in the Appendix, Plaintiffs' depositions are replete with these admissions, which are probative, unlike their conclusory allegations of defamation, and establish that the supervisors had a good faith and reasoned basis for their opinions.

    e.      ***International Paper Is Statutorily Immune from Liability for the Disclosures Pertaining to the Plaintiffs' Job Performance***

Pursuant to the Ohio Code, an employer that is requested by an employee or a prospective employer to disclose information pertaining to the job performance of that employee, and who discloses the requested information to the prospective employer, is not liable in damages in a civil action for any harm sustained as a proximate result of making the disclosure, unless the plaintiff establishes by a preponderance of the evidence that:

1) the employer disclosed the particular information with the knowledge that it was false, with the deliberate intent to mislead the prospective employer or another person, in bad faith, or with malicious purpose; or

2) the disclosure of particular information by the employer constitutes an unlawful discriminatory practice described in section 4112.02, 4112.021 [4112.02.1], or 4112.022 [4112.02.02.2] of the Revised Code.

Ohio Rev. Code Ann. § 4113.71(B).[27]

There is no dispute that SMART requested International Paper to disclose information pertaining to the job performance of its employees in connection with SMART's application process for employment at the Mill. It is also undisputed that the Plaintiffs authorized this disclosure in writing. These communications accordingly come squarely within the statutory qualified privilege. As discussed above, and discussed in the Appendix sections with regard to each of the individual Plaintiffs, Plaintiffs cannot make the necessary showing that references were knowingly false, with the deliberate

---

[27] This section essentially codifies the qualified privilege recognized by common law, but does not affect any immunities from civil liability or defenses established by another section of the Revised Code or available at common law to which an employer may be entitled under circumstances not covered by this section. Ohio Rev. Code Ann. § 4113.71(D)(2).

intent to mislead, in bad faith or with malicious purpose, or that the disclosure of particular information constituted an unlawful discriminatory practice. Accordingly, their defamation claims are barred by the Ohio Code.

> **f.    *Plaintiff's Defamation Claims Fail to the Extent Plaintiffs' Cannot Establish Any Causal Connection Between the Allegedly Defamatory Comments and Their Failure to Receive an Offer of Employment from SMART***

Even assuming that negative references can be shown to have been a factor in SMART's decision not to give job offers to certain Plaintiffs, which International Paper denies, Plaintiffs who received an offer of employment did not receive an offer of employment because of a positive drug test result, or were denied a job offer for reasons unrelated to any alleged defamatory comments, have no defamation claim as a matter of law. See Randleman v. Dick Masheter Ford, Inc., 1991 Ohio App. LEXIS 4032, at *16-17 (Ohio Ct. App. August 22, 1991) (sustaining grant of motion for summary judgment where employee failed to establish any prospective employer refused him employment as a result of defendant's defamatory statements) (attached). Defamation claims for at least the following twenty-six (26) Plaintiffs should also be rejected as a matter of law on this additional ground: Clear, Gentry, Gill, Gregory, Italiano, Jackson, Johnson, Lakes, Marsee, Miller, Pennington, Ratliff, Rodgers, Spada, Tolbert, Turley, Whitaker, and Wilkins (disqualified/positive drug test); Begley, Greene, Hess, Holland, and Rumpler (offered and accepted positions); Arthur, Campbell, and Geeding (rejected offer of employment). (See Appendix).

For all of the foregoing reasons, Plaintiffs' defamation claims fail as a matter of law and must be dismissed.

