# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| **ELMER CAMPBELL, et al.**, | : | **Case No. C-1-01-527** |
| | : | **J. Beckwith**; Mag J. Hogan |
| Plaintiffs, | : | |
| | : | |
| v. | : | **PLAINTIFFS' CONSOLIDATED** |
| | : | **MEMORANDUM IN OPPOSITION** |
| **INTERNATIONAL PAPER,** | : | **TO DEFENDANT INTERNATIONAL** |
| **SUN CAPITAL PARTNERS, INC.,** | : | **PAPER COMPANY'S MOTION FOR** |
| **SMART PAPERS** | : | **SUMMARY JUDGMENT** |
| | : | |
| Defendants. | : | |

Randolph H. Freking (0009158)
Sheila M. Smith (0065115)
George M. Reul, Jr. (0069992)
FREKING & BETZ
Trial Attorneys for Plaintiffs
215 East Ninth Street
Fifth Floor
Cincinnati, OH 45202
(513) 721-1975

# <u>TABLE OF CONTENTS</u>

I.     <u>INTRODUCTION</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    <u>BACKGROUND</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    Plaintiffs' Defamation Allegations Against Defendant IP. . . . . . . . . . . . . . . . . 2

    B.    The Players. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    C.    SP's Hiring Criteria. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    D.    All Plaintiffs Were Applying for Entry Level Positions. . . . . . . . . . . . . . . . . . 8

    E.    All Plaintiffs Had Been Held to An Increasingly High Standard of Performance by IP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    F.    IP Maintained Information on Employee Performance That Was Accessible To Its Supervisors and Other Officials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    G.    Plaintiffs' Employment Files are Clean. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    H.    SP's Application Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    I.    SP Allegedly Wanted Objective Data And Facts From IP To Reflect Each Plaintiff's Actual Work Performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    J.    During the Reference Process for the 42 Plaintiffs, IP Provided Information to SP that Was False . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    K.    IP Managers Provided False Information About Plaintiffs Despite Knowing The Importance Of Their References In The Hiring Process And The Difficulty Rejected Employees Would Have Finding Comparable Employment In Hamilton, Ohio . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    L.    The References IP Provided About Plaintiffs Were A Result Of Recklessness, Ill Will, Or Malice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        1.    Plaintiffs' Authorized Reference Checks From Their Personnel Files Because They Knew Their Files Were "Clean." . . . . . . . . . . . . . . . . . . . 18

        2.    Many References Were The Result of Malice or Ill Will . . . . . . . . . . . 18

3.   Many False References Were Made Recklessly Because The IP Official Providing The Reference Was Not The Direct Supervisor, Had No Factual Basis For The Information, And Failed To Make Any Effort To Ensure That The Information Was Truthful ........................... 20

4.   Many References Were False Because The Direct Supervisor Simply Did Not Have A Basis To Make Statements About A Plaintiff, Or Failed To Verify Information Reported To Him .......................... 22

5.   Many References Were Made Based Upon Prior Discipline That Had Been "Voided" by Champion And IP, And Was No Longer To Be Used Against Any Plaintiff ....................................... 23

M.   Maheu Has No Explanation To Justify Why Some Information Is False....... 23

III.   LEGAL STANDARD - SUMMARY JUDGMENT ............................ 24

IV.   ARGUMENT ....................................................... 26

A.   Plaintiffs Have Raised Genuine Issues Of Material Fact Regarding Their Claims For Defamation, Rendering Summary Judgment Inappropriate ............. 26

1.   Plaintiffs Have Raised Genuine Issues Of Material Fact Regarding The Existence Of False And Defamatory Statements ................... 28

a.   Patrick Durbin ....................................... 29

(1)   Durbin had a long and outstanding record of employment at IP, yet received a "RED" rating from Defendant IP on his reference check ............................... 29

(2)   Richard Dunn has admitted his statements regarding Durbin were false ............................... 31

(3)   Michael Hoff, Durbin's immediate supervisor, has testified that Dunn's statements were false ................. 32

(4)   Durbin testified that these statements were false....... 32

(5)   Defendant IP's training supervisor, Berlyn Stanifer, testified that these statements were false ............ 34

(6)   Defendant IP's own personnel records establish that these statements about Durbin were false ................. 34

ii

b.    Barney Sandlin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

        (1)    Barney Sandlin had a long and outstanding record of
               employment at IP, yet received a "RED" rating from
               Defendant IP on his reference check.  . . . . . . . . . . . . . . . 34

        (2)    Edward McCoy has admitted the statements regarding
               Barney Sandlin were false . . . . . . . . . . . . . . . . . . . . . . . . 37

        (3)    David Shepard and Leroy Havens, Barney Sandlin's
               immediate supervisors, has testified that these statements
               were false.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

        (4)    Barney Sandlin testified that these statements were false  39

        (5)    Berlyn Stanifer testified that these statements were false  40

        (6)    Defendant IP's own personnel records establish that these
               statements were false . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

c.    Larry McCreary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

        (1)    Larry McCreary had a long and outstanding record of
               employment at IP, yet received a "RED" rating from
               Defendant IP on his reference check . . . . . . . . . . . . . . . . 41

        (2)    Stevens' sworn testimony contradicts his statements to
               Defendant SP, indicating that they were false . . . . . . . . . 43

        (3)    Joel Bryant, McCreary's direct supervisor, provided sworn
               testimony that these statements were false  . . . . . . . . . . . 44

        (4)    McCreary has testified that these statements were false. . 44

d.    Stanley Knodel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

        (1)    Stanley Knodel had a long and outstanding record of
               employment at IP, yet received a "RED" rating from
               Defendant IP on his reference check . . . . . . . . . . . . . . . . 46

        (2)    Thomas has admitted the statements regarding Knodel were
               false . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

iii

(3)     John Rice, Knodel's immediate supervisor, testified that these statements were false . . . . . . . . . . . . . . . . . . . . . . . 48

(4)      Knodel has testified that these statements were false . . . 49

(5)     Defendant IP's training supervisor, Berlyn Stanifer, testified that these statements were false . . . . . . . . . . . . 50

(6)     Defendant IP's own personnel records establish that these statements were false . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

e.     The References IP Provided to SP Were Statements. . . . . . . . . . 51

2.     Defendant IP's Argument That Plaintiffs' Defamation Claims Are Barred Because Plaintiffs Signed Waivers Is Without Merit Because A Waiver Is Ineffective To Shield Future Willful And Wanton Misconduct From Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

a.     A Release of Future Claims Must Be Narrowly Construed, And the SP Waivers Do Not Include A Release For Providing False or Inaccurate Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

b.     A Release Of Future Claims Is Insufficient To Shield Intentional, Reckless, Willful, Wanton, or Malicious Misconduct From Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

(1)     The "Reference Process" Was So Shabby It Demonstrates IP Acted In Reckless Disregard For The Truth Of The Statements Published To SP . . . . . . . . . . . . . . . . . . . . . . 55

3.     Any Privilege Attached To The False And Defamatory Statements Is Destroyed By Defendant's Reckless Disregard As To The Truthfulness Of The Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

4.     Plaintiffs Can Demonstrate That Under Ohio's Totality of Circumstances Test, The Defamatory Statements Were Actionable Statements of Fact . 59

B.     Plaintiffs Have Raised A Genuine Issue Of Material Fact Regarding Their Claims For A WARN Violation, Rendering Summary Judgment Inappropriate On This Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

1.     The WARN Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

2.     Plaintiffs have established a question of fact as to whether the Hamilton

iv

Mill closed within the meaning of the WARN Act . . . . . . . . . . . . . . . . 66

3.  Plaintiffs have established a genuine issue of material fact regarding whether Defendant IP failed to provide proper notice . . . . . . . . . . . . . . 69

4.  Defendant IP cannot use the sales exception to the WARN Act to escape liability for its failure to provide WARN Act notice . . . . . . . . . . . . . . . . 70

V.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

## TABLE OF AUTHORITIES

*Abrams v. Milliken & Fitton Law Firm*, 267 F. Supp. 2d 868, 877 (S.D. Ohio 2003) . . . . . . . . 26

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Bowman v. Davis*, 48 Ohio St. 2d 41, 44-45, 356 N.E.2d 496 (1976) . . . . . . . . . . . . . . . . . . . . 54

*Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Clanin v. North Am. Bulk Transp., Inc.*, 2003 U.S. Dist. LEXIS 4156, *16 (S.D. Ohio Jan. 22, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 52, 58

*Constanzo v. Gaul*, 403 N.E. 2d 979, 983 (Ohio 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*DePiero v. City of Macedonia*, 180 F.3d 770, 776 (6th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . 25

*Fabrizio v. Hendricks*, 100 Ohio App. 3d 352, 654 N.E.2d 127 (1995) . . . . . . . . . . . . . . . . . . . 52

*Glaspell v. Ohio Edison Co.*, 29 Ohio St. 3d 44, 46-47, 505 N.E.2d 264  (1987) . . . . . . . . . . . 52

*Gosden v. Louis*, 116 Ohio App. 3d 195, 206, 687 N.E.2d 481, 487  . . . . . . . . . . . . . . . . . . . . 26

*Hahn v. Kotten,* 43 Ohio St. 2d 237, 243, 331 N.E.2d 713, 718 (Ohio 1975) . . . . . . . . . . . . . . 26

*Hotchner v. Castillio-Puche*, 551 F.2d 910, 913 (2nd Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . 62

*Jacobs v. Frank*, 60 Ohio St. 3d 111 at syllabus ¶2 (1991) . . . . . . . . . . . . . . . . . . . . . . . 26, 58, 59

*Kelly v. Medical Life Ins. Co.*, 31 Ohio St. 3d 130, 132, 509 N.E.2d 411 (1987) . . . . . . . . . . . 52

*McKimm v. Ohio Elections Comm'n.*, 89 Ohio St. 3d 139, 144-145, 729 N.E.2d 364, 371 . . . . 60

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S.Ct. 2695 (1990) . . . . . . . . . . . . . . . . . . . . . 59

*Ollman v. Evans*, 750 F.2d 970, 979 (D.C. Cir. 1984)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Pavao v. Brown & Sharpe Mfg. Co.*, 844 F. Supp. 890, 896 (D. RI 1994) . . . . . . . . . . . . . . . . 67

*Reeves v. Sanderson Plumbing*, 530 U.S. 133, 151 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Richard A. Berjian, D.O., Inc. v. Ohio Bell Tel. Co.*, 54 Ohio St.2d 147, 375 N.E.2d 410 (1978)27

*Ross v. Campbell Soup Co.*, 237 F.3d 701, 706 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Scott v. The News-Herald*, 25 Ohio St. 3d 243, 250, 496 N.E.2d 699, 706 (Ohio 1986) . . 59, 60, 62, 63

*Smith v. Klein*, 23 Ohio App. 3d 146,  492 N.E.2d 852, 855 (Ohio Ct. App. 1985) . . . . . . . . . . 58

*Snyder v. Turk,* 90 Ohio App. 3d 18, 25, 627 N.E. 2d 1053, 1058 (Ohio App. Ct. 1993) . . . . . . 59

*Swartzentruber v. Wee-K Corp.*, 117 Ohio App. 3d 420, 424, 690 N.E.2d 941 (1997)  . . . . . . . 52

*Tohline v. Central Trust Co.,* 48 Ohio App. 3d 280, 284, 549 N.E.2d 1223, 1228 (Ohio Ct. App. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United Mine Workers of Am. v. Martinka Coal Co.*, 202 F.3d 717, 723-25 (4th Cir. 2000)  . . . . 67

*Vail v. The Plain Dealer Publishing Co.*, 72 Ohio St. 3d 279, 649 N.E.2d 182 (1995)  . . . . 60, 63

*Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564 (6th Cir. 2003)(*en banc*)  . . . . . . . . . . . . 25

*Whitt v. Hutchison*, 43 Ohio St. 2d 53, 330 N.E.2d 678 (1975)  . . . . . . . . . . . . . . . . . . . . . . . . 52

<u>Secondary Authorities:</u>

BLACKS LAW DICTIONARY 254  (6th Ed. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

<u>Statutory Authorities:</u>

29 U.S.C. §2101(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

29 U.S.C. §2101(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

29 U.S.C. §2102(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

29 U.S.C. §2102(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

29 U.S.C. §2102(a)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

29 U.S.C. §2104 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

20 C.F.R. §639.3(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

20 C.F.R. §639.7(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

# I.     <u>INTRODUCTION</u>

1

Defendant International Paper Company's ("IP") Motion for Summary Judgment with respect to Plaintiffs' individual claims for defamation[1] and their common claims for violation of the Worker Adjustment and Retraining Notification Act ("WARN") should be denied.[2]  Since each Plaintiff's defamation claim must be evaluated on its individual merits, Plaintiffs have determined that genuine issues of material fact exist, and a jury should be asked to decide whether Plaintiffs' individual claims that IP recklessly made false statements about them, giving the purchasers of the Hamilton Mill (Defendants SP and Sun) an illegitimate and pretextual "excuse" not to hire them for employment at the Hamilton Mill, where they had been employed successfully for an average of 29 years.  Genuine issues of material fact also exist with respect to whether IP violated the WARN Act by failing to provide 60 days notice of the closing of the Hamilton Mill on February 9, 2001.[3]  The Court has previously denied Defendant IP's Motion to

---

[1]     Plaintiffs do not oppose the dismissal of the defamation claims of the following Plaintiffs: Adams, Arthur, Greene, Hess, Rumpler, Clear, Gentry, Gill, Gregory, Johnson, Lakes, Marsee, Miller, Pennington, Rodgers, Spada, Tolbert, Wilkins, Fisher, Gumm, Jackson, Parsley, Ratliff, Whitaker, Arthur, Begley, Elmer Campbell, Geeding, Green, Hess, Holland, and Rumpley.

[2]     After receipt of Defendants' Motion for Summary Judgment, Plaintiffs have decided not to oppose Defendants' Motion with respect to Plaintiffs' claims of age and disability discrimination *as against IP*.  As a result of discovery, Plaintiffs have determined that IP did not participate in the making of the hiring decisions at issue, contrary to information available at the time of the filing of the Fifth Amended Complaint.  However, Plaintiffs separately oppose the Motion for Summary Judgment filed by Defendant Smart Papers Company ("SP") and Defendant Sun Capital Partners ("Sun") with respect to the claims of age and disability discrimination.

[3]     The individual Plaintiffs who have determined that there are not sufficient issues of fact to oppose Defendant IP's Motion with respect to their individual claims of defamation remain Plaintiffs with respect to the common claims under the WARN Act.

Dismiss the WARN Act claim.  (Docket No. 64, Order.)

## II.    BACKGROUND

### A.    Plaintiffs' Defamation Allegations Against Defendant IP.

Defendant IP, the parent of Champion International Corporation ("Champion") placed the "for sale" sign on the Hamilton Mill and began negotiations with investors, who later created SP on December 12, 2000.  (Couch Dep. at 43, 54, 55.)  An Asset Purchase Agreement was signed on or about December 29, 2000.  (Pl. Ex.[4] 44.)  That Agreement envisioned a closing on the transaction at least within 61 days.  (*Id*. at 68.)  Once conditions in Articles IX and X were satisfied or waived, the parties expected a closing to occur "as soon as practicable thereafter." (*Id*. at 13.)  The December 29 Agreement also provided that "all of the employees of the [Hamilton Mill] shall be terminated by the Seller."  (*Id.* at 16.)  IP admits that it failed to give the affected employees 60 days notice of the termination of their employment and/or the closing of the Mill.  Indeed, prior to IP ceasing operations on February 9, 2001, the actual date of the Closing, Plaintiffs had less than two days notice.  Finally, in the Agreement, IP (Champion) was responsible "with respect to any obligations owed under the WARN Act . . ." (*Id.* at 42.)

Plaintiffs' individual claims of defamation arise out of false references that IP gave to SP, the purchasers of the Hamilton Mill.  In contrast to its hiring of "off-the-street" applicants, whose references SP never checked, SP carefully documented the references IP provided with respect to Plaintiffs.  SP then used these "documented" bad references as the articulated reasons why it refused to hire 42 Plaintiffs.

---

[4]     Plaintiffs' Exhibits are compiled in the Appendices, and are being manually filed concurrently with this Memorandum.

