# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

|  |  |  |
|---|---|---|
| ELMER CAMPBELL, et al., | : | Case No. C-1-01-527 |
|  | : | J. Beckwith; Mag J. Hogan |
| Plaintiffs, | : |  |
|  | : |  |
| v. | : | **PLAINTIFFS' CONSOLIDATED** |
|  | : | **MEMORANDUM IN OPPOSITION** |
| INTERNATIONAL PAPER, | : | **TO DEFENDANT SMART PAPERS'** |
| SUN CAPITAL PARTNERS, INC. | : | **MOTION FOR SUMMARY** |
| SMART PAPERS | : | **JUDGMENT** _____ |
|  | : |  |
| Defendants. | : |  |

Randolph H. Freking (0009158)
Kelly Mulloy Myers (0065698)
George M. Reul, Jr. (0069992)
FREKING & BETZ
Trial Attorneys for Plaintiffs
215 East Ninth Street
Fifth Floor
Cincinnati, OH  45202
(513) 721-1975

## TABLE OF CONTENTS

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      A.    According to SP, Each Plaintiff Applied for Employment With SP Generally, Not
            For A Specific Job . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      B.    Each Plaintiff Was Well Qualified For Employment At The Mill, Given That
            Each Had Worked An Average Of 29 Years In The Mill           . . . 7

      C.    SP Knew That Each Plaintiff Had Been Held To A High Level Of Performance
            By Defendant IP                     . . . . . . . . . . . . . . . . . . . . . . . 7

      D.    SP Used The Same The Qualifications To Work At The Mill That IP Used  . . . . 9

      E.    SP Obtained Demographics Of IP Applicants On January 17, 2001 From IP
            Before It Implemented A Hiring Process                     . . . 10

      F.    The Hiring Process That Disqualified Plaintiffs was Flawed And Allowed SP to
            Disqualify Predominantly Older Applicants . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            1.    Stereotyping . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            2.    Drug Testing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

            3.    The Reference Checks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

            4.    Willful Age Discrimination Evidence . . . . . . . . . . . . . . . . . . . . . . . . . 15

      G.    SP Rejected Plaintiffs For Employment And Instead Hired Younger, Less
            Qualified IP Employees                     . . . . . . 15

      H.    Eight Plaintiffs Were Offered Jobs By SP But Were Discriminatorily Placed Into
            Inferior Positions Than Younger, Less Qualified Employees          . . . . . 16

      I.    When SP Denied Each Plaintiff A Job Offer, It Was Still Had Almost 100
            Openings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

            1.    While It Was Still Looking For Employees, And Plaintiffs' Applications
                  Were Still "Active," SP Admits That It Requested And Obtained Data
                  From IP About Plaintiffs' Dates of Birth For Which It Had No Legitimate
                  Need . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

i

2.    SP Ignored Its Promise to Keep Applications Active For Six Months And, Instead, "Dumped" Plaintiffs' Applications . . . . . . . . 18

3.    SP Hired 113 Applicants Less Qualified Individuals "Off The Street"- Who Were Under The Age of 40 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

4.    All Of The "Off The Street"Hires Needed Substantial Training And Plaintiffs Needed No Training . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

5.    SP Hired Applicants "Off the Street" With Convictions for Drug Possession, DUI, Manslaughter, Robbery, Shoplifting and Assault . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

6.    Before Offering Jobs To The "Off The Street" Hires, SP Obtained Age Information On The Applicants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

7.    SP Did Not Check References For The Younger, "Off The Street" Hires . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

IV.    SUMMARY JUDGMENT STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

V.    LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

A.    Each Plaintiff Has Sufficient Evidence To Raise A Genuine Issue Of Material Fact As To Their Claims Of Age Discrimination . . . . . . . . . . . . . . . . . . . . . . 25

1.    Defendant Cannot, And Does Not, Dispute That Each Plaintiff Is A Member Of The Protected Class, Thus Establishing The First Element of The *Prima Facie* Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

2.    Each Plaintiff Applied For And Was Qualified For A Job For Which Defendant Was Seeking Applicants, Establishing The Second Element Of The *Prima Facie* Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

3.    It Is Undisputed That Each Plaintiff Was Considered For And Denied Employment With Defendant, Thus Establishing The Third Element Of The *Prima Facie* Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

4.    Each Plaintiff Can Establish The Fourth Element Of The *Prima Facie* Case Because Positions Remained Open And Defendant Continued To Seek Applicants, Hiring Younger Individuals Who Were Objectively Less Qualified Than Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

a.    All Applicants to SP Were Considered for Employment At The

ii

Mill Generally And Not For Any Particular Position.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

b.    Defendant Hired 113 Younger Employees After It Rejected
Plaintiffs' Employment For The Same Positions Denied To
Plaintiffs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

c.    Defendant's Reliance On The Language In The EEOC Charge Is
Without Merit, But, At Most, Creates An Issue Of Fact With
Respect To The Positions Applicants Sought . . . . . . . . . . . . . . 34

d.    The Plaintiffs Applied For Jobs With The Understanding From
Defendant That Their Applications Would Remain Active For At
Least Six Months . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

e.    Plaintiffs Did Not Need To Submit A Second Application Under
McDonnell Douglas and Its Progeny . . . . . . . . . . . . . . . . . . . . . 37

f.    Smart Paper's Centerpiece Argument - Its Alleged "Statistics"- Is
Fundamentally Flawed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

    (1)    Defendant's "Statistics" Contradict Earlier Information
    Produced by Defendant in Discovery . . . . . . . . . . . . . . . 38

    (2)    An Examination Of Accurate Data Of Defendant's Hiring
    Process Reveals That Defendant Substantially Reduced
    The Number of Older Workers At The Hamilton Mill,
    While Increasing The Number of Younger Workers . . . 39

5.    Each Plaintiff Can Demonstrate That Genuine Issues Exist As To Whether
The Articulated Reasons For Rejecting Their Employment Are A Pretext
For Unlawful Age Discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

a.    Defendant SP's Reliance On The Negative Reference Checks Is
Not Shielded By The Business Judgment Rule . . . . . . . . . . . . . 42

b.    Each Plaintiff Can Demonstrate That The Alleged Poor Reference
Was Insufficient To Motivate The Decision Not To Hire The
Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

    (1)    The Hiring Process With Respect To Plaintiffs Was A
    Sham And Designed To Eliminate As Many Older
    Employees From The Workforce As Possible . . . . . . . . 48

    (2)    Plaintiffs Have Produced Evidence That Defendant
    Engaged in Age Stereotyping In The Interview And
    Reference Selection Process                    . 49

iii

(3)    Plaintiffs Have Presented Evidence That The Successful Candidates Were So Much Less Objectively Qualified Than Plaintiffs As To Establish Pretext . . . . . . . . . . . . . . 50

(4)    The Sufficiency Of Defendant's Articulated Reason For Failing To Hire Plaintiffs Is Destroyed By The Fact That The 113 Younger Off The Street Hires Received Extensive Training . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

c.    Alternatively, Each Plaintiff Has Demonstrated SP's Hiring Decisions Were Illegally Motivated . . . . . . . . . . . . . . . . . . . . . . 57

d.    Plaintiffs' Data Also May Raise An Issue As To Pretext As There Is Evidence That The Age Of The Workforce Dramatically Dropped After SP Acquired The Mill . . . . . . . . . . . . . . . . . . . . . 57

e.    Each Plaintiff Who Failed The Drug Screen Can Establish Defendant's Articulated Reason For Rejecting Their Employment Was Pretext For Unlawful Age Discrimination . . . . . . . . . . . . 58

(1)    Plaintiffs Can Demonstrate That Applicants Who Had Serious Criminal Offenses, Including Drug Possession, Were Hired, Thus Establishing Pretext . . . . . . . . . . . . . 58

(2)    The Methodology Used In Drug Testing Plaintiffs Is So Suspect As To Destroy Its Purported Legitimacy As A Reason To Reject Plaintiffs For Employment . . . . . . . . . 60

f.    Eight Plaintiffs Were Discriminated Against On Account of Their Age Because Substantially Younger Employees Were Preferred When Defendant Smart Papers Made Job Assignments. . . . . . . . 62

(1)    Defendant Smart Papers preferred substantially younger, less qualified employees of International Paper to Elmer Campbell, and Campbell was constructively discharged from Smart Papers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

(2)    Defendant Smart Papers preferred younger, less qualified employees of International Paper to Alfred Holland, and Holland was constructively discharged from Smart Papers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

(3)    Defendant Smart Papers preferred younger, less qualified employees of International Paper to Govan Begley, and Begley was constructively discharged from Smart Papers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

(4)     Defendant Smart Papers preferred younger, less qualified employees of International Paper to Raymond Arthur, and Arthur was constructively discharged from Smart Papers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

(5)     Defendant Smart Papers preferred younger, less qualified employees of International Paper to Floyd Geeding, and Geeding was constructively discharged from Smart Papers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

(6)     Defendant Smart Papers preferred younger, less qualified employees of International Paper to Sonja Greene. . . . . . 73

(7)     Defendant Smart Papers preferred younger, less qualified employees of International Paper to William Rumpler.   . 74

(8)     Defendant Smart Papers preferred younger, less qualified employees of International Paper to Richard Hess. . . . . . 75

VI.     CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

I.    **INTRODUCTION**

In this "failure to hire" case, Defendant Smart Papers' ("SP") Motion for Summary Judgment with respect to each Plaintiffs' individual claims of age discrimination should be denied. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

After Plaintiffs had the opportunity to conduct discovery and review Defendants' Motion for Summary Judgment, Plaintiffs have determined that there are not sufficient issues of fact to oppose summary judgment with respect to their claims of defamation against SP.  In addition, Plaintiffs do not oppose the Motion with respect to their individual claims of disability discrimination.  Further, in regard to the individual Plaintiffs who failed to appear for depositions (Kenneth Fisher, John Gumm, George Jackson, John Parsley, David Ratliff, and James Whitaker), Plaintiffs' counsel believes a dismissal of their claims is appropriate.

With respect to Plaintiffs' remaining claim against SP alleging age discrimination, each Plaintiff has presented an abundance of evidence which raises at least a genuine issue of material fact regarding their claims, and summary judgment should therefore be denied.

II.    **SUMMARY**

In its Motion, SP chooses to side-step or ignore the critical evidence obtained by Plaintiffs after months of obstruction by SP, and only after this Court issued three discovery rulings against SP on the same issue.  The critical evidence obtained by Plaintiffs reveals what Plaintiffs <u>suspected about</u> persons hired by SP to meet its need for approximately 475 hourly employees to operate the Hamilton Mill:

> •    Although SP used the same hiring qualifications to work at the Mill than IP used, SP screened former IP employee applicants with more scrutiny than it screened other applicants because SP knew IP had employed a predominantly older workforce, and SP indicated a preference in December, 2000 and January, 2001 not to hire this older workforce.[1]  After SP continued its hiring process, the

---

[1]    SP rejected IP's initial recommendation to hire the entire workforce; instead, SP agreed, albeit reluctantly, to a penalty if it hired less than 219 employees.

workforce changed substantially, since SP hired predominately younger individuals after rejecting older Plaintiffs:

### Age Distribution of the Workforce

| Employees' Ages | 2/1/01 (Before SP) | 2/9/02 | Change |
|---|---|---|---|
| 50 + | 280 | 219 | -61 |
| 40-49 | 247 | 160 | -87 |
| 30-39 | 39 | 52 | +13 |
| 18-29 | 9 | 38 | +29 |
| Totals | 575 | 469 | -106 |

Average Age of Workforce 2/1/01:  49.1
Average Age of New Hires After 2/9/01: 38.1 years  (Exhibit 59)

•     SP's "statistical" analysis of its decisions provided to the Court are inaccurate, contradictory, and misleading, and thus should not be considered.[2]

•     The decline in older employees is a result of SP's decision not to hire older workers who had worked at the Hamilton Mill an average of 29 years, and to instead recruit younger employees who were not qualified and needed substantial training.

•     SP treated younger applicants after February 9, 2001 differently than Plaintiffs *e.g.*, e.g., it even hired applicants with drug, DUI, manslaughter, and other felonies; (*See* p. 58-59, *infra*);

•     The 72 Plaintiffs were more objectively qualified than the younger, less experienced former IP employees who were hired by SP:

---

Although SP determined that it needed at least 475 employees, it hired only 400 of the 550 plus applicants who had worked at the Mill.

[2]     SP only provides statistics related to its hiring decisions before February 9, 2001, even though the process continued unabated after SP took control of the Mill from Defendant International Paper ("IP") until early 2002. SP told Plaintiffs that their applications would remain "active" for six months. There is no dispute that positions remained available. Moreover, the seminal failure-to-hire case and its progeny allow Plaintiffs to compare themselves with younger persons who were hired after Plaintiffs. *McDonnell Douglas Corp. v. Green*, *supra*.

1)    The Plaintiffs have an average of 15 more years of experience than younger IP employees hired, (compare Exhibits 60 and 61);

2)    While no Plaintiff had less than 17 years experience at the Mill (and an average of 29 years), at least 24 younger IP employees hired had less than three years of experience at the Mill and the younger IP employees averaged just 14 years of Mill experience, (id.);

• SP did not make offers to 64 Plaintiffs even though it knew it had between 50 and 100 job openings at the time;

• The 64 Plaintiffs denied employment by SP (for consideration for any job) had an average age of 51, and an average length of service in the Hamilton Mill of 29 years, (Exhibit 60.);

• 113 individuals hired "off the street" by SP were under the age of 40, 77 of those 113 had no prior experience in the paper mill industry (let alone at the Hamilton Mill), most had relatively little work experience, and all of them needed to be trained in order to work at the Mill, (Ex. 62);

• Throughout the hiring process, SP discriminated against older workers by inaccurately stereotyping many of them as "inflexible" and "unwilling to learn new things;"

• The older Plaintiffs received average scores of 2.7 (on a scale of 1-5) on "willingness to learn" (Exhibit 60);

• The younger IP employees hired received average scores of 3.8 on "willingness to learn" (Exhibit 61);

• SP sought information related to "off the street" applicants' ages, without justification, according to its Senior Human Resources Official,  (See p. 17, infra);

• The Plaintiffs not offered jobs – even the 18 Plaintiffs whose drug test results allegedly showed that they had used a prohibited substance sometime in the past (based upon a test that is controversial at best in terms of acceptance for use in employment screening process) – are more objectively qualified than any of the younger individuals hired "off the street" by any measure, (compare Exhibits 1-58 and Ex. 60 with Ex. 62);

3

and

- The 8 Plaintiffs offered employment with SP were discriminated against on account of age because SP gave preferential assignments to younger employees, resulting in the constructive discharge of 5 of the employees offered jobs.  (*See* p. 62-75, *infra*.)

When deciding a Rule 56 motion, "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe."  *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 151 (2000).  "That is, the court should give credence to the evidence favoring [Plaintiffs] as well as that evidence supporting [Defendant] that is *uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses*."  *Id.* (emphasis added).

While Defendant can certainly try to convince a jury that younger, less experienced former IP employees and younger, less qualified individuals hired off the street with virtually no prior experience were somehow more qualified than the Plaintiffs it rejected, there are compelling - let alone genuine - issues of material fact that preclude summary judgment in SP's favor.

## III.  <u>STATEMENT OF FACTS</u>

Defendant IP, the parent of Champion International Corporation ("Champion"), placed the "for sale" sign on the Hamilton Mill and began negotiations with investors, who later created SP on December 12, 2000.  (Couch Dep. at 43, 54, 55.)  An Asset Purchase Agreement was signed on or about December 29, 2000.  (IP Pl. Ex.[3] 44.)  That Agreement envisioned a closing

---

[3]    Plaintiffs' Exhibits are compiled twos sets of Appendices, one set in support of Plaintiffs' Memorandum opposing Defendant IP's Motion, and another set in support of this Memorandum.  Both sets of Appendices are being manually filed concurrently with this Memorandum.  "IP Pl. Ex." refers to an exhibit contained in the Appendix volumes relating to Plaintiff's IP brief, and "Ex." refers to exhibits contained in the Appendix volumes supporting this brief.

on the transaction at least within 61 days.  (*Id*. at 68.)  Once conditions in Articles IX and X were satisfied or waived, the parties expected a closing to occur "as soon as practicable thereafter." (*Id*. at 13.)  The December 29 Agreement also provided that "all of the employees of the [Hamilton Mill] shall be terminated by the Seller."  (*Id*. at 16.)

Defendant SP determined that it needed a workforce of approximately 450 employees to operate the Mill.  (Maheu Dep. at 39-40, 94, 120-122.)  SP designed a hiring process in January, 2001 that would provide an "excuse" for SP not to offer jobs to a large number of older, qualified IP employees, even if it meant that SP would then have to recruit and train inexperienced younger individuals to operate the Mill.  The primary players in the initial decision-making process were Mary Rita Weissman and Dan Maheu, whom SP hired to obtain an initial workforce for SP.  (*See* Def. SP Mem. Supp. M.S.J. at Ex. 1 at ¶ 8; Ex. 2 at ¶4.)  Steve Liff is a Vice President with Sun Capital and SP.  (Couch Aff. ¶ 11.)  He is also on the Board of Managers for SP.  Liff negotiated the purchase of the Mill and hired Weissman and Maheu.  (*Id*.; Weissman Dep. at 19.)  He worked closely with Maheu and Weissman to develop the hiring process that SP used to deny Plaintiffs jobs.  (Weissman Dep. at 37.)

The SP plan worked, albeit unlawfully.  SP refused employment to 143 former IP employee applicants over the age of 40.  At least 118 of those were rejected over 45, and a least 72 were over 50.  (Ex. 59, 63.)  The 64 Plaintiffs[4] who rejected and the eight Plaintiffs to whom SP offered inferior jobs were more qualified to work at the Mill than the younger IP applicants hired and the younger applicants - most with no prior paper industry work experience - hired off the street.  Although 66 Plaintiffs remain in this action, it is not a class action; it is undisputable

---

[4]    Although six Plaintiffs failed to appear at their depositions, evidence of their qualifications vis-a-vis the younger applicants hired remains relevant, since they also alleged age discrimination.

