## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| **ELMER CAMPBELL, ET AL.,** | : | **CASE NO. C-1-01-527** |
| | : | |
| **Plaintiffs,** | : | **J. Beckwith; Mag. J. Hogan** |
| | : | |
| **v.** | : | |
| | : | **INTERNATIONAL PAPER** |
| **INTERNATIONAL PAPER,** | : | **COMPANY'S REPLY** |
| **SUN CAPITAL PARTNERS, INC.,** | : | **MEMORANDUM IN SUPPORT OF** |
| **SMART PAPERS,** | : | **ITS MOTION FOR** |
| | : | **SUMMARY JUDGMENT** |
| **Defendants.** | : | |

## SUMMARY OF ARGUMENT

### A.    Introduction

Plaintiffs' Memorandum in Opposition to International Paper's Motion for Summary Judgment concedes that their claims of age and disability discrimination against International Paper under federal and Ohio law should be dismissed. All claims of defamation with respect to allegations that International Paper referred to Plaintiffs as "excess baggage" or made other defamatory comments about Plaintiffs in the newspaper should also be dismissed because Plaintiffs have failed to offer any persuasive evidence in response to the Motion for Summary Judgment as to those claims. In fact, thirty of the seventy-two Plaintiffs concede that they dismiss their defamation claims against International Paper. Six Plaintiffs concededly have failed to prosecute their claims, and all their claims should be dismissed. Also, Plaintiffs have failed to present competent evidence of a closing for purposes of the WARN Act. Plaintiffs remaining defamation and WARN claims should be dismissed for the following reasons:

1

**B.**    **Defamation**

Forty-two Plaintiffs contend that International Paper made false and defamatory remarks about them to SMART's reference checkers. SMART's reference check interviews were conducted, however, with Plaintiffs' express written authorization, release and covenant-not-to-sue SMART or International Paper for any information disclosed in the reference check process. The interviews dealt exclusively with employment-related information. Plaintiffs concede these references were also subject to a qualified privilege under Ohio common law and under the Ohio Code.

In order to overcome the qualified privilege and survive summary judgment, Plaintiffs must identify competent evidence that International Paper supervisors acted with malice or reckless disregard for the truth in making defamatory comments to SMART about Plaintiffs' work performance. Plaintiffs' "evidence" of malice and reckless disregard consists primarily of claims that the supervisors and managers provided information beyond that contained in the employees' personnel files, and were not sufficiently prepared to provide references regarding Plaintiffs' work performance. In essence, Plaintiffs assert that unless their files contained records of discipline for performance problems, International Paper's supervisors could not provide SMART with negative comments about their work performance. Plaintiffs contend that any alleged negative comments that are not supported by formal discipline in the file (and even some that were supported by discipline) were malicious lies.

Plaintiffs' arguments fail to meet their burden to provide competent evidence in response to International Paper's Motion for Summary Judgment. The evidence – including Plaintiffs' own deposition testimony – is that performance-related issues did not necessarily result in formal discipline at International Paper. Supervisors often used informal counseling or coaching to take

corrective action, or even tolerated less than satisfactory performance, rather than go through the formal discipline and grievance process under the union contract.

Plaintiffs' argument also mischaracterizes the purpose of the reference check interviews. Plaintiffs specifically authorized and released International Paper to provide SMART with "employment-related information" in interviews of supervisors and managers. Plaintiffs' authorization and release did not prohibit the supervisors and managers from being asked about and commenting on performance-related issues that were not documented with discipline in the personnel files. Indeed, if that were the case, the reference check interviews would have served no purpose. SMART had access to Plaintiffs' actual personnel files and attendance records pursuant to the authorization, release and covenant-not-to-sue agreements signed by Plaintiffs. Moreover, International Paper's supervisors were not required to provide SMART with only positive information. Had Plaintiffs' authorization, release and covenant-no-to-sue agreements only authorized that positive information could be released, the agreements would have been completely unnecessary.

International Paper's supervisors and managers responded to the SMART interviewers' questions based upon their personal knowledge of Plaintiffs' work performance and/or information received from other supervisors who supervised Plaintiffs' work on a daily basis. Plaintiffs do not agree with the negative notations on the reference check sheets, although in their depositions, they confirmed the accuracy of many of the notations. Conclusory allegations by Plaintiffs that the reference check forms contain false information do not create issues of fact for trial.

Because their views of their own performance are more positive than some of their supervisor's views (to the extent those views are reflected in the reference forms), Plaintiffs

claim that the supervisors' statements to the reference checkers were "lies." They then argue that since the supervisors told "lies," they must have done so with malice or reckless disregard for the truth. Most of the Plaintiffs admit in their depositions, however, that they got along well with their supervisors. Most testified that they were unaware of a reason why their supervisors would lie about them to the reference checkers. As shown for each Plaintiff in the Appendix filed with this memorandum, Plaintiffs fail to offer sufficient evidence to allow a jury to conclude that International Paper's supervisors and managers acted maliciously or with reckless disregard for the truth in providing references to SMART.

Also, reference check forms contain SMART's reference checkers' notes, not International Paper's supervisors' notes. The forms themselves are hearsay. While they reflect the information communicated by the reference checkers to SMART, they cannot be offered by Plaintiffs to prove what International Paper's supervisors actually told the reference checkers.

Were Plaintiffs' theories the law, there would be no enforceable release for providing a reference to a prospective employer, and no effective qualified privilege for an employment reference. No prospective employer in Ohio could expect to obtain anything but positive references on applicants for employees. Former employers would have no incentive to risk the cost of defending themselves in a defamation jury trial by providing even an arguably negative reference about an employee's job performance. This would frustrate the express public policy of Ohio. (Ohio Rev. Code Ann. § 4113.71; Hahn v. Kotten, 43 Ohio St. 2d 237, 331 N.E.2d 713 (1975). Accordingly, International Paper is entitled to summary judgment as a matter of law on Plaintiffs' claims of defamation.

### C.    WARN

International Paper is entitled to Summary Judgment on Plaintiffs' WARN claims.

First, Plaintiffs offer no facts demonstrating that there was a "plant closing," as defined under WARN. In response to the undisputed evidence submitted by International Paper, Plaintiffs have offered only the conclusory statements of Milton Lewis and Deryl Couch that the Mill "closed" when it was sold to SMART. Plaintiffs do not dispute any of the facts submitted by International Paper that show that there was no "closing" as that term is defined by WARN and its implementing regulations.

Second, the competent evidence establishes that there was not a sufficient employment loss to constitute a "mass layoff" as that term is defined by WARN. Plaintiffs' attempt to create a dispute of fact by quoting an estimate by Milton Lewis. However, Lewis testified that this was a "ballpark" estimate and that he did not know the exact number of employees at the Mill who were hired and not hired by SMART. This testimony fails to rebut the competent evidence submitted by International Paper and SMART that over 70% of the Mill's employees were hired by SMART. Thus, there was no "mass layoff" as defined by WARN.

Third, the undisputed facts confirm that International Paper sold the Mill to SMART as a "going concern." Under the "sales exception" in WARN and its implementing regulations, International Paper is not required to give notice of any employment loss resulting from the sale and SMART's decision to hire or not hire employees who were employed at the Mill on the date of the sale. Accordingly, summary judgment should be granted under the sales exception.

Fourth and finally, Plaintiffs, along with other Mill employees, received actual notice, within a week of the date the sales agreement was reached and more than 30 days before the sale took place, that SMART intended to acquire the Mill as a going concern, hire a workforce, and continue its operation. International Paper provided information and assistance to the Mill's employees to facilitate their applications for continued employment with SMART. Before the

sale, Plaintiffs had time to apply for continued employment at the Mill, and their union had time to negotiate an effects bargaining agreement with International Paper that provided severance pay, benefits continuation and outplacement assistance for employees who did not receive continued employment with SMART.   Thus, International Paper satisfied in good faith the purpose of WARN's notice provisions.

International Paper is entitled to summary judgment on Plaintiffs' WARN claims.

## TABLE OF CONTENTS AND PRIMARY AUTHORITIES[1]

I.    INTRODUCTION....................................................................................................1

      A.    Plaintiffs Have Conceded Summary Judgment Is Appropriate For Many
            of the Claims Made in Plaintiffs' Fifth Amended Complaint...................3

      B.    International Paper is Entitled to Summary Judgment on Plaintiffs'
            Remaining Claims....................................................................................4

II.   THE MATERIAL FACTS ARE NOT IN DISPUTE ...........................................7

III.  ARGUMENT ......................................................................................................11

      A.    International Paper is Entitled To Summary Judgment As A Matter of Law
            ...........................................................................................................11

            Celotex Corp. v. Catrett, 477 U.S. 317, 328 (1986)
            Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
                  248-49 (1986)
            Gregg v. Allen-Bradley Co., 801 F.2d 859, 861
                  (6th Cir. 1986)
            First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253,
                  289-90 (1968)
            Schultz v. Newsweek, Inc., 668 F.2d 911, 918-19
                  (6th Cir. 1982)
            Fed. R. Civ. P. 56(e)

      B.    Plaintiffs Cannot Establish that References Allegedly Provided to SMART
            by International Paper Supervisors Are Defamatory ................................11

            1.    It is Undisputed that Plaintiffs Authorized International Paper to
                  Provide Job-Related Information To Smart and that Plaintiffs
                  Released International Paper From Liability Associated with Such
                  Disclosures................................................................................12

                  Schuman v. Lake Hosp. Sys., 1997 Ohio App.
                        LEXIS 727 (Ohio App., 1997)
                  Denlinger v. City of Columbus, 2000 Ohio App.
                        LEXIS 5679 (Ohio App. 2000)

            2.    Plaintiffs' Defamation Claims Fail Because They Cannot Establish
                  the Communications Were Made with Actual Malice.................14

                  Ohio Rev. Code Ann. §4113.71(b) Brunsman v.
                        Western Hills Country Club, 151 Ohio App.
                        3d 718, 727, 785 N.E.2d 794, 801 (2003)
                  Wall v. Ohio Permanente Medical Group, 119 Ohio
                        App. 3d 654, 666, 695 N.E.2d 1233, 1241
                        (1997)

---

[1] Because the Memorandum exceeds twenty pages, attached is a Table of Contents and Primary Authorities.

Curry v. Nestle USA, Inc., 2000 U.S. App. LEXIS
        18743 *20 (6th Cir. 2000)
Mosley v. Evans, 90 Ohio App. 3d 633, 630
        N.E.2d 75, 78 (1993)
Bichler v. Union Bank & Trust Co., 745 F.2d
        1006, 1014 (6th Cir. 1984)
O'Hara v Board of Education of the Brooklyn
        City School Dist., 2003 U.S. App. LEXIS
        15634, *8 (6th Cir. July 30, 2003) (Ohio)
St. Amant v. Thompson, 390 U.S. 727, 731 (1968)
A & B-Abell Elevator Co., Inc. v. Columbus/Central
        Ohio Bldg & Const. Trades Council, 73 Ohio
        St. 3d 1, 13 (1995)
New York Times Co. v. Sullivan, 376 U.S. 254, 287
        (1964)
Bressler v. Fortune Magazine, 971 F.2d 1226, 1246
        (6th Cir. 1992)
Hussain v. Fairview Gen. Hosp., 1987 Ohio App.
        LEXIS 7051 (Ohio App., 1987)
Dodson v. Wright State Univ., 91 Ohio Misc. 2d
        57, 697 N.E.2d 287 (1997)
Rinehart v. Maiorano, 76 Ohio App. 3d 413,422,
        602 N.E.2d 340, 346-47 (1991)
Tohline v. Central Trust Co., 48 Ohio App. 3d
        280, 284, 549 N.E.2d 1223, 1228 (1988)
Holbrook v. Harman Automotive, Inc., 58 F.3d 222,
        226 (6th Cir. 1995)
Longo v. Aluminum Color Indus., Inc., Case Nos.
        93-3320, 93-3366, 1994 U.S. App. LEXIS
        18758, *15 (6th Cir.  July 21, 1994)
Mosley v. Evans, 90 Ohio App. 3d 633, 637
McCartney v. Oblates of St. Francis de Sales, 80
        Ohio App. 3d 345, 609 N.E.2d 216 (1992)
Dental Care Clinic v. McDonough, 1986 Ohio App.
        LEXIS 5742, 8-9 (Ohio App., 1986)
Hersch v. E.W. Scripps Co. , 3 Ohio App. 3d 367,
        374 (1981)

