## IN THE UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| ELMER CAMPBELL, *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION NO. C-1-01-527 |
| | ) | |
| v. | ) | JUDGE: BECKWITH |
| | ) | MAGISTRATE JUDGE: HOGAN |
| INTERNATIONAL PAPER, | ) | |
| SUN CAPITAL PARTNERS, INC., | ) | |
| SMART PAPERS, | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————————— | ) | |

### DEFENDANT SMART PAPERS' REPLY BRIEF
### IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Stanley F. Lechner                          Robert J. Hollingsworth (0024559)
Margery Sinder Friedman                CORS & BASSETT, LLC
Laine S. Posel                                 537 East Pete Rose Way
Of Counsel                                      Suite 400
MORGAN, LEWIS & BOCKIUS, LLP    Cincinnati, Ohio 45202
1111 Pennsylvania Avenue, N.W.        Telephone: 513.852.8200
Washington, DC  20004                      Facsimile:  513.852.8222
Telephone:  202.739.3000
Facsimile:  202.739.3001

Date:  November 21, 2003                   Counsel For Defendant
                                                           Smart Papers LLC

**CONTENTS/SUMMARY**
**(Per Local Rule 7.2(a)(3))**
**Main Sections Of The Reply Brief**

Page

**Procedural Posture Of The Case: One Remaining**
**Issue Regarding Smart Papers** .................................................................... 1

In their opposition brief, Plaintiffs state that they are no longer pursuing their disability and defamation claims against Smart Papers. The Court previously dismissed Plaintiffs' claims under ERISA and Ohio public policy. Therefore, there is only one remaining issue in this case against Smart Papers - alleged age discrimination - and that issue is now ripe for summary judgment.

**Summary of Argument** ................................................................................ 2

In this section, we highlight what Smart Papers considers to be the most significant development in the case. Namely, in pursuing their defamation claims against International Paper ("IP"), Plaintiffs make scores of admissions that are fatal to their age discrimination claims against Smart Papers. Specifically, Plaintiffs admit that the reason Smart Papers refused to hire them was due to the negative job references provided by their IP supervisors and managers at the Hamilton Mill; that these negative references were in fact of critical importance to Smart Papers; and that these references were actually relied upon by Smart Papers and in fact motivated their hiring decisions. Given these admissions, Plaintiffs are unable to establish that the legitimate nondiscriminatory reasons that Smart Papers articulated for its employment decisions are a pretext for intentional age discrimination. See Manzar v. Diamond Shamrock Chemicals Co., 29 F.3d 1078 (6th Cir. 1994).

**ARGUMENT**

**I.    Plaintiffs Admit That Smart Papers Had Legitimate Nondiscriminatory**
**Reasons For Not Hiring Each Of Them And Further**
**Admit That Smart Papers In Fact Relied On These Reasons**
**In Its Hiring Decisions** ...................................................................... 3

In this section, we summarize in detail (by direct quotes) the specific factual admissions Plaintiffs have made regarding the reasons each of them was not hired by Smart Papers. We also set forth caselaw indicating that reliance on job references is a legitimate nondiscriminatory employment practice (see e.g., Hill v. Metropolitan Gov't of Nashville, 2002 WL 31863829 (6th Cir. 2002)); that Plaintiffs' belief that their many years of service at the Mill should have outweighed the references is insufficient to establish pretext (see e.g., Marshall v. Summa Health Sys.

i

Hosp., 2003 WL 21277336 (6th Cir. 2003)); and that Smart Papers' use of a different hiring process for subsequent hires is not evidence of pretext. (See e.g., Lee v. GTE Florida, Inc., 226 F. 3d 1249 (11th Cir. 2000).

II.  **Plaintiffs Own Statistics, As Well As Their Purported "Attack" On Smart Papers' Data Are Of No Probative Value Sufficient To Raise Even A Hint Of Pretext** ........................................................................................ 23

Plaintiffs attempt to cast doubt on Smart Papers' statistics by noting that in a prior document Smart Papers stated that only 400 hourly employees were hired in February 2001, as opposed to 410 which Smart Papers reported in its motion for summary judgment. But removing merely 9-10 additional hires from the data (Plaintiffs specifically identified only 9 to be removed) is insignificant and does not change the data in any material way. Significantly, the revised data still clearly shows that the oldest groups of applicants from the IP workforce (those in age ranges 60-65 and 55-60) had the highest selection rate:

| Age Range | Number of Applicants | Number Selected | Selection Rate By Age Group |
|---|---|---|---|
| 60-65 | 34 | 27 | 79.4% |
| 55-59 | 86 | 68 | 79.0% |
| 50-54 | 164 | 115 | 70.1% |
| 45-49 | 166 | 113 | 68.1% |
| Total 40 and over | 522 | 370 | 70.9% |
| 39 and under | 46 | 31 | 67.3% |
| Total | 568 | 401 | 70.6% |

In contrast, the "statistics" offered by the Plaintiffs are meaningless because: they reflect hiring decisions on subsequent "off the street" job applicants who are not similarly situated to Plaintiffs; they fail to include any data on the ages of the relevant applicant pool; and they include data on 106 employees who left the Mill—regardless of the reason. See e.g., Simpson v. Midland-Ross Corp., 823 F.2d 937, 943-44 (6th Cir. 1987) (rejecting proffered statistics that lacked vital information regarding the applicant pool, and rejecting statistical evidence that included all employees who left the company regardless of the reason).

III.  **Plaintiffs Deliberately Misrepresent The Record With Respect To Smart Papers' Access To Applicant Age Data** .................................................... 30

Before the Mill was sold, Smart Papers' labor and employment counsel obtained demographic data (i.e., race, gender and age) on the IP workforce as part of its due diligence "to ensure compliance with applicable employment laws." It is undisputed that this data was not used in the hiring process. After Smart Papers purchased the Mill, it began a new hiring process, using CBC Employment Screening Services to conduct

background checks of "off the street" applicants. CBC requested date of birth information on applicants recommended for employment "solely for the purpose of ensuring accurate retrieval of records"—i.e., criminal history, driving and education records of the applicant. The age data was used for legitimate purposes and is not probative of age discrimination. See e.g., Mesnick v. General Elec. Co., 950 F.2d 816, 826 (1st Cir. 1991).

**IV.  Plaintiffs' Allegations That Smart Papers Engaged In Age Stereotyping Are Incorrect and Do Not Establish Pretext** ..................................................... 33

The Weissman Group utilized legitimate nondiscriminatory factors in assessing applicants' qualifications to work for Smart Papers, including but not limited to "flexibility," "willingness and ability to learn," as well as teamwork, productivity, dependability, excellence orientation, and safety awareness. The very process that Plaintiffs allege stereotyped older workers as "inflexible" and "unwilling to learn new things" resulted in the oldest applicants receiving the highest selection rates. This totally undercuts Plaintiffs' argument.

**V.  Plaintiffs' Subjective Belief That They Were More "Objectively Qualified" Than Younger Applicants Subsequently Hired "Off The Street" Is Irrelevant** ..................................................................................................... 35

Objective qualifications are only relevant at the *prima facie* stage, and self-serving assertions that one applicant is objectively better qualified than another do not raise an issue of pretext. See Sutherland v. Michigan Dept. of Treasury, 344 F.3d 603, 617 (6th Cir. 2003).

**VI.  The 15 Remaining Plaintiffs Who Failed Their Drug Test Cannot Establish A Prima Facie Case Of Age Discrimination, Let Alone Rebut Smart Papers' Legitimate, Nondiscriminatory Reasons For Rejecting Them For Employment** ................................................................................................... 42

Smart Papers rejected all 56 applicants who failed their mandatory pre-employment drug test, regardless of their age, and this is clearly a legitimate nondiscriminatory reason for failing to hire these Plaintiffs.

**VII.  The 8 Plaintiffs Who Were Hired By Smart Papers Cannot Survive Summary Judgment** ............................................................................................ 48

In contrast to 56 remaining Plaintiffs in this litigation who are alleging that Smart Papers discriminated against them by failing to offer them any position at the Mill, these 8 Plaintiffs are alleging age discrimination because they were offered positions—but not in the precise positions they wanted. Actually, 2 of the 8 (Begley and Rumpler) did not want any job because they preferred severance from IP; 2 of the 8 (Arthur and Holland) were actually offered higher level positions than they formerly held at IP; 1 of the 8 (Campbell) was offered the exact position he held with IP at the time of the sale; 1 of the 8 (Greene) cannot make her mind up as to what

position she wants, and the final 2 (Geeding and Hess) state in their Fifth Amended Complaint that they were not hired, but the undisputed facts reveal otherwise.  The bottom line is that none of these 8 Plaintiffs has any plausible claim of age discrimination against Smart Papers

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| ELMER CAMPBELL, *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION NO. C-1-01-527 |
| | ) | |
| v. | ) | JUDGE: BECKWITH |
| | ) | MAGISTRATE JUDGE: HOGAN |
| INTERNATIONAL PAPER, | ) | |
| SUN CAPITAL PARTNERS, INC., | ) | |
| SMART PAPERS, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## DEFENDANT SMART PAPERS' REPLY BRIEF
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant Smart Papers, LLC ("Smart Papers") submits this reply brief in support of its motion for summary judgment.

## PROCEDURAL POSTURE:
## ONE REMAINING ISSUE REGARDING SMART PAPERS

In their opposition brief filed with the Court on October 31, 2003, Plaintiffs do not oppose Smart Papers' motion for summary judgment on the issues of alleged disability discrimination (Counts VII and VIII of the Fifth Amended Complaint), or on the issue of alleged defamation (Court IX). (See Plaintiffs' Consolidated Memorandum In Opposition To Defendant Smart Papers' Motion For Summary Judgment (hereinafter "Opp. to SP") at 1.) Moreover, Plaintiffs concede that the claims of six of the Plaintiffs (K. Fisher, J. Gumm, G. Jackson, J. Parsley, D. Ratliff, and J. Whitaker) should be dismissed for failure to appear at their scheduled depositions. Id.

Previously, the Court by decision dated March 25, 2003, granted Smart Papers' motion to dismiss Plaintiffs' claims under ERISA (Count V) and Plaintiffs' allegations

that Smart Papers violated Ohio public policy (Count X).  Therefore, there is one remaining issue in this case regarding Smart Papers – the allegation by 66 remaining Plaintiffs that the Company discriminated against them on the basis of their age under federal and state law (Counts I, II, III, and IV).  That issue is now ripe for decision by this Court.

## SUMMARY OF ARGUMENT

The most significant aspect of the voluminous materials Plaintiffs submitted to the Court is the fact that Plaintiffs have made critical admissions that are fatal to their remaining claims of age discrimination against Smart Papers.  Specifically, in pursuing their claims of defamation against Defendant International Paper ("IP"), Plaintiffs admit the following material facts that are now undisputed for purposes of summary judgment:

- the reason Smart Papers rejected the Plaintiffs for employment was because Smart Papers received highly negative job references and evaluations about the Plaintiffs from Plaintiffs' supervisors and managers at IP.

- IP supervisors and managers who were working at the Hamilton Mill gave Smart Papers specific negative employment related data about the Plaintiffs (such as their productivity, absenteeism, and work ethic) and Smart Papers believed that the statements were statements of fact and were true.

- the references provided by IP clearly and unambiguously indicated to the recipient, Smart Papers, that Plaintiffs were employees with poor job performance and undesirable work habits.

- the negative references provided by IP supervisors and managers were relied upon by Smart Papers and in fact motivated the hiring decision made by Smart Papers with respect to the Plaintiffs.

Under controlling case law in this jurisdiction, Plaintiffs thus are unable to establish that the legitimate nondiscriminatory business reasons articulated by Smart Papers for its employment decisions—the negative references—are a pretext for intentional age discrimination.  See Manzer v. Diamond Shamrock Chemicals Co., 29

2

F.3d 1078, 1084 (6th Cir. 1994) (to establish pretext, plaintiffs must show that the employer's articulated reasons for its decisions had no basis in fact, did not actually motivate the decisions, or were insufficient to motivate the decisions.)

## ARGUMENT

### I.    Plaintiffs Admit That Smart Papers Had Legitimate Non-Discriminatory Reasons For Not Hiring Each Of Them And Further Admit That Smart Papers In Fact Relied On These Reasons In Its Hiring Decisions

In its Motion for Summary Judgment, Smart Papers set forth in great detail the legitimate non-discriminatory reasons why it did not hire each and every one of the Plaintiffs.  For example, Plaintiff Thomas Abner was not hired because his former supervisor/manager at the Hamilton Mill (who was employed by International Paper – "IP") did not recommend Abner for employment with Smart Papers and provided Smart Papers with the following negative comments regarding Abner's work performance at the Hamilton Mill:

- "people stay away from him – lazy" (SPC 004)
- "absenteeism an issue" (Id.)
- "lazy so people don't want to [work with] him" (Id.)
- "doesn't move fast enough to get hurt" (SPC 004a)
- "quiet-doesn't comm[unicate]" (Id.)
- "below average" (Id.)

(See SP Appendix, Tab 1.)  The SP Appendix is a separate volume of evidence submitted by Smart Papers in support of its Motion for Summary Judgment.  The SP Appendix consists of 2-4 pages of facts for each of the 72 Plaintiffs in alphabetical order with full citations to all supporting documents.  All of the factual information was recorded and documented contemporaneously by the Weissman Group when it conducted the hiring process for Smart Papers in February 2001.

Significantly, as shown in detail below, Plaintiffs have not even attempted to rebut <u>any</u> of this critical factual evidence, which now is undisputed.  Moreover, not only have Plaintiffs failed to rebut any of this evidence, they admit in their opposition briefs (in opposition to both Smart Papers' *and* IP's motions) that the legitimate nondiscriminatory reasons articulated by Smart Papers were the *actual reasons* why Plaintiffs were not hired.  Indeed, this reliance by Smart Papers on the negative employment recommendations and references provided by IP supervisors and managers is the basis of Plaintiffs' defamation claims against Defendant IP.  (<u>See</u> Plaintiffs' Consolidated Memorandum In Opposition To Defendant International Paper Company's Motion For Summary Judgment (hereinafter "Opp. to IP").)

Plaintiffs' admissions are fatal to their case against Smart Papers because, under well-established caselaw, Plaintiffs have the burden of proving that the non-discriminatory reasons articulated by Smart Papers for its hiring decisions are a pretext for intentional age discrimination.  <u>See</u>, <u>e.g.</u>, <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973); <u>Reeves v. Sanderson Plumbing Products</u>, 530 U.S. 133, 146-47 (2000).  Moreover, to establish pretext in this case, Plaintiffs have the burden of proving that the well-documented and clearly articulated reasons for Smart Papers' hiring decisions:  (1) had no basis in fact; (2) did not actually motive Smart Papers; or (3) were insufficient to motivate Smart Papers' decisions.  <u>See</u> <u>Manzer v. Diamond Shamrock Chemicals Co.</u>, 29 F.3d 1078, 1084 (6th Cir. 1994).  As demonstrated below, Plaintiffs' cannot establish pretext under the <u>Manzer</u> analysis as a matter of law because they concede, as they must:

> (1) the reasons articulated by Smart Papers for its hiring decisions had a "basis in fact" because, even though Plaintiffs assert against IP that the references were false and defamatory, they admit that the negative references were in fact provided by

4

IP to Smart Papers for use in making its employment decisions and that Smart Papers believed these statements to be statements of fact. (See Opp. to IP at 55, 65) *("IP officials gave specific, objective data to SP" and "the recipient of the statements, SP, believed that the statements were statements of fact.")*

(2) the reasons articulated by Smart Papers actually motivated the hiring decisions of Smart Papers. (See Opp. to SP at 13) ("SP relied on the reference checks"); (Opp. to IP at 6) *("Statements provided by these IP officials were critical as to whether a particular applicant, all of whom worked at the Hamilton Mill, received an offer of employment.")*

(3) the reasons articulated by Smart Papers were sufficient to motivate Smart Papers' hiring decisions. (See Opp. to IP at 62) (the *"statements clearly and unambiguously indicate to an ordinary reader that Plaintiffs are employees with poor performance records and undesirable work habits")*; (Opp. to IP at 17) (IP officials *"knew that their references were important to SP's hiring decision, and that a bad reference could cost an employee his job.")*

## A. There Is No Evidence Of Pretext Because Plaintiffs Admit That Smart Papers In Fact Relied On The Negative References Provided By IP Supervisors And Managers.

