**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Elmer Campbell,                )
<u>et al.</u>,                      )
                               )
            Plaintiffs,        ) Case No. 1:01-CV-527
                               )
      vs.                      )
                               )
International Paper             )
Company, <u>et al.</u>,             )
                               )
            Defendants.        )

<u>O R D E R</u>

        This matter is before the Court on motions for summary

judgment filed by Defendants Sun Capital Partners, Inc. (Doc. No.

103) and Smart Papers, LLC (Doc. No. 105).  For the reasons set

forth below, both motions are well-taken and are **GRANTED**.

I. <u>Background</u>

A. <u>Procedural History</u>

        This lawsuit arises out of International Paper

Company's sale of the B Street Mill in Hamilton to Defendant

Smart Papers LLC in February 2001.  Plaintiffs in this case are

72 former hourly employees of International Paper Company.

Sixty-four of the Plaintiffs did not receive offers of employment

from Smart Papers when Smart Papers began operating the mill.

Eight of the Plaintiffs received offers of employment from Smart

Papers but claim that Smart Papers gave the jobs they wanted to

substantially younger persons.

Plaintiffs filed suit against International Paper Company, Smart Papers LLC, and Sun Capital Partners, Inc., Smart Papers' parent corporation, asserting the following causes of action:

Count I asserts claims under the Age Discrimination in Employment Act ("the ADEA"), 29 U.S.C. § 621, et seq., on behalf of sixty-six of the Plaintiffs.  This Count alleges that Defendants violated the ADEA by not hiring them because of their age.

Count II also asserts claims under the ADEA on behalf of six of the Plaintiffs.  This Count is captioned as a constructive discharge/demotion claim, but, as interpreted by the Court, Plaintiffs allege that while they were offered jobs with Smart Papers, they were offered lesser positions than those they held with International Paper and that substantially younger persons got the jobs they were seeking.

Count III asserts age discrimination claims under the Ohio Civil Rights Act, Ohio Rev. Code Chapter 4112, on behalf of the sixty-six Plaintiffs mentioned in Count I.

Count IV asserts the constructive discharge/demotion claim of Count II under the Ohio Civil Rights Act.

Count V alleges that Smart Paper and Sun Capital violated ERISA, 29 U.S.C. § 1140, by not hiring Plaintiffs in

2

order to prevent them from becoming participants in various employee benefits plans.

Count VI alleges that International Paper violated the Worker Adjustment and Retraining Notification Act ("WARN"), 29 U.S.C. § 2102(a), by not giving Plaintiffs 60 days notice of the closing of the Mill.

Counts VII and VIII assert disability discrimination claims under the Americans With Disabilities Act ("the ADA"), 42 U.S.C. 12101, et seq., and the Ohio Civil Rights Act, respectively, on behalf of twelve of the Plaintiffs.  These Counts allege that Plaintiffs were discriminated against because of their disabilities and treated differently from non-disabled employees.

Count IX asserts a state law defamation claim.  This Count alleges that International Paper made disparaging remarks about Plaintiffs to Smart Paper and Sun Capital, such as they were "excess baggage."  Plaintiffs apparently believe that these remarks played a part in Smart Papers' decision not to hire them to work in the Mill.

Finally, Count X alleges that Defendants violated Ohio public policy by discriminating against them on the basis of age and disability.

On motions to dismiss filed by the Defendants, the Court dismissed the ERISA claims in Count V and the public policy

3

violation claims in Count X.  <u>See</u> Doc. No. 64.  The case then
proceeded through discovery on the remaining claims.  In
September 2003, Defendants filed motions for summary judgment on
the remaining claims.  In response to the motions for summary
judgment, Plaintiffs conceded that there was no evidence that
Smart Papers defamed them or discriminated against them on the
basis of disability.  <u>See</u> Doc. No. 114, at 1.  Counsel for
Plaintiffs further conceded that summary judgment in favor of
Smart Papers and against six Plaintiffs who failed to appear at
their scheduled depositions is appropriate.  Plaintiffs also
conceded that there is no evidence that International Paper
discriminated against them on the basis of age or disability.
<u>See</u> Doc. No. 113, at 2 n.2.  Certain of the Plaintiffs also
conceded that there was no evidence that International Paper had
defamed them.  <u>Id.</u> at 2 n.1.

     Plaintiffs later reached a settlement agreement with
International Paper Company on their WARN Act and defamation
claims and recently moved to voluntarily dismiss those claims
with prejudice.  <u>See</u> Doc. No. 132.  Thus, the only claims
remaining in this case are Plaintiffs' age discrimination claims
versus Smart Papers and Sun Capital.[1]

---

    [1]    Because Plaintiffs concede there is no evidence of
defamation by Smart Papers and Sun Capital, Defendants' motions
for summary judgment on the defamation claims are well-taken and
are **GRANTED**.  Similarly, because Plaintiffs conceded there is no
evidence that Smart Papers and Sun Capital discriminated against

B. <u>Factual Background</u>

1. <u>The B Street Mill</u>

Champion International Corporation ("Champion") built the B Street Mill in 1894 and operated it continuously until 2000. Champion used the Mill to manufacture premium cast-coated and uncoated papers. Once profitable, economic downturns within the paper industry made operating the Mill a losing proposition. In June 2000, International Paper Company acquired all the assets of Champion, including the B Street Mill. Although International Paper is and was the largest paper company in the United States, the Mill continued to sustain operating losses of over $1 million per month. The Mill's prospects were apparently so dismal that after only seven months of ownership and operation, International Paper reached an agreement to sell the Mill to Smart Papers LLC. <u>See</u> Doc. No. 105, Ex. 1, Maheu Aff. ¶¶ 4-7.

2. <u>Smart Papers LLC and Sun Capital Partners, Inc.</u>

Sun Capital Partners, Inc. ("Sun Capital") is a Florida investment firm. Sun Capital is affiliated with companies who in turn make their own investments and acquisitions. One of Sun

certain of the Plaintiffs on the basis of disability, Defendants' motions for summary judgment on Plaintiffs' disability discrimination claims are well-taken and are **GRANTED.** Finally, counsel for Plaintiffs concedes that summary judgment against Plaintiffs Fisher, Gumm, Jackson, Parsley, Ratliff, and Whitaker is appropriate for failure to appear at their scheduled depositions. Accordingly, Defendants' motions for summary judgment as to the claims of these Plaintiffs are well-taken and are **GRANTED.** All of these claims are **DISMISSED WITH PREJUDICE.**

Capital's affiliates is Sun Premium Paper Partners ("Sun
Premium").  Sun Premium owns Smart Papers LLC.  Smart Papers LLC
was formed solely for the purpose of acquiring and operating the
B Street Mill.  See id. Ex. 3, Couch Aff. ¶¶ 5-8.