53

### D.    Plaintiffs Fail to Establish A Violation of the WARN Act

#### 1.    The Mill was sold as a going concern.

As of its execution of the Asset Purchase Agreement, SMART "intend[ed] to make offers of employment to a substantial number of employees of [the Mill]," and to purchase the Mill as "a going concern."  (Asset Purchase Agreement, 1; §4.1, p. 16). Toward that end, SMART bought not just the Mill's real estate, but also "all of the assets, properties, licenses and other agreements necessary to permit [SMART] to *conduct business in substantially the same manner* that it has been conducted by [International Paper] prior to" the sale.  (Asset Purchase Agreement, § 5.14, p. 31) (emphasis added). SMART purchased International Paper's accounts receivables, customer lists, and supplier lists and agreed to assume certain liabilities related to the Mill.  (Asset Purchase Agreement, §2.1, p. 7; §2.4, p. 11).  SMART acquired the Mill premises.  (Asset Purchase Agreement, §2.1, p. 7-8).  SMART also acquired the Mill's raw materials and inventory to continue the Mill's operation. (Maheu Aff. ¶13).  The Asset Purchase Agreement provided that the Mill employees employment with International Paper would terminate "[i]mmediately prior to the Closing."  (Asset Purchase Agreement, §4.1, p.16.)

Consistent with this, International Paper sent a letter to Mill employees on January 8, 2001, advising them of the agreed sale and notifying them that their employment with International Paper would terminate "when the sales transaction is finalized." (Begley App., January 8, Letter from International Paper).  International Paper employees also received a January 8, 2001 letter from SMART specifically inviting them to submit, by January 15, 2001, applications for employment with SMART after the sale, which was still several weeks away. (Weissman Tr. 25; Begley App., January 8 Letter from SMART).  Plaintiffs all applied, were interviewed, and drug-tested

54

by SMART before the sale. [See Appendix].  SMART decided before the effective date

of the sale which applicants would receive offers of employment.  (Maheu Tr. 126).

The sale was effective at the beginning of the second shift on February 9, 2001.

(Asset Purchase Agreement, p. 13.)  On that date, the Mill was in operation and most of

International Paper's employees reported to work.  Several days before, SMART had

hired high level managers from the Mill to assist SMART in the transition.  (Bergeron Tr.

6, Maheu Tr. 151).   On February 9, additional offers of employment were made by

SMART to other salaried employees at the Mill, including Annetta Johnson, Director of

Human Resources for the Mill, and other Mill employees received letters from SMART

inviting them to one of several meetings at the Hamiltonian Hotel on Saturday and

Sunday, February 10 and 11, 2001. (Maheu Aff. ¶10; Begley Tr. 38-39).

Consistent with its intent as announced in the Asset Purchase Agreement,

SMART hired a majority of the existing workforce at the Mill to continue its operation.

In a series of meetings over February 9, 10 and 11, 2001, Johnson and other members of

SMART's management team informed former International Paper employees (both

hourly and salaried) whether they were being offered employment by SMART.  (Maheu

Aff. ¶ 10; Johnson Tr. 80).  Of the former Mill employees who applied, 574 (410 hourly

and 164 salaried) received job offers.  This represented over 70% of the former

International Paper workforce.

While the Mill's production equipment was idle during the weekend transition

from International Paper to Smart, the Mill did not shut down. (Simpson Tr. 6).

Employees hired by SMART to administer the employment offers worked over the

weekend to complete paperwork and other administrative steps necessary to complete the

hiring of former International Paper employees. (Johnson Tr. 80; Maheu Aff., ¶13).

Certain hourly employees at the water treatment plant were requested to work on Sunday,

February 11. SMART warehouse employees began taking an inventory of the Mill's

equipment. (Maheu Aff. ¶14; Asset Purchase Agreement, p. 12). (Simpson Tr. 6). On

Tuesday, February 13, the majority of the hourly employees had meetings at the Mill

with their managers and supervisors to discuss scheduling and organization. (Maheu Aff.

¶14). The Mill's production equipment was not removed or mothballed. Instead, normal

operation resumed on Wednesday, February 14, much as it had under International

Paper's ownership. (Maheu Aff. ¶14). . SMART's operation of the Mill used generally

the same production process and equipment used by International Paper. SMART

continued to operate all departments and operating units of at least 50 or more that

International Paper had operated. (Maheu Aff. ¶14).