Plaintiffs separately allege that SP recognized the Hamilton Mill as an opportunity to turn an allegedly unprofitable mill into a profitable mill, not simply by improving operations, but by eliminating older workers and replacing them with less qualified, substantially younger workers "off the street." Indeed, while the average age of Plaintiffs who were terminated was 49, the average age of the purchasers' new employees was 38.1. (Pl. Ex. 45, Chart, "Age of the Workforce," and supporting data.) Plaintiffs allege that SP unlawfully stereotyped them as "unwilling or unable to change," and effectively replaced them by not extending job offers and then hiring substantially less qualified, younger applicants thereafter. In contrast to the hiring of approximately 62% of applicants who were qualified to work at the Mill (the IP applicants), (Lewis Dep. at 49-50,) SP hired 98% (195 of 198) of the off-the-street applicants, without conducting reference checks on these applicants. (Pl. Ex. 45.) Furthermore, SP reduced the percent of the workforce that was over forty years old from 91.65% before the sale to 80.81% by the following year. (*Id.*)

In every instance involving the 42 Plaintiffs with defamation claims, the information provided by IP to the purchasers was false. The falsity of the information is demonstrated in several ways:

(1)    IP's own records, including personnel files, safety records, and attendance records, reveal that the information provided was false;

(2)    The IP managers and supervisors who provided the information to the purchasers have admitted in sworn testimony that information is false for 25 of the 42 Plaintiffs;[5]

---

[5]    These Plaintiffs were: Wayne Bennett, Larry Brandenburg, Carl Brewer, James Brooks, Robert Chasteen, Joshua Combs, Jerry Combs, Terry Duncan, Patrick Durban, Mendol Eaton, Terrell Fowler, Dennis Heinrich, Edward Hensley, Emmanuel Hyden, Jr., Jerome Isreal, James Ketcham, Stanley Knodel, Steve

(3)     Immediate supervisors of 20 of the 42 Plaintiffs have provided sworn testimony that contradicts the false references;[6]

(4)     A former training officer of IP and SP has provided an affidavit attesting to the falsity of the information about 14 Plaintiffs[7] (he did not know the other 28 Plaintiffs' work abilities); and

(5)     Plaintiffs and their co-workers attest to the falsity of the information.

(Pl. Ex. 1 - 43.)

## B.     The Players.

The primary individuals involved in the hiring process Defendant SP used who are central to Plaintiffs' defamation claims are Daniel Maheu, Mary Rita Weissman, and the 16 other officials of IP that knowingly or recklessly provided false and inaccurate information to Smart Papers.

1.     <u>Daniel Maheu</u> - Mr. Maheu is a key figure in the case because, along with Mary Rita Weissman, he was responsible for the hiring of the initial workforce for SP.  (*See* Maheu Dec. at ¶8, attached to Def. SP Mem. Supp. M.S.J. as Ex. 1; Weissman Dec. at ¶ 4, attached to

---

Mann, Larry McCreary, Ross McKay, Douglas Paxton, Barney Sandlin, Everett Taulbee, Ronald Turner, and James Willis.  (Pl. Ex 3, 5, 6, 7, 11, 12, 13, 15, 16, 17, 18, 21, 22, 25, 26, 28, 29, 30, 31, 32, 34, 36, 37, 39, 41.)

[6]     These Plaintiffs were:  Wayne Bennett, Larry Brandenburg, Carl Brewer, Larry Broughton, Robert Chasteen, Joshua Combs, Terry Duncan, Patrick Durban, Mendol Eaton, Charles Freeman, Paul Italiano, James Ketcham, Stanley Knodel, Steve Mann, Larry McCreary, Barney Sandlin, Everett Taulbee, Francis "Pete" Volz, James Willis, and John York.  (Pl. Ex. 3, 5, 6, 8, 11, 12, 15, 16, 17, 19, 27, 28, 29, 30, 31, 36, 37, 40, 41, 42.)

[7]     These Plaintiffs were:  Larry Broughton, Philip Bullio Charles Campbell, Patrick Durban, Mendol Eaton, Terrell Fowler, Jerome Isreal, James Ketcham, Stanley Knodel, Steve Mann, Frederick Ogg, Barney Sandlin, Everett Taulbee, and James Willis.  (Pl. Ex. 8, 9, 10, 16, 17, 18, 26, 28, 29, 30, 33, 36, 37, 41.  *See also* Pl. Ex. 43.)

5

Def. SP Mem. Supp. M.S.J. as Ex. 2.)  Maheu became the Executive Vice President and Chief

Operating Officer of SP, but had worked for Champion International, IP's predecessor at the

Hamilton Mill, and IP as the Mill Manager in Hamilton since 1992.  (Maheu Dec. at ¶ 1, 3.)

Maheu became a 3% to 4% owner of SP, and he served on the Board of Directors.  (Maheu Dep.

at 21, 24.)  Maheu took a leave of absence from IP and began working for SP on January 22,

2001.  (Maheu Dec. at ¶ 8.)  Among his responsibilities beginning on January 22, 2001 was

"obtaining an initial workforce for Smart Papers and establishing terms and conditions of

employment for the new workforce."  (*Id.*)

    2.   <u>Mary Rita Weissman</u> - SP hired Mary Rita Weissman on January 12, 2001,

entering into a one year contract for $174,000 per year.  In fact, while she was paid the entire

amount due under the Employment Agreement, Weissman actually only worked a few weeks,[8]

which she avers was her understanding of the need for her services and her obligation under the

one year employment agreement.  (Weissman Dec. at ¶ 4.)

    Weissman, like Maheu, had a principle role in hiring an initial workforce for SP.  (*Id.*)

Weissman had no prior experience with the Hamilton Mill or its employees.

    3.   <u>IP Officials Providing References To SP</u> - In connection with the process SP

devised to hire an initial workforce, supervisors and other IP managers provided references to

SP.  Statements provided by these IP officials to SP were critical as to whether a particular

applicant, all of whom worked at the Hamilton Mill, received an offer of employment.  This

recommendation, according to Weissman, was based on "objective data" from each IP official

---

[8]    Annetta Johnson, SP's head of Human Resources when SP opened the mill in the middle of February, 2001, does not recall ever seeing Weissman at the mill when it was owned by SP.  (Johnson Dep. at 9.)

providing references, which reflected the individual's past performance on the job. (Weissman Dep. at 126; 109.) Weissman assumed that the data was true, (*id.* at 125 ("of course"),) she regarded this information as the "most accurate, powerful, and predictive information . . . about the likelihood of success of an employee," and this information was critical to her analysis and hiring recommendations to SP. (*Id.* at 144-145.)

By and large, the supervisors and other officials of IP who provided references gave positive references to SP. This fact is reflected by the number of offers SP made to former employees of the Hamilton Mill: over 62% of the IP applicants received an offer from SP.

Forty-two IP applicants did not receive offers from SP because of false information provided to SP by different IP officials. These references are at the heart of Plaintiffs' defamation claim and were given by the following individuals: Rich Barnard, Bobby Caldwell, Bob Carnean, Ken Cecil, Scott Dalesandro, Rich Dunn, Tom Jones, Mike Lopane, Ed McCoy, Art Schutte, Julie Smith, Matt Stevens, Manoj Thomas, Jon Truster, Ted Von Bargen and Tom Weiser. Maheu has admitted that each of these IP officials who Plaintiffs accuse of providing false information to SP was aware of disciplinary, safety, and integrity policies of IP, and they did their jobs with respect to enforcing those rules during their employment at IP. (Maheu Dep. at 81, 88, 91.)

**C.    SP's Hiring Criteria.**

Maheu, who was familiar with the hiring processes at Champion and IP since 1992, has described the hiring process SP used, and conceded that neither IP nor SP had any higher degree of expectations when it came to applicants for employments. This applied to all areas of inquiry, including integrity, safety, and the like:

7

Q.    Any difference between the types of people that Smart Papers attempts to hire, as opposed to the types of people International Paper used to try to hire?

A.    We're recruiting out of the same pool that we were back then.

(Maheu Dep. at 192; *see also*, *id.* at 188-189 (IP did not have any higher degree of focus in the integrity area than Champion, and Smart Papers had no higher degree of integrity focus than IP).)

It cannot be disputed that Plaintiffs were "qualified."  The average Plaintiff had worked at the Hamilton Mill for 29 years, no Plaintiff had any significant discipline or attendance problems in the previous two years that would render them unqualified,[9] and the qualifications to work at SP were the same as the qualifications to work at IP.

Q.    Was there some higher level of performance required of workers at SMART Papers that was not expected at IP, to your knowledge?

A.    No.

* * *

Q.    Do you know of any way that SMART Papers has raised the bar with respect to the necessary qualifications?

A.    No, I don't.

(Lewis Dep. at 89-91.)  Johnson also confirmed that the qualifications to work at SP were the same as existed at IP.  (Johnson Dep. at 43, 49.)

---

[9]    After one year, IP verbal and written discipline was considered void, and even major disciplinary lay-offs were void after two years.  (Pl. Ex. 46, Labor Agreement Between Champion International and UPWIU-AFL-CIO, Local 1967, at 14; *see also* Lewis Dep. at 102-103.)

### D.    All Plaintiffs Were Applying for Entry Level Positions.

While each Plaintiff had worked at the Mill for many years and in specific positions, SP

has admitted that its hiring process was not designed to analyze whether any particular candidate

was suitable for any particular position. Rather, SP simply considered whether the individual

would be a suitable employee for Smart.

> Q.    So when you were going through this process, your analysis was not
> looking at any positions specifically or what position the applicants had
> previously held?
>
> A.    None.
>
> Q.    In other words, as far as you know, when you got to the end of the
> process, the company may have needed 10 warehouse workers . . . and
> you may have recommendations to hire 60 warehouse . . .  people who had
> previously been warehouse workers?
>
> A.    Oh, very possibly.

(Weissman Dep. at 77.)

### E.    All Plaintiffs Had Been Held to An Increasingly High Standard of
Performance by IP.

Between the time of Maheu's arrival at the Hamilton Mill in 1992 and the day he began

working for SP, Maheu had observed that there had been an "accelerating" requirement for

performance, a requirement that began when the Mill was operated by Champion and a

requirement that increased when the Mill was taken over by IP. (Maheu Dep. at 74 ("There was

a much higher demand on performance by IP than previously at Champion . . . there was an

accelerating – within Champion, there was an accelerating requirement for performance.").) As

part of this increasing and accelerating emphasis on performance, Champion and IP supervisors

were directed to enforce the rules and regulations of the Mill, which related to performance,

safety, and integrity.

At all relevant times, Champion and IP had policies designed to ensure that supervisors would initiate the disciplinary process if there were performance problems, safety problems, or integrity issues. (Maheu Dep. at 70, 72.) As part of Champion's and IP's policies, the disciplinary process required supervisors to initially counsel employees who had such performance problems. (*Id.* at 72.) Significantly, and very understandably, if an employee did not improve his performance after an oral counseling, it was the supervisor's responsibility to issue a first written warning. (*Id.* at 73.) The company expected documented discipline to be maintained in an employee's personnel file.

IP did not increase the level of discipline for a previous offense that had occurred more than one or two years previously as a result of the company's collective bargaining agreement with the union. This agreement recognized that additional discipline over an oral counseling or written warning was not appropriate if the earlier discipline was sufficiently removed in time from the current issue involved. (*Id.* at 70.) The Collective Bargaining Agreement stated in Section 13.03 that a recorded disciplinary action notice will be voided if no subsequent disciplinary action(s) has occurred in accordance with the following schedule:

- Verbal and written: 12 months
- Minor Disciplinary Layoff: 18 months
- Major Disciplinary Layoff: 24 months

(Pl. Ex. 46 at 14.)

While there was a general accelerated focus on performance, IP had a particular focus on safety awareness:

10

Q.      So in the last several years prior to February 9, 2001, there was a high
        emphasis on making sure people performed their jobs?

A.      What came with International Paper was focus on safety . . .

Q.      So you didn't put up with any people who were safety problems?

A.      There were hard-and-fast rules, if you will, or very strong requirements to
        deal with people in the accelerated fashion for certain safety issues.

Q.      And how did International Paper communicate this emphasis on safety to
        your supervisors?

A.      . . . I communicated it to the supervisors . . . What it really did is it accelerated
        the level of what would happen if an incident occurred. It was pretty
        well-defined. So it was communicated from me to my directs and then from
        theirs. But because of the focus on it, if an incident occurred, it obviously got a
        lot of focus.

Maheu Dep. at 75-77.) Further, as noted earlier, Maheu believed that each of his supervisors in

the mill was aware of, and complied with, these responsibilities to enforce the disciplinary rules

of Champion and IP. (Maheu Dep. at 81, 88-91.)

**F.      IP Maintained Information on Employee Performance That Was Accessible
        To Its Supervisors and Other Officials.**

When IP assumed responsibility for running the Mill, it inherited the personnel files and

other employee relations documents from Champion. These documents included personnel files

that were maintained on each employee of the Mill, and these files housed all records of

performance concerns, even if the performance concerns were from several years ago. The

records maintained in the personnel files could relate to any performance problems, any safety

problems, any integrity problems, or any other aspect of performance that was not satisfactory to

either Champion or IP. (Lewis Dep. at 32-33, 85-88; Weiser Dep. at 42.)

In addition, the company also maintained separate records relating to employees'

attendance. (Weissman Dep. at 101.) Champion enforced its attendance policy regularly, and

each company had policies that governed whether any particular employee's attendance was

satisfactory. In the event of unsatisfactory attendance, or dependability, Champion and IP had

procedures in place for discipline to be imposed upon the employees. (Lewis Dep. at 87.)

All of the employee relations files concerning any particular employee were available to

supervisors or officials who were asked to provide a reference to SP. (Weiser Dep. at 41-43.)

**G.     Plaintiffs' Employment Files are Clean.**

As survivors of the company's increased performance scrutiny from the mid-1990s

forward, the Plaintiffs had clean performance records when they applied for employment with

SP. No Plaintiff has been disciplined beyond a written warning during the last 10 years, and 14

of the 42 defamation plaintiffs[10] have personnel files that were completely clean of any discipline

during the last 10 years. Likewise, no Plaintiff had ever been disciplined by Champion or IP due

to any concerns about dependability, *i.e.*, attendance. (*See* Pl. Ex. 1-42.) All of the documented

concerns of either Champion or IP were available to each of the supervisors or officials who

provided references about the Plaintiffs to SP.

**H.     SP's Application Process.**

After reaching agreement with IP to purchase the Mill, SP required that all current

employees of IP who were interested in continuing to work at the Hamilton Mill go through a

seemingly routine application process. The process included completion of an application for

---

[10]     These Plaintiffs were:  Thomas Bennett, Larry Broughton, Robert Chasteen, Jerry
Combs, Henry Gardner, Roger Horn, Emanuel Hyden, Jr., Paul Italiano, James
Ketcham, Frederick Ogg, Everett Taulbee, Ronald Turner, James Willis, and John
York. (Pl. Ex. 4, 8, 11, 13, 20, 23, 25, 27, 28, 33, 37, 39, 41, 42.)

employment, which all Plaintiffs completed indicating their desire to remain employed at the

Mill. In addition, each applicant was required to be interviewed by a representative of SP. Each

Plaintiff successfully completed this process. Finally, each applicant was also asked to submit to

a drug test. Each of the plaintiffs that allege a defamation claim successfully passed the drug

test.[11]

     As part of the application process, each employee was also required to sign a Waiver

Weissman drafted. That waiver permitted SP to review information that was maintained in the

personnel files of Champion and IP, and to discuss that information with IP supervisors or

managers in connection with providing references. (Weissman Dep. at 153.) However,

according to Weissman, the Waiver did <u>not</u> authorize a reference provider to state false

information about one of the applicants.

> Q.    Do you believe that the employee who signs this is authorizing a
>        reference . . . to disclose false information about them?
>
> A.    I think they are releasing the person to give the information that is
>        responsive to the questions that are asked.   If that person lies, that is a
>        different matter. *No one, of course, in their right mind, is going to . . .
>        authorize a person . . . to lie about them.*

(Weissman Dep. at 153 (emphasis added).)

     Each Plaintiff, well aware of his many successful years of performance, signed the

---

[11]    Plaintiffs who failed the drug test separately challenge the results of those drug
tests in connection with their age discrimination claims against Defendant SP.
Because they have no evidence that Defendant SP relied upon references in
connection with a decision not to hire them, those Plaintiffs are not opposing
Defendant IP's Motion with respect to their defamation claim. They are: Blevins,
Clear, Gentry, Gill, Gregory, Johnson, Lakes, Marsee, Miller, Pennington,
Rodgers, Spada, Tolbert, Turley, and Wilkins.

waiver.  While Plaintiffs were expecting truthful information to be communicated from IP to SP, they had no choice but to sign the Waiver in order to maintain their employment at the mill.

> **I.    SP Allegedly Wanted Objective Data And Facts From IP To Reflect Each Plaintiff's Actual Work Performance.**

The final step in the application process was an Applicant Reference Check.  The reference check required an IP official to provide information to SP about an applicant in six different performance areas, as well as to respond to five specific questions on a standard form.  The reference checks were performed by SP employees Roberta Griffin, Joe Moore, and Linda Mallin.

Although the reference check process appears to be substantial, it was designed to be done quickly.  While Plaintiffs' allege that SP designed this process to cast a wide net so as to have an "excuse" not to hire many applicants, it also placed IP in a position of being a participant in the process, and IP failed to take precautions against reckless or maliciousness disclosure of information.  Because of SP's alleged need to complete the process in a hurry, IP often placed its officials in the unenviable position of presenting "facts" to SP without sufficient time to verify these statements.  However, IP clearly provided SP with objective data and objective facts.