5

that each Plaintiff can establish a *prima facie* case. While SP has articulated a reason for its decision denying each Plaintiffs' application for employment, *i.e.*, SP claims that each Plaintiff was not qualified to work at SP, each Plaintiff has evidence that the articulated reason is a pretext for unlawful age discrimination.

### A.    According to SP, Each Plaintiff Applied for Employment With SP Generally, Not For A Specific Job

While each Plaintiff had worked at the Mill many years, each in various positions, SP admitted that its hiring process was not designed to analyze whether any particular candidate was suitable for any particular position. Rather, SP simply considered whether the individual would be a suitable employee for Smart:

> Q.    So when you were going through this process . . . your analysis was not looking at any positions specifically or what position the applicants had previously held?
>
> A.    None.
>
> Q.    [I]n other words, as far as you know, when you got to the end of the process, the company may have needed 10 warehouse workers . . . [a]nd you may have recommendations to hire 60 . . . people who had previously been warehouse workers?
>
> A.    Oh, very possibly.

(Weissman Dep. at 77.)

Joseph Bergeron, Production Manager, placed the hourly employees extended offers by Defendant into positions. (Bergeron Dep. at 18, 21.) Bergeron explained that once the hiring process was completed and the successful hourly candidates were chosen, he received a list of employees to place into job functions SP decided it needed in order to operate the mill. (Bergeron Dep. at 21.) Bergeron verified that he understood that the former IP hourly employees had applied for employment with Defendant, and it was SP's determination as to where to place

6

the successful applicants.  (Bergeron Dep. at 27.)

**B.**   **Each Plaintiff Was Well Qualified For Employment At The Mill, Given That Each Had Worked An Average Of 29 Years In The Mill**

It cannot be seriously disputed that the remaining Plaintiffs denied job offers were qualified for employment in the Mill.  (*See* Ex. 1 - 58.)  This is particularly true given (1) SP's acknowledgment that Plaintiffs were applying generally for employment at SP, and not for any specific position, and (2) each Plaintiff had worked in various positions in the Mill, and on average had been employed at the Mill for 29.03 years.  (Ex. 60, Summary of Plaintiffs' Ages and Work Experience; Ex. 60a.)  No Plaintiff had less than 17 years experience, and Plaintiff Henry Gardner had over 43 years of experience *at the Mill.*

**C.**   **SP Knew That Each Plaintiff Had Been Held To A High Level Of Performance By Defendant IP**

Likewise, each of the Plaintiffs had performed at high levels throughout the last several years.  In effect, they were the "survivors" after a series of restructurings and downsizing that had occurred at the Mill during the 1990s.

Between the time of the Plant Manager Dan Maheu's arrival at the Hamilton Mill in 1992 and the day he began working for SP, Maheu concedes that he knew there had been an "accelerating" requirement for performance, a requirement that began when Champion operated the Mill and increased under IP.  (Maheu Dep. at 74 ("there was a much higher demand on performance by IP than previously at Champion . . . within Champion, there was an accelerating requirement for performance").)  As part of this increasing and accelerating emphasis on performance, Champion and IP directed its supervisors to enforce the rules and regulations of the Mill, which related to performance, safety, and integrity.  SP's two most important criteria for employment was safety and integrity.  (Weissman Dep. at 136-137.)

At all relevant times, Maheu knew Champion and IP had policies designed to ensure that

7

supervisors would initiate the disciplinary process if there were performance problems, safety problems, or integrity issues. (Maheu Dep. at 70, 72.) As part of the policies of Champion and IP, the disciplinary process required supervisors to initially counsel employees who had such performance problems. (Maheu Dep. at 72.) Significantly, and very understandably, if an employee did not improve their performance after an oral counseling, it was the supervisor's responsibility to issue a first written warning about their performance. (Maheu Dep. at 73.) Discipline that was documented was expected to be maintained in an employee's personnel file of the company. (Johnson Dep. at 23.)

IP did not increase the level of discipline for an offense that had occurred more than one or two years previously due to a negotiated provision in the collective bargaining agreement. The contract prohibited discipline more severe than oral counseling or written warning because prior discipline was <u>void</u> after a specific period of time:

> A recorded disciplinary action notice will be <u>voided</u> if no subsequent disciplinary action(s) has occurred in accordance with the following schedule:

> verbal and written [warning]:          12 months

> Minor Disciplinary Layoff:       18 months

> Major Disciplinary Layoff        24 months

(Ex. 64 at 14; *see also* Maheu Dep. at 70.) Under this schedule, no remaining Plaintiff denied a job offer had any prior disciplinary action that was still significant. (*See* Ex. 1-58.) Maheu, as the Mill Manager for IP since 1992, knew that an employee's most recent performance and discipline record was the most relevant indicator of an employee's continued suitability for employment.

While there was a general accelerated focus on performance, IP had a particular focus on safety awareness:

Q.    So in the last several years prior to February 9, 2001, there was a high emphasis on making sure people performed their jobs?

A.    What came with International Paper was focus on safety . . .

Q.    So you didn't put up with any people who were safety problems?

A.    There were hard-and-fast rules, if you will, or very strong requirements to deal with people in the accelerated fashion for certain safety issues . . .

Q.    And how did International Paper communicate this emphasis on safety to your supervisors?

A.    Well, . . . so then I then communicated it to the supervisors -- to my directs, and they, I think, went to their directs. What it really did is it accelerated the level of what would happen if an incident occurred.  It was pretty well-defined. So it was communicated from me to my directs and then from theirs.  But because of the focus on it, if an incident occurred, it obviously got a lot of focus.

(Maheu Dep. at 75-77.)

As noted earlier, Maheu believed that IP had enforced the disciplinary rules of Champion and IP.  (Maheu Dep. at 81, 88-91.)

### D.    SP Used The Same The Qualifications To Work At The Mill That IP Used

According to SP's General Counsel, Milton Lewis, the qualifications to work at SP were the same as the qualifications to work at IP:

Q.    Was there some higher level of performance required of workers at SMART Papers that was not expected at IP, to your knowledge?

A.    No.

* * *

Q.    Do you know of any way that SMART Papers has raised the bar with respect to the necessary qualifications?

A.    No, I don't.

(Lewis Dep. at 89-90.)  Annetta Johnson, head of Human Resources for IP and SP, also

confirmed that the qualifications to work at SP were the same as existed at IP.  (Johnson Dep. at

43, 49.)

### E.    SP Obtained Demographics Of IP Applicants On January 17, 2001 From IP Before It Implemented A Hiring Process

*After* most Plaintiffs submitted applications to SP, Weissman was hired to assist Maheu

in the initial hiring process.  While SP implies Weissman was involved with the applications, it

is undisputed that she was hired on January 11, 2002 after the applications were completed.

Six days after SP hired Weissman, SP obtained demographic - including dates of birth -

data on each IP employee.  (*See* Ex. 65, Defendant IP's Supplemental Response to Plaintiffs'

Request for Production of Documents.)  The data SP obtained was detailed and, although SP

claims it was only given to its counsel, Weissman admits that she had discussions with counsel,

and that conversations with counsel occurred *before* job offers were extended.  (Weissman Dep.

at 43-44.)

The information SP obtained confirmed that the Mill had a predominantly older

workforce; i.e., 91% of the workers were over 40 and nearly 50% were over 50.  (Ex. 59; Ex.

65.)  After receipt of this data, SP then went through an elaborate, well-documented hiring

process for use with former IP employees only.  There was no *legitimate* need for any of this

demographic data pre-employment, and it is as inappropriate as if SP had asked for such

information on the actual application.  *See, e.g.*, 29 C.F.R. § 1625.5 (employers who request such

data pre-employment will be closely scrutinized to assure that the request is for a permissible

purpose). Lewis concedes that there was no legitimate "need to know" applicants' dates of birth.

(Lewis Dep. at 71-72.)

**F.      The Hiring Process That Disqualified Plaintiffs was Flawed And Allowed SP
to Disqualify Predominantly Older Applicants**

Knowing that 91% of the hourly employees at the Hamilton Mill were over the age of 40,

SP had a motive to design a hiring process that disqualified applicants even if they were

otherwise qualified, and it did.

**1.      Stereotyping**

First, SP's interview and reference-checking process allowed SP to give negative marks

to candidates if an interviewer believed they were not "flexible," (*See* Ex. 66, Sample Interview

Scorecard,) and/or the reference check data indicated a low score in the areas of "willingness and

ability to learn." (*See* Ex. 67, Sample Applicant Reference Check.)  Sixteen of the Plaintiffs

were subjectively rated as inflexible (a score less than 3), and 30 were rated as unwilling to learn

new things (a score less than 3).  (Ex. 60, Summary of SP's "Flexibility" Ratings of Plaintiffs.)

Both are classic stereotypes of older workers.  Only five IP employees under the age of 40 who

was offered employment by SP received a flexibility score less than "3," and only two were

judged to be unwilling to learn new things.

Weissman, the SP official who, with Maheu and Liff, designed both forms, and her

employees admit that such conclusions are classic examples of stigmatizing stereotypes of older

workers.  (Weissman Dep. at 46, 48; Sampson Dep. at 12-13.)  Given that both the interview and

the reference checks were short and covered a broad range of topics (the interview covered 10

subject areas, the reference covered 6 subject areas and asked five specific questions), little time

was available to verify scores in each category.[5]  (Moore Dep. at 20.)  Significantly, Weissman

did not train interviewers to avoid stereotyping older workers:

---

[5]      One of the interviewers estimated she did 15 or 20 interviews a day.  (Stauble
Dep. at 10.)

Q.    Have you ever been given any training from The Weissman Group in how to avoid stereotyping potential candidates or applicants?

A.    No.

(Sampson[6] Dep. at 13-14; *see also* Donaldson includ Dep. at 18-19.)

SP included these questions in the hiring process despite Maheu's belief that "Neanderthals" believe older workers are "less flexible and set in their ways," and that some of those Neanderthals were employed by IP. (Maheu Dep. at 61.)

*Only one Plaintiff received a "5" in "flexibility," and no Plaintiff received a "5" in "willingness to learn new things," with most Plaintiffs simply receiving an average or worse rating.* (Ex. 60.)[7]

### 2.    Drug Testing

SP also decided to perform a drug screen by taking hair samples from each IP employee applicant, even though SP later hired persons "off the street" with drug and DUI convictions. There was no cause to believe IP employee applicants ever came to work under the influence or were impaired on the job. These hair samples were used to detect prior drug usage, *e.g.*, marijuana, *at some time in the past.* Hair samples, as opposed to urine tests, have been discredited and are not widely used. (*See supra* at 60.) SP disqualified 18 IP applicants based

---

[6]    Sampson was a college student who was hired to conduct interviews during her senior year. (Sampson Dep. at 8-9.)

[7]    SP did not do reference checks on the younger applicants after February 9, and did not produce any documentation of its interviews. (Hampton Dep. at 17-18; Carpenter Dep. at 13-15; *see* Section V.A.5(b)(i), *infra*; Pl. Ex. 58a, George M. Reul, Jr. Aff. at ¶ 55.) As opposed to its highly selective process when it considered Plaintiffs' applications, based on SP's supplemental responses to Plaintiffs' Document Requests No. 2, after the Court's August 8, 2003 Order overruling Defendant SP's Objections to the Magistrate Judge's decision, SP hired every applicant after February 9, except for three (195 of 198 applicants accepted). (Ex. 58a at ¶ 56.)

solely on the drug test results, most of whom were over 40 years old. Interestingly, many of these older individuals who were denied job offers because of the drug tests received high scores on interviews and reference checks. (*See* Ex. 68, Summary of Plaintiffs Who Failed Drug Tests.) In light of SP's later hiring decisions, these Plaintiffs can raise a genuine issue as to whether the drug test results were a sufficient reason to disqualify well-qualified, experienced employees from employment. (*See supra* at 58.)

After the Court required SP to turn over documents concerning the younger individuals hired after February 9, SP still refused to produce copies of any drug test results of those younger applicants. (Ex. 69 at ¶ 4.)

### 3.    The Reference Checks

For most of the Plaintiffs, SP claims that a reference check disqualified them from employment with SP. The Court will need to determine if any or all of the Plaintiffs can raise a genuine issue as to whether this articulated reason is a pretext for unlawful discrimination, particularly since SP did not do a reference check on younger "off the street" applicants. (Ex. 58a at ¶¶ 55.) According to SP human resource employees involved in the hiring process of off the street hires, SP made hiring decisions after SP interviewed the applicants. Other than an initial verification of prior employment, there is no indication in the record (including documents about the applicants provided during discovery) that SP conducted reference checks on the "off the street" hires about alleged prior job performance like they did with respect to Plaintiffs or other former IP employees. (Hampton Dep. at 17-18; Carpenter Dep. at 13-15; Ex. 58a at ¶ 55.)

SP relied upon the reference checks rather than an objective personnel records that were made available to SP. First, IP provided SP access to personnel files, which were updated on a regular and consistent basis with any documented evidence of unsatisfactory work, violations of any work rules or policies, or any safety issues.

13

As survivors of the increased performance scrutiny by Champion and IP from the mid-1990s forward, each of the Plaintiffs had generally "clean" performance records when they applied for a position with SP.  While SP disqualified 46 Plaintiffs for performance reasons, (Def. SP Mem. Supp. M.S.J. at 28,) seven of these Plaintiffs[8] had clean disciplinary records for their *entire* career.  Seventeen others[9] had no discipline in the last 10 years; still 14 others[10] had none in the last three years.  (Ex. 1-58.)  Thus, 38 of the Plaintiffs identified as having performance problems had no significant performance problems within the last three years.

Likewise, IP allowed SP access to attendance records.  Rather than simply review these records and disregard any protected absenteeism, *e.g.*, absences, under the Family and Medical Leave Act or the ADA, SP chose to allow reference providers to characterize an employee's "dependability."  (*See, e.g.,* Ex. 67.)

These reference checks – which obviously were not as reliable as documented records available to SP – allowed SP to articulate reasons to "justify" its decisions not to offer Plaintiffs a job.  Plaintiffs allege this was part of a process designed to "cast a wide net" to justify its failure to hire older IP employees.  Each Plaintiff can successfully challenge this articulated reason.

### 4.    Willful Age Discrimination Evidence

During SP's hiring process, SP obtained age data on the IP applicants from IP.  (Couch

---

[8]    They are:  Abner, Brandenburg, Chasteen, Durbin, Hyden, Ogg, Paxton and Tolbert.

[9]    They are:  Brewer, Broughton, Bullio, C. Campbell, Cress, Duncan, Eaton, Fisher, Gardner, Horn, Huntington, Italiano, Ketcham,Taulbee, Turner, Volz, and Willis.

[10]    They are:  Gregory, Baylor, T. Bennett, W. Bennett, Brock, Jerry Combs, Joshua Combs, Freeman, Hensley, Knodel, Mann, McKay, Robertson and Thomas.

Dep. at 121-126.)  SP alleges that this data was provided to its counsel, and is relied on by SP in its motion for summary judgment.  SP had no legitimate reason to obtain this data and a jury could infer that SP used this information when it decided (1) not to hire Plaintiffs, (2) to "dump" the still-active applications of Plaintiffs, and (3) to seek younger applicants from "off the street" instead.

### G.____SP Rejected Plaintiffs For Employment And Instead Hired Younger, Less Qualified IP Employees

While SP claims that Plaintiffs have insufficient evidence that SP hired younger IP employees, *Defendants' own documents* confirm that SP offered jobs to a substantial number of younger, less experienced IP employees.  For 32 Plaintiffs, age 51 or above, each has evidence that SP hired 72 younger, less qualified IP employees that were at least seven years younger[11] than them.  For another seven Plaintiffs who were age 50, each has evidence that SP hired 61 younger, less qualified IP employees.  For another 26 Plaintiffs between 46 and 49 years old, each has evidence that SP hired 30 younger, less qualified employees.  Even for the remaining six Plaintiffs between ages 41 and 45, each has evidence that SP hired 12 younger, less qualified employees.  (*See* Ex. 61, Summary of younger IP employees hired.)

Twenty-four younger, former employees at IP, who were hired instead of Plaintiffs, had as little as three years of experience.  (*Id*.)  According to Berlyn Stanifer, a training supervisor for IP and SP, experienced employees were more qualified than less experienced employees. (Ex. 74, Stanifer Aff. at ¶ 1.)  This is particularly true if an employer is simply considering an applicant for any job, rather than a specific job.  (*Id.*)

Each Plaintiff has many examples of SP hiring substantially younger employees who

---

[11]    The Sixth Circuit has generally required an age discrimination Plaintiff to present evidence that an alleged "substantially younger" comparable applicant is at least seven years younger.  *Cicero v. Borg-Warner*, 280 F.3d 579, 588 (6th Cir. 2002).

were objectively less qualified.

### H.    Eight Plaintiffs Were Offered Jobs By SP But Were Discriminatorily Placed Into Inferior Positions Than Younger, Less Qualified Employees

There is evidence that Defendant discriminated against Plaintiffs E. Campbell, Holland, Begley, Arthur, Geeding, Greene, Rumpler and Hess by assigning younger, less qualified workers to better jobs for which Plaintiffs were more qualified. The assignments resulted in demotions and assignments to more menial and demanding work. As discussed below at p. 62, Plaintiffs can present sufficient evidence to demonstrate at least a genuine issue of material fact as to whether the working conditions assigned to them by Defendant were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign. Further, Plaintiffs can present evidence that younger, less qualified employees were treated more favorably in the terms and conditions of their work assignments.

### I.    When SP Denied Each Plaintiff A Job Offer, It Was Still Had Almost 100 Openings

After denying job offers to Plaintiffs, SP immediately began to recruit applicants "off the street."