3.      Plaintiffs Have Not Presented Competent Evidence That
        Defamatory Statements Were Made By International Paper
        Supervisors.................................................................................. 25

        Sperle v. Michigan Dep't of Corrections, 297 F.3d 483,
                495 (6th Cir. 2002)
        Weberg v. Franks, 229 F.3d 514, 526 n.13 (6th Cir.
                2000) Fed. R. Civ. P. 56(e)

Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183
    F.3d 155, 160 (2d Cir. 1999)
Courtney v. Canyon Television & Appliance Rental,
    Inc., 899 F.2d 845, 851 (9th Cir. 1990) Fed. R.
    Evid. 801(c)
Albert v. Loksen, 239 F.3d 256, 266-67 (2d Cir. 2001)
Bondie v. Bic Corp., 947 F.2d 1531, 1534 (6th Cir. 1991)
    F.R.E. 803(6)
Bush v. Barnett Bank, 916 F. Supp. 1244, 1255 (M.D.
    Fla. 1996)
John and Vincent Arduini Inc. v. NYNEX, 129 F.
    Supp.2d 162, 173 (N.D.N.Y. 2001)
Courtney v. Canyon Television & Appliance Rental,
    Inc., 899 F.2d 845, 851 (9th Cir. 1990)
Bularz v. Prudential Ins. Co. of Am., 93 F.3d 372,
    377-78 (7th Cir. 1996)
DeMaria v. Washington County, 12 F. Supp.2d 1093,
    1100 (D. Idaho 1996)
GMO Rice v. Hilton Hotel Corp., 1987 U.S. Dist.
    LEXIS 16893, (D.D.C. Sept. 1, 1987)

4.    Plaintiffs' own opinion of their individual work performances, or
their co-workers' opinion of their performances, is not relevant to
determining whether the supervisor's references were defamatory
.................................................................................................. 35

Millbrook v. IBP, Inc., 280 F.3d 1169, 1181 (7th Cir,
    2002)
Ost v. West Suburban Travelers Limousine, Inc., 88
    F.3d 435 (7th Cir.1996)
Anderson v. Baxter Healthcare Corp., 13 F.3d 1120,
    1125 (7th Cir.1994)
Olsen v. Marshall & Ilsley Corp., 267 F.3d 597, 602 (7th Cir. 2001)

5.    International Paper Should Not Held Liable For Statements Made
For the Benefit of SMART .......................................................... 36

Austin v. Mabey, 184 F.Supp.2d 534 (M.D.La. 2001)
Moham v. Steego Corp., 3 F.3d 873 (5th Cir. 1993)

C.    AS A MATTER OF LAW, PLAINTIFFS CANNOT ESTABLISH A
VIOLATION OF THE WARN ACT ...................................................... 39

1.    Under the Authoritative Guidance of the WARN Regulations,, No
"Closing" Occurred as a Matter of Law....................................... 39

20 C.F.R. § 649, 54 Fed. Reg 16042,
    § 639.3(j) (April 20, 1989)
29 U.S.C. § 2107(a)

20 C.F.R. §639.3(b)
20 C.F.R. § 639.1(a)
20 C.F.R. § 639.4(c)(1)
United Mine Workers v. Martinka Coal Co., 202
    F.3d 717 (4th Cir. 2000)
Int'l Alliance of Theatrical & Stage Employees v.
    Compact Video Servs., Inc. 50 F.3d 1464,
    1468 (9th Cir. 1995)
International Oil, Chemical & Atomic Workers v.
    Uno-Ven Co., 170 F.3d 779 (7th Cir. 1999)
20 C.F.R. §639.2

2.    Plaintiffs Have Not Established A Mass Layoff ......................... 45

Mich. Reg'l Council of Carpenters v. Holcroft L.L.C.,
    195 F. Supp. 2d 908, 911 (E.D. Mich. 2002)

3.    The Sales Exemption Applies ...................................................... 47

Burnsides v. MJ Optical, Inc., 128 F.3d 700 (8th Cir.
    1997)
20 C.F.R. § 649, 54 Fed. Reg. 16042,
    §639(c) (April 20, 1989)
International Oil, Chem. & Atomic Workers, Local
    7-517 v. Uno-Ven Co., 170 F.3d 779, 783
    (7th Cir. 1999)
29 U.S.C. § 2101(3)(B)

4.    International Paper Acted In Good Faith and Gave the Best Notice
It Was Able to Give .................................................................... 48

20 C.F.R. § 639.1
20 C.F.R. 639.1(c)(1)
29 U.S.C. § 2104(a)(4)
United Auto. Aerospace & Agr. Implement Workers
    of Am., Local 1077 v. Shadyside Stamping
    Corp., 1991 U.S. App. LEXIS 27051
Kildea v. Electro-Wire Prods., Inc., 2000 U.S. App.
    LEXIS 33991
Oil, Chem. & Atomic Workers Int'l Union, Local
    7-515 v. Am. Home Prods. Corp., 790 F.Supp.
    1441 (N.D.Ind. 1992)
Graphic Communs. Int'l Union, Local 31-N v. Quebecor
    Printing Corp., 252 F.3d 296, 302 (4th Cir. 2001)

CONCLUSION ............................................................................................................. 51

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ELMER CAMPBELL, ET AL.,            :
                                   :
        Plaintiffs,                :
                                   :
    v.                             :    CASE NO. C-1-01-527
                                   :
INTERNATIONAL PAPER,               :    J. Beckwith; Mag. J. Hogan
SUN CAPITAL PARTNERS, INC.,        :
SMART PAPERS,                      :
                                   :
        Defendants.                :

**INTERNATIONAL PAPER COMPANY'S REPLY MEMORANDUM
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

International Paper Company ("International Paper"), by counsel, files this memorandum in response to Plaintiffs' Consolidated Memorandum in Opposition to Defendant International Paper Company's Motion for Summary Judgment ("Plaintiffs' Opposition").

## I.    INTRODUCTION

In response to International Paper's Motion for Summary Judgment, Plaintiffs concede that there is no factual basis for many of their claims. Accordingly, Plaintiffs have withdrawn all claims of age and disability discrimination against International Paper and all claims regarding alleged defamatory comments in newspaper articles or related to comments of "excess baggage." Thirty Plaintiffs have also withdrawn their claims that they were defamed by International Paper's supervisors during reference check interviews with SMART. All that remains of Plaintiffs' defamation claims are forty-two Plaintiffs' allegations that International Paper supervisors provided inaccurate

1

information to SMART regarding their work performance during SMART's reference check process.

All Plaintiffs acknowledge that they executed written releases and covenants not to sue authorizing International Paper managers and supervisors to participate in reference check interviews and answer questions about their job performance and work-related behaviors. They also authorized International Paper to give SMART access to their personnel files and attendance records. Plaintiffs also acknowledge that to prevail on their claims of defamation under Ohio law, they must prove not only that they were defamed by International Paper but that International Paper acted with malice or reckless disregard for the truth in doing so. They do not – and cannot – identify a single statement made outside the context of SMART's reference process or without Plaintiffs' express authorization. So, in an effort to drive a square peg (the facts of this case) into a round hole (a finding of malice or reckless disregard), Plaintiffs are left to conjure up claims of ill-will or hatred (often contrary to their own deposition testimony) and argue that SMART's reference process was so "shabby" that International Paper supervisors must have acted with reckless disregard for the truth in providing SMART employment-related information.

Plaintiffs' argument is baseless. As shown in the individual appendices, the undisputed evidence is that International Paper supervisors gave SMART evaluations of Plaintiffs' work performance based on their personal observation of Plaintiffs' work performance often over several years, and/or information received from other individuals who worked with Plaintiffs on a daily basis. The great majority of Plaintiffs conceded during their depositions that they got along with their supervisors and managers and had

no reason to think they would make false reference statements to SMART. Accordingly, these statements are privileged under Ohio law and come squarely within the protection of the Authorization and Release signed by each individual Plaintiff. Plaintiffs cannot avoid summary judgment with hearsay documents or conclusory allegations of malice or by providing evidence that they or someone else disagree with the supervisor's opinion of their work performance. Summary judgment should be entered on all remaining claims of defamation.

With regard to Plaintiffs' claims under the WARN Act, under the authoritative guidance of Department of Labor Regulations, no closing or "mass layoff" occurred as a matter of law. Furthermore, International Paper provided Plaintiffs with as much notice as possible, facilitated the application process with SMART so that the Mill could continue as an operating facility, (and the vast majority of employees could continue employment at the Mill), and negotiated severance, benefits continuation and outplacement assistance packages for those employees who cooperated with the application process but did not receive job offers from SMART.

### A. Plaintiffs Have Conceded Summary Judgment Is Appropriate For Many of the Claims Made in Plaintiffs' Fifth Amended Complaint

Based on Plaintiffs' Opposition, International Paper's Motion for Summary Judgment is uncontested, and should be granted, with respect to the following:

1. Counts I-IV – International Paper is entitled to Summary Judgment on all Plaintiffs' claims against International Paper for age discrimination under both federal and Ohio law. (See Plaintiffs' Opposition at 2, footnote 2).

2. Counts VII and VIII - International Paper is entitled to Summary Judgment on all Plaintiffs' claims of disability discrimination against International Paper under

3

both federal and Ohio law. (See Plaintiffs' Opposition at p. 2, fn. 2).

3.  International Paper is entitled to Summary Judgment on all defamation claims of Plaintiffs Adams, Arthur, Begley, Blevins, Elmer Campbell, Clear, Fisher, Geeding, Gentry, Gill, Greene, Gregory, Gumm, Hess, Holland, Jackson, Johnson, Lakes, Marsee, Miller, Parsley, Pennington, Ratliff, Rogers, Rumpler, Spada, Tolbert, Turley, Whitaker and Wilkins. (See Plaintiffs' Opposition at p. 2, fn. 1; p. 13, fn. 11; p. 30, fn. 25).[1]

4.  International Paper is entitled to Summary Judgment on all claims of defamation by all Plaintiffs with respect to alleged newspaper articles or comments concerning "excess baggage," as no argument or evidence whatsoever was offered by Plaintiffs in response to International Paper's Motion for Summary Judgment on these allegations.

### B.    International Paper is Entitled to Summary Judgment on Plaintiffs' Remaining Claims

Plaintiffs' sole remaining allegations against International Paper consist of claims by 42 Plaintiffs that International Paper supervisors defamed them during SMART's reference check process and a claim that International Paper failed to provide adequate notice under the Worker Adjustment and Retraining Notification Act ("WARN") prior to the sale of the Hamilton "B" Street Mill to SMART.  For the reasons set forth below and the Appendix filed with this Reply, as well as in International Paper's Memorandum in Support of its Motion for Summary Judgment and initial Appendices ("Opening Brief"),

---

[1] Plaintiffs do not oppose the dismissal of the defamation claims of the Plaintiffs who failed to appear for their depositions:  Fisher, Gumm, Jackson, Parsley, Ratliff and Whitaker.  As set forth in International Paper's Opening Brief, all claims of these Plaintiffs should be dismissed.

International Paper is entitled to Summary Judgment on Plaintiffs' remaining claims. International Paper's Motion for Summary Judgment should be granted because:

1.    Plaintiffs' defamation claims fail because:

    a.    Plaintiffs now admit that their only claims for defamation are comments regarding job performance that were made in the course of interviews by SMART with International Papers supervisors. It is further undisputed that these interviews occurred with the authorization of Plaintiffs, and were subject to express release agreements with covenants not to sue signed by each of the individual Plaintiffs.

    b.    Plaintiffs have not identified a single allegedly defamatory comment made outside the context of SMART's hiring process. To the contrary, Plaintiffs' claims are based entirely on comments allegedly made within the scope of the releases and the qualified privileges that exist in common law and by statute in Ohio. Plaintiffs have failed to meet their burden of demonstrating actual malice and their defamation claims therefore fail as a matter of law.

    c.    The evidence proffered by Plaintiffs fails to establish defamatory comments by International Paper supervisors. Rather, Plaintiffs rely on the pre-printed, hearsay comments on SMART's reference check forms and the interpretation or characterization of information by SMART interviewers, without competent evidence to attribute those comments to International Paper supervisors.

    d.    Many of the comments Plaintiffs allege are defamatory are comments that

reflect opinion about an employee's work performance and do not constitute defamation as a matter of law.

e.      Plaintiffs do not create an issue of material fact by proffering their own affidavits that contradict their own deposition testimony, and offer their own versions of their performance, or by citing the opinions of other employees, because it is the supervisors' good faith views of Plaintiffs' job performance that are at issue.