Plaintiffs admit, in detail shown on the following pages, that Smart Papers' articulated, legitimate non-discriminatory reasons (the negative employment references) were the underline actual reasons why Plaintiffs were not hired. Because Plaintiffs admit that Smart Papers' legitimate non-discriminatory reasons were the real reasons Plaintiffs were not hired, Plaintiffs cannot establish pretext by disagreeing with the outcome of the hiring process. See Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318 (11th Cir. 1998) (once plaintiff admitted that the decisionmaker perceived other employees as having superior skills, he can not establish pretext merely by disagreeing with the evaluations.)

Plaintiffs concede both in their opposition to Smart Papers' Motion for Summary Judgment ("Opp. to SP") and in their opposition to International Paper's Motion for Summary Judgment ("Opp. to IP") that Smart Papers in fact relied on the reference checks provided by former IP managers and supervisors in determining whether or not to

hire the Plaintiffs.  (<u>See</u> Opp. to SP at 13) ("SP relied upon the reference checks. . .") and (Opp. to IP at 15) (each Plaintiff who is alleging defamation did not receive a job offer "because of the reference IP provided.").  Plaintiffs' Opposition to IP's Motion for Summary Judgment, and specifically their Appendices to such opposition, admit in detail that Smart Papers sought legitimate performance data from IP managers and supervisors, and relied on such references in rejecting Plaintiffs for employment.  In fact, Smart Papers' reliance on these job references from IP form the basis upon which Plaintiffs argue that Defendant IP should be liable for defamation.

Specifically, Plaintiffs' argument against IP for defamation centers on the fact that "IP officials gave specific, objective data to SP . . ." (Opp. to IP at 55) and that "[e]ach Plaintiff who is alleging defamation did not receive a job offer because of the reference IP provided." (<u>Id.</u> at 15.)  Plaintiffs continue by admitting that "[s]tatements provided by these IP officials to SP were critical as to whether a particular applicant, all of whom worked at the Hamilton Mill, received an offer of employment," (<u>id.</u> at 6), and that "[f]orty-two applicants did not receive offers from SP because of false information provided to SP by different IP officials."  (<u>Id.</u> at 7.)  Regardless of Plaintiffs' claim that IP provided false and defamatory references to Smart Papers, the critical factor for deciding the pending motion for summary judgment by Smart Papers is Plaintiffs' admission that IP in fact provided important negative employment information to Smart Papers about Plaintiffs' job performance and abilities, and that Smart Papers in fact relied on that information in making its employment decisions.  This totally undercuts Plaintiffs' allegations of pretext.

In arguing that IP made defamatory statements about them to Smart Papers, Plaintiffs admit that "SP believed the references were based upon 'objective data' from

IP, which was a reflection of the individual's actual performance on the job, and were 'of course' true."  (Opp. to IP at 64.)  This is another significant admission because it demonstrates Smart Papers' good faith reliance on the job references provided by IP. Plaintiffs further admit that "SP expected that these were statements of fact had [sic] been validated with information contained in employees' personnel, attendance and safety records, and had been based on the observations of their immediate supervisor."  (Id.) (See also, Opp. to IP at 17) ("[IP officials] knew that their references were important to SP's hiring decision, and that a bad reference could cost an employee his job"); (Id. at 21) ("SP expected to receive references from a direct supervisor because a direct supervisor is in the best position to actually relay information.")

     Plaintiffs' acknowledge that "the recipient of the statements, SP, believed that the statements were statements of fact." (Opp. to IP at 65.)  In fact, Plaintiffs admit that "the specific language used [in the reference checks] was clear and precise in every case," (id. at 61), "that the ratings assigned to each employee on the reference check correspond to a statement of fact regarding the employees' skills and performance," (id.), and that "the statements clearly and unambiguously indicate to an ordinary reader that Plaintiffs are employees with poor performance records and undesirable work habits." (Id. at 62.) These general admissions apply to the entire hiring process used by Smart Papers, and demonstrate beyond doubt that Smart Papers' hiring decisions were in fact motivated by IP's job references, and not by Plaintiffs' ages.

     **B.**    **Additional Critical Admissions By The Individual Plaintiffs.**

     In Plaintiffs' 2-volume Appendix in opposition to IP's Motion for Summary Judgment, Plaintiffs set forth the specific reasons why Smart Papers did not hire them. Significantly, these are the same legitimate nondiscriminatory reasons articulated by

Smart Papers in its "SP Appendix" in support of its motion for summary judgment.  The

following admissions from individual Plaintiffs thus constitute undisputed facts as to

what in fact motivated Smart Papers in its employment decisions regarding the Plaintiffs,

and demonstrate why summary judgment in favor of Smart Papers is appropriate in this

case:

- "Defendant SP relied on these statements [from IP] in rejecting Abner's application for employment . . .This testimony clearly establishes that Defendant IP's negative reference regarding Abner caused Defendant SP to reject him for employment."  (Tab 1 of Plaintiffs' Appendices)

- "Mary Rita Weissman testified under oath that Defendant IP's poor reference was the sole cause of his overall "RED" rating, because Baylor had received positive marks in his interview." (Tab 2)

- "SP did not hire Bennett because he received an overall "RED" rating from IP, indicating he should not  be offered a position." (Tab 3)

- "It is beyond dispute that Defendant SP relied on these statements in rejecting Bennett's application for employment.  Mary Rita Weissman, consultant to Defendant SP, admitted that those statements were the reason that she rated Bennett as "RED" . . .Further, in its motion for summary judgment, Defendant SP states that it and the Weissman Group relied on the negative comments made by McCoy.  This clearly establishes that Defendant IP's negative reference regarding Bennett caused SP to reject him for employment." (Tab 4)

- "Mary Rita Weissman, consultant to Defendant SP, admitted that these were the factors causing her to rate Brandenburg as "RED" . . .This testimony clearly establishes that Defendant IP's negative reference regarding Brandenburg caused SP to reject him for employment . . .Therefore, it cannot be contested that Defendant SP relied on Caldwell's negative statements in rejecting  Brandenburg's application for employment."  (Tab 5)

-  "It is beyond dispute that Defendant SP relied on these statements in rejecting Brewer's application for employment.  Mary Rita Weissman, consultant to Defendant SP, admitted that those statements were the reason that she rated Bennett as "RED" . . . This clearly establishes that Defendant IP's negative reference regarding Brewer caused SP to reject him for employment." (Tab 6)

- "It cannot be contested that Defendant SP relied on these statements in rejecting Brooks' application for employment.  Mary Rita Weissman, consultant to Defendant SP, admitted that these factors caused her to rate Brooks as "RED" . . . This clearly establishes that Defendant IP's negative reference regarding Brooks caused SP to reject him for employment." (Tab 7)

- "Defendant SP did not hired <u>Broughton</u> because he received an overall "RED" rating from IP, indicating he should not be offered a position." (Tab 8)

- "It is beyond dispute that Defendant SP relied on these statements in rejecting <u>Bullio's</u> application for employment.  Mary Rita Weissman, consultant to Defendant SP, admitted that these statements were a significant factor for her when she rated Bullio as "RED" . . . Further, in its motion for summary judgment, Defendant SP states that it relied on Smith's negative comments and her failure to recommend Bullio for employment in its decision not to hire him.  This clearly establishes that Defendant IP's negative reference regarding Bullio was a significant factor in SP's decision to reject him for employment." (Tab 9)

- "It cannot be contested that Defendant SP relied on these statements in rejecting <u>Campbell's</u> application for employment.  Mary Rita Weissman, consultant to Defendant SP, admitted that these factors caused her not to recommend Campbell for hiring. . .This testimony clearly establishes that Defendant IP's negative reference regarding Campbell caused Defendant SP to reject him for employment." (Tab 10)

- It is beyond dispute that Defendant SP relied on these statements in rejecting <u>Chasteen's</u> application for employment.  Mary Rita Weissman, consultant to Defendant SP, admitted that these statements were the reason that she rated Chasteen as "RED" . . . Further, in its motion for summary judgment, Defendant SP states that it did not hire Chasteen because of the 'negative comments regarding his work performance.'  This clearly establishes that Defendant IP's negative reference regarding Chasteen caused Defendant SP to reject him for employment." (Tab 11)

- "It cannot be contested that Defendant SP relied on these statements in rejecting <u>[Joshua] Combs'</u> application for employment.  Mary Rita Weissman, consultant to Defendant SP, admitted that these were the factors causing her to rate Combs as "RED". . .This testimony clearly establishes that Defendant IP's negative reference regarding Combs caused Defendant SP to reject him for employment." (Tab 12)

- "It cannot be contested that Defendant SP relied on these statements in rejecting <u>[Jerry] Combs'</u> application for employment.  Mary Rita Weissman, consultant to Defendant SP, admitted that these factors caused her to rate Combs as "RED.""(Tab 13)

- "It cannot be contested that Defendant SP relied on these statements in rejecting <u>Cress'</u> application for employment.  Mary Rita Weissman, consultant to Defendant SP, admitted that these factors caused her to rate Cress as "RED" . . . This testimony easily establishes that Defendant IP's negative reference regarding Cress caused Defendant SP to reject him for employment." (Tab 14)

- "It cannot be contested that Defendant SP relied on these statements in rejecting <u>Duncan's</u> application for employment.  Mary Rita Weissman, consultant to Defendant SP, admitted that these factors caused her to rate Duncan as "RED" . . . This testimony clearly establishes that Defendant IP's negative reference regarding Duncan caused Defendant SP to reject him for employment." (Tab 15)

- "Defendant SP did not hire <u>Durbin</u> because he received an overall "RED" rating from Defendant IP, indicating he should not be offered a position." (Tab 16)

- "Defendant SP clearly relied on these statements in rejecting <u>Eaton's</u> application for employment.  Mary Rita Weissman, consultant to Defendant SP, admitted that these factors cause her to rate Eaton as "RED'. . . This testimony clearly establishes that Defendant IP's negative reference regarding Eaton caused Defendant SP to reject him for employment." (Tab 17)

-  "It cannot be contested that Defendant SP relied on these statements in rejecting <u>Fowler's</u> application for employment.  Mary Rita Weissman, consultant to Defendant SP, admitted that these were the factors causing her to rate Fowler as "RED" . . . This testimony clearly establishes that Defendant IP's negative reference regarding Fowler caused Defendant SP to reject him for employment." (Tab 18)

- "Defendant SP did not hire <u>Freeman</u> because he received an overall "RED" rating from Defendant IP, indicating he should not be offered a position." (Tab 19)

- "It cannot be contested that Defendant SP relied on these statements in rejecting <u>Gardner's</u> application for employment.  Mary Rita Weissman, consultant to Defendant SP, admitted that these factors caused her to rate Gardner as "RED". . . This testimony clearly establishes that Defendant IP's negative reference regarding Gardner caused Defendant SP to reject him for employment." (Tab 20)

- "It cannot be contested that Defendant SP relied on these statements in rejecting <u>Heinrich's</u> application for employment.  Mary Rita Weissman, consultant to Defendant SP, admitted that these factors caused her not to recommend Heinrich for hiring. . . This testimony clearly establishes that Defendant IP's negative reference regarding Heinrich caused Defendant SP to reject him for employment." (Tab 21)

- "It cannot be contested that Defendant SP relied on these statements in rejecting <u>Hensley's</u> application for employment.  Mary Rita Weissman, consultant to Defendant SP, admitted that these factors causing her to rate Hensley as "RED". . . This testimony clearly establishes that Defendant IP's negative reference regarding Hensley caused Defendant SP to reject him for employment." (Tab 22)

- "It cannot be contested that Defendant SP relied on these statements in rejecting <u>Horn's</u> application for employment.  Mary Rita Weissman, consultant to Defendant SP, admitted that these statements were the reason that she rated Horn as "RED" . . . This clearly establishes that Defendant IP's negative reference regarding Horn caused Defendant SP to reject him for employment." (Tab 23)

- "It cannot be contested that Defendant SP relied on these statements in rejecting <u>Huntington's</u> application for employment.  Mary Rita Weissman, consultant to Defendant SP, admitted that these factors caused her not to recommend Huntington for hire. . . This testimony clearly establishes that Defendant IP's negative reference regarding Huntington caused Defendant SP to reject him for employment." (Tab 24)

- "It cannot be contested that Defendant SP relied on these statements in rejecting <u>Hyden's</u> application for employment.  Despite the fact Hyden was rated "GREEN" for his interview, Mary Rita Weissman, consultant to Defendant SP, admitted that the statements in the reference caused her to rate Hyden as "RED" . . . This testimony clearly establishes that Defendant IP's negative reference regarding Hyden caused Defendant SP to reject him for employment." (Tab 25)

- "SP did not hire <u>Israel</u> because he received an overall "RED" rating from IP, indicating he should not be offered a position." (Tab 26)

- "It cannot be contested that Defendant SP relied on these statements in rejecting <u>Italiano's</u> application for employment.  Mary Rita Weissman, consultant to Defendant SP, admitted that these factors caused her to rate Italiano as "RED," despite doing well on the interview. . . This testimony clearly establishes that Defendant IP's negative reference regarding Italiano caused Defendant SP to reject him for employment." (Tab 27)

- "It cannot be contested that Defendant SP relied on these statements in rejecting <u>Ketcham's</u> application for employment.  Mary Rita Weissman, consultant to Defendant SP, admitted that these were the factors causing her to rate Ketcham as "RED". . . This testimony clearly establishes that Defendant IP's negative reference regarding Ketcham caused Defendant SP to reject him for employment.  Furthermore, Defendant SP relied solely on these statements, as it cited no disciplinary record in its motion for summary judgment." (Tab 28)

- "Defendant SP did not hire <u>Knodel</u> because he received an overall "RED" rating from Defendant IP, indicating he should not be offered a position." (Tab 29)

- "Defendant SP did not hire <u>Mann</u> because he received an overall "RED" rating from Defendant IP, indicating he should not be offered a position." (Tab 30)

- "It is beyond dispute that Defendant SP relied on these statements in rejecting <u>McCreary's</u> application for employment.  Mary Rita Weissman, consultant to Defendant SP, admitted that these statements were the reason that she rated McCreary as "RED" . . . Further, in its motion for summary judgment, Defendant SP states that it and the Weissman Group relied on the negative comments made by Stevens. This clearly establishes that Defendant IP's negative reference regarding McCreary caused Defendant SP to reject him for employment." (Tab 31)

- "It is beyond dispute that Defendant SP relied on these statements in rejecting <u>McKay's</u> application for employment.  Mary Rita Weissman, consultant to Defendant SP, admitted that these statements were a significant factor for her when she rated McKay as "RED" . . . Further, in its motion for summary judgment, Defendant SP states that it and the Weissman Group relied on the negative comments made by Caldwell. This clearly establishes that Defendant IP's negative reference regarding McKay was a significant factor in Defendant SP's decision to reject him for employment." (Tab 32)