### 3. The Sale of the Mill to Smart Papers

Daniel Maheu came to the Mill in 1992 charged with the
task of turning it into a profitable business.  Despite
implementing a number of changes in the Mill's operations and
structure, it continued to underperform expectations.  At about
the time International Paper and Smart Papers reached an
agreement in principle to sell the Mill, Smart Papers approached
Maheu about becoming a paid consultant for Smart Papers.  After
signing on with Smart Papers, Maheu's primary task was hiring an
initial workforce and establishing the terms and conditions of
employment.  Maheu Aff. ¶¶ 6-8.

International Paper had been operating the Mill with a
workforce of about 800 employees.  Maheu believed, however, that
the Mill could be operated successfully with as few as 600
employees.  In addition, Maheu determined that in order to run
the Mill profitably, wages would have to be cut by as much as
20%.  Under the terms of the sale agreement, all International
Paper employees would be terminated on the closing date, which
was February 9, 2001.  The former International Paper employees
were then required to apply for employment with Smart Papers in

order to stay on at the Mill.  Maheu's goal was to hire 350 to 450 hourly employees and approximately 150 salaried employees. Id. ¶¶ 9-10, 13.

### 4. The Interview Process

In January 2001, Smart Papers retained The Weissman Group to serve as its acting human resources department and to develop a plan for interviewing, evaluating, and hiring the initial workforce.  Doc. No. 105, Ex. 2, Weissman Aff. ¶ 3. Under the plan that was developed for the hiring of hourly employees, Smart Papers conducted interviews with former managers and supervisors of International Paper and obtained their evaluations of each applicant.

These managers and supervisors also completed a form entitled "Applicant Reference Check" in which they graded each applicant in the categories of willingness and ability to learn, excellence oriented, productivity, dependability, team player, and safety awareness.  The form then asked the respondent to recommend whether the candidate should be hired.  In some cases, the respondent assigned a color code, either green, yellow, or red, to the recommendation.  Green was a positive recommendation, red was a negative recommendation, and yellow indicated the candidate was possibly acceptable.  Weissman Group employees then conducted a marathon series of short interviews with each applicant and graded each applicant in the same six categories.

Finally, the interviewer assigned the applicant the same green, red, or yellow color code.  Accordingly to Weissman, in determining the final recommendation to give to an applicant, the reference forms submitted by International Paper carried more weight than the interview scores.  Weissman Dep. at 165-66.  The interview score was not an automatic disqualifier, but a poor reference from International Paper could result in disqualification.  Id. at 166.

Applicants were not applying for particular positions. Rather, once the initial workforce was hired, Smart Papers placed the applicants into their particular positions.  Maheu testified that he hired only those applicants to whom The Weissman Group gave a favorable recommendation.  Maheu Dep. at 40.  Maheu extended job offers to all applicants whom The Weissman Group rated green or yellow.  Id. at 53.  Applicants who received a red recommendation were not eligible for employment.  Id. at 53-56.

Applicants were also required to take and pass a drug test to be considered for employment.  Failing the drug test meant automatic disqualification for employment.  Weissman Dep. at 133-34.  Smart Papers used hair sample testing to screen for drugs.  Fifty-six of the applicants, including eighteen of the Plaintiffs in this case, tested positive for marijuana or cocaine and were rejected for employment.  Maheu Aff. ¶ 12.

8

There were 568 applicants for hourly positions at the Mill, of whom Maheu hired 410. Of the 568 applicants, 522 (91.9%) were age 40 or over. Of the 410 applicants Maheu actually hired, 379 (92.4%) were age 40 or over. Maheu Aff. ¶ 11.

### 5. The Plaintiffs

As stated earlier, Plaintiffs in this case claim that Smart Papers rejected them for employment at the Mill or otherwise discriminated against them on the basis of age. Most of the Plaintiffs claim that Smart Papers discriminated against them on the basis of age by not hiring them. Eight of the Plaintiffs, in claims they persist in calling constructive discharge claims even though Smart Papers offered them jobs, allege that Smart Papers discriminated against them on the basis of age by giving more desirable positions to substantially younger persons.

As indicated above, eighteen of the Plaintiffs[2] failed drug tests and were not offered positions. Of these Plaintiffs, thirteen of them would have received positive recommendations for hire but for failing the drug test. See Doc. No. 105, Individual Plaintiffs' Appendix. Each of the remaining forty-six Plaintiffs

---

[2]     Blevins, Clear, Gentry, Gill, Gregory, Jackson, Johnson, Lakes, Marsee, Miller, Pennington, Ratliff, Rodgers, Spada, Tolbert, Turley, Whitaker, and Wilkins.

who did not receive offers of employment from Smart Papers
received overall ratings of "red" from The Weissman Group.  Id.

### 6. The Present Motions

Smart Papers and Sun Capital each move for summary
judgment on Plaintiffs' remaining claims of age discrimination.
Sun Capital's liability, if it exists at all, is derivative of
Smart Papers' liability for age discrimination.  Therefore, the
Court's analysis shall initially concentrate on Smart Papers'
motion.

Smart Papers contends that summary judgment in its
favor is appropriate as to the Plaintiffs who did not receive job
offers because the record shows that they were rejected for
employment either because they received negative recommendations
from The Weissman Group or because they failed their drug tests.
Smart Papers argues that summary judgment in its favor is
appropriate as to the remaining eight Plaintiffs because they
either received higher paying jobs than the jobs they actually
wanted, wanted severance pay from International Paper instead of
a job from Smart Papers,[3] or were actually promoted to higher
paying positions soon after being hired.  Smart Papers also

---

[3]    Under the terms of a severance payment program offered
by International Paper, which is not at issue here but was the
subject of other litigation before the Court, former employees
who did not receive job offers from Smart Papers were eligible
for severance benefits.  Former employees who did receive job
offers from Smart Papers were not eligible for severance
benefits.

argues that the record shows that it also hired applicants as old
or older than Plaintiffs for the positions they wanted, thus
demonstrating that age was not a determining factor in its
placement decisions.

In opposition, Plaintiffs argue that Smart Papers'
reasons for not hiring them are but pretexts for age
discrimination because the reasons were insufficient to motivate
Smart Papers' hiring decisions.  Plaintiffs claim they were
unfairly stereotyped as being inflexible and unwilling to learn.
Plaintiffs further argue that failing the drug test was an
insufficient reason not to hire them because Smart Papers later
hired many applicants with prior criminal histories, including
applicants with substance abuse offenses.  Plaintiffs also
contend that hair sample testing is an unreliable method to
detect drug use.  Plaintiffs contend that pretext is shown
because Smart Papers disregarded their years of experience at the
Mill and later hired many younger off-the-street applicants with
little or no experience in the paper industry.  Plaintiffs
further allege that pretext is shown because Smart Papers
surreptitiously collected age data on all of its applicants.
Finally, Plaintiffs also argue that age discrimination is
demonstrated because the average age of the workforce dropped
dramatically in the year following Smart Papers' purchase of the
Mill.