> **2.    There was no "mass layoff" because the Mill employees
> hired by SMART did not suffer an "employment loss."**

Plaintiffs' apparently contend that there was a "mass layoff" that triggered the

notice requests of WARN. The undisputed facts described above, however, make clear

that there was no "mass layoff" within the meaning of WARN.

Under WARN, a "mass layoff" is a reduction in force which results in

"employment loss" within a 30-day period for at least 50 employees constituting at least

33% of the employees, or at least 500 employees at a single site of employment. 29

U.S.C. § 2101(a)(3)(b). An "employment loss" is an employment termination (other than

a discharge for cause, voluntary departure, or retirement), a layoff exceeding six months,

or a reduction in hours of work of more than 50% in six consecutive months. Id.,

§ 2101(a)(6).

Plaintiffs apparently contend that there was a "mass layoff" because all of the Mill's employees suffered "employment loss" as a result of being terminated by International Paper.  Such a contention is squarely foreclosed by controlling precedent. "The proper focus in this case is what actually happened to [the seller's] employees after the sale (notwithstanding the provision in the final purchase agreement that seller had responsibility for terminating employees or the fact that the termination notices apparently went out after the sale had been completed)." Wiltz v. M/G Transport Services, Inc., 128 F.3d 957 (6th Cir. 1997).

In Wiltz, the employer sold operations which had employed 160 persons, and as here, the sales agreement provided that the seller would terminate its employees "upon or prior to" the sale.  The Sixth Circuit noted that "Courts addressing § 2101(a)(6), whether in the context of a sale, plant closing or mass layoff, have all applied a '*practical, effects-driven analysis* of whether a break in employment actually occurred' to trigger the notification requirements of the WARN Act." Id. at 964 (emphasis added), *quoting* Gonzalez v. AMR Servs. Corp., 68 F.3d 1529, 1531 (2[d] Cir. 1995) (also citing legislative history and numerous other cases); *accord* International Oil, Chemical, and Atomic Workers v. Uno-Ven Co., 170 F.3d 779, 783 (7th Cir. 1999) (attributing the same result to WARN's sales exclusion, 29 U.S.C. § 2101(b)(1)).  Since most of the seller's employees had "continued, or had the opportunity to continue" in employment with the buyer, the court found that no "mass layoff" had occurred, despite the fact that their employment with the seller was ended. Id. at 965

For a "mass layoff" under WARN, there must be both an employment loss by at least 50 employees and that loss much comprise at least 33% of the employees at a single

site of employment or a minimum of 500 employees.  It is undisputed that more than

70% of the Mill's 800-employee workforce received offers of employment from

SMART.  Fewer than 33% (and fewer than 500) suffered an "employment loss," so, as a

matter of law, no "mass layoff" occurred under WARN.

>           **3.      There was no "plant closing" because there was no**
>                     **"permanent or temporary shutdown" of the Mill and**
>                     **Plaintiffs' employment losses did not result from any**
>                     **"plant closing."**

Plaintiffs also allege that International Paper failed to give notice of a "plant

closing" which they claim occurred at the time of the sale. (Fifth Amended Complaint

¶¶ 121, 161).  A "plant closing" is

> a *permanent or temporary shutdown* of a single site of
> employment, or one or more facilities or operating units within a
> single site of employment, if the shutdown *results in* an
> employment loss at the single site of employment during any 30-
> day period for 50 or more employees excluding any part-time
> employees.

29 U.S.C. § 2101(a)(2) (emphasis added).

The "plant closing" provisions of WARN, unlike the "mass layoff" provisions,

does not focus solely on the loss of employment.  In order to establish liability for giving

failure to give notice of a "plant closing," Plaintiffs must also show both (a) that there

was a "shutdown" within the meaning of the definition quoted above, and (b) that the

shutdown "result[ed] in" their employment losses.  Plaintiffs' claim here fails on both

counts.[28]

---

[28] However, this analysis was discussed, although the issues in question were not decided by the Court, in
Alter v. SCM Office Supplies, Inc., 906 F.Supp. 2d 1243, 1249 (S.D.Ind. 1995).