According to Moore, the reference check would normally take "anywhere from 10 minutes to 20 minutes."[12]  (Moore Dep. at 20.)  During that time, SP expected specific

---

[12]    Interviews were conducted in a large room, as Moore described, "similar to the type that would be used for a banquet . . ."  (Moore Dep. at 62.)  In other words, there were a number of tables around a room and each interviewer would man a table in this "banquet" setup.  (*Id.* at 62-63.)

information and data from the person providing the reference.

> I let the supervisor know that *I want data, specific data, about the performance, data that's, you know, easy to back up with examples.* . . . If the supervisor has not given me any data about "ability and willingness to learn, I might ask that supervisor to clarify what he knows about the candidate in that area and then I'll write down notes as I go along. *Sometimes* I have supervisors who are very numbers – based and *they want to rate a candidate using numbers. If that is the case, I will let them do that.* Normally I am careful with that and *I make sure the number I circle is backed up by the data I gathered*, not just whatever the supervisor has said.

(Moore Dep. at 24-25 (emphasis added).)

Weissman trained Moore that the reference contains the most applicable, valid data about the applicant's performance. (*Id.* at 16-17.) Moore's description of the information he forwarded on the Applicant Reference Check is confirmed by Weissman, who designed the process with Maheu and other SP officials.

Weissman describes the reference as a "reflection of the individual's past performance on the job" and describes the statements from the supervisors as objective data relied upon by SP.

> Q.    You're saying that all these comments from supervisors that you solicit are based on objective facts?
>
> A.    The data we solicit is objective data.
>
> * * *
>
> Q.    And the objective data that you are referring [to] . . . are the examples and comments made by the supervisor when interviewed by the reference person?
>
> A.    Correct.

(Weissman Dep. at 126-127.) As noted above, Weissman testified that the reference check is "critical" in deciding whether to offer an applicant a job with SP. Each Plaintiff who is alleging defamation did not receive a job offer because of the reference IP provided.

15

Finally, in receiving a reference from IP, SP expected that the reference would be provided by the applicant's direct supervisor. (Moore Dep. at 14.) However, with respect to 27 of the 42 Plaintiffs who are alleging defamation by IP, the reference was provided by someone other than the individual's direct supervisor.[13] This is a direct violation of SP's expectation.

> Q.    When you were checking references, you were told that the person you were talking to was a supervisor of the applicant?

> A.    Well, in filling out this form, if I talked to Art Schutte, he would have told me that Govan Begley was his direct report.

(Moore Dep. at 16.) Moore elaborated by stating that it was his preference, and Weissman's preference, that a reference be provided by a direct supervisor as opposed to some other official of the company. (Moore Dep. at 16.)

### J.    During the Reference Process for the 42 Plaintiffs, IP Provided Information to SP that Was False.

As explained in the individual memoranda on each defamation Plaintiff, included in the Appendix as Pl. Ex. 1 - 42, each Plaintiff alleging defamation has substantial evidence that the information IP provided to SP was false. Inaccurate information that IP provided about the Plaintiffs related to their job performance, their attendance records, their safety records, and other matters that were easily verifiable by the person providing the reference.

In most cases, genuine issues are demonstrated by admissions given by the IP official

---

[13]    These Plaintiffs were:  Wayne Bennett, Thomas Bennett, Larry Brandenburg, Carl Brewer, Larry Broughton, Charles Campbell, Robert Chasteen, Joshua Combs, Jerry Combs, Mendol Eaton, Terrell Fowler, Charles Freeman, Henry Gardner, Dennis Heinrich, Rickey Huntington, Paul Italiano, James Ketcham, Stanley Knodel, Steve Mann, Larry McCreary, Frederick Ogg, David Robertson, Barney Sandlin, Everett Taulbee, Ronald Turner, James Willis, and John York. (Pl. Ex. 3, 4, 5, 6, 8, 10, 11, 12, 13, 17, 18, 19, 20, 22, 25, 28, 29, 30, 31, 32, 34, 36, 37, 38, 40, 42, 43.)

providing the reference, the immediate supervisor, Plaintiff, a co-worker of Plaintiff's, and/or Berlyn Stanifer, a former training official for IP and SP. Similarly, the falseness of much of the information is revealed by personnel files or attendance records that IP maintained. It cannot be seriously disputed that each Plaintiff has sufficient evidence to demonstrate that the reference information was false.

**K.** **IP Managers Provided False Information About Plaintiffs Despite Knowing The Importance Of Their References In The Hiring Process And The Difficulty Rejected Employees Would Have Finding Comparable Employment In Hamilton, Ohio.**

The IP officials who were asked to provide references for employees knew the score. They knew that their references were important to SP's hiring decision, and that a bad reference could cost an employee his job. Yet, these managers knowingly, maliciously, or at least recklessly, provided false information about Plaintiffs, knowing not only that their statements would likely cost Plaintiffs employment opportunities with SP, but that employment at the mill was just about the only employment available in Hamilton. (*See, e.g.* Caldwell Dep. at 72 ("We [realized we] had hundreds of peoples' lives in our hands with these interviews . . . I'm talking about the families and everybody."); *id.* at 73 (acknowledging that it would be tough to find another job in the current economy in Hamilton, Ohio, and that a job at the mill was a plum job for that community); Lopane Dep. at 51-53 (acknowledging that he knew that SP would be basing hiring decisions, at least in part, on the references he provided, that Plaintiffs' jobs at the mill were important to them, and that they would have difficulty replacing these jobs if they lost them).)

**L.    The References IP Provided About Plaintiffs Were A Result Of Recklessness, Ill Will, Or Malice.**

The record is replete with testimony indicating the IP's malice and/or recklessness.  Most of the supervisors deposed testified to a shocking lack of concern and preparation for their meetings with SP interviewers.  Eight supervisors testified that they did not take notes in preparation for these meetings. (Lopane Dep. at 20; Schutte Dep. at 14-15; Truster Dep. at 44-45; Bokeno Dep. at 19-21; McCoy Dep. at 31; Carmean Dep. at 30; Caldwell Dep. at 14; Thomas Dep. at 25.)

A number of supervisors did nothing at all to prepare for these meetings.  They did not review personnel files; they did not review attendance records; and they did not speak to any other people that may have had pertinent information regarding the individuals for whom they were providing references.  (*See, e.g.,* Caldwell Dep. at 14-15; Carmean Dep. at 30-31; Truster Dep. at 44-45; Lopane Dep. at 20-21.)  This is despite the fact that these supervisors were providing references for as many as 50 employees or more.  (*See, e.g.,* Caldwell Dep. at 14.) Many of these supervisors submitted references for employees who were not their direct reports, and with whom they did not interact or observe on a daily basis.  (*See, e.g.,* McCoy Dep. at 28-31; Weiser Dep. at 39; Dunn Dep. at 11.)  Many of these "second-line supervisors" prepared to give references by having short informal meetings with direct supervisors at which they discussed many employees but took no notes.  (*See, e.g.,* McCoy Dep. at 31; Dunn Dep. at 11; Weiser Dep. at 39.)  The undisputed lack of supervisor preparation for these meetings, coupled with IP's acknowledgment of the great value and importance of Plaintiffs' employment at the Hamilton Mill, at the very least raises a genuine issue of material fact regarding IP's recklessness.

1.      **Plaintiffs' Authorized Reference Checks From Their Personnel Files Because They Knew Their Files Were "Clean."**

As described above, each Plaintiff had survived a series of restructurings at the Hamilton Mill and performed well under "accelerating" standards of performance. (Maheu Dep. at 74.) IP/Champion supervisors dealt with any work performance problems or attendance issues, and Maheu admits every IP official providing references in this case was aware of the heightened requirements and did their jobs. (*Id.* at 70, 72-73.)

Thus, when Plaintiffs authorized IP to release information from their personnel files and to discuss that information, Plaintiffs had a reasonable expectation that any reference would be provided in good faith. Instead, for Plaintiffs, they received references that often were motivated by malice or ill will, but always demonstrated a reckless disregard for whether the information was true.

2.      **Many References Were The Result of Malice or Ill Will.**

21 Plaintiffs[14] received false references due to the ill will or malice of the particular IP manager providing the reference. Often, the ill will or malice appears to be evident from the manager's resentment about some prior issue involving the Plaintiff that either did not go to the manager's way initially, or which was later determined to be without merit. In other cases, testimony simply indicates an unfounded hostility, often due to union advocacy, toward the

---

[14]      These Plaintiffs are: Thomas Abner, Charles Baylor, Carl Brewer, Larry Broughton, Philip Bullio, Jerry Combs, John Cress, Terry Duncan, Patrick Durban, Terrell Fowler, Charles Freeman, Henry Gardner, Dennis Heinrich, Rickey Huntington, Jerome Isreal, Paul Italiano, Larry McCreary, Ross McKay, Douglas Paxton, Barney Sandlin, and Everett Taulbee. (Pl. Ex. 1, 2, 6, 8, 9, 12, 14, 15, 16, 18, 19, 20, 21, 24, 26, 27, 31, 32, 34, 36, 37.)

Plaintiff that improperly influenced the reference.

For example, Ed McCoy harbored animus for Paul Italiano because Italiano was Chief Union Steward. (Italiano Dep. at 24.) In fact, McCoy threw Italiano out of his office several times, telling him he did not give a damn what the Union's position was. (*Id*.) One of the most recent examples of a dispute between Italiano and McCoy was over a grievance Italiano filed when McCoy refused to install a safety cable for workers who had to work at a dangerous height, precariously reaching off a 30-foot ladder to unclog the trim system. (*Id*. at 20-21.) McCoy refused to implement Italiano's recommendation. (*Id*. at 21.) Italiano also tried to resolve an issue involving oil that had permeated the floor of the mill. (*Id*. at 40-41.) Italiano had expressed concern about the oil, because at certain temperatures, the oil would make the floors dangerously sticky. (*Id*. at 40-41.) Management refused to address the oil problem until another worker's forklift slid off the dock floor at the mill, crashed, and crushed the employee's hand. (*Id*.) Astonishingly, McCoy criticized Italiano's "Safety Awareness," falsely stating that he had had accidents. (Pl. Ex. 27 at Ref. Check at SPC 663.) The fact that McCoy falsely stated that Italiano had safety problems, when Italiano was advocating, on behalf of the union, for management change over safety issues, indicates that McCoy made false statements about Italiano with malice.

As another example, there is evidence that Art Schutte's defamatory statements about Jerome Isreal were motivated by feelings of malice. Schutte's false and misleading statements may very well have been motivated by the fact that Isreal spoke out against the discriminatory treatment he and other African Americans received at the mill, the subject of an EEOC charge he had filed. (Isreal Dep. at 101-102.) This vendetta against Isreal is evidenced by Schutte's own

20

reference to SP about Isreal, in which he attributed a racist attack on Isreal as "bad blood" and the product of the "personalities involved."  (Pl. Ex. 26 at Ref. Check at SPC 647; Pl. Ex. 26 at Isreal Aff. at ¶¶ 8-11.)

> ### 3.     Many False References Were Made Recklessly Because The IP Official Providing The Reference Was Not The Direct Supervisor, Had No Factual Basis For The Information, And Failed To Make Any Effort To Ensure That The Information Was Truthful.

SP expected to receive references from a direct supervisor because a direct supervisor is in the best position to actually relay information.  For 27 Plaintiffs,[15] this was not the case and references were provided by someone who did not directly supervise them.  Some of these managers providing references had never directly observed the Plaintiffs' performance, some had not done so recently, and some had only done so on a casual or infrequent basis.  Thus, they had no factual basis to give the reference without an investigation into the Plaintiff's actual work record.

There were several sources of information available to these IP managers.  First and foremost, each IP manager providing references had access to the personnel files maintained by Champion and IP.  These files contained documented records of any performance problem within the last year, and any serious problem within the last two years.  Based upon their deposition testimony, it appears that no IP manager providing references ever took advantage of this basic source of information.  (*See, e.g.,* Caldwell Dep. at 14; Carmean Dep. at 30-31; Truster Dep. at 44-45; Lopane Dep. at 20-21.)

Second, each IP official providing references could have obtained information from

---

[15]     *See* fn 14 for the list of these Plaintiffs.

others more familiar with a Plaintiffs' work history. Often, this was not done. (*See, e.g.,* Lopane Dep. at 20-21.) Other times, a reference giver did convene meetings with direct supervisors, but failed to take any notes during meetings with the several different direct supervisors when many employees were discussed. (*See, e.g.,* McCoy Dep. at 31; Dunn Dep. at 11; Weiser Dep. at 39.) Thus, the IP managers providing the references often left those meetings with an idea, perhaps, of the most desirable employees, but no record of information about the other employees. Later, when confronted during a lengthy session with SP, the IP managers relied solely on memory to provide references. As many now admit, this process resulted in false information being provided to SP.

Another source of information for reference givers were non-direct supervisors who did have an opportunity to observe an employee's performance. For example, Berlyn Stanifer, a trainer for IP, was familiar with the work of many employees. Others were also available, obviously. These resources were not used.

Unfortunately, whether SP or IP is at "fault" for the hurried process, these IP official providing the references simply did not do anything to be careful about the references. The references were given during lengthy sessions, the IP managers did not have access to notes or personnel files, and it was literally impossible for them to provide accurate references. Thus, many now admit that the information provided was false. These admissions may be the best indications that the previously provided false information was the result of recklessness.

Because of the clear importance of the information being sought by SP, these IP managers should not have provided information unless there was a basis for the information. While many may now be sorry for speaking when they had no factual basis to do so, such

remorse does not excuse the reckless behavior during a hurried process in January 2001.

**4.     Many References Were False Because The Direct Supervisor Simply Did Not Have A Basis To Make Statements About A Plaintiff, Or Failed To Verify Information Reported To Him.**

In other cases, the reference did come from a direct supervisor.[16]  However, even in these cases, the information provided was false, either because of a short tenure of supervision (with no efforts made to discuss the Plaintiff with others more familiar) or the supervisor reported information based upon hearsay or innuendo.

For example, James Brooks' supervisor, Rick Bernard, had only been the supervisor in Brooks' department for a period of a few months when he made the defamatory statements about Brooks to Defendant SP.  (Brooks Dep. at 10-12.)  Bernard admitted that he felt uncomfortable evaluating Brooks, because he did not feel he had sufficient information about him.  (Bernard Dep. at 47.)  Specifically, Bernard admitted that he had no interaction with Brooks other than meeting with him once.  (*Id.* at 38, 66.)  Similarly, Pete Volz' supervisor, James Parker, was assigned as Volz' supervisor only in the last few months of Volz' employment.  (Hamblin Dep. at 45.)  Parker didn't have much interaction with Volz, (Volz Dep. at 49,) and Volz continued to work mainly with Jim Hamblin.  (Volz Dep. at 52.)  Thus, Parker was not in a position to know much about Volz' performance, while Hamblin had a great deal of knowledge about Volz through many years of close observation.

---

[16]     These Plaintiffs were:  Thomas Abner, Charles Baylor, James Brooks, Philip Bullio, John Cress, Terry Duncan, Patrick Durban, Edward Hensley, Roger Horn, Emanuel Hyden, Jr., Jerome Isreal, Ross McKay, Frederick Ogg, Douglas Paxton, Robert Thomas, and Francis "Pete" Volz.  (Pl. Ex. 1, 2, 7, 9, 14, 15, 16, 22, 23, 25, 26, 33, 35, 38, 40.)

   5.   **Many References Were Made Based Upon Prior Discipline That Had Been "Voided" by Champion And IP, And Was No Longer To Be Used Against Any Plaintiff.**

Under the express terms of a collective bargaining agreement between Champion/IP and the union representing Plaintiffs, prior discipline was "void" after a period of 12-24 months, depending on the seriousness of the discipline. Nonetheless, 9 Plaintiffs[17] received negative references on the basis of such discipline, which IP had agreed to consider "void." Thus, it was reckless, and perhaps malicious, to make statements to SP about this prior discipline.

   M.   **Maheu Has No Explanation To Justify Why Some Information Is False**.

Maheu, who was familiar with Champion's and IP's extensive record-keeping as well as the companies' increased emphasis on performance, was at a loss to explain how IP could give some of the information that it provided to SP.

   Q.   With this increased focus on safety, how do you suppose it happens that some supervisors who had never disciplined an employee for safety reported to SMART Papers that particular employees were safety risks, that otherwise had clean records at International Paper?

   A.   I can't answer that. I don't know.

   Q.   Okay. But while you were watching as the mill manager, you expected them to document any safety concern?

   A.   Right.

(Maheu Dep. at 77-78.)

Fifteen of the Plaintiffs in this action were defamed by IP in connection with safety, yet

---

   [17]   These Plaintiffs were: Charles Baylor, Wayne Bennett, Thomas Bennett, Larry Brandenburg, Philip Bullio, Terry Duncan, Dennis Heinrich, Edward Hensley, and John York. (Pl. Ex. 2, 3, 4, 5, 9, 15, 21, 22, 42.)