Q.    Did you learn of plans to hire hourly employees shortly after you came on board?

A.    Yes.

(Milton Lewis Dep. at 50.) SP began to place ads in the local newspapers "[r]ight after it opened." (Id. at 55.) This was necessary because the SP model was "to run to the market demand" with four shifts. (Lewis Dep. at 53.) SP was below its hiring goal as of the date of start up, being almost 100 short of what the full complement would be. (*Id.* at 53.) (*see also* Johnson Dep. at 38, 40; Bergeron Dep. at 28.)

16

    **1.**     **While It Was Still Looking For Employees, And Plaintiffs'
Applications Were Still "Active," SP Admits That It Requested And
Obtained Data From IP About Plaintiffs' Dates of Birth For Which
It Had No Legitimate Need**

As summarized above, SP admits that it obtained demographic data from IP, including the ages of its former employees. (Couch Dep. at 121-126; Ex. 65.) With respect to applicants it did not hire, SP had no legitimate need for such information.[12] The only possible explanations for obtaining this data was either because SP wanted to hire as few older employees as possible,[13] it was already concerned that it may be sued for age discrimination (though no claim had yet been made), or it wanted to determine whether it would honor its promise to keep the applications "active."

At the time SP obtained this data, all Plaintiffs were still applicants for jobs at SP. The application completed by each Plaintiff stated that the application "will remain active for a period of six months." Annetta Johnson, IP's head of Human Resources since 1996 who assumed the same role for SP before she quit,[14] admits that the application meant what it said:

Q.    When it says it will remain active, what does that mean...?

A.    That it won't be destroyed . . . if this person have been qualified for a position, but may not have been the top candidate, that if another position came open, we would be able to go back and consider this individual for another opening.

---

[12]    SP had no legitimate need for the data at any time, even with respect to employees it hired. There is no age component to SP's 401(k) Plan. (Lewis Dep. at 97.)

[13]    SP could not avoid hiring most of the older applicants, simply because it needed a complement of workers to open the Mill soon after IP closed the Mill.

[14]    Johnson quit six weeks after SP opened the Mill, describing her experience as a "nightmare, . . . knowing a lot of people didn't have jobs that obviously had families to support." (Johnson Dep. at 67-68.) Presumably Johnson was not in agreement with SP's hiring practices.

(Johnson Dep. at 42.)  SP suggested, in opposition to Plaintiffs' discovery requests, that
Plaintiffs had to reapply for jobs.  This is obviously not true.

### 2.  SP Ignored Its Promise to Keep Applications Active For Six Months And, Instead, "Dumped" Plaintiffs' Applications

After obtaining the age data on each Plaintiff, SP did not hire any Plaintiff for
employment despite its need for almost 100 employees.  Lewis, Johnson's successor,[15] admitted
that SP simply "dumped" Plaintiffs' applications:

Q.    Did you ever look back at old applications?

A.    We didn't keep IP applications, . . . they were boxed up and sent away.

Q.    How about the applications that IP [employees] submitted to [SP] did you keep those prior applications?

A.    No.

Q.    Are you familiar with regulations with regard to how long an employer is supposed to maintain records such as applications?

A.    We have an informal policy.  We keep what is necessary to keep and dump the rest.

(Lewis Dep. at 98.)  Each Plaintiff believes that his application was "dumped" for unlawful
reasons.

### 3.  SP Hired 113 Applicants Less Qualified Individuals "Off The Street"- Who Were Under The Age of 40

SP recruited and hired 113 employees under the age of 40 during the next year instead of
the 64 Plaintiffs.  (Ex. 62.)  None are as objectively qualified as Plaintiffs.  (*Compare* Ex. 62,
Summary of each such employee hired, with Ex. 1-58.)

Each Plaintiff can raise a genuine issue of fact by comparing himself with several
younger employees subsequently hired.

---

[15]    Lewis is also a lawyer, serving as SP's General Counsel.  (Lewis Dep. at 16.)

18

### 4.    All Of The "Off The Street" Hires Needed Substantial Training And Plaintiffs Needed No Training

Maheu acknowledged that the off the street hires required training (two to three weeks for the easiest job in the Mill), while the former IP employees obviously would not require training:

Q.    people that did not receive offers, most of the people who did not receive offers had the skills and abilities to work in the Hamilton Mill?

A.    They may have had the skills. . .

A.    -- the jobs we were looking to fill, people off the street could fill those be trained.

Q.    And they would need to be trained?

A.    *They would need to be trained.* Anybody needs to be trained. You need to be trained to drive to work in a warehouse or anything, you have to be trained.

Q.    *Let's take the easiest job in the mill. How long would it take to train me?*

A.    *Two to three weeks.*

Q.    and what does that two to three weeks of training for the easier job in the mill entail?

A.    More than likely include mill orientation, and job orientation, mobile equipment training, safety training, that type of thing.

Q.    Do you think it's more than likely that *the employees who were not offered jobs but had worked at the mill for many years* had mill orientation, had job orientation, had equipment training, had safety training, that type of thing.

A.    Did they have that? yes.

Q.    All right. So *they would not have required any training*?

A.    *No.*

Q.    and during the two to three weeks of training, are you paying the new hire for the training?

A.    Yes, they have an entry rate. At that point in time it was $11.00 an hour. ...

Q.    Do you have any reason to think that [former IP employees] who were

19

storekeepers, mechanical technicians, rewinder operators, warehouse workers couldn't immediately go into DR if they had worked in the Hamilton Mill for many years?

A.    No reason to think they couldn't become DR.

Q.    So everybody you hired since February 9th, 2001, has started in Department Reserve?

A.    Department Relief, yeah, Department Reserve, yes -

(Maheu Dep. at 98-99, 113-114; *see also*, Bergeron Dep. at pp. 36-37.)

### 5.    SP Hired Applicants "Off the Street" With Convictions for Drug Possession, DUI, Manslaughter, Robbery, Shoplifting and Assault

One question on SP's application asks for an applicant to disclose whether the applicant has been convicted of a felony.  Several new hires had such convictions.  (Ex. 62.)  Each Plaintiff can compare himself to each of these new hires, or such data indicates that a bad reference is simply a pretext.

### 6.    Before Offering Jobs To The "Off The Street" Hires, SP Obtained Age Information On The Applicants

Before hiring anyone off the street, SP obtained date of birth information on each of the applicants surreptitiously, both by directly asking the applicants, (*See, e.g.*, Ex. 62a,) but also by obtaining the data through a "background check" on the applicant's driving record and educational history.  (*Id.*)  Johnson admits that SP did not have a legitimate need for the "off the street" applicants' ages during the application process, that it is "taboo" to obtain such data, and that obtaining the year of high school graduation is "*a sneaky way to get the age information*." (Johnson Dep. at 58.)  Even after hire, SP does not need age data for its retirement plan because the plan "has no age component to it . . ."  (Lewis Dep. at 97.)  SP can offer no legitimate explanation for obtaining age data on applicants, and one reasonable inference is that it wanted to ensure it knew the ages of its applicants before it offered jobs.  Such conduct is impermissible

20

under age discrimination laws.

Lewis concedes that there was no legitimate "need to know" applicants' dates of birth (Lewis Dep. at 71-72.)  Although he is now head of HR and General Counsel for SP, he admits that he has never "been that current" on age discrimination law.  (*Id.* at 14.)

### 7.    SP Did Not Check References For The Younger, "Off The Street" Hires

SP also did not check references on the younger applicants after February 9, even though it used "reference checks" as a "reason" not to hire 43 of the Plaintiffs.  (Ex. 58a at ¶55.)  (*See* Def. SP Mem. Supp. M.S.J. at 28-33.)  Likewise, while SP claims it used the same interview process with off the street applicants, (Johnson Dep. at 43, 61-63), SP did not provide any "interview" documents with respect to the off the street applications after this Court ordered it to provide documents related to the applications; thus, they either were lost, "dumped," or never existed.  SP did produce interview documents as to Plaintiffs.

## IV.    SUMMARY JUDGMENT STANDARD

Summary judgment may only be granted if there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  As the party moving for summary judgment, SP bears the burden of showing the absence of a genuine issue of material fact as to every element of Plaintiffs' claims.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  If SP meets its burden, Plaintiffs must then present evidence that reveals a genuine issue for trial.  *Id.*  This Court must accept Plaintiffs' evidence as true and draw all reasonable inferences in their favor, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986), viewing all facts and inferences drawn therefrom in the light most favorable to Plaintiffs.  *DePiero v. City of Macedonia*, 180 F.3d 770, 776 (6th Cir. 1999). When deciding a Rule 56 motion, "although the court should review the record as a whole, it must disregard all evidence favorable to the moving

party that the jury is not required to believe." *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 151 (2000). "That is, the court should give credence to the evidence favoring [Plaintiffs] as well as that evidence supporting [Defendant] that is *uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.*"  *Id.* (emphasis added).

In its recent *en banc* decision of *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564 (6th Cir. 2003)(*en banc*), the Sixth Circuit reiterated the proper standard for summary judgment. The court stressed that summary judgment is improper where both parties have presented sufficient evidence:

> In sum, this is a case that on its facts could go either way.  This means that a jury's verdict in a properly tried case would likely be sustained regardless of whether the verdict was in favor of Wexler or in favor of White's.  **But that is precisely the point**.  The conflicting proof and the inferences that can be drawn therefrom raise genuine issues of material fact that preclude the grant of summary judgment in the case before us.  Although the dissent labors long and hard in marshaling all the facts and inferences in support of White's, this does not, in our opinion, diminish the contrary evidence to the point that it is so one-sided that White's must prevail as a matter of law.

*Id.* at 578 (emphasis added) (internal quotations omitted).  Where the evidence is not so one-sided that a party must prevail, a jury must determine the outcome.

It is well-recognized that when the motivation, intent, or state of mind of the Defendant is at issue, summary judgment is rarely appropriate, so that the trier of fact may resolve the dispute over motive.  *Ross v. Campbell Soup Co.*, 237 F.3d 701, 706 (6th Cir. 2001) ("that question -- i.e. the employer's motive - is one rarely susceptible to resolution at the summary judgment stage).

The Eleventh Circuit Court of Appeals reviewed an order granting summary judgment in a matter with facts strikingly similar to the case at bar.  *Maddow v. Procter & Gamble Co., Inc.,* 107 F.3d 846, 849 (11th Cir. 1997).  The Court determined that summary judgment against the Plaintiffs on the issue of discrimination must be reversed.  (*Id*. at 852.)  In *Maddow*, the Plaintiffs, each age 40 or older, were sales representatives for Max Factor.  (*Id*. at 849.)  The

defendant acquired Max Factor and assigned it to Noxell Corporation, a wholly - owned subsidiary.  *Id*.  Noxell then decided not to continue employment of a substantial number of the former Max Factor sales representatives.  *Id*.

During the selection process for terminations, a Noxell manager interviewed the former Max Factor employees.  *Id*.  Based on the interview, the manager rated each interviewee in seven categories.  *Id*.  The ratings were then tabulated into a "Recruiting Quality Index" for each employee.  *Id*.  The Defendant believed the rating was indicative of future sales performance.  *Id*.  The Index was the sole factor in the selection process.  *Id*.  Prior sales experience and performance were not considered.  *Id*.  Noxell offered employment to former Max Factor employees who scored 16 or higher on the Index.  *Id*.

The Plaintiffs presented evidence that while Noxell was terminating former Max Factor employees, it was hiring new, inexperienced sales representatives.  (*Id*. at 850.)  Noxell followed a different interview procedure for those hires than for the former Max Factor employees.  *Id*.  The process used for the new, inexperienced sales representatives was more objective than the Max Factor interviews.  *Id*.

The *Maddow* Plaintiffs submitted data showing that the defendant preferred younger candidates.  *Id*.  The Plaintiffs also presented evidence that the Defendant had requested date of birth information from at least one employee.  *Id*.  The Defendant argued it obtained that data to assess the impact of proposed terminations with respect to equal employment opportunity laws.  *Id*.

In reversing the District Court's granting of summary judgment, the Court noted that, taken alone, any one of the pieces of evidence may not raise a genuine issue of material fact with respect to pretext.  (*Id*. at 852.)  However, the Court concluded that, as a whole, a reasonable person could infer discrimination.  *Id*.  The Court held:

> The Defendant's explanation for their termination decisions is entirely plausible. However, the statistical, circumstantial, and direct evidence in the record, when viewed in the light most favorable to the Plaintiff, creates a genuine issue of material fact that Defendants proffered reason is a pretext and that there was discrimination. Summary judgment against the Plaintiffs in the issue of discrimination must therefore be reversed.

*Id*.

In the case at bar, Plaintiffs like those in *Maddow*, have presented substantial evidence which, when taken as whole, and viewed in the light most favorable to the Plaintiffs, could allow a reasonable person to infer discrimination.

The hiring process used for Plaintiffs was different than that used for off the street employees, *e.g.,* prior convictions were acceptable, references were not checked, and virtually every applicant ws hired. The reference process used to rate the Plaintiffs was faulty to such a degree that it resulted in false and inaccurate references.[16] Other information readily available to Defendant would have produced a more accurate picture of each Plaintiff's prior work history at the Hamilton Mill, and SP ignored that information. There is evidence of age stereotyping in that the Plaintiffs received lower rankings in areas of "flexibility" and "wllingness to learn" than the younger IP applicants who received employment offers. Younger employees hired by Defendant were so much less objectively qualified than Plaintiffs as to cast doubt on the legitimacy of Defendants articulated reason for denying Plaintiffs employment. The number of older workers in the workforce under SP's control dropped dramatically. Finally, SP obtained age data on the applicants which a reasonable juror could determine was used for an illegal purpose in reducing the age of the workforce in the Mill. Thus, the evidence offered by Plaintiffs to establish their claims for age discrimination mandates that summary judgment be denied because genuine issues of material fact with respect to Plaintiffs' claims have been

---

[16]     43 Plaintiffs have alleged defamation against Defendant IP as a result.

established.

## V.    LEGAL ARGUMENT

### A.    Each Plaintiff Has Sufficient Evidence To Raise A Genuine Issue Of Material Fact As To Their Claims Of Age Discrimination

Federal and Ohio law prohibit age discrimination in employment decisions.  29 U.S.C. §623; O.R.C. §4112.02(A).  Plaintiff may establish a claim of discrimination either by introducing direct evidence of discrimination, or by proving circumstantial evidence which would support an inference of discrimination.  *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997).

In a failure to hire case, to establish a *prima facie* case of age discrimination each Plaintiff must prove the following elements: (1) he/she was over 40;  (2) he/she applied for and was qualified for a job for which the employer was seeking applicants; (3) despite his/her qualifications, he/she was rejected; and (4) after the rejection, positions remained open and the employer continued to seek applicants.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803 (1973) (this seminal case in employment discrimination jurisprudence set forth the *prima facie* case with respect to a failure to hire case).  *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312 (1996); *Dew v. A.B. Dick Co.*, 231 F.3d 1016, 1020-21 (6th Cir. 2000).

Once established, these elements create a mandatory inference of intentional discrimination.  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993).  The Defendant may rebut this presumption by articulating a legitimate, non-discriminatory reason for its action.  *Id.*

Once Defendant meets this burden of production, Plaintiffs must then show that Defendant's articulated reason for its failure to hire them is a pretext for discrimination.  *Id.* at 507.  This burden of proof does not require Plaintiffs to proffer evidence in addition to their *prima facie* case:

25

> The factfinder's disbelief of the reasons put forward by the defendant (particularly
> if disbelief is accompanied by a suspicion of mendacity) may, together with the
> elements of the prima facie case, suffice to show intentional discrimination.
> Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to
> infer the ultimate fact of intentional discrimination, and the Court of Appeals was
> correct when it noted that, upon such rejection, [n]o additional proof of
> discrimination is required.

*Id.* at 511 (emphasis in original; footnote and citation omitted). Thus, Plaintiffs need not

produce *additional* evidence of discrimination. As the Supreme Court clarified in *Reeves,* 530

U.S. at 149, a plaintiff's *prima facie* case combined with sufficient evidence to find that the

employer's asserted justification lacks credibility will permit the trier of fact to infer that the

employer was motivated by unlawful discrimination. In *Reeves*, the Supreme Court

unanimously and authoritatively rejected the pretext-plus approach that several circuits had used

previously in ruling on motions for summary judgment. *Id.* at 140-41. The Court held that the

Fifth Circuit had "erred in proceeding from the premise that a plaintiff must always introduce

additional, independent evidence of discrimination." *Id*. at 149.

The *Reeves* Court explained that proof that the defendant's explanation is unworthy of

credence is one form of circumstantial evidence that is probative of intentional discrimination,

and it may very well be quite persuasive to the trier of fact. *Id*. at 147. The Court noted that a

trier of fact can reasonably infer from the falsity of the defendant's explanation that the employer

is dissembling to cover up a discriminatory purpose. *Id*. Such an inference is consistent with the

general principal of evidence law that the trier of fact is entitled to consider the defendant's

dishonesty about a material fact as "affirmative evidence of guilt." *Id.* The *Reeves* Court also

noted that once the employer's justification has been eliminated, discrimination may well be the

most likely alternative explanation, particularly since the employer is in the best position to

articulate the actual reason for its decision. *Id.*

The method and order of proof is the same under federal and Ohio law. *The Plumbers*

*and Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm.*, 66 Ohio St.2d 192, 196 (1981) (O.R.C. §4112.02 is to be interpreted in accordance with interpretations of federal anti-discrimination law.)

> **1. Defendant Cannot, And Does Not, Dispute That Each Plaintiff Is A Member Of The Protected Class, Thus Establishing The First Element of The *Prima Facie* Case**

Defendant concedes that each Plaintiff was over 40 years old, and therefore a member of the protected class at the time that they were rejected for employment with SP.