2.      Plaintiffs' claims under WARN fail because:

a.      Plaintiffs have not offered any facts to rebut the undisputed facts shown by International Paper and SMART that there was no plant closing as defined by WARN;

b.      Plaintiffs have not offered any competent evidence to establish that the requisite percentage of employees lost their employment to constitute a "mass layoff" under WARN; the only competent evidence establishes that there was not sufficient employment loss to constitute a mass layoff under WARN;

c.      The "sales of business" exemption of WARN applies to this transaction because the undisputed facts establish that this sale was of a going concern;

d.      Plaintiffs received actual notice of the pending sale of the Mill within approximately one week of the date the sale agreement was reached and more than 30 days before the sale, which enabled Mill employees to apply for and obtain employment with SMART, and their union to negotiate an

effects bargaining agreement that provided severance pay, benefits

continuation and outplacement assistance, all before the sale occurred.

## II.    THE MATERIAL FACTS ARE NOT IN DISPUTE

Plaintiffs' Opposition serves to focus the court's attention onto the areas in

controversy, and makes it clear that the facts are either undisputed or Plaintiffs have

offered no facts to contradict the evidence submitted by International Paper and SMART.

The following facts are undisputed in light of Plaintiffs' Opposition:

1.    All Plaintiffs signed valid and binding agreements authorizing International Paper

to provide SMART with access to employee personnel files, attendance records,

and access to employees' managers and supervisors to inquire about Plaintiffs'

job performance. (Plaintiffs' Opposition at 13). Plaintiffs concede that these

releases are clear and unambiguous and that they include covenants not to sue

International Paper with respect to any action taken on such information as might

be disclosed in SMART's reference check. (Plaintiffs' Opposition at 52, 54.)

2.    The releases and covenants not to sue signed by Plaintiffs expressly authorized

SMART to conduct interviews with supervisors and managers regarding

"employment-related information," "job performance and the information

contained in [the employee's] personnel file." (Plaintiffs' Opposition at 13;

Authorization / Release in Opening Brief Appendix for each Plaintiff).

3.    The only statements that Plaintiffs allege were defamatory were statements made

by managers and supervisors in the course of reference interviews by authorized

representatives of SMART, conducted pursuant to the reference process

authorized by Plaintiffs in their releases and covenants not to sue.

4.    Statements made in the context of an employment reference that relay

7

employment related-performance information are subject to a qualified privilege under Ohio common law and under the Ohio Code.

5.    All of the allegedly defamatory comments relate to one or more aspects of an employee's job performance, employment records or behaviors at work. There is no evidence of comments made by International Paper supervisors related to anything other than an employee's job performance or employment at the Hamilton "B" Street Mill.

6.    With Plaintiffs' express written consent and release, SMART was given access to the Plaintiffs' actual personnel files and attendance records in making its employment decisions and in evaluating the information provided by the interviews of supervisors and managers. (See Plaintiffs' Opposition to Smart Papers' Motion for Summary Judgment at 14.)

7.    SMART determined which supervisors and managers it would interview and what questions would be asked during these interviews. International Paper cooperated with this process and provided the requested information as long as it related to job performance and/or work records. (Asset Purchase Agreement, p.16).[2]

8.    The PACE Union, representing Plaintiffs, agreed to an Effects Bargaining Agreement that provided severance pay for Plaintiffs if they completed the SMART application process, submitted all required forms, and did not receive job offers from SMART.

9.    After they did not receive job offers from SMART, all Plaintiffs received

---

[2] Depositions are identified by the name of the deponent and the transcript page reference. Exhibits to depositions are identified by the name of the deponent and the exhibit number. Transcript pages and Exhibits from Plaintiffs' depositions are located in the attached appendices. Transcript pages and Exhibits from other depositions are attached to this memorandum.

severance pay pursuant to the Effects Bargaining Agreement.

10.     Plaintiffs offer no competent evidence to rebut the undisputed evidence that fewer

than 33% of the Mill's work force did lost their jobs at the Mill.  Plaintiffs have

not offered any facts to show that there is a dispute about the actual number of

employees who were and were not hired by Smart as a result of this sale.  [3]

11.     Plaintiffs have offered only conclusory statements that the plant had "closed" in

response to the affidavit evidence that the facts do not establish a "plant closing"

as defined by WARN.  (Plaintiffs' Opposition at 67.)  Plaintiffs' arguments fail to

establish a dispute of fact as to what actually occurred at the mill.[4]   On the

contrary, the undisputed competent evidence is that the Mill continued as a going

concern with the same equipment, inventory, raw materials, plant site, and

processes, and there was only a short hiatus in production of product while

SMART attended to administrative details, oriented its workforce to its pay and

benefits structure and implemented the organizational and operational changes

that it did make. (Opening Brief at 55-56; Maheu Aff. ¶13-14).[5]  It is undisputed

that no organizational unit of at least 50 employees was eliminated, and the plant

continued as an operating business. (Maheu Aff. ¶14).

12.     There is no dispute of facts related to the "sales exception" provision in WARN.

---

[3] Plaintiffs' Opposition only offers the open-ended estimate of Milton Lewis that "the sale of the mill resulted in the termination of an <u>at least 264 employees</u> out of a total of <u>more than 700 employees</u>. International Paper has provided competent, sworn evidence as to the actual number of employees at the mill at the time of the sale (800) and the actual number of employees from the Mill offered employment by Smart (574). (Opening Brief at 12-13; Wilson Aff. ¶2; Maheu Aff. ¶10).  As this is the only competent evidence, the evidence is undisputed that the mass layoff requirements of WARN were not triggered.
[4] It is also important to note the distinction between the "closing" of a sale and the physical "closing" of a plant.  As pointed out in International Paper's memorandum, a plant in one sense can be said to "close" anytime it shuts down for the holidays or inventory or a rebuild of its production line; however, that does not mean that it is a closure in the sense the term is used in WARN.  (Opening Brief at 59).
[5]  Maheu Affidavit is attached to the Opening Brief.

Plaintiffs rely solely on their arguments and the Court's ruling on International Paper's Motion to Dismiss. However, at the Motion to Dismiss stage, the Court had to accept the facts as alleged in Plaintiffs' Complaint. The affidavits and testimony under oath, however, establish that this was the type of transaction to which WARN's "sale of business" exemption does apply.

13.    Plaintiffs did receive notice within approximately one week of an agreement to sell the Mill, were given specific instruction that they would be able to apply for continued employment with the Mill, and were told who the buyer was and how to apply for employment. (Plaintiffs' Opposition at 65; Asset Purchase Agreement p. 1; Lewis Tr. 44; Bray Tr. 15). Moreover, Plaintiffs' union was notified and promptly negotiated an effects bargaining agreement which provided for the right of the employees to apply for employment with the buyer and provided for benefits, including outplacement assistance and severance pay for those employees not hired by SMART. (Bray Tr. 14-15, 17; Bray Tr. Ex. 3). The purpose of WARN is to assure that employees have sufficient notice to apply for other employment, and seek retraining, and that their union representatives have time to negotiate with the company about the upcoming mass layoff or closure. Plaintiffs in fact received the best notice that International Paper could, in good faith, provide under the circumstances of the sale and the purposes of the WARN Act were achieved.

### III.    ARGUMENT

#### A.    International Paper is Entitled To Summary Judgment As A Matter of Law

Parties who bear the burden of proof on a crucial issue at trial cannot survive judgment without sufficient <u>evidence</u> to sustain their burden of proof on that point. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 328 (1986) (emphasis added.)  They must provide "significant probative evidence tending to support the complaint" or provide "specific facts showing that there is a genuine issue for trial."  <u>Anderson v. Liberty Lobby, Inc.,</u> 477 U.S. 242, 248-49 (1986).  Thus, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  <u>Anderson</u>, 477 U.S. at 252.  A "nonmoving party is not entitled to a trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint."  <u>Gregg v. Allen-Bradley Co.</u>, 801 F.2d 859, 861 (6th Cir. 1986) (citing <u>First Nat'l Bank v. Cities Serv. Co.</u>, 391 U.S. 253, 289-90 (1968) and <u>Schultz v. Newsweek, Inc.</u>, 668 F.2d 911, 918-19 (6th Cir. 1982)).  The non-moving party "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).

In this case, because Plaintiffs have failed to produce significant probative <u>evidence</u> or specific <u>facts</u> sufficient to raise a material issue of fact, International Paper is entitled to summary judgment on all of Plaintiffs' claims.

#### B.    Plaintiffs Cannot Establish that References Allegedly Provided to SMART by International Paper Supervisors Are Defamatory

Plaintiffs admit that their claims for defamation are based solely on comments regarding job performance that were allegedly made in the course of interviews by SMART representatives with International Paper supervisors.  It is further undisputed

11

that these interviews occurred at the behest of SMART, with the authorization of

Plaintiffs, and were subject to express release agreements with covenants not to sue

signed by each of the individual Plaintiffs. Plaintiffs also concede the statements are

subject to a qualified privilege under Ohio statutory and common law. Finally, Plaintiffs

concede that, because of the qualified privilege, the references are not actionable if they

are simply inaccurate and were made negligently.

Plaintiffs assert that the references are not protected by the release and privilege,

however, because they were made with malice and reckless disregard for the truth. The

record is devoid of any evidence supporting this claim. Plaintiffs do not and cannot

identify facts on which a reasonable fact-finder could determine that International Paper's

supervisors acted with malice in providing SMART's representatives with information

about Plaintiffs' work performance.

> **1.    *It is Undisputed that Plaintiffs Authorized International Paper to Provide Job-Related Information To Smart and that Plaintiffs Released International Paper From Liability Associated with Such Disclosures***

As set forth in International Paper's Opening Brief, it is undisputed that each

Plaintiff in this matter authorized International Paper to provide "any employment related

information" regarding each Plaintiff, as well as information regarding each Plaintiff's

"job performance and the information contained in [the Plaintiffs'] personnel file." (See

Certification and Authorization and Authorization / Release ("Release") in Appendix for

each Plaintiff). It is further undisputed that Plaintiffs released International Paper from

"all liability" for disclosing "employment-related information" to SMART and "any

claims arising under federal, state or local law relating to the disclosure" of such

12

information to SMART. Id. In their Opposition, Plaintiffs concede, "[t]he language employed in the waiver in this case is very clear." (Plaintiffs' Opposition 54).

However, Plaintiffs contend that the signed releases do not shield International Paper from liability because they do not "authorize [International Paper] to make false, defamatory statements about Plaintiffs." While, as set forth in the individual appendices attached hereto, the record is devoid of any evidence that International Paper supervisors made "false, defamatory statements about Plaintiffs," it is clear that the release covers the comments International Paper's supervisors made to SMART. The release clearly and unambiguously authorizes International Paper's supervisors to provide "**any** employment-related information" regarding Plaintiffs to SMART. (emphasis added). Ohio courts routinely recognize the validity of such releases to bar future tort liability, such as defamation, so long as the intent of the parties is in clear and unambiguous terms. See e.g. Schuman v. Lake Hosp. Sys., 1997 Ohio App. LEXIS 727 (Ohio App., 1997) (Copy Attached); Denlinger v. City of Columbus, 2000 Ohio App. LEXIS 5679 (Ohio App. 2000) (copy attached) (finding release where employees waives all claims "arising from or in connection with his employment and resignation "clearly and unambiguously includes plaintiff's defamation claim).

In Schuman, the plaintiff, a nurse, was discharged from her position with the defendant hospital for violating proper nursing procedures. Schuman alleged, *inter alia*, that the defendant hospital defamed her when it provided an uncomplimentary recommendation concerning her work ethic to a prospective employer. The hospital filed a motion for summary judgment on the defamation claim on the basis that Schuman had released the hospital from "any and all liability" in supplying information regarding her

13

employment to the prospective employer. The Ohio Court of Appeals upheld the trial court's grant of summary judgment on Schuman's defamation claim ruling that:

> As a matter of law, we hold that the phrase "any and all liability" was not ambiguous. Thus, the trial court did not err in concluding that the second defamation claim could not be maintained against appellant because the release would readily apply to a claim predicated upon alleged false statements concerning appellant's work ethic.