11

- "It cannot be contested that Defendant SP relied on these statements in rejecting <u>Ogg's</u> application for employment. Mary Rita Weissman, consultant to Defendant SP, admitted that these factors caused her to rate Ogg as "RED". . . This testimony clearly established that Defendant IP's negative reference regarding Ogg caused Defendant SP to reject him for employment." (Tab 33)

- "It cannot be contested that Defendant SP relied on these statements in rejecting <u>Paxton's</u> application for employment. Mary Rita Weissman, consultant to Defendant SP, admitted that these were the factors causing her to rate Paxton as "RED."" (Tab 34)

- "It cannot be contested that Defendant SP relied on these statements in rejecting <u>Robertson's</u> application for employment. Mary Rita Weissman, consultant to Defendant SP, admitted that these factors caused her to rate Robertson as "RED". . . This testimony easily establishes that Defendant IP's negative reference regarding Robertson caused Defendant SP to reject him for employment." (Tab 35)

- "Defendant SP did not hire <u>Sandlin</u> because he received an overall "RED" rating from Defendant IP, indicating he should not be offered a position." (Tab 36)

- "In turn, Defendant SP relied on these statements in rejecting <u>Taulbee's</u> application for employment. Mary Rita Weissman, consultant to Defendant SP, admitted that Taulbee did well on his interview but scored low on his Applicant Reference Check. . .This testimony clearly establishes that Defendant IP's negative reference regarding Taulbee caused Defendant SP to reject him for employment." (Tab 37)

- "It is beyond dispute that Defendant SP relied on these statements in rejecting <u>[Wayne] Thomas'</u> application for employment. Mary Rita Weissman, consultant to Defendant SP, admitted that these statements were the reason that she rated Thomas as "RED" . . . Further, in its motion for summary judgment, Defendant SP states that it and the Weissman Group relied on the negative comments made by Jones. This clearly establishes that Defendant IP's negative reference regarding Thomas caused Defendant SP to reject him for employment." (Tab 38)

- "It cannot be contested that Defendant SP relied on these statements in rejecting <u>Turner's</u> application for employment. Mary Rita Weissman, consultant to Defendant SP, admitted that these factors caused her to rate Turner as "RED". . . This testimony easily establishes that Defendant IP's negative reference regarding Turner caused Defendant SP to reject him for employment." (Tab 39)

- "It cannot be contested that Defendant SP relied on these statements in rejecting <u>Volz'</u> application for employment. Mary Rita Weissman, consultant to Defendant SP, admitted that these were the factors causing her to rate Volz as "RED" for the position he last held. . . This testimony clearly establishes that Defendant IP's negative reference caused Defendant SP to reject him for employment." (Tab 40)

- "SP did not hire <u>Willis</u> because he received an overall "RED" rating from IP, indicating he should not be offered a position." (Tab 41)

- "It cannot be contested that Defendant SP relied on these statements in rejecting <u>York's</u> application for employment.  Mary Rita Weissman, consultant to Defendant SP, admitted that these were the factors causing her to rate York as "YELLOW". . . This testimony clearly establishes that Defendant IP's negative reference regarding York caused Defendant SP to reject him for employment." (Tab 42)

In summary, the above admissions are fatal to Plaintiffs' claims of age discrimination against Smart Papers.  The admissions show (1) that Smart Papers in fact received negative references about Plaintiffs' job performance at the Hamilton Mill, (2) Smart Papers believed in good faith that the references were true and justifiably relied on the references, and (3) that the negative references were the actual motivating factor in Smart Papers' decisions not to hire the Plaintiffs.  Based on controlling case law, these admissions by the Plaintiffs conclusively demonstrate that Smart Papers' employment decisions were based on legitimate, nondiscriminatory reasons and were not a pretext for intentional age discrimination.  <u>See</u>, <u>e.g.</u>, <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 146-47 (2000) ("the ultimate question is whether the employer intentionally discriminated"); <u>Hill v. Metropolitan Gov't of Nashville</u>, 2002 WL 31863829 at *2 (6th Cir. Dec. 17, 2002) (employer's reliance on Plaintiff's poor employment references is a legitimate nondiscriminatory reason for not hiring the Plaintiff).  (<u>See</u> <u>also</u> Smart Papers' initial brief in support of its Motion for Summary Judgment (hereinafter Smart Papers' initial brief) at pp. 31-33 and cases cited therein.)

### C.    Plaintiffs Further Admit That The Negative References Given By IP Officials Were Not Based On Age Animus.

Plaintiffs further admit in this case that the references given by IP officials—upon which it is undisputed that Smart Papers relied—were not based on age animus.  In fact, although Plaintiffs' Fifth Amended Complaint alleges age discrimination against IP and Plaintiffs pursued intensive discovery against IP for age discrimination, Plaintiffs have now dropped their claims of age discrimination against IP.  (Opp. to IP at 2, n. 2.)  As

13

such, Plaintiffs are admitting that the negative job references provided by IP to Smart Papers were not motivated by age discrimination.

In supporting their argument for defamation against IP, Plaintiffs now state that the references provided by IP officials were motivated by malice or ill-will: "some of the malice was clearly the result of anti-union animus . . . while other IP managers were motivated by a spirit of revenge for Plaintiffs' testimony against them or prior successful challenges to management's decisions. . .Some managers simply expressed general hostility toward Plaintiffs." (Opp. to IP at 56.) Even if these allegations against IP were accepted as true, Plaintiffs cannot prove that Smart Papers engaged in intentional age discrimination against them where they admit that Smart Papers relied on references from IP in not hiring them and where it is undisputed that these reference checks were not based on age.

There are numerous statements by Plaintiffs in their Appendices to IP alleging all kinds of nefarious motivations by the IP managers and supervisors – but not age discrimination. See, e.g., (Tab 2 at 7) (IP supervisor had "personal vendetta against Baylor for perceived injuries to his authority); (Tab 6 at 9) ("Weiser harbored malice toward Brewer because of his adversarial participation in a grievance resulting from discipline issued by Weiser"); (Tab 8 at 7) ("Weiser provided false information regarding Broughton because his position as chief union steward put him in frequent conflict with Weiser and other members of management"); (Tab 13 at 5) ("Weiser revealed that he harbored resentment for Combs because, 'I terminated him 10-12 years ago for faking an injury and he was brought back on the job'"); (Tab 14 at 6) (stating that Dunn harbored malice against Cress for reporting harassment by a supervisor); (Tab 15 at 5) (Caldwell "bears a grudge against Duncan" because he "never got over this blow to his ego"); (Tab

14

16 at 9) ("maliciously negative reference was motivated solely by his dislike for

Durbin"); (Tab 19 at 8) (false and defamatory statements made because of a "personal

grudge"); (Tab 20 at 5) ("Weiser clearly resented Gardner for refusing to place others and

himself in danger"); (Tab 21 at 5) (Caldwell "seemed to carry a grudge against

Heinrich"); (Tab 24 at 6) ("Lopane clearly harbored continuing resentment of Huntington

over that issue"); (Tab 26 at 7) (Schutte motivated by "feelings of ill will" after "Israel

spoke out against the discriminatory treatment of himself and other African-Americans. .

."); (Tab 27 at 5) ("McCoy harbored animus for Italiano, in part because Italiano was

Chief Union Steward"); (Tab 31 at 9) ("Stevens harbored malice toward McCreary

because of union involvement"); (Tab 32 at 6) ("Caldwell may have been motivated by

anti-union animus"); (Tab 34 at 5) (Von Bargen had a motive to provide false

information because he "felt he had been 'cussed out' by a subordinate"); (Tab 36 at 9)

(motivated by feelings of ill will because of Sandlin's "long-time position as chief union

steward"); (Tab 37 at 10) (Von Bargen had motive to provide false information because

Taulbee had "on one occasion expressed anger to Von Bargen.")

Not only do Plaintiffs admit that IP's negative employment references to Smart

Papers were not based on age discrimination, Plaintiffs do not even attempt to refute the

statistical evidence provided by Smart Papers regarding the IP supervisors. Specifically,

in the "SP Appendix" with 72 tabs, Smart Papers provided detailed charts on virtually

every Plaintiff who received a negative reference from IP. The charts show, for example,

that although Plaintiff Abner was 52 years old and received a *negative* job reference from

IP supervisor Parker, supervisor Parker provided a *positive* job reference for 8 out of 10

other IP employees (who applied to Smart Papers) who were older than Abner, the same

age, or not more than two years younger. (See SP Appendix at Tab 1, p. 3.) Similar data

was presented for each of the Plaintiffs and none of it has been rebutted by Plaintiffs. Therefore, there is undisputed evidence in the record that the negative references by IP supervisors were not motivated by age discrimination, and that older applicants did not receive a disproportionate number of negative references from the IP supervisors. This further undercuts Plaintiffs' unsupported assertion that the Smart Papers' hiring process was motivated by age discrimination.

### D.    Reliance On Negative References Is A Legitimate Non-Discriminatory Reason For Not Hiring Plaintiffs And Not A Pretext For Age Discrimination.

Plaintiffs argue that "simple reliance on a bad employment reference, in the face of other, overwhelming evidence that Plaintiffs were good employees who should be preferred over untrained candidates, is insufficient." (Opp. to SP at 44.) In an attempt to support this argument, Plaintiffs cite King v. New Hampshire Dep't. of Resources and Econ. Dev., 562 F.2d 80, 82-83 (1st Cir. 1977). Plaintiffs' reliance on King is completely misplaced. In King, the court held that a negative reference that was discovered after the employer had made its employment decision was not the real reason for its refusal to hire plaintiff. Therefore, the court concluded that the plaintiff established pretext by showing that the employer did not actually rely on the negative reference in making its decision. Id. The facts in this case are completely opposite from the facts in King. In this case, there is overwhelming, undisputed evidence showing that the negative references were critical in the hiring process and were the actual reasons why Plaintiffs were not hired. Numerous courts, including the Sixth Circuit, have held that reliance on reference checks is a legitimate nondiscriminatory reason for an employer's hiring decisions. (See e.g., Smart Papers' initial brief at pp. 31-33 and cases cited therein.)

Moreover, Plaintiffs allege that the reference check process was "designed to 'cast a wide net' to justify its failure to hire older IP employees."  (Opp. to SP at 14.) Plaintiffs' argument is wholly without support.  As discussed above, it is undisputed that the negative comments made by Plaintiffs' former IP managers or supervisors were age-neutral and not motivated by age animus.  Moreover, over 72 percent of the applicants age 40 and over were hired by Smart Papers, compared to 67 percent of the applicants under age 40.  Therefore, contrary to Plaintiffs' bare assertion that the reference checking process was a pretext for age discrimination, it is undisputed that the negative references "merely indicate that the candidates were lacking traits needed for the job, which explains why they were not selected by [Smart Papers.]"  See Millbrook v. IBP, Inc., 280 F.3d 1169, 1176 (7th Cir. 2002.)

### E.    Plaintiffs' Assertion That Smart Papers Should Have Considered Other Factors In The Hiring Process Is Insufficient To Establish Pretext.

Plaintiffs argue that Smart Papers' decision-making process was flawed because Smart Papers "had the opportunity to obtain accurate and current information about the applicants who had previously worked for IP 'first-hand' from personnel files and attendance records. . .[but] instead, Defendant made its hiring decisions based on less reliable 'second-hand' information from reference checks." (Opp. to SP at 48); (see also id. at 13) (alleging that "SP relied upon the reference checks rather than an [sic] objective personnel records that were made available.")

Whether Plaintiffs dislike Smart Papers' hiring process or thought that Smart Papers should have relied on their personnel records rather than upon the reference checks is irrelevant and immaterial.  See e.g., Lewis-Calhoun v. City of Jackson, 977 F. Supp. 1148, 1152 (S.D. Ala. 1997) (reasonable people may disagree about whether an

employer should have relied on a negative reference, but such disagreement does not create a basis to disbelieve the employer's explanation that it did in fact rely on it.)

The Sixth Circuit recently held that although a plaintiff believed that her prior performance evaluations should have outweighed staff complaints about her, the employer did not violate the ADEA by "resolving this balance against her." Marshall v. Summa Health Sys. Hosp., 2003 WL 21277336 at *2 (6th Cir. June 2, 2003). In Marshall, the Court of Appeals held that while the plaintiff insisted that the complaints against her were unjustified, she conceded that the employer relied upon them in terminating her, and therefore, the record was devoid of any evidence tending to show that the employer's non-discriminatory explanation "has no basis in fact, did not actually motivate the decision, or was insufficient to warrant her termination." Id.

The Sixth Circuit's recent decision in Marshall is devastating to Plaintiffs' arguments against Smart Papers, and further shows why summary judgment is appropriate to dispose of this case. Like the plaintiff in Marshall who insisted that negative staff complaints about her were unjustified and outweighed by positive performance evaluations in her file, Plaintiffs here are insisting that the negative job references about them are outweighed by "objective evidence" such as their experience in the Mill on various jobs, their years of service in the Mill, and other "positive" factors. But as the Sixth Circuit noted in Marshall, and as numerous other courts have held, Plaintiffs' challenges to the wisdom or effectiveness of an employer's hiring process are insufficient to establish pretext. See also, Lee v. GTE Florida, Inc., 226 F.3d 1249 (11th Cir. 2000) (citing Combs v. Plantation Patterns, 106 F.3d 1519, 1543 (11th Cir. 1997)) (while plaintiff may have believed that employer should have given greater weight to her educational experience, a "plaintiff may not establish that an employer's proffered reason

is pretextual merely by questioning the wisdom of the employer's reason.")  Although Plaintiffs may disagree with their negative references provided by IP, and may believe that Smart Papers should have reviewed their personnel files in making its hiring decisions, their beliefs are not sufficient to prove pretext.  Chappell v. GTE Products Corp., 803 F.2d 261, 268 (6th Cir. 1986) ("mere personal beliefs, conjecture and speculation are insufficient to support an inference of age discrimination.")

Plaintiffs argue in their brief against Smart Papers that the reference checks were "less reliable 'second-hand' information" than "first-hand" information from personnel files.  (Opp. to SP at 48.)  Plaintiffs contradict that position by arguing in their brief against IP that "IP officials gave specific, objective data to SP," that "SP believed the references were based upon 'objective data' from IP, which was a reflection of the individual's actual performance on the job," that "SP expected that these were statements of fact and had been validated with information contained in employees' personnel, attendance and safety records, and had been based on the observations of their immediate supervisor," and that "the statements clearly and unambiguously indicate to an ordinary reader that Plaintiffs are employees with poor performance records and undesirable work habits."  (Opp. to IP at 55, 62, and 64.)  Plaintiffs cannot have it both ways.  This shows that Plaintiffs are engaged in unprincipled, meritless, and contradictory arguments that are ripe for summary disposition by the Court.

###    F.    The Fact That Smart Papers Used A Different Hiring Process After It Purchased The Hamilton Mill Is Not Evidence Of Pretext.

Plaintiffs assert, again without support, that Smart Papers' reliance on the reference checks was a pretext for age discrimination because in the months after the Weissman Group hired the initial workforce at the Mill and made decisions about the applicants from the IP workforce, Smart Papers used a different hiring process and did

not conduct reference checks on "younger, off the street candidates." (Opp. to SP at 44 & 48.) Plaintiffs' argument fails for at least three reasons.