The motions for summary judgment are now fully briefed and ready for disposition.

## II. Summary Judgment Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The evidence presented on a motion for summary judgment is construed in the light most favorable to the non-moving party, who is given the benefit of all favorable inferences that can be drawn therefrom. United States v. Diebold, Inc., 369 U.S. 654 (1962). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)(emphasis in original). The Court will not grant summary judgment unless it is clear that a trial is unnecessary. The threshold inquiry to determine whether there is a need for trial is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250. There is no issue for trial

unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.  Id.

The fact that the weight of the evidence favors the moving party does not authorize a court to grant summary judgment.  Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 472 (1962).  "[T]he issue of material fact required by Rule 56(c) . . . to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or a judge to resolve the parties' differing versions of the truth at trial."  First National Bank v. Cities Service Co., 391 U.S. 253, 288-89 (1968).

Moreover, although summary judgment must be used with extreme caution since it operates to deny a litigant his day in court, Smith v. Hudson, 600 F.2d 60, 63 (6th Cir.), cert. dismissed, 444 U.S. 986 (1979), the United States Supreme Court has stated that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'"  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).  According to the Supreme Court, the standard for granting summary judgment mirrors the standard for a

directed verdict, and thus summary judgment is appropriate if the moving party establishes that there is insufficient evidence favoring the non-moving party for a jury to return a verdict for that party.  Id. at 323; Anderson, 477 U.S. at 250.

Accordingly, summary judgment is clearly proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.  Significantly, the Supreme Court also instructs that the "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion" against a party who fails to make that showing with significantly probative evidence.  Id.; Anderson, 477 U.S. at 250.  Rule 56(e) requires the non-moving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial."  Id.

Further, there is no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or similar materials negating the opponent's claim.  Id.  Rule 56(a) and (b) provide that parties may move for summary judgment "with or without supporting affidavits."  Accordingly, where the non-moving party will bear the burden of proof at trial on a dispositive issue, summary judgment may be appropriate based

solely on the pleadings, depositions, answers to interrogatories, and admissions on file.

### III. Analysis

Before starting the analysis, the Court observes that claims of age discrimination under the Ohio Civil Rights Act are subject to the same evidentiary standards as claims arising under the ADEA. Therefore, the Court may analyze Plaintiffs' federal and state statutory claim concurrently. Fisher v. Lincoln Electric Co., 285 F.3d 456, 469 (6th Cir. 2002).

A plaintiff may establish a prima facie case of age discrimination either through direct evidence or circumstantial evidence. Manzer v. Diamond Shamrock Chem. Co., 29 F.3d 1078, 1081 (6th Cir. 1994). If the plaintiff presents direct evidence that the employer discriminated against him or her on the basis of age, the burden of production shifts to the employer who then must show that it would have taken the same action even without the discriminatory motivation. Id.

In the absence of direct evidence of discrimination, the plaintiff may establish a prima facie case of discrimination through the familiar McDonnell Douglas burden shifting framework. Id. Under this method, the plaintiff establishes a prima facie case of discrimination by showing: 1) he or she is a member of a protected class; 2) he or she suffered an adverse employment action; 3) he or she was qualified for the job lost or not gained; and 4) that a person substantially younger than the

15

plaintiff replaced or was selected over him or her, or that the
position remained open while the employer sought other
applicants. O'Connor v. Consolidated Coin Caterers Corp., 517
U.S. 308, 313 (1996); Monette v. Electronic Data Sys. Corp., 90
F.3d 1173, 1186 n.12 (6th Cir. 1996); Cooley v. Carmike Cinemas,
Inc., 25 F.3d 1325, 1329 (6th Cir. 1994).  A plaintiff may also
satisfy the last part of the McDonnell Douglas test by showing
that the defendant treated similarly situated non-protected
persons more favorably than the plaintiff.  Talley v. Bravo
Pitino Restaurant, Ltd., 61 F.3d 1241, 1246 (6th Cir. 1995).
Once the plaintiff establishes a prima facie case of
discrimination, the burden of production shifts to the defendant
to proffer legitimate non-discriminatory reasons for its actions.
Manzer, 29 F.3d at 1082.

        If the defendant meets its burden of production, the
burden shifts back to the plaintiff to show that the reasons
proffered by the defendant are pretextual.  Id.  However, the
burden of persuasion remains with the plaintiff at all times.
St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993).

        The plaintiff may prove pretext in three ways:  1) by
showing that the defendant's reasons had no basis in fact; 2) by
showing that the reasons did not actually motivate the defendant;
or, 3) by showing that the proffered reasons were not sufficient
to warrant the action taken.  Kline v. Tennessee Valley

16

Authority, 128 F.3d 337, 346 (6th Cir. 1997).  When the plaintiff proves pretext by the first or third methods, the fact finder may infer discrimination and the plaintiff need not produce any additional evidence of discrimination.  Id.  In the second situation, the factual basis for the discharge is not challenged; therefore, the plaintiff must adduce additional evidence of discrimination in order to prevail.  Id. at 346-47.

      In this case, there is no direct evidence, such as disparaging or derogatory comments by persons involved in the hiring process, that Smart Papers discriminated against Plaintiffs on the basis of age.  Therefore, the case proceeds through the McDonnell Douglas circumstantial evidence analysis.

      For purposes of the present motions, the Court will assume that each Plaintiff can establish a prima facie case that Smart Papers discriminated against him or her on the basis of age.  For those Plaintiffs to whom Smart Papers did not extend job offers, Smart Papers has proffered a legitimate non-discriminatory reason for not hiring that Plaintiff.  Rejecting an applicant for failing a drug test is a legitimate, non-discriminatory employment action.  Shiplett v. National R.R. Passenger Corp., No. 97-2056, 1999 WL 435169, at **10 n. 2 (6th Cir. June 17, 1999).  Likewise, rejecting the Plaintiffs on the basis of negative employment references from both International Paper and The Weissman Group is a legitimate, non-discriminatory

17

action.  Hill v. Metropolitan Gov't of Nashville, 54 Fed. Appx.
199, 201 (6th Cir. 2002).  The evidence and arguments proffered
by Plaintiffs, however, are insufficient to create an issue of
material fact on the issue of pretext.  Accordingly, summary
judgment in Smart Papers' favor with respect to the claims of
these Plaintiffs is appropriate.  Furthermore, Plaintiffs who
actually received job offers from Smart Papers have no evidence
that Smart Papers discriminated against them because of their
age.  Therefore, summary judgment against these claimants is
appropriate as well.