**a.    No "permanent or temporary shutdown" occurred within the meaning of § 2101(a)(2).**

It is undisputed that SMART resumed normal production at the Mill, using the same Mill facility, equipment, raw materials, inventory, processes and customers, four days after the effective date of the sale on Friday, February 9. It is also undisputed that SMART had part of the Mill's workforce involved in Mill administration immediately on and after February 9. Plaintiffs are therefore reduced to arguing that the brief hiatus in normal production that was required for SMART's management to handle administration and meet with employees constituted a "shutdown" of the sort WARN was intended to regulate. A "shutdown" is not a mere failure to operate normally. If that were the meaning, a plant would undergo a "temporary shutdown" for any hours in which the plant does not operate as normal.

Department of Labor regulations provide that a "shutdown" is an "employment action that results in the effective cessation of production or the work performed by a unit." 20 C.F.R. § 639.3(b). This regulation is entitled to deference,[29] and limits the term to an event fundamental enough to constitute an "employment action," and consequential enough that it can be said to halt "the work performed by a unit." The regulation is sufficient to make clear that, for example, a suspension of normal operations to take inventory, to perform maintenance, to observe a holiday or vacation period or to train employees, will not constitute a covered "plant closing." To the extent that production operations at the Mill were briefly suspended after the sale, such suspensions occurred for

---

[29] "Regulations that are substantive and promulgated by an agency pursuant to statutory authority have the force of law, unless they are irreconcilable with the clear meaning of the statute as revealed by its language, purpose, and history . . . The WARN Act specifically directed the [Department of Labor ("DOL")] to prescribe such regulations as may be necessary to carry out this Act. 29 U.S.C. § 2107." *See* <u>Washington v. Aircap Indus. Corp.</u>, 831 F. Supp. 1292 (D.S.C. 1993).

administrative reasons, not because there was any "effective cessation" in the work of the Mill.[30]

In its decision on International Paper's Motion to Dismiss, the Court relied on Burnsides v. MJ Optical, Inc., 128 F.3d 700 (8th Cir. 1997) for the proposition that Plaintiffs' Complaint alleged a plant closing at the Hamilton Mill that would constitute a WARN event. While the Court was required to rely on the allegations set forth in Plaintiffs' Complaint, the undisputed facts demonstrate that what occurred at the Mill was far different than what occurred in MJ Optical.

In MJ Optical, the buyer had signed a letter of intent to purchase most of the seller's assets and to take over operations at the seller's plant. Only a few days before the intended sale, the buyer decided that it would not continue operations at the facility, and offered to purchase only the equipment and inventory. The resulting sales agreement allowed the buyer to remove equipment but prohibited it from manufacturing on the seller's premises. The Court reasoned that a plant closing occurred on the day of the sale, emphasizing that the seller caused the employment loss by accepting the buyer's offer to purchase its equipment without continuing operations at the facility. MJ Optical, 128 F.3d at 702-703. The Court stressed that the seller did not buy Commercial's facility, conduct any operations there, or take on any of Commercial's receivables or liabilities. Id. The Court thus determined that the seller had closed its own plant and was therefore

---

[30] Guidance as to what constitutes a "shutdown" for purposes of the plant closing can be found in the definition of "employment loss" in 29 U.S.C. § 2101(a)(6). By implication, WARN notice is not required to an employee who is laid off from employment for any period of less than six months. See, e.g., Rifkin v. McDonnell Douglas Corp., 78 F.3d 1277 (8th Cir. 1996). Thus, for example, an employer can suspend all its operations at a large plant for a period up to six months and layoff all of its employees for up to six months without giving prior notice under WARN. That result is absolutely clear, and shows the absurdity of Plaintiff's contention that a few days' interruption in the normal flow of production, while other activity occurs, should be considered a "plant closing."

responsible for giving notice.  However, the facts in this case are more like the deal initially planned in MJ Optical than what ultimately occurred.