24

they had clean safety records while they were employed at IP.[18]  Similarly, most of the Plaintiffs

maintained clean attendance records.  Nonetheless, IP defamed 13 of these Plaintiffs by alleging

that their attendance records were poor.[19]  Like safety records, attendance records were readily

available to each supervisor.  Finally, negative statements about each Plaintiffs' performance is

also unexplainable in light of the clean performance records of most of the Plaintiffs.[20]

## III.    LEGAL STANDARD - SUMMARY JUDGMENT

Summary judgment may only be granted if there are no genuine issues of material fact,

and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  As the party

moving for summary judgment, IP bears the burden of showing the absence of a genuine issue of

material fact as to every element of Plaintiffs' claims.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

324 (1986).  If IP meets its burden, Plaintiffs must then present evidence that reveals a genuine

issue for trial.  *Id.*  This Court must accept Plaintiffs' evidence as true and draw all reasonable

---

[18]    These Plaintiffs were:  Thomas Bennett, Carl Brewer, Joshua Combs, Patrick Durban, Terrell Fowler, Henry Gardner, Edward Hensley, Rickey Huntington, Paul Italiano, Steve Mann, Larry McCreary, Ross McKay, David Robertson, Everett Taulbee, and John York.  (Pl. Ex. 4, 6, 12, 16, 18, 20, 22, 24, 27, 30, 31, 32, 36, 37, 42.)

[19]    These Plaintiffs were:  Wayne Bennett, Larry Brandenburg, Carl Brewer, Philip Bullio, Mendol Eaton, Charles Freeman, Edward Hensley, Roger Horn, Rickey Huntington, Jerome Isreal, James Ketch am, Barney Sandlin, and Everett Taulbee.  (Pl. Ex. 3, 5, 6, 9, 17, 19, 22, 23, 24, 26, 28, 36, 37.)

[20]    These Plaintiffs were:  Charles Baylor, Wayne Bennett, Thomas Bennett, Larry Brandenburg, Carl Brewer, James Brooks, Larry Broughton, Robert Chasteen, Jerry Combs, John Cress, Terry Duncan, Patrick Durban, Mendol Eaton, Terrell Fowler, Charles Freeman, Henry Gardner, Edward Hensley, Rickey Huntington, Emanuel Hyden, Jr., Paul Italiano, James Ketcham, Stanley Knodel, Steve Mann, Larry McCreary, Douglas Paxton, David Robertson, Barney Sandlin, Everett Taulbee, Robert Thomas, Ronald Turner, Francis "Pete" Volz, James Willis, and John York.  (Pl. Ex. 2, 3, 4, 5, 6, 7, 8, 11, 13, 14, 15, 16, 17, 18, 19, 20, 22, 24, 25, 27, 28, 29, 30, 31, 34, 35, 36, 37, 38, 39, 40, 41, 42.)

inferences in their favor, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986), viewing all

facts and inferences drawn therefrom in the light most favorable to Plaintiffs. *DePiero v. City of*

*Macedonia*, 180 F.3d 770, 776 (6th Cir. 1999). When deciding a Rule 56 motion, "although the

court should review the record as a whole, it must disregard all evidence favorable to the moving

party that the jury is not required to believe." *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 151

(2000). "That is, the court should give credence to the evidence favoring [Plaintiffs] as well as

that evidence supporting [Defendant] that is *uncontradicted and unimpeached, at least to the*

*extent that that evidence comes from disinterested witnesses*." *Id.* (emphasis added).

In its recent *en banc* decision of *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564 (6th

Cir. 2003)(*en banc*), the Sixth Circuit reiterated the proper standard for summary judgment. The

court stressed that summary judgment is improper where both parties have presented sufficient

evidence:

> In sum, this is a case that on its facts could go either way. This means that a jury's
> verdict in a properly tried case would likely be sustained regardless of whether the
> verdict was in favor of Wexler or in favor of White's. **But that is precisely the**
> **point**. The conflicting proof and the inferences that can be drawn therefrom raise
> genuine issues of material fact that preclude the grant of summary judgment in the
> case before us. Although the dissent labors long and hard in marshaling all the facts
> and inferences in support of White's, this does not, in our opinion, diminish the
> contrary evidence to the point that it is so one-sided that White's must prevail as a
> matter of law.

*Id.* at 578 (emphasis added)(internal quotations omitted). Where the evidence is not so one-sided

that a party must prevail, a jury must determine the outcome.

It is well-recognized that when the motivation, intent, or state of mind of the Defendant is

at issue, summary judgment is rarely appropriate, so that the trier of fact may resolve the dispute

over motive. *Ross v. Campbell Soup Co.*, 237 F.3d 701, 706 (6th Cir. 2001) ("that question -- i.e.

26

the employer's motive - is one rarely susceptible to resolution at the summary judgment stage).

## IV.  **ARGUMENT**

      **A.**    **Plaintiffs Have Raised Genuine Issues Of Material Fact Regarding Their Claims For Defamation, Rendering Summary Judgment Inappropriate.**

Summary judgment must be denied if the Plaintiffs establish a genuine issue of material fact regarding:

1.    the existence of a false and defamatory statement;

2.    about Plaintiffs;

3.    which was published without privilege;

4.    with the fault of at least negligence on the part of Defendant; and

5.    that was either defamatory *per se* or caused special harm to the Plaintiffs.

*Abrams v. Milliken & Fitton Law Firm*, 267 F. Supp. 2d 868, 877 (S.D. Ohio 2003) (citing *Gosden v. Louis*, 116 Ohio App. 3d 195, 206, 687 N.E.2d 481, 487 (Ohio Ct. App. 1996)). "Defamation *per se* includes 'that which reflects perniciously on a person's character or *injures one in his trade, profession, or occupation*.'" *Tohline v. Central Trust Co.,* 48 Ohio App. 3d 280, 284, 549 N.E.2d 1223, 1228 (Ohio Ct. App. 1988) (emphasis added).

Once a *prima facie* case for defamation is established, a defendant may avoid liability by establishing the defense of a qualified or statutory privilege. *Hahn v. Kotten,* 43 Ohio St. 2d 237, 243, 331 N.E.2d 713, 718 (Ohio 1975). If a privilege exists, a plaintiff can defeat the defense of a privilege by showing by clear and convincing evidence that the defendant acted with actual malice. *Jacobs v. Frank*, 60 Ohio St. 3d 111 at syllabus ¶2 (1991). A defendant acts with "actual malice" when it acts with knowledge that the statements are false or with reckless disregard of whether its statements were true or false. *Id*.

27

Similarly, Defendant IP argues that it may avoid liability because the Plaintiffs signed waivers which purported to release Defendant IP from liability in providing employment information to SP. However, Ohio law is clear that no release is valid to relieve a party of liability for future willful or wanton misconduct. *Richard A. Berjian, D.O., Inc. v. Ohio Bell Tel. Co.*, 54 Ohio St.2d 147, 375 N.E.2d 410 at syllabus ¶ 2 (1978). Therefore, in the same way Plaintiffs can defeat a qualified privilege, Plaintiffs can demonstrate the waivers in this case are invalid by proving that Defendant IP acted intentionally, recklessly, willfully or wantonly in providing false information about Plaintiffs to SP. *Clanin v. North Am. Bulk Transp., Inc.*, 2003 U.S. Dist. LEXIS 4156, *16 (S.D. Ohio Jan. 22, 2003) (copy attached as Pl. Ex. 47.)

Each Plaintiff can demonstrate that statements IP published to SP contained false and defamatory statements about them. (*See* Pl. Ex. 1 - 42.) Therefore, a genuine issue of material fact exists with respect to the first two elements of the *prima facie* defamation case. Defendant IP's argument that the statements are protected by a privilege as a matter of law is without merit because there is a genuine issue regarding whether any privilege has been destroyed due to IP's alleged reckless disregard for the truth of the statements. Therefore, Plaintiffs can demonstrate at least a genuine issue of material fact with respect to the third and fourth elements of the *prima facie* case. The fifth element of the *prima facie* case is not contested because the statements clearly involved Plaintiffs' occupations. Finally, Plaintiffs can demonstrate that the waivers on which Defendant IP relies in attempting to shield itself from liability are ineffective because Defendant IP recklessly disregarded the truth when it published these defamatory statements about Plaintiffs.

28

1.    **Plaintiffs Have Raised Genuine Issues Of Material Fact Regarding The Existence Of False And Defamatory Statements**.

Defendant IP's argument that the statements made during the reference process were true as a matter of law is without merit. Plaintiffs have raised substantial genuine issues of material fact with respect to the falsity of each of the defamatory statements:

- For 25 Plaintiffs, the IP manager providing the reference has now made admissions that contradict the information provided to SP;[21]

- For 20 Plaintiffs, their direct supervisors, who inexplicably did not provide the references, have given sworn testimony contradicting the information provided to Smart;[22]

- For 24 Plaintiffs, their personnel files contained no discipline for the two years prior to the sale of the mill;[23]

- All Plaintiffs have testified by deposition or Affidavit that the information is false;

- For 14 Plaintiffs, Berlyn Stanifer — a former management employee of IP and SP responsible for training has sworn that the references were inaccurate.[24]

Each Plaintiff's individual claim for defamation is addressed in the individual appendices

---

[21]    *See* fn. 5.

[22]    *See* fn. 6.

[23]    These Plaintiffs were: Charles Baylor, Wayne Bennett, Larry Brandenburg, Carl Brewer, Robert Chasteen, Joshua Combs, Terry Duncan, Mendol Eaton, Terrell Fowler, Henry Gardner, Edward Hensley, Roger Horn, Rickey Huntington, Emanuel Hyden, Jr., Jerome Isreal, Paul Italiano, James Ketcham, Stanley Knodel, Steve Mann, Frederick Ogg, David Robertson, Everett Taulbee, Robert Thomas, and James Willis. (Pl. Ex. 2, 3, 5, 6, 11, 12, 15, 17, 18, 20, 22, 23, 24, 25, 26, 27, 28, 29, 30, 33, 35, 37, 38, 41.)

[24]    *See* fn. 7.

29

attached to the Memorandum in Opposition.[25]  However, the following examples are
representative of the issues of fact regarding the falsity of the statements.

> a.    **Patrick Durbin**
>
> (1)    **Durbin had a long and outstanding record of
> employment at IP, yet received a "RED" rating from
> Defendant IP on his reference check.**

Plaintiff Patrick Durbin was loyal and valued employee of IP for more than 33 years.

(Durbin Dep. at 23.)  Durbin's last position with Defendant IP was Electrical and

Instrumentation Technician ("E&I"), in which he was responsible troubleshooting and fixing all

of the plant's electrical equipment and instruments, indicating management's high level of

confidence in Durbin's skill and experience.  (Dunn Dep. at 14-16.)  In fact, in order to become

an E&I he was required to progress through a four year electrical apprenticeship, become a

certified journeyman, and spend two years in an instrumentation apprenticeship  (Hoff Dep. at

22; Durbin Dep. at 21, 29.)  Management even encouraged Durbin to apply for a supervisor

position.  (Pl. Ex. 16 at Durbin Aff. at ¶ 6.)

Durbin was a devoted and dependable employee, and had near perfect attendance.  (*Id.* at

---

[25]    Plaintiffs do not oppose the dismissal of the defamation claims of those Plaintiffs
who received "GREEN" references from IP supervisors.  These are:  Adams,
Arthur, Greene, Hess, and  Rumpler.  Further, Plaintiffs do not oppose the
dismissal of the defamation claims of those Plaintiffs who were not offered
employment because of a positive drug screen.  These are:  Clear, Gentry, Gill,
Gregory, Johnson, Lakes, Marsee, Miller, Pennington, Rodgers, Spada, Tolbert,
and Wilkins.  Plaintiffs do not oppose the dismissal of the defamation claims of
the plaintiffs who failed to appear for their depositions.  These are: Fisher,
Gumm, Jackson, Parsley, Ratliff, and Whitaker.  Finally, Plaintiffs do not oppose
dismissal of the defamation claims of the plaintiffs who received job offers.
These are: Arthur, Begley, Elmer Campbell, Geeding, Greene, Hess, Holland, and
Rumpley.

¶¶ 1, 10.)  In his 33 years with IP, he was never disciplined for any reason.  (*Id.* at ¶ 4.)  He was never demoted or received a pay cut for merit reasons.  (*Id.* at ¶¶ 4, 9.)  His immediate supervisor, Michael Hoff, stated that the quality of Durbin's work met acceptable levels.  (Hoff Dep. at 13, 15.)  Durbin was extremely knowledgeable and well-educated about safety issues, having attended numerous safety training courses, and was made a Safety Captain of his department.  (Durbin Dep. at 21, 36.)

Durbin's received a "GREEN" rating for the interview with SP, recommending employment.  (Pl. Ex. 16 at App. Tracking Sheet at SPC 343.)  Despite his favorable interview, however, Mary Rita Weissman stated that Durbin was not hired because he did not meet the reference check standards for Willingness and Ability to Learn, Excellence Oriented, Team Player, Safety Awareness and Productivity.  (Weissman Dep. at 176.)

IP Manager Richard Dunn provided information to Defendant SP for reference for Durbin, resulting in an overall "RED" rating from Defendant IP, indicating he should not be offered a position.  (Pl. Ex. 16 at Applicant Tracking Sheet at SPC 733.)  Dunn made the following statements on Durbin's reference check:

- "Definite lack of knowledge.  Very little understanding of job duties.  Needs considerable instruction.  Makes little effort to add to his knowledge.  Not very knowledgeable of current job - doesn't like new tasks."

- "Poor quality of work; frequently makes errors; requires excessive checking and rework.  Must be closely supervised.  Doesn't take responsibility or accountability [sic]."

- "Slow worker.  Does very little work.  Wastes time.  Does not meet standards.  Very poor [productivity]."

- "Has difficulty getting along with others and often is in conflict with others.  Uncooperative.  Don't like playing games.  Others dislike."

31

- "Frequently disregards safety rules.  Careless/reckless.  Constantly have to remind PPE.  [Safety t]hreat to himself."

- "Nothing [about Durbin is particularly outstanding].  Below average."

- "Skill level [is particularly troublesome]."

- "Doesn't communicate well - plays games, doubt integrity."

(Pl. Ex. 16 at Applicant Reference Check for Patrick Durbin at SPC 344-345.)

### (2)   Richard Dunn has admitted his statements regarding Durbin were false.

Dunn testified that an E&I who performed poorly would be a serious safety risk at the plant, and that both he and IP always put safety first.  (Dunn Dep. at 16.)  He also admitted that an unsafe or unskilled E&I would first be counseled and then, if no improvement was made, formally disciplined.  (*Id.*)  Despite his statement that Durbin didn't know his job and that his skill level was "troublesome," Dunn admits that the only time he ever counseled Durbin was once for not wearing his PPE.  (*Id.* at 17.)  This single incident hardly justifies Dunn's statement that he "constantly" had to remind Durbin to wear his PPE.  He also admits that he never counseled him on any other issue, safety, performance or otherwise, let alone initiate formal discipline.  (*Id.*)  When pressed, Dunn could offer no explanation for this obvious discrepancy.  (*Id.* at 22.)

Despite Dunn's assertion that others disliked Durbin and he was often in conflict with his coworkers, Dunn contradicted himself under oath, stating that he did not recall Durbin having difficulty getting along with anyone and, in fact, "got along with the guys."  (*Id.* at 23.)  Finally, Dunn admitted that Durbin was very knowledgeable about mill operations and was qualified for other plant positions.  (*Id.* at 31.)

32

### (3)    Michael Hoff, Durbin's immediate supervisor, has testified that Dunn's statements were false.

Unlike Dunn, Michael Hoff was Durbin's direct supervisor and had the best opportunity to evaluate his performance. (Hoff Dep. at 6; Durbin Dep. at 2.) As E&I Finishing Supervisor in the mill for over five years, Hoff was responsible for all functions of supervising the E&I's, including assigning work and discipline. (Pl. Ex. 16 at Durbin Aff. at ¶ 11.)

Hoff stated that, far from being unknowledgeable and a poor performer, Durbin's performance as an electrician was within an acceptable range, and only had occasional problems with very highly technical skills. (Hoff Dep. at 13, 19.) Hoff explained that Durbin did not "play games," trying to shift responsibility from himself, but merely recognized when a mechanical problem was not electrical or instrumental, and thus outside his duties and abilities. (*Id.* at 18.) Hoff verified that Durbin is a state-certified journeyman. (*Id.* at 22.)

Hoff disagreed with Dunn that Durbin was a safety threat to himself, and only recalls minor incidents where Durbin occasionally had to be reminded to wear his earplugs. (*Id.* at 15-16.) Rather than someone whom others dislike, and who is in conflict with others, Hoff stated that he personally liked Durbin. Finally, Hoff stated that he never told Dunn that Durbin wasn't a very good worker. (*Id.* at 28.)

### (4)    Durbin testified that these statements were false.

Durbin categorically disagreed with each of Dunn's negative statements. He was a loyal employee of IP for over 33 years and was well-liked by Hoff, his immediate supervisor. (*Id.* at 31.) Far from being unknowledgeable about his job or making little effort to learn new information, Durbin took it upon himself to constantly increase his skill level through correspondence courses and other training. (Pl. Ex. 16 at Durbin Aff. at ¶ 16.) In fact, he was

33

required to complete two apprenticeships and state certification to do his job. (Durbin Dep. at 21, 29.)