> **2. Each Plaintiff Applied For And Was Qualified For A Job For Which Defendant Was Seeking Applicants, Establishing The Second Element Of The *Prima Facie* Case**

The Defendant does not dispute that each Plaintiff applied for employment with SP. As Defendant ultimately concedes with respect to those 51 remaining Plaintiffs who passed the drug screen, there is absolutely no question that each of those Plaintiffs was objectively qualified for employment with SP. Defendant makes a conclusory argument that none of the Plaintiffs possessed the minimal qualifications for hire with SP. However, in a subsequent footnote, Defendant abandons that argument and correctly sets forth the law establishing the proper analysis of Plaintiffs' qualifications. (Def. SP Mem. Supp. M.S.J. at 22.)

In order to establish he/she was qualified for employment, each Plaintiff need only demonstrate that he/she was objectively qualified for the position. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574-76 (6th Cir. 2003) (*en banc*); *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 1999). In both *Wexler* and *Cline*, the Sixth Circuit held that while analyzing a *prima facie* case of discrimination, courts are not to use the defendant's articulated nondiscriminatory reason for termination to assess whether the plaintiff was qualified for the position. *Wexler*, 317 F.3d at 574; *Cline*, 206 F.3d at 660-61. This approach would

impermissibly conflate the distinct stages of the *McDonnell Douglas* analysis, and set the *prima facie* burden too high. *Cline*, 206 F.3d at 660-61.

Instead, courts must analyze the qualifications of the plaintiff *independent* of the defendant's nondiscriminatory reason for the failure to hire. *Wexler*, 317 F.3d at 574-75; *Cline*, 206 F.3d at 660-61. Thus, each Plaintiff's qualifications must be evaluated *objectively*, by determining whether he/she presented evidence that he/she met at least the minimum objective criteria required for employment in his/her field. *Wexler*, 317 F.3d at 575-76. This inquiry should focus on each Plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills. *Id.* at 576.

In the case at bar, each Plaintiff had worked in various positions in the Mill, and on average had been employed at the Mill for over 28 years. (Ex. 60, Summary of Plaintiff's Age and Work Experience; *see also* Ex. 1 - 58a.) The Plaintiffs have an average of 14 more years of experience than younger IP employees hired by SP. (Ex. 61, Summary of Younger Employees Hired by SP.)

No Plaintiff had less than 17 years' experience at the Mill, and Plaintiff Henry Gardner had over 43 years of experience at the Hamilton Mill. (Ex. 23, 60.) Each Plaintiff's years of experience at the Mill renders them objectively qualified for the entry level mill positions SP sought to staff. Thus, as Defendant concedes at least with respect to those Plaintiffs who passed the drug screen, Plaintiffs have established they applied for and were qualified for employment.

Defendant does maintain that the 15 remaining Plaintiffs who failed the drug screen are not objectively qualified for employment and have thus failed to prove the second element of their *prima facie* case. Defendant improperly conflates this argument with the issue of pretext when it presents the drug test as its legitimate, non-discriminatory reason for refusing to hire those Plaintiffs who failed the drug test. Each Plaintiff who failed the Defendant's drug

screening procedure was objectively qualified for employment with the Defendant as each had many years' successful experience working in the Hamilton Mill.  (*See* Ex. 60; Ex. 68; the individual memoranda for Plaintiffs Earl Blevin, Ex. 6, James Clear, Ex. 14, David Gentry, Ex. 24, Everett Gill, Ex. 25, John Gregory, Ex. 26, Chester Johnson, Ex. 34, James Lakes, Ex. 37, Linda Marsee, Ex. 39, David Miller, Ex. 42, Ronald Pennington, Ex. 45, Jim Rodgers, Ex. 47, Peter Spada, Ex. 49, Theresa Tolbert, Ex. 52, Jerry Turley, Ex. 53, and Robert Wilkins, Ex. 56.)

### 3.    It Is Undisputed That Each Plaintiff Was Considered For And Denied Employment With Defendant, Thus Establishing The Third Element Of The *Prima Facie* Case

Defendant does not dispute that each Plaintiff was considered for employment.  Neither does Defendant dispute that 64 Plaintiffs were denied employment, thus establishing the third prong of the *prima facie* case.

Defendant does argue that the eight employees who received offers of employment from Defendant cannot establish a *prima facie* case for age discrimination.  This argument is without merit.  As will be demonstrated below in Part 62, the Plaintiffs who received job offers from Defendant received offers for positions inferior to those offered to substantially younger employees.  Therefore, these Plaintiffs have raised a genuine issue of material fact as to whether or not they were victims of discrimination by Defendant, rendering summary judgment inappropriate.

### 4.    Each Plaintiff Can Establish The Fourth Element Of The *Prima Facie* Case Because Positions Remained Open And Defendant Continued To Seek Applicants, Hiring Younger Individuals Who Were Objectively Less Qualified Than Plaintiffs

Defendant's argument that Plaintiffs fail to prove the fourth element of the *prima facie* case because they cannot identify younger employees that were hired into their positions is fundamentally flawed.  Defendant incredibly asserts that Plaintiffs were only able to show during

discovery that a younger person was hired for their former positions *in a few cases*, and that those they could identify were not sufficiently young to meet the "substantially younger" test articulated in *Black v. Columbus City Sch.*, 124 F. Supp.2d 550, 575 (S. D. Ohio 2000) (overruled on other grounds).   This argument relies on  Defendant's misleading inference that it considered former IP employees and off-the-street applicants for specific positions with SP. Defendant's own admission in its Motion for Summary Judgment and the sworn testimony of its representatives demonstrates the flaw in this assertion.

Defendants' own documents confirm that SP offered jobs to a substantial number of younger, less experienced IP employees.  For 32 Plaintiffs, age 51 or above, each has evidence that SP hired 72 younger, less qualified IP employees that were at least seven years younger[17] than them.  For another seven Plaintiffs who were age 50, each has evidence that SP hired 61 younger, less qualified IP employees.  For another 26 Plaintiffs between 46 and 49 years old, each has evidence that SP hired 30 younger, less qualified employees.  Even for the remaining six Plaintiffs between ages 41 and 45, each has evidence that SP hired 12 younger, less qualified employees.  (*See* Ex. 61, Summary of younger IP employees hired.)

Twenty-four of the younger, former employees at IP, who were hired instead of Plaintiffs, had less than three years of experience,and all of the younger, former IP hires had an average length of service of only 14 years.  (*Id.*.)  According to Berlyn Stanifer, a training supervisor for IP and SP, experienced employees were more qualified than less experienced employees.  (Ex. 74, Stanifer Aff. at ¶ 1.)  This is particularly true if an employer is simply considering an applicant for any job, rather than a specific job.  (*Id.*)

---

[17]     The Sixth Circuit has generally required an age discrimination Plaintiff to present evidence that an alleged "substantially younger" comparable applicant is at least seven and one-half years younger.  *Cicero v. Borg-Warner*, 280 F.3d 579, 588 (6th Cir. 2002).

Further, SP recruited and hired 113 off the street employees under the age of 40 during the next year instead of the 64 Plaintiffs.  None were as objectively qualified as Plaintiffs. (*Compare* Ex. 62a, Summary of each such employee hired and their prior work experience, with Ex. 1-58a.)

### a.     All Applicants to SP Were Considered for Employment At The Mill Generally And Not For Any Particular Position.

The facts demonstrate that, when making its hiring decisions, Defendant did not take into account which employees were to be placed in which position.  It is clear that those decisions were not made until after Defendant made its final decisions as to who it was going to hire. Mary Rita Weissman testified that her role in hiring the new employees for SP was to "select the data about the behavioral characteristics [of applicants], not to make decisions about the hires that included technical competence."  (Weissman Dep. at 77.)  Weissman, whose hiring decisions Dan Maheu accepted without exception, clearly articulated they were not considering specific skills, knowledge and experience.  Rather, according to Weissman, she hired for "behavior and values," (Weissman Dep. at 78,) and it was not until after she made her recommendations that other SP representatives placed the new hires into their positions.  (Maheu Dep. at 153-156.)

Q.     So when you were going through this process, you didn't care - - your analysis was not looking at any positions specifically on what positions the applicants had previously held?

A.     None.

Q.     [I]n other words, as far as you know, when you got to the end of the process, the company may have needed 10 warehouse workers . . . and you may have recommendations to hire 60 . . . people who had previously been warehouse workers?

A.     Oh, very possibly.

(Weissman Dep. at 77.)

31

Joseph Bergeron, Production Manager, placed the hourly employees who had been extended offers by Defendant into positions. (Bergeron Dep. at 18, 21.) Bergeron explained that once the hiring process was completed and the successful hourly candidates were chosen, he received a list of employees to place into job functions SP decided it needed in order to operate the mill. (Bergeron Dep. at 21.) Bergeron verified that he understood that the former IP hourly employees had applied for employment with Defendant, and it was SP's determination as to where to place the successful applicants. (Bergeron Dep. at 27.)

Maheu testified similarly that SP did not place its employees in specific positions until after all the hiring decisions had been made. (*Id*.) In addition, SP's employment application did not ask Plaintiffs to apply for any particular position and the applications filled out by all 72 Plaintiffs were identical. (Ex. 60a. Sample Employment App.) Therefore, it is clear that after the closing of the IP Mill, Plaintiffs were applying for any position, and their specific former position and the age of the employee placed into that specific former position is immaterial.

> **b.    Defendant Hired 113 Younger Employees After It Rejected Plaintiffs' Employment For The Same Positions Denied To Plaintiffs.**

Moreover, Plaintiffs do not have to rely solely on evidence of the ages of employees who were hired on or before February 9, 2001 to establish that SP hired younger employees for positions to which Plaintiffs applied. Rather, the jury should be allowed to consider the ages of all of Defendant's new employees, including those hired "off-the-street" after February 9, 2001. *McDonnell Douglas v. Green,* 411 U.S. 792, 802 (1973). It is beyond belief that Defendant attempted to withhold from Plaintiff evidence of the demographics of the people it hired after February 9, 2001. Despite the Court's holding in its Order of August 8, 2003 that Plaintiffs were entitled to such information during discovery, Defendant completely ignores this issue in its Motion for Summary Judgment. This is a basic principle of proof in a failure to hire case. *Id*.

Plaintiffs can easily demonstrate that the evidence concerning SP employees hired off-the-street should be presented to a jury. First, Defendant cannot argue that these off-the-street jobs were different than those for which Plaintiffs applied in February 2001. As noted above, the record clearly demonstrates that Plaintiffs were applying for the same entry level positions as were the people SP hired off-the-street. SP interviewed both sets of applicants for the same attributes and abilities. (Johnson Dep. at 43, 49; Lewis Dep. at 89-90.) Neither the applications completed by Plaintiffs nor those completed by the "off the street" applicants listed any specific positions. Therefore, the evidence is clear that there was no difference in the positions Defendant sought to staff. (Ex. 60a, Sample Employment Application.) SP classified all of the applicants as applying for the entry level job of department relief. (Maheu Dep. at 114; Weissman Dep. at 77.)

Further, the entry level jobs that Defendant claims were not available to or desired by Plaintiffs and were filled by the off-the-street hires were not newly created positions. The sworn testimony in the record clearly establishes that these department relief positions existed at the same time that Plaintiffs applied for and were rejected for employment with SP. Maheu admitted that the Hamilton Mill had not reached its hiring goal and that SP needed 50 to 100 additional employees to minimally staff the Mill. (Maheu Dep. at 40, 94.)

In addition, there exists at least a genuine issue of material fact as to whether the jobs applied for by Plaintiffs were the same positions that Defendant advertised as open immediately after rejecting Plaintiffs' application. See *Nordquist v. Uddeholm Corp.*, 615 F.Supp. 1191, 1198 n.1 (D. Conn. 1985) ("Given the language of the advertisements in the Boston Globe, the description of [the plaintiff's] duties when he was employed by [the defendant] and the lack of any evidence from the defendant that the ads were seeking applicants for positions quite unlike that which was held by [the plaintiff], a jury could reasonably have concluded that the ads were

seeking a replacement for [the plaintiff]"); *Quercia v. Allmerica Fin.*, 84 F. Supp. 2d 222, 226

(D. Mass. 2000) (rejecting the defendant's argument that two positions were not the same, the

court determined that "[u]ltimately, the comparison of departmental functions of the two

employees is a question of material fact best suited for a jury to determine"); *Hennick v. Schwans*

*Sales Enterprises, Inc.*, 168 F. Supp. 2d 938, 947 (N.D. Iowa 2001) (in analyzing an Equal Pay

Act Claim, the court "finds that there is a jury question on whether there were only 'insubstantial

or minor differences" between [the plaintiff's] position . . .and the positions of her male

comparators, where initial training for the two positions was identical, and both jobs involved

many of the same duties.")

 The Sixth Circuit, in *NLRB v. Interurban Gas Co.*, 354 F.2d 76, 78 (6th Cir. 1965),

opined that the question whether jobs are substantially equivalent is an issue of fact. Similarly,

the Sixth Circuit found that the "issue as to whether one job is substantially equivalent to another

. . .must ultimately be determined based upon the individual facts of each case." *NRLB v. Baer*,

1996 U.S. App. LEXIS 42533, *38 (6th Cir. 1996), citing *NRLB v. State Stove & Manufacturing*

*Co.*, 403 F.2d 656, 657 (6th Cir. 1965), (unpublished, copy attached as Ex. AA).

 SP recruited and hired 113 employees under the age of 40 during the next year instead of

the 64 Plaintiffs. None were as objectively qualified as Plaintiffs. (*Compare* Ex. 62, Summary

of each such employee hired and their prior work experience with Ex. 1-58a.)

    **c.** **Defendant's Reliance On The Language In The EEOC Charge**
     **Is Without Merit, But, At Most, Creates An Issue Of Fact With**
     **Respect To The Positions Applicants Sought**

 Defendant points to an alleged conflict between the EEOC charges filed by each Plaintiff

and the Plaintiffs' deposition testimony in regard to the parties who replaced them in their

former positions at the Hamilton Mill. Relying on *Barwick v. Celotex Corp.*, 736 F.2d 946, 960

(4th Cir. 1984), Defendant argues that the Court should ignore Plaintiffs' deposition testimony

regarding their willingness to accept a job offer for any position at the Hamilton Mill. *Barwick* is distinguishable, and Defendant's reliance on it is inapposite. The Plaintiff in *Barwick*, attempted to create a genuine issue of material fact in a products liability case through a "conclusory" affidavit which did not set forth facts in the plaintiff's personal knowledge. *Id*. The plaintiff attested to this affidavit after the defendant extensively deposed him twice, each time for several days. *Id*. at 959. Here, Plaintiffs filed their EEOC charges before any discovery took place, and before they were deposed.

Furthermore, it is absolutely irrelevant as to which particular positions, if any, the Plaintiffs may have believed they had applied. The relevant inquiry is, of course, for what positions Defendant considered Plaintiffs. As demonstrated above, the evidence before this court is sufficient to establish at least a genuine issue of material fact as to the positions for which Plaintiffs were considered and whether those positions were offered to younger, less qualified employees.

> **d.    The Plaintiffs Applied For Jobs With The Understanding From Defendant That Their Applications Would Remain Active For At Least Six Months**

Defendant cannot argue in its reply as it did in its Objections to the Magistrate Judge's Order of June 3, 2003, that Plaintiffs failed to apply for the positions which were filled after February 9, 2001. The application completed by each Plaintiff stated that the application "will remain active for a period of six months." Annetta Johnson, IP's head of Human Resources since 1996 who assumed the same role for SP before she quit, admits that the application meant what it said:

Q.    When it says it will remain active, what does that mean . . .?

A.    That it won't be destroyed . . . That if there are – if this person have been qualified for a position, but may not have been the top candidate, that if another position came open, we would be able to go back and consider

this individual for another opening.

(Johnson Dep. at 42.)

The cases cited to by Defendant in its Objections are distinguishable from the case at bar. The plaintiff in *Wanger v. G.A. Gray Co.*, 872 F.2d 142 (6th Cir. 1989), was told after his dismissal, that "his phone may ring [with a job offer]," giving him some indication that he could be hired again *if he applied. Id.* at 144. Wanger's employer terminated him in *June 1983* and his position did not become available again until *August of 1984*, over a year later. *Id.* Finally, Wanger never sent in a new resume or filled out an application for employment for the position advertised a year later. *Id.*

In the instant matter, SP rejected Plaintiffs for employment and Defendant sought additional applicants immediately thereafter. Significantly, the *Wanger* Court cited *Babrocky v. Jewell Food Co. and Retail Meat Cutters Union Local 320,* 773 F.2d 857 (7th Cir. 1985), which held that the plaintiff's failure to reapply was not fatal "because an employer may create an atmosphere in which employees understand that their applying for certain positions is fruitless." *Id.* at 867. Plaintiffs here were rejected for employment only a few days before Defendant placed ads in local newspapers. (Lewis Dep. at 50, 55.) It is hard to imagine a situation which would more dramatically indicate the fruitless nature of submitting a second job application. Again, why would an applicant resubmit an application after he was told that his first application would remain active *for six months*?

Defendant's reliance on *Williams v. Hevi-Duty Elec.*, 819 F.2d 620, 629 (6th Cir. 1987), is also misplaced. In that case, the plaintiff's failure to reapply was fatal to his case because, *after a year*, the company no longer kept his application on file. It is hard to believe that SP raises this case as a defense, when the applications submitted by Plaintiffs clearly stated that their *applications were active for six months after their termination from IP and while Defendant*

36

*SP ran advertisements for new employees.* (Lewis Dep. at 50, 55; Johnson Dep. at 41-42.)