Id. at *15.

As in Schuman, the release in the instant matter clearly contemplates the possibility that Plaintiffs will disagree with the information provided by International Paper's supervisors to SMART. The release does not state that International Paper supervisors will only provide positive employment related information. Indeed, a release to provide only positive information about Plaintiffs' work performance would serve no purpose. Rather, Plaintiffs understood that they were authorizing International Paper supervisors to provide information to SMART regarding their employment and job performance with International Paper. (See, e.g., Bray Tr. 21; Huntington Tr. 47-48; Italiano Tr. 48). Furthermore, Plaintiffs authorized International Paper supervisors to provide information about Plaintiffs' performance – "good, bad or indifferent." (See, Huntington Tr. 48; Ogg Tr. 54).

Plaintiffs' execution of the releases and covenants not to sue bar them from pursuing claims against International Paper for any disclosures made pursuant to the releases.

### 2. Plaintiffs' Defamation Claims Fail Because They Cannot Establish the Communications Were Made with Actual Malice

As discussed in International Paper's Opening Brief, International Paper

14

supervisors' statements are subject to a qualified privilege. International Paper is not liable for statements made subject to this privilege unless Plaintiffs established that International Paper supervisors disclosed the particular information with the knowledge that it was false, with the deliberate intent to mislead the prospective employer or another person, in bad faith, or with malicious purpose.

Ohio Rev. Code Ann. §4113.71(b).

However, Plaintiffs' evidence regarding actual malice consists of little more than a summary allegation that the statements were false and, therefore, they were made with malice. This falls well short of meeting Plaintiffs' burden.

To defeat International Paper's arguments that the supervisors' comments are protected by a qualified privilege, as well as International Paper's argument that Plaintiffs' claims are barred by the releases, Plaintiffs must prove that the published statements were made with actual malice. Brunsman v. Western Hills Country Club, 151 Ohio App. 3d 718, 727, 785 N.E.2d 794, 801 (2003). "[M]ere inaccuracies in statements and alleged improper motivations by speakers are insufficient to show actual malice. Rather, the party seeking relief must present evidence that defendants knew the statements were false, entertained serious doubts about whether they were false, or disregarded a high probability that they were false." Wall v. Ohio Permanente Medical Group, 119 Ohio App. 3d 654, 666, 695 N.E.2d 1233, 1241 (1997); see also Curry v. Nestle USA, Inc., 2000 U.S. App. LEXIS 18743 *20 (6th Cir. 2000) (to establish "reckless disregard," a plaintiff must present sufficient evidence to permit a finding that the defendant had serious doubts as to the truth of his publication); Mosley v. Evans, 90 Ohio App. 3d 633, 630 N.E.2d 75, 78 (1993) (finding no actual malice where conclusions

based on defendants observations and conversations with others). Once it has been determined that the statements are privileged, speculation as to whether the statement is truthful is unnecessary – the proper inquiry is to determine whether the defendant has lost its qualified privilege by making knowingly false statements or making statements with reckless disregard of whether they were false. See Bichler v. Union Bank & Trust Co., 745 F.2d 1006, 1014 (6th Cir. 1984). Plaintiffs cannot meet the requisite standard of proof to overcome the releases or the qualified privilege.

While each individual Plaintiff's claims are dealt with in the attached appendices, Plaintiffs generally base their claims of actual malice and reckless disregard on their allegations that (a) there was no discipline or not much discipline documented in Plaintiffs' personnel files; (b) International Paper supervisors did not review Plaintiffs' personnel files prior to meeting with SMART's reference checkers; and (c) International Paper supervisors harbored some sort of malice or ill will toward several Plaintiffs. As shown in detail in the attached Appendices, the facts in evidence do not support these claims.

> a.    **Supervisors' Opinions About Job Performance Are Not limited to Disciplinary Action or Documents in the Personnel Files**

Plaintiffs attempt to establish actual malice by arguing that because International Paper's personnel files do not contain discipline supporting every negative performance-related comment attributed to a supervisor, the supervisor's comment must be false. Plaintiffs erroneously equate good job performance with a lack of discipline. Their theory would limit what the International Paper supervisors could say to SMART's reference checkers to information already contained in Plaintiffs' personnel files. That argument does not make sense. If International Paper's supervisors were not entitled to

16

raise performance-related issues that were not documented through formal discipline, then the reference check interviews served no purpose – pursuant to Plaintiffs' authorizations and releases, SMART already had access to the personnel files and attendance records. (Plaintiffs' Opposition at 12).

Plaintiffs also assert that any disciplinary actions more than two years old should not have been discussed with SMART because they could no longer provide a basis for progressive discipline under the union contract. (Opposition Appendix, Tab 46, Collective Bargaining Agreement at 8). This provision in the collective bargaining agreement does not mean, however, that the discipline did not occur or that the employee's conduct did not reflect negatively on the employee's job performance. The fact that a disciplinary form was removed from a personnel file is irrelevant as to whether International Paper supervisors were speaking the truth about Plaintiffs' performance issues.

As the pre-printed Applicant Reference Check forms show, SMART's reference checkers asked specific questions and made an evaluation regarding Plaintiffs' job performance and workplace behavior as compared with SMART's employment standards, not whether the employee received discipline in accordance with the collective bargaining agreement under International Paper's employment standards. Moreover, the Applicant Reference Check forms and interviews regarding Plaintiffs generally did not concern whether employees had disciplinary paperwork in their files. Rather, they discussed the individuals' job performance as viewed by the supervisors.

Additionally, the undisputed evidence is that many performance-related issues did not result in formal discipline. Rather, as several supervisors testified, sometimes

17

supervisors could elect informally to counsel or coach employees on performance issues

without resorting to the formal union disciplinary process. This is neither unusual nor

surprising, particularly in a union shop:

> Q:    Was it your practice to document any disciplinary
>       action you would impose on an hourly worker?
>
> A:    Usually, yeah.
>
> Q:    And was a copy of that documentation put in that
>       employee's personnel file?
>
> A:    Usually; if I had, in fact, done the paperwork.
>       Sometimes -- generally, I wouldn't start out by
>       doing paperwork on anybody, you know. We try to
>       work it out and try to get the problem corrected
>       before it would get to that point. So there may be
>       times in the early stages where there wasn't any
>       paperwork made out.

(Schutte Tr. 18). Furthermore, International Paper did not necessarily discipline

employees each time they exhibited poor performance. For example, manager Ed

McCoy testified that there were several ways International Paper handled performance-

related issues as the Mill:

> It could be discipline, it could be formal discipline, it could
> be suspension at that point, it could be coaching [the
> supervisor] on how to sit down and try and turn the
> employee around without going through formal discipline.

(McCoy Tr. 18). McCoy further testified that not all disciplinary actions at the Mill were

documented, and that he often preferred "coaching" an employee in an effort to "turn

their performance around to be a positive performance rather than a negative

performance." (McCoy Tr. 21-22; see also Dunn Tr. 20, Weiser Tr. 32-33).

Finally, SMART was not necessarily interested in whether Plaintiffs were not

disciplined or even whether they were adequate performers under International Paper's

standards. SMART's reference checkers were evaluating Plaintiffs for employment under

SMART's standards. International Paper manager Dunn testified as follows about his

reference interview:

> Q: Were you asked some kind of question in the
> reference as to whether or not you would
> recommend the person for employment with
> SMART Papers, kind of a conclusory
> recommendation.
>
> A: Yes.
>
> Q: Were you given any kind of criteria upon which to
> make that recommendation, or was that just
> basically up to you?
>
> A: I do recall the person saying specifically something
> of the effect, "Is this person the absolute topnotch?"
> It's not just, "were they good enough? Were they
> average? Are they okay?" But "topnotch," and
> that's what SMART Paper is looking for is only the
> topnotch.
>
> Q: Okay. So when you were answering the question
> whether to recommend the person, you were
> answering the question whether the employee was
> topnotch?
>
> A: Yes.

(Dunn Tr. 25-26).

In short, an employee need not have received actual discipline for workplace

behavior in order for a supervisor to have a reasonable basis to make negative or less than

completely positive comments about it.

### b. Supervisors Were Not Required To Review Personnel Files Before Providing References

Plaintiffs' other "evidence" of actual malice is that not all of the supervisors who

gave the references reviewed their employees' records before meeting with SMART's

reference checkers. Plaintiffs' assertion that supervisors "lied" about them or demonstrated "malice" or "reckless disregard" because they did not consult personnel files before answering questions about job performance is neither suggested by the facts nor the legal standard for defamation. There is nothing improper about providing employment-related information that did not result in discipline documents or other records in the file. That was expressly authorized by the releases and covenants not to sue, and was the whole point – to obtain additional information about job performance beyond the file contents that were otherwise available to SMART. It is clear from the releases and covenants not to sue that SMART was authorized to obtain and review the discipline, attendance and other personnel records and interview the supervisors and managers about job performance. (See Authorizations/Releases Attached to each Plaintiff's Appendix).

As is more fully discussed in the individual Appendices, any comments fairly attributable to an International Paper supervisor had a basis in the supervisor's personal observation or from information available to the supervisor. Moreover, the Appendices show that the supervisors did not need to review files before giving a reference, because they had personal knowledge of the Plaintiffs' job performance and/or because they participated in interviewing their immediate supervisors to obtain information about their job performance. (See e.g., Dunn Tr. 12 – Plaintiff Cress worked for Dunn for five years; Caldwell Tr. 55 – Terry Duncan worked for Caldwell "off and on since '91"; VonBargen Tr. 36 – "I felt it would be more informative if I asked [three other managers] input since I had only been in that position a short time.") In fact, many of the negative comments

on the reference sheets complained of by Plaintiffs are confirmed by the testimony of two or more supervisors, and frequently by the Plaintiffs' own deposition testimony as well.

It is undisputed that SMART was permitted to determine whom it wished to interview. In instances where it was determined that one supervisor had inadequate knowledge of an applicant, SMART was permitted to interview another supervisor with knowledge of that applicant. SMART would therefore sometimes conduct second confirmatory interviews. (Weissman Tr. 114). Each supervisor who provided a reference also completed the application process with SMART and was well aware of the fact that SMART had access to each applicant's personnel files to confirm the written records.

Even assuming that the supervisors who were interviewed could have been more fully prepared for the interviews had they first reviewed the personnel files, that does not establish malice or reckless misconduct. "Mere failure to verify may constitute negligence, but is not sufficient to support a finding of reckless misconduct." O'Hara v Board of Education of the Brooklyn City School Dist., 2003 U.S. App. LEXIS 15634, *8 (6th Cir. July 30, 2003) (Ohio) (Copy Attached). The Supreme Court of Ohio adopted the United States Supreme Court's analysis in St. Amant v. Thompson, 390 U.S. 727, 731 (1968) regarding failure to investigate: "reckless conduct is not measured by whether a reasonably prudent man . . . would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." A & B-Abell Elevator Co., Inc. v. Columbus/Central Ohio Bldg & Const. Trades Council, 73 Ohio St. 3d 1, 13 (1995). It is the publication with a high probability of falsity that evidences actual malice, not the

failure to investigate.  St. Amant, 390 U.S. at 731; see also New York Times Co. v. Sullivan, 376 U.S. 254, 287 (1964) (finding that recklessness requires proof that the defendant "in fact entertained serious doubts as to the truth of the publication"); see also Bressler v. Fortune Magazine, 971 F.2d 1226, 1246 (6th Cir. 1992) (same).

In the final analysis, as set forth in the attached Appendices, Plaintiffs are really saying that they disagree with any negative aspects of their supervisors' views of their job performance (while, of course, agreeing with any positive comments reflected in the applicant reference check forms).  According to Plaintiffs, the supervisors' views (as Plaintiffs believe they are reflected in the reference forms) are therefore malicious "lies."

This sort of boot-strapped view of assumed malice simply is not sufficient to allow a claim for defamation to proceed to trial.  If it were, any time an employee disagreed with a negative employment reference, the employee could claim it was a "lie." If for every "lie" there must have been malice, then in each defamation case the only question will be whose view of the employee's performance was "true."  An Ohio reference-giver would never say anything negative for fear of incurring the expense of a jury trial in a defamation case.  The negative implication on the future of employment references is inconsistent with both the law and the public policy of Ohio.  There would be no such thing as a qualified privilege under Ohio common law or the Ohio statute protecting employment references with a statutory qualified privilege.