First, Smart Papers had no obligation to seek reference checks for off the street hires. See e.g., Lee v. GTE Florida, Inc., 226 F.3d 1249, n.2 (11th Cir. 2000) (change in importance of criteria used in selection process after decision about plaintiff had been made was not probative of pretext); Nichols v. Lewis Grocer, 138 F.3d 563, 568 (5th Cir. 1998) (no pretext where employer changed importance of criteria used in selection process); Hensley v. General Motors Corp., 2003 WL 298902 (N.D. Tex. Feb. 11, 2003) (plaintiffs' speculation was not sufficient to prove pretext regarding company's decision to change its hiring practices); Murre v. A.B. Dick Co., 625 F.Supp. 158, 168 (N.D. Ill. 1985) (no evidence that change in hiring practices was engineered as pretext for harming older employees).

Second, Smart Papers sought reference checks for former IP applicants because Smart Papers had the opportunity to get job-related information about applicants *at the Hamilton B Street Mill*. The information received about IP applicants related directly to an applicant's job performance and skills at the Hamilton Mill. Data from an applicant's supervisor or manager about past performance at the Mill was obviously of considerable interest to the new employer that would be operating the same mill. On the other hand, Smart Papers made a business judgment that seeking reference checks on applicants hired "off the street" who did not previously work at the Hamilton Mill would not provide Smart Papers with the same predictive measurement as to an applicant's potential performance at the Mill.

Third, Smart Papers' hiring criteria was applied uniformly for all off the street applicants—of all ages. Once Smart Papers received a resume of an interested applicant,

it would conduct a telephone screen of that individual to see if they had completed high school, if they had a valid driver's license, and if they had three-years work experience. (Hampton Dep. at 8-11); (Carpenter Dep. at 9-10.)[1/] If the applicant met these criteria, they were scheduled for an on-site interview. (Hampton Dep. at 8-11); (Carpenter Dep. at 10.) An interview team would interview the candidate and then would make a recommendation to the HR person in charge of the hiring decisions. (Hampton Dep. at 13-18); (Carpenter Dep. at 14-15.) At the same time as the interview, all applicants were subject to a drug test. (Hampton Dep. at 19-20); (Carpenter Dep. at 10.) If an applicant was recommended for hire, a background check was conducted, including a criminal check, driver's license check and a high school verification. (Opp. to SP at Exhibit 58a.) At the same time, applicants would receive a conditional offer from Smart Papers, contingent upon the results of the background check. This process has been routinely and uniformly applied to all applicants for employment with Smart Papers since Smart Papers hired its initial workforce in February 2001. Smart Papers did not conduct employment reference checks for <u>any</u> applicant who applied to Smart Papers after February 2001, regardless of age.

In short, no reasonable jury could infer that Smart Papers discriminated against Plaintiffs in February 2001 because of their age because when it subsequently hired applicants "off the street" who were not similarly situated to Plaintiffs, it utilized a different hiring process.

---

1/    Plaintiffs have filed every deposition taken in this case with the Court in support of their opposition to Smart Papers' Motion for Summary Judgment. In an effort to limit the amount of material filed in support of this reply, Smart Papers has not attached the specific deposition pages cited herein.

G.     **Plaintiffs Attempt To Second-Guess Smart Papers' Business Judgment Is Insufficient To Establish Pretext.**

Plaintiffs assert unsupported, conclusory allegations that "Smart Papers' decision-making process was so flawed that it destroys the credibility of Defendant's legitimate non-discriminatory reasons for its hiring decisions." (Opp. to SP at 48.)  As discussed above, regardless of whether Plaintiffs believe that Smart Papers made unwise or flawed hiring decisions, Plaintiffs cannot establish pretext by second-guessing the wisdom or soundness of those personnel decisions.  "[T]he aim is not to . . . question the soundness of an employer's judgment."  McDonald v. Union Camp Corp., 898 F.2d 1155, 1160 (6th Cir. 1990).

Plaintiffs argue that an employers business judgment is not an absolute defense to unlawful discrimination.  (Opp. to SP at 43.)  In Wexler, however, the Court of Appeals stated that "the reasonableness of an employer's decision may be considered to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its *actual motivation*."  317 F.3d at 576.

By Plaintiffs own admissions in their claims against IP, Smart Papers honestly and reasonably relied upon the IP job references in making its hiring decisions.  (See e.g., Opp. to IP at 61, 62) ("the specific language used [in the reference checks] was clear and precise in every case;" "the statements clearly and unambiguously indicate to an ordinary reader that Plaintiffs are employees with poor performance records and undesirable work habits.")  Accordingly, the Court does not need to inquire into the reasonableness of Smart Papers' process as Plaintiffs have already acknowledged what actually motivated Smart Papers.

Regardless of how flawed Plaintiffs think the hiring process was, the record is devoid of any evidence to prove that the decisions were based on age.  See Fischbach v.

District of Columbia Dep't of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996) ("[e]ven

if a court suspects that a job applicant 'was victimized by [] poor selection procedures' it

may not 'second-guess' an employer's personnel decision absent demonstrably

discriminatory motive") (internal citations omitted); Pignato v. American Trans Air, Inc.,

14 F.3d 342, 349 (7th Cir. 1994) ("[i]t's not enough for the plaintiff to show that a reason

given for a job action is not just, or fair, or sensible.  He must show that the explanation

given is a phony reason.")

II.    **Plaintiffs' Own "Statistics," As Well As Their Purported "Attack" On The Actual Data Provided By Smart Papers, Are Of No Probative Value Sufficient To Raise Even A Hint Of Pretext**

As Smart Papers conclusively demonstrated in its initial brief, its hiring decisions

did not have an adverse impact based on age.  Significantly, over 72 percent of applicants

age 40 and over were hired, while 67 percent of applicants under 40 were hired.  (See

Smart Papers' initial brief at 12.)  Plaintiffs do not dispute the conclusions drawn by

Smart Papers from this data, but merely quibble over whether the sample size that Smart

Papers used in its analysis should be based on a count of 400 or 410 total hourly

employees.  (See Opp. to SP at 38) (noting that prior memorandum showed 400 job

offers, yet chart shows 410 job offers).  In addition, Plaintiffs concoct their own

"statistical evidence" built on erroneous and faulty assumptions that, when examined

closely, provide no probative value as to whether Smart Papers discriminated against

Plaintiffs based on their age.  Each of these points will be discussed in turn below.

A.    **Smart Papers' Own Statistics Demonstrate That Its Hiring Decision Had No Adverse Impact on Older Employees.**

As Smart Papers detailed in its initial brief, its hiring decisions in February 2001

did not have an adverse impact based on age. (See Smart Papers initial brief at 12.)

Specifically, out of the 568 hourly job applicants received by Smart Papers, Smart Papers

23

made offers to 72.6 percent of the applicants age 40 or over.  In contrast, Smart Papers
made offers to 67.3 percent of the applicants under age 40.  In addition, the highest job
offer rate for any age group (79.4%) was for the oldest applicant age group, 60-65; and
the second highest job offer rate (79.0%) was for the second oldest age group, 55-59:

| Age Range | Number of Applicants | Number Selected | Selection Rate By Age Group |
|---|---|---|---|
| 60-65 | 34 | 27 | 79.4% |
| 55-59 | 86 | 68 | 79.0% |
| 50-54 | 164 | 117 | 71.3% |
| 45-49 | 166 | 120 | 72.3% |
| Total 40 and over | 522 | 379 | 72.6% |
| 39 and under | 46 | 31 | 67.3% |
| Total | 568 | 410 | 72.2% |

(Smart Papers initial brief at 12.)

Plaintiffs' only response to this data is to quibble over whether Smart Papers in
fact made offers to a total of 410 hourly employees (as stated above), or to only 400
hourly employees, as Plaintiffs contend Smart Papers originally told them during
discovery.  (See Opp. to SP at 38.)  This apparent "contradiction," as Plaintiffs call it
presumably to cast doubt on Smart Papers' data, stems not from any misrepresentation by
Smart Papers, but from Plaintiffs' own failure to examine the data produced to them in
discovery.  Moreover, even if Smart Papers were to base its analysis on a sample size of
400 employees, it still would conclusively show that its hiring decisions in February 2001
were not based on age.

First, Plaintiffs' confusion over the data provided them in discovery stems entirely
from Plaintiffs' own misreading of the documents produced to them.  Specifically,
Plaintiffs contend that Smart Papers gave them two different data sets that purported to
show the number of hourly job offers Smart Papers made in February 2001.  Even a
cursory examination of these two data sets, however, reveals that Plaintiffs simply have

misunderstood what they were given.  The document attached as Plaintiffs' Exhibit 63 identifies the 400 "IP Hourly Employees with Job Offers from Smart Papers," i.e., those employees who formerly were IP hourly employees and who received job offers from Smart Papers.  In contrast, the document attached as Plaintiffs' Exhibit 71 identifies the 410 individuals that actually received hourly job offers from the Company.  As Plaintiffs themselves know, because they took the depositions of several of the affected former IP managers, Smart Papers reduced the number of managers needed to operate the Mill, and some of the affected *former IP managers* received offers *for hourly positions* with the Company instead. (See, e.g., Butz Dep. at 11; Gregory Holland Dep. at 25.)  As such, the second list contains not only the 400 "IP Hourly Employees" who received offers from Smart Papers, but several former IP salaried or management employees who were offered *hourly jobs* with the Company.

Moreover, even if the Court were to subtract these 10 individuals from the age data provided by Smart Papers, Plaintiffs cannot escape the ultimate conclusion that Smart Papers' hiring decisions had no adverse impact based on age.  Specifically, even if the Court were to exclude the individuals not included in Plaintiffs' Exhibit 63, and based its analysis solely on the 400 job offers that undisputedly were made, Smart Papers' hiring data still shows that its hiring decisions in February 2001 were not based on age.  In fact, no material difference exists in the data and the important point remains the same as before:  a higher percentage of applicants age 40 and over were hired by Smart Papers compared to applicants under age 40, and the oldest groups of applicants (those in age ranges 60-65 and 55-59) had the highest selection rate.  Smart Papers respectfully submits that no court has ever found age discrimination in light of hiring data such as this:

| Age Range | Number of Applicants | Number Selected | Selection Rate By Age Group |
|---|---|---|---|
| 60-65 | 34 | 27 | 79.4% |
| 55-59 | 86 | 68 | 79.0% |
| 50-54 | 164 | 115 | 70.1% |
| 45-49 | 166 | 113 | 68.1% |
| Total 40 and over | 522 | 370 | 70.9% |
| 39 and under | 46 | 31 | 67.3% |
| Total | 568 | 401 | 70.6% |

Source:  Plaintiffs' Exhibit 63. [2/]

## B.    Plaintiffs' Own Data Offers No Probative Evidence Demonstrating Pretext.

Unable to directly refute Smart Papers' statistical evidence, Plaintiffs offer what they claim is the "real data" surrounding Smart Papers' hiring decisions, focusing in large part on Smart Papers' hiring decision made in the months after the Plaintiffs were rejected.  (See Opp. to SP at 39-40).  Plaintiffs' self-styled "real data," however, is flawed because it does not contain any information regarding the age distribution of the applicable labor market from which Smart Papers hired "off the street."   In addition, when examined in detail, Plaintiffs' "real data" further confirms that Smart Papers' hiring decisions did not have an adverse impact based on age.[3/]

---

[2/]    Subtracting the nine individuals listed in Plaintiffs' Exhibit 71 but not in Plaintiffs' Exhibit 63 still leaves apparently one individual who appears in one exhibit but not the other.  Plaintiffs did not identify the remaining individual, and Smart Papers has not been able to identify him or her.  Accordingly, Smart Papers in this chart has simply excluded the nine known managers from its prior calculations.

[3/]    Plaintiffs erroneously allege in their Opposition that Smart Papers hired 195 of 198 applicants for employment with the Company after February 9, 2001.  This assertion has no basis in fact.  Plaintiffs do not provide any data on the size or characteristics of the labor pool that applied "off the street" for jobs with the Company after February 2001.  Smart Papers produced to Plaintiffs all relevant files of applicants who were hired by Smart Papers after February 2001, but did not keep – and had no obligation to  keep – information regarding persons who applied "off the street" in 2001 and were not hired by Smart Papers.  (See Decl. of Doris J. Hampton, ¶ 5) (attached hereto as SP Exh 1.)  After receiving resumes from applicants, Smart Papers would screen the resumes and conduct preliminary telephone interviews of the applicants before inviting some of these candidates in for a personal interview.  (Id., ¶¶ 2-3.)  Smart Papers during 2001 and early 2002 conducted approximately 800 individual interviews, (Id., ¶ 5), and ultimately hired approximately 195 of these candidates.  (Id., ¶ 4.)

For their statistics to have any relevance, Plaintiffs' data must eliminate the "most common nondiscriminatory explanations for the disparity" Plaintiffs ultimately claim the data reveals. Brown v. EG&G Mound Applied Tech., Inc., 117 F. Supp. 2d 671, 679 (S.D. Ohio 2000) (citations omitted). To do so, "both the methodology and the explanatory power of the statistical analysis must be sufficient to permit an inference of discrimination." Simpson v. Midland-Ross Corp., 823 F.2d 937, 944 (6th Cir. 1987). Unless the statistics, "either standing alone or in comparison, are sufficient to lead the mind naturally to the conclusion sought, they have no probative value" and "do not move the proof one way or another." Id.

Plaintiffs' statistics do not meet this standard. Their data simply provides two demographic snapshots, one on February 1, 2001 (when IP owned the Mill), the second on February 9, 2002, a year after Smart Papers acquired it. (Opp. to SP at 39.) These snapshots, however, fail to account for Smart Papers' decision when acquiring the Mill in February 2001 to cut by about 200 the total number of hourly jobs that were available.[4/] (See Smart Papers' initial brief at 5-6) (unrebutted testimony by COO Maheu indicating that Smart Papers decreased the work force by about 200 in an attempt to operate more efficiently and survive as a profitable stand-alone business).

Moreover, Plaintiffs' so-called "off-the-street" hiring statistics (1) concern applicants who are not similarly situated to Plaintiffs because they never worked at the Mill, (2) reflect hiring decisions not made by Mary Rita Weissman but by others months after Plaintiffs were rejected, and (3) fail to provide any data about the ages of the relevant labor pool. The lack of data on the ages of the "off the street" applicant pool

---

[4/]    Smart Papers disputes the overall accuracy of Plaintiffs' headcount estimates at the Mill for the period February 1, 2001 to February 9, 2002. For purposes of summary judgment, however, Smart Papers will accept as true Plaintiffs' data and use only the sources that Plaintiff relied on in creating their misleading statistical portrait.

makes Plaintiffs' statistics meaningless.  See Simpson, 823 F.2d at 943 (rejecting

proffered statistics because they lacked "vital information regarding the pool of

applicants and whether, for example, qualified older employees were available or applied

for those jobs"); Grano v. Dept. of Dev. of City of Columbus, 637 F.2d 1073, 1078 (6th

Cir. 1980) (finding statistical evidence of discrimination worthless where no evidence

introduced regarding the relevant labor market in question).  As the Seventh Circuit has

remarked,

> [W]e are dubious of statistical evidence of hiring which fails to
> account for the applicant pool. At best, [the employee's] statistics
> show that older employees were replaced by younger employees.
> As we have previously noted, this 'phenomenon' represents the
> normal course of employment histories, and is nothing to marvel
> at.  When older employees leave the work force, for whatever
> reasons, they will often be replaced by younger employees.  This
> does not give rise to an inference that an employee was fired
> because of his age.

Kier v. Commercial Union Ins. Co., 808 F.2d 1254, 1258 (7th Cir. 1987) (citations

omitted).  The same holds true here, for Plaintiffs have offered no context that would

explain the natural changes that one would expect in a work force over time, such as

normal retirements and a presumably younger applicant pool "off the street".  Because

Plaintiffs thus have failed to carry both "the burden and obligation of demonstrating that"

their statistics have any meaning, their statistical "proof" should be rejected on this basis

alone. See Hall v. Martin Marietta Energy Sys., Inc., 856 F. Supp. 1207, 1215 (W.D. Ky.