### A. The Failed Drug Tests

Plaintiffs argue that disqualifying them from
consideration for employment because of their failed drug tests
is a pretext for discrimination because Smart Papers later hired
younger applicants with prior criminal offenses, including
numerous applicants with prior convictions for driving under the
influence and one applicant who had a prior conviction for
marijuana possession.  Plaintiffs also point out that one
applicant had a prior conviction for manslaughter.

Whether or not these applicants engaged in prior
conduct which is worse than Plaintiffs' current drug usage is not
relevant to the issue of pretext.  The disqualifying factor at
issue was a positive drug screen.  As Smart Papers points out in
its brief, there were fifty-six applicants from International

Paper, ranging from age 38 to age 56, who failed their drug test. Smart Papers rejected every applicant who failed his or her drug test. <u>See</u> Doc. No. 105, Ex. 1, Maheu Aff. ¶ 12. Thus, Smart Papers treated all applicants from International Paper equally, regardless of age, with respect to failing the drug test. Moreover, subsequent applicants were also required to take and pass drug tests as a condition of employment, but there is no evidence that Smart Papers hired any substantially younger applicant who also failed his or her drug test. <u>See</u> Carpenter Dep. at 10; Hampton Dep. at 19-20. Thus, the record establishes that Smart Papers treated new job applicants the same as it did all of the other applicants, including Plaintiffs, with respect to the drug test requirement.

Finally, of the fourteen new applicants with prior criminal convictions identified by Plaintiff, three of them were within the protected class at the time of their hiring. <u>See</u> Plaint. Ex. 72.[4]  At age 54, Bowling was actually older than the average age of the Plaintiffs, which is 51.18. <u>See</u> Fifth Amended Complaint ¶¶ 10-81. At ages 48 and 47, respectively, Crane and Willsey were not substantially younger than the average age of the 72 individual Plaintiffs.[5]  Smart Papers also points out that

---

[4]    Fred Bowling was age 54. Barry Crane was age 48. James Willsey was 47.

[5]    In <u>Grosjean v. First Energy Corp.</u>, 349 F.3d 332 (6th Cir. 2003), the Sixth Circuit held that in an ADEA case, in the absence of direct evidence of discrimination, an age difference

it extended a job offer to Plaintiff Elmer Campbell, despite the
fact that he had a prior conviction for gross sexual imposition.
Campbell Dep. at 18-19.   In other words, Smart Papers treated
applicants within Plaintiffs' own age group equally as favorably
as it did substantially younger applicants with respect to prior
criminal convictions.   This clearly establishes that Smart Papers
did not use the drug test as a method to disqualify older
applicants from employment opportunities.

        Plaintiffs also challenge the reliability of using hair
samples to screen for drugs.   Plaintiffs claim that hair sample
testing is inaccurate because it does not show whether the
subject was impaired while on the job.   Plaintiffs further claim
that hair sample testing will net more women than men and more
African-Americans than Caucasians.   Plaintiffs also complain that
they were not afforded an opportunity to retest after they
failed.   These criticisms are all beside the point, however.   As
noted, Smart Papers treated each applicant, regardless of age,
the same with respect to the drug test - failure meant
disqualification.   There is no evidence that hair sample testing
is unfairly biased against older persons, which is the relevant
group (and not gender or race) for purposes of comparison.   Even
if there were false positives among the Plaintiffs, there is no
evidence that any applicant, much less substantially younger
ones, were given opportunities to retake the drug test.   It is

_____

of six years or less is not significant as a matter of law.   Id.

further irrelevant that hair sample testing does not show current drug usage or impairment on the job because the disqualifying factor was failing the test, and not whether any applicant was actually impaired on the job.

In short, it is not possible on this record for a reasonable person to infer that Smart Papers used drug testing to screen out older applicants. Accordingly, Smart Papers' motion for summary judgment with respect to the claims of those Plaintiffs who failed the drug test is well-taken and is **GRANTED**.

B. <u>Negative Reference Checks</u>

As indicated above, forty-six Plaintiffs received negative job references and as a consequence were not hired by Smart Papers. Although, as Smart Papers points out in its reply brief, Plaintiffs appear to admit that the negative job references cost them jobs with Smart Papers, Plaintiffs still contend that the negative references were not sufficient for Smart Papers to reject them.

As evidence of pretext, Plaintiffs claim that they were negatively stereotyped during the interview process as being inflexible and unwilling to learn. Plaintiffs point out, for whatever weight it carries, that The Weissman Group interviewers had no training in guarding against ageist stereotypes during interviews. Plaintiffs also argue that the negative job references are pretexts for discrimination because Smart Papers

did not obtain employment references from the new applicants it hired after taking over the Mill and because it hired many new applicants with little or no experience working in paper mills. Thus, Plaintiffs argue, Smart Papers preferred to hire younger applicants who were objectively less qualified than them. Plaintiffs also claim that Smart Papers' hiring procedures were part of a nefarious plan to reduce the age of its workforce. Plaintiffs also contend that Smart Papers collected age data from applicants when it had no legitmate need to do so. None of these contentions is borne out by the record, however.

As far as being stereotyped as being inflexible and unwilling to learn, even if Plaintiffs did receive below average marks in these areas, there is no evidence that flexibility and willingness to learn were weighted more heavily in the hiring calculus than the five remaining factors - excellence oriented, productivity, dependability, team player, and safety awareness. As Smart Papers points out in its pleadings, the same hiring criteria under which Plaintiffs were rejected resulted in applicants over the age of 40 being hired at a higher rate than applicants under the age of 40. See Doc. No. 105, Maheu Aff. ¶ 12 (showing that whereas Smart Papers hired 67.3% of the applicants age 39 and under, it hired 72.05% of the applicants over age 40 and over).

Moreover, the import of Plaintiffs' own evidence eludes them. Plaintiffs take pains to point out that the average age of the hourly employees at the Mill was 49.1 while under International Paper's ownership and that the average age of applicants not hired by Smart Papers was 49.0. See Plaint. Ex. 59. What Plaintiffs apparently fail to recognize is that if the average age of the hourly workers under International Paper was 49 and the average age of the applicants rejected was 49, then the average age of applicants actually hired must have been 49 as well.[6] In other words, Smart Papers' hiring procedures, even if they did grade each applicant on flexibility and willingness to learn, did not discriminatorily impact older workers.