The Court, in MJ Optical, also held that Commercial was partially protected by the "unforeseeable business circumstance" exception in WARN, based on the buyer's late change of heart.  However, because Commercial did not notify its employees immediately when it became aware that the sale had changed to become simply an equipment purchase, the court remanded for a determination of damages for the relevant time period.  The Court's analysis confirms that, had the sale agreement not changed, and had gone through as a "going concern" sale as originally contemplated, the seller would not have been required to give WARN notice.  This fully supports International Paper's position that no WARN event occurred in connection with the sale of the Mill.

Plaintiffs have shown no evidence that SMART or International Paper ever intended to "shutdown" or close the Hamilton Plant or any of its operating units.  Nor was SMART's decision to suspend manufacturing for a few days following the February 9 sale date a "shutdown" or "plant closing" under WARN.  SMART's  intent to continue operations is undisputed based on the unequivocal language of the Asset Purchase Agreement and also the undisputed fact that the plant workforce returned Tuesday, February 13, 2001 and resumed full production on February 14, 2001.

On these undisputed facts, SMART's decision to suspend manufacturing for a few days after it acquired the plant on February 9, 2001, cannot be a shutdown as a matter of law.  SMART never made a decision to cease operations and "shut down" the mill; to the contrary it advised employees in its letters of January 8, 2001, that it would operate the

plant after the sale and consider employment applications from all International Paper employees in advance of the sale.

Nor is there any basis for arguing that International Paper shut down the Hamilton "B" Street Mill. The evidence is undisputed that International Paper sold the Hamilton Street assets as a going concern to SMART and that the plant continued to operate up until the effective date of the sale. International Paper advised employees that employment would terminate "when the sale is final."

On these facts, WARN regulations make clear that a brief pause in operations is not a "plant closing." In comments to the final WARN regulations, the Department of Labor expressly stated:

> The Department disagrees, however, that the mere closing of a plant for hours when it was previously open constitutes the closing of an operating unit. As long as the plant continues to operate and no recognized department, operation or major work function has been terminated, the fact of a reduction in hours of plant operation is not the closing of an operating unit.

Comments to final WARN Regulations, 20 C.F.R. 649, 54 FR 16042, § 639.3(j) (April 20, 1989).

The Department of Labor's comments to the final WARN Regulations also make clear that a termination of employment that results because of a sale cannot be a basis for a WARN notice if the plant continues to operate:

> Several commentors discussed the provision of WARN that assigns the seller's employees to the buyer after the sale. These commentators agree that this provision does not create any additional employment rights, other than WARN notice rights and that, *although a technical termination (i.e. termination of employment with the seller) may be deemed to have occurred in a sale, that termination, by itself, is not a basis for a WARN notice.*

Comments to final WARN Regulations, 54 Fed. Reg. 16042, § 639.3(c) (April 20, 1989) (emphasis added).

The WARN Regulations provide that "WARN requires employers who are *planning* a plant closing or mass layoff to give affected employees at least 60 days' notice of such an employment action." 20 C.F.R. § 639.2 (emphasis added). Neither International Paper nor SMART planned or carried out any plant closing. Rather, both companies intended the sale of the Mill as a going concern, and that is exactly what it was.

In this case, International Paper informed its employees on January 8, that it was selling the Mill to SMART, and all Mill employees would be terminated by International Paper when the sale was finalized, that SMART intended to continue the Mill as a going concern, and that they would have the opportunity to apply for jobs with SMART before the sale. International Paper could not, however, have given notice to Plaintiffs, or anyone else, as to whether specific employees would be employed in SMART's operations at the Mill, or even how many Mill employees would be hired by SMART. International Paper had no notice of any definite plans by SMART to have a plant closing or mass layoff, and therefore could not give such notice.[31] In fact, SMART had no such plans. To the contrary, International Paper believed (and SMART agreed) that the Mill would continue as a going concern – which it did. No plant closing or mass layoff ever occurred, and no WARN notice was required from International Paper or SMART.