Dunn stated that Durbin had a troublesome skill level, played games to avoid responsibility, made frequent errors and had to be closely supervised. Yet management actually suggested to Durbin that he apply for a supervisor's position. (Pl. Ex. 16 at Durbin Aff. at ¶ 6.) Not only was Durbin at least as quick as his counterparts, (Durbin Dep. at 56,) he actually exceeded the performance of other E&I's. While other electricians made mistakes that shut down production, Durbin never made such mistakes. (Durbin Dep. at 102.)

Contrary to Dunn's statements that others disliked Durbin because he was not a team player and was uncooperative, Durbin states that he was always the first person on the scene of a production problem, was viewed as conscientious by his coworkers, and they got along well together. (Pl. Ex. 16 at Durbin Aff. at ¶ 13; Durbin Dep. at 57.) He noted that when the plant was especially busy, "we all pulled together," and he knew enough to pitch in and help the millwrights when necessary. (Pl. Ex. 16 at Durbin Aff. at ¶ 13.)

Durbin was particularly surprised by Dunn's assessment of his productivity as "very poor." He was never counseled in his 33 years with the company about his ability or productivity. Dunn also falsely stated that Durbin's integrity was questionable. Durbin was actually so conscientious about the plant that he voiced concern to his supervisors about throwing away extra working parts. (Durbin Dep. at 58-59.) Finally, Dunn's statement that Durbin was a threat to himself is false. In fact, Durbin was such a safe employee that the company made him a Safety Captain, making him responsible for inspecting all of the machines and ensuring that other workers were following safety guidelines. (Pl. Ex. 16 at Durbin Aff. at ¶

14.)  Additionally, Maurice Kollstedt, SP's Safety Director, provides a favorable reference for

Durbin.  (Durbin Dep. at 9.)  Furthermore, he was never disciplined for safety or any other

reason.  (Durbin Dep. at 62.)

> **(5)    Defendant IP's training supervisor, Berlyn Stanifer, testified that these statements were false.**

Berlyn Stanifer worked closely with Durbin in the plant and would have known of any

complaints about him, but never heard that Durbin was a slow, bad, or an unsafe worker. (Pl. Ex.

43 at Stanifer Aff. at ¶ 15.)  Contrary to Dunn's statement that Durbin's skill level was

troublesome and he had very poor productivity, Stanifer testified that there was nothing amiss in

Durbin's skills and abilities.  (*Id.*)  He flatly disagrees with Dunn's statement that Durbin was

not knowledgeable, pointing out that Durbin graduated from the apprenticeship program, and

was very knowledgeable.  (*Id.*)  Furthermore, Stanifer testified that Durbin got along well with

his coworkers, was not disliked, and was cooperative and helpful.  (*Id.*)

> **(6)    Defendant IP's own personnel records establish that these statements about Durbin were false.**

In over 33 years of employment, Durbin received absolutely no disciplinary action of any

kind.  (Durbin Dep. at 42-43.)  There is absolutely no record of any problems with Durbin's

knowledge level, work quality or quantity, productivity, safety or ability to work with others.

> **b.    Barney Sandlin**

> **(1)    Barney Sandlin had a long and outstanding record of employment at IP, yet received a "RED" rating from Defendant IP on his reference check.**

Plaintiff Barney Sandlin was an employee of Defendant IP for more than 25 years.

(Sandlin Dep. at 19.)  Sandlin worked his way up through a series of jobs with increasing

responsibility and pay, including serviceman, back tender, machine tender, and subforeman. (Sandlin Dep. at 19-20.) Sandlin spent the last seventeen years alternating among those four positions where the need arose and where union seniority rules would allow, and also served as a union steward. (Sandlin Dep. at 19-21, 63.)

As subforeman, a position he held as late as 2000, (Pl. Ex. 36 at Letter of Commendation at IP-C105637,) he was responsible for a department of over 30 employees working the paper machines and in the beater room. (Pl. Ex. 36 at Sandlin Aff. at ¶ 18.) Machine tender was also a lead position, in which he was entrusted with primary responsibility for his machine, indicating management's high level of confidence in Sandlin's skill and experience. (Sandlin Dep. at 25.) In fact, in order to become a machine tender, he was required to progress through at least four other positions. (McCoy Dep. at 65.) Sandlin's outstanding performance was recognized by more than one letter of commendation issued by the mill manager, Edward McCoy. (Pl. Ex. 36 at Letter of Commendation at IP-C105637; Pl. Ex. 36 at Sandlin Aff. at ¶ 2.) He was never demoted or received a pay cut for merit reasons. (Pl. Ex. 36 at Sandlin Aff. at ¶ 3.)

Sandlin was a devoted and dependable employee, had an excellent attendance record, and regularly worked overtime. (Pl. Ex. 36 at Sandlin Aff. at ¶¶ 1, 4.) He was extremely knowledgeable about the machines in the mill, and was so helpful that mill managers would frequently call him at home to ask his advice or to come in to fix a machine. (*Id.* ¶ 7.) Sandlin was able to run every machine at its fullest capacity and was called upon to fix things when no one else could. (*Id.* ¶¶ 6, 7.) He was mindful of his coworkers and always helped them out when he could. (*Id.* ¶ 5.) He was so team-oriented and had such excellent quality work that Defendant IP appointed him to an involvement team that solved plant problems and met with

36

plant customers to address quality concerns, efficiency, and customer relations. (Pl. Ex. 36 at Documentation and Scoresheet at SPC 973; Pl. Ex. 36 at Sandlin Aff. at ¶ 8.) His immediate supervisor, David Shepard, stated that Sandlin was probably the best worker in the department and knew more about Shepard's job than Shepard himself. (Shepard Dep. at 28.)

The Weissman Group's evaluation of Sandlin's interview recognized him as a valuable Defendant IP employee, and he received an overall rating of "4-." (Pl. Ex. 36 at Documentation and Scoresheet at SPC 973-974.) During his interview, Sandlin described instances of troubleshooting and problem-solving that had helped customer relationships and saved Defendant IP time and money. (*Id.*) In spite of a favorable interview, Mary Rita Weissman stated that Sandlin was not hired because he received a poor rating on the reference and did not meet the reference check standards for team player because of various statements made by McCoy. (Weissman Dep. at 212-213.)

_____Edward McCoy provided information to Defendant SP for reference for Sandlin, resulting in an overall "RED" rating from Defendant IP, indicating he should not be offered a position. (Pl. Ex. 36 at Applicant Tracking Sheet at SPC 970.) McCoy made the following statements on Sandlin's reference check:

- "Poor quality of work; frequently makes errors; requires excessive checking and rework. Must be closely supervised. None or horrible."

- "Slow worker. Does very little work. Wastes time. Does not meet standards. [Productivity] excellent when in the right state of mind. 50/50. Otherwise terrible."

- "Often absent or tardy. Does not report absence or tardiness in advance. Not forthcoming. Hides mistakes. Considers behavioral expectations unimportant. Not dependable."

- "Instigates conflict and problems. Is uncooperative and encourages others to be

37

uncooperative.  Poor attitude at best - decent moody.  At worst - horrible.
Conflicts with others - cursed supervisor out - letter of reprimand.  Concerns with
selling - removed letter.  Good employee 6 months, back to old ways.  New letter
for damaging company property." [26]

• "Tried hard to change him over 10 years - hasn't worked."

(Pl. Ex. 36 at Applicant Reference Check for Barney Sandlin at SPC 971-972.)

### (2)    Edward McCoy has admitted the statements regarding Barney Sandlin were false.

During the same reference, McCoy admitted that, despite the above negative statements

in the reference, Sandlin had "a lot of knowledge and skills, knows machine like back of hand,"

had good communications skills, and had "no problems" with dependability.  (Pl. Ex. 36 at Ref.

Check at SPC 971-972.)  McCoy also testified that employees had to be promoted several times

to achieve the position of machine tender.  (McCoy Dep. at 65.)

McCoy's esteem for Sandlin is evidenced by the fact that he wrote more than one

personnel letter commending Sandlin's performance.  (Pl. Ex. 36 at Sandlin Aff. at ¶ 2; Pl. Ex.

36 at Letter of Commendation at IP-C105637.)  The latest commendation was placed in

Sandlin's file as recently as June, 2000, because Sandlin had, once again, risen to the occasion

by filling a supervisory role and leading the department.  (*Id.*)

> [Y]our performance while moved up into shift supervisor's role was just
> exceptional.  Your **leadership was outstanding** and you helped us keep our
> machines performing well in the absence of our regular supervisors. . . .[We] wish
> to thank you for your help.  **As always, your outstanding performance was
> appreciated.  Thanks again for a job well done.**

(Pl. Ex. 36 at Letter of Commendation at IPC-C105637 (emphasis added).)

---

[26]    Sandlin grieved the new disciplinary action to which McCoy referred, and the
grievance was in the third step process at the time McCoy gave this reference.
(Pl. Ex. 36 at Application at SPC 969; Sandlin Dep. at 54.)

McCoy's statements in the reference, made just a few months after he wrote this letter, make no sense in light of this letter and the fact that Sandlin was appointed to the involvement team. (Pl. Ex. 36 at Sandlin Aff. at ¶ 8.)  It defies reason to suppose that Sandlin would be both an outstanding leader and also an uncooperative instigator who was a poor team player and in conflict with others. (Pl. Ex. 36 at Ref. Check at SPC 972.)

> **(3)     David Shepard and Leroy Havens, Barney Sandlin's immediate supervisors, has testified that these statements were false.**

Unlike McCoy, Shepard was one of Sandlin's direct supervisors and had a much better opportunity to evaluate Sandlin's performance. (Shepard Dep. at 6; Pl. Ex. 36 at Sandlin Aff. ¶ 10.)  As Shift Supervisor, Shepard was responsible for all functions of the rotating shifts he supervised, including assigning work and recommending discipline. (Shepard Dep. at 6-8, 24-26.)  Shepard met with McCoy to discuss his employees' performance, yet his assessment of Sandlin differs markedly from the statements McCoy made in the reference.

Shepard states that, far from producing "horrible" quality work, Sandlin was probably his best worker and knew more about the area Sandlin worked in than Shepard did. (*Id.* at 28.)  In fact, Shepard would have hired Sandlin, saying "[I]f I was starting a company I would . . . want him to be over it, he could run the place." (*Id.* at 40.)

Shepard admitted that Sandlin could do any job on any paper machine in the mill, and he would rather have Sandlin than a new hire. (*Id.* at 66.)  Finally, Shepard disagreed that Sandlin had been disciplined for "cuss[ing] out a supervisor, " because his input encouraged McCoy to pull the disciplinary action out of Sandlin's file. (Pl. Ex. 36 at Sandlin Aff. at ¶ 13.)

Similarly, Leroy Havens testified that Sandlin was very knowledgeable about his job.

39

(Havens Dep. at 56-57.)

          **(4)     Barney Sandlin testified that these statements were false.**

     Sandlin testified that he was a loyal employee of Defendant IP for over 25 years and got along well with management.  (Pl. Ex. 36 at Sandlin Aff. at ¶ 11; Sandlin Dep. at 23.)  He took particular umbrage at McCoy's assertion that he had 'none or horrible" work quality, stating that he understood what drove quality and the mill's ideals for quality, and he implemented those ideals.  (Sandlin Dep. at 58.)  Furthermore, Sandlin was appointed to the Involvement Team in large part because his quality was so exceptional.  (Pl. Ex. 36 at Application at SPC 969; Pl. Ex. 36 at Sandlin Aff. at ¶¶ 8-9.)

     Contrary to McCoy's statements that Sandlin had a poor attitude and was not dependable, Sandlin was so team-oriented and involved with his work that he was appointed to that same involvement team, which met regularly to troubleshoot and solve plant problems.  (Pl. Ex. 36 at Sandlin Aff. at ¶¶ 8, 9.)  Moreover, Sandlin contradicted McCoy's statement that he was not dependable, pointing out that he was promoted to subforeman precisely because he was dependable and knowledgeable.  (Sandlin Dep. at 25.)  He also testified that his promotion was inconsistent with McCoy's claim that he was a poor team leader because leadership skills were critical in that position, and he was called upon not only to set an example for other employees but also to help others resolve their own conflicts.  (*Id.* at 27.)

     Sandlin regularly helped others with problems on their machines.  (Pl. Ex. 36 at Documentation and Scoresheet at SPC 974.)  Sandlin's exceptional productivity is proven by the fact that he once ran his paper machine at 117% production for over a month, which was a department record.  (*Id.*; Pl. Ex. 36 at Sandlin Aff. at ¶ 14.)  He recalls that at least once

management called him at home at 3:00 a.m. to fix a problem at the mill.  (Pl. Ex. 36 at Sandlin Aff. at ¶ 7.)

          **(5)**      **Berlyn Stanifer testified that these statements were false.**

Berlyn Stanifer, who knew Sandlin and was familiar with his work performance, strongly disagreed with McCoy's statements in the reference.  (Pl. Ex. 43 at Stanifer Aff. at ¶ 14.) Contrary to McCoy's statement that Sandlin had horrible quality, Stanifer said that Sandlin was "a very hard worker who should have been given a job." (*Id.*)  He remarked that Sandlin held a very technical and high level position as machine tender.  (*Id.*)  Stanifer also noted that Sandlin would not have been made a subforeman for over 15 years if management thought it could not depend on him.  (*Id.*)  Stanifer also believes that McCoy's statements that Sandlin's productivity was below acceptable levels is unjustified because Sandlin was very fast at his work.  (*Id.*)

          **(6)**      **Defendant IP's own personnel records establish that these statements were false.**

In over 25 years of employment, Sandlin never received any disciplinary action at all regarding the quality of his work, and he has received no disciplinary action that relates to his performance or dependability since 1993.  (Pl. Ex. 36 at Sandlin Aff. ¶ 17.)  Because Defendant IP has no record that Sandlin was recently counseled or disciplined for the quality of his performance or dependability, its negative statements about Sandlin must be false.

        **c.**      **Larry McCreary**

          **(1)**      **Larry McCreary had a long and outstanding record of employment at IP, yet received a "RED" rating from Defendant IP on his reference check.**

Plaintiff Larry McCreary was a 27-year employee with an exemplary work record at IP. (McCreary Dep. at 28.) McCreary worked in the Cutter Department for nearly 23 years, then transferred to the 50 Calendar Complex Area as a Rewheel Operator when the Cutter Department shut down in 1997. (*Id*. at 27-30.) McCreary also served as a Union Steward during this time. (*Id*. at 46-47.) During his career, McCreary was a member on a safety assessment team, and was applauded as a "key member of safety leadership." (Pl. Ex. 31 at McCreary Aff. at ¶ 6.) He worked on several cost reduction projects that resulted in company savings. (*Id*. at ¶ 7; McCreary Dep. at 152.) He also played a key role in efforts to increase and improve teamwork at the mill. (McCreary Dep. at 152.) For his efforts, Defendant IP rewarded him with 17 company jackets and other gifts given to employees in recognition of achievement. (*Id*. at 152, Dep. Ex. 1; Pl. Ex. 31 at McCreary Aff. at ¶ 8.) Defendant IP also recognized McCreary's willingness to go over and above expectations for clean-up work, and often offered him overtime work as a result. (McCreary Dep. at 35-36.)

McCreary's outstanding performance is reflected by the minimal amount of disciplinary action taken against him. His personnel file contains only two disciplinary actions over his 27 year career. First, he and another employee received a verbal warning in 1996 while he still worked in the Cutter Department, because of a mistake in measuring some paper. (McCreary Dep. at 58-59; Dep. Ex. 5.) That was the only discipline McCreary received during his 23 years in the Cutter Department. (Pl. Ex. 31 at McCreary Aff. at ¶¶ 1-2.) McCreary also received a written warning in April, 2000 for allegedly filing an incorrect time sheet. (McCreary Dep. at 50-52, 109.) McCreary disputed the write-up, but he did not receive the benefit of the full grievance process because the sale of the mill interrupted the process. (*Id*. at 50-52.)

42

McCreary's record contains no other disciplinary action for his entire 27-year career. (Pl. Ex. 31 at McCreary Aff. at ¶ 9.)

Matthew Stevens, the Supercalendar Coordinator (and McCreary's area supervisor), provided information to Defendant SP for a reference, rating McCreary, as follows:

- "[Employment Dates:] 2 yrs."

- "Not only lacks knowledge, but detracts from the pool of knowledge. Causes more problems than makes contributions. Needs a lot of attention - needs it."

- "Causes others to make mistakes. Detracts from others work as well as doing poor work. Points out problems, bad attitude, likes to stir things up - uncompromise!"

- "Interferes with others getting work done. Unfocused, knows job but other things get in way, doesn't do job, poor productivity."

- "Instigates conflict and problems. Is uncooperative and encourages others to be uncooperative. Hard to work with - points out everyone's problems, uncompromise - sticks his nose where it doesn't belong."