**e.    Plaintiffs Did Not Need To Submit A Second Application Under *McDonnell Douglas* and Its Progeny**

Courts have uniformly followed the rationale of *McDonnell Douglas* and recognized that a rejected applicant may properly compare himself with later applicants without the necessity of a new application. *See, e.g., Mazus v. Department of Transp.*, 629 F.2d 870, 874 (3d Cir. 1980), *cert. denied*, 449 U.S. 1126 (1981); *McLean v. Phillips-Ramsey, Inc.*, 624 F.2d 70, 71-72 (9th Cir. 1980) (*per curiam*); *Miller v. Weber*, 577 F.2d 75, 77 (8th Cir. 1978) (*per curiam*); *Smith v. Liberty Mut. Ins. Co.*, 569 F.2d 325, 328 (5th Cir. 1978); *Meyer v. Missouri State Highway Comm'n*, 567 F.2d 804, 811 (8th Cir. 1977), *cert. denied*, 435 U.S. 1013 (1978); *Chavez v. Tempe Union High School Dist.*, 565 F.2d 1087, 1091 (9th Cir. 1977); *Subia v. Colorado & S. Ry.*, 565 F.2d 659, 662 (10th Cir. 1977); *Frausto v. Legal Aid Soc'y of San Diego, Inc.*, 563 F.2d 1324, 1328 (9th Cir. 1977); *King v. New Hampshire Dep't of Resources & Economic Dev.*, 562 F.2d 80, 83 (1st Cir. 1977); *Kinsey v. First Regional Sec., Inc.*, 557 F.2d 830, 837 (D.C. Cir. 1977); *Lindsey v. Angelica Corp.*, 508 F. Supp. 363, 366 (E.D. Mo. 1981); *EEOC v. High Top Coal Co.*, 508 F. Supp. 553, 558 (E.D. Tenn. 1980); *Danzl v. North St. Paul-Maplewood-Oakdale Indep. School Dist. No. 622*, 25 FEP 291, 296 (D. Minn. 1980), *aff'd*, 25 FEP 296 (8th Cir.), *rev'd and remanded en banc*, 663 F.2d 65, 27 FEP 556 (8th Cir. 1981) (*per curiam*); *Smith v. Bolger*, 22 FEP 717, 719 (N.D. Ga. 1980); *Rajender v. University of Minn.*, 24 FEP 1051, 1056 (D. Minn. 1979); *Rogillio v. Diamond Shamrock Chem. Co.*, 446 F. Supp. 423, 430 (S.D. Tex. 1977); *Leiman v. Fashion Inst. of Tech.*, 441 F. Supp. 854, 858 (S.D.N.Y. 1977), *aff'd mem.*, 591 F.2d 1330 (2d Cir. 1978); *Brooks v. Virginia Marine Resources Comm'n*, 16 FEP 604, 607, (E.D. Va. 1977); *Weadon v. American Cyanamid Co.*, 14 FEP 533, 535 (N.D. Fla. 1976).

**f.    Smart Paper's Centerpiece Argument - Its Alleged "Statistics"- Is Fundamentally Flawed**

_____

Defendant's centerpiece defense rest on its alleged hiring statistics related to its hiring in early February, 2001. Of course this defense ignores obvious facts:

- In early February, 2001, the IP hiring "pool" was predominantly older, thus it is not surprising that most employees hired then were older; what is surprising is that SP regarded only about 75% of the older, experienced, applicant pool as qualified, while it regarded 98% of the second (younger) hiring pool as qualified even though they had virtually no relevant experience.

(Ex. 58a at ¶ 56; Ex. 59.)

### (1)  Defendant's "Statistics" Contradict Earlier Information Produced by Defendant in Discovery

The statistics relied upon by SP cite to Maheu's Declaration, in which Maheu claims that his statistics are based on information produced to Plaintiffs in discovery. This is a half-truth because Defendant produced contradictory data during discovery. While Maheu now claims that 410 IP applicants were offered jobs, his own memo prepared on March 6, 2001 (as Executive Vice President and COO of SP) identified only *400* employees as receiving job offers. (Ex. 63.) The same document claims 15 employees declined offers, but then lists only 384 employees as accepting offers. Thus, Maheu's Declaration, which identifies 410 job offers, apparently includes at least 10 employees who SP said had not been offered jobs. Likewise, SP produced a list of "hourly offers and acceptances" as of March 1, 2001, (Ex. 71,) which includes the names of 9 individuals[18] who were not identified as being hourly employees at IP in another response. (Ex. 70.)

_____

[18]  The names are <u>not</u> included in Exhibit 70: Adriel N. Kirkland, Sandor Katan, William F. Bowling, Michael J. McQueen, Arthur Schutte, Michael S. Durbin, Randy Butz, Robert Caldwell, and Gregory Holland.

38

**(2)  An Examination Of Accurate Data Of Defendant's Hiring Process Reveals That Defendant Substantially Reduced The Number of Older Workers At The Hamilton Mill, While Increasing The Number of Younger Workers**

The real data reveals a completely different picture. While Defendant failed to offer jobs to 143 former IP employees over the age of 40, all of whom had actively worked at the Mill, it then began a process that resulted in 113 younger, less-qualified, applicants receiving job offers. All 113 needed substantial training, unlike Plaintiffs. It strains any notion of a legitimate hiring process to believe that an employer would prefer inexperienced applicants, whose references were not checked, and who needed substantial training, over experienced applicants who obviously needed no training.

After its first year of operation, Defendant had decreased its workforce by 106 employees, and this reduction was achieved by reducing the number of older employees by 148 and increasing the number of younger employees by 42:

### Age Distribution of the Workforce

| Employees' Ages | 2/1/01 (Before SP) | 2/9/02 | Change |
|---|---|---|---|
| 50 + | 280 | 219 | -61 |
| 40-49 | 247 | 160 | -87 |
| 30-39 | 39 | 52 | +13 |
| 18-29 | 9 | 38 | +29 |
| Totals | 575 | 469 | -106 |

Average Age of Workforce 2/1/01: 49.1

Average Age of New Hires After 2/9/01: 38.1 years

(Ex. 59.)

Plaintiffs have presented evidence that SP considered all of the applicants' employment

39

at the Mill in general as opposed to employment in any particular position. Plaintiffs have demonstrated that Defendant hired a substantial number of younger, less experienced former IP employees. Plaintiffs have also presented evidence that Defendant hired 113 younger employees with no mill experience shortly after rejecting Plaintiffs for employment. Plaintiffs have further demonstrated that they need not have applied again for positions after February 9, 2001 because SP had just rejected them for open positions and told them their applications would remain active for six months. Finally, Plaintiffs have presented evidence that the age of the workforce at the mill decreased significantly in the months following the Defendant's acquisition of the facility. Thus, Plaintiffs have raised at least a genuine issue of material fact with respect to the fourth element of the *prima facie* case, that is whether they were rejected for employment in favor of substantially younger applicants.

> **5.    Each Plaintiff Can Demonstrate That Genuine Issues Exist As To Whether The Articulated Reasons For Rejecting Their Employment Are A Pretext For Unlawful Age Discrimination**

To establish pretext, Plaintiff need not produce *additional* evidence of discrimination. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507 (1993). As the Supreme Court clarified in *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 147-148 (2000), a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification lacks credibility, will permit the trier of fact to infer that the employer was motivated by unlawful discrimination.

"There are no hard and fast rules as to . . . what evidence is needed in order to establish pretext." *Rowe v. Cleveland Pneumatic Co.*, 690 F.2d 88, 97 (6th Cir. 1982). The Sixth Circuit has stated explicitly that evidence that the articulated reason did not actually motivate the discharge will be sufficient to create a factual question concerning pretext. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), quoting *McNabula v. Chicago*

40

*Transit Authority*, 10 F.3d 501, 513 (7th Cir. 1993). The United States Supreme Court has held that disbelief of the articulated reason will permit the fact finder to find intentional age discrimination. *St. Mary's Honor Center*, 509 U.S. at 511.

To establish that Defendant's explanation for the termination is unworthy of belief, Plaintiff may show that (1) the proffered reasons had no basis in fact, (2) the proffered reasons did not actually motivate his discharge, or (3) they were insufficient to motivate his discharge. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). The first type of proof may require that Plaintiff show that the alleged basis for the termination never happened or is actually false. *Id*. The second type of proof consists of a demonstration that "an illegal motivation was more likely than the reasons offered by the Defendant." *Id*. The third type of proof consists of evidence that other employees outside the protected class otherwise equally or less qualified than Plaintiff were hired. *Id*.

According to the Sixth Circuit, the court should not accept blindly an employer's proffered reason as honest. *Id*. Further, an employer's business judgment is not an absolute defense. *Wexler v. White's Fine Furniture*, 317 F.3d 564, 576 (6th Cir. 2003). The court may "consider the *reasonableness* of an employer's decision . . . to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation. *Id*. (emphasis added). The Sixth Circuit has stressed that it is important to analyze all of the evidence of pretext together. *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160 (6th Cir).

Defendant SP has articulated two reasons for not hiring Plaintiffs: first, 18 of the Plaintiffs failed the drug screen; and second 44 Plaintiffs received "RED" ratings on the reference checks. (Def. SP Mem. Supp. M.S.J. at 27-33.) Plaintiffs have substantial evidence that both these reasons are pretextual, and the real reason these Plaintiffs were not hired is age

discrimination.

      **a.**      **Defendant SP's Reliance On The Negative Reference Checks Is
Not Shielded By The Business Judgment Rule**

Plaintiffs can easily demonstrate that a reasonable jury could conclude that Defendant

SP's reliance on the negative reference checks is pretext, particularly in light of each Plaintiff's

substantial work experience at the Mill, Maheu's knowledge that the older workers were

survivors under accelerating expectations of performance, and the fundamental fact that *none* of

the off the street hires were remotely as qualified as *any* Plaintiff. An alleged poor reference

hardly[19] would outweigh all of the other substantial advantages of hiring Plaintiffs over the new

hires that needed significant training.

Defendant correctly cites *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1160 (6th Cir.

1990), for the proposition that a plaintiff cannot necessarily *establish* pretext by demonstrating

---

[19]      In regard to 11 Plaintiffs, Defendant argues that poor interviews, in addition to
bad references, provides a second legitimate nondiscriminatory reason for its
decision. This argument also fails.

      First, the record indicates that poor interviews were not sufficient to deny
employment. Weissman testified that "no individual would not be recommended
solely based upon the interview." (Weissman Dep. at 166.) She further testified
that "it probably would be the case that most people not recommended got poor
references" (Id.) Thus, a jury could reject Defendant's reliance on the allegedly
poor interview as just another example of pretext.

      In addition, the interview process conducted by Defendant was equally suspect as
its process for collecting references. For example, Jessica Sampson, one of the
people hired to conduct employee interviews and make judgments about
Plaintiffs' skills, attitudes, and work behavior was a "very part-time" employee of
the Weissman Group. (Sampson Dep. at 10.) Sampson was still in college and
had little or no training by the Weissman Group in avoiding stereotyping based on
age. (*Id*. at 13-14.) More importantly, she had absolutely no experience in the
paper industry and had very little understanding of Defendant's business.
(Sampson Dep. at 24-25.)

the unsoundness of Defendant's methods for collecting references and acting upon them.  (Def. SP Mem. Supp. M.S.J. at 34) (also citing *Godfredson v. Hess & Clark, Inc*, 173 F.3d 365, 372 (6th Cir. 1999).)  However, this "business judgment rule" in no way prevents Plaintiffs from pointing to unsound business practices as *evidence* of pretext.  The Supreme Court, in *Tex. Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 259 (1981), explained that "the fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to . . . liability, although *this may be probative of whether the employer's reasons are pretexts for discrimination*."  (*Id.*) (emphasis added).

The Sixth Circuit, sitting en banc, recently held in *Wexler v. White's Fine Furniture*, 317 F.3d 564, 576 (6th Cir. 2003), that an "employer's business judgment . . . is not an absolute defense to unlawful discrimination," citing *E.E.O.C. v. Yenkin-Majestic Paint Corp.* 112 F.3d 831, 835 (6th Cir. 1997) ("Although it is true that a factfinder should refrain from probing an employer's business judgment, a decision to terminate an employee based upon unlawful considerations does not become legitimate because it can be characterized as a business decision.").  As noted by the Second Circuit in *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d  93, 105 (2d Cir. 2001), "while the business judgment rule protects the sincere employer against second-guessing of the reasonableness of its judgments, it does not protect the employer against attacks on its credibility." *Id.*, citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1048 (11th Cir. 2000).  See also *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 313 (2d Cir. 1997) ("While we do not second-guess an employer's hiring standards, the reasons for its employment decision, including its alleged reliance on such standards, are subject to scrutiny under Title VII.").

In the case at bar, Defendant SP blatantly ignored Plaintiffs' extensive qualifications, based on their average of 29 years of service *at the mill,* and instead hired numerous, younger

candidates with *no paper mill experience*. Just as the *Byrnie* court found, it strains credulity that the Plaintiffs would have remained employed so long if they had been unqualified or undesirable employees.

Simple reliance on a bad employment reference, in the face of other, overwhelming evidence that Plaintiffs were good employees who should be preferred over untrained candidates, is insufficient. *See, King v. New Hampshire Dep't of Resources and Econ. Dev.*, 562 F.2d 80, 82-83 (1st Cir. 1977) (defendant's reliance on bad reference check is insufficient to overcome plaintiff's ample evidence she was reliable and responsible employee). Thus, this Court must consider the totality of Plaintiffs' evidence that they were more qualified than untrained candidates and that Defendant SP was more likely than not motivated by a desire to reduce the average age of the mill workforce and allow a jury to decide whether Defendant SP really relied on the negative references, or whether this was a convenient excuse.

One reason in particular that Defendant SP's reliance on the negative reference checks is suspect is because it never conducted similar employment reference checks on the younger, off the street candidates. (Ex. 58a at ¶ 55.) When an employer waives a particular hiring criteria in favor of a non-protected candidate, a fact finder can (and should) conclude that the employer did not really rely on the criteria when making the hiring decision in question. *Kinsey v. First Regional Securities, Inc.*, 557 F.2d 830, 836 (D.C. Cir. 1977) ("non uniform and unequal application of criteria by an employer constitutes an unfair employment practice"). Obviously, Defendant SP did not consider an employment reference check necessary to its hiring decisions with respect to 198 candidates, most of whom were substantially younger than Plaintiffs, who had little or no paper industry experience. (*See*, Ex. 58a at ¶55.) Therefore, when it states that this was the critical and most important (if not only) reason it rejected Plaintiffs, who brought significant paper mill experience with them, for employment, a jury is likely to conclude that

44

Defendant SP lacks credibility and is covering up an unlawful motive, namely age discrimination. The "Business Judgment Rule" does not require a jury to disregard this stark evidence.

> **b.      Each Plaintiff Can Demonstrate That The Alleged Poor Reference Was Insufficient To Motivate The Decision Not To Hire The Plaintiffs**

The cases cited by Defendant to show that its alleged reliance on the negative recommendations is sufficient to require this Court to grant summary judgment misinterprets the law as applied to this case. Unlike the plaintiffs involved in the cases cited by Defendant, Plaintiffs here are able, at the very least, to produce evidence that demonstrates a genuine issue of material fact as to the legitimacy of the references in question. For instance, the court in *Lewis-Calhoun v. City of Jackson*, 977 F. Supp. 1148, (S.D. Al. 1997), determined that Plaintiff did not sufficiently rebut the defendants' legitimate articulated non-discriminatory reason, two bad references, because she had "provided no evidence that a discriminatory reason more likely motivated the defendants." *Id*. at 1153. See also, *Kehrer v. City of Springfield*, 104 F. Supp. 2d 1001, 1007 (C.D. Ill. 2000) (the defendant granted summary judgment *because the plaintiff did not allege any evidence to cast suspicion on the defendant's reason for not hiring her*) (emphasis added).

Courts have recognized that an employer's disregard of a plaintiff's job qualifications may undermine the credibility of an employer's stated justification for an employment decision. *Byrnie*, 243 F.3d at 93, citing *Fischback v. D.C. Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) ("Evidence indicating that an employer misjudged an employee's performance or qualifications is, of course, relevant to the question whether its stated reason is a pretext masking prohibited discrimination."). See also, *Tyler v. Re/Max Mountain States, Inc.*, 232 F.3d 808, 814 (10th Cir. 2000). Moreover, courts have noted that "evidence showing an employer hired a less

qualified applicant over the plaintiff may be probative of whether the employer's proffered reason for not promoting plaintiff was pretextual." *Alexander v. Fulton County, GA*, 207 F.3d 1303, 1340 (11th Cir. 2000).

In *Byrnie*, the plaintiff, a 61-year old male, applied for a job as an art teacher in a Connecticut high school ("Cromwell"). *Byrnie*, 243 F.3d at 98. The posted announcement for the position specified that the appropriate candidate would have a degree in art education. The plaintiff had a bachelor's and master's degree in art education and had taught at the high school level for 21½ years, had been substitute teaching at Cromwell for five years, had been serving as the advisor to Cromwell's literary magazine, and was certified to teach at the high school level in Art History, Social Studies and adult education. *Id*. Cromwell High School hired Esther Mancarella, a 42-year-old woman with a degree in fine arts. *Id.* at 99. She had some graduate course work, no experience teaching at the high school level (although she had taught middle school for four years), and was teaching on a part-time basis. Based on these credentials alone, the defendant ranked Mancarella higher than the Plaintiff before conducting any interviews.

The *Byrnie* Court questioned the legitimacy of the process the defendant engaged in that resulted in Mancarella's credentials (e.g. no experience teaching high school, only a bachelor's degree, only four years teaching in any school) being ranked above the plaintiff's relevant experience and superior education. The Court held that a reasonable trier of fact would be entitled to find that the defendant's suspicious ranking reflected negatively on the credibility of the employer. *Id*. at 104.

Other courts have evaluated attacks on the credibility of reference and screening processes and found that they were faulty to the extent that the Defendant's articulated nondiscriminatory reason was called into question. For example, the Seventh Circuit found evidence of a flawed interview process ostensibly designed to hire the best candidate for an art

teacher position significant to their finding of pretext.  *Byrnie,* 243 F.3d at 106 ("strains credulity to believe that a teacher unfamiliar with the competencies necessary for effective teaching would be relied upon for so long.")

In the case, Defendant SP blatantly ignored Plaintiff's extensive qualifications, based on their average of 29 years of service *at the mill*, and instead hired numerous, younger candidates with no paper mill experience.