### c. Plaintiffs Have Not Established Actual Malice or Ill Will

As is more fully set forth in the attached appendices, Plaintiffs have not submitted evidence sufficient to establish that International Paper supervisors provided comments to SMART with actual malice or ill will.  Plaintiffs base their actual malice claim on either

anti-union animus, a spirit of revenge because of the Plaintiffs' previous challenges to the supervisor's authority or because of a general hostility. However, as set forth in the attached Appendices, most of the Plaintiffs admitted under oath that they had good working relationships with the supervisors who provided their references. (See e.g., Bennett Tr. 20; Brandenburg Tr. 32; Bullio Tr. 14; Campbell Tr. 32; Fowler Tr. 27; Hensley Tr. 70; York Tr. 52). Plaintiffs' admissions that they got along with their supervisors directly contradict the claims of actual malice or ill will they now make in response to International Paper's Motion for Summary Judgment. See Hussain v. Fairview Gen. Hosp., 1987 Ohio App. LEXIS 7051 (Ohio App., 1987) (No malice found where the plaintiff conceded "no one had demonstrated an evil intent toward him" and that the allegedly defamatory statements could be an "honest difference of opinion.")

Their failure to present evidence of actual malice defeats Plaintiffs' claims as a matter of law. See Dodson v. Wright State Univ., 91 Ohio Misc. 2d 57, 697 N.E.2d 287 (1997) (communications regarding reason for removal as department chair were qualifiedly privileged and plaintiff's failure to prove actual malice by a preponderance of the evidence warranted judgment for defendant); Rinehart v. Maiorano, 76 Ohio App. 3d 413,422, 602 N.E.2d 340, 346-47 (1991) ("bold allegations" without more are insufficient to establish actual malice and overcome qualified privilege between former employer and prospective employer regarding disclosure of reason for plaintiff's discharge); Tohline v. Central Trust Co., 48 Ohio App. 3d 280, 284, 549 N.E.2d 1223, 1228 (1988) (allegation that managers "misapprehended the facts" insufficient to establish actual malice and therefore qualified privilege applied to protect allegedly false statements).

23

d.    **International Paper Supervisors Had a
Reasonable Basis For Their Comments**

Reckless disregard cannot be proven where statements are based upon a

reasonable belief. Holbrook v. Harman Automotive, Inc., 58 F.3d 222, 226 (6th Cir.

1995) (affirming summary judgment on fact that the publisher based his comments in

reliance on three trusted employees, although the information turned out to be false);

Longo v. Aluminum Color Indus., Inc., Case Nos. 93-3320, 93-3366, 1994 U.S. App.

LEXIS 18758, *15 (6th Cir. July 21, 1994) (affirming summary judgment because the

employer did not have a duty to investigate and relied upon the representation of

another); Mosley v. Evans, 90 Ohio App. 3d 633, 637 (affirming directed verdict because

publisher had a "factual foundation" for the alleged defamatory statement, although the

statement may have been false).

As discussed in the attached appendices, Plaintiffs' supervisors each had a factual

basis for their opinions concerning each of the Plaintiffs. They relied upon their own

observations of Plaintiffs' performance, discussions with current and former supervisors,

and their knowledge acquired from personal interaction with these individuals. The

statements provided "must be viewed on the *subjective* belief of the author." McCartney

v. Oblates of St. Francis de Sales, 80 Ohio App. 3d 345, 609 N.E.2d 216 (1992) (citations

omitted). Ohio courts have determined that the published statement is not defamatory if

"it was substantially true and conveyed no greater opprobrium than the truth." Dental

Care Clinic v. McDonough, 1986 Ohio App. LEXIS 5742, 8-9 (Ohio App., 1986); see

also Hersch v. E.W. Scripps Co. , 3 Ohio App. 3d 367, 374 (1981) (report that the judge

said the lawyer acted stupidly is not defamatory if the judge said that the lawyer

exercised poor judgment).

24

3.    *Plaintiffs Have Not Presented Competent Evidence That Defamatory Statements Were Made By International Paper Supervisors*

a.    **Introduction**

In their Opposition to International Paper's Motion for Summary Judgment,

Plaintiffs make no effort to identify which comments contained in SMART's reference

check sheets are attributable to International Paper's supervisors or managers and which

are attributable to SMART's reference checkers.  Instead, Plaintiffs advance the novel

argument that <u>every</u> statement in <u>every</u> form – including the number grade assigned by

SMART's Weissman Group reference checkers, and the pre-printed form

characterizations, prepared for SMART by the Weissman Group corresponding to those

grades – represents an actionable statement by International Paper.[6]  For example, if the

reference check sheet indicates that the individual received a "2" for "Dependability,"

Plaintiffs not only automatically attribute that grade to International Paper's supervisor

but also argue that each of the pre-printed characterizations next to the number "2" were

also made by the supervisor.[7]

This argument flies in the face of the undisputed record evidence regarding the

reference check forms and with black letter law on the admissibility of hearsay evidence.

Except for those comments that International Paper's supervisors or managers

acknowledge making Plaintiffs have failed to meet their obligation to produce competent

---

[6] It is undisputed that the Weissman Group employers acted solely as the agents of SMART and not as the agents of International Paper.  (Weissman Tr. 104).

[7] Thus, in this instance, Plaintiffs would argue that a "2" grade means that the International Paper supervisor made <u>every</u> pre-printed comment next to that number on the form (i.e. "Often absent or tardy," "Not forthcoming,"  "Hides mistakes," and "Considers behavioral expectations unimportant") even though there is <u>no evidence</u> that the supervisor ever made any such statements.

evidence demonstrating the most fundamental element of a defamation claim – that the defendant actually made the alleged defamatory statement.[8]

The undisputed evidence is that the applicant reference check forms contain SMART's grades and comments based on SMART's grading system, SMART's employment standards, and SMART's interpretation of information provided by International Paper's supervisors. (Weissman Tr. 226-227, 229). Plaintiffs concede that grades were based on the SMART interviewer's subjective belief. (Plaintiffs' opposition to SMART's Motion for Summary Judgment at 11). Plaintiffs cannot overcome this evidence or create a triable issue with hearsay or conclusory allegations that these forms accurately represent comments made by International Paper's supervisors.

b.    **Hearsay Is Not Admissible to Overcome A Motion for Summary Judgment**

It is elementary that a "party opposing a motion for summary judgment cannot use hearsay or other inadmissible evidence to create a genuine issue of material fact." Sperle v. Michigan Dep't of Corrections, 297 F.3d 483, 495 (6th Cir. 2002), citing Weberg v. Franks, 229 F.3d 514, 526 n.13 (6th Cir. 2000) (disregarding many of the plaintiff's allegations because they were based upon hearsay rather than personal knowledge). See also Fed. R. Civ. P. 56(e) (affidavits in opposition to summary judgment motion "shall set forth such facts as would be admissible in evidence"); Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 160 (2d Cir. 1999) (holding that hearsay statement "did not constitute competent evidence" and thus could not be considered in opposition to motion for summary judgment); Courtney v. Canyon

---

[8] Of course, any statement made by a Weissman Group employee to SMART is itself not actionable as defamation because there is no publication when an agent communicates the reference to the agent's principle. See Parry v. Mohawk Motors of Mich., Inc., 236 F.3d 299, 312 (6th Cir. 2000).

Television & Appliance Rental, Inc., 899 F.2d 845, 851 (9th Cir. 1990) (affirming summary judgment on defamation claim where only evidence that defamatory statements were in fact made was inadmissible hearsay).

Plaintiffs here cannot use hearsay evidence to survive summary judgment on their defamation claims. They must produce competent admissible evidence demonstrating the elements of defamation under Ohio law.

### c.    The Applicant Reference Check Forms Are Inadmissible Hearsay

The only evidence Plaintiffs offer to demonstrate that International Paper made the alleged defamatory statements contained in the applicant reference check forms are the forms themselves and the testimony of the supervisor to the extent they were asked about the forms. It is undisputed that these forms prepared by SMART are preprinted by the Weissman Group, the language characterizing employee performance or character is solely that of the reference check form prepared by the Weissman Group or the Weissman Group's reference checker acting for SMART. The rating of the employee is determined solely by the Weissman Group reference checker on behalf of SMART. (Weissman Tr. 226-227; Plaintiffs' Opposition to SMART's Motion for Summary Judgment at 11). International Paper supervisors simply responded to questions posed by SMART's reference checkers supplied by the Weissman Group. The SMART reference checkers evaluated those statements and made selective notes from these interviews. (Moore Tr. 24; Weissman Tr. 113, 226-227, 229).

Mary Rita Weissman, the individual in charge of SMART's application process, specifically testified that that was the case. (Weissman Tr. 229). Furthermore, Weissman stated International Paper supervisors answered questions that solicited

information regarding each candidate against SMART's performance standards not International Paper's. (Weissman Tr. 122). The Weissman Group not only created the categories and description of job performance and workplace behavior in the form, but also decided what numbers to circle on the reference check sheets. Moreover, because SMART's standards were different than International Paper's standards, these grades did not necessarily correspond with the comments made by the International Paper supervisor. Weissman, who acted as SMART's Director of Human Resources, testified:

> Q:   Who was the person who was actually supposed to determine whether it was 1, 2, 3, 4, 5? Did you ask the supervisor to do that, or did the reference checker make the listing?
>
> A:   In some cases the supervisor would say he was average, for example, or something that would indicate a 1, 2 or 3, but the bottom line decision as to whether that category and the individual was a 1, 2, 3, 4 or 5 was the reference checker, based on all the data that the supervisor provided.
>
> Q:   Okay. So the reference checker in each area would ask the supervisor to kind of talk about that person with respect to that –
>
> A:   Exactly.
>
> Q:   And the reference checker would interpret whatever
>
> A:   Exactly
>
> Q:   And the reference checker would determine what numbers should be circled?
>
> A:   Yes, against -- in other words, the supervisor may be given an evaluation based upon his standard, but his standard might be lower than the standard set by SMART. In which case, even though the supervisor said, you know, "he's a 4," or, "hey, he's average," or, "hey, he meets the requirements," those may be the supervisor's requirements, they may not meet SMART's or they may exceed SMART's.

> Although, frankly, that, I don't think, ever happened
> where a supervisor rated the person lower than
> SMART might rate them.

(Weissman Tr. 226-227) (emphasis added).[9]

Nonetheless, Plaintiffs contend that as a matter of law every comment on the forms is properly attributable to International Paper. Stated differently, according to Plaintiffs, the applicant reference check forms represent a statement by the Weissman Group to SMART as to what International Paper said about the individual Plaintiffs.

These forms are classic hearsay. They are out of court statements offered to prove the truth of the matter asserted (i.e., that International Paper's supervisor actually said that the plaintiff hides his mistakes). See Fed. R. Evid. 801(c) (hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). See also Albert v. Loksen, 239 F.3d 256, 266-67 (2d Cir. 2001) (finding inadmissible plaintiff's statement that one defendant told him that the reason for his discharge was that a co-defendant defamed him, and holding that "[w]hen challenged on a motion for summary judgment, a plaintiff may not rely solely on hearsay or conclusory allegations that the slanderous statement was made") (citations omitted).

Perhaps the most compelling illustration as to why the notes and statements on the reference check forms cannot properly be attributed to International Paper is found in Plaintiffs' own argument. Plaintiffs repeatedly claim that the reference check forms contradict themselves. This is the result of Plaintiffs' attribution of every number grade

---

[9] There is also no evidence presented as to whether the supervisors made additional comments or qualified their statements. As one International Paper supervisor testified when asked whether he provided any negative information to the SMART interviewer: "I provided my opinion, whether or not that was perceived as negative or positive is – I don't know." (Truster Tr. 33).

circled by SMART's reference checkers – and every pre-printed comment next to those grades – to International Paper's supervisors even when there is no evidence establishing that the International Paper supervisors made any such comments.