1994) (rejecting statistics where no information about relevant labor pool provided).

Plaintiffs' data, however, has another fatal flaw that further undermines its utility.

For some reason, Plaintiffs have chosen to compare the number of employees at the Mill

on February 1, 2001, when IP still owned it, with the number of employees at the Mill on

February 9, 2002, a year after Smart Papers purchased it.  (Opp. to SP at 39.)  During this period, which included the sale of the Mill to Smart Papers and the subsequent reduction in hourly employee positions at the Mill, Plaintiffs' data shows that the overall number of hourly employees 40 years of age and older decreased, whereas the total number of employees under the age of 40 increased.  Plaintiffs, however, have included in this data every employee who left the Mill regardless of the reason for their departure.  For example, an unknown number of employees took jobs elsewhere when Smart Papers acquired the Mill, left because they disliked Smart Papers, failed their drug test, retired, were terminated for cause, or quit for any other reason.  See Simpson, 823 F.2d at 943 (rejecting statistical evidence where sample included all employees who left the company regardless of reason); Chappell v. GTE Products Corp., 803 F.2d 261, 268 (6th Cir. 1986) (demotion statistics, which included anyone who left company for any reason, insufficient evidence to support inference of age discrimination.)

Finally, between February 9, 2001 and August 9, 2001, or the period in which Plaintiffs claim their own applications should have remained on file with the Company, Smart Papers hired approximately the same number of employees age 40 or older (48%) as employees under the age of 40 (52%).  (See Plaintiffs' Exh. 72 (Defendant Smart Papers' Response to Plaintiffs' Interrogatory No. 2 – Hire Report.))  By failing to account for this data, and by failing to provide any evidence of the labor pool from which Smart Papers hired new applicants from, Plaintiffs' attempt to show that Smart Papers' hiring decisions were motivated by age is meaningless.

### C.    Smart Papers Preferred To Hire From The IP Workforce

Plaintiffs repeatedly assert, without any factual support whatsoever, that Smart Papers knew the IP workforce was predominately older, and therefore designed a strict

hiring process that screened out as many older applicants as possible.  (See e.g., Opp. to SP at 1, 11, 14.)  Among other things, this argument is flatly contradicted by the undisputed testimony of Mary Rita Weissman, who stated that she was not given a quota or limit on the number of IP employees who could be hired by Smart Papers.  (Weissman Dep. at 85) (noting "I was never given a number [such as] hire 600 people, hire 20 people.")  And contrary to Plaintiffs' bare assertion that Smart Papers had a preference not to hire from the older IP workforce, the evidence is the opposite.  Indeed, Ms. Weissman testified that Smart Papers' "goal was to fill the positions, insofar as was possible, from among those individuals who worked for the seller [IP]."  (Id.)

Smart Papers' goal of preferring the IP workforce was implemented because Smart Papers made 400-410 offers of employment to such employees, which is over 70 percent of the applicant pool.  Moreover, there can be no inference of age discrimination because, as noted previously, over 70 percent of the applicants were age 40 and over, and the oldest applicants had the highest selection rate.

## III.    Plaintiffs Deliberately Misrepresent The Record With Respect To Smart Papers' Access To Applicant Age Data

In their Opposition, Plaintiffs allege that Smart Papers improperly collected age data on applicants for employment with the Company and suggest that, based on its purported access to such data, Smart Papers "was more likely motivated by an illegal motive, age, than not" with respect to its hiring decisions.  (Opp. to SP at 10, 57.)  In making this argument, however, Plaintiffs deliberately conceal the facts from the Court.

First, the Asset Purchase Agreement between Smart Papers and IP states the following:

> [A]t Buyer's request a reasonable period prior to the Closing Data, Seller's counsel shall provide *to Buyer's labor and employment counsel (but not to Buyer)* demographic information

30

> on a confidential basis concerning each of its employees at the
> Hamilton Mill *to ensure compliance with applicable employment
> laws.  Buyer will not use the demographic information in the
> interviewing and hiring process* and Buyer shall be responsible
> for any liability incurred by Seller for any unlawful use of the
> information by Buyer's counsel.

(<u>See</u> Schedule 4.1 Asset Purchase Agreement, attached hereto as Exhibit 2) (emphasis

added).[5/]

In other words, there is undisputed evidence showing that when Smart Papers

purchased the Mill, Smart Papers' labor and employment counsel obtained demographic

information on a confidential basis as part of its due diligence "to ensure compliance with

applicable employment laws."  <u>Id.</u>  The information was "not use[d] . . . in the

interviewing and hiring process."  <u>Id.</u>  Indeed, Mary Rita Weissman, who conducted the

hiring process for Smart Papers, presented unrebutted testimony in her deposition that she

never requested or used age data in the hiring process because "it was irrelevant."  (<u>See</u>

Smart Papers' initial brief at 11-12.)  However, as noted above, the hiring decisions made

by the Weissman Group clearly did not discriminate against older applicants.  To the

contrary, the oldest applicants had the highest selection rate.

In addition, Plaintiffs allege that Smart Papers "surreptitiously" obtained age data

on "off the street" job applicants.  (Opp. to SP at 20).  Again, Plaintiffs' accusations are

false and misleading.  The facts show that Smart Papers' employment application does

<u>not</u> request any information on the age or date of birth of the applicant.  (<u>See</u> Plaintiffs'

Exhibit 62a.)  After Smart Papers hired its initial workforce and no longer used the

services of the Weissman Group, it retained the services of CBC Employment Screening

Services to conduct background checks of "off the street" applicants recommended for

---

[5/]     Plaintiffs' counsel received a copy of the entire Asset Purchase Agreement, including this section,
during discovery.

employment.  The CBC form requests from the applicant his or her date of birth, and expressly states that "this information is requested by CBC Employment Screening Services solely for purposes of ensuring accurate retrieval of records."  (See id.)  CBC then used this information and other data to conduct a criminal background check of the applicant, a Driving Records Search Screen, and education verification.  (See Plaintiffs' Appendix Vol. I, Tab 58a, ¶55.)

EEOC Regulations state that requesting date of birth information "is not, in itself, a violation of the Act" and that the requester should make clear "[t]hat the purpose is not one proscribed by the statute and should be made known to the applicant . . ." 29 C.F.R. §1625.5.  Here, the date of birth information was requested by a third party (CBC) to conduct a background check on the applicant, and the sole purpose for the collection of this data is told to the applicant on the form requesting the information.  Under these circumstances, no inference of age discrimination is created.  "The intentions of a third party may not be attributed to an employer without some rational basis for attribution." Mesnick v. General Electric Co., 950 F.2d 816, 826 (1st Cir. 1991) (search firm's collection and disclosure of age data to employer not probative of age discrimination by employer).

Finally, Plaintiffs erroneously state in their brief that Annetta Johnson, former Director of Human Resources at Smart Papers, "admits that Smart Papers did not have a legitimate need for the "off the street" applicants ages during the application process. . ." (Opp to SP at 20.)  In fact, Johnson testified in her deposition that the applicant was requested to provide date of birth information solely to "make sure they [CBC] obtain an accurate record" for the background check.  (See Johnson Dep. at 54-55.)

**IV.     Plaintiffs' Allegations That Smart Papers' Engaged In Age Stereotyping Is Incorrect And Does Not Establish Pretext.**

In a desperate attempt to attack Smart Papers' non-discriminatory hiring process, Plaintiffs allege that "Defendant engaged in age stereotyping in the selection process and that Plaintiffs were adversely affected." (Opp. to SP at 49.) Specifically, Plaintiffs allege that rating them on criteria such as "flexibility" and "willingness and ability to learn" inaccurately stereotyped them. (Id. at 11-12 & 49-50.)

Plaintiffs' argument fails because the hiring process was facially neutral and did not have an adverse impact on older employees. Hazen Paper Co. v. Biggins, 507 U.S. 604, 609 (1993.) Plaintiffs do not allege in their Fifth Amended Complaint that the hiring process resulted in an adverse impact on older workers; therefore, each Plaintiff must prove that Smart Papers intentionally discriminated against him or her on the basis of age. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 146 (2000) ("[t]he ultimate question is whether the employer intentionally discriminated").

Further, Plaintiffs cite Mary Rita Weissman's deposition testimony in an attempt to support their claim that factors such as flexibility and willingness to learn are "classic stereotypes of older workers." (Opp. to SP at 11 and 49.) Ms. Weissman's actual testimony, however, revealed that she does not have a negative stereotype of older workers:

> [t]hey're wise, they're experienced, they generally have better attendance than individuals who are younger, they generally have a better work ethic than individuals who are younger – not always, but in general. They've you know – they're beyond sewing [sic] their wild oats. So when they are at work, they're generally better – better able to focus on the task at hand. (Weissman Dep. at 46.)

In response to a potential stereotype that older workers might be less open to new ways of doing things, Ms. Weissman stated that, in her view, this is not a true reflection

of reality and thinks that "younger people are just as likely to reject new ideas as older people."  (Id.)  Ms. Weissman also testified that she does not hold these age related stereotypes and while she thinks that the "misconception exists" that older people are less adaptable or less flexible, she explained "that's not my experience for sure."  (Id. at 47-48.)

Consequently, Plaintiffs have no evidence to prove that Weissman, whose hiring recommendations were accepted by Smart Papers, holds any stereotypes about older people or that such stereotypes existed in the hiring process.[6/]

In addition, there is no evidence to support Plaintiffs' speculation and conjecture that Smart Papers' consideration of "flexibility" and "willingness and ability to learn" adversely impacted older applicants.  To the contrary, there is undisputed evidence showing that the hiring process used to select former IP employees such as Plaintiffs did not have an adverse impact based on age.  As noted previously, more than 70 percent of IP applicants age 40 and over were offered jobs by Smart Papers, compared to less than 70 percent of those under age 40.

Significantly, the very process that Plaintiffs allege stereotyped older workers as "inflexible" and "unwilling to learn new things" resulted in the oldest applicants having the highest selection rate.[7/]

---

[6/]    Plaintiffs' repeated comment to the Court that one of the Weissman Group employees (Jess Sampson) "was a college student" (Opp. to SP at 12, n. 6, 42, n. 19 & 50, n. 21) is a bizarre attempt to discredit the work of the Weissman Group.  First, it is undisputed that the Weissman Group employed 11 individuals to help gather data during the hiring process, 6 of whom were over the age of 40 in February 2001. (Weissman First Decl. ¶7, SP Exh. 2.)  Weissman herself was 52 years old.  (SP Exh. 5 at 13.)  Moreover, it is undisputed that Jess Sampson was only hired "to conduct interviews" of applicants and not to conduct reference checks with former IP supervisors.  (Opp. to SP at 12, n.6.)  Because the undisputed evidence establishes that Smart Papers primarily relied on the supervisor reference checks in making hiring decisions, the age of the interviewers is simply irrelevant.

[7/]    "Flexibility" and "willingness to learn" were only but two of the factors used to determine an applicant's overall qualifications for employment with Smart Papers.  As detailed in Smart Papers' Motion for Summary Judgment, IP managers and supervisors were asked questions to elicit information about

Finally, despite the undisputed fact that older IP workers were hired by Smart Papers at a higher rate than younger workers, and that the Smart Papers' hiring process did not have an adverse impact on protected age groups, Plaintiffs offer meaningless "statistics" on the number of Plaintiffs and others who received low scores (below 3) on the factors of "flexibility" and "willingness to learn." (Opp. to SP at 11-12, 49-50.) Plaintiffs' rating numbers prove nothing and are unsupported by any expert testimony indicating that they are statistically significant. In addition, Plaintiffs' numbers are incomplete and misleading, because out of 370 applicants (90.5%) age 40 and over who were hired by Smart Papers, 335 received a rating of 3 or higher in "flexibility", and 311 of 370 applicants (89%) age 40 and over who were hired by Smart Papers received a rating of 3 or higher on "willingness to learn."

## V. Plaintiffs' Subjective Belief That They Were More "Objectively Qualified" Than Younger Employees Subsequently Hired "Off The Street" Is Irrelevant To Rebut Smart Papers' Documented Legitimate Non-Discriminatory Reasons For Not Hiring Them.

Plaintiffs repeatedly state in their opposition brief that they were more "objectively qualified" than younger employees subsequently hired "off the street" by Smart Papers. (See e.g., Opp. to SP. at 2-3, 15-16, 18, 31, 34, 50 & 54.) As discussed below, it is well-established that such subjective beliefs are insufficient to create a genuine issue of material fact or establish pretext.

---

applicants in the following categories: work record, safety awareness, customer orientation, analytical/problem solving ability, dependability, excellence orientation, team player, integrity, and flexibility. (Smart Papers' Motion for Summary Judgment at 7.) Additionally, applicants were asked questions during their individual interviews regarding their work record, safety awareness, customer orientation, analytical/problem solving ability, dependability/attendance, excellence orientation, team player, integrity, and flexibility. (Id.) It was the totality of the information in the end that drove the final recommendation. (Weissman Dep. at 180.)

### A.    Objective Qualifications Are Only Relevant At The *Prima Facie* Stage.

As stated by the Sixth Circuit in <u>Wexler</u>, the focus on a plaintiff's "objective qualifications" should be at the *prima facie* stage.  317 F.3d at 575-76.  For purposes of summary judgment, Smart Papers does not dispute that, based upon Plaintiffs' prior service at the Mill, Plaintiffs (with the exception of those who failed their drug tests) were at least minimally objectively qualified for employment at the Hamilton Mill.  (<u>See</u> Smart Papers' initial brief at 22, n.7 & 26.)

It is well-established that Plaintiffs cannot establish pretext merely by asserting that they are more objectively qualified than the applicants hired by Smart Papers.  <u>See e.g.</u> <u>Sutherland v. Michigan Dept. of Treasury</u>, 344 F.3d 603, 617 (6th Cir. 2003) (plaintiff's assertion that he was objectively better qualified did not raise the issue of pretext); <u>Murphy v. Yellow Freight System, Inc.</u>, 832 F.Supp. 1543, 1548 (N.D. Ga. 1993) ("the fact that Plaintiff was objectively more qualified for the position cannot supply sufficient evidence of pretext.)  <u>See also</u>, <u>Buchanan v. Tower Automotive, Inc.</u>, 31 F. Supp. 2d 644, 659 (E.D. Wis. 1999) (plaintiff's argument that he was as objectively qualified as other applicants and even more objectively qualified than one applicant "misses the mark" as plaintiff's beliefs do not raise a material dispute about the "employer's honesty in its asserted reason for a decision."); <u>Ferron v. West</u>, 10 F. Supp. 2d 1363, 1371 (S.D. Ga. 1998) (simply continuing to insist that plaintiff is more objectively qualified than other applicants fails to rebut the employer's stated reasons for its actions.)