In addition, while we are addressing the statistical data, Plaintiffs point out that the average age of the hourly workers under International Paper was 49 and that the average age of the new applicants hired by Smart Papers was 38.1. Plaintiffs also argue that after buying the Mill from International Paper, Smart Papers eliminated 148 workers in the protected class while adding 42 workers under age 40. See Doc. No. 114, at 39-40. Plaintiffs contend that this evidence shows that Smart Papers

---

[6]    There were 575 hourly employees under International Paper and 568 applicants for hourly positions with Smart Papers. See Plaint. Ex. 59; Maheu Aff. ¶ 11. Thus, because the sample group remained essentially the same size, the average age of the applicants hired by Smart Papers had to remain substantially the same.

acted to substantially reduce the number of older workers at the
Mill.  In actuality, this evidence carries little if any
probative weight.  Simply comparing the average age of the hourly
workers under International Paper to the average age of Smart
Papers' new hires proves nothing because, quite simply,
International Paper and Smart Papers are two different employers.
Furthermore, because Smart Papers planned to reduce the total
number of hourly workers when it took over the Mill, and because
the composition of the hourly workforce was predominately workers
over age 40, more employees within the protected class would
naturally lose their jobs as a consequence.  But, as the evidence
has shown, the workforce reduction was not unfairly directed at
older workers because the average age of the persons hired was
the same as the average age of the applicants rejected.

        Moreover, pointing out that the average age of new
hires was 38.1 shows very little because, as Smart Papers
observes, there is no information about the average age of the
total applicant pool.[7]  Furthermore, the raw numbers themselves
do not indicate why the total number of older workers was
reduced.  Again, however, Plaintiffs own evidence demonstrates
that Smart Papers did not embark on a course to rid itself of

---

        [7]    According to Smart Papers, while it hired 195 new
employees, i.e., persons who did not previously work for
International Paper, between February 9, 2001 and April 26, 2002,
it actually received over 800 new applications.  Doc. No. 124,
Ex. 1, Hampton Aff. ¶ 5.

older workers.  Plaintiffs' Exhibit 73 is a list of employees who
terminated employment from Smart Papers in the approximate one
period year after Smart Papers bought the Mill.  This exhibit
shows that 123 employees left Smart Papers' employ between
February 9, 2001 and April 26, 2002.  Of these employees, 67
(54.47%) were age 40 or over.  In other words, terminations were
distributed fairly equally between workers inside and outside of
the protected class.  Looking further into these numbers, Exhibit
73 reflects that of the 67 terminations in the plus-40 group, 54
(81%) of the employees terminated employment for presumably
voluntary reasons,[8] whereas 13 members (19%) of the plus-40 group
were terminated through direct employer action.[9]  Exhibit 73
further reflects that in the under-40 group who terminated
employment during this period, 44 employees (79%) left employment
for presumably voluntary reasons and 12 employees (21%) were
terminated through direct company action.  These figures show
that Smart Papers actively terminated as many employees outside
of the protected class as it did within the protected class.
These numbers clearly do not demonstrate a bias against older

---

[8]    On the exhibit, this group of employees has the
following notations regarding the reason for termination: no
reason given, retirement, at will, another job, dissatisfied,
personal reason, transfer to new file #, resigned, agreement, no
word, walked off job.

[9]    On the exhibit, this group of employees has the
following notations regarding the reason for termination: layoff,
performance, position eliminated, absenteeism, discharged,
insubordination.

workers.  Finally, the Court further notes that the average age

of the plus-40 group of employees who terminated employment was

49.8 years, which one would expect given that the average age of

the workforce when Smart Papers bought the Mill was 49.  That

figure further reflects, however, that Smart Papers did not

disproportionately eliminate employees at the high end of the age

group.

Plaintiffs also attempt to find pretext in the fact

that of the 195 new employees Smart Papers hired between February

9, 2001 and April 26, 2002, 113 were under age 40 and the average

age of the new hires was 38.1.  This approximately 60/40 split

between age groups, however, would not appear to be the kind of

gross disparity indicative of discriminatory hiring practices,

Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 308 (1977),

particularly in the absence of data concerning the demographics

of the relevant applicant pool.  Compare with Browning v. Rohm &

Haas Co., No. 98-6186, 1999 WL 1000884, at **4 (6th Cir. Oct. 29,

1999)(indicating that the fact that only 12.50% of new hires were

in the protected group in a two year period and only 17.28% of

new hires were in the protected group in a four year period not

evidence of age discrimination).  The Court notes further that

the average age of the plus-40 group of applicants Smart Papers

did hire was 46.69 years, only slightly below the average age of

the entire hourly workforce at the time Smart Papers began

operating the Mill.  This figure indicates that there was not a
bias towards hiring substantially younger employees within the
protected age group.  Taking into consideration the full impact
of all the terminations and all of the new hires from February
10, 2001 to April 26, 2002, the average age of the entire hourly
workforce dropped only slightly from 49 to 46.44.  The average
age of the hourly employees following these adjustments still
resulted in a population that was not substantially younger than
the average age of the Plaintiffs.  Again, contrary to
Plaintiffs' contention, these figures do not indicate a concerted
effort on the part of Smart Papers to create a younger workforce.

        Plaintiffs also claim that the reasons proffered by
Smart Papers are pretexts for discrimination because Smart Papers
collected age data on applicants for no legitimate reason.  This
argument is not supported by the facts or the law, however.  EEOC
regulations require employers to maintain date of birth records
on their employees.  29 C.F.R. § 1627.3 (2004).  Moreover, the
mere maintenance and development of age information, absent
direct evidence that it was used in making adverse employment
decisions, does not raise even a circumstantial inference of
discrimination.  Wilson v. Firestone Tire & Rubber Co., 932 F.2d
510, 514 (6th Cir. 1991); Bowman v. Firestone Tire & Rubber Co.,
724 F. Supp. 493, 506 (N.D.Ohio 1989).  There is no direct
evidence in this record that Smart Papers or The Weissman Group

collected any age data for the purpose of assisting in making hiring decisions.  Indeed, Mary Rita Weissman testified without contradiction that she did not request nor did she use any age data in making her hiring recommendations.  Weissman Dep. at 51.

Plaintiffs contend that pretext is demonstrated because Smart Papers did not conduct employment reference checks on the applicants it hired after February 9, 2001, although it did conduct employment reference checks on all applicants from International Paper Company.  This fact, however, raises no inference of age discrimination in the context of this case. Smart Papers uniformly applied an age-neutral set of criteria to all former International Paper employee-applicants.  It uniformly applied a different, but also age-neutral, set of criteria to all of the so-called "off-the street" applicants.[10]  The statistics just discussed indicate that Smart Papers' hiring practices, both before and after the change in criteria, did not disproportionately eliminate older employees from employment. Moreover, as Smart Papers argues, it had a legitimate reason for dropping the employment reference check for off-the-street applicants.  International Paper was a ready source of information regarding the likely performance of applicants from

---

[10]    In fact the record shows that the only difference in the hiring process for off-the-street applicants was that Smart Papers dropped the employment reference check.  Otherwise, the applicants were judged according to the same criteria as International Paper applicants.  Carpenter Dep. at 11-17.

the Mill which was not available for the off-the-street
applicants.  The decision not to conduct employment reference
checks for off-the-street applicants was not so unreasonable or
ridden with error that Smart Papers could not have honestly made
it.  Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 576-77
(6th Cir. 2003); Koval v. Dow Jones & Co., 86 Fed. Appx. 61, 70
n.10 (6th Cir. 2004).  Therefore, Smart Papers' decision not to
conduct employment reference checks for off-the-street applicants
does not create an issue of fact regarding pretext in the context
of this case.