---

[31] Under WARN Regulations, "if the seller is made aware of any definite plans on the part of the buyer to carry out a plant closing or a mass layoff within 60 days of purchase, the seller may give notice to affected employees as an agent of the buyer, if so empowered..." 20 C.F.R. § 639.4(c)(1).

      **b.**     ***Even if the brief hiatus in production operations at the Mill was a "shutdown" within the meaning of § 2101(a)(2), there is no genuine issue of material fact that the hiatus did not "result in" any employment losses.***

The "employment losses" relied upon by Plaintiffs are alleged to have occurred by reason that they were not hired after the sale. As discussed below, no employment loss occurs *as the result of the sale* of a plant, in and of itself. More fundamentally, however, there is no *causal connection* whatever between the three-day hiatus in production operations and Plaintiffs' not being hired.[32]

It is undisputed that the decision about which employees to hire was made by SMART prior to February 9, 2001 sale. (Maheu Tr. 126). Plaintiffs simply cannot show any causal relationship, proximate or otherwise, between the fact that the first three days after the sale were used for meetings, inventory and other administrative work, and SMART's hiring decisions regarding Plaintiffs or others.

Plaintiffs were not hired by SMART for reasons that were completely independent of the weekend hiatus. They were not offered jobs at SMART because they did not meet SMART's hiring standards. (Weissman Tr. 121-122). They would not have been hired even had SMART made all of its employment offers, and received all acceptances, before February 9. They would not have been hired, even if the production equipment had continued operating without being idle even for a moment. Thus, even assuming *arguendo* the weekend hiatus in production was a "temporary shutdown" within the meaning of § 2101(a)(2) occurred, the hiatus did not cause or, in statutory

---

[32] The hiatus in operations which plaintiffs apparently allege was a "temporary shutdown" within the meaning of § 2101(a)(2) did, of course, "result in" a one, two or three-day hiatus in employment for the former International Paper employees. But a one, two or three-day hiatus in employment was neither a "termination" nor a "layoff exceeding 6 months" and, hence, did not constitute an "employment loss" within the meaning of § 2101 (a)(6) for any of the former International Paper employees.

terms "result in," their employment losses. On this ground also, International Paper is entitled to summary judgment with respect to Plaintiffs' "plant closing" WARN claim.

### 4. The conclusion that the termination of Plaintiffs' employment was not a WARN event is compelled by WARN's sales exemption, 29 U.S.C. § 2101(b).

It is undisputed that International Paper terminated the employment of Plaintiffs, and all other Mill employees, on February 9, 2001. WARN and the regulations issued by the Department of Labor make it clear that the termination of employment that occurs in a sale of a business does not, in and of itself, require WARN notices. See 29 U.S.C. § 2101(b)(1). The Labor Department regulation interpreting the sales exclusion states: "[a]lthough a technical termination of the seller's employees may be deemed to have occurred when a sale becomes effective, WARN notice is only required where the employees, in fact, experience a covered employment loss." See 20 C.F.R. § 639.6 (1996). In a sale of a plant, the employees of the seller are deemed to not suffer an employment loss at the time of the sale. See Int'l Alliance of Theatrical & Stage Employees v. Compact Video Servs., Inc., 50 F.3d 1464, 1468 (9th Cir. 1995).

In deciding International Paper's Motion to Dismiss, the Court had to assume the facts asserted in Plaintiffs' Complaint were complete and accurate. Plaintiffs alleged that a plant closing had occurred prior to the sale. Accordingly, the Court relied on Burnsides v. MJ Optical, Inc., 128 F.3d 700 (8th Cir. 1997) to conclude that on such facts the sales exemption would not support International Paper's Motion to Dismiss. However, as set forth above, the actual facts of the case show that MJ Optical is very different from the instant matter, and that the sales exception does apply to Plaintiffs' WARN Act claim.