- "Frequently disregards safety rules. Careless/reckless. Hurt twice - strained back pushing crane - bent crane."

- "[Communication skills] below average."

- "Nothing [particularly outstanding about McCreary]."

- "Caught cheating on time sheets. Lied to me; coded time incorrected [sic] - co. charge vs. union charge."

(Pl. Ex. 31 at Applicant Reference Check for Larry McCreary at SPC 765-766.) Mary Rita Weissman, consultant to Defendant SP, admitted that these statements in the reference check were the reason that she rated McCreary as "RED." (Weissman Dep. at 160-161.)

### (2) Stevens' sworn testimony contradicts his statements to Defendant SP, indicating that they were false.

Contrary to his comments that McCreary lacked knowledge and "needs a lot of

attention," Stevens later admitted that McCreary had the skills to operate the rewheeler. (Stevens Dep. at 22.) Stevens testified that McCreary was knowledgeable about his job, and did not require additional instruction. (*Id*.) This is in sharp contrast to his reference that led to a rating of "1" for Willingness and Ability to Learn.

Similarly, Stevens contradicted his comments in the reference regarding poor work quality and causing others to make mistakes when he testified that he had no knowledge of McCreary causing others to make mistakes. (*Id.* at 22-23.) Further, Stevens testified that he had no knowledge about McCreary's attitude despite telling SP that he had a "bad attitude." (*Id*.) In fact, Stevens could not recall any conflicts that McCreary caused on the job, contradicting his reference statements that he was uncooperative, hard to work with, and an employee who instigates conflict. (*Id.* at 25-26.)

Stevens also told Defendant SP that McCreary frequently disregarded safety rules, and had been hurt twice. However, Stevens admitted that he never observed McCreary disregarding a safety rule. (Stevens Dep. at 26.) In fact, Stevens admitted that the only safety issue with McCreary involved an incident which led to a strained back, which Stevens knew had *not* led to any disciplinary action against McCreary. (*Id*. at 26-27.) Finally, Stevens admitted that he knew that McCreary had worked at the mill much longer than two years, despite telling SP that he had been employed only two years. (*Id.* at 21.)

> **(3)    Joel Bryant, McCreary's direct supervisor, provided sworn testimony that these statements were false.**

Joel Bryant, who directly supervised McCreary, considered McCreary to be a productive and reliable employee. (*See* Bryant Dep. at 10-14; McCreary Dep. at 30-31.) Significantly, Bryant was in a better position than Stevens to evaluate McCreary's performance. Bryant

directly observed McCreary's performance several times each shift, while Stevens' opportunity to observe McCreary was limited to one week per month. (Bryant Dep. at 11-13.) That opportunity was further limited by the fact that Stevens supervised the entire area. (*Id.*)

Bryant's assessment of McCreary is in sharp contrast to Stevens' statements. Bryant never had to discipline McCreary for any reason. (*Id.* at 10.) Bryant stated that McCreary met all quality and productivity requirements. (*Id.*) In fact, McCreary was flexible and could adapt to new methods for doing the job. (*Id.* at 10-11.) Bryant also testified that McCreary got along well with other employees, and he had no concerns about McCreary's safety awareness. (*Id.* at 14.) Bryant believed that McCreary performed his job well, and with reasonable care. (*Id.*)

### (4)    McCreary has testified that these statements were false.

McCreary cannot recall ever being counseled for lacking knowledge or for requiring a lot of attention. (Pl Ex. 31 at McCreary Aff. at ¶ 4.) In fact, McCreary received praise and awards for his many contributions. Stevens recognized McCreary's willingness to go over and beyond expectations when he rewarded him with overtime. (McCreary Dep. at 35-36.) Among other recognitions, McCreary received 17 company jackets as acknowledgment for his contributions to the company. (*Id.* at 152; Dep. Ex. 1; Pl. Ex. 31 at McCreary Aff. at ¶ 8.)

All Stevens' statements that McCreary liked to stir things up, was hard to work with, sticks his nose where it doesn't belong, and needs a lot of attention are a result of McCreary's duties as Union Steward. (McCreary Dep. at 46-49.) Stevens told McCreary directly that his duties as Union Steward got in the way of job performance. (*Id.* at 105-106.) For instance, Stevens opposed McCreary's occasional practice of filing grievances for employees outside of his area. (*Id.* at 48; Pl. Ex. 31 at McCreary Aff. at ¶ 5.) However, there were too few stewards

which resulted in employees in other departments seeking out an available steward.  (McCreary Dep. at 48.)  Also, managers in other departments would request that McCreary sit in on disciplinary actions to satisfy the requirements of the collective bargaining agreement.  (*Id*.)  Stevens was clearly hostile toward this.  (P. Ex. 31 at McCreary Aff. at ¶ 5.)  McCreary was not stirring the pot or sticking his nose into other's affairs, but instead was satisfying his duties as Union Steward.

Neither Stevens nor Bryant ever counseled or disciplined McCreary for productivity or safety issues.  (Pl. Ex. 31 at McCreary Aff. at ¶ 3.)  In fact, McCreary was a member of a safety awareness team, and was recognized as a "key member of safety leadership."  (*Id*. at ¶ 6.)

Further, Stevens' statements that McCreary lied to him and that he caught him cheating on time sheets are misleading and a knowing mischaracterization of the incident.  Stevens admitted that he could not recall any specifics regarding the incident, and could only remember that McCreary was disciplined.  (Stevens Dep. at 13-16.)  McCreary admitted that his time sheets contained mistakes, but he did not intentionally file a false time sheet. (McCreary Dep. at 50-52.)  McCreary had inadvertently coded time wrong on one occasion, where he listed his hours as company time instead of union time.  (*Id*. at 109.)  This did not result in an overpayment.  (*Id*. at 51.)  Another mistake occurred when a secretary attempted to correct McCreary's time sheet. (*Id*.)  Critically, McCreary filed a grievance, but the grievance procedure was interrupted by the sale of the mill.  (*Id*. at 50-52.)  Thus, he was disciplined without benefit of the full grievance process.

### d.    Stanley Knodel

**(1)    Stanley Knodel had a long and outstanding record of employment at IP, yet received a "RED" rating from**

46

**Defendant IP on his reference check.**

Plaintiff Stanley Knodel was an employee of Defendant IP for more than 32 years. (Knodel Dep. at 18.)  Knodel worked his way up to the position of mechanical technician through a series of jobs with increasing responsibility and pay, including a 3-1/2 year apprenticeship and both first and second class construction.  (*Id.* at 18-22.)  Knodel and his counterparts were responsible for the mechanical needs of the plant, indicating management's high level of confidence in Knodel's skill and experience.  (Rice Dep. at 13.)  Knodel's outstanding performance was recognized by a service award in 1999.  (Pl. Ex. 29 at Knodel Aff. at ¶1.)  He was never demoted and never received a pay cut.  (*Id.* at ¶12.)

Knodel was a devoted and dependable employee, and in recent years missed very little work except for a period of disability caused by a broken shoulder.  (*Id.* at ¶¶1, 15.)   His immediate supervisor, John Rice, stated that the quality of Knodel's work was good and he was a productive and safe team player.  (Rice Dep. at 42-43.)  Knodel was a good employee, gave one hundred percent, and consistently received positive feedback from his supervisors.  (Pl. Ex. 29 at Knodel Aff. at ¶2.)   He was always more than willing to assist or advise his coworkers and believed that sharing knowledge with other mechanical technicians was critical to the success of the plant.  (*Id.* at ¶4.)   Whenever he discovered a safer, faster, or better way to perform aspects of his job, Knodel always made sure to share this information, and he also sought out this information from his coworkers.  (*Id.* at ¶9.)  He was always mindful of customer and production needs.  (*Id.* at ¶10.)

SP's interviewer recognized Knodel's value as an employee, rating him "GREEN" and recommending employment.  (Pl. Ex. 29 at App. Tracking Sheet at SPC 733.)  However, Mary

Rita Weissman stated that in spite of this favorable interview, Knodel was not hired because he did not meet the reference check standards for Willingness and Ability to Learn, Excellence Oriented, Productivity and Dependability. (Weissman Dep. at 203.)

Manoj Thomas provided information to Defendant SP about Knodel for its reference check. Thomas made the following statements regarding Knodel:

- "Definite lack of knowledge. Very little understanding of job duties. Needs considerable instruction. Makes little effort to add to his knowledge. Has not learned."

- "Poor quality of work; frequently makes errors; requires excessive checking and rework. Must be closely supervised."

- "Slow worker. Does very little work. Wastes time. Does not meet standards."

- "[Team Work:] Probably good so he can hide in team."

- "Lots of hesitation [before recommending for employment]."

- "Doesn't learn quickly because he's not willing. He is capable but doesn't want to work. Does only what's necessary to get by."

(Applicant Reference Check for Stanley Knodel at SPC 734-735)

### (2)    Thomas has admitted the statements regarding Knodel were false.

Thomas testified under oath that, despite his statements made in the reference, he had no understanding of why Knodel was not hired. (Thomas Dep. at 28-29.) In fact, he had no recollection of recommending that SP not hire Knodel. (*Id.* at 32.) He also admitted that Knodel was a reasonably good employee who "tried." (*Id.* at 29, 34.) Despite his assertion that he was very involved with disciplining the employees who worked under his direction, Thomas recalled no discussions with Knodel about his skill level or any disciplinary actions regarding any aspect of his performance. (*Id.* at 20, 30.)

48

Although Thomas stated that Knodel "has not learned," he could not remember specifically what it was Knodel allegedly refused to learn. (*Id.* at 31.) In direct contradiction to his assertion that Knodel had to be closely supervised, Thomas admitted that because mechanical technicians worked in teams, Knodel required little supervision. (*Id.* at 36.) Despite his reference statement that Knodel's work was of poor quality, Thomas admitted that he could not accurately state an evaluation of Knodel's performance because mechanical technicians were evaluated as teams, not individuals. (*Id.* at 36.)

> ### (3)   John Rice, Knodel's immediate supervisor, testified that these statements were false.

Unlike Thomas, John Rice was Knodel's direct supervisor and had the best opportunity to evaluate his performance, (Knodel Dep. at 24-25,) yet he flatly testified that Thomas' statements were "inaccurate." (Rice Dep. at 44-46.) As Maintenance Supervisor of the mill for over five years, Rice was responsible for all functions of supervising the mechanical technicians, including assigning work and discipline. (*Id.* at 10, 29.)

Rice was surprised that Knodel had not been recommended for hire and could not understand why, saying, "I knew he could do the work." (*Id.* at 40, 65.) He stated that Knodel was a good employee, was fast, productive and dependable, and knew his job. (*Id.* at 40, 42.) Knodel got along well with his coworkers and was a team player. (*Id.* at 43, 46.) Rice strongly disagreed with all of Thomas' negative statements about Knodel, including that he was unwilling to learn, needed to be closely supervised, made frequent errors, and had poor work quality. (*Id.* at 44-45.) Rice called all of these statements "inaccurate." (*Id.* at 44-45.)

> ### (4)   Knodel has testified that these statements were false.

Knodel categorically disagreed with each of Thomas' negative statements. (Knodel

49

Dep. at 27, 49.) He was a loyal employee of IP for over thirty-two years and had no problems

with management. (Knodel Dep. at 18, 25; Pl. Ex. 29 at Knodel Aff. at ¶ 2.) Knodel testified

that he was both capable and willing to learn and there was no reason for Thomas to state

otherwise. (Knodel Dep. at 33.) In fact, he learned so much at IP that he is currently receiving

excellent feedback at his present job, resulting in an "exceeds expectations" performance review

in July, 2002. (Pl. Ex. 29 at Knodel Aff. at ¶ 6.) Furthermore, he had extra skills because he was

one of only three mechanical technicians who could do welding work, demonstrating an ability

and willingness to learn. (*Id.* at ¶ 11.)

Contrary to Thomas' statements that Knodel does only what is necessary to get by,

Knodel worked so hard that he averaged over $10,000 per year in overtime pay for the last five

years. (*Id.* at ¶ 8.) Rather than a slow or unproductive performer, Knodel was self-directed and

self-motivated and a very good worker. (*Id.* at ¶ 3.) Far from needing close supervision, Knodel

was never closely supervised because technicians worked in pairs, and no supervisor, including

Thomas or Knodel's immediate supervisor, John Rice, directly supervised maintenance work.

(Knodel Dep. at 67; Thomas Dep. at 36.)

### (5) Defendant IP's training supervisor, Berlyn Stanifer, testified that these statements were false.

Berlyn Stanifer worked closely with Knodel in Maintenance, and would have known of

any complaints about him, but never heard that Knodel was a slow or bad worker. (Pl. Ex. 43 at

Stanifer Aff. at ¶ 13.) Contrary to Thomas' allegation that Knodel doesn't learn quickly, and

does only what's necessary to get by, Stanifer noted that if Knodel had pretended not to learn

things to avoid working, Knodel's coworkers would not have tolerated this behavior. (*Id.*) Nor

would they tolerate Knodel's alleged lack of knowledge. (*Id.*.) Furthermore, Knodel

successfully completed the intense and challenging apprenticeship program, thus the references

to willingness and ability to learn are "obviously false**."**  (*Id.*)  He also explained that Thomas's

statement that Knodel learned new tasks slowly were unfair because mechanical technicians

received only on-the-job training for new responsibilities.  (*Id.*)

> **(6)    Defendant IP's own personnel records establish that these statements were false.**

In over 32 years of employment, Knodel's personnel file contains no performance-related

disciplinary action.  (Pl. Ex. 29 at Knodel Aff. at ¶ 16.)  There is absolutely no record of any

problems with Knodel's willingness or ability to learn, work quality or quantity, productivity, or

dependability.  (*Id.*)  In contrast, Defendant IP recognized Knodel as a valuable employee by

giving him a service award in 1999.  (*Id.* at ¶ 1.)  Because Defendant IP has no record that

Knodel was ever counseled or disciplined for any reason justifying its negative statements about

Knodel, these statements about Knodel must be false.

> **e.    The References IP Provided to SP Were Statements.**

Defendant IP makes a conclusory and erroneous argument that the comments and ratings

recorded on the reference sheets are the impressions and interpretations of the SP interviewers,

not the verbatim statements of the IP supervisors.  (Def. IP Mem. Supp. M.S.J. at 41, n.22.)

Apparently, Defendant IP is attempting to argue that these negative statements were not

attributable to IP.  However, Defendant IP then quickly abandons this argument by arguing that

the statements were true or were the IP supervisors' "opinions."  (*Id.* at 40-43.)  IP further argues

that it is protected from liability for these statements by the waivers and by qualified and

statutory privileges.  (*Id.* at 36-40, 44-49, 52-53.)  Finally, Defendant IP relegates this argument

to a footnote, and provides no legal support for its conclusory statements.  (*See, id.* at 41, n. 22.)

Despite its contradictory positions, Defendant IP's argument that the recorded statements are not verbatim, and therefore not attributable to it, clearly fails. First, under Ohio law, a plaintiff need not establish the verbatim statements of the defendant in order to establish defamation. O.R.C. § 2739.01.

Second, there is a genuine issue of material fact regarding whether the recorded comments are the interviewers' impressions or verbatim statements by the IP managers. For instance, there is significant evidence that the role of the SP representative was that of a data-gatherer who interviewed the IP managers and "wrote down things they said." (*See* Moore Dep. at 24, 27, 48, 49, 75; Weissman Dep. at 50, 113, 125, 126, 127.) This conflicting evidence should be decided by a jury.

> **2.     Defendant IP's Argument That Plaintiffs' Defamation Claims Are Barred Because Plaintiffs Signed Waivers Is Without Merit Because A Waiver Is Ineffective To Shield Future Willful And Wanton Misconduct From Liability.**

Plaintiffs concede that, in order to be considered for employment, they were forced to sign waivers which purported to release IP from liability in providing employment information to SP. However, the waivers are invalid because, first, the waivers do not contemplate that IP will provide false information to SP, and second, the waivers do not shield IP's reckless misconduct in releasing false and defamatory information. *Clanin v. North Am. Bulk Transp., Inc.*, 2003 U.S. Dist. LEXIS 4156, *16 (S.D. Ohio Jan. 22, 2003) (Pl. Ex. 47.)

> **a.     A Release of Future Claims Must Be Narrowly Construed, And the SP Waivers Do Not Include A Release For Providing False or Inaccurate Information.**

A release is a contract and the overriding consideration in interpreting a release is to ascertain the intent of the parties, which is presumed to reside in the language the parties chose

to employ in the agreement.  *See, generally*, *Whitt v. Hutchison*, 43 Ohio St. 2d 53, 330 N.E.2d 678 (1975); *Fabrizio v. Hendricks*, 100 Ohio App. 3d 352, 654 N.E.2d 127 (1995).  A court will not resort to extrinsic evidence in its effort to give effect to the parties' intentions unless the language in a contract is unclear or ambiguous, or where the circumstances surrounding the agreement invest the language of the contract with a special meaning.  *Kelly v. Medical Life Ins. Co.*, 31 Ohio St. 3d 130, 132, 509 N.E.2d 411 (1987).