Likewise, the Court in *Puhy v. Delta Air Lines, Inc.*,  833 F. Supp. 1577 (N.D. Ga. 1993), examined the defendant's reliance on a preemployment test and found sufficient evidence of pretext to prohibit summary judgment.  The plaintiff in *Puhy* was subjected to the Shipley Institute for Living Test  ("the Shipley") on which the plaintiff fared poorly and which allegedly resulted in him not being hired.  *Id*. at 1579.  The *Puhy* Court held that evidence of "testing irregularity, coupled with the other circumstances [statistical evidence offered by Plaintiff to demonstrate a discriminatory animus on the part of Delta] of the case, could permit a fairminded jury to conclude that Delta's reliance upon the test was pretext for discrimination." *Id*. at 1585.

The Court in *Loiseau v. Dep't. of Human Resources of Or.*, 567 F. Supp. 1211, 1218-19 (D. Or. 1983), likewise rejected the defendant's articulated reason for failure to promote plaintiff, in part, because of the plaintiff's length of time on the job and because the record offered no basis for the low ratings given to the plaintiff in the areas of leadership and organization.  In *Downing v. United Parcel Serv., Inc.*, 215 F. Supp. 2d 1303 (M.D. Fla. 2002). The Court found the conflicting results of several hearing tests enough to created a genuine issue of material fact as to whether the defendant's reliance on the results of one of the conflicting tests was really pretext for discrimination.  *Id*. at 1310.

47

     **(1)    The Hiring Process With Respect To Plaintiffs Was A Sham And Designed To Eliminate As Many Older Employees From The Workforce As Possible**

In the case at bar, a reasonable jury, could conclude that Smart Paper's decision-making process was so flawed that it destroys the credibility of Defendant's legitimate nondiscriminatory reasons for its hiring decisions. Defendant had the opportunity to obtain accurate and current information about the applicants who had previously worked for IP "first-hand" from personnel files and attendance records. These records documented any relevant evidence of unsatisfactory work, safety issues, or violations of work rules or policies. (Maheu Dep. at 72-77.) Instead, Defendant made its hiring decisions based on less reliable "second-hand" information from reference checks. Like the "testing irregularities" in *Puhy* and conflicting results of hearing tests in *Downing*, a jury could look at the process for gathering information upon which Defendant relied and conclude that the information gathered was unreliable and insufficient to motivate Defendant's decision not to hire these well-qualified Plaintiffs for open positions.

Furthermore, there is evidence that Defendant did not check reference on the individuals hired off the street. According to SP human resource employees involved in the hiring process of off the street hires, SP made hiring decisions after SP interviewed the applicants. Other than an initial verification of prior employment, there is no indication in the record (including documents about the applicants provided during discovery) that SP conducted reference checks on the "off the street" hires about alleged prior job performance like they did with respect to Plaintiffs or other former IP employees. (Hampton Dep. at 17-18; Carpenter Dep. at 13-15.) The fact that Defendant did not even bother to obtain a job performance references on the younger, off the street candidates, clearly destroys Defendant's argument that the suspect references garnered for the older IP employees resulted in its decision not to hire those employees.

48

> **(2)    Plaintiffs Have Produced Evidence That Defendant Engaged in Age Stereotyping In The Interview And Reference Selection Process**

"It is the very essence of age discrimination for an older employee to be fired because the employer believes that productivity and competence decline with old age." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993). In the instant case, there is persuasive evidence that the Defendant engaged in age stereotyping in the selection process and that Plaintiffs were adversely affected.

First, SP's interview and reference checking process allowed SP to give negative marks to candidates if an interviewer believed they were not "flexible" (see sample Interview Scoreboard, Exhibit 66) and/or a reference reported data indicating a low score in the areas of "willingness and ability to learn." (*See* Ex. 67, Sample Applicant Reference Check.) Sixteen of the Plaintiffs were subjectively rated as inflexible, and 30 were rated as unwilling to learn new things. (Ex. 60, Summary of SP's "Flexibility" Ratings of Plaintiffs.) Both are classic stereotypes of older workers. Only five IP employees under the age of 40 offered employment by SP received a flexibility score less than "3," and only two were judged to be unwilling to learn new things. (Ex. 61, Summary of Younger IP Employees Hired.)

Weissman, the SP official who designed both forms, and her employees admit that such conclusions are classic examples of stigmatizing stereotypes of older workers. (Weissman Dep. at 46, 48; Sampson Dep. at 12-13.) Given that both the interview and the reference checks would be short and covered a broad range of topics (the interview covered 10 subject areas, the reference covered 6 subject areas, and asked five specific questions), little time was available to verify scores in each category.[20] (Moore Dep. at 20.) Significantly, Weissman did not train

---

[20]    One of the interviewers estimated she did 15 or 20 interviews a day. (Stauble Dep. at 10.)

interviewers to avoid stereotyping older workers:

> Q.    Have you ever been given any training from The Weissman Group in how
>        to avoid stereotyping potential candidates or applicants?
>
> A.    No.

(Sampson[21] Dep. 13-14; *see also* Donaldson Dep. at 18-19.)

These questions were included in the hiring process despite Maheu's belief that "Neanderthals" believe older workers are "less flexible and set in their ways," and that some of those Neanderthals were employed by IP.  (Maheu Dep. at 61.)

Throughout the hiring process, SP discriminated against older workers by inaccurately stereotyping many of them as "inflexible" and "unwilling to learn new things."  *Only one Plaintiff received a "5" in "flexibility" and no Plaintiff received a "5" in "willingness to learn new things," with most Plaintiffs simply receiving an average or worse rating.*  (Ex. 60.)[22]

### (3)    Plaintiffs Have Presented Evidence That The Successful Candidates Were So Much Less Objectively Qualified Than Plaintiffs As To Establish Pretext

Numerous courts have analyzed cases in which the plaintiff alleges that the defendant erroneously judged their qualifications to the degree that the defendant's articulated non-discriminatory reason must be pretext.  For example, the District of Columbia Circuit Court, sitting en banc, opined that if "a factfinder can conclude that a reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, the

---

[21]    Sampson was a college student who was hired to conduct interviews during her senior year. (Sampson Dep. at 8-9.)

[22]    SP did not do reference checks on the younger applicants after February 9, and did not produce any documentation of its interviews.  As opposed to its highly selective process when it considered Plaintiffs' applications, SP hired every applicant after February 9, except for three (195 of 198 applicants accepted).  (Ex. 58a at ¶56.)

factfinder can legitimately infer that the employer consciously selected a less-qualified candidate–something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998). See also, *Lathram v. Snow*, 336 F.3d 1085 (D.C. Cir. 2003) (summary judgment not warranted on two claims where the employer hired outside candidates over the employee because there was an issue that the candidates were more qualified or that the assertion was pretextual); *Price v. Fed. Express Corp.* 283 F.3d 715 (5th Cir. 2002) (in a Title VII case, a showing that the unsuccessful employee was clearly better qualified is enough to prove that the employer's proffered reasons are pretextual); *Millbrook v. IBP, Inc.*, 280 F.3d 1169 (7th Cir. 2002) (differences in qualifications between job candidates are generally not probative evidence of discrimination *unless* those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue).

The *en banc* D.C. Circuit, in *Aka,* 156 F.3d at 1284, faced a significant disparity, similar to the one before the Court today, between the plaintiff and the job candidate to whom the defendant extended an employment offer. It is telling that the *Aka* Court, repeatedly emphasized that the plaintiff had nineteen years experience with the employer as compared with Jaime Valenzuela, the successful candidate: "Aka had worked directly with patients at WHC for 19 years, and so would have been familiar with many of the relevant hospital procedures. Valenzuela, with his year working in the laundry, could not make this claim." *Id.* at 1297. "Aka thus had 19 years of close experience with the administration of medications." *Id.* "A reasonable juror could conclude that [the successful candidate] would have learned much less of the medical terminology relevant to the pharmacy job in his year at Metpath than Aka did in his 19 years [with the defendant]." *Id.*

51

*Wexler,* 317 F. 3d at 575 (6th Cir. 2003) holds that an inquiry into an employee's objective qualifications should focus on his or her "education, experience in the relevant industry, and demonstrated possession of the required general skills." While the standard cited by the *Wexler* Court refers to a prima facie case analysis, other courts have applied a similar analysis to the pretext stage of a plaintiff's case. *See, e.g., Aka* 156 F.3d at 1295. Under this inquiry, Plaintiffs can easily establish that they were objectively much more qualified to work at the Hamilton Mill than any of the employees hired off-the-street.

An examination of the evidence before the Court demonstrates that Defendant disregarded Plaintiffs' skills, talents and work ethics such that the legitimacy of its reliance on those evaluations is called into question. Despite bad references, every single Plaintiff can point to sworn testimony by first line and second line supervisors, evidence of work performance, and/or years of service that creates at minimum an issue of fact to be decided by a jury regarding their actual qualifications to work in the Hamilton Mill. Most Plaintiffs in this case have over 25 years experience at the Hamilton Mill. (*See* Ex. 60.) Many Plaintiffs have 30 plus years experience (*See* Ex. 60.) Henry Gardner had 43 years of service. (Ex. 23, 60.)

Twelve Plaintiffs[23] have "clean files, with no discipline *ever*, and Gardner had one discipline in 43 years. Twenty-three Plaintiffs[24] had no discipline in the last 10 years at least. Seventeen Plaintiffs[25] had no discipline in the last three years at least.

---

[23]    They are: Abner, Brandenburg, Chasteen, Clear, Durbin, Gentry, Hyden, Johnson, Miller, Ogg, Paxton, Tobert.

[24]    They are: Brewer, Broughton, Bullio, C. Campbell, Cress, Duncan, Eaton, Fisher, Gardener, Horn, Huntington, Italiano, Ketcham, Lakes, Marsee, Rodgers, Spada, Taulbee, Turley, Turner, Volz, Wilkins, Willis.

[25]    They are: Gregory, Baylor, T. Bennett, W. Bennett, Blevins, Brooks, Jerry Combs, Joshua Combs, Freeman, Gill, Hensley, Knodel, Mann, McKay, Pennington, Robertson and Thomas.

Many Plaintiffs were members on numerous teams and many took leadership roles. For example, Charles Campbell was a safety captain, founder of the daily mill newspaper "Paper Clips," served on Chaco Credit Union Board of Directors, was involved in the Employee Assistance Program Committee and completed the Line Leadership Program. (Campbell Dep. at 105-108.) Everett Taulbee served on the Hazmat safety and rescue team. (IP Pl. Ex. 37 at Taulbee Aff. at ¶ 4.) Barney Sandlin was a member of IP's team that met with customers to identify problems with quality. (IP Pl. Ex.36 at Sandlin Aff. at ¶ 8.) Larry McCreary won awards for ideas to help with cost savings and production. (McCreary Dep. at 152; IP Pl. Ex. 31 at McCreary Aff. at ¶ 7.) Jerome Isreal served as safety coordinator for his shift and Team Concept Coordinator and held regular meetings to discuss team work. (IP Pl. Ex. 26 at Isreal Aff. at ¶ 5.) Terrell. Fowler helped write training manuals and train others in his department and was the most experienced worker in his department. (Fowler Dep. at 22, 110.) Patrick Durbin's supervisor, Richard Dunn, encouraged him to apply for a supervisor position. (IP Pl. Ex. 16 at Durbin Aff. at ¶ 6.) Jerry Combs attended several training classes in order to be certified to train others and served on IP's training team. (Jerry Combs Dep. at 18-20.) Larry Brandenburg was a quality control operator for six months and was head of safety in his department for six months. (Brandenburg Dep. at 35.) Many of those employees SP rejected were highly trained craftsmen.[26] All of them had been trained to work in the positions for which SP hired untrained, inexperienced off-the-street employees.

In addition, all Plaintiffs had previously been qualified to work at Champion and IP and none of them had been disciplined in the recent past for work performance issues. The record is

---

[26]    For example, Stan Knodel, Douglass Paxton, Everett Taulbee, Patrick Durbin, and Mendol Eaton all completed an apprenticeship training program at great expense to Champion and were thus highly trained and skilled employees. (Ex. 74, Stanifer Aff. ¶ 19.)

replete with testimony that Champion and IP standards closely if not completely matched those standards set by SP when hiring its new employees. (Johnson Dep. at 44; Lewis Dep. at 50, 55.) Thus, if Plaintiffs were objectively qualified to work for IP, they were objectively qualified to work for SP.[27]

Finally, the testimony of a number of Plaintiffs' immediate supervisors demonstrates that Plaintiffs were clearly qualified for the positions for which Defendant hired younger, untested applicants. John Rice, Stan Knodel's immediate supervisor, testified that he thought the only reason people were not hired was because they tested positive for drugs and was surprised that Knodel was not hired by Defendant. (Rice Dep. at 40-41.) Barney Sandlin's immediate supervisor, David Shepard, stated that Sandlin "was probably [the] best worker. . . [who knew] more about the job than I did." (Shepard Dep. at 28.) Shepard further testified "if I was starting a company, I would want him to be over it." (*Id.* at 40.) Everett Taulbee's supervisor, P. Joseph, testified that he would have recommended him for employment with SP. (Joseph Dep. at 26.)

Defendant's discriminatory evaluation of Plaintiffs' qualifications becomes especially clear when the qualifications of the people hired off the street are taken into consideration. For example, *113* of the 195[28] people hired by SP off the street *had no experience* working in a paper mill. (Ex. 62.) Plaintiffs in this case have 17 - 43 years of experience working in the Hamilton Mill. Plaintiffs had worked in numerous departments and had skills that easily transferred from

---

[27]     These are only a few examples of Plaintiffs' superior skills and qualifications. Plaintiffs have attached a table comparing the qualifications of all individual Plaintiffs with those of the off the street applicants Defendant hired to fill the positions.

[28]     It appears from the discovery provided by Defendant SP that it hired all but three of the 198 post-February 9, 2001 applicants. Obviously, Defendant SP was in desperate need of workers and was not as selective in its post-February 9, 2001 hiring process after it denied jobs to the qualified Plaintiffs.

department to department.  (*See* Dunn Dep. at 31 (Patrick Durbin's and Mendol Eaton's background in the Mill would have been helpful in regard to working as a drum operator)).)  The majority of the new hires did not have a college degree and many had only GED's or no high school diploma at all.  (Ex. 62.)

One successful applicant, whose previous, and presumably only, job had been at Wendy's, was only *18 years-old.*  (Ex. 62 at 1.)  One of the new hires stated on his application that he left his previous job because "he got arrested."  (Ex. 62 at 1.)  One of them did not even complete the application for employment.  (Ex. 62 at 2.)  A number of these new hires had "DUI" convictions and other traffic violations.  (Ex. 62 at 2, 8, 12.)  More than one of these new employees had spent time in jail and were convicted of assault.  (Ex. 62 at 2, 3, 6, 8.)  *One of the new hires admitted to a manslaughter conviction on his employment application*.  (Ex. 62 at 13.) *Clearly, by almost any standard one could apply, Plaintiffs were objectively more qualified than these new employees.*

Thus, in the absence of illegal conduct, SP would not have hired these new, extremely inexperienced employees over the highly skilled and experienced Plaintiffs.  Plaintiffs have clearly presented sufficient evidence with respect to the issue of pretext as to render summary judgment inappropriate on these grounds.

> **(4)     The Sufficiency Of Defendant's Articulated Reason For Failing To Hire Plaintiffs Is Destroyed By The Fact That The 113 Younger Off The Street Hires Received Extensive Training**

Maheu acknowledged that the off the street hires required training (two to three weeks for the easiest job in the Mill), while the former IP employees obviously would not require training:

Q.     . . . people that did not receive offers, most of the people who did not receive offers had the skills and abilities to work in the Hamilton Mill?

A.    They may have had the skills. ...

A.    -- the jobs we were looking to fill, people off the street could fille those be trained.

Q.    And they would need to be trained?

A.    *They would need to be trained.* Anybody needs to be trained. You need to be trained to drive to work in a warehouse or anything, you have to be trained.

Q.    *Let's take the easiest job in the mill. How long would it take to train me?*

A.    *Two to three weeks.*

Q.    and what does that two to three weeks of training for the easier job in the mill entail?

A.    More than likely include mill orientation, and job orientation, mobile equipment training, safety training, that type of thing.

Q.    Do you think it's more than likely that *the employees who were not offered jobs but had worked at the mill for many years* had mill orientation, had job orientation, had equipment training, had safety training, that type of thing.

A.    Did they have that? yes.

Q.    All right. So *they would not have required any training*?

A.    *No*.

Q.    and during the two to three weeks of training, are you paying the new hire for the training?

A.    Yes, they have an entry rate. At that point in time it was $11.00 an hour. . . .

Q.    Do you have any reason to think that [former IP employees] who were storekeepers, mechanical technicians, rewinder operators, warehouse workers couldn't immediately go into DR if they had worked in the Hamilton Mill for many years?

A.    No reason to think they couldn't become DR.

Q.    So everybody you hired since February 9th, 2001, has started in Department Reserve?

A.    Department Relief, yeah, Department Reserve, yes -

56

(Maheu Dep. at 98-99, 113-114; *see also* Berger on Dep. at 36-37.)

       **c.**     **Alternatively, Each Plaintiff Has Demonstrated SP's Hiring Decisions Were Illegally Motivated**

      Another way Plaintiffs can demonstrate an issue as to pretext is to identify evidence that Defendant was more likely motivated by an illegal motive, age, than not. First, it is clear that Defendant obtained age data on all of the IP applicants *before* making hiring decisions. This is highly suspect, as there is no legitimate need for an equal opportunity employer to solicit this data before making such decisions. Defendant may articulate some reason for this conduct, but the Court should not consider at this stage any reason that a jury is not required to believe.