The reference check forms provide competent evidence of information available to SMART to consider when deciding whether to hire Plaintiffs, but they cannot properly be admitted as evidence of what International Paper supervisors actually said to SMART's reference checkers. The reason is confirmed by reviewing the reference forms themselves. For example, the applicant reference check form of Terrell Fowler, in the "Willingness and Ability to learn" section, reads as follows:

## WILLINGNESS AND ABILITY TO LEARN

*Inflexible*

1. Not only lacks knowledge, but detracts from the pool of knowledge. Causes more problems than makes contributions.
2. Definite lack of knowledge. Very little understanding of job duties. Needs considerable instruction. Makes little effort to add to his knowledge.
3. Has adequate knowledge of duties. Needs little additional instruction. Takes advantage of available learning opportunities.
4. Excellent understanding of job assignments. Requires very little direction. Extremely capable. Seeks out learning opportunities.
5. Is recognized as an expert by peers and supervisors. Is technical leader. Creates learning opportunities for self and others.

Comments or Examples: *High explained — will want to new machine if asked-*

The handwritten notations are of SMART's reference checker, and the preprinted form is the creation of the Weissman Group for SMART. Here, the reference checker then circled both the "1" and "2" rating under "Willingness and Ability to Learn." Plaintiffs' Opposition attributes the preprinted comments next to the number 1 category to International Paper supervisor Art Schutte. Plaintiffs assert that the "1" rating under Willingness and Ability to Learn establishes that Schutte stated that Fowler "not only lacks knowledge, but detracts from the pool of knowledge." (Fowler Opposition Appendix at 3). The form does not, of course, even say that Schutte made such a statement. This is one of several preprinted characteristics listed under a "1" rating.

30

Plaintiffs do not mention at all that the reference checker also circled the number 2 category. The reference checker also made the notation "High Experienced," which is arguably inconsistent with a "1" or a "2". Schutte testified that he did not fill out any paperwork related to the applicant reference checking process. (Schutte Tr. 15). The applicant reference form for Fowler was undisputedly completed by the SMART reference checker, and the inconsistency can only be attributed to the reference checker. (Weissman Tr. 226-227). There is no evidence that Schutte made the comments attributed to him by Plaintiffs.

Similarly, Plaintiffs cite the reference checker's notes on the preprinted applicant reference check form for Edward Hensley to support their claim that Hensley's supervisor Tom Jones said regarding whether Hensley was a Team Player: "2. Has difficulty getting along with others and often is in conflict with others. Uncooperative." (Hensley Opposition Appendix at 2). An excerpt of the actual applicant reference check form for Hensley confirms the fallacy of accepting Plaintiffs' arguments based on the SMART reference checker's notes:

## TEAM PLAYER

1. Instigates conflict and problems. Is uncooperative and encourages others to be uncooperative.
2. Has difficulty getting along with others and often is in conflict with others. Uncooperative.
3. Gets along well with others. Reacts well to constructive feedback. Few conflicts with others. Cooperative.
4. Gets along well with almost everyone. Helps others solve problems. Most cooperative. Handles conflict well.
5. Leads in a collaborative, helpful way. Encourages cooperation. Leads conflict resolution. Respected by all.

*average to below.*
*people just leave him alone*

Comments or Examples:

## SAFETY AWARENESS

1. A safety hazard for others. Contemptuous of safety rules.
2. Frequently disregards safety rules. Careless/reckless.
3. Performs with reasonable care but not overly cautious. Follows safety rules.
4. Always careful. Takes lead in pointing out hazards. Follows safety rules and encourages other to do likewise.
5. Assertive in creating a safe workplace. Takes responsibility and accepts leadership in safety on his team. Addresses safety violations directly with coworkers.

*needs to be reminded of PPE*
*capability situation*

Comments or Examples:

As the actual form indicates, the SMART reference checker circled both the "2" and the "3" ratings in the "Team Player" and "Safety Awareness" categories. Assuming Plaintiffs' theory that the preprinted forms are statements made by International Paper supervisors, Jones should be attributed with saying both that Hensley "2. Has difficulty getting along with others . . ." and "3. Gets along well with others," as well as "2. Uncooperative" and "3. Cooperative." Similarly, under Safety Awareness, Hensley is again graded both a "2" and a "3" by the SMART reference checker. (Of course, Plaintiffs only cite to the "2" ratings in their Opposition.) Under Plaintiffs' theory of attributing the reference checkers' categorization to Jones, however, Jones said both that Hensley"2. Frequently disregards safety rules…" and "3. … Follows safety rules."

Plaintiffs' selective attribution of the preprinted reference check sheet statements and reference checkers notes to International Paper supervisors must be rejected. In addition to the hearsay problems with the forms, it is undisputed that the SMART reference checker graded the applicants according to the standards set forth by SMART, not the performance standards of International Paper. (Weissman Tr. 122, 226-227). The applicant reference check forms are grades, notes, and comments written by SMART's reference checkers, and do not purport to quote what International Paper supervisors said about Plaintiffs. (Weissman Tr. 226-227, 229).

As no hearsay exceptions apply to these forms, the applicant reference check forms are not admissible to prove that International Paper supervisors made the statements at issue. Fed. R. Evid. 802.[10]

---

[10] There is no basis to contend that the applicant reference check forms are admissible under the business records exception. The Sixth Circuit has held that a document is admissible under this exception if it satisfies the following four requirements:

For example, in <u>Bush v. Barnett Bank</u>, 916 F. Supp. 1244, 1255 (M.D. Fla. 1996), the plaintiff alleged that her employer published statements to its employees that the plaintiff had been fired for misuse of her checking account. In support, the plaintiff proffered an affidavit from one of Defendant's managers (Ms. Campbell) which stated that she (Ms. Campbell) was told by another manager (Mr. Connell) that "an announcement was made in his office to all the employees that Ms. Bush had been kiting checks and they had to let her go." <u>Id.</u> The court in <u>Bush</u> found that the plaintiff was attempting to introduce an otherwise inadmissible statement via two out-of-court declarations. Because the declarations were hearsay and did not fall under any hearsay exception, the court held that the declarations were inadmissible:

> [I]n this case, Campbell's testimony is offered to prove that Barnett in fact published a defamatory statement to third parties -- a statement offered to prove the truth of the matter asserted. Plaintiff presented no affidavit or deposition from Connell; therefore, Campbell's quotation of Connell is pure hearsay. This Court finds that Campbell's allegation is a classic example of hearsay and will not be considered since it is incompetent evidence with respect to a crucial element of Plaintiff's burden of proof.

---

it must have been kept in . . . a regularly conducted business activity; (2) it must have been kept in the regular course of that business; (3) the regular practice of that business must have been to have made the memorandum; and (4) the memorandum must have been made by a person with knowledge of the transaction or from information transmitted by a person with knowledge.

<u>Bondie v. Bic Corp.</u>, 947 F.2d 1531, 1534 (6th Cir. 1991). Here, Plaintiffs admit that SMART did not regularly utilize the applicant reference check form or keep similar records. <u>See</u> Plaintiffs' Opposition to SMART's Motion for Summary Judgment, p. 13, Ex. 58a at Para. 55. Furthermore, as is set forth above, Mary Rita Weissman who was in charge of the applicant reference checking process, testified that the notes on the applicant reference check forms were taken so that the reference checkers could explain why they rated someone the way they did, not to record what the International Paper supervisor said. She further noted that statements on the applicant reference check forms are the statements of the reference checkers, not quotations of International Paper's supervisors. As such, the applicant reference sheets are not sufficiently trustworthy to qualify as a hearsay exception. <u>See</u> Fed.R.Evid. 803(6).

33

Id. at 1256. Therefore, because the plaintiff had failed to prove that the defendant had published a false statement, the court granted summary judgment in the defendant's favor on the plaintiff's defamation claim. Id.

In John and Vincent Arduini Inc. v. NYNEX, 129 F. Supp.2d 162, 173 (N.D.N.Y. 2001), an agent of Defendant (Boire) allegedly told a third party subcontractor (Filantrante) that Plaintiff, a cleaning company (Heritage), was a "bad company" who could not do a particular job. In support of this claim, Plaintiffs submitted an affidavit from one of its employees (Kosinski) declaring that "Filantrante further indicated to me that Mr. Boire told him that Heritage was no good and that he did not want Heritage in his buildings." Kosinski's testimony was offered to prove the truth of the matter asserted in that statement, namely that Boire told Filantrante, the subcontractor, that Heritage was no good. The court ruled that the statement fell squarely within the purview of the hearsay rule and was inadmissible. Id. The Court further found that the letter Kosinski attached to the affidavit that memorialized the conversation he had with Filantrante was hearsay and inadmissible for the same reasons that the affidavit was inadmissible. Id. at 173, fn. 6.

Similarly, here, Plaintiffs seek to avoid summary judgment by relying on the reference check forms – out of court statements of third parties offered to prove the truth of the matter asserted. They do not – and cannot – offer any competent evidence demonstrating that International Paper made the preprinted or handwritten comments contained in the reference sheet. Accordingly, these forms cannot be used to support Plaintiffs' claims of defamation. Summary judgment should, therefore, be entered on these claims. See, e.g., Courtney v. Canyon Television & Appliance Rental, Inc., 899

F.2d 845, 851 (9th Cir. 1990) (plaintiff's statement that employee of defendant defamed

him in front of defendant's customers was hearsay and "summary judgment on the

defamation claim was proper.") (citations omitted); Bularz v. Prudential Ins. Co. of Am.,

93 F.3d 372, 377-78 (7th Cir. 1996) (although it would not have been hearsay for first-

hand witness of defamatory statement to testify, it was hearsay for someone who heard

about the statement from an actual witness to do so); DeMaria v. Washington County, 12

F. Supp.2d 1093, 1100 (D. Idaho 1996) (finding inadmissible section 1983 plaintiff's

declaration that police dispatcher heard defendants and employees of defendants refer to

plaintiff in ethnically discriminatory manner); GMO Rice v. Hilton Hotel Corp., 1987

U.S. Dist. LEXIS 16893, (D.D.C. Sept. 1, 1987) ("In this instance, plaintiff seeks to

testify that one person ('B') told the plaintiff that another person ('A') made a statement

defaming plaintiff. Plaintiff offers this testimony in an effort to show that 'A' did, in fact,

make the defamatory statement. This is inadmissible hearsay; plaintiff has no personal

knowledge as to whether the defamatory statement was made and he cannot be cross-

examined with respect thereto.")

> **4.** ***Plaintiffs' own opinion of their individual work***
> ***performances, or their co-workers' opinion of their***
> ***performances, is not relevant to determining whether the***
> ***supervisor's references were defamatory***

Neither Plaintiffs' own opinions of their individual work performances, nor those

of their co-worker, Berlyn Stanifer[11], are relevant to determining whether their references

were defamatory.

---

[11] Plaintiffs erroneously assert that Berlyn Stanifer was "Defendant International Paper's training supervisor." (Plaintiffs' Opp., at page 50). Stanifer's affidavit (Plaintiffs Ex. 43), however, states that he worked as a training supervisor "[f]rom February 11, 2001 to June 26, 2003." Since it is undisputed that SMART acquired the Mill on February 9, 2001, Stanifer avers that he was a training supervisor at SMART, not at International Paper. Plaintiffs ceased working at the Mill on February 9, 2001. Stanifer was a co-worker of Plaintiffs at International Paper, not a supervisor.

In the context of employment discrimination claims, courts have found that a plaintiff's subjective opinion of his performance is not alone sufficient to create a material fact issue sufficient to defeat a motion for summary judgment. See, e.g., Millbrook v. IBP, Inc., 280 F.3d 1169, 1181 (7th Cir, 2002). "[A] plaintiff's own opinions about her work performance or qualifications do not sufficiently cast doubt on the legitimacy of her employer's proffered reasons for its employment actions." See id. (quoting Ost v. West Suburban Travelers Limousine, Inc., 88 F.3d 435 (7th Cir.1996)). Similarly, courts have held that evidence that a co-worker or supervisor believed that an employee's performance was satisfactory does not create a material issue of fact. See id. (citing Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1125 (7th Cir.1994). "An employee's perception of his own performance . . . cannot tell a reasonable factfinder something about what the employer believed about the employee's abilities." Olsen v. Marshall & Ilsley Corp., 267 F.3d 597, 602 (7th Cir.2001).