**B.    Plaintiffs' Repeated Subjective Conclusions That They Are More Qualified Are Insufficient To Create An Issue For The Jury.**

It is well-settled that a plaintiff's subjective belief of his own qualifications does not raise a material dispute about the employer's honesty in its asserted reason for a decision.  See Buchanan, 31 F. Supp. 2d at 659.  See also Chappell v. GTE Products Corp., 803 F.2d 261, 266 (6th Cir 1986) ("mere personal beliefs, conjecture and speculation are insufficient to support an inference of age discrimination"); Millbrook, 280 F.3d at 1181 (plaintiff's own opinions about her work performance, or opinions of her co-workers or supervisors, does not create an issue of material fact because "an employee's perception of his own performance . . . cannot tell a reasonable factfinder something about what the employer believed about the employee's abilities"); Grigsby v. Reynolds Metals Co., 821 F.2d 590, 597 (11th Cir. 1987) (merely stating that plaintiff is more objectively qualified than other applicants "is not sufficient to raise an inference of pretext or intentional discrimination where [defendant] has offered such extensive evidence of legitimate, nondiscriminatory reasons for its actions"); Potter v. City of Albany, 68 F. Supp. 2d 1360, 1367 (M.D. Ga. 1999) ("[p]laintiff cannot support a claim of pretext by alleging that he was more qualified.")

Plaintiffs argue that they are more qualified than other applicants because of their tenure and experience at the Hamilton Mill.  (Opp. SP at 3, 14, 42-44.)  These arguments are insufficient to rebut Smart Papers' articulated legitimate non-discriminatory reasons for not hiring them.  See Sutherland v. Michigan Dept. of Treasury, 344 F.3d 603, 616 (6th Cir. 2003) (fact that plaintiff had worked longer with defendant and at a higher level than the successful candidate did not "negate the Defendants' legitimate, non-discriminatory reason for their employment decision"); Price v. Federal Express Corp, 283 F.3d 715, 723 (5th Cir. 2002) ("[plaintiff's] better education, work experience, and

longer tenure with the company do not establish that he is clearly better qualified");

Nichols v. Lewis Grocer, 138 F.3d 563, 568-69 (5th Cir. 1998) (plaintiff's longer tenure

and more varied work experience with the company did not make her "clearly better

qualified" than the winning applicant); Ferron, 10 F. Supp. 2d at 1367 ("[t]ime on the job

does not always translate into a net performance improvement—which is one of the

reasons why general allegations of superior qualifications are legally meaningless.")

### C.    Smart Papers Relied On More Than Minimal "Objective Qualifications" – It Relied Most Heavily On The Business Judgements And Recommendations of IP Supervisors.

Plaintiffs' argument that they were more "objectively qualified" also fails because

Smart Papers' hiring decisions were not only based upon minimal objective

qualifications.  (See e.g., Maheu Dep. at 115) ("there's more to the hiring process than,

'can you do the job.'  More to the hiring process.")  Rather, the Weissman Group

conducted one-on-one interviews with various IP managers and supervisors who were

working in the Mill at the same time as Plaintiffs, and the IP managers and supervisors

provided their judgments on Plaintiffs' excellence orientation, productivity, team player,

dependability, safety awareness, and willingness to learn.  (Smart Papers initial brief at 9-

11.)  Ms. Weissman testified that she considered these references as "the most accurate,

powerful and productive information " in the IP hiring process.  (Smart Papers' initial

brief at 10.)

Assuming, *arguendo,* that the Court considers the IP references to be based in part

on subjective judgments by the IP supervisors and managers, that provides no support to

Plaintiffs' case.  Subjective employment evaluations are clearly a legitimate factor which

an employer may consider in making its employment decisions.  Johnson v. United States

Dep't of Health and Human Resources, 1992 WL 675943, at *19 (N.D. Ohio Sept 17,

1992) ("[i]ndeed, an employer may even include an evaluation of negative factors such as personality deficiencies and negative attitude that would detract from the person's abilities.")  Accordingly, Plaintiffs' conclusory assertions that they are more objectively qualified are irrelevant to the hiring decision at issue.  See e.g., Jones v. Barnhart, 215 F. Supp. 2d 1195, 1204 (D. Kan. 2002) (plaintiff's assertion that she was more objectively qualified than successful candidates did not prove pretext where the "undisputed evidence . . . is that the sole decision maker did not employ strictly objective criteria in making his decision . . . "); Murphy, 832 F. Supp. at 1548-49 (plaintiff did not prove pretext where the evidence establishes only that she was more objectively qualified for position and failed to present "significant probative evidence" that her employer did not actually rely on his stated subjective criteria in making its employment decision.)

> **D.    Different Decision-Makers Were Involved In The Hiring Process Of Plaintiffs Than For Subsequent Off The Street Hires, And Thus, Comparing Subsequent Hires With Plaintiffs Sheds No Light On The Intent Of The Decision-Maker Relevant To Plaintiffs.**

It is undisputed that Mary Rita Weissman was the sole person to make all hiring recommendations concerning the Plaintiffs in February 2001. (Weissman Dep. at 75) ("only my recommendation was conveyed to Dan, not any of the others . .  Ultimately it's a one-person recommendation.")  Those recommendations were accepted by Dan Maheu without exception.  (See Smart Papers initial brief at 11); (Opp. to SP at 31.)  Moreover, it is also undisputed that Mary Rita Weissman did not play any role in the hiring process of subsequent off the street applicants.  (Weissman Dep. at 18) ("Q: Do you know whether or not [Smart Papers] hired other—any hourly workers from off the street, so to speak? A: If they did, it was after I ended my tenure as Director of Human Resources.  Q: So you don't know whether they did or not?  A: I do not.");  (Id. at 130) ("I did not have

knowledge whether Smart Paper [sic] was soliciting applications from individuals who had not worked for the seller.")

In a case of disparate treatment where each plaintiff is required to prove that the decision maker intentionally discriminated against him or her based on age, comparing Plaintiffs to subsequent off the street hires that involved a different hiring process and different decision maker is irrelevant to Mary Rita Weissman's motivation at the time she was making the hiring recommendations about the Plaintiffs.  Idusuyi v. Tennessee Dep't of Children's Services, 2002 WL 220640 (6th Cir. Feb. 11, 2002) ("plaintiffs had to show evidence that discriminatory motives influenced the 'ultimate decision-makers'"); Mitchell v. Toledo Hosp., 1989 WL 67987 (6th Cir. June 23, 1989) (denying summary judgment when defendant produced uncontradicted and probative evidence that its decision-maker was not unlawfully motivated, but was striving to select the most qualified candidate for the position.)  Therefore, Plaintiffs' attempt to compare themselves to subsequently hired off the street applicants who are not similarly situated to Plaintiffs and who were hired by others does not shed any light on Ms. Weissman's motivation.

### E.    Plaintiffs' Argument That Smart Papers "Erroneously Judged Their Qualifications" Is Insufficient To Prove Pretext.

Plaintiffs argue that "Defendant disregarded Plaintiffs' skills, talents and work ethics such that the legitimacy of its reliance on those evaluations is called into question." (Opp. to SP at 52).  Plaintiffs assert that "despite bad references," they can point to "sworn testimony by first line and second line supervisors, evidence of work performance, and/or years of service," which creates at least a jury issue regarding pretext.  Id.

There are several problems with Plaintiffs' argument.  First, as discussed

previously, it is well-established in this circuit that Plaintiffs' belief that the employer

should have given greater weight to certain employment factors (such as years of

experience in the Mill) as opposed to other factors (such as negative references) is

insufficient as a matter of law to establish pretext or avoid summary judgment.  See e.g.,

Marshall v. Summa Health Sys. Hosp., 2003 WL 21277336 at *2 (6th Cir. June 2, 2003)

(plaintiff's complaint that her prior performance evaluations should have outweighed

staff complaints about her insufficient to show pretext, especially when plaintiff

conceded that her employer relied upon the staff complaints in terminating her.)

Second, Plaintiffs' reliance on Aka v. Washington Hospital Center, 156 F.3d 1284

(D.C. Cir. 1998) is misplaced.  In Aka, the D.C. Circuit explained that a "plaintiff can

attempt to show that the employer's explanation misstates the candidates' qualifications .

. .if the plaintiff can show that he [did have the required qualifications], and *that the*

*employer knew it.*"  (emphasis added).  In this case, Plaintiffs concede that Smart Papers

received negative job references for each of the Plaintiffs, had reason to believe that the

references were true and accurate, and relied heavily on them.  Thus this case is the

opposite of Aka because here the decision maker knew that the Plaintiffs did not possess

the legitimate employment qualities that the employer sought.

Third, as explained previously, the fact that Smart Papers did not conduct

reference checks on subsequent "off the street" hires is irrelevant and fails to establish

pretext.  The subsequent hires had never worked at the Hamilton Mill, were not similarly

situation to Plaintiffs, and there was not a readily available and reliable reference source

available to provide insights as to their future performance at the Mill.  See e.g., Lee v.

GTE Florida, Inc., 226 F.3d 1249, n.2 (11th Cir. 2000) (change in importance of criteria

used in selection process after decision about plaintiff had been made was not probative

of pretext.)

**VI.    The 15 Remaining Plaintiffs Who Failed Their Drug Test Cannot Establish A**
**        *Prima Facie* Case Of Age Discrimination, Let Alone Rebut Smart Papers'**
**        Legitimate, Non-Discriminatory Reason For Rejecting Them For**
**        Employment.**

    Plaintiffs do not refute, nor could they, the following basic facts:

- Smart Papers required all applicants to pass a mandatory pre-employment drug test as
  part of the hiring process;

- all the applicants, including 15[8/] of the Plaintiffs (the "Drug Test Plaintiffs") who
  failed the drug test were aware of this basic requirement for employment with Smart
  Papers;

- each of the 15 Drug Test Plaintiffs also admitted in their depositions that they had
  engaged in recreational, illegal drug use; and

- each of the 15 Drug Test Plaintiffs were rejected for employment with Smart Papers
  because they failed their drug test.

(See Smart Papers' initial brief at 8, 22-24, 27-28.)  Despite these facts, Plaintiffs

nonetheless continue to maintain that they not only have articulated a *prima facie* case for

age discrimination, but that Smart Paper's justification for not hiring them was mere

pretext.  (Opp. to SP at 28, 58.)  These claims are preposterous, for the 15 Drug Test

Plaintiffs not only have failed to show that they satisfied a basic requirement for

employment with Smart Papers, but also have failed to rebut Smart Paper's legitimate,

non-discriminatory reason – their failed drug test results – for not hiring them.

**A.    The Drug Test Plaintiffs Fail to State a Prima Facie Case Because**
**        They Were Not Otherwise Qualified For a Position.**

    First, the 15 Drug Test Plaintiffs do not dispute that Smart Papers required each

job applicant submit to a drug test, or that they knew that failing the drug test would be

---

[8/]    There were 18 Plaintiffs who had failed their drug test, but Plaintiffs do not oppose Smart Papers'
Motion for Summary Judgement on 3 of them who failed to appear for their depositions.  These 3 should be
dismissed from the case without the need for further briefing.

grounds for immediate disqualification – regardless of the applicant's age – from employment with the Company.  (See, e.g., Pennington Dep. at 55-56) (acknowledging that drug test pre-condition of employment with Smart Papers, and failing drug test grounds for immediate rejection); (Marsee Dep. at 31-32) ("Q.   And you knew that, if that drug screen resulted in a positive result, that would be grounds for Smart Papers to immediately reject your application for employment?  A.   Yes.")

Despite this undisputed evidence, the 15 Drug Test Plaintiffs still insist that, because of their long service at the Mill, they otherwise were "qualified" for a position and thus have articulated a *prima facie* case of age discrimination.  (Opp. to SP at 28.) This assertion is ludicrous.  "Failed drug tests are an objective criteria that are relevant in employment decisions."  Scott v. Genuine Parts Co., 2002 WL 31844681, at * 5 (S.D. Ind. 2002) (finding that applicant could not establish a prima facie case of gender discrimination where applicant recently had been terminated from prior employment due to failed drug test).  Because the 15 Drug Test Plaintiffs did not meet this rudimentary, "objective" requirement for a job, they cannot establish a *prima facie* case.  See, e.g., Young v. Chicago Transit Auth., 189 F. Supp.2d 780, 789 (N. D. Ill. 2002) (finding that employee could not establish a *prima facie* case of race discrimination based on his termination because he could not show that he was meeting the employer's legitimate performance expectations where he tested positive for cocaine); see also Redding v. Chicago Transit Auth., No. 99 C 1082, 2000 WL 1468322, at * 4 (N.D. Ill. Sept. 29, 2000) (unpublished opinion attached as SP Exh. 29 to Smart Papers' initial brief) (recognizing that an employee who tested positive for cocaine was not qualified and therefore could not establish a *prima facie* case of disability discrimination).

**B.     The Drug Test Plaintiffs Cannot Rebut Smart Papers' Legitimate, Non-Discriminatory Reason for Not Hiring Them Based on the Results of Their Failed Drug Tests.**

Moreover, even assuming *arguendo* that the 15 Drug Test Plaintiffs could establish a *prima facie* case, they fail to state a claim for age discrimination because they cannot demonstrate that Smart Papers' legitimate, non-discriminatory reason for not hiring them was mere pretext for intentional age discrimination. Courts consistently have concluded that an employer's reliance on a failed drug test is a legitimate non-discriminatory reason for taking an adverse employment action, and that, in relying on a failed drug test, an employer need not show that the results of the drug test were actually correct, but only that the employer reasonably relied on them. See Graham v. Island Rail Road, 230 F.3d 34, 44 (2d Cir. 2000). See generally Saridakis v. United Airlines, No. 00-16141, 2001 WL 1646875, at * 1 (9th Cir. Dec. 20, 2001) (unpublished opinion attached as SP Exh. 29 to Smart Papers' initial brief) (finding that the employer "easily" established a legitimate non-discriminatory reason for terminating the plaintiff where he tested positive for drugs); Knighton v. City of Syracuse Fire Dep't, 145 F. Supp. 2d 217, 224 (N.D.N.Y. 2001) (holding that "Defendants correctly assert that the two positive drug tests provided a legitimate non-discriminatory reason for terminating [p]laintiff.")

The undisputed evidence in this case establishes that Smart Papers rejected the 15 Drug Test Plaintiffs solely because they failed their drug test. Ms. Weissman testified, without rebuttal, that without exception she rejected all applicants who failed their drug test on that basis alone. (See e.g., Weissman Dep. at 133-134.) Indeed, there is undisputed evidence that 56 total applicants were rejected based on a failed drug test, and they range in ages from 38 to 56. (See Smart Papers initial brief at 8.) Because these Plaintiffs have no evidence that this reliance was misplaced, or that Smart Papers'

44

decision had anything to do with their age, they cannot rebut Smart Papers' legitimate, non-discriminatory reason for failing to hire them.

Nonetheless, the 15 Drug Test Plaintiffs try, contending that Smart Papers' reliance on the results of their drug tests is mere pretext because: (1) "the methodology of the drug test is so suspect to establish as the destroy its legitimacy [sic] as a reason to reject" these 15 Plaintiffs from employment; and (2) Smart Papers allegedly hired several applicants after February 2001 that had "Criminal Records."  (Opp. to SP at 58.)  These arguments are frivolous.

First, the Drug Test Plaintiffs' attempt to attack the validity of using hair samples in drug testing by casting aspersions on the methodology itself without suggesting in any way that Smart Papers' own drug testing procedures were flawed, or that Smart Papers itself interfered with the drug test to skew its results, or that a plaintiffs' age played any role in the process.  (Opp. to SP at 60.)  As the Second Circuit has held, "[t]he key question [when assessing an employer's reliance on a drug test result] is whether it was reasonable for the employer to rely on the test result in making its employment decision . . .[such] reliance by an employer on a laboratory test, even where misplaced, does not provide any basis for a jury to find pretext."  Graham, 230 F.3d at 44.