     Finally, Plaintiffs argue that pretext is shown
because, despite their substantial collective years of experience
working at the Mill, Smart Papers preferred to hire 113 younger
applicants with little or no experience in the paper industry.
See Plaint. Ex. 60.  In other words, Plaintiffs argue, pretext is
shown because Smart Papers hired many substantially younger
employees who were objectively less qualified than them.  This
argument would carry some force if in fact simple years of
experience in the paper industry was the primary qualification
for employment with Smart Papers.  Compare with Carberry v.
Monarch Marking Sys., Inc., 30 Fed. Appx. 389, 393-94 (6th Cir.
2002)(pretext shown where plaintiff established that he was
objectively more qualified than candidate selected according to
employer's documented evaluative criteria).  In fact, as

29

indicated above, Smart Papers considered a variety of factors in its evaluation of both former International Paper employees and off-the-street applicants.  Thus, Smart Papers' apparent decision not to assign controlling weight to the applicant's experience within the paper industry is not evidence of pretext.

Plaintiffs' argument also rests on the mistaken notion that mere longevity is a proxy for an employee's worth to an organization.  See Sutherland v. Michigan Dept. of Treas., 344 F.3d 603, 617 (6th Cir. 2003)(pretext not shown; plaintiff's greater work experience did not make him more qualified than candidate selected by employer).  In fact, from sampling the evaluations of Plaintiffs' performance at the Mill provided by International Paper,[11] a reasonable conclusion to be drawn is that Plaintiffs' experience is an empty credential, even when compared to applicants with little or no experience in the paper industry.[12]

---

[11]    The Court observes that Plaintiffs have adopted a safety in numbers approach in which they compare their own collective years of experience at the Mill to the off-the-street applicants' relative inexperience in order to argue that they are more objectively qualified than the off-the-street applicants. Therefore, the Court believes it is fair to assess Plaintiffs' collective performance at the Mill, as reported to Smart Papers by International Paper.

[12]    The Individual Plaintiffs' Appendix submitted by Smart Papers, with appropriate cites to the record, includes the following comments regarding Plaintiffs' performance: "Doesn't move fast enough to get hurt." (Ex. 1); "Does the minimum required." (Ex. 4); "Tries to get out of work." (Ex. 6); "Just enough productivity to stay employed." (Ex. 7); "Poor in all categories." (Ex. 9); "Poor quality of work." (Ex. 10); "Does

The Court is further compelled to observe that Plaintiffs tell only half the story of their own evidence. To be sure, while Plaintiffs' Exhibit 60 shows that Smart Papers hired

---

minimum to keep his job." (Ex. 11); "Has some quality issues." (Ex. 12); "Isn't great at productivity." (Ex. 13); "Average quality." (Ex. 14); "He waits until others get started on work and then just follows along." (Ex. 16); "Finds things to stop us from speeding up." (Ex. 18); "Productivity is not there-slow worker." (Ex. 19); "Not a self-starter." (Ex. 20); "May intentionally slow the process so he doesn't have to work so hard." (Ex. 21); "Productivity very poor." (Ex. 22); "Problems, not dependable." (Ex. 23); "Do as little as he can to get by-nothing extra." (Ex. 24); "Doesn't like the good workers because they make him look bad." (Ex. 25); "Wastes time." (Ex. 26); "Takes short cut and frequently makes errors." (Ex. 27); "No matter what position he plays, it's low production." (Ex. 33); "Not real productive." (Ex. 34); "Lack of effort." (Ex. 35); "He's lazy-takes easy path." (Ex. 39); "Inconsistent-can be best and can detract." (Ex. 40); "Dependability problems." (Ex. 41); "Low quality." (Ex. 42); "Runs poor quality." (Ex. 45); "He is capable but doesn't want to work." (Ex. 46); "Doesn't do things on his own-no initiative." (Ex. 48); "Doesn't do job-poor productivity." (Ex. 50); "Does as little as necessary to get by. (Ex. 51); "Moves very slow." (Ex. 52); "Dependability-changes a little then go back to old habits." (Ex. 54); "Fair worker-not outstanding." (Ex. 55); "Not a good worker." (Ex. 58); "Below average." (Ex. 61); "Poor productivity-poor attitude." (Ex. 63); "Worst operator." (Ex. 64); "Lazy-rubs people wrong way." (Ex. 67); "Just enough to get by." (Ex. 68); "Fair productivity." (Ex. 71); "Has knowledge; uses it to make it difficult not easy." (Ex. 72).

Plaintiffs argue that the references from International Paper are inaccurate and that they were in fact good employees. Whether the references were accurate, however, is not relevant. The question is whether Smart Papers could have reasonably relied on them. Smith v. Chrysler Corp., 155 F.3d 799, 807-08 (6th Cir. 1998). Nothing in this record suggests that Smart Papers could not have reasonably relied on these references. Although the hiring process was undoubtedly rushed, Smart Papers' process resulted in applicants within the protected class being hired at a higher rate than younger applicants. To the extent that the process was flawed, it did not unfairly eliminate older applicants. Thus, under the circumstances of this case, Smart Papers' reliance on the references from International Paper was reasonable.

many younger workers with little or no paper industry experience, it also shows that of the 82 off-the-street applicants Smart Papers hired from within the protected class, 43 (52%) also had one year or less experience in the paper industry.  The Court further notes that the average age of these employees is 47.48, which is not substantially younger than the average age of the Plaintiffs, which is 51.80.  In actuality, Exhibit 60 shows that Smart Papers was not adverse to hiring older applicants with little or no experience in the paper industry and that lack of experience within the paper industry was not a disqualifying factor for all age groups.

In short, none of the evidence proffered by Plaintiffs leads to a reasonable inference that Smart Papers' reasons for not hiring them, the poor references from International Papers and The Weissman Group's recommendations, are but pretexts for age discrimination.  This is particularly true in light of the statistical data, which the Court has carefully analyzed, and which shows that Smart Papers' hiring practices did not screen out older applicants from employment at the Mill.  In fact, the Court believes that the record conclusively demonstrates that Smart Papers treated younger and older applicants equally with respect to employment opportunities at the Mill.