In MJ Optical, as previously stated, the facts showed that there was a plant closing – the buyer bought and removed the plant's equipment, did not purchase the plant, was

prohibited from any production operations at the plant, and did not continue to operate the business as a going concern. With the Mill, the opposite occurred – the facility, equipment, raw materials, inventory, accounts receivable and liabilities remained at the facility, the great majority of the Mill's workforce was hired, and SMART continued production as the ongoing business at the Mill.

In this case, it is clear that the notice requirements of the WARN Act were not triggered by International Paper's sale of the Mill to SMART. As set forth in Plaintiffs' Amended Complaint, the sale of the Mill was finalized on February 9, 2001. (Amended Complaint ¶62). In accordance with the Asset Purchase Agreement, "[i]mmediately prior to the Closing, the employment of all of the employees of the Business shall be terminated by the Seller, and all such employees shall have the right to apply for employment with Buyer." (Asset Purchase Agreement ¶4.1(a), p. 16). International Paper's employees ceased their employment with International Paper on February 9, 2001 only because of the sale.

No WARN event occurred that would give either International Paper or SMART an obligation to provide notice. There was neither a "plant closing" nor a "mass layoff;" International Paper therefore had no statutory obligation to provide notice pursuant to the Act to those employees who ceased to be employed by International Paper as a result of the sale. See International Alliance, supra, 50 F.3d at 1468 (where buyer made offers to most employees of buyer, sales exclusion applied and WARN notice not required, despite termination letter from seller and requirement that employees apply for employment with buyer).

## V.    CONCLUSION

Although Plaintiffs have advanced various theories and claims in an oft-amended

Complaint, now that discovery has been completed, they must be tested on the facts.  The

undisputed facts show that International Paper sought out and located a buyer that would

continue operation of the Hamilton "B" Street Mill, employ a majority of its employees,

and maintain the Mill and these jobs in the Hamilton community.  In order to obtain a

sale to such a buyer, International Paper agreed to facilitate the buyer's hiring process by

making SMART's application forms available to its employees, by allowing employees

the opportunity to interview with SMART, by permitting SMART to check references for

the employees, and by giving SMART access to employee's personnel files and records.

This was done with the express, advance written consent of International Paper's

employees, including Plaintiffs.  The Plaintiffs and other hourly employees received the

guarantee, pursuant to the Effects Bargaining Agreement negotiated with their Union,

that International Paper would provide severance pay to all who cooperated with the

SMART hiring process and who, nevertheless, failed to receive an employment offer

from SMART.

The great majority of the employees at the Mill (over 70%) did receive jobs with

SMART.  Those who cooperated in SMART's hiring process but did not receive job

offers received severance from International Paper.  Plaintiffs did not receive job offers,

or the offers they wanted, but they were not discriminated against or defamed by

International Paper.  Any reference information provided by International Paper was

pursuant to Plaintiffs' written authorization and release, and was privileged under Ohio

law.  Other than a long weekend during which SMART offered jobs and received

acceptances, conducted an inventory, and handled administrative details, SMART

continued the Mill's operation without change or disruption. WARN notice to Plaintiffs
was not required by the Act. International Paper has not engaged in any wrongful
conduct toward Plaintiffs, and is entitled to summary judgment as a matter of law.

Respectfully submitted,

INTERNATIONAL PAPER COMPANY

By_____
                    Counsel

Michael Roberts, Esq.                   W. Carter Younger
Graydon Head & Ritchey, LLP             Vincent Miraglia
1900 5th 3rd Center                     McGuireWoods LLP
511 Walnut Street                       1050 Connecticut Avenue, Suite 1200
Cincinnati, Ohio 45202                  Washington, DC 20036
Phone: 513-629-2799                     Phone: 202-857-1704
                                        Fax: 202-828-2990

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was hand-delivered to the
offices of Randolph Freking, Freking & Betz, 215 East Ninth Street, Fifth Floor,
Cincinnati, Ohio 45202, and Stan Lechner, Morgan, Lewis & Bockius, 1111
Pennsylvania Avenue, N.W., Washington, D.C. 20004, this 30th day of September 2003.