Releases from liability for future tortious conduct, however, are generally not favored by the law and **will be narrowly construed**.  *Glaspell v. Ohio Edison Co.*, 29 Ohio St. 3d 44, 46-47, 505 N.E.2d 264  (1987); *Swartzentruber v. Wee-K Corp.*, 117 Ohio App. 3d 420, 424, 690 N.E.2d 941 (1997).  In this case, as part of the application process, each employee was required to sign a Waiver Weissman drafted primarily for the protection of SP (her employer).  That waiver permitted SP to review *only* information that was maintained in IP's personnel files, and to discuss *only* that information with IP supervisors or managers in connection with providing references.[27]  (Weissman Dep. at 153.)

---

[27]     The Waiver provides:

### AUTHORIZATION/RELEASE

I, _____, hereby authorize representatives of International Paper Company (the "Company") to make available any information **contained in my personnel files** to Smart Papers L.L.C. (the Buyer") or to any representative of the Buyer.  I further hereby authorize Company managers/supervisors to meet with the Buyer and/representatives of the Buyer to discuss **my job performance and the information contained in my personnel files.**  I authorize representatives of the Company to provide the above-referenced information to the Buyer, or to any representative of the Buyer, prior and subsequent to the completion of the sale of the Mill's assets.

In addition, I hereby release the Company and the Buyer and their subsidiaries, affiliates, officers, directors, managers, supervisors, agents,

The parties never contemplated shielding IP from liability for releasing false information. Obviously, no employee would ever agree to such a release. In fact, each Plaintiff, well aware of his many successful years of performance, signed the waiver with no reservation that a review of his personnel file would prove detrimental to his future employment prospects with SP. Further, according to Weissman, the waiver most certainly did *not* authorize a reference provider to state false information about any of the applicants, as SP wanted only truthful information about the IP employees. (Weissman Dep. at 125 (assuming information from IP reference checks would be true); *see also id.* at 153 ("*No one, of course, in their right mind, is going to . . . authorize a person . . . to lie about them.*") (emphasis added).)

The language employed in the waiver in this case is very clear. It simply does not authorize IP to make false, defamatory statements about Plaintiffs, and therefore does not shield IP from liability. Alternatively, where the language of the release is ambiguous or too general, courts have held that the intent of the parties is a factual matter for the jury. *Bowman v. Davis*, 48 Ohio St. 2d 41, 44-45, 356 N.E.2d 496 (1976). Thus, at the very least, a jury must be allowed to consider the intent of the parties to the waiver (the employee and SP) to determine whether they intended to release IP from all liability for making false, defamatory statements about Plaintiffs that cost them their livelihoods.

**b.    A Release Of Future Claims Is Insufficient To Shield**

---

representatives and employees from any claims arising under federal, state or local law relating to the disclosure of the above-referenced information to the Buyer or its representatives. I further hereby agree not to bring any action or proceeding against the Company, the Buyer or its representatives relating to the Company's disclosure of the above-referenced information.

(Pl. Ex. 48, Sample Authorization/Release signed by Patrick S. Durbin, 1/9/01.)

**Intentional, Reckless, Willful, Wanton, or Malicious
Misconduct From Liability.**

Defendant IP concedes that a party may not avoid future liability on the basis of a release
when liability is premised upon intentional, reckless, willful, wanton, or malicious misconduct.
(Def. IP Mem. Supp. M.S.J. at 37.)  But Defendant argues there is no evidence that IP
supervisors intentionally, recklessly or willfully provided false information about any Plaintiff.
(*Id.*)  Defendant's argument should be rejected because there is a wealth of evidence that IP,
knowingly or with reckless disregard for the truth, made inaccurate and defamatory statements to
SP.  (*See supra* at 16-22.)

       **(1)**     **The "Reference Process" Was So Shabby It
Demonstrates IP Acted In Reckless Disregard For The
Truth Of The Statements Published To SP**

The false information that Defendant IP provided to SP was the result of a hurried and
arbitrary process.  That process involved Defendant SP collecting references from IP officials
during "interviews" during which many references would be provided within a span of a few
hours, spending only a few minutes on each employee while covering at least six areas of
performance.  IP officials evaluated each Plaintiff's prior performance without much, if any
preparation or regard to the Plaintiffs' actual, documented performance over an average of 29
years.  A fact-finder could reasonably determine that IP's publication of the false information
about Plaintiffs was reckless because the IP officials gave specific, objective data to SP even
though they did not know anything material about the particular individual, and because the IP
officials ignored available, accessible, reliable and objective information, such as personnel
records, safety records, attendance records, and consultation with more knowledgeable

supervisors.  (*See, e.g.,* Caldwell Dep. at 14; Carmean Dep. at 30-31; Truster Dep. at  44-45;

Lopane Dep. at 20-21; McCoy Dep. at 28-31; Weiser Dep. at 39-44; Dunn Dep. at 11.)

 Moreover, to the extent the IP officials providing the references claim to have made an

attempt to obtain reliable information about Plaintiffs by meeting with Plaintiffs' immediate

supervisors, any such attempt was cursory at best.  These IP managers admitted that they only

conducted short meetings with direct supervisors, and that they reviewed up to 50 employees

during those meetings.  (*See, e.g.,* Caldwell Dep. at 14; McCoy Dep. at 31; Dunn Dep. at 10;

Weiser Dep. at 39-44.)  The IP managers took no notes at such meetings, resulting in the

inability to accurately provide information about the Plaintiffs to SP.  (Lopane Dep. at 20;

Schutte Dep. at 14-15; Truster Dep. at 44-46; Bokeno Dep. at 19-22; McCoy Dep. at 30-31;

Carmean Dep. at 31; Caldwell Dep. at 14; Thomas Dep. at 24-25.).  These IP managers then

relied wholly on memory during the interviews with SP, which required them to provide specific

information in at least six different areas about many employees, without ever referring to any

notes, company files, safety records, or attendance records.

 Plaintiffs have also established at least genuine issues of fact regarding whether the

references for 21 Plaintiffs were motivated by malice or ill-will.  (*See supra* at 18-19.)  Some of

the malice was clearly the result of anti-union animus, (*see, e.g.*, Duncan, Pl. Ex. 15, Durban, Pl.

Ex. 16, Sandlin, Pl. Ex. 36, Italiano, Pl. Ex. 27, Broughton, Pl. Ex. 8, McCreary, Pl. Ex. 31,

Fowler, Pl. Ex. 18, and McKay, Pl. Ex. 32,) while other IP managers were motivated by a spirit

of revenge for Plaintiffs' testimony against them or prior successful challenges to management's

decisions.  (*See, e.g.*, Isreal, Pl. Ex. 26, Jerry Combs, Pl. Ex. 13, and Brewer, Pl. Ex. 6.)  Some

managers simply expressed general hostility toward Plaintiffs.  (*See, e.g.*, Abner, Pl. Ex. 1,

Baylor, Pl. Ex. 2, and Cress, Pl. Ex. 14.)

Additional evidence of malice or recklessness includes the fact that many of the IP
managers who provided references later admitted that their defamatory statements about
Plaintiffs were not true.  (*See supra* at 4, fn 5.)  In fact, these managers provided false
information about Plaintiffs, knowing not only that their statements would likely cost Plaintiffs
employment opportunities with SP, but that employment at the mill was just about the only
employment available in Hamilton.  (*See, e.g.* Caldwell Dep. at 72 ("We [realized we] had
hundreds of peoples' lives in our hands with these interviews . . . I'm talking about the families
and everybody."); *id.* at 73 (acknowledging that it would be tough to find another job in the
current economy in Hamilton, Ohio, and that a job at the mill was a plum job for that
community); Lopane Dep. at 51-53 (acknowledging that he knew that SP would be basing hiring
decisions, at least in part, on the references he provided, that Plaintiffs' jobs at the mill were
important to them, and that they would have difficulty replacing these jobs if they lost them).)

Finally, Plaintiffs have established that at least some of the IP statements provided to SP
were known to be false at the time IP made the statements.  For instance, Richard Dunn admitted
that his statements that others disliked Patrick Durbin, that he was often in conflict with his
coworkers, and that Durbin was not knowledgeable about his job, were false.  (*Id.* at 23, 31.)
Similarly, Ted Von Bargen admitted that his statements that Everett Taulbee "dropped the ball,
was not dependable, and was not excellence oriented, were false.  (Von Bargen Dep. at 54-55.)
Also, Matthew Stevens admitted that he knew that McCreary had worked at the mill much
longer than two years, despite telling SP that he had been employed only two years.  (Stevens
Dep. at 21.)  Because Stevens, Dunn, Von Bargen, and others readily admitted that their

57

statements were false, they must have known at the time they provided these statements to SP

that they were false.    Plaintiffs have demonstrated at least a genuine issue of material fact exists

as to whether Defendant IP's conduct in publishing the false and defamatory statements to SP

was intentional, malicious, or reckless, rendering the waivers ineffective to shield Defendant IP

from liability for defamation.

   **3.  Any Privilege Attached To The False And Defamatory Statements Is Destroyed By Defendant's Reckless Disregard As To The Truthfulness Of The Statements.**

  Plaintiffs do not dispute that a qualified privilege exists with respect to the published

statements.  O.R.C. 4113.17 (B).[28]    However, any privilege is defeated due to Defendant IP's

intentional, malicious, and/or reckless publication of false and defamatory statements.  O.R.C.

4113.17(B)(1) (privilege is lost if plaintiff establishes by a preponderance of the evidence that

defendant (1) "disclosed particular information with the knowledge that it was false, with the

deliberate intent to mislead the prospective employer or another person, in bad faith, or with

malicious purpose" or (2) "the disclosure of particular information by the employer constitutes

an unlawful discriminatory practice described in section 4112.02, 4112.021 [4112.02.1], or

4112.022 [4112.02.2] of the Revised Code").

  In analyzing similar qualified privilege issues, the Ohio Supreme Court held that a

defamation plaintiff can defeat a qualified privilege by showing that defendant acted with

---

[28]  In 1996, the Ohio legislature codified the common law qualified privilege for employers in connection with job performance information released to prospective employers.  *See* O.R.C. § 4113.17; Ohio Employment Procedures Law § 5:8.  This codified privilege is the same common law privilege on which Defendant IP relies, and both are analyzed similarly.  Thus, Plaintiffs will provide one analysis to establish that Defendant IP cannot escape liability through its reliance on either the statutory or the common law qualified privilege.

reckless disregard for the truth of the defamatory statements. *Jacobs v. Frank*, 60 Ohio St.3d 111, 116, 573 N.E.2d 609, 614 (1991).[29] As noted by this Court in *Clanin v. North Am. Bulk Trans., Inc.,* 2003 U.S. Dist LEXIS 4156 (S.D. Ohio Jan. 22, 2003) (Pl. Ex. 47), in the defamation context, malice is established when a defendant makes a statement with knowledge that the statement is false or with reckless disregard for its truth. *Id.* at *10, citing *Smith v. Klein*, 23 Ohio App. 3d 146, 492 N.E.2d 852, 855 (Ohio Ct. App. 1985); *Constanzo v. Gaul*, 403 N.E. 2d 979, 983 (Ohio 1980). Factual issues, such as whether a qualified privilege was abused or exceeded, are for the jury. *Snyder v. Turk,* 90 Ohio App. 3d 18, 25, 627 N.E. 2d 1053, 1058 (Ohio App. Ct. 1993).

As discussed above in section IV(A)(2), Plaintiffs have presented a wealth of evidence which raises at least a genuine issue of material fact that Defendant IP gave false and defamatory references with knowledge of falsity, with malice or ill-will, or with reckless disregard for the truth of the statements. Therefore, any privilege is destroyed and summary judgment is inappropriate on these grounds.

> **4.    Plaintiffs Can Demonstrate That Under Ohio's Totality of Circumstances Test, The Defamatory Statements Were Actionable Statements of Fact.**

The Ohio Supreme Court, citing the United States Supreme Court's decision in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S.Ct. 2695 (1990), opined that there is no "wholesale defamation exemption for anything that might be labeled 'opinion,'" and "no special immunity or privilege is automatically granted to expressions of opinion." *Jacobs v. Frank*, 60 Ohio St.3d

---

[29]    Unlike the common law requirement that a plaintiff present clear and convincing evidence of recklessness to defeat a qualified privilege, ORC 4113.17 only requires a **preponderance of the evidence**.

111, 119, 573 N.E.2d 609, 617 (1991).   Opinion is not an automatic defense to defamation because "expressions of 'opinion' may often imply an assertion of objective fact" and "[e]ven if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact." *Id.*

The Ohio Supreme Court has adopted a totality of circumstances test to be used in order to distinguish opinion from fact in defamation claims. *Scott v. The News-Herald*, 25 Ohio St. 3d 243, 250, 496 N.E.2d 699, 706 (Ohio 1986).  The totality of circumstances test considers:  1) the specific language used; 2) whether the statement is verifiable; 3) the general context of the statement; and 4) the broader context in which the statement appeared.  *Id.*; *Vail v. The Plain Dealer Publishing Co.*, 72 Ohio St. 3d 279, 649 N.E.2d 182 at syllabus (1995).  This not a bright-line test.  *Scott*, 25 Ohio St. 3d at 250, 496 N.E.2d at 706.  *See also, Vail*, 72 Ohio St.3d at 282, 649 N.E.2d at 186.

All four factors of this test depend on a reasonable reader's perception of the statement and not on the intent of the publisher.  *McKimm v. Ohio Elections Comm'n.*, 89 Ohio St. 3d 139, 144-145, 729 N.E.2d 364, 371 (2000) (citing *Vail*, 72 Ohio St.3d at 282-283, 649 N.E.2d at 185-186).  In the instant matter, SP, the recipient of the statements, did, in fact, believe the statements to be those of fact and not opinion.  (Def. SP Mem. Supp. M.S.J. at 7, 9-10, 29.)

Evaluating the first factor in the totality of circumstances test, the court must examine the specific language used, focusing on the common meaning ascribed to those words by an ordinary reader.  *Vail*, 72 Ohio St.3d at 282, 649 N.E.2d at 186.  The inquiry must focus on "whether a reasonable reader would view the words used to be language that normally conveys information

60

of a factual nature or hype and opinion; whether the language has a readily ascertainable meaning or is ambiguous." *Id.* For example, in *Scott*, the Plaintiff-Appellant alleged he was defamed by being accused of the crime of perjury. 25 Ohio St. 3d at 251, 496 N.E.2d at 707. While the Court noted that no express statement that the plaintiff had committed perjury was published, it nevertheless determined that the clear impact of the statements was that the plaintiff had lied under oath. *Id.* The Court determined that the published language would have been an actionable statement of fact, if based solely on the first step in the totality of the circumstances analysis. *Id.*

In this case, the specific language used was clear and precise in every case. The common meaning of the words is not difficult to ascertain. The precise defamatory statements are discussed in detail in the attached appendices. For instance, the ratings assigned to each employee on the reference check corresponded to a statement of fact regarding the employees' skills and performance, such as:

- Not only lacks knowledge, but detracts from the pool of knowledge. Causes more problems than makes contributions.

- Causes others to make mistakes. Detracts from others' work as well as doing poor work.

- Interferes with others getting work done.

- Often absent or tardy. Detracts from team dependability. Subtracts value. Is contemptuous of and disregards behavioral expectations. Instigates trouble.

- Instigates conflict and problems; is uncooperative and encourages others to be uncooperative.

- A safety hazard for others. Contemptuous of safety rules.

(*See, e.g.* Applicant Reference Check for Patrick Durbin at SPC 344-345.) Clearly, the common

meanings of the specific language used to define these ratings would lead an ordinary reader to interpret these statements as statements of fact rather than hype and opinion.

The same is true of the additional statements the IP managers made. The following examples illustrate the specificity and clarity of the language used. For example, Defendant IP's Manager, Robert Caldwell, stated that Plaintiff Wayne Bennett had "poor skills, unwilling to learn." (Pl. Ex. 3 at Applicant Reference Check for Wayne Bennett at SPC 093.) Tom Weiser stated that Plaintiff Barry Broughton was "an instigator-argumentative." (Pl. Ex. 8 at Applicant Reference Check for Barry Broughton at SPC 175.) John Truster stated that Plaintiff Charles Campbell "has had conflicts with others . . . stirs up issues." (Pl. Ex. 10 at Applicant Reference Check for Charles Campbell at SPC 206.) The common meaning of the language used in these examples and all other defamatory statements clearly and unambiguously indicate to an ordinary reader that Plaintiffs *are* employees with poor performance records and undesirable work habits. Thus, the first factor of the totality of the circumstances test clearly weighs in favor of finding these statements actionable statements of fact.