      Likewise, there is undisputed evidence on the record that SP representatives collected age data on the off-the-street applicants. (*See supra* at 17.) Johnson and Lewis both acknowledged that there was no legitimate need for such information. (Johnson Dep. at 58; Lewis Dep. at 97.) Johnson confirmed that high school graduation dates were a "sneaky" way to obtain age data. (Johnson Dep. at 58.) This conduct is similarly suspect, and one obvious inference is that Defendant was zealously attempting to identify older applicants, since it had earlier rejected IP's suggestion to hire all of the older workers. (Couch Dep. at 79.)

       **d.**     **Plaintiffs' Data Also May Raise An Issue As To Pretext As There Is Evidence That The Age Of The Workforce Dramatically Dropped After SP Acquired The Mill**

      The Sixth Circuit has long noted the propriety of using statistical evidence to prove pretext in a discrimination case. See *Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1202 (6th Cir. 1974) ("In cases concerning racial discrimination, 'statistics often tell much and the Courts listen.'"), citing *State of Ala. v. United States*, 304 F.2d 583, 586 (5th Cir. 1962) aff'd per curiam 371 U.S. 37, 83 S.Ct. 145 (1962). In *Sims v. Cleland*, 813 F.2d 790, 794, (6th Cir. 1987), the Court opined that, in an attempt to prove pretext, a plaintiff "is free to offer direct or statistical

evidence tending to establish sex-based animus." The Court, in *Simon v. NuTone, Inc.*, 1995 U.S. App. LEXIS 22543 (6th Cir. Aug. 1, 1995) (unpublished, copy attached as Pl.'s Ex. AA) applied a similar analysis to a claim pursuant to the ADEA, citing *Barnes v. Gencorp Inc.*, 896 F.2d 1457, (6th Cir. 1990), cert. denied, 498 U.S. 878 (1990). There is no requirement that Plaintiffs statistical evidence be supported by expert testimony. *McCabe v. Champion Int'l Paper*, 1990 U.S. App. LEXIS 18542 *14 (6th Cir. 1990) (unpublished, attached as Pl.'s Ex. BB), citing *E.E.O.C. v. N.Y. Times*, 543 F. Supp. 911, 914 (M.D. Ala 1982), aff'd, 719 F.2d 383 (11th Cir. 1983).

Indeed, when the data concerning the off-the-street hires is examined, a picture of SP's hiring process emerges that suggests a desire to reduce the number of older workers. At a minimum, this data creates a genuine issue of material fact as to pretext.

> ### e.    Each Plaintiff Who Failed The Drug Screen Can Establish Defendant's Articulated Reason For Rejecting Their Employment Was Pretext For Unlawful Age Discrimination

Each Plaintiff who failed the drug screen has presented a prima facie case for age discrimination as discussed above at p. 25. Defendant's articulated reason for failing to hire Plaintiffs Blevins, Clear, Gentry, Gill, Gregory, Johnson, Lakes, Marsee, Miller, Pennington, Rodgers, Spada, Tolbert, Turley, and Wilkins is that they failed their drug tests. (Def. SP Mem. Supp. M.S.J. at 24.) These Plaintiffs can establish that this explanation is a mere pretext because several of the subsequent off the street hired had Criminal Records, including drug convictions and because the methodology of the drug test is so suspect to establish as the destroy its legitimacy as a reason to reject Plaintiffs for employment.

> ### (1)    Plaintiffs Can Demonstrate That Applicants Who Had Serious Criminal Offenses, Including Drug Possession, Were Hired, Thus Establishing Pretext

Each Plaintiff who failed the drug screen can establish that the articulated reason for

rejecting their employment was insufficient to motivate the adverse employment action. The following off the street employees, who were objectively substantially less qualified than Plaintiffs in terms of experience, see p. 18, had a record of criminal offenses comparable or worse than the articulated reason for not hiring these Plaintiffs.

| | | |
|---|---|---|
| Gary Arvin | - | Convicted of assault |
| Fred Bowling | - | convicted of manslaughter and possession of marijuana |
| Don Boyd | - | convicted of DUI, received a suspended license and jail time |
| Jay Brittain | - | convicted of disorderly conduct |
| Matthew Carey | - | left a job because he "got arrested"; convicted of numerous traffic violations |
| Barry Crane | - | Convicted of DUI and driving without a drivers' license |
| Brian Coates | - | convicted of DUI and two traffic violations |
| Michael Hardess | - | Convicted felon with eight traffic violations |
| Greg McQueen | - | Convicted of DUI and other traffic violations |
| Mark Popp | - | convicted DUI |
| Tamara Riley | - | Convicted of assault |
| Mark Scrimizzi | - | Convicted of DUI |
| Paul Stapleton | - | convicted of disorderly conduct |
| James Willsey | - | Convicted of DUI |

(Pl. Ex. 62.)

These less qualified applicants had a history of criminal offenses including substance abuse related crimes such as DUI and possession of marijuana. Defendant obviously did not consider these factors as be disqualifying as these candidates were offered and accepted

employment.  Thus, a reasonable juror could thus infer that the Plaintiffs' drug test failures were insufficient to motivate the decision to reject them for employment as for more serious issues wer overlooked in the off the street applicants.

> **(2)    The Methodology Used In Drug Testing Plaintiffs Is So Suspect As To Destroy Its Purported Legitimacy As A Reason To Reject Plaintiffs For Employment**

Hair sample drug testing is a wide net drug testing method that is inaccurate in a number of ways.  Hair sample drug testing cannot pinpoint the time of use of a drug detected, and it cannot determine impairment while on the job.  KEVIN B. ZEESE, DRUG TESTING LEGAL MANUAL AND PRACTICE AIDS §2:39 (2nd ed. 2003).  (Citing University of California at Davis Department of Medical Pharmacology and Toxicology Study, cited in Drug Detection Rep., Sept. 20, 1994, at 5.)  Hair sample drug testing will detect 5-10 times as many people with a history of usage of drugs of abuse than a urine screen.  (Psychemedics Corporation's Internet brochure on corporate drug testing services, 10/14/03.)  Defendant SP used Psychemedics Corporation ("Psychemedics") to perform the hair sample drug testing on Plaintiffs.  As such, it is a poor way to determine whether an employee was impaired while on the job, or whether an employee was using drugs on or near the date of testing.

This type of drug testing can also be discriminatory in nature.  Drugs will be held in the hair follicle longer and at a higher level in women than in men.  KEVIN B. ZEESE, DRUG TESTING LEGAL MANUAL AND PRACTICE AIDS §2:39 (2nd ed. 2003).  (Citing Health and Human Services Secretary, Donna Shalala in a letter to the Honorable Charles E. Grassley, Chairman, Caucus on International Narcotics Control, United States Senate.  August 16, 1996, pg. 2).  Hence, women who tested positive for drugs from a hair sample may not be users at or near the time of testing. Plaintiffs Marsee and Tolbert (both female) both testified they had not used drugs for a long period before the testing occurred, but nonetheless tested positive for marijuana and cocaine,

respectively.  (Marsee Dep. at 34; Tolbert Dep. at 65.)

Non-Caucasians retain two to 12 times more cocaine in their hair follicles than Caucasians, leaving the potential for testing positive when a Caucasian does not test positive. KEVIN B. ZEESE, DRUG TESTING LEGAL MANUAL AND PRACTICE AIDS §2:39 (2nd ed. 2003). (Citing Health and Human Services Secretary, Donna Shalala in a letter to the Honorable Charles E. Grassley, Chairman, Caucus on International Narcotics Control, United States Senate. August 16, 1996, pg. 2.)  The amount of pigment in hair will affect how long drugs remain in the hair follicles, therefore, dark hair will retain traces of drugs longer than light hair.  (*Id*.; 1994 U.S. Navy Study, cited in Drug Detection Rep., March 8, 1994, at 2.)   Plaintiffs Rodgers and Tolbert are African American.  Both testified that it had been years since they used drugs of any type, but they still tested positive.  (Rodgers Dep. at 92; Tolbert Dep. at 65.)

Hair testing is also inaccurate because a person can get a drug in his/her hair from exposure to second hand smoke or even from exposure to the sweat of someone who is a drug user.  KEVIN B. ZEESE, DRUG TESTING LEGAL MANUAL AND PRACTICE AIDS §2:39 (2nd ed. 2003).  (Citing 1994 U.S. Navy Study, cited in Drug Detection Rep., March 8, 1994, at 2.) Plaintiffs Blevins, Clear, Gentry, Gill, Gregory, Johnson, Lakes, Marsee, Miller, Pennington, Rodgers, Spada, Tolbert, Turley, and Wilkins were never asked by Defendant SP if they had been exposed to second-hand smoke and were never asked to re-test in order to cure any potential inaccuracies in the testing process.  A reasonable juror could infer that Defendant failed to re-test because Defendant SP wanted an excuse not to hire Plaintiffs Blevins, Clear, Gentry, Gill, Gregory,  Johnson, Lakes, Marsee, Miller, Pennington, Rodgers, Spada, Tolbert, Turley, and Wilkins.

Further, Defendant could not reasonably rely on the hair tests provided by Psychemedics because of the test's non-definitive nature .  In *Smith v. Chrysler Corporation*, 155 F.3d 799

61

(1998 6th Cir.), the Court determined that the main inquiry an employer should make into an adverse hiring decision is a reasonably informed and considered decision. (Citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256, explaining that an employee shows pretext "by showing that an employer's proffered explanation is unworthy of credence.") Defendant did not make a reasonable and considered decision when it failed to hire Plaintiffs. It simply relied on a drug test that was discriminatory and far too broad. Each of these Plaintiffs had over 20 years of service to Defendant IP. (Blevins Dep. at 22; Clear Dep. at 22; Gentry Dep. at 18; Gill Dep. at 10; Gregory Dep. at 13; Johnson Dep. at 11; Lakes Dep. at 12; Marsee Dep. at 11; Miller Dep. at 28; Pennington Dep. at 10; Rodgers Dep. at 18; Spada Dep. at 16; Tolbert Dep. at 15; Turley Dep. at 10; Wilkins Dep. at 25.)

Finally, a number of other employees were known drug users but were hired by Defendant. (Blevins Dep. at 55; Marsee Dep. at 70; Miller Dep. at 78; Rogers Dep. at 94; Spada Dep. at 39; Turley Dep. at 28-30.) A reasonable juror could conclude that the positive drug tests were insufficient to reject Plaintiffs for employment given that it hired other known drug users.

Thus, Plaintiffs have presented a genuine issues of material fact regarding the sufficiency of the drug test results as the articulated reason for Defendant's failure to hire them. Therefore, summary judgment is inappropriate regarding these 15 Plaintiffs' claims of age discrimination.

> **f.    Eight Plaintiffs Were Discriminated Against On Account of Their Age Because Substantially Younger Employees Were Preferred When Defendant Smart Papers Made Job Assignments.**

Plaintiffs can establish discrimination in the form of failure to hire by demonstrating that: 1) they were more than 40 years old; 2) they applied for and were qualified for a job for which Defendant was seeking applicants; 3) despite their qualifications, they were rejected; and 4) after their rejection, the positions remained open and the employer continued to seek applicants from

persons of their qualifications.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

To maintain an action for constructive discharge, Plaintiffs must show that "working conditions would have been so difficult or unpleasant that a reasonable person in the employees' shoes would have felt compelled to resign." *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 887 (6th Cir. 1996.)  The *Kocsis* Court also held that a plaintiff suffers an adverse employment action where there is 1) a termination of employment; 2) a demotion resulting in the loss of benefits or salary reduction; 3) conferring of a less distinguished title; 4) material loss of benefits; 5) significantly diminished material responsibilities; or 6) other factors unique to the particular situation.  (*Id.* at 882-883.)

The Sixth Circuit, in *Logan v. Denny's Inc.*, 259 F.3d 558, 569 (2001), held that whether a reasonable person would have felt compelled to resign depends of the facts of each case.   The Logan Court did offer factors the fact finder might consider including in making the determination including: 1) demotion; 2) reduction in salary; 3) reduction in job responsibilities; 4) reassignment to menial or degrading work; 5) reassignment to work under a younger supervisor; 6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or 7) offers of early retirement or continued employment on less favorable terms than the employee's former status.  (*Id.*)

> **(1)    Defendant Smart Papers preferred substantially younger, less qualified employees of International Paper to Elmer Campbell, and Campbell was constructively discharged from Smart Papers.**

Plaintiff Elmer Campbell was a devoted and dependable employee of IP for over 35 years and was 60 years old when IP sold the mill.  (Ex. 70.)  For this reason he expected to receive the position of Beater Engineer or Assistant Beater Engineer when the mill was sold.  (Application for Elmer Campbell, attached as Exhibit 75.)  However, Defendant SP constructively discharged

Campbell by assigning him as a Pulper Finisher, (IP/SP Assignment Comparison Chart, attached as Exhibit 76,) rather than more preferable and higher paying jobs for which Campbell was qualified.

Furthermore, Defendant gave preferential treatment to substantially younger, less qualified workers than Campbell by placing them in the very positions Campbell should have received. John Fore, age 38, was Department Relief at IP, an entry-level position, but was promoted to Beater Engineer at SP, the top job in the department. (*Id.*) Palmer Bowling, age 48, was a Pulper Furnisher/Materials Handler at IP and was assigned as Assistant Beater Engineer. (*Id.*) James Carl Spahni, age 53, remained an Assistant Beater Engineer even though Campbell had been with the mill longer. (*Id.*) There is at least a genuine issue of material fact as to whether Campbell was more qualified and experienced than these three workers, especially Fore, who had 7 years less experience in the mill, and was 22 years younger than Campbell. (Ex. 70.)

Although Campbell was working as a Pulper Finisher at the time the mill was sold, he explained that it was a temporary step down from Assistant Beater Engineer, which was his main job at the mill since 1988. (Campbell Dep. at 31-33.)[29] These temporary periods Campbell spent as Pulper Furnisher were the result of seniority changes, and he would be moved back up to Assistant Beater Engineer as more senior workers left their positions. (*Id.* at 34.) In fact, he frequently filled in as Beater Engineer, which was the top job in that line of progression. (*Id.*)

The position of Pulper Finisher at SP was more demeaning and physically demanding than his position at IP and resulted in a dramatic reduction in salary, and was so intolerable that Campbell was forced to decline the job. (*Id.* at 78, 54; Ex. 76.) Campbell testified that Pulper

---

[29]    Although Campbell's title technically would have changed from Pulper Furnisher/Materials Handler to Pulper Finisher, the two jobs are identical. (Campbell Dep. at 91.)

64

Furnisher required heavy lifting, and was the "bottom" job. (Campbell Dep at 65.) The only reason he was temporarily able to perform the lifting as a Pulper Furnisher at IP was because there were extra employees in the department to help him. (*Id.* at 77-78.) Additionally he was still performing some duties of Assistant Beater Engineer. (*Id.* at 89-90.) However, he knew that extra help would not be available to him as a Pulper Finisher at SP. (*Id.*) Moreover, he recalls informing SP at the time of his application that he could not physically do the Pulper Finisher job.

Campbell stated that he would have preferred to work as an Assistant Beater Engineer than receive severance. (Campbell Dep. at 74, 76.)[30] However, faced with the prospect of a job that both Campbell and Defendant SP knew he could not perform and a nearly thirty percent pay cut, Campbell chose to retire. (*Id.* at 54.) Thus Defendant SP deliberately created a work environment that was physically and financially intolerable.

Despite Campbell's superior qualifications and experience, Defendant SP discriminated against Campbell by ignoring his qualifications for the positions he wanted, placing him in the more demeaning and physically demanding position of Pulper Finisher, and assigning younger, less qualified workers in his place, and by subjecting him to less desirable working conditions than those younger employees. forcing him to decline his assignment.

> **(2)    Defendant Smart Papers preferred younger, less qualified employees of International Paper to Alfred Holland, and Holland was constructively discharged from Smart Papers.**

Plaintiff Alfred Holland was a loyal and valued employee of IP for over 30 years and was

---

[30]    Contrary to Defendant SP's assertion that Campbell did not want to work for SP, he repeatedly testified that he would have preferred to work as an Assistant Beater Engineer rather than accept severance and retire. (Campbell Dep. at 74, 76.)

62 years old when IP sold the mill.  (Ex. 65.)  However, Defendant SP constructively discharged Campbell by assigning him as a Drum Operator, (Ex. 76,) rather than assigning him in the less physically demanding job of Embosser Operator, a job Holland had performed since 1985. (Holland Dep. at 16-17.)

Furthermore, Defendant gave preferential treatment to substantially younger, less qualified workers than Holland by offering them the very positions that Holland should have received.  Edward Roberts, age 49, was in the Labor Pool at IP, an entry-level position, but was promoted to Embosser Operator at SP.  (Ex. 76.)[31]  Other, significantly younger Operators who did not have the experience and seniority that Holland had accumulated were also assigned as Embosser Operator.  (*Id.*)  Olivia Day was 42, Jim Bowling was 44, John Rice was 52, and John Hunt was 54.  (*Id.*)  In fact, every single Embosser Operator that was hired from IP was significantly younger than Holland.  (*Id.*)  There is at least a genuine issue of material fact as to whether Holland was more qualified and experienced than these five workers, especially Roberts who had 3 years less experience in the mill, and was 13 years younger than Campbell.  (Ex. 65.)

Although Holland served as a Drum Operator for 15 years, he intentionally abandoned that job for the lower-paying position of Embosser Operator in 1985 because the heat and stress associated with being a Drum Operator made those working conditions intolerable.  (Holland Dep. at 17.)  Contrary to Defendant SP's assertion that Holland did not want an offer from SP, Holland testified unequivocally that he did want a position with SP.  (*Id.* at 21).  Holland further testified that he did not know at the time the offer was made to him whether Drum Operators made more than Embosser Operators at Smart Paper.  (*Id.* at 27.)   Finally, Holland testified that

---

[31]    Although it appears that Holland was assigned to the labor pool in February, 2001, (Ex. 70,) he testified that he was an Embosser Operator from 1985 until the mill was sold  (Holland Dep. at 16-17.)

he did not want to work as a Drum Operator because of the increased heat and stress associated with the position. (*Id.* at 28.) Faced with a job that Holland knew he could not perform, Holland chose to retire. (*Id.*) Thus Defendant SP deliberately created a work environment that was physically intolerable.