Because Plaintiffs cannot demonstrate that International Paper's supervisors agreed with Plaintiffs' opinions of themselves, or those of Berlyn Stanifer, evidence of those irrelevant opinions is not sufficient to establish that the supervisors' statements were defamatory.

### 5.    *International Paper Should Not Held Liable For Statements Made For the Benefit of SMART*

International Paper should not be held liable for statements by supervisors or managers made during these reference interviews because any benefit advanced only SMART's interests, not International Paper's.

An illustrative case with facts very similar to the instant dispute is Austin v. Mabey, 184 F.Supp.2d 534 (M.D.La. 2001). In Austin, Employer A filed for bankruptcy

and Employer B agreed to buy Employer A's assets. Certain supervisors from Employer A were offered and accepted positions with Employer B. After accepting employment with Employer B but while they were still employed by Employer A, these supervisors made recommendations to Employer B regarding which Employer A employees Employer B should hire.

Plaintiffs, employees of Employer A who were not hired by Employer B, sued Employer A alleging that the Employer A supervisors discriminated against Plaintiffs on the basis of age, gender, and race when they failed to recommend Plaintiffs to Employer B. The court held that because the supervisors were making recommendations for the benefit of Employer B, and not Employer A, the supervisors were not acting as agents of Employer A. Therefore, Employer A could not be liable to Plaintiffs for the supervisors' allegedly discriminatory conduct.

The court first outlined the relevant agency principle—i.e., that a master is liable for the acts of his servants committed while acting in the scope of their employment— and outlined the criteria for determining that conduct is within the scope of employment. The conduct must: 1) be the kind of conduct the servants were employed to perform; 2) occur substantially within the authorized time and space limits; and 3) be actuated, at least in part, by a purpose to serve the master. Austin,184 F.Supp.2d at 538; see also Moham v. Steego Corp., 3 F.3d 873 (5th Cir. 1993).

The court focused primarily on the third criterion. The plaintiffs presented deposition testimony from some of the supervisors indicating that part of their reason for making recommendations to Employer B was to fulfill Employer A's duty to cooperate under the purchase agreement that had been approved by the bankruptcy court. They also

37

acted in part to benefit Employer A by helping to insure an orderly takeover of operations

by Employer B. The court concluded that this evidence failed to contradict or negate the

fact that the supervisors made the recommendations for the benefit of Employer B. See

id. at 539. "The only reasonable inference that could be drawn from this evidence is an

intent by the [supervisors] to cooperate with [Employer B]—for its benefit—during the

transition period from the approval of the asset purchase agreement to the date of the sale,

and to help [Employer B] select the employees it needed to run the company after the

closing date—again, for its benefit." Id. at 540.

The court also noted the following:

- The agreement clearly stated that Employer B had the sole discretion to determine whether Employer A employees would be employed with Employer B after the closing date. There was no language therein assigning any responsibility to Employer A for making this determination.

- The asset sale did not require Employer A to hire employees or otherwise have a workforce in place for Employer B by the sale date. The fact that Employer A had a duty to cooperate with Employer B did not mean that Employer A or its agents had a responsibility to have a workforce in place on the closing date. There was uncontradicted deposition testimony that Employer B was responsible for having its organization and workforce in place by the closing date.

- The sale price would not be increased, nor would the sale be more likely to occur, if Employer A supplied a workforce to Employer B.

184 F.Supp.2d 534, 539-40.

In the instant case, International Paper actually had a financial intent for its

supervisors to give positive, not negative, references to SMART. Because of

International Paper's severance agreement with PACE, every employee not hired by

SMART received a negotiated severance package from International Paper. It is

undisputed that SMART had the sole discretion to determine which employees it would

hire. And, while SMART had not yet announced which supervisors it would hire, it is

undisputed that all of the supervisors who provided references for Plaintiffs applied for positions with SMART.

Under these circumstances, the supervisors were not acting for International Paper, but rather were acting in the intent of SMART. If the supervisors were acting as agents for SMART, there was no publication when they provided reference information to SMART through its other agents in the employment process – the reference checkers. Parry v. Mohawk Motors of Michigan, Inc., 236 F.3d 299, 312 (6th Cir. 2000). Moreover, International Paper cannot be held vicariously liable for any allegedly tortious conduct that occurred during this process.

### C. AS A MATTER OF LAW, PLAINTIFFS CANNOT ESTABLISH A VIOLATION OF THE WARN ACT

#### 1. *Under the Authoritative Guidance of the WARN Regulations, No "Closing" Occurred as a Matter of Law*

Plaintiffs cannot and do not dispute that Plaintiffs' "closing" argument is contrary to the WARN regulations issued by the Department of Labor. The Department of Labor has authoritatively[12] stated that a "closing" does not occur under WARN upon "the mere closing of a plant for hours when it was previously open." Comments to Final WARN Regulations, 20 § F.R.649, 54 F.R.16042, § 639.3(j) (April 20, 1989). The test under WARN is whether "the plant continues to operate and no recognized department, operation or major work function has been terminated." Id.

Thus, the WARN regulations make clear that no closing resulted from SMART's decision that the plant would not operate from Saturday, February 10 through Tuesday, February 13. Because SMART always intended to continue, and did continue, plant

---

[12] In 29 U.S.C. §2107(a), Congress directed the Secretary of Labor to "prescribe such regulations as may be necessary to carry out this chapter."

operations and all department operations, no "shutdown" or "closing" occurred under

WARN as a matter of law.

> a. **Because the Mill and its Departments Continued to Operate After the Sale, No "Shutdown" or "Closing" Occurred Under WARN As A Matter of Law**

Plaintiffs do not dispute that:

- SMART purchased the Mill as a "going concern." (Asset Purchase Agreement, 1; §4.1, p. 16; Bray Tr. 15)

- SMART continued to operate all departments and operating units of at least 50 or more that International Paper had operated. (Maheu Aff. ¶14).

- SMART purchased "all of the [Mill's] assets, properties, licenses and other agreements necessary to permit [SMART] to conduct business in substantially the same manner that it had been conducted by [International Paper] prior to" the sale. (Asset Purchase Agreement §5.14, p. 31);

- SMART purchased International Paper's accounts receivables, customer lists, and supplier lists and agreed to assume certain liabilities related to the Mill. (Asset Purchase Agreement pp. 7, 11).

- SMART acquired the Mill premises. (Asset Purchase Agreement, p. 7-8).

- SMART acquired the Mill's raw materials and inventory to continue the Mill's operation. (Maheu Aff. ¶13).

- SMART conducted an extensive, professionally-designed application and interview process in January 2001 in order to continue operating the Mill after the sale and retained a Human Resources Director. (Weissman Tr. 11-12).

- SMART hired over 70% of the Mill's employees over the weekend following the completion of the sale on February 9, 2001.

- SMART assumed International Paper's obligation to provide accrued but unused vacation to Mill employees it hired;

- SMART hired its top management team before or immediately following the completion of the sale on February 9, 2001; (Johnson Tr. 80; Maheu Aff. ¶13).

- SMART and International Paper ran the Mill's power plant continuously throughout the transition from International Paper to SMART. (Simpson Tr. 6).

- SMART never removed or mothballed the Mill's production equipment and resumed normal operation using the Mill's existing production equipment on Wednesday, February 14. (Maheu Aff. ¶13).

Plaintiffs have no evidence that SMART or International Paper ever intended to "shutdown" or close the Hamilton Mill or any of its operating units. Under the WARN regulations, SMART's decision to suspend manufacturing for a few days following the February 9 sale date cannot be a "shutdown" or "plant closing." SMART's intent to continue operations is undisputed based on the unequivocal language of the Asset Purchase Agreement, the extensive hiring process in January 2001, the return of employees to the plant on Tuesday, February 13, 2001 and the resumption of full production on February 14, 2001. See 20 C.F.R. §639.3(b) (a "shutdown" is an "employment action that results in the effective cessation of production or the work performed by a unit").

As a matter of law, SMART's decision that the Mill would not operate during the four day hiatus cannot constitute a "shutdown" or "plant closing." SMART's decision was an administrative pause in operations - - not a decision that operations would cease. There was no actual shutdown or plant closing. SMART was busy during this hiatus, hiring employees and scheduling them to restart production on February 14. SMART operated the Mill as a going concern – no decision to shut down the Mill or its units was ever made. Likewise, International Paper never closed or shut down the Mill. International Paper operated the Mill up to the time of sale and sold it to SMART as a going concern, knowing that SMART intended to continue Mill operations and hire a substantial number of employees.

The WARN regulations make clear that WARN is concerned about mitigating the impact of employment loss. The purpose of the Act is to extend

41

> protection to workers, their families and communities by
> requiring employers to provide notification 60 calendar
> days in advance of plant closings and mass layoffs.
> Advance notice provides workers and their families some
> transition time to adjust to the prospective loss of
> employment, to seek and obtain alternative jobs and, if
> necessary, to enter skill training or retraining that will allow
> these workers to successfully compete in the job market.

20 C.F.R. § 639.1(a).

The regulations thus contemplate that a plant closing or shutdown means "loss of employment," the need "to seek and obtain alternative jobs" with possible "skill training or retraining." SMART's administrative pause in production entailed no threat of job loss and cannot be a shutdown or plant closing.

Plaintiffs cite the deposition testimony of Milt Lewis[13] and Deryl Couch, who use the term "closing" when discussing the sale of the Mill from International Paper to SMART. However, the statements of these individuals are insufficient to establish a "plant closing" under the clear legal standards of the WARN Act. These conclusory statements do not change the undisputed facts that the Mill continued to operate as a going concern. The term "plant closing" is defined by the WARN Act and regulations, not by Lewis and Couch. That definition turns on whether the plant continues to operate; there can be no dispute that the Mill continued operations.

Plaintiffs also refer to the use of the term "close" in a document entitled "Guidelines for International Paper Exit Process." The form states "the expected close

_____

[13] The alleged statement of Milt Lewis is hearsay. Lewis' testimony refers to a statement allegedly told to him by Annetta Johnson. (Plaintiffs' Opposition at 66). As such, this is hearsay as it is an out of court statement offered for the truth of the matter asserted. As discussed above, inadmissible hearsay is insufficient to defeat International Paper's motion for summary judgment.

date will be known a few days in advance."[14]  Plaintiffs have not laid any foundation for

this document, and it does not create a dispute of fact as to whether a "plant closing"

occurred under WARN.  First, the term apparently refers to the close of the sale.  This is

a common term for the conclusion of a sales transaction.  Second, the form actually

demonstrates that no "plant closing" occurred under WARN, by showing a continuity of

operations.  The document discusses the fact that at the time of an employee's exit

interview with International Paper (February 9, 2001), employees would receive a letter

from SMART indicating an appointment time (February 10 or 11) and that it would be

during that appointment when SMART would be providing offers to applicants.  The

document also confirms that employees hired by SMART would receive the vacation

from SMART that they earned with International Paper.  The document thus shows that

the Mill continued operations.

United Mine Workers v. Martinka Coal Co., 202 F.3d 717 (4th Cir. 2000), does

not support Plaintiff's position.  In Martinka, a catastrophic roof fall occurred at one of

the defendant's mines.  Martinka decided to close the mine because it would no longer

operate.

In contrast, there was no plant closure at the Hamilton Mill, which was purchased

as a going concern, and continued operations and employment of over 70% of the

employees of the Mill.  (Maheu Aff. ¶10).  There was no "cessation of production" at the

Mill and no WARN Act notice was required.  See 20 C.F.R. §639.3(b).

Plaintiffs do not and cannot dispute that WARN regulations also make clear that

in the context of a sale, "termination, by itself, is not a basis for a WARN notice."

---

[14] This document is also further evidence that International Paper did not have knowledge SMART's
"definite plans" for the Mill. See 20 C.F.R. §639.4(c)(1).

Comments to Final WARN Regulations, 20 C.F.R. 649, 54 Fed. Reg. 16042, § 639.3(c)

(April 20, 1989). In the sale, WARN "assigns the seller's employees to the buyer after

the sale" for purposes of WARN notice rights. Id. See Int'l Alliance of Theatrical &

Stage Employees v. Compact Video Servs., Inc. 50 F.3d 1464, 1468 (9th Cir. 1995).