Numerous states, including Ohio, officially have recognized the validity of using hair samples for purposes of drug testing, in large measure because hair testing is less intrusive than other means.  See, e.g., Ohio Admin. Code § 4723-6-01(H) (authorizing hair testing for purposes of conducting random drug testing of state-certified nurses who have known chemical dependencies).  Given the widespread acceptance of hair testing as a proper means to conduct drug screens, and the fact that the Drug Test Plaintiffs have offered no evidence suggesting that Smart Papers in any fashion interfered with the

45

testing procedures on the basis of age, Plaintiffs' contention is insufficient to rebut Smart Paper's stated reliance on their drug test results.

The 15 Drug Test Plaintiffs also intentionally distort the record by suggesting that, because Smart Papers hired approximately 14 applicants after February 2001 who allegedly had "Criminal Records," the Company's articulated reason for not hiring these Plaintiffs must be false. (Opp. to SP at 59.) This accusation, however, ignores the fact that Smart Papers treated past drug use detected through a pre-employment screen and past criminal convictions differently during the hiring process. As the evidence in this case demonstrates, Smart Papers – both in February 2001 with respect to the hiring of the IP workforce and afterwards – rejected all applicants who failed their drug test, but did not automatically exclude applicants with past criminal records. Moreover, in both instances, Smart Papers' decisions had nothing to do with an applicant's age.

Although Smart Papers automatically rejected each applicant who failed the pre-employment drug test, Smart Papers is precluded by law from automatically rejecting all applicants who may have prior criminal convictions because refusing to hire such individuals could in certain situations be a violation of Title VII. See, e.g., Green v. Missouri Pac. R.R., 523 F.2d 1290 (8th Cir. 1975).

Moreover, there is undisputed evidence showing that Smart Papers made offers to former IP employees in the Plaintiffs' protected age class who had prior "Criminal Records." This includes the lead named Plaintiff in this case, Elmer Campbell, who was offered a position by Smart Papers even though he had been convicted of "gross sex imposition" involving improper contact with children. (Campbell Dep. at 18-19.) In addition, other applicants from the IP workforce with alleged "Criminal Records" were over age 40, and were hired by Smart Papers:

| Name | Age |
|------|-----|
| Cox, Larry | 49 |
| Richardson, Darrell | 45 |
| Hurst, David | 44 |
| Baldwin, Rick | 44 |
| Turner, Gilmore | 54 |
| Whitaker, Daniel | 45 |

(See SP Exh. 4, ¶5 (attached to Smart Papers' initial brief).)

Finally, Plaintiffs identify 14 individuals hired "off the street" after February 2001 as having criminal records, and claim that this shows pretext in refusing to hire the 15 Drug Test Plaintiffs who failed their drug test. (Opp. to SP at 58-59). Again, Plaintiffs are wrong as a matter of law. As noted above, there is a legally recognized difference between rejecting an applicant for failing a preemployment drug test, as compared to rejecting an applicant for a prior criminal conviction. In addition, of the 14 individuals listed by Plaintiffs, only one was convicted of a crime involving a drug offense, and that occurred, according to his application, in 1971. (See Plaintiffs' Exh. 62) Further, three of the individuals – Bowling (56), Crane (50), and Willsey (50) – are the same age or older than the 15 Drug Test Plaintiffs themselves.[9]

In summary, Plaintiffs' continuing allegations of age discrimination on behalf of the 15 Plaintiffs who failed their drug test illustrates the extent to which all of the Plaintiffs and their counsel have lost sight of the law. The federal and state laws prohibiting employment discrimination on the basis of age do not guarantee continued employment to Plaintiffs based on their length of service for prior companies at the Hamilton Mill. Plaintiffs obviously are disappointed that they lost their jobs at the

---

[9] A socially useful reason also exists for the presence of some employees with criminal records in the Smart Papers' workforce. The Ohio Department of Rehabilitation and Correction, through its "Jobs for Offenders Program," encourages employers to consider ex-offenders for employment by making various federal and state tax credits available for participating employers. (See http://www.DRC.STATE.OH.US/WEB/JOBOFFEN.HTM.) Smart Papers participates in this program and has hired several employees with prior criminal records through this program.

Hamilton Mill, but the Mill has been struggling to survive economically and has been forced to downsize. (See Smart Papers initial brief at 3-6) (changes affecting the paper industry and the Hamilton Mill). Faced with difficult choices, Smart Papers hired a professional human resources consultant who created a legitimate nondiscriminatory hiring process to determine which former IP employees would be hired. That process legitimately and understandably relied heavily on references and recommendations of the IP supervisors and managers at the Mill. Age was not a factor in Smart Papers' hiring decisions, and the hiring decisions did not adversely impact older applicants. Smart Papers made approximately 400 offers of employment for hourly jobs, and more than 70 percent of the offers were to applicants over the age of 40. In addition, the age of applicants clearly was not a negative factor in the hiring decisions because applicants in the oldest age groups (55 to 59, and 60 to 65) were offered jobs at a selection rate (over 79 percent) that was higher than any other age group.

## VII.    The Eight Plaintiffs Who Were Hired By Smart Papers Cannot Survive Summary Judgment.

Eight Plaintiffs (E. Campbell, Hess, Holland, Begley, Greene, Rumpler, Geeding and Arthur) allege that Smart Papers "constructively discharged" them by hiring them and then assigning them to certain positions. (Opp. to SP at 62-76.) Moreover, these eight Plaintiffs also claim that "Defendant gave preferential treatment to substantially younger, less qualified workers than [Plaintiffs] by placing them in the very positions [Plaintiffs] should have received." (Id.) Plaintiffs' allegations cannot survive summary judgment for numerous reasons.

**A.    Plaintiffs' Age Claims Fail Because They Were Hired For Employment With Smart Papers Without Regard To Their Ages.**

The eight Plaintiffs argue in their brief that they can establish discrimination *in the form of failure to hire* by demonstrating that: 1) they were more than 40 years old; 2) they applied for and were qualified for a job for which Defendant was seeking applications; 3) despite their qualifications, *they were rejected*; and 4) after their rejection, the positions remained open and the employer continued to seek applications from persons with their qualifications.  (Opp. to SP at 62-63) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).)  Based on this legal standard, Plaintiffs' age claims clearly fail because it is undisputed that they were hired for employment with Smart Papers notwithstanding their age and thus were not rejected for employment.

**B.    Plaintiffs Cannot Claim Constructive Discharge For The First Time In Their Opposition To Smart Papers' Motion For Summary Judgment.**

Plaintiffs' allege in their opposition to Smart Papers' Motion for Summary Judgment that they were "constructively discharged" by Smart Papers.  (Opp. to SP at 63-76.)  Plaintiffs' allegations must fail as Plaintiffs did not allege constructive discharge in their Fifth Amended Complaint nor have Defendants had an opportunity to take discovery on claims not asserted.

Plaintiffs initially filed three amended Complaints that contained two counts entitled "Count II: Federal Age Discrimination, Demoted Employees/Constructive Discharges—ADEA, 29 U.S.C. § 621 et seq." and "Count IV: Ohio Age Discrimination, Demoted Employees/Constructive Discharges—O.R.C. § 4112." (See Plaintiffs' Third Amended Complaint, DKT #39.)  Smart Papers moved to dismiss these claims on the basis that "Smart Papers was not Plaintiffs' employer when they were terminated by IP. The only employment action taken by Smart Papers was to offer Plaintiffs employment in

certain positions and at certain rates of pay." (See Smart Papers' Motion to Dismiss at 7-8, DKT # 41.)

In this Court's Order of March 24, 2003, the Court stated that "[a]s explained by Plaintiffs, however, they are really contending that Smart Paper [sic] discriminated against them by offering them less desirable jobs and giving the better jobs to substantially younger persons." (Order of March 24, 2003 at 12-13, DKT # 64.) Thus, rather than dismissing these counts, the Court ordered Plaintiffs to file a more definite statement explaining these claims.

On April 3, 2003, these eight Plaintiffs filed a Fourth Amended Complaint (and a Fifth Amended Complaint on September 5, 2003) recasting their allegations as "Count II: Federal Age Discrimination, Discriminatory Hiring Practice—ADEA, 29 U.S.C. § 621 et seq." and "Count IV: Ohio Age Discrimination, Discriminatory Hiring Practice —O.R.C. § 4112," alleging that "Defendants treated Plaintiffs . . . less favorably than younger applicants." (See Plaintiffs' Fourth Amended Complaint, DKT #65.) Significantly, however, neither the Fourth nor the Fifth Amended Complaint included a claim of constructive discharge.

Now, faced with a motion for summary judgment by Smart Papers, Plaintiffs attempt to argue that Smart Papers "constructively discharged" them by "subjecting [Plaintiffs] to less desirable working conditions than those younger employees." (Opp. to SP at 62-76.) Plaintiffs cannot raise constructive discharge allegations in an opposition brief after months of discovery and after this Court ordered them to explain their allegations - - after which they dropped their constructive discharge claim. See e.g., Strouss v. Michigan Dept. of Corrections, 250 F.3D 336, 341 (6th Cir. 2001) (failure to

raise claim in complaint precludes plaintiff from raising it before the district court in a motion opposing summary judgment.)

**C.    Plaintiffs Geeding and Hess Allege Only Failure To Hire In Their Fifth Amended Complaint, And Cannot Raise New Claims In Their Opposition Brief.**

After amending their complaint five separate times, Plaintiffs Geeding and Hess continue to allege in the Complaint (as they have all along) that they were not hired by Smart Papers.  (See Fifth Amended Complaint at ¶ 90-96.)  The Complaint contains no other claims on their behalf.  Because the undisputed record shows that Plaintiffs Geeding and Hess were offered jobs by Smart Papers, their claims cannot survive summary judgment.  (See SP Appendix Volume II, Tabs 28 & 36.)  In their opposition brief, however, Gedding and Hess allege for the first time constructive discharge, and that they were treated less favorably than younger workers.  (Opp. to SP at 71-73 and 75-76.)

**D.    Regardless, Plaintiffs Cannot Show That They Were Constructively Discharged By Smart Papers.**

As explained in detail in Smart Papers' Motion to Dismiss Plaintiffs' Third Amended Complaint, Plaintiffs' claim of constructive discharge fails because "Smart Papers was not Plaintiffs' employer when they were terminated by IP.  The only employment action taken by Smart Papers was to offer Plaintiffs employment in certain positions and at certain rates of pay."  As stated by the Sixth Circuit, a constructive discharge occurs when working conditions are "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."  See Scott v. Goodyear Tire & Rubber Co., 160 F.3d 1121, 1127 (6th Cir. 1999) (quoting Yates v. Avco Corp., 819 F.2d 630, 636-37 (6th Cir. 1987)); Wilson v. Firestone Tire & Rubber Co., 932 F.2d 510, 515 (6th Cir. 1991) (quoting same).

The constructive discharge claims of Plaintiffs Campbell, Arthur, Holland and Geeding fail for the simple reason that they declined their offers of employment with Smart Papers and therefore cannot prove "constructive discharge" by Smart Papers because they never were employed by Smart Papers in the first place. Scott, 160 F.3d at 1127 (resignation is an essential element of constructive discharge); The American Heritage College Dictionary 1161 (3rd ed. 2000) (defining "resign" as to give up one's job.)

The constructive discharge claims of Rumpler and Hess fail because, to this day, they are still employed by Smart Papers and therefore cannot prove an essential element of their claim – that they resigned. See Scott, 160 F.3d at 1127.

The constructive discharge claims of Begley and Greene fail because they did not allege in their Fifth Amended Complaint that working conditions were "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign" and cannot raise this allegation for the first time in their opposition brief. Scott, 160 F.3d at 1127.

**E.** **Plaintiffs' Conclusory Statements That They Were Treated Less Favorably Than Younger Workers Is Insufficient To Establish Pretext.**

Without support, the eight Plaintiffs who were offered jobs by Smart Papers assert that "Smart Papers preferred substantially younger, less qualified employees of International Paper." (Opp. to SP at 62-76.) It is ironic that eight Plaintiffs allege that Smart Papers discriminated against them by not offering them certain positions when the remaining Plaintiffs allege that they would have accepted any position in the Mill. These unprincipled and inconsistent allegations further undermine Plaintiffs' allegations of age discrimination against Smart Papers.

Plaintiffs' self-serving and conclusory statements that they are more qualified and experienced than certain younger employees is insufficient to establish pretext. (See e.g. Chappell v. GTE Products Corp., 803 F. 2d 261, 268 (6th Cir. 1986) ("mere personal beliefs, conjecture and speculation are insufficient to support an inference of age discrimination"). Plaintiffs are required to prove that Smart Papers intentionally discriminated against them because of their age. It is hard to imagine how Smart Papers could have discriminated against these eight plaintiffs by offering them the very jobs that are coveted by the remaining Plaintiffs. Plaintiffs have produced no evidence to show that age played any role the Company's decisions to offer these eight Plaintiffs jobs that the other Plaintiffs are still seeking.

It is undisputed that once the hiring decisions on job applicants were made, Dan Maheu gave the list of successful candidates to his four deputies to place eligible applicants into Smart Papers' jobs. (Smart Papers' initial brief at 12-13.) Hourly applicants with "green" ratings generally were placed first. (Id.) Those with "yellow" ratings were placed after the greens. (Id.) Generally, new hires were placed into jobs that they had previously performed at IP. (Id.) If it was uncertain what job an applicant had performed or what jobs he or she was qualified for, Joe Bergeron (the Smart Papers' manager tasked with assigning new hires into positions) would review prior training records to determine for what jobs the applicant was trained. (Id.) An applicant would not be placed in any job for which he or she had not been trained and was not qualified. (Id. at 59.) Plaintiffs have offered no evidence to rebut this legitimate non-discriminatory way of placing eligible employees into open positions. Age was not a factor in this process, and the eight Plaintiffs offer no evidence to the contrary.

Plaintiffs' bare assertions that certain younger employees got the job that the Plaintiff "expected" or "wanted" is insufficient to establish pretext.  See e.g., Dabrowski v. Warner-Lambert Co., 815 F.2d 1076, 1078 (6th Cir. 1987) ("The mere fact that a younger employee or applicant receives better treatment than an older one is insufficient to carry the burden of proof in a case under the federal [ADEA];" Chappell v. GTE Products Corp., 803 F.2d 261, 267 (6th Cir. 1986) ("The isolated fact that a younger person eventually replaces an older employee is not enough to permit a rebuttal inference that the replacement was motivated by age discrimination.") (See also Smart Papers' initial brief at 36.)

**F.    The Eight Plaintiffs' Individual Assertions Are Absurd, Counter-Intuitive and Do Not Establish Pretext.**

**1.    Elmer Campbell**

It is undisputed that Smart Papers offered Elmer Campbell (age 60 in February 2001) the exact position (i.e. Pulper Finisher) that he was performing at International Paper at the time of the sale of the Mill.  (Smart Papers' initial brief at 39); (Opp. to SP at 64).  That fact alone disposes of any allegations of age discrimination by Smart Papers. Plaintiffs' argument that Campbell's job as a Pulper Finisher with IP was merely "temporary" and that he expected to be promoted by IP is nothing more than self-serving speculation, and is irrelevant to the pending allegations of age discrimination.

Campbell's assertion that his job offer resulted in a "dramatic reduction in salary" is also irrelevant as the undisputed evidence shows that Smart Papers reduced the wages for every hourly employee by about 20 percent, regardless of the employee's age.  (See Smart Papers' initial brief at 6.)  Campbell's bare assertion that a substantially younger employee was hired into the position that "he should have received" is insufficient to establish pretext where Campbell presents no evidence that age played any role in the

54

placement decisions at issue.  In fact, Campbell fails to acknowledge that Smart Papers hired two other Beater Engineers (ages 59 and 52) and three Assistant Beater Engineers (ages 54, 53, and 48.)  (See SP Exh. 4, ¶5 attached to Smart Papers' initial brief.)  The fact that Smart Papers hired numerous individuals approximately the same age as Campbell (age 60) for the positions that he alleges he "should have received" dispels any inference that Smart Papers intentionally discriminated against Campbell on the basis of his age.