Accordingly, Smart Papers' motion for summary judgment with respect to the claims of these Plaintiffs is well-taken and is **GRANTED**.

## C. The Remaining Plaintiffs

Remaining are the claims of eight Plaintiffs (Elmer Campbell, Alfred Holland, Govan Begley, Raymond Arthur, Floyd Geeding, Sonja Greene, William Rumpler, and Richard Hess) who contend that Smart Papers discriminated against them on the basis of age even though it actually offered them jobs at the Mill.[13]

Smart Papers offered Plaintiff Elmer Campbell (age 60) a position as a pulper finisher, the position he was occupying when International Paper sold the Mill. Campbell rejected this offer. Campbell wanted a position as either a beater engineer or an assistant beater engineer. The record establishes, however, that Smart Papers hired one beater engineer (age 59) and one

---

[13] As noted, Plaintiffs continue to maintain that they were constructively discharged even though Smart Papers offered them jobs. This cannot be. A constructive discharge occurs when working conditions were so difficult or unpleasant that a reasonable person in the plaintiff's shoes would have felt compelled to resign. Yates v. Avco Corp., 819 F.2d 630, 636-37 (6th Cir. 1987). Some of these Plaintiffs rejected the jobs that Smart Papers offered to them; the other Plaintiffs actually accepted the offers from Smart Papers. One cannot resign from a job if one has decided not to work for the employer in the first instance. Conversely, if one has decided to work for an employer, then the conditions could not have been unbearably difficult or unpleasant to a reasonable person. As the Court has tried to explain before, these Plaintiffs are really complaining that Smart Papers did not offer them the jobs they wanted. Therefore, these Plaintiffs' claims are either failure to hire claims and/or disparate treatment claims and the Court will treat them as such.

assistant beater engineer (age 54) who were not substantially younger than Campbell as a matter of law.  Doc. No. 124, at 55. Smart Papers filled two other beater engineer positions with applicants (ages 52 and 53) who were only slight outside of the presumptively non-discriminatory age differential.  Id.  As Smart Papers correctly argues, the placement of applicants of substantially the same age as Campbell into the beater engineer positions he desired shows that age was not a factor in filling the these jobs.  Cf. Mereish v. Walker, 359 F.3d 330, 338 (4th Cir. 2004)(retention of twenty-one employees older than plaintiffs during reduction-in-force showed that employer not targeting positions staffed by older employees for elimination). Campbell has not adduced any evidence which suggests that Smart Papers denied him a position as a beater engineer or assistant beater engineer because of his age.  Consequently, granting summary judgment against Campbell on his age discrimination claims is appropriate.

There was no adverse employment action with respect to Plaintiff Raymond Arthur (age 62).  Smart Papers offered Arthur a position as a paper inspector rather than the raw material quality assurance tester position he held with International Paper.  Even though Smart Papers placed a younger employee in the position he held with International Paper, Arthur admitted that the job which he was offered paid more than his former position,

was not demeaning, was not more physically demanding than his old

job, and that his old job was not more desirable than the

position he was offered.  Arthur Dep. at 21-33; <u>Burlington Ind.</u>

<u>v. Ellerth</u>, 524 U.S. 742, 761 (1998)("A tangible employment

action constitutes a significant change in employment status,

such as hiring, firing, failing to promote, reassignment with

significantly different responsibilities, or a decision causing a

significant change in benefits.").  Arthur rejected the position

offered by Smart Papers because he subjectively believed that he

was not qualified to perform it.  <u>Id.</u> at 54.  There is no

evidence that Smart Papers would not have given Arthur training

adequate to allow him to perform this position.  There is simply

nothing to suggest that age discrimination played a part in Smart

Papers' job offer to Arthur.  Therefore, summary judgment against

Arthur on his age discrimination claims is appropriate.

Plaintiff Richard Hess (age 49) applied for a position

with Smart Papers as a machine tender, back tender or winder

operator.  Smart Papers offered and Hess accepted a position as

an assistant winder operator.  The assistant winder operator

position was actually a higher level position than the department

relief position Hess held with International Paper.  Hess

eventually did receive a promotion to winder operator.  Hess's

own deposition testimony establishes that Smart Papers filled the

three available machine tender operator positions with applicants

who were older than him.  Hess Dep. at 72.  Smart Papers also
filled the three available back tender positions with persons as
old or older than Hess.  Id. at 73.  Although one of the winder
operators hired by Smart Papers was younger than Hess (Dan
Steward, age 40), the remaining winder operators (Walter Bowling,
age 47, Les Feltner, age 49, Curtis Roberts 50) were older or not
substantially younger than Hess.  There is simply no evidence in
this record that Smart Papers' initial decision to place Hess as
an assistant winder operator was due to his age.  Accordingly,
summary judgment against Hess on his age discrimination claims is
appropriate.

        Smart Papers offered Plaintiff Alfred Holland a
position as a drum operator at a rate of $17 per hour, which was
a higher wage than the embosser operator position he wanted.
Holland Dep. at 43-44; Holland Dep. Ex. 3.  Holland had been a
drum operator with International Papers for a number of years,
but rejected Smart Papers' offer because of the heat and stress
involved in working in the drums.  In his deposition, Holland
complained that Smart Papers gave younger employees his former,
lower paying position.  On balance, Holland did not suffer an
adverse employment action.  Although the drum operator position
was more physically demanding than the embosser operator
position, it was also a higher paying job.  See Kocsis v. Multi-
Care Management, Inc., 97 F.3d 876, 885-87 (6th Cir. 1996)

36

(plaintiff's reassignment to a new position at same or greater
pay, with no other material changes in working conditions, not an
adverse employment action); <u>Mungin v. Katten, Muchin & Zavis</u>, 116
F.3d 1549, 1556 (D.C.Cir. 1997)("[C]hanges in assignments or
work-related duties do not ordinarily constitute adverse
employment decisions if unaccompanied by a decrease in salary or
work hour changes.").  The fact that the drum operator position
was more stressful did not make the offer to Holland an adverse
action.  <u>See</u> <u>Harlston v. McDonnell Douglas Corp</u>., 37 F.3d 379,
382 (8th Cir. 1994) (reassignment to a different position without
any reduction in title, salary, or benefits was not adverse
employment action although new position involved different duties
and was more stressful).  Therefore, Holland has failed to
establish a prime facie case of age discrimination.  Accordingly,
summary judgment against Holland on his age discrimination claims
is appropriate.