The second factor of the totality of the circumstances test examines whether the statement is verifiable. *Scott*, 25 Ohio St. 3d at 251, 496 N.E.2d at 707. The *Scott* court recognized that if the publisher represents that he has first-hand knowledge substantiating his statements, expressions of opinion become as damaging as assertions of fact. *Id.* (citing *Hotchner v. Castillio-Puche*, 551 F.2d 910, 913 (2nd Cir. 1977)). Conversely, where a statement lacks a plausible method of verification, the *Scott* court noted that a reasonable reader will not believe that the statement has a specific factual content. *Id.* at 251-252, 496 N.E.2d at 707 (citing *Ollman v. Evans*, 750 F.2d 970, 979 (D.C. Cir. 1984)). The *Scott* court found that whether or not the

plaintiff had indeed perjured himself was verifiable.  *Id.*

In this case, IP's statements are all easily verifiable through an examination of Plaintiffs' personnel records, attendance records, safety records and information from their immediate supervisors.  Even if some of the statements could be interpreted as opinion, the fact that IP represented to SP that it had first-hand knowledge of all the facts behind the summary statements implied to SP that the statements could be substantiated.  Thus, based on their damaging nature, these statements should not be protected, and the second factor of the totality of the circumstances test dictates that the statements be categorized as actionable statements of fact.

The third factor of the test requires an examination of the general context of the statement. In *Scott*, the court noted that cautionary terms place a reader on notice that what is being read is the opinion of the writer.  *Scott*, 25 Ohio St. 3d at 252, 496 N.E.2d at 707.  Terms such as "in my opinion" or "I think" are suggestive of opinion.  *Id.*  In the *Scott* case, the alleged defamatory language appeared in a newspaper article in which a large caption stated "TD [the author] says," indicating to even the most gullible reader that the article was, in fact, opinion.  *Id.*  In *Vail*, the court evaluated whether the subject newspaper column used objective statements of fact or subjective hyperbole.  72 Ohio St.3d at 282, 649 N.E.2d at 186.  Moreover, the *Vail* court noted that the general tone of the column was sarcastic, indicating persuasive rather than factual reporting, and that the column was preceded by the work "Commentary."  *Id.*

In this case, IP presented the statements with no "language of apparency."  None of the statements were prefaced with qualifiers such as "I think" or "in my opinion," or "in the opinion of Richard Dunn."  Nothing on the reference check document gave any indication that the expressions were merely the opinion of the IP manager.  The reader therefore had no indication

whatsoever that these statements were opinion.  The absence of any such indication weighs in favor of finding these remarks statements of fact.

The fourth and final factor to be evaluated under the totality of the circumstances test requires an examination of the "broader context in which the statement appeared." *Scott*, 25 Ohio St. 3d at 250, 496 N.E.2d at 706.  With respect to alleged defamatory statements in a newspaper article, the court examined the type of article and its placement in the newspaper, and how those factors would influence the reader's viewpoint on the question of fact or opinion.  *Id.*; *Vail*, 72 Ohio St.3d at 282, 649 N.E.2d at 185.

In this case, IP published the statements to SP as employment references.  SP believed the references were based upon "objective data" from IP, which was a reflection of the individual's actual performance on the job, and were "of course" true.  (Weissman Dep. at 109, 125-126.) Further, SP expected that these were statements of fact had been validated with information contained in employees' personnel, attendance and safety records, and had been based on the observations of their immediate supervisors.  (Moore Dep. at 16-17.)  No reasonable reader would interpret these statements, based on the context of an employment reference, as mere hyperbole or opinion. Therefore, the fourth and final factor of the totality of the circumstances test also supports the conclusion that the statements made were statements of fact and not opinion.

The Plaintiffs have presented a wealth of evidence which demonstrates that the false and defamatory statements were statements of fact under all four factors of Ohio's totality of circumstances test.  The specific language IP used was clear and precise.  The statements were easily verifiable through an examination of the Plaintiffs' personnel records.  Finally, both the general and broader contexts in which IP made the false and defamatory statements are clearly

fact as opposed to opinion.  Indeed, the recipient of the statements, SP, believed that the

statements were statements of fact.  Thus, all four factors of the totality of circumstances test

weigh in favor of finding that IP's false and defamatory statements were statements of fact.

> **B.    Plaintiffs Have Raised A Genuine Issue Of Material Fact Regarding Their Claims For A WARN Violation, Rendering Summary Judgment Inappropriate On This Issue.**

This litigation arose out of the sale of the paper mill located in Hamilton, Ohio previously

owned by Defendant IP to Defendants Sun Capital Partners and SP.  As result of this sale, all

employees of IP were terminated and were required to apply to SP for new employment.  (Letter

from IP to IP Employees dated 1/8/01, Pl. Ex.)  Some former employees of IP did not receive

offers of employment by Defendant SP after their termination by Defendant IP.  In January, 2001,

all employees of the Hamilton Mill received a letter from IP, informing them of the sale, their

expected termination from IP, and SP's application process, dated January 8, 2001.  (*Id*.)

This letter did not contain a precise date as to when the mill was to be shut down and mass

terminations were to occur.  Joe Bergeron, who is currently Paper Manufacture Manager for

Defendant SP, testified that, although he heard rumors from supervisors about interested buyers at

the end of 2000, he was not informed of his anticipated termination and the application process to

be hired as an SP employee until approximately one month before the mill closed and employees

were terminated.  (Bergeron Dep. at 11-12.)

Milton Lewis, Vice President and General Counsel for Defendant SP, testified that he

participated in the exiting process that took place as a result of the mass termination.  (Lewis Dep.

at 43.)  Lewis did not know of any published material distributed to IP employees that named a

precise date on which the Hamilton Mill would close and the mass termination would take effect.

(*Id.* at 45.)  Additionally, before the mass termination, IP employed approximately six hundred-plus hourly and 100-plus salaried employees.  (*Id.* at 50.)  After the closing of the Hamilton Mill, Defendant SP employed approximately 374 hourly and 62 salaried employees.  (*Id.* at 49-50.) Lewis referred to the event on February 9, 2001 as a "closing." (*Id.* at 44, 45.)

Two other witnesses articulated similar conclusions.  Deryl Couch, Senior Vice President and General Counsel for Defendant Sun Capital Partners, testified that "the mill was opened sometime after the transaction closed because International Paper closed the mill prior to the acquisition." (Couch Dep. at 83.)  Couch further testified that he had "knowledge that the plant was closed." (Couch Dep. at 93.)  When asked to clarify this testimony Couch testified that the "operations at the Hamilton Mill ceased." (Couch Dep. at 144-145.)  Dan Maheu similarly testified that "the mill shut down on Friday [February 9, 2001] and then we began to make product again on Wednesday." (Maheu Dep. at 158.)

### 1.    The WARN Act

The responsibilities of an employer who closes a plant or engages in a mass layoff are simple and clear.  The employer must provide written notification of the closing 60 days before the expected termination occurs.  29 U.S.C. § 2102(a).  The written notification must include, *inter alia*, the expected date of the closing or termination.  *Id*.

This Court, in its Order of March 25, 2003, has already held that the facts alleged in Plaintiffs' Complaint, if established, create liability pursuant to the WARN Act as a matter of law. (Docket No. 64, Order at 20).  Thus, if Plaintiffs can establish a genuine issue of material fact that the plant closed or that more than 50 and 1/3 of the workforce were terminated, and that those employees did not receive adequate, timely, written notice informing them of the expected date of

the termination, the Court cannot grant summary judgment in favor of Defendant IP.

> **2.    Plaintiffs have established a question of fact as to whether the Hamilton Mill closed within the meaning of the WARN Act.**

The facts of this case clearly establish, at the very least, a question of fact as to whether IP closed the Hamilton Mill.  A "plant closing" is defined as:

> The permanent or temporary shutdown of a single site of employment, or one or more facilities or operating units within a single site of employment, if the shut down results in an employment loss at the single site of employment during any 30-day period for 50 or more employees excluding any part-time employees.

29 U.S.C. § 2102(a)(2).  Further, an "employment loss" is defined as:

> (A) an employment termination, other than a discharge for cause, voluntary departure, or retirement, (B) a layoff exceeding 6 months, or (C) a reduction in hours of work of more than 50 percent during each month of any 6-month period.

29 U.S.C. § 2102(a)(6).

IP itself referred to the plant as closing in the "Guidelines For International Paper Exit Process" issued to its employees.  (Pl. Ex. 50.)  "It is expected that the actual *close* date will be known a few days in advance."  (*Id.* (emphasis added).)  Lewis referred to the plant as closing when describing IP's exit process.  (Lewis Dep. at 45.)  In describing SP's acquisition of the Hamilton Mill, Couch testified that IP "closed the mill prior to the acquisition."  (Couch Dep. at 83.)  Couch, in fact, testified that he had personal "knowledge that the plant had closed."  (*Id.* at 93.)  The fact that IP and SP leaders and corporate officers believed that mill had closed clearly demonstrates that a reasonable juror could determine the Hamilton Mill shut down on February 9, 2001.

Even without this compelling evidence and testimony, the facts before the Court

67

demonstrate a reasonable jury could conclude that the Hamilton Mill shut down was a plant closing as contemplated by the WARN Act.  The Fourth Circuit in *United Mine Workers of Am. v. Martinka Coal Co.*, 202 F.3d 717, 723-25 (4th Cir. 2000), affirmed the decision of the district court in a case analogous to this case.  In determining that the coal mine in question had closed down within the meaning of the WARN Act, the court relied, at least in part, on the fact that production at the mine had stopped.  *Id.* at 724.   The court in *Pavao v. Brown & Sharpe Mfg. Co.*, 844 F. Supp. 890, 896 (D. RI 1994), relied on the Code of Federal Regulations provision that an "employment action that results in the effective cessation of production or the work performed by a unit, even if a few employees remain, is a shutdown." Id. (citing 20 C.F.R. § 639.3 (b)). Moreover, the definition of "close" is to "suspend or stop operation." BLACKS LAW DICTIONARY 254  (6th Ed. 1990).

It is undisputed that the mill ceased operation on February 9, 2001.  When Couch was asked to clarify his testimony regarding the plant closure, he answered  that operations at the Hamilton Mill ceased.  (Couch Dep. at 144-145.)  Maheu testified that the "mill shut down on Friday and then we began to make product again on Wednesday."  (Maheu Dep. at 158.)

It is also undisputed that more than 50 employees permanently lost their jobs as a result of the mill closure.  In fact, at least 226 hourly employees lost their jobs.  (Lewis Dep. at 49-50.) Thus, the shut-down resulted in an employment loss for 50 or more employees, triggering the notice requirements of the WARN Act.

Alternatively, Plaintiffs can establish a WARN violation by demonstrating that the terminations from the mill constitute a "mass layoff."  According to the Act, a "mass layoff" means:

a reduction in force which--

(A) is not the result of a plant closing; and

(B) results in an employment loss at the single site of employment during any 30-day period for--

      (i)    (I) at least 33 percent of the employees (excluding any part-time employees); and

            (II) at least 50 employees (excluding any part-time employees); or

      (ii) at least 500 employees (excluding any part-time employees).

29 U.S.C. § 2101(3).

According to the sworn testimony of Milton Lewis, the sale of the mill resulted in termination of at least 264 employees, out of a total of more than 700 employees.[30] (Lewis Dep. at 49-50.) Because this is more than 1/3 of the workforce at the mill, and substantially more than 50 employees, the notice requirement of the WARN Act were triggered.

> **3.** **Plaintiffs have established a genuine issue of material fact regarding whether Defendant IP failed to provide proper notice.**

Proper notice pursuant to the WARN act requires that the written notice to employees contain the following information:

    (1)    The name and address of the employment site where the plant closing or mass layoff will occur, and the name and telephone number of a company official to contact for further information;

    (2)    A statement as to whether the planned action is expected to be permanent or temporary and, if the entire plant is to be closed, a statement to that effect;

---

[30]    Any statistics Defendant IP may attempt to present to rebut these numbers simply creates an issue of fact regarding whether the statutory definition of "mass layoff" has been met. Therefore, a jury must determine whether the definition has been satisfied, and summary judgment must not be granted.

(3)    The expected date of the first separation and the anticipated schedule for making separations; and

(4)    The job titles of positions to be affected and the names of the workers currently holding affected jobs

20 C.F.R. § 639.7(c). If an employer fails to provide 60 days notice before the plant closing, it is liable for back pay, lost benefits, civil penalties, and attorneys' fees. 29 U.S.C. § 2104.

IP failed to provide this notice. Defendant IP did not inform Plaintiffs in writing of the closing of the Hamilton Mill and the consequential mass termination until the letter sent to them dated January 8, 2001. (*See* Bergeron Dep. at 11-12; Lewis Dep. at 45; Pl. Ex. 49.) Even that letter failed to comply with the WARN Act, because it was not issued 60 days or more before the closing, and because Plaintiffs were not informed of the expected date of the closing and employment terminations. Thus, any notification that IP did provide was too little, too late. A reasonable jury could find IP liable for this failure.

**4.    Defendant IP cannot use the sales exception to the WARN Act to escape liability for its failure to provide WARN Act notice.**

Finally, Defendant has not demonstrated as a matter of law that its responsibility to provide written notification transferred to SP as a result of the sale of the Hamilton Mill. This is true for two reasons. First, IP agreed that it was responsible for fulfilling this obligation in the Asset Purchase Agreement between Champion International Corporation and Smart Papers LLC dated December 29, 2000. (Pl. Ex. 44 at 17.) The relevant language in the agreement states that:

> in respect of notices and payments relating to events occurring on or prior to the Closing, Seller shall be responsible and assume all liability for any and all notices, payments, fines or assessments due to any government authority, pursuant to any applicable federal, state or local law, common law, statute, rule or regulation with respect to the employment, discharge or layoff of employees by the Seller as of or before the Closing, including but not limited to the

70

> [WARN Act] and any rules or regulations as have been issued in
> connection with the foregoing [WARN Act].

(*Id.*)  This language clearly demonstrates that IP and SP intended for IP to retain any liability

pursuant to the WARN Act, up to and including the closing date of the sale.

    More importantly, this Court has already explicitly rejected IP's attempt to escape liability

in its Order denying Defendant IP's Motion to Dismiss.  In its Motion to Dismiss, IP argued that

its employees  did not suffer an employment loss, even though they were terminated by IP, until

SP made the decision not to hire them.  In making its argument, IP relied on the 29 § U.S.C. 2101

(b)(1).  This Court has rejected IP's  argument, determining that it "stretches this [above]

exclusion too far."  (Docket No. 64, Order at 19.)  The Court based its rejection on its conclusion

that § 2101(b)(1) was intended to foreclose claims "based on mere technical terminations of

employment where plant employees simply change employer." (*Id.*)  This, as the Court noted, is

clearly not the case here.  (*Id.*)  The terminations Plaintiffs suffered were anything but technical;

their employment was permanently terminated and they became unemployed.  The Court

correctly concluded that IP's interpretation "excludes from the Act's coverage employees who

suffered actual loss of employment when it is clear that the exclusion was meant to apply only to

employees who transferred employment." (*Id.*)  This Court thus concluded that "the duty to give

notice [to employees] never shifted to Smart Papers." (*Id.* at 20).  Defendant is therefore liable

for its failure to properly notify Plaintiffs of the mass layoff and plant closing resulting in their

termination on February 9, 2001 and Defendant cannot transfer that responsibility on another

party.

    Plaintiffs have, at the very least, established a genuine issue of material fact regarding

their WARN Act claims against Defendant IP.   IP terminated all its employees on February 7 and

8, ceased production, and shut down the mill on February 9, 2001, the effective date of the sale. (Couch Dep. at 83, 93, 145; Maheu Dep. at 158 ).  As a result, many more than 50 IP employees, and at least 1/3 of the workforce, suffered an employment loss on or before February 9, 2001. Therefore, under the plain language of the statute, and as held by this Court in its prior Order, Defendant IP, as employer, was responsible for providing notice of the plant closing up to and including the effective date of the sale pursuant to WARN.  29 U.S.C. § 2101(b)(1).  Defendant IP therefore had the duty to provide written notification, including an expected date of the actual shut down, to affected employees 60 days prior to the expected date of the shut down.   Defendant IP failed to do so and is thus liable to Plaintiffs for 60 days of back pay and benefits, and attorney's fees.

## V.    <u>CONCLUSION</u>

Plaintiffs have established a genuine issue of material fact as to their WARN Act and defamation claims.  Therefore, for all of the foregoing reasons, Plaintiffs respectfully request that Defendant IP's Motion for Summary Judgment be denied regarding their defamation and WARN Act claims.

Respectfully submitted,


_____/s/ Randolph H. Freking_____

Randolph H. Freking (0009158)
Sheila M. Smith (0065115)
George M. Reul, Jr. (0069992)
FREKING & BETZ
Trial Attorneys for Plaintiffs
215 East Ninth Street
Fifth Floor
Cincinnati, OH  45202
(513) 721-1975

73

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 31, 2003, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system and copies will be mailed via U.S. Mail to those parties who are not served via the Court's electronic filing system.  Parties may access this filing through the Court's system.  Exhibits that are being manually filed are being hand delivered to local counsel for Defendant IP, and by overnight mail to counsel for Defendants Sun and SP, this 31st day of October, 2003.


   /s/ Randolph H. Freking

74