Like Campbell, this evidence creates a genuine issue of material fact concerning the Holland's objective feelings as to whether there was a constructive discharge. Holland did not know at the time of the offer whether he would make more money as drum operator. He only knew that there was more heat and more stress involved in that job. A reasonable jury could find that Holland objectively felt that this increased heat and extra stress was sufficient to create intolerable working such that he could not accept Defendant SP's assignment.

Despite Holland's superior qualifications and experience, Defendant SP discriminated against Holland by placing him not in the less demanding position he desired and was then performing, but in the more physically demanding position of Drum Operator. Furthermore, Defendant SP discriminated against Holland by assigning younger, less qualified workers in Holland's place, and by subjecting him to less desirable working conditions than those younger employees.

> **(3)** **Defendant Smart Papers preferred younger, less qualified employees of International Paper to Govan Begley, and Begley was constructively discharged from Smart Papers.**

Plaintiff Govan Begley was a devoted and dependable employee of IP for over 35 years and was 59 years old when IP sold the mill. (Ex. 65) For this reason he expected to receive the position of Packing Specialist when the mill was sold. (Begley Dep. at 29-30; Begley Dep. Ex. 1

at p.1.)[32]  Begley was also one of four head carton operators in the department.  (Begley Dep. at 83.)  However, Defendant SP constructively discharged Begley by placing him as an Assistant Packing Specialist, (Ex. 76,) rather than more preferable and higher paying job for which Begley was qualified.

Furthermore, Defendant gave preferential treatment to substantially younger, less qualified workers than Begley by placing them in the very position Begley should have received. Other, significantly younger Packing Specialists who did not have Begley's experience and seniority were allowed to keep their positions.  (*Id.*)  Gregory Laney was 46, Jeffrey Kittner was 46, and Robert Holland was 49. (*Id.*)  Robert Holland also was not a Head Carton Packer.  (*Id.*; Begley Dep. at 83.)  There is at least a genuine issue of material fact as to whether Begley was more qualified and experienced than these three workers.[33]

The position of Assistant Packing Specialist at SP forced Begley to assist Packing Specialists that he had previously been on equal footing with, and was thus more demeaning than his position at IP.  Despite these intolerable conditions, Begley made an effort to work at SP as an Assistant Packing Specialist.  (Begley Dep. at 50.)  It appears that the Assistant position was a mere artifice to allow SP to pay Begley and others less money, because there was no difference in job duties between the Assistants and the Specialists.  (*Id.* at 52.)  As a result, Begley was mystified as to why he was making $12.00 at SP and the younger, less qualified Specialists made

---

[32]    Begley testified that he was an Involvo Operator since 1988, (Begley Dep. at 18,) but this was not a formal job title at IP.  His formal title was Packing Specialist Class A.  (Ex. 76.)

[33]    Defendant SP alleges that Begley would have preferred to not have been offered a position at all.  Begley testified that it was financially more worthwhile for him to have received severance and retire than accept a job with SP, so he applied for a job with SP hoping for severance.  (Begley Dep. at 28, 30.) Regardless, there is no prima facie requirement that an employee objectively desire a particular job that is lost to a younger, less qualified person for disparate treatment to exist.

$14.00, and SP never offered him an explanation for this disparity. (*Id.* at 65.) Additionally, Begley testified that SP departmental relief workers who were ten to fifteen years younger than he were making $15.00 per hour. Because the position as Assistant Packing Specialist was demoralizing and financially intolerable, Begley was forced to take early retirement rather than accept the job. (*Id.* at 68-69.) Thus Defendant SP deliberately created a work environment that was physically and financially intolerable, thereby forcing him to decline his assignment.

Despite Begley's superior qualifications and experience, Defendant SP discriminated against Begley by ignoring his qualifications for the positions he wanted, placing him in the more demeaning and physically demanding position of Pulper Finisher, assigning younger, less qualified workers in his place, and by subjecting him to less desirable working conditions than those younger employees.

**(4)    Defendant Smart Papers preferred younger, less qualified employees of International Paper to Raymond Arthur, and Arthur was constructively discharged from Smart Papers.**

Plaintiff Raymond Arthur began working for IP in 1968 after serving in the Navy. (Arthur Dep. Ex. 1 at 3.) He was a loyal employee of IP for over 32 years and was 62 years old working as an RMQA/Pulp Tester when IP sold the mill. (Ex. 65.) However, Defendant SP constructively discharged Arthur by assigning him as a Product Analyst, (Ex. 76,) a position for which he was untrained, rather than the job for which Arthur was qualified.[34] (Arthur Dep. Ex. 1 at 3.) Defendant SP thus changed Arthur's working conditions for the worse by attempting to throw him into a lower-paying job he could not do, and made Arthur's work environment mentally and

---

[34]    Arthur testified that he thought SP RMQA Testers made less money than SP Paper Testers, not that he made less money as an IP RMQA Tester than he would have as an SP Paper tester, as asserted in Defendant SP's Memorandum in Support of its Motion for Summary Judgement. (Arthur Dep. at 28-29.)

financially intolerable.[35]

Furthermore, Defendant gave preferential treatment to a substantially younger, less qualified worker than Arthur by promoting him from the same position that Arthur had held. Dale Williams, 46, had been an RMQA Tester at IP, but was assigned as an Instrument Service Technician at SP. (Ex. 76.)  Instrument Technicians were paid $17.00 at SP as opposed to the $14.00 wage Arthur was offered as a Product Analyst, $5.00 more than the wage for RMQA Tester.   There is at least a genuine issue of material fact as to whether Arthur was more qualified and experienced than Williams, who had 5 years less experience in the mill, and was 16 years younger than Arthur.  (Ex. 65.)

Arthur testified that he could not have performed the job of Product Analyst because that position required one to two years' additional training.  (Arthur Dep. at 54-55.)  In fact, he had no understanding of the job at all and was unqualified to perform it.  (*Id.* at 23.)  The position of Product Analyst was also more stressful and demanding than Arthur's position at IP  (*Id.* at 24.) In fact, Arthur suspected that the only reason SP gave him the job was in the hopes that he would quit.  (*Id.* at 32.)  This situation was so intolerable and demeaning that Arthur was forced to decline the job and take early retirement.  (Arthur Dep. Ex. 3.)

Despite Arthur's qualifications and experience, Defendant SP discriminated against Arthur by ignoring his application for the position he wanted and by placing him a more demanding position that SP knew he could not perform.  For Arthur to accept his assignment would have been demeaning, futile, and financially unwise.  Finally, Defendant SP promoted a younger, less qualified worker to another position at a much higher rate of pay and subjected Arthur to less desirable working conditions than younger employees.  Thus Arthur was forced to

---

[35]    Although Arthur's new title at SP was Product Analyst, it was synonymous with the title of Paper Inspector at IP.  (Arthur Dep. at 22.)

decline his assignment. and by subjecting him to less desirable working conditions than those younger employees.

> **(5)    Defendant Smart Papers preferred younger, less qualified employees of International Paper to Floyd Geeding, and Geeding was constructively discharged from Smart Papers.**

Plaintiff Floyd Geeding was a devoted and dependable employee of IP for over 29 years and was 55 years old when IP sold the mill.  (Ex. 65.)  For this reason he expected to receive his position as Trainer.  (Geeding Dep. Ex. 1 at 1.) However, Defendant SP constructively discharged Geeding by assigning him as a Mixer Operator, (Ex. 76,) rather than more preferable, less physically demanding, and higher paying jobs for which Geeding was qualified.

Furthermore, Defendant gave preferential treatment to substantially younger, less qualified workers than Geeding by placing them in the very positions Geeding should have received.  Geeding moved into his training position at IP in 1991 after he developed a sleeping disorder from working rotating shifts in the Coating Prep Department, mainly as a Blender Operator.  (Geeding Dep. at 18-20, 26.)  As Trainer, Geeding worked only days and was responsible for writing training manuals and for teaching technical and teamwork skills in the Coating Area.  (*Id.* at 20-21, 24.)  Geeding testified that of the seven Trainers at IP, four were hired as Trainers at SP.  (*Id*. at 24, 57, 83.)[36]  Of these four, three were substantially younger than Geeding, and a much younger Human Resources employee became a Trainer.  Jerry Allen, 46, Michael Carpenter, 47, and Norman Reid, 47 were all Trainers at IP who were offered salaried Trainer positions at SP. (*Id.* at 57.)

Omar Sandlin, a Human Resources employee of IP who was approximately in his thirties,

---

[36]    IP Trainers were hourly employees, whereas SP Trainers were salaried positions. (Geeding Dep. at 85-86, 96.)

71

was also assigned as a Trainer, but was fired for performance reasons shortly after the changeover. (*Id.* at 58, 79.) Geeding saw an advertisement for his old position and attempted to reapply, but was told that he could not because former SP employees could not reapply within six months after leaving their employment. (*Id.* at 79-80.)

Geeding was also qualified to perform the job of Blender Operator. (*Id.* at 18-20.) Yet three significantly younger IP employees were offered this position instead. David Chitwood, age 45, John Fath, age 45, and Mike Spenny, age 44, were all assigned as Blender Operators instead of Geeding. There is at least a genuine issue of material fact as to whether Geeding was more qualified and experienced than these Trainers and Blender Operators, especially Sandlin, who had not been a trainer at IP at all.

Although Geeding was a trainer for the entire Coating Area, his hands-on experience with the machinery consisted primarily of his ten years as a Blender Operator. (*Id.* at 19, 35.) Geeding never worked as a Mixer Operator, and had only limited, observational experience with that machine. (*Id.* at 19, 26.) Mixer Operators at SP were required to work rotating shifts, thus Geeding could not physically perform the job because of his sleep disorder. (*Id.* at 55-56.)

Geeding was never given an explanation for why he was not offered a position as Trainer. Although Defendant SP claims he was not assigned as a Trainer because he received a poor reference, SP has offered no evidence that the decision by SP not to give a training job was actually caused by the reference. (Geeding Dep. at 66-67.) Geeding could only conclude that his age was the reason he was treated less favorably than his younger counterparts:

> The only explanation I can come up with is because I was the oldest one in the group. It doesn't make sense because I was more involved with training and what was going on in training, with the exception of one other person, than the whole group. Why would you get rid of your better employee? It just doesn't make sense. Age has to be the only thing left.

(*Id.* at 90.)

72

Far from being allowed to decide freely whether to work for SP, Geeding would have been more than willing to accept any day shift job, and testified that he would not have needed to retire if he had been able to take a job at SP. (*Id.* at 77-78.) However, faced with the prospect of a job that demeaningly placed him back amongst the workers he used to instruct, that Geeding knew he could not perform, Geeding was forced to decline his assignment and retire. Thus Defendant SP deliberately created a work environment that was physically, emotionally and financially intolerable. Defendant SP discriminated against Geeding by assigning younger, less qualified workers in his place, and by subjecting him to less desirable working conditions than those younger employees.

        **(6)**      **Defendant Smart Papers preferred younger, less qualified employees of International Paper to Sonja Greene.**

Plaintiff Sonja Greene was a devoted and dependable employee of IP for over seventeen years and was 49 years old when IP sold the mill. (Ex. 65.) For this reason she expected to receive her position as Clerk. (Greene Dep. at Greene Dep. Ex. 3 at 1.) In the alternative, Greene was also well qualified for a position as Sheeter Operator. (Greene Dep. Ex. 5.) However, Defendant SP treated younger, less qualified employees better than Greene by assigning her as an Assistant Sheeter Operator, (Ex. 76,) rather than a the more preferable, higher level, and higher paying jobs for which Greene was qualified.

Furthermore, Defendant gave preferential treatment to a substantially younger, less qualified worker than Greene by placing this worker in the very position Greene should have received. Greene moved into her last position with IP as Finishing Area Clerk after working for several years as Assistant Sheeter Operator and Sheeter Operator, which was the top job in the department just under crew leader. (Greene Dep. at 30-33.) However, SP assigned Wanda Tyree, age 37, to Sheeter Operator instead of Greene. There is at least a genuine issue of material fact as

to whether Greene was more qualified and experienced than Tyree, who had not even worked for the mill three years when SP offered Tyree a more senior position than Greene's.

Greene was never given an explanation for why she was not offered a position as Clerk or Sheeter Operator, but there is evidence that the clerical position she desired and was qualified for was available all along. SP's Human Resources Manager was suddenly able to find Greene a position as Logistics Clerk at a higher rate of pay after he mistakenly terminated her under the erroneous belief that she was eligible for a buyout. (*Id.* at 52-54.)

Thus Defendant SP discriminated against Greene by assigning younger, less qualified workers to better jobs for which she was more qualified, even though an open clerical position existed, and by subjecting her to less desirable working conditions than younger employees.

### (7)     Defendant Smart Papers preferred younger, less qualified employees of International Paper to William Rumpler.

Plaintiff William Rumpler was a devoted and dependable employee of IP for over 31 years and was 50 years old when IP sold the mill. (Ex. 65.) For this reason he expected to receive a position as Packing Specialist. (Rumpler Dep. at 9.) In the alternative, Rumpler was also well qualified for a position as Crane Operator. (*Id.* at 51.) However, Defendant SP treated younger, less qualified employees better than Rumpler by assigning him as an Assistant Packing Specialist, rather than the more preferable, higher level, and higher paying jobs for which Rumpler was qualified. (Ex. 76.)

Rumpler testified that new SP employees were brought in to do higher paying jobs than his, such as crane operator, yet he was never given the opportunity to perform these jobs. (Rumpler Dep. at 51-52.) Rumpler was never given an explanation for why he was not initially offered a position as Packing Specialist, but there is evidence that the position he desired and for which he was qualified was available all along because Rumpler was promoted eventually to his

rightful position only after he threatened to resign. (*Id.* at 67.) He was humiliated by the fact that he had to work underneath a worker who he had trained at IP and who had far less experience in the department than Rumpler. (*Id.* at 62-63.) Rumpler also testified that whenever the older workers at SP would make suggestions, SP management told them they could just quit their jobs, but never said this to younger workers. (*Id.* at 52-53.)

Thus Defendant SP discriminated against Rumpler by assigning younger, less qualified workers to better jobs for which he was more qualified, even though there apparently was a more senior position available, and by subjecting him to less desirable working conditions than younger employees.

### (8)  Defendant Smart Papers preferred younger, less qualified employees of International Paper to Richard Hess.

Plaintiff Richard Hess was a loyal employee of IP for over 27 years and was 49 years old when IP sold the mill. (Ex. 65.) For this reason he expected to receive a position as Backtender. (Hess Dep. at 47.) However, Defendant SP treated younger, less qualified employees better than Greene by assigning him as an Assistant Winder Operator, the bottom job in the department. (Ex. 76.) By contrast, Hess was well-qualified to be both a Backtender and a Winder Operator, which were more preferable, higher level, and higher paying jobs. (Hess Dep. at 32, 63-65.)

Although Hess was technically assigned to the labor pool at the time the mill was sold, he explained that it was a temporary step down from Backtender, which was his main job at the mill, because IP had shut down a machine early in 2000. (*Id.* at 65.) He testified that when the mill was sold, he was still being paid at a higher rate than the labor pool because of this change. (*Id.* at 69-70.) Furthermore, he served as a Winder Operator as recently as 2000, which was the top job in that department's line of progression. (*Id.* at 70-76.)

Defendant gave preferential treatment to substantially younger, less qualified workers than

Hess by placing them in the very positions Hess should have received. Jason Barnes, age 24 and a Coater Operator at IP, had not even worked in Hess' department at IP. (Ex. 76.)  Jeffrey McClain, age 43, and Michael Steele, age 40, were allowed to remain on as Backtenders despite the fact that McClain had worked at the mill nine years fewer than Hess, and Steel eight years fewer. (*Id.*)  There is at least a genuine issue of material fact as to whether Campbell was more qualified and experienced than these three workers, especially Fore, who had 15 years less experience in the mill, and was 22 years younger than Campbell. (*Id.*)

Hess was also qualified to perform the job of Winder Operator. (*Id.* at 32, 63-65.)  Yet three significantly younger IP employees, none of whom were Winder Operators when the mill closed, were offered this position instead.  Troy Ervin, age 27 and an Assistant Operator at IP, Rodney Taylor, age 37 and a member of the labor pool, and Daniel Steward, age 40 and a member of the labor pool were all assigned as Winder Operators, (Ex. 76,) which was the senior job in the department. (Hess Dep. at 62.)  There is at least a genuine issue of material fact as to whether Hess was more qualified and experienced than these Backtenders and Winder Operators all three Winder Operators, all of whom received a promotion because of their SP assignments.

Thus Defendant SP discriminated against Hess by assigning younger, less qualified workers to better jobs for which he was more qualified, and by subjecting him to less desirable working conditions than younger employees.

**VI.    CONCLUSION**

For all the foregoing reasons, each Plaintiff has presented at least genuine issues of material fact with respect to their claims of age discrimination.  Therefore, summary judgment must be denied.

Respectfully submitted,


    /s/ Randolph H. Freking
Randolph H. Freking (0009158)
Sheila M. Smith (0065115)
George M. Reul, Jr. (0069992)
FREKING & BETZ
Trial Attorneys for Plaintiffs
215 East Ninth Street
Fifth Floor
Cincinnati, OH  45202
(513) 721-1975


## CERTIFICATE OF SERVICE

I hereby certify that on October 31, 2003, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system and copies will be mailed via U.S. Mail to those parties who are not served via the Court's electronic filing system.  Parties may access this filing through the Court's system.  Exhibits that are being manually filed are being hand delivered to local counsel for Defendant IP, and by overnight mail to counsel for Defendants Sun and SP, this 31st day of October, 2003.


    /s/ Randolph H. Freking