In International Oil, Chemical & Atomic Workers v. Uno-Ven Co., 170 F.3d 779

(7th Cir. 1999), the seller terminated 377 employees on the date of the sale. The Court

clearly states – as WARN regulations make it clear – that termination of employment by

the seller upon sale is not a basis for a WARN notice, which depends upon "whether the

purchaser refuses to rehire them or lays them off." Id. at 783-84. As the Court observed:

> [WARN] deem[s] the employees on the date of the sale
> employees of the purchaser after the sale. [29 U.S.C.]
> §2101(b) (1). Thus, unless the purchaser refuses to rehire
> them or lays them off, there is no "employment loss" and so
> no duty of advance notice of the "mass layoff."

Id.

Under WARN, International Paper had no duty to issue a WARN notice because

it was not "planning a plant closing or mass layoff." 20 C.F.R. §639.2. It is undisputed

that International Paper believed (and SMART agreed) that the Mill would continue as a

going concern. International Paper had no notice of definite plans by SMART as to

which or how many employees it would hire. Thus, International Paper had no

knowledge (or information from SMART) that would permit International Paper to

advise employees 60 days in advance as to whether they would be hired by SMART. See

20 C.F.R. §639.4(c) (1).

Moreover, under WARN, no employment loss occurred as the result of the sale of

the Mill or the brief pause in production. The decision about which employees to hire was

made by SMART prior to February 9, 2001 sale. (Maheu Tr. 126). Plaintiffs have not presented any evidence to show a causal relationship, proximate or otherwise, between the fact that the first three days after the sale were used for meetings, inventory, and other administrative work, and SMART's hiring decisions regarding Plaintiffs or others.

Plaintiffs were not offered jobs at SMART because SMART decided they did not meet SMART's hiring standards. Plaintiffs contend they were not hired because of their negative references (in their claims against International Paper) or their ages (in their claims against SMART). But they do not claim they were not hired because the Mill shut down. The evidence is undisputed that the pause in production did not cause Plaintiffs' loss of employment at the Mill.

Plaintiffs cannot rely on allegations in the Complaint, but must set forth competent evidence to show an actual closing – i.e. termination of operations of the plant or its departments – that resulted in their employment loss. Under the WARN regulations, the test is whether plant operations continued after the sale. Because it is undisputed that SMART continued all operations after the sale, no closing or shutdown occurred under WARN as a matter of law.

### 2.   *Plaintiffs Have Not Established A Mass Layoff*

Plaintiffs offer no competent evidence to rebut the undisputed evidence that the requisite 33% of the mill's work force did not lose their jobs because of the sale. Thus, the undisputed facts show that no "mass layoff" occurred under WARN.[15] Plaintiffs have

---

[15] Also, the WARN Act defines a "mass layoff" as "a reduction in force which-- (A) is not the result of a plant closing..." Thus, a determination of whether a mass layoff occurred is only necessary if the Court determines that no "plant closing" occurred. Mich. Reg'l Council of Carpenters v. Holcroft L.L.C., 195 F. Supp. 2d 908, 911 (E.D. Mich. 2002).

not offered any facts to show that there is a dispute about the number of employees who were and were not hired by Smart as a result of this sale.

Plaintiffs' Opposition asserts that Milton Lewis testified that the sale of the mill resulted in the termination of an <u>at least 264 employees</u> out of a total of <u>more than 700 employees</u>. However, Lewis' actual testimony was:

> Q:    Do you know how many hourly employees there were on or about February 10th of 2001 for SMART Papers?
>
> A:    On 2/10 I think the final number was about 374 -- 376 hourly and about 62 salaried, in that ballpark.
>
> Q:    Did you know how that compared with the number of employees that IP had?
>
> A:    I think IP hourly force was like 600-plus hourly, and 100-plus salaried.

(Lewis Tr. 49-50). These numbers are clearly rough estimates by Lewis. Lewis used terms such as "about," "I think," "in that ballpark" and "600 plus" to modify his estimates. Nothing in his testimony indicates he knew the actual number of employees involved. Indeed, Mr. Lewis further testified that he did not know the precise number of employees at the Hamilton Mill:

> Q:    Are you aware of the precise number of employees that were at the Hamilton Mill at the time of the sale from IP to SMART?
>
> A:    No.

(Lewis Tr. 105).

International Paper, however, has provided competent, sworn and undisputed evidence as to the actual number of employees at the mill at the time of the sale (800) and the actual number of employees from the Mill offered employment by Smart (574).

(Opening Brief at 12-13; Wilson Aff. ¶2; Maheu Aff. ¶10). Lewis' imprecise estimates are not competent to create a factual dispute concerning the numbers of employees hired and not hired.

### 3.    *The Sales Exemption Applies*

There is no dispute regarding the facts applicable to WARN's sales exemption. Plaintiffs can no longer rely on the allegations in their Complaint. The undisputed facts show the WARN sales exemption clearly applies. Plaintiffs do not dispute that the facts here are distinguishable from the facts in the <u>Burnsides v. MJ Optical, Inc.</u>, 128 F.3d 700 (8th Cir. 1997), relied on the by the Court in ruling on the Motion to Dismiss.

As discussed in International Paper's Opening Brief, all of International Paper's employees suffered a technical termination when the Mill was sold to SMART. Under WARN, however, no termination occurs as the result of a sale. Comments to Final WARN Regulations, 20 C.F.R. 649, 54 Fed. Reg. 16042, §639(c)(April 20, 1989); <u>International Oil, Chem. & Atomic Workers, Local 7-517 v. Uno-Ven Co.</u>, 170 F.3d 779, 783 (7th Cir. 1999). In a sale, WARN "assigns the seller's employees to the buyer after the sale" for purposes of WARN notice rights.

In <u>Uno-Ven</u>, LLC, the seller fired its 377 employees effective the date of the sale to Citgo. The next day, Citgo hired 367 of the discharged employees. <u>Id.</u> In determining that the employees had not suffered an "employment loss," Judge Posner explained:

> A formalistic interpretation would treat the discharge of all 377 by Uno-Ven or LLC as permanent because they were rehired by a different employer … But this interpretation is blocked by a provision of the WARN Act that excludes from the definition of "employment loss" the situation here, where the sale of a business results in a technical termination of employment. The provision does this by deeming the employees on the date of the sale employees of the purchaser after the sale. § 2101(b) (1). Thus, unless

47

> the purchaser refuses to rehire them or lays them off, there is no "employment loss" and so no duty of advance notice of the "mass layoff."

Id. at 783.

Similarly, employees terminated on the date of the sale to SMART, were not entitled to a WARN notice from International Paper. Only when SMART decided not to hire them did an "employment loss" occur. As discussed above, because less than 1/3 of the Mill employees suffered an employment loss, there was no mass layoff and no WARN notice was required. 29 U.S.C. § 2101(3) (B).

### 4.    *International Paper Acted In Good Faith and Gave the Best Notice It Was Able to Give*

The purpose of the WARN Act is to "provide workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining that will allow these workers to successfully compete in the job market." 20 C.F.R. 639.1. For the reasons discussed above, International Paper was not required to provide notice under WARN. Because International Paper could not know when SMART would decide to hire its Mill workforce, International Paper gave the best notice it was able to give.

The parties had reached an agreement in principle regarding the sale of the Mill on December 29, 2000, but the actual transition date had not yet been established. International Paper knew SMART intended to purchase the Mill on an ongoing basis and was not aware of any plans by SMART to close the Mill or have a mass layoff by causing a job loss for over 33% of the employees at the Mill. Indeed, SMART indicated in the Asset Purchase Agreement that they intended to operate the Mill, not close it, and to offer employment to a "substantial number" of International Paper's employees.

48

Under WARN regulations, "If the seller is made aware of any definite plans on the part of the buyer to carry out a plant closing or mass layoff within 60 days of purchase, the seller may give notice to affected employees as an agent of the buyer, if so empowered…" 20 C.F.R. 639.1(c)(1). As International Paper was unaware of SMART's plans, it could not provide any such notice. Moreover, SMART had no such plans. SMART did not close the Mill and SMART hired over 2/3 of the Mill's employees

International Paper nevertheless gave the Mill employees the best notice it could. It advised the union and the employees the following week, on January 8, 2001, that the sale was forthcoming toward the end of the month. (Bray Tr. 14-15; Bennett Tr. 33; Bergeron Tr. 14; Campbell Tr. 47; Plaintiffs' Opposition Appendix Tab 49). International Paper did not know when or who SMART would hire or not hire. Furthermore, it is undisputed that International Paper agreed during effects bargaining in mid-January to provide severance to all employees not hired by SMART and to assist in SMART's application and hiring process. (Effects Bargaining Agreement at 1; Asset Purchase Agreement at 16). Furthermore, International Paper agreed to provide outplacement assistance, employee assistance support, and continuing health care coverage for all employees not hired by SMART. (Effects Bargaining Agreement at 3).

Pursuant to the notice provided by International Paper, Plaintiffs all applied for positions with SMART in time for SMART to determine whether to offer them jobs before the completion of the sale. SMART did not advise Plaintiffs (or International Paper) that Plaintiffs would not be offered employment until February 10, 2001. If Plaintiffs had been provided 60 days notice that the sale would finalize on February 9, 2001, they would still not have known that they would not continue working at the Mill

49

until SMART announced its decisions on February 10, 2001. Nevertheless, the entire Mill workforce had completed the application process in time for offers to be made on or before the day of the sale. Quite simply, International Paper could not have provided more effective notice than it did with respect to these employees.

The WARN Act provides that an employer's liability or penalty may be reduced if the employer establishes that "the act or omission that violated this chapter was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of this chapter". 29 U.S.C. § 2104(a) (4). Courts have thus found that even where an employer has violated the Act, summary judgment for the employer may be appropriate under this provision. See United Auto. Aerospace & Agr. Implement Workers of Am., Local 1077 v. Shadyside Stamping Corp., 1991 U.S. App. LEXIS 27051 (copy attached) (affirming district court's grant of summary judgment to the employer even though employer had violated WARN Act because employer demonstrated that it had acted in good faith); Kildea v. Electro-Wire Prods., Inc., 2000 U.S. App. LEXIS 33991 (copy attached) (same); Oil, Chem. & Atomic Workers Int'l Union, Local 7-515 v. Am. Home Prods. Corp., 790 F.Supp. 1441 (N.D.Ind. 1992) (although employer violated the WARN Act, employer entitled to summary judgment under "good faith" defense provided by the Act).

Assuming, *arguendo*, notice was required under WARN, the Court must determine whether International Paper's January 8, 2001 notice was an honest effort to give its employees the best and most timely information regarding their employment prospects. See Graphic Communs. Int'l Union, Local 31-N v. Quebecor Printing Corp., 252 F.3d 296, 302 (4th Cir. 2001).

International Paper did provided employees with information regarding the sale as it obtained it and it provided all employees with outplacement assistance and severance (if SMART failed to hire them), and facilitated most of the employees' employment with SMART. International Paper could not know which or how many employees of the Mill SMART intended to hire. International Paper knew only, because it was part of the Asst Purchase Agreement, that SMART would continue to run the Mill, would hire a significant number of International Paper's employees, and would continue to be an employer in the Hamilton community.

## III.    CONCLUSION

As set forth in its Opening Brief, International Paper has not engaged in any wrongful conduct toward Plaintiffs. International Paper is entitled to summary judgment as a matter of law on all remaining claims, and Plaintiffs' claims should be dismissed with prejudice.

Respectfully submitted,

INTERNATIONAL PAPER COMPANY


By /s Michael A. Roberts
　　　　　　　Counsel

Michael Roberts, Esq.　　　　　　W. Carter Younger
Graydon Head & Ritchey, LLP　　　Vincent Miraglia
1900 5th 3rd Center　　　　　　　McGuireWoods LLP
511 Walnut Street　　　　　　　　1050 Connecticut Avenue, Suite 1200
Cincinnati, Ohio 45202　　　　　　Washington, DC 20036
Phone: 513-629-2799　　　　　　　Phone: 202-857-1704
　　　　　　　　　　　　　　　　Fax: 202-828-2990

CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of November, 2003, a copy of the foregoing was sent

via hand delivery to:

        Randolph H. Freking, Esquire
        Freking & Betz
        214 East Ninth Street, 5th Floor
        Cincinnati, Ohio  45202

        Stan Lechner, Esquire
        Morgan, Lewis & Bockius LLP
        1111 Pennsylvania Avenue, NW
        Washington, DC 20004

               /s Michael A. Roberts