### 2.    Alfred Holland

It is undisputed that Holland (age 62 in February 2001) was offered a *higher level* position (Drum Operator) by Smart Papers than the one he wanted, and that the position he was offered paid a *higher wage* than the one he wanted.  (Smart Papers' initial brief at 38-39.)  This fact alone dispels any allegations of age discrimination.  Holland's allegation that this somehow equates to age discrimination is absurd and meritless.  (Opp. to SP at 65-67).  Holland's argument alleges that younger workers received the *lower level*, *lower paying* wage position that he "should have received."  (Opp. to SP at 66.)  The fact that younger individuals received a lower level, lower paying job than Holland cannot be grounds for a claim of age discrimination.  Moreover, neither Holland nor any of the eight Plaintiffs presents any evidence of intentional age discrimination in the process of assigning jobs.  The fact that Smart Papers made approximately 400 offers and placement decisions, and only eight are claiming discrimination, strongly suggests that the placement decisions did not have a disproportional adverse impact on employees age 40 and over.

###    3.    **Govan Begley**

It is undisputed that Govan Begley's age discrimination claim (he was age 59 in February 2001) against Smart Papers rests solely on the fact that Smart Papers' *offered him* a job, which prevented him from obtaining a severance package from IP. (Smart Papers' initial brief at 39.) Despite Begley's admission that his age claim against Smart Papers turns on the fact that he was *hired* by Smart Papers, Plaintiffs argue in their opposition brief that Begley was discriminated against on the basis of age because others received "preferential treatment" during the hiring process. (Opp. to SP at 68.) Plaintiffs' post-hoc allegations are insufficient to create even an inference of age discrimination.

Plaintiffs assert in their opposition brief that Smart Papers placed "less qualified" workers in the position that Begley claims he should have received. (Opp. to SP at 68.) In his deposition, however, Begley admitted that Smart Papers reduced the number of people performing the job he had held – Packing Specialist – from four to three, and the three individuals Smart Papers placed in that job – Greg Laney, Carl Laney, and Jeff Kittner – also had held this position with IP. (Begley Dep. at 82-84.)[10] Although Plaintiffs state in their opposition brief that these three individuals were less qualified than Begley, Begley previously admitted in his deposition that they were just as qualified as he was to perform the functions of the Specialist job. (Begley Dep. at 84) ("Q: [W]ere the two Mr. Laneys and Mr. Kittner qualified to be head carton operators? A: Yes. Q:

---

[10]    Begley states in his opposition brief that Smart Papers placed a "Robert Holland" (instead of Carl Laney) in the Specialist position. (Op. to SP at 68.) This unsworn statement is false and unsupported because, despite Plaintiffs' citation to Begley's deposition in support of this allegation, Begley never testified about a "Robert Holland" anywhere in his deposition. (See Begley Dep. and index thereto.)

And were they just as qualified as you --.  A: Correct.  Q: – to perform that job?  A: Correct.")[11]

In sum, Begley did not want Smart Papers to offer him a job so he could receive a severance package from IP.  The fact that Smart Papers offered him a job does not constitute age discrimination.

### 4.    Raymond Arthur

It is undisputed that Smart Papers offered Plaintiff Arthur (age 62 in February 2001) a higher-level position than the one he previously held at IP, and that his sole reason for turning down Smart Papers' offer of employment was his own subjective belief that he was unqualified for the position. (See Smart Papers' initial brief at 39). Plaintiffs' allegation that Smart Papers gave preferential treatment to a "substantially younger, less qualified" employee is not enough to survive summary judgment. Plaintiffs' subjective beliefs as to relative qualifications are insufficient to create an inference of pretext.

In Arthur's deposition, it was established that Arthur worked as a Raw Material Quality Assurance ("RMQA") tester, which paid *less* than the position of Product Analyst at IP.  (See Smart Papers' Exhibit 3 (Wage Rates.))  Although Smart Papers paid a lower wage for all hourly jobs that previously existed at IP, it retained the relative difference in the wage rates between the RMQA Tester and the Product Analyst positions, and offered Arthur the *higher-paying* Product Analyst position in February 2001.  (Arthur Dep. at 30.)  As such, Smart Papers offered Arthur a position with *a*

---

11/    Begley also alleges that he was treated differently on account of his age because several younger department relief personnel allegedly received a higher wage than Begley.  When asked in his deposition for the identity of these individuals who allegedly received this higher wage rate, Begley stated he could not recall their names or even what they looked like.  (Begley Dep. at 84.)  Such unsubstantiated comments that cannot be verified are insufficient to support his claim.

*higher wage rate* than he would have received if he had been offered a RMQA tester position with Smart Papers.

Arthur testified in his deposition that he believed that he could not perform the Product Analyst job and thus turned it down, even though he admitted that with training he could do the job. (Arthur Dep. at 54.) Significantly, however, Arthur never told anyone at Smart Papers about his concerns over his qualifications before rejecting the Product Analyst offer, nor asked Smart Papers to place him as an RMQA tester. (Arthur Dep. at 26-27.)

Plaintiffs nevertheless contend in their brief that Smart Papers discriminated against Arthur by giving "preferential treatment" to a "substantially younger, less qualified" individual. (Opp. to SP at 70.) According to Plaintiffs in their opposition brief, Dale Williams, age 46, worked with Arthur as the second of IP's two RMQA testers and, like Arthur, was offered a higher-level position with Smart Papers, but Williams was offered the position of Instrument Service Technician. (Id.) Contrary to Arthur's contention, however, the position Williams received paid the same wage rate as the position offered Arthur. [12/] Moreover, given Arthur's reservation about his lack of qualifications for the job he was offered, and his failure to provide any evidence that he was more qualified for the position that was offered Williams, there simply is no evidence to support his claim of age discrimination. The indisputable evidence confirms that Smart Papers offered Arthur a higher-paying job. Arthur cannot show that Smart Papers' offer constitutes age discrimination.

---

[12/]    In Plaintiffs' opposition brief, which is not sworn testimony, Plaintiffs assert, wholly without support, that Williams' position paid $ 3.00 an hour more than the position Arthur was offered. (Opp. to SP 70). During discovery, Plaintiff Rumpler produced a wage comparison chart reflecting the differences in wages between IP and Smart Papers. This document, which was marked as Exhibit 8 of Rumpler's deposition, clearly shows that the position Williams was offered paid the same wage rate as the position offered Arthur. (See Smart Papers' Exhibit 3 (Wage Rates).)

### 5.    Floyd Geeding

It is undisputed that Smart Papers offered Plaintiff Geeding a position with the Company as a Mixer Operator and that he declined that offer.  (See SP Appendix at Tab 28.)  Geeding nonetheless contends that Smart Papers discriminated against him on the basis of age because he was offered a production job rather than the training job he had previously held with IP at the time of the Mill's sale.  Because Geeding points to no evidence that Smart Papers based its decision to place Geeding in an operations job on account of his age, his claim should be rejected.

At the time that Smart Papers acquired the Mill, Geeding, who was then age 55, was one of seven trainers employed by IP.  Smart Papers extended offers to four of these trainers, who ranged in age from age 46 to age 52.  (See SP Appendix at Tab 28.)  It is undisputed that Smart Papers, when it made its decision to not offer Geeding a training position, relied on the negative reference it received from Geeding's former IP supervisor, who had commented among other things that Geeding's team members had to carry him, and that Geeding was not highly respected in his group.  (See SP Appendix at Tab 28.)

Geeding's former supervisor, however, did recommend Geeding for an operations job.  (Id.)  Based on the comments Smart Papers' received, it thus offered Geeding a position in a department he previously had worked.  (Id.)  Geeding offers no evidence that Smart Papers took anything but his former supervisor's comments into account when it made its offer of employment to him, and he cannot show pretext by merely expressing dissatisfaction with the job and its interference with his personal life.

### 6.    Sonja Greene

Greene (age 49 in Feb. 2001) testified, under oath, that the only job that she would accept at Smart Papers was the Finishing Clerk position. (Greene Dep. at 104: "Q: Is finishing clerk the only position you wanted at Smart Papers? A: Yes.")  Greene also stated that she believes that Smart Papers hired someone "approximately ten years younger" to fill the position she wanted.  (Id. at 51.)  The undisputed evidence shows that Nancy Etter, the individual Greene claims is ten years younger, is in fact only three years younger than Greene.  (See Smart Papers' initial brief at 40.)

Faced with this reality, Plaintiffs now argue in their opposition brief that Wanda Tyree, age 37, was assigned the Sheeter Operator position instead of Greene and that this constitutes age discrimination.  (Opp. to SP at 73.)  Greene admitted in her deposition, however, that Tyree had been performing the Sheeter Operator job more recently than Greene had.  (Greene Dep. at 73-74.)  In addition, as explained in detail in the SP Appendix, Tab 31, to Smart Papers' motion for summary judgment, Smart Papers hired four Sheeter Operators who were older than Greene, four who were 1-3 years younger than Greene, and only one applicant, Tyree, who was under the age of 40.  Accordingly, whether Greene wanted the Finishing Clerk position (as she swore to in her deposition) or whether she wanted the Sheeter Operator position (as Plaintiffs now assert in their opposition brief), age played no role in the decision to hire Greene and place her into an open position for which she was qualified.

### 7.    William Rumpler

Rumpler (age 50 in February 2001) stated under oath in his deposition that he is claiming age discrimination because Smart Papers hired him, preventing him from obtaining severance from IP.  (See Smart Papers Appendix Tab 60; Smart Papers' initial

brief at 39.)  Rumpler testified that "Yeah, I wanted my severance. I wanted out of there. "Id.  In their opposition brief, Plaintiffs argue that Smart Papers discriminated against Rumpler by assigning him the position of *Assistant* Packing Specialist.  (See Opp. to SP at 74-75.)  As detailed in SP Appendix Volume III, Tab 60, the undisputed evidence shows that four individuals were offered the position of Packing Specialist – one was ten years older, one was seven years older, one was one year younger and one was four years younger than Rumpler.  It is also undisputed that Smart Papers promoted Rumpler into the exact position that he wanted (Packing Specialist) within three months of his being offered a position with Smart Papers  (Id.)  Rumpler continues to work in that position today.  (Id.)  Based on these facts, Rumpler cannot survive summary judgment.

### 8.  Richard Hess

It is undisputed that Plaintiff Richard Hess was offered a higher-level job with Smart Papers than the one he previously had held with IP at the time of the sale, and that he accepted it.  (See SP Appendix at Tab 36.)  It also is undisputed that Smart Papers, after Hess accepted employment, promoted him to an even higher-level position seven months later.  (See SP Appendix at Tab 36; Hess Dep. at 75-76.)  Nonetheless, Plaintiffs assert in their opposition brief that Smart Papers has discriminated against Hess on account of his age by not offering him the job "he expected to receive" when Smart Papers acquired the Mill.  (Opp. to SP at 75.)  The mere fact that Hess did not receive the job he "expected," yet did receive a higher-level job than he previously had held, demonstrates that Smart Papers *did not* discriminate against him on the basis of age.

Hess testified in his deposition that due to operational cutbacks imposed by IP in 2000, and the seniority provisions of the collective bargaining agreement at the Mill, Hess had been bumped down by IP to the lowest position in his department, department

relief, at the time of the sale to Smart Papers.[13] (See SP Appendix at Tab 36.) Despite these pre-existing cut-backs, and Smart Papers' own plans to curtail production further in his department, Smart Papers offered Hess a higher-level position, Assistant Winder Operator, than the one he had held with IP. (Id.) Hess further admitted in his deposition that the move from department relief to Assistant Winder Operator was in fact a promotion. (Id.; Hess Dep. at 67, 72.)

Nonetheless, Plaintiffs in their opposition brief now claim that Smart Papers discriminated against Hess by allegedly placing several "younger, less qualified" individuals in jobs he should have received. (Opp. to SP at 75-76.) The section of Plaintiffs' opposition that addresses Hess's claim, however, is riddled with typographical errors, at times referring to Hess as Plaintiff Greene and at times referring to him as Plaintiff Campbell. Thus, it is not clear that the individuals Hess allegedly identifies as having received "preferential treatment" actually should be compared to Hess or other Plaintiffs.[14] (See, e.g., Opp. to SP at 76) (alleging that Campbell, not Hess, was substantially more qualified than "these three workers, especially Fore.")

This confusion, however, which stems solely from Plaintiffs' own sloppiness, is immaterial, for Hess admitted in his deposition that, with the exception of one individual, *every* former IP employee in his department who received a higher-level position than Hess was approximately his age (49) or older:

---

[13] The progression of jobs in Hess's department runs from the lowest-level position of department relief, up through the Assistant Winder Operator position, the Winder Operator position, and the Back Tender position, before culminating in the Machine Tender position. (Hess Dep. at 63-64.)

[14] This uncertainty is compounded by the fact that, despite being asked in his deposition, Hess never mentioned the individuals now listed in Plaintiffs' Opposition. (See Hess Dep. at 46-47.)

| Name | Age | Position |
|------|-----|----------|
| Halcomb, Brian | 50 | Machine Tender |
| Sweeney, Bill | 52 | Machine Tender |
| Von stein, Ed | 59 | Machine Tender |
| Cheek, Terry | 53 | Backtender |
| Cox, Gary | 50 | Backtender |
| Pigg, John | 49 | Backtender |
| Bowling, Walter | 47 | Winder Operator |
| Feltner, Les | 49 | Winder Operator |
| Roberts, Curtis | 50 | Winder Operator |
| Steward, Dan | 40 | Winder Operator |

(Hess Dep. at 73-75.)  This undisputed evidence defeats any allegation that Hess was treated differently on account of his age.

## **CONCLUSION**

For all of the foregoing reasons and the reasons set forth in Smart Papers' initial brief, the SP Appendices, and supporting materials, Smart Papers respectfully submits that its Motion for Summary Judgment should be granted in its entirety.

Respectfully Submitted,

s/_Robert J. Hollingsworth by Stanley F.
Lechner per telephone authorization

Robert J. Hollingsworth (0024559)
Trial Attorney
CORS & BASSETT, LLC
537 East Pete Rose Way
Suite 400
Cincinnati, Ohio 45202
Telephone: 513.852.8200
Facsimile:  513.852.8222

Stanley F. Lechner
Margery Sinder Friedman
Laine S. Posel
Of Counsel
MORGAN, LEWIS & BOCKIUS, LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC  20004
Telephone:  202.739.3000
Facsimile:   202.739.3001

Counsel for Defendant
Smart Papers, LLC

Dated: November 21, 2003

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing Defendant Smart Papers' Reply Brief to Plaintiffs' Consolidated Memorandum In Opposition To Smart Papers' Motion For Summary Judgment with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Randolph H. Freking, Esq.
George M. Reul, Jr., Esq.
Freking & Betz
215 East 9th Street, 5th Floor
Cincinnati, OH  45202

 Michael A. Roberts, Esq.
Graydon Head & Ritchey LLP
1900 53rd Center
511 Walnut Street
Cincinnati, OH  45202

and I hereby certify that I have sent this document by First Class Mail, postage prepaid, on this 21st day of November, 2003, to the following non CM/ECF participants:

Counsel for Defendant International Paper Company:

W. Carter Younger, Esq.
Vincent Miraglia, Esq.
McGuire Woods LLP
1050 Connecticut Avenue, N.W.
Suite 1200
Washington, DC  20036

s/_____Laine S. Posel_____
Laine S. Posel