     Sonja Greene, age 49, cannot establish a prima facie
case of age discrimination.  Greene applied for a position as a
finishing area clerk or a secretary.  Smart Papers offered her a
position as an assistant sheeter operator.  However, the person
who received the position Greene wanted, Nancy Etter, at age 46,
was not substantially younger than Greene as a matter of law.
Moreover, as Smart Papers indicates in their brief, within weeks
of being hired, Greene was promoted to a higher paying clerical

position.  Greene Dep. at 42-55; Doc. No. 105, Ex. 4 ¶ 7.  In addition, although Greene identified one younger sheeter operator that Smart Papers hired, she also admitted that Smart Papers hired at least three other sheeter operators who were older than her or not substantially younger than her.  Greene Dep. at 73; 114-15; 144-45.  Clearly, Smart Papers did not use age as a criteria to fill the sheeter operator positions.  Nothing in the record suggests that Smart Papers discriminated against Greene because of her age.  Accordingly, summary judgment against Greene on her age discrimination claims is appropriate.

Smart Papers offered Plaintiff William Rumpler (age 50) a position as an assistant header operator.  Within four months of being hired, Smart Papers promoted Rumpler to header operator.  As Smart Papers correctly argues, Rumpler's primary complaint seems to be that because Smart Papers offered him a job, he was ineligible to collect a severance package from International Paper.  Rumpler Dep. at 57.  This complaint, however, is hardly the basis for a claim of age discrimination against Smart Papers.  Furthermore, the record demonstrates that none of the four persons Smart Papers hired into the position Rumpler wanted were substantially younger than him as a matter of law.  See Doc. No. 105, Individual Plaintiffs Appendix, Ex. 60.  Therefore, Rumpler has failed to establish a prima facie case of age discrimination.

Accordingly, summary judgment against Rumpler on his age discrimination claims is appropriate.

Although Floyd Geeding (age 55) held a position as a trainer with International Paper, Smart Papers offered him a position as a mixer operator.  Geeding, however, rejected this offer because it involved shift work.  Geeding Dep. at 55-56 Smart Papers states that it did not offer Geeding a training position because of negative comments from International Paper regarding his performance as a trainer.  See id. Ex. 28.  The record demonstrates that Smart Papers also placed two substantially younger former trainers, Fern Gadd (age 45) and Frances Spurlock (age 42) in hourly non-training positions as well.  Id.; Geeding Dep. at 88-89.  Therefore, Smart Papers did not treat Geeding worse than similarly-situated substantially younger employees.  Thus, Geeding fails to make out a prima facie case of age discrimination.  Furthermore, Geeding's own testimony establishes that Smart Papers hired at least one person not substantially younger than him, Berlin Standefer (age 50), as a trainer.  Id. at 82-83.  Geeding further admitted that one of the younger persons Smart Papers placed in a training position, Jerry Allen, had more training experience than him.  Id. at 66. Geeding also admitted that the other two younger trainers were qualified for the position.  Id. at 82.  In his brief, Geeding complains that Smart Papers hired several substantially younger

39

persons as blender operators instead of him.  Although he had
been a blender operator in the past, there is no suggestion in
Geeding's deposition that he was even interested in working as a
blender operator or that it somehow is a better job than the
mixer operator position.  In short, there is nothing in the
record to suggest that Smart Papers' decision not to offer
Geeding a position as a trainer had anything to do with his age.
Accordingly, granting summary judgment against Geeding on his age
discrimination claims is appropriate.

        Finally, there is no evidence that Smart Papers
discriminated against Plaintiff Govan Begley (age 59) because of
his age.  Smart Papers offered Begley a position working on the
inward/outward table instead of the head carton operator position
he held with International Paper.  Upon taking over the Mill,
Smart Papers reduced the number of head carton operators from
four to three and hired Carl Laney (age 56), Greg Laney (age 46),
and Jeff Kittner (age 46) to fill those positions.  Doc. No. 105,
Individual Plaintiffs Appendix, Ex. 5.  Again, the fact that
Smart Papers filled one of the three positions with a person not
substantially younger than Begley (Carl Laney) shows that age did
not play a roll in Smart Papers' selection process.  Moreover,
Begley also admitted that each of these applicants was as
qualified as him to perform the head carton operator position.
Begley Dep. at 83, 86.  Nothing in this record suggests that

Smart Papers discriminated against Begley because of his age with respect to his job offer.  Accordingly, summary judgment against Begley on his age discrimination claims is appropriate.

Although Plaintiffs point to evidence that Smart Papers hired substantially younger employees for higher paying jobs for which they were also qualified, that evidence does not show that the real motive behind Smart Papers' actions was age discrimination.  See Barnhart v. Pickrel, Schaeffer & Eberling Co., 12 F.3d 1382, 1395 (6th Cir. 1993)("[P]roof of replacement by a person outside the protected class is merely a prerequisite to the establishment of a prima facie case of employment discrimination.  Such proof does nothing to establish pretext.").  Nothing in the record suggests that age played a part in the placement decisions Smart Papers made regarding these Plaintiffs.  Moreover, given that Smart Papers was endeavoring to hire an initial workforce for the Mill, Plaintiffs' theory that Smart Papers offered them jobs it knew they would not accept is implausible and attributes to Smart Papers a Machiavellian streak which is not evident on this record.  It just makes no sense that an organization in need of workers would make sham job offers to these eight applicants because of their age when it was in the process of hiring a workforce largely composed of older workers.  Therefore, no reasonable inference of discrimination can be drawn

41

from this argument.  <u>Reeves v. Sanderson Plumbing Prod., Inc.</u>,
530 U.S. 133, 148 (2000).

In summary, nothing in this record demonstrates that
Smart Papers discriminated against these Plaintiffs on the basis
of age.  Accordingly, Smart Papers' motion for summary judgment
with respect to the age discrimination claims of these Plaintiffs
is well-taken and is **GRANTED.**

<u>Conclusion</u>

In conclusion, upon complete review of the pleadings
and evidence for and against Smart Papers' motion for summary
judgment, nothing in the record, even when viewed in the light
most favorable to Plaintiffs, leads to a reasonable inference
that Smart Papers' discriminated against Plaintiffs because of
their age.  Accordingly, Smart Papers' motion for summary
judgment is well-taken and is **GRANTED.**  Each of Plaintiffs' age
discrimination claims versus Smart Papers is **DISMISSED WITH
PREJUDICE.**  In addition, because Defendant Sun Capital's
liability for age discrimination is completely derivative of
Smart Papers' liability, Sun Capital's motion for summary

judgment is well-taken and is **GRANTED**.  Each of Plaintiffs' age discrimination claims versus Sun Capital is **DISMISSED WITH PREJUDICE**.

      **IT IS SO ORDERED.**

Date  May 12, 2004                   s/Sandra S. Beckwith
                                Sandra S. Beckwith
                            United States District Judge